**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
----------------------------------
DORATHA KLUGEL,                   )
                                  )
          Plaintiff,              )
                                  )
                                  ) Civil A. No. 06-1886 (HHK)
v.                                )
                                  )
G. WAYNE CLOUGH, Secretary,       )
Smithsonian Institution,[1]       )
                                  )
and                               )
                                  )
THE UNITED STATES OF AMERICA,     )
                                  )
          Defendants.             )
                                  )
----------------------------------
```

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, G. Wayne Clough, Secretary of the Smithsonian Institution, and the United States of America, hereby submit their Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. Defendants respectfully seek an Order granting them summary judgment in this matter because the undisputed facts demonstrate that they are entitled to judgment as a matter of law.

In support of this motion, defendants hereby submit their Statement of Material Facts Not in Genuine Issue, a memorandum of points and authorities with exhibits, and a proposed order.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Mr. G. Wayne Clough is automatically substituted for defendant Cristian Samper.

Respectfully Submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar #498610
United States Attorney

_____/s/_____
Rudolph Contreras, D.C. Bar #434122
Assistant United States Attorney

_/s/ Michelle Johnson_____
MICHELLE N. JOHNSON, D.C. Bar #491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, NW – Room E4212
Washington, DC 20530
(202) 514-7139 (Telephone)
(202) 514-8780 (Facsimile)


Of Counsel:

Christine Nicholson
Associate General Counsel
Office of the General Counsel
Smithsonian Institution Building – Room 302
1000 Jefferson Drive, SW M.C.-012
P.O. Box 23286
Washington, DC 20026

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
----------------------------------
DORATHA KLUGEL,                    )
                                   )
          Plaintiff,               )
                                   )
                                   )  Civil A. No. 06-1886 (HHK)
v.                                 )
                                   )
G. WAYNE CLOUGH, Secretary,        )
Smithsonian Institution,¹          )
                                   )
and                                )
                                   )
THE UNITED STATES OF AMERICA,      )
                                   )
          Defendants.              )
                                   )
----------------------------------
```

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants, G. Wayne Clough, Secretary, Smithsonian Institution, and the United States of America, hereby submit their Memorandum of Law in Support of their Motion for Summary Judgment.

Discovery has now closed in this case and has revealed the truth regarding the allegations made in plaintiff's complaint: most are without any factual support and none can sustain plaintiff's claims of discrimination based on her gender and/or alleged disability or her claim that the defendants invaded her privacy. In short, plaintiff has failed to present any viable claims warranting a trial and summary judgment in defendants'

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Mr. G. Wayne Clough is automatically substituted for defendant Cristian Samper.

favor is warranted.

## I.   FACTUAL BACKGROUND

This is a case involving relatively straight-forward facts that have been exaggerated and completely distorted by plaintiff to support her theory of her case.

### A.   Plaintiff's Temporary Employment with SERC.

Plaintiff, Doratha Klugel, ("Plaintiff" or "Ms. Klugel") was employed at the Smithsonian Environmental Research Center ("SERC") located in Edgewater, Maryland, as an education specialist, IS-9, from February 11, 2001 until May 13, 2005. Exhibit ("Ex.") 1, Declaration of Robert Gallagher ("Gallagher Decl.") ¶ 3, Ex. A (Personnel Notification Document), Ex. E (plaintiff's position description); Ex. 4, Declaration of Mark Haddon ("Haddon Decl.") ¶ 3.  Plaintiff was a trust, not a federal employee, meaning that her position was funded by grants received from outside sources, not from federal appropriations to the Smithsonian Institution.  Ex. 1, (Gallagher Decl.) ¶ 4; Ex. 2, Excerpts from the Deposition of Doratha Klugel dated May 6, 2008 ("Klugel Depo. Vol. I"), at 13; Ex. 3, Excerpts from the Deposition of Doratha Klugel dated May 8, 2008 ("Klugel Depo. Vol. II"), at 52, 54.  The grant funding plaintiff's employment was funded for a period of five years.  Id. at 54.  Plaintiff's appointment was temporary for a term not to exceed ("NTE") one year.  Ex. 1, (Gallagher Decl.) ¶ 5; see also id. Ex. A (NTE

2

dated 9/30/02).  Plaintiff's appointment was extended three times, each time for one year.  Id. ¶ 6.  The final extension of plaintiff's temporary appointment was scheduled to end on August 5, 2005, when the grant that funded her position would be depleted.  Ex. 4 (Haddon Decl.) ¶ 4.  Plaintiff resigned effective May 13, 2005, prior to the end of her temporary appointment.  Ex. 3, (Klugel Depo. Vol. II) at 9 (authenticating her resignation letter), id. at 98; Ex. 8 (Plaintiff's letter of resignation); Ex. 4 (Haddon Decl.) ¶ 5.

Plaintiff's supervisor during her employment at SERC was Mark Haddon, SERC's Director of Education.  Ex. 5, Excerpts from the deposition of Mark Haddon ("Haddon Depo.") at 5-6, 10. Plaintiff's primary job responsibilities were to coordinate distance learning programs, which included assisting SERC's Education Director in producing video conferences and planning electronic field trips.  Ex. 2 (Klugel Depo. Vol. I) at 15-16; Ex. 1, (Gallagher Decl.), Ex. E (Plaintiff's position description).  Plaintiff also served as the volunteer coordinator.  Ex. 2 (Klugel Depo. Vo. I) at 16; Ex. 5 (Haddon Depo.) at 13.  As volunteer coordinator, plaintiff was responsible for registering new SERC volunteers and reporting the time (date and hours) volunteers worked.  Ex. 1 (Gallagher Decl."), Ex. E (plaintiff's position description indicating under "Principal Duties" of Distance Learning Coordinator that

plaintiff was to "supervise interns and volunteers . . . ."); Ex. 2 (Klugel Depo. Vol. I) at 16; Ex. 5 (Haddon Depo.) at 13. During her time as volunteer coordinator, plaintiff assisted her boyfriend, Mr. Phillip Yunger, in signing up as a SERC volunteer. Ex. 6, Excerpts from Deposition of Phillip Yunger ("Yunger Depo.) at 11-12. Mr. Yunger worked directly for plaintiff and Mr. Haddon. Id. at 14. Mr. Yunger did not seek to conceal his relationship with plaintiff; in fact, Mr. Yunger's Record Update listed plaintiff as his emergency contact, provided her home telephone number, and specified his relationship to her as "partner." Ex. 7, Declaration of Amy Lemon ("Lemon Decl."), Ex. A (Yunger Record Update).

**B.     The OIG Conducts a Justified Inquiry Concerning Plaintiff's Questionable Travel.**

The events precipitating plaintiff's complaint began to occur in December 2004, when questions arose concerning some travel plaintiff was planning. Carol Ailes, then the Assistant Manager of the Smithsonian's Travel Services Office ("STSO"), IS-10,[2] had concerns about plaintiff's use of Smithsonian official travel. Ex. 11, Excerpts from the deposition of Carol Ailes ("Ailes Depo.") at 8, 22; Ex. 12, Excerpts from the deposition of Gerard Roy ("Roy Depo.") at 19. What concerned Ms. Ailes was

_____

[2] Since April 2007, Ms. Ailes has been the supervisor of the Travel Management Office at the Smithsonian Institution. Ex. 11 (Ailes Depo.) at 7.

4

that she had received conflicting information regarding whether the purpose of plaintiff's planned travel to Belize was for official SERC business or for personal leave.

Plaintiff had informed Ms. Ailes that the travel was for official purposes. Ex. 11 (Ailes Depo.) at 10-11, 13. However, Kathleen Suite, SERC's travel manager, informed Ms. Ailes that she had paperwork from plaintiff indicating that the travel to Belize was personal. Id. at 12-14, 18; see also Ex. 13, Excerpts from the deposition of Kathleen Suite ("Suite Depo.") at 18-20, 141-42; Ex. 14, Email showing flights to/from Panama ("Panama travel.").[3] Plaintiff had submitted a travel request form to Ms. Suite that included a note indicating that she and Mr. Yunger would be taking a trip to Belize and that the trip would be "annual leave." Ex. 13 (Suite Depo.) at 20, 141-42; Ex. 16, Travel authorization form for travel to Belize filled out by plaintiff); ("Belize auth."); Ex. 26 (handwritten note from plaintiff). It is a violation of the federal travel regulations for an employee to include a personal trip on an official travel

_____

[3]There were other irregularities in plaintiff's travel forms. Plaintiff's initial travel authorization form, which was signed by her supervisor Mr. Haddon, only included plaintiff's travel to Panama. Ex. 13 (Suite Depo.) at 160. Plaintiff subsequently submitted a second travel request form to Ms. Suite on which she had added a trip from Panama to Belize. Id.; Ex. 16 (Belize auth.). This second form was not signed by Mr. Haddon. Id. Plaintiff wrote a note on this form stating "You have Mark's signature already[,]" which was then crossed out. Id. In actuality, Mr. Haddon had only previously authorized plaintiff's travel to Panama. Ex. 5 (Haddon Depo.) at 168-69.

authorization.  Ex. 11 (Ailes Depo.) at 8, 12-13, 22.

As a result of these conflicting accounts regarding the justification for plaintiff's travel, Ms. Ailes contacted Mr. Gerard Roy, a special agent with the Office of the Inspector General ("OIG") on December 8, 2004.  Ex. 11 (Ailes Depo.) at 8, 22; Ex. 12 (Roy Depo.) at 19.  The OIG has the responsibility to receive and investigate complaints or information from Smithsonian employees or others concerning possible fraud, waste, abuse or violations of law that may be occurring at the Smithsonian.  Ex. 9 (SD-107) at 4; Ex. 10, Excerpts from the deposition of 30(b)(6) designee Michael Pickett ("Pickett Depo.") at 8.  Additionally, it is the responsibility of all Smithsonian employees to immediately notify the OIG if they become aware of any potential violation of law, rule, or regulation or the mismanagement, gross waste of funds, or abuse of authority.  Ex.9 (SD 107) at 6.  Over an approximate ten year period, Ms. Ailes had referred between five to ten people to the OIG's office when she believed there to be potential fraud or abuse of travel.  Ex. 11 (Ailes Depo.) at 9-10.

When the OIG receives an allegation or complaint, it conducts a preliminary inquiry to determine whether the information it has received is credible and specific enough to recommend to the Inspector General that either an administrative inquiry or a criminal investigation be conducted.  Ex. 10

(Pickett Depo.) at 10.  In response to Ms. Ailes' allegations, on December 9, 2004, Mr. Roy requested and obtained from Ms. Suite documents pertaining to plaintiff's travel.  Ex. 13 (Suite Depo.) at 24-25, 52-53.  Included with the documentation concerning plaintiff's travel to Belize was documentation concerning a separate trip she was planning to take to Hawaii.  Ex. 12 (Roy Depo.) at 31-32.  Plaintiff was traveling to Hawaii to present a paper at an international education  conference, the dates of which were January 4-7, 2005.  Ex. 2 (Klugel Depo Vol. I) at 43. Ms. Amy Erb, another SERC employee, was also traveling to this conference.  Id. at 44.  In addition, travel request forms had been completed for Mr. Yunger and Mr. Recep Celikay, Ms. Erb's boyfriend, to travel to Hawaii to videotape presentations of plaintiff and Ms. Erb at the conference.  Id. at 45-46; 48-50. The travel authorization form for Messrs. Yunger and Celikay indicated that they would be reimbursing the government for their tickets to Hawaii.  Ex. 17, Travel authorization for travel to Hawaii for Mr. Yunger ("Yunger Hawaii auth."); Ex. 18 Travel authorization to Hawaii for Mr. Celikay ("Celikay Hawaii auth."); see also Ex. 13 (Suite Depo.) at 194-95.

    Mr. Roy was concerned about the trip to Hawaii for several reasons.  First, while volunteers may travel on official business with proper authorization at government rates, it is not proper for a volunteer to obtain the government rate and then reimburse

7

the government for that cost.  Ex. 12 (Roy Depo.) at 73-74, 86,
88, 136.  <u>See also</u> Ex. 11 (Ailes Depo.) at 25-26; Ex. 13 (Suite
Depo.) at 17, 57, 194-95.  Furthermore, there was a fee to attend
the conference that had been paid for plaintiff, but not Mr.
Yunger.  Ex. 12 (Roy Depo.) at 31-32; <u>Compare</u> Ex. 19, Plaintiff's
travel authorization for Hawaii ("Hawaii auth.") <u>with</u> Ex. 17
(Yunger Hawaii auth.).  Mr. Roy noted that Mr. Celikay, the
second volunteer, signed up for the trip a week or so prior to
the trip, to assist Mr. Yunger with the videography.  Ex. 12 (Roy
Depo.) at 31-33.  The addition of the second volunteer raised a
concern in Mr. Roy's mind that there could be abuse or waste.
<u>Id.</u> at 31-33, 37, 45.  In addition, Mr. Roy was concerned that
having two persons travel for a week to videotape a one-hour
presentation could be considered wasteful.  <u>Id.</u> at 33.  Based
upon the information he had received, Mr. Roy decided to conduct
an inquiry concerning plaintiff's travel plans to determine if
there was any need for a more formal investigation.  <u>Id.</u> at 26.

On December 14, 2004, Mr. Roy traveled to SERC where he met
individually with Mr. Gallagher, Mr. Haddon, Ms. Suite,
plaintiff, and Ms. Erb.  <u>Id.</u> at 40-41.[4]  During his discussion
with Mr. Haddon, Mr. Roy asked questions about the purpose for
the travel of the two volunteers to Hawaii and whether they were

---

[4]Mr. Yunger and Mr. Celikay were not present at SERC on the day
of Mr. Roy's visit.  Ex. 20 (Email dated December 13, 2004).

qualified to perform those duties.  Ex. 5 (Haddon Depo.) at 48-54.  Although Mr. Haddon understood that Mr. Roy was questioning his judgment in approving the trip, he was not upset or intimidated by Mr. Roy's questions.  Id. at 53-54, 152-53.

After his meeting with Mr. Haddon, Mr. Roy met with plaintiff.  Ex. 12 (Roy Depo.) at 102.  The entire meeting lasted 20-30 minutes.  Id. at 116-17; Ex. 2 (Klugel Depo. Vol. I) at 77.  According to plaintiff, Mr. Roy asked her inappropriate questions about her sex life.  Id. at 70-71, 80-81.[5]  Plaintiff refused to answer any questions that she felt were inappropriate and informed Mr. Roy that those were not appropriate questions.  Id. at 71, 75.[6]  However, plaintiff told Mr. Roy that Mr. Yunger was her boyfriend because she felt there was nothing to hide.  Id. at 80.  At one point during the interview, Mr. Roy told plaintiff she was a "tough nut to crack."  Id. at 71.  Plaintiff

---

[5]Specifically, plaintiff testified that Mr. Roy:

> [A]sked me about the trip to Hawaii.  He asked me about Mr. Yunger going.  He asked me what the nature of the trip was.  He asked me the nature of my relationship with Mr. Yunger.  He asked me how many boyfriends I have and how many boyfriends I try to sleep with on my travel trips.  He – yes.  That's what he asked me.

Ex. 2 (Klugel Depo. Vol. I) at 70-71.  See id. at 80-81.

[6]Mr. Roy denies that he asked plaintiff any inappropriate questions about her sex life.  Ex. 12 (Roy Depo.) at 108-10.  However, for purposes of summary judgment, defendants do not contest plaintiff's assertion that she believed that Mr. Roy asked her inappropriate questions.

9

interpreted this to be a physical threat.  <u>Id.</u> at 76.[7]  Plaintiff
left the interview at one point to obtain Mr. Yunger's press pass
to show to Mr. Roy to answer his concern regarding why Mr. Yunger
had not paid the conference attendance fee.  <u>Id.</u> at 78.  At no
time did plaintiff ever ask that someone be present with her
during Mr. Roy's questioning and in fact, prior to returning to
the room to show Mr. Yunger's press pass to Mr. Roy, plaintiff
did not stop to speak to anyone about her concern that Mr. Roy
had not acted appropriately when questioning her.  <u>Id.</u> at 72, 83.

     According to plaintiff, toward the end of their meeting,
Mr. Roy stated to her that she was going to be on his radar
screen and that if there were any further allegations of wrong-
doing on her part he would come out with the red lights flashing
and handcuffs.  <u>Id.</u> at 83.  However, despite what plaintiff
contends was Mr. Roy's preoccupation with her sex life, Mr. Roy
informed plaintiff that there was nothing wrong with her planned
trip to Panama, on which Mr. Yunger was also scheduled to
accompany her.  <u>Compare</u> Ex. 2 (Klugel Depo. Vol. I) at 71 <u>with</u>
<u>id.</u> at 73.

     Mr. Roy also questioned Amy Erb concerning her planned
travel to Hawaii.  Ex. 12 (Roy Depo.) at 120.  According to
plaintiff, Ms. Erb stated that Mr. Roy told her that her

---

[7]Mr. Roy testified that he used the term "tough nut to crack" as
an idiom meant to convey that he was having a hard time getting
through to plaintiff.  Ex. 12 (Roy Depo.) at 126, 128-29.

boyfriend was not going on the trip and that she should not "do this again."  Ex. 2 (Klugel Depo. Vol. I) at 117.  After speaking to Ms. Erb and Ms. Suite, Mr. Roy again spoke to plaintiff to report the results of his inquiry.  Ex. 12 (Roy Depo.) at 120.  Mr. Roy informed plaintiff that the trip to Hawaii could not go forward as planned.  Id.  He explained that management had made a mistake and that Mr. Yunger and Mr. Celikay could not obtain the government rate for their tickets to Hawaii and then reimburse the government.  Id. at 120-21, 125.[8]  On December 16, 2004, Mr. Roy closed the complaint regarding plaintiff's travel.  Ex. 12 (Roy Depo.) at 147; Ex. 21, Declaration of Gerard Roy ("Roy Decl."), Ex. A (Memorandum to the File).[9]

After the questioning by Mr. Roy on December 14, 2004, no one asked plaintiff any questions regarding her sex life or her relationship with Mr. Yunger.  Ex. 2 (Klugel Depo. Vol. I) at 109-111.  Mr. Roy did not conduct any monitoring or surveillance

---

[8] Mr. Roy informed Ms. Suite that Messrs. Yunger and Celikay would not be permitted to travel to Hawaii in an official capacity and that she should cancel their tickets.  Ex. 13 (Suite Depo.) at 133.

[9]As further evidence that the matter involving plaintiff's travel was resolved, Mr. Roy sent an email to William Hoyt, Administrative Officer for OIG, indicating that the "complaint was closed on 12/16/04.  Management cancelled the trip for the two male volunteers."  Ex. 21, (Roy Decl.), Ex. C (Email dated December 20, 2004).  In addition, on December 16, 2004, Mr. Roy sent an email to Mr. Gallagher stating that no report was prepared regarding his inquiry and that the complaint was closed.  Ex. 21 (Roy Decl.), Ex. B (Email dated December 16, 2004).  Mr. Roy told Mr. Gallagher that Mr. Gallagher could "consider my participation as more of a Technical Assistance Visit than an inquiry."  Id.

of plaintiff at any time. Ex. 12 (Roy Depo.) at 138. Nor did
Mr. Roy review any of plaintiff's future travel plans. Id. at
134. Nor was plaintiff's employment threatened. Ex. 2 (Klugel
Depo. Vol. I) at 118. In fact, plaintiff testified that after
her meeting with Mr. Roy, both Mr. Gallagher and Mr. Haddon told
plaintiff that no one at SERC thought she had done anything
wrong. Ex. 3 (Klugel Depo Vol. II) at 12. See also Ex. 5
(Haddon Depo.) at 69. In addition, Ross Simons, the then-
Director at SERC, informed plaintiff that nothing had come out of
the OIG's inquiry into her travel, that there was no wrong-doing
found, and that nobody at SERC thought plaintiff had done
anything wrong or had tried to defraud the government. Ex. 2
(Klugel Depo.) at 101-02.[10] Indeed, after the OIG inquiry,
plaintiff, Ms. Erb, Mr. Yunger and Mr. Celikay all still traveled
to Hawaii. Ex. 6 (Yunger Depo.) at 22-23. Mr. Yunger and
plaintiff also subsequently traveled to Panama in February 2005.
Ex. 2 (Klugel Depo. Vol. II) at 40, 42, 46. Plaintiff did not
travel to Belize because of work demands. Id. at 40.

According to plaintiff, her relationship with Mr. Haddon,
which had been relatively good, changed after the OIG's inquiry
into her travel. Ex. 3 (Klugel Depo. Vol. II), at 18. Plaintiff

---

[10]Thus, there appears to be absolutely no basis in fact for
plaintiff's allegation that she was threatened with "termination for
continuing a romantic relationship with [Mr. Yunger] . . . ."
Complaint ("Compl.") ¶ 50. Nor is there any evidentiary support for
plaintiff's assertion that defendants "sought to . . . create a false
justification for Ms. Klugel's removal from the agency." Id. ¶ 49.

believes that the cause of this change was the fact that Mr.
Haddon was mad at her because she would not let the OIG inquiry
"go" and "from that place, he then began reacting to me by
denying leave and taking away my assignments . . . ." Id. at
34.[11]

### C.   Plaintiff's Leave Requests Interfere with her Ability to Complete Her Work.

On November 9, 2004, prior to the OIG inquiry into her
travel, plaintiff was involved in a car accident while driving
home from SERC. Ex. 2 (Klugel Depo. Vol. I) at 39. As a result
of her accident, plaintiff suffered contusions to her knees and a
broken right arm. Id. at 39, 138. After her car accident,
plaintiff began attending physical therapy two full days a week.
Id. at 142. Plaintiff took extensive leave related to her
injuries from her car accident.[12] In addition to this leave,
since the fall of 2004, plaintiff had also been taking leave to
attend classes at the Wesleyan Theological Seminary during SERC
business hours. Ex. 3 (Klugel Depo. Vol. II) at 31.

Despite the extensive leave she was taking, plaintiff had

_____

[11]Plaintiff further testified that she was informed by Mr. Simons
and Mr. Gallagher that the OIG's inquiry into her travel was based on
Ms. Suite's and Ms. Ailes' personal dislike for her and that it had
been initiated to "adjust her attitude." Ex. 2 (Klugel Depo. Vol. I)
at 66, 89, 100, 103. Plaintiff said that she did have "personality
issues" with Suite. Id. at 104

[12]From November 10, 2004 through May 13, 2005, plaintiff took 451
hours of annual leave, which included 257 of annual leave, 64 hours of
sick leave, and 130 hours of leave without pay ("LWOP"). Ex. 22,
Declaration of Nicole Campbell ("Campbell Decl.") ¶ 3.

not been providing leave slips documenting her need for physical therapy. Ex. 5 (Haddon Depo.) at 158-59. As a result, Mr. Haddon and Mr. Gallagher asked plaintiff to provide documentation from her medical providers to support her leave requests. Ex. 2 (Klugel Depo. Vol. I) at 156-58. This documentation was requested to protect the agency so that if any future audits were done and documentation was requested, they would have the documentation, and to substantiate plaintiff's requests for leave. Ex. 5 (Haddon Depo.) at 114-16, 122; 158; Ex. 23 Excerpts from the deposition of Anson Hines ("Hines Depo.") at 44-45. Mr. Haddon also asked for documentation regarding plaintiff's leave so he could determine how long her treatment could be expected to last and how long her duties would need to be reduced. Ex. 5 (Haddon Depo.) at 124. This information was needed so Mr. Haddon could appropriately plan for the running of the department. Id.

Due to plaintiff's continued need for leave, Mr. Gallagher, Mr. Hines and Mr. Haddon had discussions regarding plaintiff's ability to complete her work assignments timely. Ex. 23 (Hines Depo.) at 40-42. Mr. Haddon had concerns about getting plaintiff's work done, in light of her absences, especially because plaintiff was involved in several of SERC's large projects that were pending. Ex. 24, Excerpts from the deposition of Robert Gallagher ("Gallagher Depo.) at 9-10, 26-27. Mr. Hines recommended that Mr. Haddon take over some of plaintiff's

14

responsibilities "that would require travel and high pressure
deadline performance and allow her to maintain her schedule that
she had requested for medical leave." Ex. 23 (Hines Depo.) at
42-43, 46.[13]  Mr. Hines asked Mr. Haddon to fill in for plaintiff
because Mr. Haddon was the most familiar with and knowledgeable
about the work plaintiff was doing.  Id. at 46.  Mr. Gallagher
and Mr. Haddon also met with plaintiff to discuss the issue of
her work getting done and discussed a work schedule to ensure all
of plaintiff's work would be completed.  Ex. 24 (Gallagher Depo.)

---

[13]Plaintiff's complaint contains numerous allegations concerning
Mr. Hines.  See, e.g., Compl. ¶ 12 (alleging Mr. Hines "questioned
[plaintiff] on her travel arrangements . . . and asked her how many
boyfriends she had."); ¶ 13 ("Mr. Hines continued to harass Ms. Klugel
about her boyfriend . . . and made remarks to Ms. Klugel and to others
about Ms. Klugel's sexuality."); ¶ 14 ("Mr. Hines told Ms. Klugel that
she is 'one step away from being a marked employee' . . . ."); ¶ 16
("Mr. Hines . . . reiterated disparaging remarks about Ms. Klugel,
which they knew to be untrue . . . ."); ¶ 18 ("Mr. Hines directed Ms.
Klugel to a mandatory mental health referral to the Agency's [EAP] . .
. ."); ¶ 20 ("Mr. Hines . . . threatened Ms. Klugel with adverse
action . . . .").  In reality, however, Mr. Hines did not commit any
of these actions, which plaintiff readily admitted at her deposition.
See Ex. 2 (Klugel Depo. Vol. I) at 82 (Mr. Hines did not question
plaintiff); 95 (Mr. Hines never questioned plaintiff about her travel
to Hawaii); 102 (Mr. Hines did not state that plaintiff was "one step
away from being a marked employee . . . ."); 112 (plaintiff admitted
she had no knowledge of any disparaging remarks Mr. Hines made about
her); 128 (admitting Mr. Hines did not refer her to a mandatory EAP
referral).  Plaintiff's excuse for alleging that Mr. Hines had
committed these acts is her belief that he was responsible for what
occurred at SERC while he was acting director.  Id. at 129; Ex. 3
(Klugel Depo. Vol. II) at 58-59.  However, Mr. Simons was actually
director during the time that some of the allegations made in
plaintiff's complaint occurred and in fact, plaintiff testified that
it was indeed Mr. Simons who allegedly told her that she was a marked
employee.  Ex. 2 (Klugel Depo. Vol. I) at 25, 102.  Therefore, there
was no basis for asserting that this statement was made by Mr. Hines.
Most troubling is the fact that plaintiff initially sought to sue Mr.
Hines in his individual capacity, despite the fact that she contends
that he was only responsible for actions taken in his official
capacity as SERC's acting director.  Compl. ¶ 53.

at 27, 38-39.  Despite the removal of some of her work
assignments, plaintiff was still responsible for conducting the
video conferences to which she had been assigned and these were
keeping her busy.  Ex. 2 (Klugel Depo. Vol. I) at 171.  In fact,
plaintiff herself asked to be removed from her role as volunteer
coordinator, in part so she could focus on her other
responsibilities.  Id. at 166.[14]  However, at the time she made
this request, Mr. Simons stated that he could not remove this
responsibility at the time.  Id. at 170.

   None of plaintiff's requests for leave relating to the
treatment of her injuries was ever denied.  Ex. 5 (Haddon Depo.)
at 76-77, 166; Ex. 24 (Gallagher Depo.) at 57-58.  However, in
light of the difficulties plaintiff had completing her
assignments, Mr. Haddon did deny plaintiff's request for several
days of annual leave for the purpose of a personal trip to Belize
in April 2005.  Ex. 5 (Haddon Depo.) at 76-77, 164-65; Ex. 24
(Gallagher Depo.) at 58; Ex. 2 (Klugel Depo. Vol. I) at 40-41,
125-26, 153; Ex. 3 (Klugel Depo. Vol. II) at 79.  Mr. Haddon
denied plaintiff's request for annual leave because (1) it was a
very busy time in the education department and it was very
unusual for an employee to ask for leave during April through the
middle of June; (2) plaintiff had "little or no leave to take" at

---

[14]According to plaintiff, she also sought to be removed from her
position as volunteer coordinator because she was uncomfortable with
certain volunteer policies.  Ex. 2 (Klugel Depo. Vol. I) at 167.

16

that time; and (3) since plaintiff was only at SERC two to three days a week because of her physical therapy, her job assignments were not being completed. Ex. 5 (Haddon Depo.) at 76-78; 90-92. Mr. Haddon had concerns about plaintiff's request for leave at a time when she was needed to support and assist in some of the activities that were happening in the education department. Id. at 165. Notably, plaintiff had already informed Mr. Haddon that she did not have enough time to get all of her work accomplished. Id.

According to plaintiff, Mr. Haddon placed her on a "progress report." Ex. 2 (Klugel Depo. Vol. I) at 172. As a result, plaintiff had to meet with Mr. Haddon to discuss the progress of her projects. Id. at 174-75. Plaintiff is not aware of any written report by Mr. Haddon. Id. Plaintiff contends that Mr. Haddon informed plaintiff that he was doing a progress report with her because he had recently attended supervisory training and realized that he should have been conducting progress reports with her. Id. at 176.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment pursuant to Fed. R. Civ. P. 56(c) is appropriate when the record shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317,

17

322 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith</u> <u>Radio Corp.</u>, 475 U.S. 574, 587 (1986).  In determining whether a genuine issue of material fact exists, the trier of fact must view all the facts, and the reasonable inferences to be drawn from them, in a light most favorable to the non-moving party.  <u>Anderson</u>, 477 U.S. at 255.  If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Id.</u> at 249-50.  In order to withstand summary judgment, the non-moving party is not at liberty to rest upon mere allegations or denials but must come forth with evidence establishing a material issue of fact for trial.  <u>Id.</u> at 248.  The mere existence of some factual dispute is insufficient to withstand summary judgment; there must be a genuine issue of <u>material</u> fact.  <u>Id.</u> at 247-48.  If the submitted evidence is of such a character that it would not permit a reasonable fact-finder to find in favor of the non-moving party, summary judgment is appropriate.  <u>Id.</u> at 251.

### III.  ARGUMENT

Plaintiff has three claims that remain in this case.[15] First is her claim that the Smithsonian violated Title VII by discriminating against her on the basis of her sex in connection with the OIG's inquiry in December 2004.  Mem. Op. at 15.

---

[15]On October 25, 2007, this Court partially granted defendant's motion for summary judgment concerning several of plaintiff's claims. Memorandum Opinion dated October 25, 2007 ("Mem. Op.") at 15-16.

Plaintiff's second remaining claim is that the Smithsonian violated the Rehabilitation Act by asking her questions about her medical leave.  Id.  Plaintiff's third remaining claim contends that defendants violated the Federal Tort Claims Act ("FTCA") by invading her privacy by "unjustly [prying] into [plaintiff's] romantic relationship with Mr. Yunger and others."  Id. ¶ 48; see also Mem. Op. at 16.  As discovery has revealed, there is no merit to any of these contentions, and defendants are therefore entitled to judgment as a matter of law.

### A.  Plaintiff Cannot Sustain Her Claims of Gender Discrimination or Hostile Work Environment.

Plaintiff has alleged a claim pursuant to Title VII of the Civil Rights Act in which she contends that she "suffered discrimination which created a hostile work environment and was subject to disparate treatment based on her gender."  Compl. ¶ 9. According to plaintiff, as a result of this disparate treatment, she was subjected to an "abusive and heavy-handed and quasi-criminal interrogation[ ] by S.A. Roy, Mr. Hines, and others . . . ."  Compl. ¶ 31.  In addition, plaintiff complains that she was "removed . . . from meaningful assignment[s] and duties, demoted . . . without cause, denied . . . leave when properly requested, and [was subjected] . . . to unwarranted supervision, and . . . retaliatory threats of legal action . . . ."  Id. ¶ 32.  As will be further discussed infra, plaintiff cannot establish a claim of disparate treatment or hostile work environment.

19

1.    **Plaintiff Cannot Establish a Claim of Disparate Treatment.**

Plaintiff contends that she was treated differently on the basis of her sex when she was subjected to questioning by the OIG regarding her travel.  It appears that plaintiff further contends that certain other actions were taken against her because of her sex, namely, that she was removed from meaningful assignments, she was demoted without cause, she was denied leave, she was subjected to unwarranted supervision and there were retaliatory threats of legal action made against her.  Compl. ¶ 32.[16]

In attempting to establish a claim of disparate treatment under Title VII, plaintiffs may proceed using direct evidence of discrimination or under the now-familiar formula enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981). Under the McDonnell Douglas burden-shifting analysis, plaintiff has the burden of establishing a prima facie case of discrimination by a preponderance of the evidence.  Lester v. Natsios, 290 F. Supp. 2d 11, 20 (D.D.C. 2003).  If plaintiff successfully establishes a prima facie case, the burden shifts to

---

[16]It is not clear from her complaint or her testimony whether plaintiff is asserting a disparate treatment claim as it concerns these actions or whether she is asserting these actions constituted a hostile work environment.  For this reason, defendants have analyzed plaintiff's claims under both theories.

20

the employer to "articulate a legitimate, non-discriminatory reason for its actions." Id. at 21 (citing McDonnell Douglas, 411 U.S. at 802). "The employer's burden, however, is merely one of production." Id. Once the employer has met its burden, the burden shifts back to plaintiff "to show that the employer's stated reason was a pretext for discrimination . . . ." Id.

No direct evidence of intentional discrimination exists in this case. Accordingly, to prove her case, plaintiff must meet all the elements of the McDonnell Douglas formula, which requires her to show that she 1) belonged to a statutorily-protected group; and (2) suffered an "adverse employment action" (3) under circumstances giving rise to an inference of discrimination. See Stella v. Mineta, 284 F.3d 135, 144-45 (D.C. Cir. 2002) (citing McDonnell Douglas, 411 U.S. at 802); Harding v. Gray, 9 F.3d 150, 152 (D.C. Cir. 1993); Oshiver v. Norton, No. Civ.A. 00-2284, 2005 WL 3454336, at *3 (D.D.C. Dec. 16, 2005) (Kennedy, J.), aff'd, No. Civ.A. 06-5120, 2006 WL 3986351 (D.C. Cir. Oct. 4, 2006).

The District of Columbia Circuit has recently held that where, as here, an employer has asserted a legitimate, non-discriminatory reason for a challenged decision, "the question whether the employee actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'" Brady v. Office of the Sgt. At Arms, 520 F.3d 490, 493-94 (D.C. Cir. 2008) (citations omitted). See also Adeymei v.

21

District of Columbia, 525 F.3d 1222, 1226 (D.C. Cir. 2008) ("As Supreme Court precedents establish, the prima-facie case aspect of McDonnell Douglas is irrelevant when an employer has asserted a legitimate, non-discriminatory reason for its decision – as an employer almost always will do by the summary judgment stage of an employment discrimination suit.") (citations omitted).  Thus, where, as here, a plaintiff alleges a Title VII claim of disparate treatment based on an adverse action and the employer asserts a legitimate, non-discriminatory reason for its decision, in considering the employer's motion for summary judgment the "central question" to be resolved by the district court is:

> [h]as the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex or national origin?

Brady, 520 U.S. at 494 (citations omitted).  In this case, defendant has legitimate, non-discriminatory reasons for each of the actions about which plaintiff complains.[17]

---

[17]Because defendants have valid legitimate, non-discriminatory reasons for all but one of the actions about which plaintiff complains, but see infra, at 28, defendants have not spent time analyzing whether each of plaintiff's claims is sufficient for purposes of establishing a prima facie case.  See Brady, 520 F.3d at 494 ("[T]he prima facie case is a largely unnecessary sideshow[ ] . . . [that] has not benefitted employees or employers; nor has it simplified or expedited court proceedings.").  However, the Supreme Court has held that, even in instances where the defendant has asserted a legitimate, non-discriminatory reason for its actions, reference to the plaintiff's prima facie case remains a factor that the Court may analyze to determine whether the plaintiff has carried her burden of showing intentional discrimination.  See Reeves v.

First, as it concerns the OIG's questioning of plaintiff, this was precipitated by Ms. Ailes' genuine concern over inconsistent information she received concerning whether plaintiff's travel to Belize was personal or official.  Ex. 11 (Ailes Depo.) at 11 (stating that she referred the matter concerning plaintiff's travel because she "questioned were both stops official Smithsonian business as is policy."); id. at 12-13 (explaining that she had received conflicting information from Ms. Suite and plaintiff concerning whether both stops were business related).  All employees, including Ms. Ailes, have a duty to report any suspected violations of law, rule, or regulation or the mismanagement, gross waste of funds, or abuse of authority.  Ex. 9 (SD-107) at 4.  Furthermore, the OIG had an independent duty to review Ms. Ailes' allegations to determine whether a further inquiry was warranted.  Id. at 4; Ex. 10, (Pickett Depo.) at 8.  Here, special agent Roy became concerned

---

Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000) ("[A]lthough the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production . . . the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual[.]") (citations omitted).  And, at least one court in this district has, post-Brady, continued to factor in the strength of the plaintiff's prima facie case in evaluating summary judgment, despite the employer's proffer of a legitimate, non-discriminatory reason for its actions.  See Short v. Chertoff, No. Civ.A. 05-1034, 2008 WL 2174856, at *10 (D.D.C. May 27, 2008) (citing Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007) (recognizing that, even once defendant has proffered a nondiscriminatory justification the court evaluates plaintiff's prima facie case as part of the evidence of whether plaintiff has created a genuine issue of discrimination)).

about plaintiff's travel to Hawaii because two volunteers were traveling at the government rate but sought to reimburse the government. Ex. 12 (Roy Depo.) at 73-74. In addition, the volunteers were not registered for the conference, which was the purported business reason for the travel, and had been added just days before the trip was scheduled to occur. Id. at 31-33, 37, 45. These reasons provided sufficient justification for Mr. Roy to travel to SERC to speak not only with plaintiff, but with her supervisor, Mr. Haddon, and Ms. Erb. Id. at 146. These facts establish that defendants had a legitimate, non-discriminatory reason for the OIG questioning plaintiff about her travel, and there is simply no evidence that this justification is pretextual. See Brantley v. Kempthorne, No. Civ.A. 06-1137, 2008 WL 2073913, at *6 & n.6 (D.D.C. May 13, 2008) ("Under Brady, plaintiff must also demonstrate sufficient evidence to prove that a reasonable juror could find that the employer's asserted nondiscriminatory reason is mere pretext.") (citation omitted). Nor is there any evidence that plaintiff was targeted for questioning because of her sex, notably in light of the fact that Mr. Haddon was also questioned concerning his approval of plaintiff's travel. Ex. 5 (Haddon Depo.) at 152-53.

Plaintiff next contends that, after the OIG's inquiry, she was removed from meaningful assignments and was "demoted."

24

Compl. ¶ 32.[18]  It is true that plaintiff's supervisor, Mr.

Haddon, removed some of her responsibilities.  However, this

action was recommended by Mr. Hines so that plaintiff would be

able to "maintain her schedule that she had requested for medical

leave."  Ex. 23 (Hines Depo.) at 42-43, 46.  Notably, due to her

car accident, plaintiff was attending physical therapy on two

full days each week, and therefore was out of the office and

unable to attend to all of her work responsibilities.  Id. at 40-

42.  Mr. Haddon was concerned about plaintiff's absences in light

of the fact that she was integrally involved in several pending

projects.  Ex. 24 (Gallagher Depo.) at 9-10, 26-27.  And, despite

the removal of some of her work assignments, plaintiff was still

responsible for conducting the video conferences to which she had

been assigned and these were keeping her busy.  Ex. 2 (Klugel

Depo. Vol. I) at 171.[19]  In fact, plaintiff herself asked to be

---

[18]There is absolutely no factual basis to support plaintiff's
claim that she was "demoted."  Defendants interpret plaintiff's
assertion to mean that she believed that the removal of certain of her
duties was in effect a "demotion."  However, since there was no
resultant change in the material terms of her employment, plaintiff's
allegations fail to amount to "adverse action" under Title VII.
Oshiver, 2008 WL 3454336, at *11 ("To make a claim based on a change
or reduction in responsibilities, 'a plaintiff must show that the
change in duties resulted in a loss of pay, benefits or promotion
possibilities, or resulted in a change in position that was not as
high profile.'").

[19]Specifically, plaintiff testified:

    Q:   Okay. After you were told that the . . . electronic
         field trips were being taken away from you, what
         responsibilities did you have left?
    A:   At that point, the responsibilities I had left if I
         was still volunteer coordinator – again, I don't

removed from her role as volunteer coordinator, in part so she could focus on her other responsibilities. Id. at 166. Thus, while some of her responsibilities were removed, this was done because of a legitimate and reasonable concern that the work that plaintiff was assigned be completed. See Brady, 520 F.3d at 495 ("If the employer's stated belief about the underlying facts is reasonable in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts.") (citation omitted). In light of the agency's stated concern that plaintiff was not able to complete her work assignments due to her extensive absences from the office, which provides a legitimate, non-discriminatory reason for the decision to reassign some of plaintiff's responsibilities, plaintiff cannot establish a violation of Title VII. See Brady, 520 F.3d at 496 (no finding of discrimination based on agency's demotion of plaintiff where agency asserted a legitimate, non-discriminatory reason for its action).

Nor was plaintiff's request for annual leave denied for a discriminatory reason. While Mr. Haddon did deny plaintiff's

---

        remember what happened with that – I would have still
        been volunteer coordinator and conducting video
        conferences.
Q.      Okay, Do you recall . . . how many video conferences
        you were working on?
A.      I don't remember.
Q.      Was it keeping you busy?
A.      Yes. Yes.

Ex. 2 (Klugel Depo. Vol. I) at 171.

request for several days of annual leave she requested for the purpose of a personal trip to Belize in April 2005, the basis for this denial was not at all because of plaintiff's sex.  Ex. 5 (Haddon Depo.) at 76-77, 164-65; Ex. 24 (Gallagher Depo.) at 58-59.  Rather, Mr. Haddon testified that he denied plaintiff's request for annual leave because (1) it was a very busy time in the education department and it was very unusual for an employee to ask for leave during April through the middle of June; (2) plaintiff had "little or no leave to take" at that time; and (3) because plaintiff was only at SERC two to three days a week due to her physical therapy, her job duties were not being completed. Ex. 5 (Haddon Depo.) at 76-78; 90-92.  Plaintiff cannot refute these justifications for the denial of her leave or the fact that Mr. Haddon believed these reasons to be a sufficient basis for denying her leave request, and accordingly, she cannot establish that the agency's proffered justification for its actions is pretextual.  Adeyemi, 525 F.3d at 1226 (once the employer has asserted a legitimate, non-discriminatory basis for its actions, plaintiff must produce "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis.") (citing Brady, 520 F.3d at 494); Brady, 520 F.3d at 495 ("If the employer's stated belief about the underlying facts is reasonable

27

in light of the evidence . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying about the underlying facts.") (citations omitted).

There is one claim for which the agency contends that plaintiff cannot establish a <u>prima facie</u> case of discrimination – her claim that she was subjected to unwarranted scrutiny which apparently refers to plaintiff's belief that she was placed on a "progress report." Ex. 2, at 172.[20] Plaintiff contends that, as a result of being placed on this "progress report," she had to meet with Mr. Haddon to discuss the progress of her projects. <u>Id.</u> at 174-75. Plaintiff is not aware of any written report by Mr. Haddon. <u>Id.</u> Clearly requiring plaintiff to meet with her supervisor to discuss her progress on her work assignments is not an adverse action within the meaning of Title VII.

"To qualify as an adverse action, the incident must be inherently related to plaintiff's employment status, such as termination, demotion or change in benefits. Events that merely have an <u>effect</u> on plaintiff's work environment are legally insufficient." <u>Brantley</u>, 2008 WL 2073913, at *5 (citation omitted). Plaintiff's claim that she had to meet with her

---

[20]While defendants admit that plaintiff discussed the progress of her work assignments with Mr. Haddon, Ex. 24 (Gallager Depo.) at 27, 38-39, there was no "progress report." Ex. 4 (Haddon Decl.) ¶ 3. Thus, defendants have no "legitimate reason" for something that did not actually occur. However, for purposes of summary judgment, defendants will not contest plaintiff's assertion that she believed she was placed on a "progress report."

28

supervisor to discuss the progress of her work clearly had no impact on her employment status and therefore does not qualify as an adverse action under Title VII.  See, e.g., Oshiver, 2005 WL 3454336, at *13 (holding that plaintiff's placement on a performance improvement plan was not an adverse action because these actions did not have "any immediate tangible impact on [plaintiff] . . . .").

In sum, the agency has demonstrated that plaintiff's disparate treatment claims are not worthy of submission to a jury and request that summary judgment be entered in defendant's favor.

### 2.    Plaintiff Cannot Establish a Viable Hostile Work Environment Claim.

Plaintiff also contends that she was subjected to a hostile work environment.  Under Title VII, a prima facie hostile work environment claim requires the plaintiff to show that (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with plaintiff's work performance and creating an intimidating, hostile, or offensive working environment and (5) respondeat superior liability.  Davis v. Coastal Int'l Security, Inc., 275 F.3d 1119, 1123 (D.C. Cir. 2002).

"Hostile environment claims are different in kind from

discrete acts.  Their very nature involves repeated conduct."
National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115
(2002).  In contrast to a discrete act of discrimination, "a
single act of harassment may not be actionable on its own."  Id.
(citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)
(other citation omitted)).  A plaintiff seeking to establish such
a claim must establish that "'the workplace is permeated with
'discriminatory intimidation, ridicule and insult' that is
'sufficiently severe or pervasive to alter the conditions of the
victim's employment and create an abusive working environment' .
. . ."  Id. (quoting Harris, 510 U.S. at 21).

     In determining whether an actionable hostile work
environment claim exists, courts must look to "'all of the
circumstances,' including the 'frequency of the discriminatory
conduct; its severity; whether it is physically threatening or
humiliating, or a mere offensive utterance; and whether it
unreasonably interferes with an employee's work performance.'"
Id. (quoting Harris, 510 U.S. at 23).  Plaintiff must show "not
only that [she] experienced harassment in the workplace, but that
such harassment arose *because of* . . . [her] . . . sex . . . ."
Oshiver, 2005 WL 3454336, at *16 (citations omitted).

     In this case, plaintiff cannot establish that she was
subjected to a hostile work environment because of her sex or
that any of the alleged actions against her rose to the level of

30

an actionable hostile work environment.  Plaintiff apparently
claims that the alleged hostile work environment consisted of the
OIG's questioning of her; "unwarranted scrutiny"; removal from
meaningful assignments; denial of leave, and threats of legal
action.  Compl. ¶¶ 30-32.  However, discovery in this case has
now revealed that these incidents, to the extent they occurred,
were isolated and not of the nature alleged by plaintiff.  Most
significantly, there is no evidence that any of these actions
occurred <u>because of</u> plaintiff's sex.

First, as it concerns the OIG inquiry, this isolated event
is insufficient to sustain a hostile work environment claim.
Rather, this event occurred on one day (December 14, 2004), and
plaintiff's participation lasted 20-30 minutes.  Ex. 12 (Roy
Depo.) at 116-17.  Plaintiff testified that after this one day –
during which she was questioned by Mr. Roy for 20 to 30 minutes –
no one asked plaintiff any questions regarding her sex life or
her relationship with Mr. Yunger.  Ex. 2 (Klugel Depo. Vol. I) at
109-111.[21]  <u>Compare</u> <u>id.</u> at 109-11 <u>with</u> Compl. ¶ 12 ("The

---

[21]Specifically plaintiff testified as follows:

    Q:  After that day that Mr. Roy spoke to you, did he or
        anyone else ask you any questions about your
        relationship with Mr. Yunger?
    A.  Not that I can recall, no.
    Q.  What about any inappropriate questioning about your
        sexual partners or behavior?  Anyone else after that
        day make those – ask you those kind of questions?
    A.  Nobody else asked me those kinds of questions, no.

Ex. 2 (Klugel Depo. Vol. I) at 109.  <u>See</u> <u>id.</u> at 110 (plaintiff

Smithsonian thereafter continued to make inappropriate and unreasonable inquiries into Ms. Klugel's personal life and her relationship with Mr. Yunger, and thereafter attempted to portray Ms. Klugel as unchaste."); ¶ 13 ("During December 2004, Special Agent Jerry Roy ("S.A Roy") and Mr. Hines continued to harass Ms. Klugel about her boyfriend, Mr. Yunger, and made remarks to Ms. Klugel and to others about Ms. Klugel's sexuality.").[22]  This one day of questioning, even assuming that plaintiff was asked questions she felt to be intrusive, is not sufficient to establish a hostile work environment claim.  Brantley, 2008 WL 2073913, at *8 ("[A] hostile work environment claim must be based on incidents comprising 'one unlawful employment practice' of intimidation, insult and ridicule that pervades plaintiff's day-to-day working life.") (citing Morgan, 536 U.S. at 118) (other citations omitted).  Nor does plaintiff's contention that Mr. Roy

---

testified "There were no further questions about my sex life or my boyfriend from that day, no.").

[22]This allegation was also revealed to not be factually supported:

> Q.   Do you have any knowledge of any statements that Mr. Hines made about you that were disparaging?
> A.   I don't know what Mr. Hines said, no.
> Q.   And when you were referring to Mr. Roy [in paragraph 16 of the complaint], what statements are you referring to?
> A.   I'm referring to the original statements from the December investigation and the questions by Mr. Haddon and Mr. Gallagher.

Ex. 2 (Klugel Depo. Vol.I) at 112.

physically threatened her by stating that she was a "tough nut to crack" satisfy the requirements for such a claim.  Rather, this was an isolated incident and not one that "pervaded" plaintiff's day-to-day working life.[23]  See, e.g., Lester, 290 F. Supp. 2d at 31-32 (holding that a single incident where "[a] highly derogatory letter with reference to the Ku Klux Klan was left on the desks of several African-American employees . . ." at the plaintiff's workplace, although "serious and extremely offensive[,]" was "only a single offensive act . . ." which, "[s]tanding alone" was "not enough to create a *pervasive* hostile work environment actionable under Title VII, notwithstanding its seriousness as an isolated event.").

Plaintiff may also contend that the unwarranted scrutiny"; removal from meaningful assignments; denial of leave, and threats of legal action further support her hostile work environment claim.  Compl. ¶¶ 30-32.  However, it is doubtful whether plaintiff can use these discrete acts of alleged disparate treatment to sustain a broader hostile work environment claim, especially when they were insufficient to establish her disparate treatment claims.  See Brantley, 2008 WL 2073913, at *8 ("A hostile work environment under Title VII must be based on 'one

---

[23]Furthermore, the fact that plaintiff's supervisor, Mr. Haddon, was also questioned by Mr. Roy undercuts any finding that plaintiff was questioned "because of" her sex.  See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, (1998) ("Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . because of . . . sex.").

unlawful employment practice' of pervasive, insulting, discriminatory conduct that makes plaintiff's day-to-day work environment severely 'abusive.' . . . Therefore, cobbling together a number of distinct, disparate acts will not create a hostile work environment.") (citations omitted); Lester, 290 F. Supp. 2d at 32 ("[I]t is not at all clear that mere reference to alleged disparate acts of discrimination against plaintiff can ever be transformed, without more, into a hostile work environment claim.  The courts have been reluctant to do so.") (citations omitted).

However, even assuming that the events that plaintiff alleges were true, the "totality of the incidents alleged does not establish a pattern of 'severe or pervasive' conduct that altered the conditions of plaintiff's working environment." Brantley, 2008 WL 2073913, at *9; see also Lester, 290 F. Supp. 2d at 33 ("[P]laintiff's reliance on discrete acts that are neither severe and pervasive nor (as the Court has already concluded) discriminatory falls short of the showing she must make to state a viable hostile work environment claim.").  Nor has plaintiff shown that these actions occurred because of her sex.  See, e.g., Oshiver, 2005 WL 3454336, at *17 (holding that plaintiff's hostile work environment claim, which consisted in part of the employer's requirement that plaintiff provide "medical verification for her sick leave" was not legally

34

sufficient, notably in light of the fact that plaintiff presented no evidence that the "requests for medical verification were in response to [plaintiff's] gender . . . ."). See also Davis, 275 F.3d at 1124 (holding that plaintiff failed to establish a hostile work environment claim where he could not show that he was not targeted for harassment by his coworkers "because of his behavior as an individual rather than because of his sex.").  In sum, plaintiff has not shown such "extreme conduct" that it amounted "to a change in the terms and conditions of employment[,]" Brantley, 2008 WL 2073913, at *7.  Nor has she shown that any actions were taken against her because of her sex. Thus, defendants are entitled to summary judgment as it concerns her hostile work environment claim.  Oshiver, 2005 WL 3454336, at *17 (granting summary judgment in favor of defendant on plaintiff's hostile work environment claim where "no reasonable jury could conclude that [plaintiff] suffered a hostile work environment or that her workplace was permeated with 'discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment such that Title VII is violated.'") (quoting Gary v. Long, 59 F.3d 1391, 1395 (D.C. Cir. 1995) (other citation omitted)).[24]

---

[24]Notably, plaintiff's own testimony belies that notion that Mr. Haddon allegedly denied her leave and took away her assignments because of her sex.  Ex. 3 (Klugel Depo. Vol. II) at 34 (plaintiff

**B.    Plaintiff Cannot Establish A Viable Claim Under the Rehabilitation Act.**

Plaintiff asserts that the defendants violated the Rehabilitation Act by asking her questions about her medical leave.  Compl. ¶ 37 ("In violation of the Rehabilitation Act, the Agency made unreasonable and unwarranted requests for medical information from Ms. Klugel . . . .").[25]

Clearly, a prerequisite to assertion of a Rehabilitation Act claim is that the plaintiff be a disabled individual subject to the Act's protections.  Lester, 290 F. Supp. 2d at 23-24.  A person is disabled under the Rehabilitation Act if he 'has a physical or mental impairment which substantially limits one or more of [his] major life activities; has a record of such an impairment; or is regarded as having such an impairment."  Thompson v. Rice, 422 F. Supp. 2d 158, 166 (D.D.C. 2006) (quoting 29 U.S.C. § 705(20)(B)).  In this case, plaintiff has failed to

---

testifying that "Mr. Haddon was mad at me because, in his words, 'I wouldn't let it go.'  And from that place he then began reacting to me by denying leave and taking away my assignments, assignments that he himself had recommended me for awards for.").

[25]The Court granted defendants motion for summary judgment concerning plaintiff's claim that she was referred to a mandatory mental health evaluation with an Employee Assistance Program ("EAP") counselor.  Mem. Op. at 9.  Even if this claim remained, however, discovery has revealed that there was no "mandatory EAP referral"; rather, Mr. Gallagher suggested plaintiff speak to the EAP counselor to facilitate communication between herself and her supervisor Mr. Haddon. Ex. 24 (Gallagher Depo.) at 18-19, 21.  Plaintiff refused to speak to the EAP counselor without her attorney being present, and in fact, she never spoke to the EAP counselor.  Ex. 2 (Klugel Depo. Vol. I) at 127.  This hardly supports a finding that there was any referral to "a mandatory mental health evaluation with the EAP."  Compl. ¶ 38.

present <u>any</u> evidence that she has a physical or mental impairment
that substantially limits any of her major life activities.
While plaintiff alleges in her complaint that "she suffers from a
recognized disability (anxiety). . . ." Compl. ¶ 36, she
indicated in discovery that she does not consider herself
disabled.  Ex. 25 Plaintiff's responses to defendants' first set
of interrogatories ("Pl.'s Resp. to Def.'s Rogs"), No. 7
("Plaintiff has never claimed she is disabled; Plaintiff contends
the Agency claimed she was disabled.").[26]  Nor can plaintiff
present any evidence that she in fact was, or that her supervisor
believed she was, significantly limited in any major life
activity.  These factors preclude a finding that plaintiff is a
disabled individual under the Rehabilitation Act.  <u>Scarborough v.
Natsios</u>, 190 F. Supp. 2d 5, 23 (D.D.C. 2002)(granting summary
judgment on plaintiff's Rehabilitation Act claims where
"plaintiff cannot show that he was substantially limited in the
major life activity of working–or any other major life
activity–and therefore cannot make out a prima facie case of
discrimination under the Rehabilitation Act.") (citation
omitted).

    However, even assuming plaintiff is a covered individual

---

[26]While plaintiff testified that she has Irritable Bowel Syndrome
("IBS") and has had sleeping difficulties, she also testified that
neither of these conditions significantly impacted her ability to
work.  Ex. 2 (Klugel Depo. Vol. I), at 131-33.

under the Rehabilitation Act, see Brady, 520 F.3d at 493-94, she
cannot refute the agency's legitimate, non-discriminatory reason
for its requests for medical documentation from plaintiff.  Mr.
Haddon and Mr. Gallagher asked plaintiff to provide documentation
from her medical providers to support her leave requests.  Ex. 2,
at 156-58.  This documentation was requested to protect the
agency so that if any future audits were done and documentation
was requested, they would have the documentation and to
substantiate plaintiff's requests for leave.  Ex. 5 (Haddon
Depo.) at 114-16, 122; 158; Ex. 23 (Hines Depo.) at 44-45.  Mr.
Haddon also asked for documentation regarding plaintiff's leave
so he could determine how long her treatment could be expected to
last and how long her duties would need to be reduced.  Ex. 5
(Haddon Depo.) at 124.  This information was needed so Mr. Haddon
could appropriately plan for the running of the department.  Id.
Clearly, in light of the extensive leave that she was taking –
451 hours over a five month period[27] – plaintiff cannot
demonstrate that the agency's request that she present
documentation concerning her need for continued leave was
unreasonable or discriminatory.  See, e.g., Brady, 520 F.3d at
496.  Cf. Lester, 290 F. Supp. 2d at 30 ("[P]laintiff's [Title
VII] claim based on unreasonable workplace monitoring,
particularly having to submit a weekly calendar of activities, is

---

[27]See supra at 13 & n.11.

insufficient.  The record establishes that plaintiff was repeatedly out of the office, and that her supervisor's request to know of her whereabouts during works hours was reasonable.").  Accordingly, summary judgment in favor of the agency is warranted concerning plaintiff's Rehabilitation Act claim.

### C.    Plaintiff Has Not Asserted a Viable Tort Claim for Invasion of Privacy.

Finally, plaintiff has asserted a claim, pursuant to the FTCA, for invasion of privacy by intrusion upon seclusion against the United States.  This claim, too, is not sufficient for presentation at trial[28]

In this case, because the alleged tort was committed in Maryland, District of Columbia choice of law rules dictate that Maryland law govern.  Nix v. Hoke, 139 F. Supp. 2d 125, 131 (D.D.C. 2001).[29]  However, both Maryland and the District of

---

[28]Plaintiff initially sought to name Messrs. Roy and Hines in their individual capacities for defamation.  Compl. ¶ 53.  In its October 2007 Memorandum Opinion, this Court granted defendants' motion to substitute the United States as the sole defendant as it concerns plaintiff's FTCA claim and granted summary judgment to defendant concerning plaintiff's defamation claim.  Mem. Op. at 16.

[29]"In resolving choice of law questions, the District of Columbia employs a governmental interests approach, which balances the competing interests of the two jurisdictions."  Nix, 139 F. Supp. 2d at 131.  When determining which jurisdiction has the greater interest in having its own law apply, "this Court considers 'the place of the injury, the place where the conduct occurred, the domicile of the parties, [and] the place where the relationship between the parties is centered.'"  Id. at 131-32 (citations omitted).  Here, the alleged conduct and injury took place at SERC's offices in Edgewater, Maryland, which is also where plaintiff's employment relationship was centered.  Plaintiff is a resident of the District of Columbia.

Columbia adhere to the Restatement of Torts in defining the
elements of the tort of intrusion upon seclusion.  <u>Wolf v.
Regardie</u>, 553 A.2d 1213, (D.C. 1989); <u>Barnhart v. Paisano
Publications, LLC</u>, 457 F. Supp. 2d 590, 593 (D. Md. 2006)
("Maryland cases look to the definitions and comments contained
in the Restatement in applying invasion of privacy law.");
<u>Trundle v. Homeside Lending, Inc.</u>, 162 F. Supp. 2d 396, 400 (D.
Md. 2001).  Under either District of Columbia or Maryland law,
plaintiff's claim is insufficient.

"The tort of intrusion upon seclusion has three elements:
(1) an invasion or interference by physical intrusion, by use of
a defendant's sense of sight or hearing, or by use of some other
form of investigation or examination . . . (2) into a place where
the plaintiff has secluded himself, or into his private or secret
concerns . . .  (3) that would be highly offensive to an
ordinary, reasonable person."  <u>Wolf v. Regardie</u>, 553 A.2d 1213,
(D.C. 1989); <u>see also</u> <u>Trundle</u>, 162 F. Supp. 2d at 401 (citations
omitted) ("The elements of [the] tort [of intrusion on seclusion]
are an intentional intrusion upon another person's solitude,
seclusion, private affairs, or concerns in a manner which would
be highly offensive to a reasonable person.") (citations
omitted).  The types of invasions "intrinsic" in this tort are
those "such as harassment . . . peeping through windows or into
other locations in which a plaintiff has chosen to seclude

40

himself, . . . opening personal mail, . . . eavesdropping on
private conversations, . . . entering a plaintiff's home without
permission or searching his or her belongings, . . . examining a
plaintiff's private bank account, . . . or other invasions of
that nature." <u>Wolf</u>, 553 A.2d at 1217-18.  <u>See also</u> <u>Trundle</u>, 162
F. Supp. 2d at 401 ("The intrusion on seclusion tort deals with
the manner in which Defendant obtained the information rather
than the truth or falsehood of the information itself.").

Plaintiff cannot satisfy the elements necessary for a claim
of intrusion upon seclusion.  First, she cannot demonstrate that
there was a physical intrusion into her private affairs.  Here,
Mr. Roy obtained information concerning plaintiff's travel from
Ms. Suite.  Ex. 13 (Suite Depo.) at 24-25, 52-53.  And, he
visited plaintiff at SERC's offices in Edgewater, Maryland, to
question plaintiff about her travel.  Ex. 20 (Email dated
December 13, 2004).  Thus, by obtaining documents from the agency
and visiting her workplace, Mr. Roy clearly did not "intrude"
upon any area that plaintiff sought to keep secluded.  <u>See, e.g.,</u>
<u>Benz v. Washington Newspaper Publishing Co.</u>, No. Civ.A. 05-1760,
2006 WL 2844896, at *8 (D.D.C. Sept. 29, 2006) (holding plaintiff
did not assert a viable claim for intrusion upon seclusion where
plaintiff did not allege that defendant learned of her private
facts "by eavesdropping on her private conversations or looking
through her personal papers.").

Second, plaintiff cannot demonstrate that the alleged
intrusion was made into her private or secret concerns. "[E]ven
assuming an intrusion, where the defendant did not actually delve
into a plaintiff's <u>private</u> concerns, or where plaintiff's
activities were already known or public, there can be no
liability." <u>Wolf</u>, 553 A.2d at 1218 (citations omitted).
Clearly, plaintiff was not entitled to any privacy concerning her
travel documentation related to government-paid travel.[30] <u>See,
e.g.</u>, <u>Danai v. Canal Square Assoc.</u>, 862 A.2d 395, 403 (D.C. 2004)
(plaintiff had no expectation of privacy in trash); <u>Barnhart</u>, 457
F. Supp. 2d at 593 (no expectation of privacy when plaintiff
lifted her blouse up at an outdoor fundraising event); <u>Trundle</u>,
162 F. Supp. 2d at 401 (plaintiff failed to establish claim of
intrusion upon seclusion where she could not show that the
information obtained about her came from a "private source.").
Plaintiff cannot show that the alleged intrusion here - namely,
into facts relevant to her official travel - is of the type
sought to be protected by the tort. The tort of intrusion upon
seclusion "was not created to protect against . . . invasions . .
. [such as] the garnering of information from third parties, and
the culling of facts from public records." <u>Wolf</u>, 553 A.2d at

---

[30]Furthermore, plaintiff testified that she told Mr. Roy that Mr.
Yunger was her boyfriend because "there was nothing to hide." Ex. 2,
at 80. It is clear that this fact is not something plaintiff sought
to keep hidden, as Mr. Yunger indicated on his volunteer record update
form that he was plaintiff's "partner." Ex. 7, (Lemon Decl.), Ex. A
(Yunger Record Update).

1218.  To the extent that plaintiff contends that Mr. Roy's alleged questions concerning her sex life were intrusive, plaintiff herself testified that she refused to answer such questions and informed Mr. Roy that she felt such questions were inappropriate.  Ex. 2 (Klugel Depo. Vol. I) at 71, 81.  However, clearly Mr. Roy did not seek to obtain this information by intruding upon plaintiff's private concerns; according to her, he asked her inappropriate questions, she refused to answer, and that was the end of the inquiry.

Finally, plaintiff cannot demonstrate that the alleged intrusion would be "highly offensive to an ordinary, reasonable person."  Wolf, 553 A.2d at 1217 (citation omitted).  "While determining offensiveness in an invasion of privacy case is usually the province of the jury . . . the trial court must make a threshold determination of offensiveness in discerning the existence of a cause of action for intrusion . . . ."  Id. at 1219.[31]  Plaintiff contends that Mr. Roy asked her inappropriate questions about her sex life during his meeting with her, she contends that she informed Mr. Roy that she felt those questions

---

[31]Plaintiff must also establish that she suffered emotional distress and embarrassment.  Wolf, 553 A.2d at 1219 (citing Bernstein v. National Broadcasting Co., 129 F. Supp. 817, 825 (D.D.C. 1955)).  However, to date, plaintiff has refused to provide a medical release to enable defendants to view her medical records concerning the emotional distress she alleges to have suffered.  Ex. 3(Klugel Depo. Vol. II) at 32-33 (testifying that she suffered "extensive emotional distress" as a result of the OIG inquiry).  Per the parties' conversations with the Court's law clerk, defendants expect to file a motion compelling this information shortly.

were inappropriate, and she testified that she refused to answer
these questions.  Ex. 2 (Klugel Depo. Vol. I) at 71, 81.
Plaintiff does not state that Mr. Roy tried to coerce her to
respond to these questions.  Furthermore, plaintiff's own actions
indicate that she did not find the questioning that had occurred
was "highly offensive" – after the questioning was concluded,
plaintiff left the room to obtain Mr. Yunger's press credentials
to show to Mr. Roy and returned to the room, alone, without
asking that anyone accompany her.  Id. at 78, 83.  Therefore,
even assuming that Mr. Roy asked plaintiff inappropriate
questions about her sex life, the circumstances here do not
support a finding that reasonable persons would find such
questions to be "highly offensive."  Cf. Helton v. United States,
191 F. Supp. 2d 179, 182 (D.D.C. 2002) (denying dismissal of
plaintiffs' claim for intrusion upon seclusion where plaintiffs
might be able to show that "[b]eing forced – allegedly without
legal justification - to strip and squat in view of law
enforcement officials to determine if one has any concealed
contraband would be highly offensive to a reasonable person.").

## IV.  CONCLUSION

For the reasons set forth above, defendants respectfully
request that the Court grant their motion and enter judgment in
defendants' favor regarding the claims remaining in the

complaint.

Respectfully submitted,

_____/s/ Jeffrey A. Taylor_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____/s/ Rudolph Contreras_____
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

_____/s/ Michelle N. Johnson_____
MICHELLE N. JOHNSON, D.C. BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W. – Room E4212
Washington, D.C. 20530
(202) 514-7139

COUNSEL FOR DEFENDANT



Of Counsel:

Christine Nicholson
Associate General Counsel
Office of the General Counsel
Smithsonian Institution Building – Room 302
1000 Jefferson Drive, SW M.C.-012
P.O. Box 23286
Washington, DC 20026

45

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
----------------------------------
DORATHA KLUGEL,                    )
                                   )
          Plaintiff,               )
                                   )
                                   )  Civil A. No. 06-1886 (HHK)
v.                                 )
                                   )
G. WAYNE CLOUGH, Secretary,        )
Smithsonian Institution,¹          )
                                   )
and                                )
                                   )
THE UNITED STATES OF AMERICA,      )
                                   )
          Defendants.              )
                                   )
----------------------------------
```

**DEFENDANTS' STATEMENT OF MATERIAL FACTS AS
TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Civil Rules 7(h) and 56.1, defendants, G. Wayne Clough, Secretary of the Smithsonian Institution, and the United States of America, hereby file their statement of material facts as to which there is no genuine issue.

**I.   Plaintiff's Employment with the Smithsonian Environmental Research Center**

1.   Plaintiff, Doratha Klugel,("Plaintiff" or "Ms. Klugel") was employed at the Smithsonian Environmental Research Center ("SERC") located in Edgewater, Maryland, as an education specialist, IS-9, from February 11, 2001 until May 13, 2005. Exhibit ("Ex.") 1, Declaration of Robert Gallagher ("Gallagher

---

[1]Pursuant to Fed. R. Civ. P. 25(d), Mr. G. Wayne Clough is automatically substituted for defendant Cristian Samper.

Decl.") ¶ 3, Ex. A (Personnel Notification Document), Ex. E
(plaintiff's position description); Ex. 4, Declaration of Mark
Haddon ("Haddon Decl.") ¶ 3.

2.   Plaintiff was a trust, not a federal employee, meaning that
her position was funded by grants received from outside sources,
not from federal appropriations to the Smithsonian Institution.
Ex. 1, (Gallagher Decl.) ¶ 4; Ex. 2, Excerpts from the Deposition
of Doratha Klugel dated May 6, 2008 ("Klugel Depo. Vol. I"), at
13; Ex. 3, Excerpts from the Deposition of Doratha Klugel dated
May 8, 2008 ("Klugel Depo. Vol. II"), at 52, 54.  The grant
funding plaintiff's employment was funded for a period of five
years.  Id. at 54.

3.   Plaintiff's appointment was temporary for a term not to
exceed ("NTE") one year.  Ex. 1, (Gallagher Decl.) ¶ 5; see also
id. Ex. A (NTE dated 9/30/02).  Plaintiff's appointment was
extended three times, each time for one year.  Id. ¶ 6.  The
final extension of plaintiff's temporary appointment was
scheduled to end on August 5, 2005, when the grant that funded
her position would be depleted.  Ex. 4, (Haddon Decl.) ¶ 4.

4.   Plaintiff's supervisor during her employment at SERC was
Mark Haddon, SERC's Director of Education.  Ex. 5, Excerpts from
the deposition of Mark Haddon ("Haddon Depo."), at 5-6, 10.

5.   Plaintiff's primary job responsibilities were to coordinate
distance learning programs, which included assisting SERC's

Education Director in producing video conferences and planning electronic field trips. Ex. 2 (Klugel Depo. Vol. I) at 15-16; Ex. 1, (Gallagher Decl.) ¶ 7, Ex. E (plaintiff's position description).

6. Plaintiff also served as the volunteer coordinator. Ex. 2 (Klugel Depo. Vol. I) at 16; Ex. 5 (Haddon Depo.) at 13. As volunteer coordinator, plaintiff was responsible for registering new SERC volunteers and reporting the time (date and hours) volunteers worked. Ex. 2 (Klugel Depo. Vol. I) at 16; Ex. 5 (Haddon Depo.) at 13; Ex. 1 (Gallagher Decl."), Ex. E (plaintiff's position description indicating under "Principal Duties" of Distance Learning Coordinator that plaintiff was to "supervise interns and volunteers . . . .").

7. During her time as volunteer coordinator, plaintiff assisted her boyfriend, Mr. Phillip Yunger, in signing up as a SERC volunteer. Ex. 6, Excerpts from Deposition of Phillip Yunger ("Yunger Depo.") at 11-12; Ex. 7, Declaration of Amy Lemon ("Lemon Decl."), Ex. A (Yunger Record Update form).

8. Mr. Yunger worked directly for plaintiff and Mr. Haddon, and plaintiff served as Mr. Yunger's timekeeper. Ex. 6 (Yunger Depo.) at 14; Ex. 7 (Lemon Decl.), Ex. B (Yunger volunteer registration form indicating that plaintiff was his supervisor and timekeeper), Ex. C (Project Description for Mr. Yunger identifying Mr. Haddon and Ms. Klugel as his supervisors); Ex. D

(Attendance Reports listing "Dottie Klugel" as the timekeeper for Distance Leaning volunteers including Mr. Yunger).

9.    Mr. Yunger's Record Update listed plaintiff as his emergency contact and specified his relationship to plaintiff as "partner" and provided her home number.  Ex. 7,(Lemon Decl.), Ex. A (Yunger Record Update).

10.    Plaintiff resigned effective May 13, 2005, prior to the end of her temporary appointment.  Ex. 3, (Klugel Depo. Vol. II) at 9 (authenticating her resignation letter), id. at 98; Ex. 8 (Plaintiff's letter of resignation); Ex. 4 (Haddon Decl.) ¶ 5.

## II.  The Office of the Inspector General ("OIG") Conducts An Inquiry Into Plaintiff's Travel.

### A.    The Powers and Responsibilities of the OIG

11.  The Smithsonian's OIG has both the responsibility and authority to conduct and supervise audits and investigations relating to the programs and operations of the Smithsonian Institution.  Inspector General Act Amendments of 1988, 5 U.S.C. App. 3; Ex. 9, Smithsonian Directive ("SD") 107, at 3.

12.  In conducting an inquiry or an investigation, the OIG has access to all records, reports, audits, reviews, documents, papers, recommendations, or other materials that relate to the Smithsonian's programs and operations.  5 U.S.C., App. 3; Ex. 9 (SD-107), at 3.

13.  The OIG has the responsibility to receive and investigate complaints or information from Smithsonian employees or others

concerning possible fraud, waste, abuse or violations of law that may be occurring at the Smithsonian. Ex. 9 (SD 107) at 4; Ex. 10, Excerpts from the deposition of 30(b)(6) designee Michael Pickett, ("Pickett Depo.") at 8.

14.  It is the responsibility of all Smithsonian employees to immediately notify the OIG if they become aware of any potential violation of law, rule, or regulation or the mismanagement, gross waste of funds, or abuse of authority. Ex. 9 (SD-107) at 6.

15.  When the OIG receives an allegation or complaint, it conducts a preliminary inquiry to determine whether the information it has received is credible and specific enough to recommend to the Inspector General that either an administrative inquiry or a criminal investigation be conducted. Ex. 10 (Pickett Depo.) at 10.

### B.  Plaintiff's Travel Plans to Belize and Hawaii.

16.  On December 8, 2004, Carol Ailes, then the Assistant Manager of the Smithsonian's Travel Services Office ("STSO"), IS-10, called OIG senior special agent Gerard Roy to report a concern she had about plaintiff's use of Smithsonian official travel. Ex. 11, Excerpts from the deposition of Carol Ailes ("Ailes Depo.") at 8, 22; Ex. 12, Excerpts from the deposition of Gerard Roy ("Roy Depo.") at 19.

17.  Specifically, Ms. Ailes was concerned because although plaintiff was seeking to travel to Belize using SERC funds it

appeared that the travel might be for personal reasons.  Ex. 11
(Ailes Depo.) at 11-13.

18.  Plaintiff had informed Ms. Ailes that the trip to Belize was
for official travel.  Id. at 10-11, 13.

19.   However, Kathleen Suite, SERC's travel manager, informed
Ms. Ailes that she had paperwork from plaintiff indicating that
the travel to Belize was personal.  Id. at 11-14, 18; see also
Ex. 13, Excerpts from the deposition of Kathleen Suite ("Suite
Depo.") at 18-20, 141-42; Ex. 14, (Email showing flights to/from
Panama) ("Panama travel.").

20.  Plaintiff was planning to take Mr. Phillip Yunger, her
boyfriend, on her trip to Belize.  Ex. 15, Request for travel
authorization to Panama for Mr. Yunger ("Yunger Panama auth.").

21.  Plaintiff had submitted a travel request form to Ms. Suite
that included a note indicating that she and Mr. Yunger would be
taking a trip to Belize and that the trip would be "annual
leave."  Ex. 13 (Suite Depo.) at 20, 141-42; Ex. 16, Travel
authorization form for travel to Belize filled out by plaintiff);
("Belize auth."); Ex. 26 (handwritten note from plaintiff).

22.  Ms. Klugel's initial travel authorization form, which was
signed by her supervisor Mr. Haddon, only included plaintiff's
travel to Panama.  Ex. 13 (Suite Depo.) at 20, 35; Ex. 14 (Panama
travel).

23.  Plaintiff subsequently submitted a travel request form to

Ms. Suite on which she added a trip from Panama to Belize.  Ex.
10 (Suite Depo.) at 160; Ex. 16 (Belize auth.).

24.  This second form was not signed by Mr. Haddon.  Ex. 16
(Belize auth.).  Plaintiff wrote a note on this form stating "You
have Mark's signature already[,]" which was then crossed out.
Id.  In actuality, Mr. Haddon had only previously authorized
plaintiff's travel to Panama.  Ex. 5 (Haddon Depo.) at 168-69.

25.  It is a violation of the federal travel regulations for an
employee to include a personal trip on an official travel
authorization.  Ex. 11 (Ailes Depo.) at 8, 12-13, 22.

26.  Ms. Ailes contacted the OIG regarding plaintiff's travel
because it is part of her job responsibility to alert the OIG if
she has a question concerning the propriety of official travel.
Id. at 22-23.  Over an approximate ten year period, Ms. Ailes had
referred between five to ten people to the OIG's office when she
believed there to be potential fraud or abuse of travel.  Id. at
9-10.

27.  In response to Ms. Ailes' allegations, on December 9, 2004,
Mr. Roy requested and obtained from Ms. Suite documents
pertaining to plaintiff's travel.  Ex. 13 (Suite Depo.) at 24-25,
52-53.

28.  Included with the documentation concerning plaintiff's
travel to Belize was documentation concerning a separate trip she
was planning to take to Hawaii.  Ex. 12 (Roy Depo.) at 31-32.

29.  Plaintiff was traveling to Hawaii to present a paper at an international education conference, the dates of which were January 4-7, 2005.  Ex. 2 (Klugel Depo. Vol. II) at 43.  Ms. Amy Erb, another SERC employee, was also traveling to this conference.  Id. at 44.

30.  In addition, travel request forms had been completed for Mr. Yunger and Mr. Recep Celikay, Ms. Erb's boyfriend, to travel to Hawaii to videotape the presentations of plaintiff and Ms. Erb. Id. at 45-46; 48-50.

31.  The travel authorization form for Messrs. Yunger and Celikay indicated that they would be reimbursing the government for their tickets to Hawaii.  Ex. 17, Travel authorization for travel to Hawaii for Mr. Yunger ("Yunger Hawaii auth."); Ex. 18 Travel authorization to Hawaii for Mr. Celikay ("Celikay Hawaii auth."); Ex. 13 (Suite Depo.) at 194-95.

32.  While volunteers may travel on official business with proper authorization at government rates, it is not proper for a volunteer to obtain the government rate and then reimburse the government for that cost.  Ex. 11 (Ailes Depo.) at 25-26; Ex. 12 (Roy Depo.) at 73-74, 86, 88, 136; Ex. 13 (Suite Depo.) at 17, 57, 194-95.

33.  Furthermore, there was a fee to attend the conference that had been paid for plaintiff, but not Mr. Yunger.  Ex. 12 (Roy Depo.) at 31-32; Compare Ex. 19, Plaintiff's travel authorization

8

for Hawaii ("Hawaii auth.") <u>with</u> Ex. 17 (Yunger Hawaii auth.).

34.  Mr. Roy noted that Mr. Celikay, the second volunteer, signed up for the trip a week or so prior to the trip, to assist Mr. Yunger with the videography.  Ex. 12 (Roy Depo.) at 31-33. The addition of the second volunteer raised a concern in Mr. Roy's mind that there could be abuse or waste.  <u>Id.</u> at 31-33, 37, 45.

35.  Specifically, Mr. Roy was concerned that having two persons travel for a week to videotape a one-hour presentation could be considered wasteful.  <u>Id.</u> at 33.

36.  Based upon the information he had received, Mr. Roy decided to conduct an inquiry concerning plaintiff's and Ms. Erb's travel plans to determine if there was any need for a more formal investigation.  <u>Id.</u> at 26.

     **C.**  **<u>Mr. Roy's Visit to SERC</u>**

37.  On December 13, 2004, Mr. Roy notified Mr. Haddon, that he was coming to SERC the next day to speak with Mr. Haddon, Ms. Suite, Ms. Klugel, Ms. Erb, Mr. Yunger, and Mr. Celikay concerning some travel they were taking.  Ex. 12 (Roy Depo.) at 146, authenticating Ex. 20 (Email dated December 13, 2004).

38.  On December 14, 2004, Mr. Roy traveled to SERC where he met individually with Mr. Gallagher, Mr. Haddon, Ms. Suite, plaintiff, and Ms. Erb.  Ex. 12 (Roy Depo.) at 40-41.

39.  During his meeting with Mr. Haddon, Mr. Roy asked questions

about the purpose for the travel of the two volunteers to Hawaii and whether they were qualified to perform those duties.  Ex. 5 (Haddon Depo.) at 48-54.

40.  Although Mr. Haddon understood that Mr. Roy was questioning his judgment in approving the trip, he was not upset or intimidated by Mr. Roy's questions.  Id. at 53-54, 152-53.

41.  Mr. Roy met with plaintiff next.  Ex. 12 (Roy Depo.) at 102. The entire meeting lasted 20-30 minutes.  Id. at 116-17; Ex. 2 (Klugel Depo. Vol. I) at 77.

42.  Plaintiff felt that Mr. Roy asked her inappropriate questions about her sex life.  Ex. 2 (Klugel Depo. Vol. I) at 70-71, 80-81.  Plaintiff refused to answer any questions that she felt were inappropriate and informed Mr. Roy that those were not appropriate questions.  Id. at 71, 75.

43.  Plaintiff informed Mr. Roy that Mr. Yunger was her boyfriend because she felt there was nothing to hide.  Id. at 79-80.

44.  At one point during the interview, Mr. Roy told plaintiff she was a "tough nut to crack."  Id. at 71.  Plaintiff interpreted this to be a physical threat.  Id. 71-72, 76.

45.  Plaintiff left the interview at one point to obtain Mr. Yunger's press pass to show to Mr. Roy to alleviate his concern regarding why Mr. Yunger had not paid the conference fee.  Id. at 78.  Prior to returning to the room to give the pass to Mr. Roy plaintiff did not stop to speak to anyone about her concern that

Mr. Roy had not acted appropriately when questioning her.  Id. at 83.

46.  At no time did plaintiff ask that someone be present during Mr. Roy's questioning of her.  Id. at 72.

47.  According to plaintiff, toward the end of their meeting, Mr. Roy stated to her that she was going to be on his radar screen and that if there were any further allegations of wrong-doing on her part he would come out with the red lights flashing and handcuffs.  Id. at 83.

48.  Mr. Roy informed plaintiff that there was nothing wrong with her planned trip to Panama, on which Mr. Yunger was scheduled to accompany her.  Id. at 73.

49.  Mr. Roy also questioned Amy Erb concerning her planned travel to Hawaii.  Ex. 12 (Roy Depo.) at 120.  According to plaintiff, Ms. Erb stated that Mr. Roy told her that her boyfriend was not going on the trip and that she should not "do this again."  Ex. 2 (Klugel Depo. Vol. I) at 117.

50.  After speaking to Ms. Erb and Ms. Suite, Mr. Roy again spoke to plaintiff to report the results of his inquiry.  Ex. 12 (Roy Depo.) at 120.

51.  Mr. Roy informed plaintiff that the trip to Hawaii could not go forward as planned.  Id.  He explained that management had made a mistake and that Mr. Yunger and Mr. Celikay could not obtain the government rate for their tickets to Hawaii and then

reimburse the government.  Id. at 120-21, 125.

52.  Mr. Roy informed Ms. Suite that Messrs. Yunger and Celikay would not be permitted to travel to Hawaii in an official capacity and that she should cancel their tickets.  Ex. 13 (Suite Depo.) at 133.

53.  After the questioning by Mr. Roy on December 14, 2004, no one asked plaintiff any questions regarding her sex life or her relationship with Mr. Yunger.  Ex. 2 (Klugel Depo. Vol. I) at 109-111.

54.  After his meeting with her, Mr. Roy did not conduct any monitoring or surveillance of plaintiff at any time.  Ex. 12 (Roy Depo.) at 138.  Mr. Roy did not review any of plaintiff's future travel plans.  Id. at 134.

55.  No one threatened plaintiff with being fired.  Ex. 2 (Klugel Depo Vol. I) at 118.

56.  After the OIG's inquiry, Mr. Gallagher and Mr. Haddon told plaintiff that no one at SERC thought she had done anything wrong.  Ex. 3 (Klugel Depo. Vol. II) at 12; Ex. 5 (Haddon Depo.) at 69.

57.  Ross Simons, the then-Director at SERC, informed plaintiff that nothing had come out of the OIG's inquiry into her travel, that there was no wrong-doing found, and that nobody at SERC thought plaintiff had done anything wrong or had tried to defraud the government.  Ex. 2 (Klugel Depo. Vol. I) at 101-02.

58.  On December 16, 2004, Mr. Roy closed the complaint regarding plaintiff's travel.  Ex. 12 (Roy Depo.) at 147; Ex. 21, Declaration of Gerard Roy ("Roy Decl."), Ex. A (Memorandum to the File).

59.  On December 20, 2004, Mr. Roy sent an email to William Hoyt, Administrative Officer for OIG, indicating that the "complaint was closed on 12/16/04.  Management cancelled the trip for the two male volunteers."  Ex. 21 (Roy Decl.), Ex. C (Email dated December 20, 2004).

60.  On December 16, 2004, Mr. Roy sent an email to Mr. Gallagher stating that no report was prepared regarding his inquiry and that the complaint was closed.  Ex. 21, (Roy Decl.), Ex. B (Email dated December 16, 2004).  Mr. Roy told Mr. Gallagher that Mr. Gallagher could "consider my participation as more of a Technical Assistance Visit than an inquiry."  Id.

61.  Plaintiff, Ms. Erb, Mr. Yunger and Mr. Celikay all traveled to Hawaii.  Ex. 6 (Yunger Depo.) at 22-23.  Mr. Yunger paid for his own ticket.  Id. at 19-21.

62.  After their trip to Hawaii, plaintiff and Mr. Yunger also completed their scheduled trip to Panama.  Ex. 2 (Klugel Depo. Vol. I) at 113.

**III. Plaintiff's Automobile Accident and Requests for Leave.**

63.  Prior to the OIG inquiry, on November 9, 2004, plaintiff was involved in an automobile accident while driving home from SERC.

Id. at 39.

64.  As a result of her accident, plaintiff suffered contusions to her knees and a broken right arm.  Id. at 39, 138.

65.  After her car accident, plaintiff began attending physical therapy two full days a week.  Id. at 142.

66.  From November 10, 2004 through May 13, 2005, plaintiff took 451 hours of annual leave, which included 257 of annual leave, 64 hours of sick leave, and 130 hours of leave without pay ("LWOP"). Ex. 22, Declaration of Nicole Campbell ("Campbell Decl.) ¶ 3.

67.  During the fall of 2004, plaintiff also began taking leave to attend classes at the Wesleyan Theological Seminary during SERC business hours.  Ex. 3 (Klugel Depo. Vol. II) at 31.

68.  Mr. Haddon and Mr. Gallagher asked plaintiff to provide documentation from her medical providers to support her leave requests.  Ex. 2 (Klugel Depo. Vol. II), at 156-58.  This documentation was requested to protect the agency so that if any future audits were done and documentation was requested, they would have the documentation, and to substantiate plaintiff's claims for leave.  Ex. 5 (Haddon Depo.) at 114-16, 122; 158; Ex. 23, Excerpts from the Deposition of Anson Hines ("Hines Depo.), at 44-45.

69.  Mr. Haddon also asked for documentation regarding plaintiff's leave so he could determine how long her treatment could be expected to last and how long her duties would need to

14

be reduced.  Ex. 5 (Haddon Depo.) at 124.  This information was
needed so Mr. Haddon could appropriately plan for the running of
the department.  <u>Id.</u>

70.  Mr. Haddon did not deny plaintiff's request for leave to
receive treatment needed for her injuries from her car accident.
<u>Id.</u> at 76-77, 166; Ex. 24, Excerpts from the deposition of Robert
Gallagher ("Gallagher Depo.) at 57-58.

71.  Mr. Haddon denied plaintiff's request for several days of
annual leave for the purpose of taking a personal trip to Belize
in April 2005.  Ex. 5 (Haddon Depo.) at 76-77, 164-65; Ex. 24
(Gallagher Depo.) at 58; Ex. 2 (Klugel Depo. Vol. I) at 40-41,
125-26, 153; Ex. 3 (Klugel Depo. Vol. II) at 79.

72.  Mr. Haddon denied plaintiff's request for annual leave
because (1) it was a very busy time in the education department
and it would be very unusual for an employee to ask for leave
during April through the middle of June; (2) plaintiff had
"little or no leave to take" at that time; and (3) because
plaintiff was only at SERC two to three days a week due to her
physical therapy, her job duties were not being completed.  Ex. 5
(Haddon Depo.) at 76-78, 90-92, 164-65.  <u>See also</u> Ex. 24
(Gallagher Depo.) at 58-59.

73.  Mr. Haddon had concerns about plaintiff's request for leave
at a time when she was needed to support and assist in some of
the activities that were happening in the education department at

that time.  Id. at 165.  Plaintiff had previously informed Mr.
Haddon that she did not have enough time to get all of her work
accomplished.  Id.

74.  As a result of her need to attend physical therapy on two
full days, Mr. Haddon, Mr. Hines, then acting-director of SERC,
and Mr. Gallagher had ongoing discussions regarding reassigning
some of plaintiff's work responsibilities.  Ex. 23 (Hines Depo.)
at 40-42.

75.  Mr. Haddon had concerns about getting plaintiff's work done,
in light of her absences, especially because plaintiff was
involved in several of SERC's pending large projects.  Ex. 24
(Gallagher Depo.) at 9-10, 26-27.

76.  Mr. Hines recommended that Mr. Haddon take over some of
plaintiff's responsibilities "that would require travel and high
pressure deadline performance and allow her to maintain her
schedule that she had requested for medical leave."  Ex. 23
(Hines Depo.) at 42-43, 46.

77.  Mr. Hines asked Mr. Haddon to fill in for plaintiff because
Mr. Haddon was the most familiar with and knowledgeable about the
work plaintiff was doing.  Id. at 46.

78.  Mr. Gallagher and Mr. Haddon met with plaintiff to discuss
the issue of her work getting done and discussed a schedule to
ensure all of plaintiff's work would be completed.  Ex. 24
(Gallagher Depo.) at 27, 38-39.

79.  Despite the removal of some of her work assignments, plaintiff was still responsible for conducting the video conferences to which she had been assigned and these were keeping her busy.  Ex. 2 (Klugel Depo. Vol. I) at 171.

80.  According to plaintiff, Mr. Haddon placed her on a "progress report."  Id. at 172.  As a result, plaintiff believes she had to meet with Mr. Haddon to discuss the progress of her projects. Id. at 174-75. Plaintiff is not aware of any written report by Mr. Haddon.  Id.

81.  According to plaintiff, Mr. Haddon informed her that he was doing a progress report with her because he had recently attended supervisory training and realized that he should have been conducting progress reports with her.  Id. at 176.

82.  Plaintiff asked to be removed from her role as volunteer coordinator in part so she could focus on her other responsibilities.  Id. at 166-67.  However, at the time she made this request, Mr. Simons stated that he could not remove this responsibility at the time.  Id. at 170.

83.  Plaintiff's injuries as a result of her accident improved, although she continued to request leave up until the date she resigned.  Ex. 5 (Haddon Depo.) at 83-84.

84.  Plaintiff informed Mr. Haddon that she had irritable bowel syndrome and sleeping issues.  Ex. 2 (Klugel Depo. Vol. I) at 132-33; Ex. 5 (Haddon Depo.) at 95-96.  Her IBS would sometimes

17

result in her calling in sick to work, but Mr. Haddon never denied her requests to stay home to deal with her IBS.  Ex. 2 (Klugel Depo. Vol. I) at 132; Ex. 5 (Haddon Depo.) at 95-96.

85.  Plaintiff's sleeping difficulties did not affect her ability to go to work, except that she might have to take leave to go see a sleep doctor.  Ex. 2 (Klugel Depo. Vol. I) at 132-33.

86.  Plaintiff does not contend that she is disabled.  Ex. 25, Plaintiff's Responses to Defendants' First Set of Interrogatories, Response to Interrogatory No. 7.

87.  Plaintiff believes that Mr. Haddon was mad at her because she would not let the OIG inquiry "go" and "from that place, he then began reacting to me by denying leave and taking away my assignments . . . ."  Ex. 3 (Klugel Depo. Vol. II) at 34.

88.  At no time did Mr. Hines question plaintiff about her travel arrangements, make any statements about plaintiff's sexuality to her or to others, direct plaintiff to a mandatory health referral or threaten plaintiff with any adverse action.  Ex. 2 (Klugel Depo. Vol. I) at 82, 95, 102, 112, 128.


                         Respectfully submitted,

                             /s/ Jeffrey A. Taylor
_____
                         JEFFREY A. TAYLOR, D.C. BAR # 498610
                         United States Attorney

                             /s/ Rudolph Contreras
                         _____
                         RUDOLPH CONTRERAS, D.C. BAR #  434122
                         Assistant United States Attorney

```
                                   /s/ Michelle N. Johnson
_____
                         MICHELLE N. JOHNSON, D.C. BAR # 491910
                         Assistant United States Attorney
                         United States Attorney's Office
                         Civil Division
                         555 4th Street, N.W. – Room E4212
                         Washington, D.C. 20530
                         (202) 514-7139

                         COUNSEL FOR DEFENDANT
```

Of Counsel:

Christine Nicholson
Associate General Counsel
Office of the General Counsel
Smithsonian Institution Building – Room 302
1000 Jefferson Drive, SW M.C.-012
P.O. Box 23286
Washington, DC 20026

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
---------------------------------
DORATHA KLUGEL,                    )
                                   )
          Plaintiff,               )
                                   )
                                   )  Civil A. No. 06-1886 (HHK)
v.                                 )
                                   )
G. WAYNE CLOUGH, Secretary,        )
Smithsonian Institution,¹          )
                                   )
and                                )
                                   )
THE UNITED STATES OF AMERICA,      )
                                   )
          Defendants.              )
                                   )
---------------------------------
```

**<u>PROPOSED ORDER</u>**

This matter having come before the Court on defendants' Motion for Summary Judgment, and in consideration of the motion, plaintiff's response in opposition, if any, and defendants' reply, it is hereby

**ORDERED** that defendants' Motion for Summary Judgment is **GRANTED.** And it is further

**ORDERED** that judgment is entered in favor of defendants.

This is a final appealable order.

**SO ORDERED** on this ____ day of _____, 200__.

_____        _____
                                        Henry H. Kennedy
                                        UNITED STATES DISTRICT JUDGE

---

[1]Pursuant to Fed. R. Civ. P. 25(d), Mr. G. Wayne Clough is automatically substituted for defendant Cristian Samper.

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Doratha Klugel,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| **v.** | )    Civil Action 06-01886 (HHK) |
| | ) |
| **G. Wayne Clough, Secretary,** | ) |
| **Smithsonian Institution,** | ) |
| | ) |
| **and the United States of America,** | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF ROBERT GALLAGHER

1. I am the Executive Officer for the Smithsonian Environmental Research Center
(SERC), a unit of the Smithsonian Institution, located in Edgewater, Maryland. I have held this position
since December 2006. Previously, I was the Administrative Officer for SERC, a position I assumed in
February 2004.

2. In my official capacity, I am responsible for administration of the operations of SERC,
including personnel recruitments and actions. I serve as the principal administrative liaison between
SERC and the Smithsonian Institution's Office of Human Resources.

3. Plaintiff Dorotha Klugel received a temporary appointment to the position of
education specialist, IS-9, on February 11, 2001. Attached here as Exhibit A is a true and accurate
copy of the Personnel Notification Document (Temporary Appt. Accession) (SI-49).

4. Plaintiff was a trust employee, meaning her position was not funded by federal
appropriations to the Smithsonian Institution.

-1-

5. Plaintiff's appointment was temporary, for a term not to exceed (NTE) one year. Exhibit A is a true and accurate copy of the Personnel Notification Document for Ms. Klugel's appointment showing a NTE date of 9/30/02. (SI-49, Box 34)

6. Plaintiff's appointment was extended three times, each time for one year. Attached here as Exhibits B, C, and D are true and accurate copies of Extension of Appointment NTE 9/30/03 (SI-10 (Box 34)); Extension of Temporary Appointment NTE/ One Year 9/30/04 (SI-5 (Box 34)); and Extension of Temp Appt NTE 9/30/05 (SI-30 (Box 34)).

7. Exhibit E to this Declaration is a true and accurate copy of the position description for Plaintiff's position of education specialist, IS-9. (SI-24 to 27)

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Robert Gallagher

EXECUTED on July 8, 2008.

# EXHIBIT A

SI-650
SI Trust Fund
Rev. 9/91

**PERSONNEL**
**NOTIFICATION DOCUMENT**

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| KLUGEL, DORATHA C | | | 02/11/01 |

| **FIRST ACTION** | | **SECOND ACTION** | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 955 | TEMPORARY APPT ACCESSION | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | EDUC SPECLST |
| | 001        042970 |

| 8. Pay Plan | 9. Occ Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13 Pay Basis | 16. Pay Plan | 17 Occ Code | 18. Grade or Level | 19 Step or Rate | 20. Total Salary/Award | 21 Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | IS | 1701 | 09 | 01 | 36,656.00 | PA |

| 12A. Basic Pay | 12B. Locality Pay | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Pay | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | 33,254.00 | 3,402.00 | 36,656.00 | |

| 14. Organization Name | 22. Organization Name |
|---|---|
| | SMITHSONIAN INSTITUTION (TRUST) |
| | UNDER SECRETARY FOR SCIENCE |
| | SMITHSONIAN ENVRN RES CT EDGWT |
| | PUBLIC EDUCATION |

SM 7130006040000000000        PP 03 2001

**EMPLOYEE DATA**

| 23. Veterans Preference | 24. Type of Appointment | 25. Citizenship | 26. Sex |
|---|---|---|---|
| 1    1 - None    6 - 30% Comp. | 9    8 - Indefinite    9 - Temporary | 1    1 - U.S.    8 - Other | F |

| 27. Life Insurance | 28. Health Insurance | 29. Pay Rate Determinant |
|---|---|---|
| 1    1 - Eligible    2 - Ineligible | 1    1 - Eligible    2 - Ineligible | 0 |

| 30. Retirement Plan | 31. Service Comp. Date | 32. Work Schedule | | 33. Part-Time Hours |
|---|---|---|---|---|
| 2    1 - CS    3 - TIAA    5 - TIAA/FICA    2 - FICA    4 - None    6 - Pan Soc Sec | 02/11/01 | F    FULL TIME | F - Full time    P - Part time    I - Intermittent | Per Biweekly Pay Period |

| 34. NTE Date | 35. FLSA Category | 36. Organizational Structure Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 09/30/02 | N    E - Exempt    N - Nonexempt | 71-30-06-0400-00 | 2222 |

| 38. Duty Station Code | 39. Duty Station (City-County-State or Overseas Location) |
|---|---|
| 24-0496-003 | EDGEWATER    ANNE ARUNDEL    MD |

| 40. Supervisory Code | 41. | 42. | 43. | 44. Accounting Fund Number |
|---|---|---|---|---|
| 8 | | | | |

45. Remarks

SELECTED FROM 00CS-1346 DATED 11-16-00.
POSITION IS AT THE FULL PERFORMANCE LEVEL.

KLUGEL V. SAMPER
SI - 0049

| 46. Employing Organization | 50. Signature/Authentication and Title of Approving Officer |
|---|---|
| SMITHSONIAN INSTITUTION (TRUST) | *Bernice B. Abram* |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | BERNICE B. ABRAM |
|---|---|---|---|
| SM  1 | 1536 | 02/11/01 | ASSISTANT DIRECTOR FOR MGMT SUPPORT |

2 - OPF COPY - LONG-TERM RECORD - DO NOT DESTROY    SI-650 OSS 754-348
Previous Editions Unusable After 9/30/91

# EXHIBIT B

SI – 610
Trust Fund

# REQUEST FOR PERSONNEL ACTION

36-6-0187

**PART A** – Requesting Office (Also complete Part B, Items 1, 7-22, 32, 33, 36, 39 and 44.)

| 1. Actions Requested | 2. Request Number |
|---|---|
| **EXTENSION OF APPT** | 83E497 |

OFC. OF HUMAN RESOURCES

| 3. For Additional Information Call (Name and Telephone Number) | 4. Proposed Effective Date |
|---|---|
| **JEANINE ROBERT 443-482-2202** | 2002 AUG 20 PM 3: 14  09-30-02 |

| 5. Action Requested By (Typed Name, Title, Signature and Request Date) | 6. Action Authorized By (Typed Name, Title, Signature and Concurrence Date) |
|---|---|
| *signature*  A. MARK HADDON, EDUCATION DIRECTOR | *signature*  8/9/02  BRUCE W. BROOKS, EXECUTIVE OFFICER |

**PART B** – For preparation of SI-650 (Show dates in month-day-year order.)

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| **KLUGE L., DORATHA C.** | | | 10/01/02 |

| First Action | | Second Action | |
|---|---|---|---|
| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
| 957 | Ext. of Appt. | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | **EDUCATION SPECIALIST 001 042970** |
| | Basic 33,254 |

| 8. Pay Plan | 9. Occ Code | 10. Grade or Level | 11. Step or Rate | 12. Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ Code | 18. Grade or Level | 19. Step or Rate | 20. Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | IS | 1701 | 09 | 01 | 36,656 | PA |

| 14. Organization Name | 22. Organization Name |
|---|---|
| | **SMITHSONIAN INSTITUTION**  **UNDER SECRETARY FOR SCIENCE**  **SMITHSONIAN ENVIRONMENTAL RESEARCH CENTER** |

## EMPLOYEE DATA

| 23. Veterans Status | 24. Type of Appointment | 25. Agency Use | 26. Sex |
|---|---|---|---|
| 1 – None    6 – 30% Comp | 8 – Indefinite  9 – Temporary | | |

| 27. Life Insurance | 28. Health Insurance | 29. Pay Rate Determinant |
|---|---|---|
| 1 – Eligible    2 – Ineligible | 1 – Eligible    2 – Ineligible | |

| 30. Retirement Coverage | 31. Service Comp Date | 32. Work Schedule | 33. Part-time Hours |
|---|---|---|---|
| 1-CS  3-TIAA  5-TIAA/FICA  2-FICA  4-None  6-Pan Soc Sec | | F-Full-time  P-Part-time   I-Intermittent | Per Biweekly Pay Period |

| 34. NTE Date | 35. FSLA Category | 36. Organizational Structure Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 09-30-03 | E-Exempt  N-Nonexempt | 71-30-06-0400-00 | |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 24-0496-003 | **EDGEWATER, MD  ANNE ARUNDEL COUNTY** |

| 40. Agency Data | 41. | 42. | 43. | 44. Accounting Fund Number |
|---|---|---|---|---|
| | | | | |

| 45. Educational Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship | 50. Vietnam Era Vet | 51. Supervisory Code |
|---|---|---|---|---|---|---|
| | | | | 1-USA 8-Other | V-Yes N-No | |

**PART C** – Reviews and Approval (Not to be used by requesting office.)

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature | Date |
|---|---|---|---|---|---|
| A. Su OHR | JU | 8/11/02 | D. | | |
| B. | | | E. | | |
| C. | | | F. | | |

| 2. Approval: I certify that the information entered on this form is accurate and that the proposed action is in compliance with Trust Fund personnel policies. | Signature  *William Kashula* | Approval Date  8/20/02 |
|---|---|---|

CONTINUED ON REVERSE SIDE

**KLUGEL V. SAMPER**
**SI - 0010**

SW ENTERED 8-21-02

Previous Edition Unusable after 09/30/87

SI-610 Rev 8-8705575436

| PART D - Remarks by Requesting Office |
|---|

| (Note to Supervisors) Do you know of additional or conflicting reasons for the employee's resignation/retirement? If "YES", please state these facts on a separate sheet and attach to SI-610) | ☐ YES  ☐ NO |
|---|---|

| PART E - Employee Resignation/Retirement |
|---|

You are requested to furnish a specific reason for your resignation and a forwarding address. Your reason for resigning may be used to determine your eligibility for unemployment compensation benefits. Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay or compensation to which you are entitled.

The furnishing of this information is voluntary; however, failure to provide it may result in your not receiving: (1) your copies of those documents you should have, (2) pay or other compensation due you, and (3) any unemployment compensation benefits to which you may be entitled.

1. Reason for Resignation/Retirement (NOTE: Your reasons are used in determining possible unemployment benefits. Please be specific and avoid generalizations. Your resignation/retirement is effective at the end of the day – midnight – unless you specify otherwise.)

| 2. Effective Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address (*Number, Street, City, State, ZIP Code*) |
|---|---|---|---|
| | | | |

| PART F - Remarks for SI-650 |
|---|

499   CONTINUED COORDINATION OF ALL DISTANCE LEARNING PROGRAMS AT SERC

KLUGEL V. SAMPER
SI - 0011

# EXHIBIT C

**PART A - Requesting Office (Also complete Part B, items 1, 7-22, 32, 33, 36 and 39)**

| 1. Action Requested | 2. Request Number |
|---|---|
| EXTENSION OF TEMPORARY APPT NTE/ONE YEAR | 83E697 |

| 3. For Additional Information Call (Name and Telephone Number) | 4. Proposed Effective Date |
|---|---|
| EMILY GLEASON 443 482 2317 | 10/01/03 |

| 5. Action Requested by (Typed Name, Title, Signature, and Request Date) 9/9/03 | 6. Action Authorized By (Typed Name, Title, Signature, and Concurrence Date) |
|---|---|
| HADDON, ALEXANDER M. Supr. Educ. Spec. | Ross B. Simons, Director  Ross B. Simons 9/9/03 |

**PART B**

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| KLUGEL, DORATHA C. | | | 10/01/03 |

**FIRST ACTION** | **SECOND ACTION**

| 5-A Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 957 | Ext Temp Appt. | | |

**7. FROM: Position Title and Number** | **15. TO: Position Title and Number**
EDUC SPECLST #042970

| 8.Pay Plan | 9.Occ.Code | 10.Grade or level | 11.Step or Rate | 12. Salary | 13.Pay Basis | 16.Pay Plan | 17.Occ.Code | 18.Grade or Level | 19.Step or Rate | 20.Salary/Award | 21.Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | IS | 1701 | 09 | 01 | | PA |

| 12A Basic Pay | 12B Locality Adj. | 12C Adj. Basic Pay | 12D Other Pay | 20A Basic Pay | 20B Locality Adj. | 20C Adj. Basic Pay | 20D OtherPay |
|---|---|---|---|---|---|---|---|
| | | | | 35,519 | | | |

| 14. Organization Name | 22. Organization Name |
|---|---|
| | Smithsonian Institution |
| | Under Secretary for Science |
| | Smithsonian Environmental Research Center |

| 23. Veterans Status | 24. Type of Appointment | 25.Agency Use | 26.Sex |
|---|---|---|---|
| 1-None  6-30% Comp. | 8 8-Indefinite 9-Temporary | | |

| 27. Life Insurance | 28.Health Insurance | 29.Pay Rate Determinant |
|---|---|---|
| 1-Eligible  2-Ineligible | 1-Eligible  2-Ineligible | |

| 30.Retirement Coverage | 31.Service Comp.Date | 32.Work Schedule | 33.Part-Time Hours Biweekly Pay Period |
|---|---|---|---|
| 2-FICA  4-None | | F F-Full-time P-Part-time I-Intermittent | 40 |

| 34.NTE Date | 35 FSLA Category E-Exempt N-Nonexempt | 36 Organizational Structure Code | 37 Bargaining Unit Status |
|---|---|---|---|
| 09/30/04 | | 71-30-06-0200-00 | |

| 38.Duty Station Code | 39. Duty Station City - County - State or Overseas Location |
|---|---|
| 24-0496-003 | Edgewater, Anne Arundel Maryland |

| 40. Agency Data | 41 | 42 | 43 | 44. Accounting Fund Number |
|---|---|---|---|---|
| | | | | 803 |

| 45. Education Level | 46. Year Degree Attained | 47. Academic Discipline | 48. Functional Class | 49. Citizenship 1-USA  8-Other | 50.Vietnam Era Vet Y-Yes N-No | 51.Supervisory Code |
|---|---|---|---|---|---|---|
| | | | | | | |

**PART C - Signatures and Approvals of Requesting or Authorizing Officials**

| 1. Office / Function | Initials / Signature | Date | Office / Function | Initials / Signature | Date |
|---|---|---|---|---|---|
| A | | | D | | 10/11/03 |
| B | | | E | | |
| C | | | F | | |

| 2. Approval: I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements. | Signature | Approval Date 9/15/83 |
|---|---|---|

CONTINUED ON REVERSE SIDE.
In ohr 1/11/03 KH

KLUGEL V. SAMPER
SI - 0005

Previous Edition Unusable after 05/01/99
SF-610 Rev 5-99 OSS 754-36

SI-610 (Reverse)

**Part D.  Remarks by Requesting Office**

(NOTE TO SUPERVISORS:  Do you know of additional or conflicting reasons for the employee's resignation/retirement?   ☐ YES  ☐ NO
            If "yes", please state these facts on a separate sheet and attach to SI-610.)

**Part E.  Employee Resignation/Retirement**

You are requested to furnish a specific reason for your resignation and a forwarding address.  Your reason for resigning may be used to determine your eligibility for unemployment compensation benefits. Your forwarding address will be used primarily to mail you copies of any documents you should have or any pay or compensation to which you are entitled.

The furnishing of this information is voluntary; however, failure to provide it may result in your not receiving:  (1)  your copies of those documents you should have;  (2)  pay or other compensation due you; and  (3)  any unemployment compensation benefits to which you may be entitled.

1. Reason for Resignation/Retirement  (NOTE:  Your reasons are used in determining possible unemployment benefits.  Please be specific and avoid generalizations.  Your resignation/retirement is effective at the end of the day-midnight-unless you specify otherwise.)

| 2. Effective Date | 3. Your Signature | 4. Date Signed | 5. Forwarding Address | (Number, Street, City, State, ZIP Code) |
|---|---|---|---|---|
| | | | | |

**Part F.  Remarks for SI-610**

499 Continued coordination of all distance learning programs @ SEKC

KLUGEL V. SAMPER
SI - 0006

EXHIBIT D

SI-850
SI Trust Fund
Rev, 8/: I

**PERSONNEL**
**NOTIFICATION DOCUMENT**

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| KLUGEL, DORATHA C | | | 10/01/04 |

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 957 | EXT OF TEMP APPT NTE | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| | EDUC SPECLST 00008275    042970 |

| 8. Pay Plan | 9. Occ Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13 Pay Basis | 16. Pay Plan | 17 Occ Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21 Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | IS | 1701 | 09 | 02 | 43,209.00 | PA |

| 12A. Basic Pay | 12B. Locality Pay | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Pay | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | 37,694.00 | 5,515.00 | 43,209.00 | |

| 14. Organization Name | 22. Organization Name |
|---|---|
| | SMITHSONIAN INSTITUTION (TRUST) UNDER SECRETARY FOR SCIENCE SMITHSONIAN ENVRN RES CT EDGWT PUBLIC EDUCATION |

| 23. Veterans Preference | 24. Type of Appointment | 25. Citizenship | 26. Sex |
|---|---|---|---|
| 1  1 - None   5 - 30% Comp. | 9   8 - Indefinite  9 - Temporary | 1   1 - U.S.  6 - Other | F |

| 27. Life Insurance | 28. Health Insurance | 29. Pay Rate Determinant |
|---|---|---|
| 1  1 - Eligible   2 - Ineligible | 1   1 - Eligible  2 - Ineligible | 0 |

| 30. Retirement Plan | 31. Service Comp. Date | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| 5  1 - CS  3 - TIAA  5 - TIAA/FICA  2 - FICA  4 - None  6 - Pan Sec Sec | 07/06/93 | F   FULL TIME   F - Full time  P - Part time  I - Intermittent | |

| 34. NTE Date | 35. FLSA Category | 36. Organizational Structure Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 09/30/05 | N  E - Exempt  N - Nonexempt | 71-30-06-0400-00 | 2222 |

| 38. Duty Station Code | 39. Duty Station (City-County-State or Overseas Location) |
|---|---|
| 24-C496-003 | EDGEWATER   ANNE ARUNDEL   MD |

| 40. Supervisory Code | 41. | 42. | 43. | 44. Accounting Fund Number |
|---|---|---|---|---|
| 8 | | | | |

45. Remarks:

KLUGEL V. SAMPER
SI - 0030

| 46. Employing Organization |
|---|
| SMITHSONIAN INSTITUTION (TRUST) |

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | 50. Signature/Authentication and Title of Approving Official |
|---|---|---|---|
| SM 71 | 1536 | 10/01/04 | JULIE FORTIN  MANAGER, MGMT SUPPORT BRANCH |

# EXHIBIT E

19-13-00    07:53    SMITHSONIAN ENVIRON RES CTR

**TRUST FUND**
**POSITION DESCRIPTION**
**COVER SHEET**

| REASON FOR THIS POSITION | | | |
|---|---|---|---|
| 1. NEW | 2. IDENTICAL ADDITION TO THE ESTABLISHED PD NUMBER | 3. REPLACES PD NUMBER | 042970 |

| RECOMMENDED | | 5. PAY PLAN | 6. SERIES | 7. GRADE |
|---|---|---|---|---|
| 4. TITLE EDUCATION SPECIALIST (Distance Learning) | | IS | 1701 | 09 |
| | 9. INCUMBENT (OPTIONAL) | | | |
| 8. WORKING TITLE (OPTIONAL) | | | | |

**OFFICIAL**

10. TITLE *Education Specialist (Distance Learning/Environmental Sciences)*

| 11. PP | 12. SERIES | 13. FUNC | 14. GRADE | 15. DATE | | | 16. I/A | 17. CLASSIFIER |
|---|---|---|---|---|---|---|---|---|
| | | | | MONTH | DAY | YEAR | | |
| IS | 1701 | | 9 | 9 | 19 | 00 | YES ☐  NO ☒ | C Mol Stuermer |

**18. ORGANIZATIONAL STRUCTURE (AGENCY/BUREAU)**

| | | 5th EDUCATION DEPARTMENT |
|---|---|---|
| 1st | **Smithsonian Institution** | 6th |
| 2nd | OFFICE OF THE PROVOST | |
| 3rd | NATIONAL MUSEUM OF NATURAL HISTORY | 7th |
| | | 8th |
| 4th | SMITHSONIAN ENVIRONMENTAL RES. CENTER | |

**SUPERVISOR'S CERTIFICATION**
THIS IS A COMPLETE AND ACCURATE DESCRIPTION OF THE DUTIES AND RESPONSIBILITIES OF THIS POSITION.

| 19. SUPERVISOR'S SIGNATURE | 20. DATE 09/11/00 | 22. SECOND-LEVEL SUPERVISOR'S SIGNATURE | 23. DATE 09/11/00 |
|---|---|---|---|
| 21. SUPERVISOR'S NAME AND TITLE A. Mark Haddon, Education Director, SERC | | 24. SECOND LEVEL SUPERVISOR'S NAME AND TITLE Anson H. Hines, Assistant Director, SERC | |

**FACTOR EVALUATION SYSTEM**

| FACTOR | 25. FLD/BMK | 26. POINTS | FACTOR | 25. FLD/BMK | 26. POINTS |
|---|---|---|---|---|---|
| 1. Knowledge Required | 1-6 | 950 | 6. Personal Contacts | 6-3 | 60 |
| 2. Supervisory Controls | 2-3 | 275 | 7. Purpose of Contacts | 7-2 | 50 |
| 3. Guidelines | 3-3 | 275 | 8. Physical Demands | 8-1 | 5 |
| 4. Complexity | 4-3 | 150 | 9. Work Environment | 9-1 | 5 |
| 5. Scope and Effect | 5-3 | 150 | 27. TOTAL POINTS | 27. 1920 | |
| | | | 28. GRADE | 28. 9 | |

**CLASSIFICATION CERTIFICATION**
I CERTIFY THAT THIS POSITION HAS BEEN CLASSIFIED/GRADED AS REQUIRED BY SSH 1200, CHAPTER 511.

| 29. SIGNATURE *C Mol Stuermer* | 30. DATE 9/19/00 |
|---|---|
| 31. NAME AND TITLE | C.M.R. STUERMER PERSONNEL MANAGEMENT SPECIALIST BY DIRECTION |

32. REMARKS
Pcs *General Education & Training Series, GS-1701 (10/91, TS-109)*        FPL 9
Pc: *Education Program Series, GS-1720 (10/91, TS-109)*
SI-63

Previous Edition Unusable after 9-30-87

KLUGEL V. SAMPER
SI - 0024

# IS-9 Education Specialist/Distance Learning Coordinator

This position is within the Education Department of the Smithsonian Environmental Research Center in Edgewater, Maryland and involves an array of responsibilities that coordinate and implement environmental education programs with multiple audiences. The means of disseminating SERC's research includes communicating with small groups, giving presentations to large audiences, implementing video conferences that connect scientists and students in real time interactions, and coordinating traveling school exhibits in the Maryland/Virginia/ Washington, DC area. The position also includes the duties of a volunteer coordinator.

## PRINCIPAL DUTIES

- *Assists SERC's Education Director:* Incumbent will help conceive, design, implement and evaluate education and distance learning programs.

- *Serve as Distance Learning Coordinator:* Develop and implement at lease four video conferences a year that include various ecological principles and ecosystems studied by SERC scientists. Supervise interns and volunteers to ensure projects remain on schedule and are of the quality set by SERC's Education Committee.

- *Conduct Teacher Workshops:* Develop and lead teacher training workshops for New York and Washington area teachers who are interested and involved with Distance Learning programs offered at SERC.

- *Serve as Volunteer Coordinator for Center's education docents and behind the scenes volunteers:* This involves maintaining contact with the Smithsonian's volunteer office and provides records of volunteer/docent applications, number of hours, and work status. This also includes conducting volunteer recruitment, orientation, and training for research and education staff at SERC as well as writing newsletter articles about volunteer activity.

- *Recruit students, teachers, and the public to participate in SERC's Distance Learning education programs:* This includes attending workshops, conferences and fairs to disseminate SERC's education materials and program information, sending fliers and teacher information packets to schools and principals, and communicating with various community organizations by email or telephone.

- *Communicate with Science Coordinators:* Maintain a professional relationship with various key personnel within the school systems of Maryland, Virginia, Washington, DC, and New York and communicate SERC's education programs and relevance to environmental research that address learning outcomes and standards.

- *Coordinate traveling exhibits to schools:* Incumbent will maintain schedule for SERC's traveling exhibit, *Tales of the blue Crab* and subsequent exhibits, and coordinate the setup and take down operations as well as the teacher workshops associated with the school visit.

- *Assist Education Director in preparing grant proposals:* At various times of the year proposals are written to ensure that environmental programs relating to SERC's research are continued and expanded.

KLUGEL V. SAMPER
SI - 0025

EVALUATION FACTORS

**Knowledge/Experience Required by the Position**
A professional knowledge of the principles of environmental sciences.
Ability to communicate through video communication technology
Skill in English composition and editing of written materials.
Knowledge of educational teaching methods and strategies for various age levels.
Experience in techniques of planning, directing and coordinating public outreach programs is desired.
Basic knowledge of computer programs for word processors, data files, email access, and web browsers is necessary. Experience in video equipment is preferred.

**Supervisory Controls**
Works directly under the supervision of the Director of Education. Receives assignments with suggestions for procedures and information about project scope, objectives to be achieved, and expected problems. Supervisor is consulted for advise and guidance as unusual problems arise and for resolving controversial issues. Incumbent participates with supervisor in regular planning sessions to establish priorities. Completed work is evaluated in terms of professional soundness, appropriateness, and conformance to policy.

**Guidelines**
Guidelines follow Smithsonian mission as well as SERC's research and education mission statements. Financial matters and transactions are to be conducted in accordance with SERC and SI administrative policies and procedures. However, guidelines to not cover specific problems or all areas of assignments. Therefore, the incumbent must use judgement to independently determine to what extent guidelines must be extended or adapted.

**Complexity**
Work involves maintaining the connections between research staff, the education staff, and the various visitors who participate in SERC's on-site and outreach programs. This position provides opportunities to become involved with multi disciplinary programs with a wide variety of participants including scientists, educators, volunteers, teachers, students and the public. Statistical summaries of programs and audiences are necessary for future projection and department planning. Work involves interrelated tasks and/or problems that require judgement and/or analysis in adapting precedents and practices where objectives are clearly defined.

**Scope and Effect**
The purpose of the Education Specialist/Distance Learning Coordinator is to contribute to the development and  coordination of the various programs and activities that interpret and disseminate the aquatic, terrestrial, and atmospheric research findings and publications produced by SERC scientists to a local, regional, and national audience. The incumbent is responsible for assessing the effectiveness of assigned projects. The incumbent's work and recommendations impact the operating methods, effectiveness, and cost of SERC's environmental/distance learning education programs.

**Personal Contacts**
The main purpose of contacts outside of SERC is for exchange of mutually beneficial information and to stimulate cooperative ventures that benefit and inform the constituents. Contacts are on a

KLUGEL V. SAMPER
SI - 0026

local, regional, national, and international level for the purpose of disseminating research and education information and establishing collaborations with various organizations.

PURPOSE OF CONTACTS: The incumbent works closely with SERC staff members to improve and plan the education programs and docent training to meet major objectives and with the research volunteers to provide services and assure that their period of service progresses satisfactorily.

**Physical Demands**
The incumbent should be generally familiar with the full array of SERC research and education programs, facilities and projects requiring traveling by walking, boats, field vehicles, and various other means to gain close, hands-on interaction with these activities where students and visitors are working. These activities may require expose to extremes of weather, prolonged heat and cold, wetness, stinging and biting insects, and aquatic animals. Proper precaution should be taken to ensure safety against environmental hazards and exposure to the elements. Travel to other time zones and habitats is required.

**Work Environment**
The work environment is in an office located in the Reed Education Center. Much of the time could be spent outside in the field environment of the terrestrial and aquatic settings of the Chesapeake Bay. Traveling to other parts of the world are also a part of the activities of the position.

Summary of duties and time allocations

IS 9 Ed Specialist/DL Coordinator

| % Time | Description | Hrs/wk |
|--------|-------------|--------|
| 5 | Assists Ed Director | 2 |
| 40 | Distance Learning Coordinator | 16 |
| 20 | Volunteer Coordinator | 8 |
| 10 | Recruit students, teachers, and the public | 4 |
| | | |
| 5 | Communicate with Science Coordinators | 2 |
| 10 | Coordinate traveling exhibits to schools | 4 |
| 5 | Conduct teacher training workshops | 2 |
| 5 | Assist in preparing grant proposals | 2 |
| Total | | Total |
| 100 | | 40 |

**KLUGEL V. SAMPER**
**SI - 0027**

EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3  ----------------------------x

 4  DORATHA KLUGEL,                )

 5          Plaintiff             )    Case No.

 6          V.                    )    06-1886(HRK)

 7  CHRISTIAN SAMPER, Acting      )
    Secretary, Smithsonian

 8  Institution and THE UNITED    )
    STATES OF AMERICA,

 9                                )

            Defendants                Page 1-184

10  ----------------------------x

11

12

13

14          DEPOSITION OF DORATHA KLUGEL

15              Tuesday, May 6, 2008

16                Washington, DC

17

18

19

20  Reported by:  Sherry L. Brooks

21  Job No.  187244

22
```

**Doratha Klugel**

Page 10

1  A.  No.

2  Q.  What did you do, if anything, to prepare

3 for your deposition today?

4  A.  I did not do anything to prepare for my

5 deposition today. I came here today.

6  Q.  You didn't review any documents?

7  A.  No.

8  Q.  Okay. The focus of our discussion today

9 will be on the time that you were employed at the

10 Smithsonian Environmental Research Center, but I'd

11 like to get a little bit of background regarding your

12 employment history.

13      Prior to coming to work for SERC -- which

14 I believe was in 2001; is that correct?

15  A.  Yes.

16  Q.  And when I say SERC, S-E-R-C, I'm

17 referring to the Smithsonian Environmental Resource

18 Center, okay -- Educational Research Center --

19 Environmental Research Center.

20      MR. BYRNES: Just so we're clear, it's the

21 Smithsonian Environmental Research Center.

22      MS. JOHNSON: Yes.

Page 11

1      BY MS. JOHNSON:

2  Q.  When I'm referring to SERC, I'm referring

3 to the Smithsonian Environmental Research Center,

4 okay?

5  A.  Yes.

6  Q.  Prior to being employed by SERC, where

7 were you working?

8  A.  I was working at the Smithsonian's Natural

9 History Museum.

10  Q.  And when did you start your employment

11 there?

12  A.  I began working for the Smithsonian and

13 specifically at the Natural History Museum in July of

14 1993.

15  Q.  And what was your status at the

16 Smithsonian Natural History Museum? Were you a

17 federal employee?

18  A.  I was a federal employee.

19  Q.  Were you full time?

20  A.  I was.

21  Q.  And what were your job -- what was your

22 job title?

Page 12

1  A.  I had two. I started as the assistant

2 manager I believe was my job title. Education

3 specialist was the official title in the exploring

4 marine ecosystems exhibit.

5      And when that exhibit closed, I then

6 became the -- a project manager in the Natural

7 Partners Program, so that would have been 1999 or

8 2000.

9  Q.  And then you began with SERC in 2001; is

10 that correct?

11  A.  Yes.

12  Q.  Why is it that you left the Natural

13 History Museum to work for SERC?

14  A.  Mark Haddon encouraged me to apply for the

15 distance learning coordinator position at SERC and so

16 I did.

17  Q.  Did you know Mr. Haddon previously prior

18 to the time you began working at SERC?

19  A.  I had met him a few times as a colleague.

20  Q.  And so what position did he tell you you

21 should apply for at SERC?

22  A.  Their distance learning coordinator

Page 13

1 position.

2  Q.  And did he explain what kind of status you

3 would have as a distance learning coordinator?

4  A.  What do you mean by status?

5  Q.  Sure. Would you be a federal employee?

6  A.  He explained I would be a trust fund

7 employee.

8  Q.  What did you understand that to mean?

9  A.  It meant I would not be a federal

10 employee, I would be a trust fund employee.

11  Q.  Did the word trust fund employee to you

12 have any meaning regarding whether your status was

13 going to be full time, whether it be permanent?

14  A.  It would be full time and my position

15 would be paid for by grant money.

16  Q.  Did Mr. Haddon ever indicate to you that

17 there was only going to be a certain amount of

18 funding for your position so that the position might

19 terminate on a certain date --

20      MR. BYRNES: By time?

21      BY MS. JOHNSON:

22  Q.  -- at the time you were hired?

4 (Pages 10 to 13)

**Doratha Klugel**

Page 14

1    A.    No. There was grant money for -- there
2 was grant money and we would continue to apply for
3 grants to fund the position.
4    Q.    Did he give you the impression -- or were
5 you under the impression that the position would be
6 indefinite?
7    A.    Yes. I did have the impression.
8    Q.    At any time during your employment with
9 SERC, did your understanding of how long the position
10 might be funded for change?
11    A.    No, though I learned subsequently that Mr.
12 Haddon said that.
13    Q.    How did you learn that?
14    A.    In materials that he provided in response
15 to this case, he provided a termination date for me.
16    Q.    Were you ever aware of any documents
17 called a not-to-exceed appointment that were filled
18 out on your behalf in regards to your employment?
19    A.    I don't remember such documents, no.
20    Q.    I'm sorry to jump around, but just before
21 we go further into SERC, aside from the Natural
22 History Museum, were there any other federal jobs

Page 15

1 that you held?
2    A.    No.
3    Q.    Okay. So just the Smithsonian Natural
4 History Museum and SERC?
5    A.    Yes.
6    Q.    And prior to leaving the Natural History
7 Museum, were you having any problems with your
8 coworkers?
9    A.    No.
10    Q.    Now, what were your responsibilities and
11 duties as the distance learning coordinator?
12    A.    As distance learning coordinator, I
13 coordinated our distance learning programs, which
14 were video conferences, web casts and electronic
15 field trips, so I worked with teachers to develop
16 video conferences and electronic field trips.
17        I worked with our partners to develop
18 those projects to select topics that we would do
19 programs about to develop curriculum to go along with
20 it. I worked with Smithsonian scientists to
21 incorporate their research into the projects.
22        I coordinated between the teachers and the

Page 16

1 Smithsonian scientists. I was also the volunteer
2 coordinator for SERC. That's about it.
3    Q.    What were your responsibilities as the
4 volunteer coordinator?
5    A.    My responsibilities as the volunteer
6 coordinator were to facilitate the registration of
7 new volunteers.
8        So if somebody wanted to become a
9 volunteer at SERC, to interview them and place them
10 in an appropriate lab at SERC, to work with the
11 scientists to keep track of their volunteer hours, to
12 collect those hours from the lab and send those
13 forward to — send them to the downtowns
14 behind-the-scenes volunteer program office.
15    Q.    Were you responsible for recording the
16 time that volunteers spent volunteering at SERC?
17    A.    Unless a volunteer was working
18 specifically for me, I was not responsible for
19 logging their hours.
20    Q.    In 2002 -- 2001 when you began working at
21 SERC, did you have any volunteers working for you?
22    A.    I don't remember who was a volunteer and

Page 17

1 when. Yes, there were volunteers at SERC in 2001. I
2 don't know if there were -- there were volunteers who
3 were behind-the-scenes volunteers and there were also
4 docents who were people that provided educational
5 tours.
6    Q.    Could you spell that, D-O-C-E-N-T? Is
7 that correct?
8    A.    That is correct, yes. Most of the
9 volunteers in the education department were docents
10 and so therefore worked with either Katie Drew
11 (phonetic) or Jane Holley who were the education
12 program people in the education department.
13        So most of the volunteers in the education
14 department would have fallen under them. If there
15 were other volunteers who worked behind the scenes,
16 they primarily would have worked with either Katie or
17 with Jane.
18        And then at some point -- and then whether
19 there would be a volunteer that was specifically
20 working in the distance learning department, in the
21 distance learning part of it, that would be someone
22 who would work directly with me.

5 (Pages 14 to 17)

**Doratha Klugel**

1 forms?

2   A.   I didn't fill out the forms.

3   Q.   Did there come a time that you registered
4 or helped to register Mr. Phillip Yunger as a
5 volunteer with SERC?

6   A.   Yes.

7   Q.   When did that occur?

8   A.   I believe Mr. Yunger was a volunteer for
9 about three years. There was a period of time that
10 he was also an employee at SERC.

11   Q.   Do you know what time that was when he was
12 an employee?

13   A.   No. I don't remember what time that was
14 that he was an employee.

15   Q.   Was that during -- do you recall whether
16 it was during the time that you were also working at
17 SERC in the 2001 period?

18   A.   Yes. It was somewhere between 2001 and
19 2005, yes.

20   Q.   And did you register Mr. Yunger as a
21 volunteer after he left his employment with SERC?

22   A.   I don't remember. I do believe he was a

1 volunteer and then he might have been a staff person
2 and then gone back to being a volunteer. I don't
3 remember for sure.

4   Q.   Okay. Do you know Recep Celikay?

5   A.   Yes.

6   Q.   Did you register Mr. Celikay as a
7 volunteer with SERC?

8   A.   Mark asked me to register him as a
9 volunteer, yes.

10   Q.   R-E-C-E-P, C-E-L-I-K-A-Y. Did you ever
11 send a registration form for Mr. Celikay to the
12 behind-the-scenes volunteer program?

13   A.   I don't remember.

14   Q.   Were you aware of where Mr. Celikay
15 resided permanently during the period of 2004 to
16 2005?

17   A.   I do not know. I think he lived in
18 Pennsylvania. I don't know for sure.

19   Q.   I can represent he did live in
20 Pennsylvania.

21       MR. BYRNES: Objection. I don't think
22 it's appropriate for you to represent facts. I mean,

1 I think if she knows it, she either has knowledge or
2 she doesn't. She said she thinks he lives in
3 Pennsylvania, and that's what we're stuck with unless
4 you've got something you wish to show her that can
5 establish residence.

6       I don't think it's appropriate for counsel
7 to fill in the facts.

8       MS. JOHNSON: I don't think it's
9 appropriate for you to give a three-sentence
10 objection, but I understand the purpose of your
11 objection.

12       MR. BYRNES: Right.

13       BY MS. JOHNSON:

14   Q.   Do you know how many hours Mr. Celikay was
15 volunteering at SERC during the '04 to '05 period?

16   A.   I don't know that he ever became a
17 volunteer officially.

18   Q.   Do you have any understanding as to --
19 well, what's the basis of your belief that he maybe
20 did not become an official volunteer?

21       MR. BYRNES: Objection as to the form.

22       THE WITNESS: Amy Erb and Mark Haddon and

1 I were talking about the upcoming trip to Hawaii to
2 present at a conference. Phillip Yunger was
3 attending as a volunteer.

4       Amy asked Mark Haddon if Ray could go and
5 if he could go with her on the same ticket. Mark
6 said sure, just have him made a volunteer, and as
7 long as he carries one of Phillip's camera bags, he
8 can be an assistant to Mr. Yunger.

9       And Dottie, since you're the volunteer
10 coordinator, you register him as a volunteer. I
11 don't remember if all of that ended up going through.

12   Q.   Did you have any concerns about Mr.
13 Haddon's statement that as long as he was carrying a
14 camera bag he would be a volunteer?

15   A.   Mr. Haddon was the supervisor and knew the
16 policies of SERC and how SERC handled volunteers.
17 He'd been the volunteer coordinator before me, so I
18 assumed he was speaking out of his understanding as a
19 former volunteer coordinator.

20   Q.   Now, during the time that Mr. Yunger was a
21 SERC volunteer, was he working directly for you?

22   A.   Yes.

**Esquire Deposition Services, LLC**
DC 1-800-441-3376       MD 1-800-539-6398       VA 1-800-752-8979

**Doratha Klugel**

Page 38

1    Q.    Do you have any recollection as to how
2    many days you were going to be spending working
3    versus how many days you were going to be on annual
4    leave?
5    A.    I do not. Since it was a trip that never
6    happened, I don't know.
7    Q.    Looking at Exhibit 3, Exhibit 4 and the
8    dates that were indicated for Belize, does that
9    refresh your recollection any as to how many days
10   were going to be annual leave in Belize?
11   A.    Those were the dates of the trip in
12   totality. I don't have a recollection of anything
13   other than that, no.
14   Q.    So Belize was originally scheduled for
15   November 14th; is that correct -- I'm sorry.
16   Panama was originally scheduled to take
17   place November 14th?
18   A.    Yes.
19   Q.    And that didn't happen?
20   A.    Correct.
21   Q.    Could you explain why that didn't happen?
22   A.    I was in a car accident prior to that.

Page 39

1    Q.    When did your car accident occur?
2    A.    November 9th maybe.
3    Q.    And was that something that occurred here
4    in the District of Columbia?
5    A.    No.
6    Q.    Where did it happen?
7    A.    It happened driving home from SERC.
8    Q.    Somewhere in Maryland?
9    A.    Yes.
10   Q.    Can you tell me a little bit about what
11   happened, the car accident?
12   A.    I was T-boned. A car -- I was traveling
13   straight. A car that was stopped at the stop sign
14   pulled out in front of me.
15   Q.    Did your airbags deploy?
16   A.    Yes.
17   Q.    And were you injured as a result of the
18   car accident?
19   A.    Yes.
20   Q.    And what injuries did you have?
21   A.    Contusions to my knees and a broken right
22   arm.

Page 40

1    Q.    Were you in the car alone?
2    A.    Yes.
3    Q.    And so you said the trip never happened.
4    Did you eventually go to Panama?
5    A.    We did eventually go to Panama, yes.
6    Q.    When did you go?
7    A.    We eventually went in February of '05, I
8    believe.
9    Q.    And did you also go to Belize?
10   A.    I did not also go to Belize.
11   Q.    Why not?
12   A.    I was -- a trip -- we were trying to
13   schedule a trip, but I could not go due to work.
14   Q.    Did one of your -- well, who was your
15   supervisor at this time?
16   A.    Mark Haddon.
17   Q.    Did Mr. Haddon tell you you were unable to
18   go to Belize?
19   A.    He told me I was unable to take the time
20   to go.
21   Q.    Were you requesting to go at the same time
22   that you were going to Panama?

Page 41

1    MR. BYRNES: Objection. As to the time.
2    THE WITNESS: No.
3    BY MS. JOHNSON:
4    Q.    When did you request to go to Belize?
5    MR. BYRNES: Objection again as to the
6    time.
7    MS. JOHNSON: I just asked when.
8    MR. BYRNES: But the problem I have is
9    that there are several requests to go -- are we
10   talking about in February? Are we talking about this
11   form?
12   MS. JOHNSON: No. We're talking about
13   after her car accident.
14   MR. BYRNES: We need to specify that.
15   THE WITNESS: I don't remember when it
16   was. It was whenever the tagging project was again
17   happening, but that would have been, I believe, March
18   or April. It was after the Panama trip.
19   BY MS. JOHNSON:
20   Q.    March or April of 2005?
21   A.    Yes.
22   Q.    And do you recall how much time you were

11 (Pages 38 to 41)

**Doratha Klugel**

Page 42

1 requesting to take in March or April of 2005 to go to
2 Belize?
3    A.    It was a couple days. I wasn't going to
4 be able to travel more than that and trying to
5 schedule it around physical therapy.
6    Q.    How long was the Panama trip that
7 eventually happened in February of '05?
8    A.    I don't remember.
9    Q.    More than a few days?
10   A.    Five days maybe. Four or five days.
11   Q.    Were there any other trips -- we're going
12 to talk about your trip to Hawaii.
13      So after Panama in February of '05, were
14 there any other trips that you took before the trip
15 to Hawaii?
16      MR. BYRNES: I'm sorry. I'm not
17 understanding the time frame.
18      THE WITNESS: Could you rephrase?
19      BY MS. JOHNSON:
20   Q.    Sure. When did you go to Hawaii?
21   A.    January.
22   Q.    You took the trip to Hawaii a month before

Page 43

1 the trip to Panama?
2    A.    Yes.
3    Q.    Okay. Sorry. When did you start planning
4 that trip?
5    A.    I don't remember when we started planning
6 that trip. I remember the IG coming to talk to me
7 about that trip in the middle of December, so we must
8 have started planning it before that.
9    Q.    What was the purpose of the Hawaii trip?
10   A.    To present at a conference.
11   Q.    What were you going to be presenting?
12   A.    A paper that I had written.
13   Q.    What was the paper about?
14   A.    Distance learning at SERC.
15   Q.    And you said it was a conference. Do you
16 have any recollection of how long the conference was
17 scheduled to last?
18   A.    I don't remember how long the conference
19 was scheduled to last.
20   Q.    On how many days were you going to have to
21 present the paper?
22   A.    I believe I was just presenting once.

Page 44

1    Q.    Was Project View in any way involved in
2 this trip to Hawaii?
3    A.    Not that I remember.
4    Q.    Were any other SERC employees going to
5 travel with you to Hawaii?
6    A.    Amy Erb.
7    Q.    And who was Amy Erb?
8    A.    She was the coordinator of the Star
9 Program. I'm never going to be able to remember what
10 Star means. Students and teachers in aquatic
11 research or something. She was a fellow employee in
12 the education department.
13   Q.    Was Amy Erb, to your knowledge, going to
14 be presenting at the conference as well?
15   A.    Yes.
16   Q.    Do you have any idea of how long her
17 presentation was scheduled to occur?
18   A.    I don't have any idea of that, no.
19   Q.    And when you say yours was going to be on
20 one day, how many hours in that day, your
21 presentation, your paper presentation?
22   A.    I don't remember how long the presentation

Page 45

1 was. I'm trying to remember if I had a presentation
2 and then also sat on a panel or whether the
3 presentation was part of the panel. I don't
4 remember.
5    Q.    Aside from you and Ms. Erb, were any other
6 SERC employees traveling to Hawaii?
7    A.    No.
8    Q.    What about volunteers?
9    A.    Yes.
10   Q.    Which volunteers were scheduled to travel
11 to Hawaii?
12   A.    Phillip Yunger and Recep Celikay.
13   Q.    And do you have any knowledge of why Mr.
14 Yunger was scheduled to travel to Hawaii?
15      MR. BYRNES: Objection. Asked and
16 answered.
17      MS. JOHNSON: I didn't ask that question.
18      THE WITNESS: He was going as the
19 videographer to photograph and videotape my
20 presentation and Amy's presentations.
21      BY MS. JOHNSON:
22   Q.    Do you have any knowledge of why Mr.

12 (Pages 42 to 45)

**Doratha Klugel**

Page 46

1 Celikay was going to travel?

2       MR. BYRNES: Objection. Asked and

3 answered.

4       THE WITNESS: He was going to help Mr.

5 Yunger.

6       BY MS. JOHNSON:

7    Q.   Now, when you went to Panama, Mr. Yunger

8 went and videotaped, correct?

9    A.   Yes.

10   Q.   Did he have anyone assisting him?

11   A.   No.

12   Q.   Did you have any understanding as to why

13 Mr. Celikay was going to assist him on this trip, the

14 trip to Hawaii?

15       MR. BYRNES: Objection.

16       THE WITNESS: That was for Mark Haddon.

17 You'd have to ask Mark Haddon.

18       MR. BYRNES: Asked and answered.

19       BY MS. JOHNSON:

20   Q.   Did you fill out the travel forms for Mr.

21 Yunger to travel to Hawaii?

22   A.   I believe I did.

Page 47

1       MS. JOHNSON: We'll mark this as Exhibit

2 Number 6.

3       (Exhibit Number 6 was marked for

4 identification and was retained by counsel.)

5       BY MS. JOHNSON:

6    Q.   This is the proposed travel plan form,

7 this is Number 6. Do you recognize this form?

8    A.   I do.

9    Q.   Is that your handwriting?

10   A.   Some of it is, yes. Most of it is.

11   Q.   Okay. Can you identify what is not your

12 handwriting?

13   A.   This personal January 2nd and 10. That's

14 not mine. Some of these stars down here are not

15 mine. $150.40/night is not mine. The actual expense

16 rate is not mine. January 7th – I think that's mine

17 actually. I'm not sure. I think this 550 – $550.70

18 plus 6, I don't think that's mine.

19       ACCS2, that's not mine. On the next page,

20 402040213 is not mine. Obviously the signature is

21 not mine. This January 10/9. This January 3rd.

22   Q.   Looking at this form, does this refresh

Page 48

1 your memory as to what the scheduled dates of your

2 travel to Hawaii were supposed to be?

3    A.   Yes.

4    Q.   What were the scheduled dates for your

5 travel to Hawaii?

6    A.   The 2nd through the 10th.

7    Q.   And was that entire period to be scheduled

8 for work purposes?

9    A.   I think my travel dates the first day on

10 the end and the last day on the end were not, but the

11 rest of it was.

12   Q.   Were those first and last days going to be

13 annual leave?

14   A   I think so.

15       MS. JOHNSON: Let's mark this as Exhibit

16 7.

17       (Exhibit Number 7 was marked for

18 identification and was retained by counsel.)

19       BY MS. JOHNSON:

20   Q.   One question again, regarding Exhibit 6.

21 Does that refresh your memory any as to what date you

22 were going to present your paper?

Page 49

1    A.   No.

2    Q.   Okay.

3    A.   Sometime in that time period.

4    Q.   Looking at Exhibit 7, do you recognize

5 this document?

6    A.   Yes.

7    Q.   Is that your handwriting on the document?

8    A.   Yes.

9    Q.   And this is the proposed travel plan for

10 Mr. Yunger?

11   A.   Yes.

12   Q.   You indicated on purpose of travel that

13 volunteer will pay own expenses. Do you see that

14 statement on the first page?

15   A.   Yes.

16   Q.   Why did you write that?

17   A.   Because the volunteer was going to pay his

18 own expenses.

19   Q.   If he was paying -- did you have any

20 understanding of what the travel requirements were at

21 SERC for a volunteer to travel in order for SERC to

22 pay his or her expenses?

13 (Pages 46 to 49)

**Doratha Klugel**

| Page 50 |
|---|
| 1    A.    I don't understand your question. |
| 2    Q.    Sure. I'll rephrase it. |
| 3          Did you have any understanding of what |
| 4    requirements there were at SERC in order for a |
| 5    volunteer to travel and have SERC pay their expenses? |
| 6    A.    My understanding of what the requirement |
| 7    was for SERC to pay a volunteer's travel was that |
| 8    there be the money for SERC to be able to pay the |
| 9    volunteer's travel. |
| 10    Q.    That's the only requirement you were aware |
| 11 of? |
| 12    A.    And that they fill out an official travel |
| 13 form and be a registered volunteer. |
| 14    Q.    Were there any requirements, to your |
| 15 knowledge, that volunteers had to comply with if, in |
| 16 fact, they were going to pay their own way to travel? |
| 17          MR. BYRNES: I'm sorry. Vague. I don't |
| 18 understand the question. |
| 19          THE WITNESS: Could you rephrase? |
| 20          BY MS. JOHNSON: |
| 21    Q.    Sure. Were you aware of any requirements |
| 22 the volunteers had to comply with if they were going |

| Page 51 |
|---|
| 1 to travel on SERC business but they were going to pay |
| 2 their own way to travel? |
| 3    A.    No. |
| 4    Q.    So why did you complete this form? |
| 5          MR. BYRNES: Objection. Asked and |
| 6 answered. |
| 7          THE WITNESS: So the volunteer could |
| 8 travel. |
| 9          BY MS. JOHNSON: |
| 10    Q.    Well, I just asked you if there were any |
| 11 requirements that the volunteer had to comply with if |
| 12 he or she were going to pay their own travel and you |
| 13 said no. |
| 14          MR. BYRNES: Objection. Argumentative. |
| 15          BY MS. JOHNSON: |
| 16    Q.    So I want to understand why you completed |
| 17 this form if there were no requirements if -- |
| 18          MR. BYRNES: Argumentative, Counsel. |
| 19 You're arguing with the witness. |
| 20          MS. JOHNSON: I am not. I'm asking her to |
| 21 explain something. |
| 22          BY MS. JOHNSON: |

| Page 52 |
|---|
| 1    Q.    I just want to understand if there were no |
| 2 requirements why Mr. -- why you filled out this form |
| 3 for Mr. Yunger to travel if he was paying his own |
| 4 way? |
| 5          MR. BYRNES: Objection. Argumentative. |
| 6 Misstates the testimony. |
| 7          Go ahead and answer, to the extent you |
| 8 can. |
| 9          THE WITNESS: So that he could travel for |
| 10 SERC. In order to be able to travel, you have to be |
| 11 -- in order to be able to travel for SERC, you had to |
| 12 be -- as I said, there has to be the money available. |
| 13 You have to fill out a travel form and you have to be |
| 14 a registered volunteer. |
| 15          BY MS. JOHNSON: |
| 16    Q.    And that's the case even if the volunteer |
| 17 is paying his own way? |
| 18          MR. BYRNES: Objection. Asked and |
| 19 answered. |
| 20          THE WITNESS: Yes. |
| 21          BY MS. JOHNSON: |
| 22    Q.    And when you listed this amount for the |

| Page 53 |
|---|
| 1 cost, how did you arrive at that figure, the $986.70, |
| 2 where you said volunteer pays? |
| 3    A.    I'm assuming what I did was call the |
| 4 travel office and ask what the fare was to Hawaii, |
| 5 what the government fare was to Hawaii, and that's |
| 6 what that amount was. |
| 7    Q.    Was it your understanding that Mr. Yunger |
| 8 as a volunteer who was paying his own way would be |
| 9 entitled to the government rate for travel? |
| 10    A.    I did not know of any reason why he |
| 11 wouldn't be. |
| 12    Q.    Did you ask anyone? |
| 13    A.    I talked with Mark Haddon about Phillip |
| 14 going and whether -- and that Phillip was willing to |
| 15 pay for his airfare, so yes, Mark and I had a |
| 16 conversation about that, yes. |
| 17    Q.    And what did Mr. Haddon state about Mr. |
| 18 Yunger being able to use the government rate? |
| 19    A.    He said it was great if Phillip was |
| 20 willing to pay for it. |
| 21    Q.    Did he say anything about Mr. Yunger using |
| 22 the government rate? |

14 (Pages 50 to 53)

**Doratha Klugel**

Page 66

1    A.    They mentioned that it was not Amy Erb
2 being investigated, it was me being investigated
3 because persons in the travel office did not like my
4 attitude and that they thought that I would be a bad
5 influence on Amy Erb, and so I was being investigated
6 to adjust my attitude so as to no longer be a bad
7 influence on Amy.
8    Q.    Did they indicate who in the travel office
9 did not like your attitude?
10    A.    They indicated Kathie Suite in SERC's
11 travel office. They did not indicate who in the
12 downtown office.
13    Q.    And so you said there was Mr. Simons, Mr.
14 Galligher, and there was a third person you spoke to?
15    A.    Mr. Haddon.
16    Q.    Did they each tell you that same thing
17 regarding the need to -- that someone in travel
18 didn't like you or is that one person who told you
19 that?
20    A.    No. Each one of them told me versions of
21 that story. They did not use all of the exact same
22 words. We were not all together when they told me.

Page 67

1 In the three separate meetings with them, that's what
2 I was told by them.
3    Q.    What was your response?
4    A.    I was hurt. I had worked for the
5 Smithsonian for a very long time and had done my job
6 well and suddenly my credibility had been called into
7 question and attacked.
8    And I was told that the IG's office — I
9 was told by Mr. Simons, Mr. Galligher, and Mr. Haddon
10 that the — Kathie Suite and whoever she was working
11 with in the downtown travel office were using the
12 IG's office to adjust my attitude because they didn't
13 like it.
14    Q.    Did you ever talk to Ms. Suite directly
15 about that?
16    A.    No.
17    Q.    What about anyone else in travel? Did you
18 know anyone else in the travel office at that time?
19    A.    I knew two people in the travel office
20 downtown having traveled before and worked with them.
21 No, I did not talk to anyone in the downtown travel
22 office about that.

Page 68

1    Q.    Who were the persons that you knew in the
2 downtown office?
3    A.    Judy Petrofsky and Carol Ailes.
4    Q.    Okay. So I want to go back to when you
5 spoke with Mr. Roy. You stated that you went into an
6 office space?
7    A.    Yes.
8    Q.    Was this office space in the SERC building
9 where you worked?
10    A.    It was not in the education building where
11 I worked. It was up in the conference building up on
12 the main campus. There was a large conference room
13 and there was a side office.
14    At some point that side office became Mark
15 Haddon's office. I can't remember if at the time it
16 was Mark Haddon's office during that interview or if
17 it became his office afterwards.
18    Q.    And can you describe what the office
19 looked like for me? Were there windows? Was it big?
20 Was it small?
21    A.    It was probably about the size of this
22 room. There was one wall that about half of the wall

Page 69

1 were windows almost from floor to ceiling if not
2 completely from floor to ceiling.
3    Q.    Do you remember what floor it was on?
4    A.    It was on the ground floor. There was
5 just one floor to the building.
6    Q.    And was there an office desk? chairs?
7    A.    If I remember correctly, there was a table
8 with some chairs in one corner. Then in the other
9 corner in front of the windows was the desk and a
10 chair and I think it was like an L-shaped desk and a
11 chair.
12    Q.    And when Mr. Roy was going to speak to
13 you, was anyone else present?
14    A.    No.
15    Q.    Did you request that anyone else be
16 present?
17    A.    No.
18    Q.    And can you tell me – do you remember
19 what time of day it was? Was it the morning? Was it
20 sunny out? Was it evening?
21    A.    It would have been morning or early
22 afternoon. I believe it was before lunch.

18 (Pages 66 to 69)

**Doratha Klugel**

Page 70

1  Q.  And where did you sit?

2  A.  I sat at that L-shaped desk.

3  Q.  Behind the desk?

4  A.  Behind the desk.

5  Q.  And where did Mr. Roy sit?

6  A.  He sat in front of the desk across from

7 me.

8  Q.  Who was closer to the door?

9  A.  He was.

10  Q.  Okay.

11  A.  He was sitting between me and the door.

12  Q.  Did anyone tell you to sit behind the

13 desk? How did you know where to sit?

14  A.  He did. He ushered me to that chair.

15  Q.  Was the door open or closed?

16  A  The door was closed.

17  Q.  And who closed it?

18  A.  I don't know if Mr. Roy closed it or if

19 Mark Haddon closed it on his way out of the room.

20  Q.  And so what did Mr. Roy say to you after

21 you both were seated?

22  A.  He said lots of things. He asked me about

Page 71

1 the trip to Hawaii. He asked me about Mr. Yunger

2 going. He asked me what the nature of the trip was.

3 He asked me the nature of my relationship with Mr.

4 Yunger. He asked me how many boyfriends I have and

5 how many boyfriends I try to sleep with on my travel

6 trips. He -- yes. That's what he asked me.

7  Q.  When he asked you about how many

8 boyfriends you had and how many you had tried to

9 sleep with, what was your response?

10  A  I told him those weren't appropriate

11 questions to ask me.

12  Q.  And what did he say when you said that?

13  A.  He said that I was a tough nut to crack

14 but that he didn't suppose that he had to crack me

15 right there and then.

16  Q.  What was your response to that when he

17 said you were a tough nut to crack but he didn't

18 think he had to crack you right then and there?

19  A.  Honestly, I was frightened. He was

20 sitting between me and the door. I took that as a

21 physical threat. He had laid his badge and his

22 credentials out on the desk and so they were there.

Page 72

1      And he also told me then that even though

2 he didn't feel the need to crack me right there and

3 then I was on his radar screen and the next time that

4 he needed to come out to even talk with me if there

5 were any even further allegations or accusations that

6 he would come out with the red lights flashing and

7 the handcuffs.

8  Q.  Were those his words?

9  A.  Those were his words.

10  Q.  And what was your response?

11  A.  I told him I certainly didn't want to see

12 that happen.

13  Q.  During this time when this interchange was

14 going on -- so he's telling you that he could have

15 red lights and cuffs -- did you ever ask that someone

16 else be brought into the room to participate in the

17 questioning?

18  A.  No.

19  Q.  Did you ever ask him if you could leave?

20  A.  I did not ask him if I could leave. The

21 way he was sitting between me and the doorway seemed

22 fairly obvious I wasn't going to be leaving until he

Page 73

1 said I could leave.

2  Q.  Before he started asking questions, did he

3 ever tell you what the purpose of the questions were,

4 why he was there?

5  A.  He was looking into the Hawaii travel.

6  Q.  Is that what he said to you?

7  A.  Yes.

8  Q.  And did you have any questions for him

9 about what in particular about the Hawaii travel he

10 wanted to know about?

11  A.  I did ask him what were the exact

12 questions about the Hawaii travel so I could try to

13 answer them. I also asked him about the Panama

14 travel that was going to be rescheduled, and he said

15 the Panama travel was fine, there was never a problem

16 with the Panama travel.

17  Q.  Did he mention Amy Erb during this

18 conversation at all?

19  A.  Yes, because he said it wasn't appropriate

20 for Amy and I to be taking our boyfriends on travel.

21 I believe he used her name.

22      MR. BYRNES: Can we take a break? We've

19 (Pages 70 to 73)

**Page 74**

1 been at this for a little while.

2          MS. JOHNSON: Sure. This is a good time.

3          MR. BYRNES: Ten minutes?

4          MS. JOHNSON: That's fine.

5          (A break was taken.)

6          BY MS. JOHNSON:

7     Q.   Ms. Klugel, we were discussing your

8 questioning by Mr. Roy, and I just wanted to be sure

9 that I'm getting everything that you recall Mr. Roy

10 saying to you.

11          When he asked about the nature of your

12 relationship with Yunger, do you remember his precise

13 words, how he phrased that at all?

14    A.   I don't remember his precise words. I

15 don't remember his precise words. He asked me what

16 my relationship was to Phillip Yunger or Phillip

17 Yunger's relationship to me.

18    Q.   And did he ask you any other specific

19 questions about Mr. Yunger that you recall?

20    A.   I'm trying to remember back. I'm thinking

21 back to what he asked me. He may have asked me

22 directly if he was my boyfriend because then the next

**Page 75**

1 question was how many other boyfriends am I arranging

2 travel trips for; how many other men am I sleeping

3 with on travel trips.

4     Q.   And what was your response to those

5 questions?

6     A.   They weren't appropriate questions to be

7 asking me, and that yes, I didn't appreciate having

8 — he basically called me a whore in that interview,

9 and I didn't appreciate being called -- being

10 insulted like that.

11    Q.   Did he use those words, whore?

12    A.   He did not use the words whore, no. He

13 just asked me how many boyfriends I have and how many

14 men I sleep with on travel trips.

15    Q.   I just want to be clear. You said that

16 those were not appropriate questions. Is that how

17 you responded to him at the time or did you give him

18 actual responses?

19    A.   No. I told him those were not appropriate

20 questions to be asking me.

21    Q.   And what was his response when you said

22 that?

**Page 76**

1     A.   That I was a tough nut to crack but that

2 he didn't have to crack me right there and then.

3     Q.   And you said you took that as a physical

4 threat?

5     A.   Yes.

6     Q.   Did you have any other understanding of

7 what he was meaning when he said that to you? What

8 was your understanding, aside from it being a

9 physical threat?

10    A.   That was my understanding of it, you're a

11 tough nut to crack; I don't have to crack you right

12 now. I didn't see how else to take that.

13    Q.   Okay. Do you recall any other specific

14 questions that you thought were inappropriate, aside

15 from the questions about you and Mr. Yunger and how

16 many boyfriends you had?

17    A.   He asked me questions about what made me

18 think that this travel was okay or what made me think

19 that this travel was approved. What made me think

20 that this travel passed the smell test. He did use

21 the word smell test, and I replied the approval of my

22 supervisor.

**Page 77**

1     Q.   And did he accept that response or did he

2 continue asking those same types of questions?

3     A.   I don't know whether he accepted the

4 answer or not. That would be something only he would

5 be able to speak to, but that was part of at least a

6 20- or 30-minute conversation that we had.

7     Q.   So this conversation lasted about 20 to 30

8 minutes total?

9     A.   Yes.

10    Q.   Was it just the two of you during that

11 entire time?

12    A.   Yes. He does ask specific questions about

13 Mr. Yunger being a volunteer. What were Mr. Yunger's

14 credentials for being a volunteer, what were his

15 credentials for performing his volunteer duties.

16    Q.   Did you answer those questions?

17    A.   Yes.

18    Q.   What were your responses to that?

19    A.   That Mr. Yunger was a volunteer and that

20 he had been registered as a volunteer for several

21 years at that point, that Mr. Yunger was a

22 videographer and a photographer for the department

20 (Pages 74 to 77)

**Doratha Klugel**

Page 78

1 and had been for several years.

2        I believe Mr. Roy asked questions about

3 Mr. Yunger attending the conference, and I described

4 that Mr. Yunger had a press pass which allowed him to

5 attend conferences. Mr. Roy asked me to produce

6 documentation of that press pass.

7    Q.   Did you do that?

8    A.   Yes.

9    Q.   When did you provide that to him? Was it

10 the same day?

11   A    The same day.

12   Q.   Did he give you an explanation as to why

13 he was asking if Mr. Yunger could attend the

14 conference?

15   A.   I believe the question had been raised

16 about why Mr. Yunger had not paid a registration fee.

17   Q.   And when he asked about the nature of your

18 relationship with Mr. Yunger, did you give him a

19 response to that question?

20   A.   I believe I told him the nature of our

21 relationship was that Phillip was a volunteer in the

22 education department; that I was the volunteer

Page 79

1 supervisor; that Phillip did volunteer work

2 specifically for the distance learning program; and

3 that yes, Phillip Yunger was my boyfriend as well.

4    Q.   And did you ever indicate to him – well,

5 did he ever indicate to you whether or not he already

6 knew that Mr. Yunger was your boyfriend?

7    A.   I don't know what he knew before he asked

8 me the question, no.

9    Q.   How long had you and Mr. Yunger been

10 dating at that point?

11       MR. BYRNES: Objection. Relevance.

12       Go ahead and answer.

13       THE WITNESS: Three years.

14       BY MS. JOHNSON:

15   Q.   Was that – did you understand that

16 employees at SERC knew that the two of you dated

17 about three years?

18       MR. BYRNES: Objection. Assumes facts not

19 in evidence.

20       THE WITNESS: Could you ask that again?

21       BY MS. JOHNSON:

22   Q.   What I'm trying to get at is whether or

Page 80

1 not you had any knowledge that other employees knew

2 that you and Mr. Yunger were girlfriend and

3 boyfriend?

4    A.   I don't know what other people's knowledge

5 of our relationship was.

6    Q.   Did you think that was an inappropriate

7 question about Mr. Yunger, the nature of your

8 relationship?

9    A.   It concerned me, yes.

10   Q.   Why did it concern you?

11   A.   How far the inappropriate questioning was

12 going to go. There was certainly precedent at SERC

13 for family members and significant others to travel

14 and to participate in the research of SERC employees,

15 the assistant director, for example.

16   Q.   But you answered that question whereas

17 with others you told him they were inappropriate?

18   A.   Yes.

19   Q.   So why did you answer that question?

20   A.   There was nothing to hide.

21   Q.   Were there any other inappropriate

22 questions, aside from what you've told me, that you

Page 81

1 recall that Mr. Roy was asking you?

2    A.   Yes. Aside – other than specifics about

3 my sex life and who I was seeing the inappropriate

4 questions revolved around that area.

5    Q.   What type of questions did he ask you

6 about your sex life?

7    A.   How many boyfriends I have; how many of

8 them I'm trying to sleep with on trips.

9    Q.   And what he did he ask you specifically

10 about who you were seeing, aside from Mr. Yunger?

11   A.   He asked me how many other boyfriends do

12 you have. How many other boyfriends are you trying

13 to arrange travel for. How many other boyfriends are

14 you sleeping with while you're on travel.

15   Q.   Aside from those questions, anything else?

16   A.   No.

17   Q.   And you said that the meeting lasted about

18 20 or 30 minutes. Did anyone come in during that

19 period of time?

20       MR. BYRNES: Objection. Asked and

21 answered.

22       THE WITNESS: No.

21 (Pages 78 to 81)

**Doratha Klugel**

Page 82

1       MS. JOHNSON: Let's mark this as Exhibit
2 10.
3       (Exhibit Number 10 was marked for
4 identification and was retained by counsel.)
5       BY MS. JOHNSON:
6    Q.   Ma'am, what's been marked as Exhibit 10 is
7 the complaint you filed in this case?
8    A.   Yes.
9    Q.   If you could take a minute to look through
10 it, but my question is going to be directed to
11 paragraph 12 on page 3.
12       And my specific question is, you indicate
13 that on December 14th, 2004, S.A. Roy, an acting
14 director of SERC, Mr. Tuck, T-U-C-K, Hines questioned
15 Ms. Klugel on her travel arrangements with Mr.
16 Yunger.
17       I just want to be clear, did Mr. Hines
18 question you on that date regarding your travel with
19 Mr. Yunger?
20    A.   No.
21    Q.   What was your basis for writing this in
22 the complaint for including that allegation?

Page 83

1    A.   That Tuck Hines is the acting director of
2 SERC and that these things were going on while he was
3 acting director.
4    Q.   But he did not personally question you?
5    A.   No.
6    Q.   So tell me how the first meeting with Mr.
7 Roy came to an end.
8    A.   He told me that I was on his radar screen;
9 that if there were any other accusations or
10 allegations against me he would come out with the red
11 lights flashing and the handcuffs; and that -- and
12 then at that point he asked me to go get a copy of
13 Phillip Yunger's press credentials and provide those
14 to him, which I then went and did and brought them
15 back.
16    Q.   When you left the office, did you speak
17 with anyone about the fact that Mr. Roy had been
18 asking you inappropriate questions before you came
19 back to give him the press credentials?
20    A.   Not before I came back to give him the
21 press credentials, no.
22    Q.   And when you -- before you left, did he

Page 84

1 tell you if he was speaking to other people about the
2 travel, if he was going to be speaking with other
3 employees?
4    A.   Well, I had seen him speaking speak with
5 Mark Haddon. I'd seen him speak with Amy Erb. When
6 I came back to bring the press credentials, he was
7 speaking again with Mark Haddon.
8       He didn't say anything else about whether
9 he was speaking to anybody else at SERC.
10    Q.   How did you see him speaking to Amy Erb?
11    A.   I saw Mark Haddon take Amy Erb in to speak
12 with him.
13    Q.   And so whether you went back in and Mr.
14 Haddon was there to give the press -- let me rephrase
15 it.
16       You went back in the room to give Mr.
17 Yunger's press credentials and Mr. Haddon was there.
18 Did you say anything to Mr. Haddon about the fact
19 that you felt Mr. Roy had asked you inappropriate
20 questions?
21    A.   I did not say anything at that moment to
22 Mr. Haddon about it. I said that to Mr. Haddon

Page 85

1 later.
2    Q.   And what did you say to Mr. Roy, if
3 anything, when you gave him the press credentials?
4    A    I believe I just gave him the press
5 credentials and that was it.
6    Q.   Did he say anything to you when you came
7 back?
8    A.   I don't remember.
9    Q.   Did you get someone -- did you try to look
10 for someone to go back with you into the room to give
11 him the press credentials before you returned?
12    A    No.
13    Q.   And did you speak to him again that day?
14    A.   I don't believe I did. I believe it all
15 happened that morning.
16    Q.   And so after he left, what was the next
17 thing that happened regarding -- or what were you
18 informed of was happening regarding this questioning
19 about the Hawaii trip?
20    A.   That day I don't remember -- I believe
21 that day we were informed that neither Phillip Yunger
22 nor Recep Celikay would be traveling to Hawaii as

22 (Pages 82 to 85)

**Doratha Klugel**

Page 86

1 volunteers, so that's what came out of that day.

2       Then at some point -- and I don't remember

3 if it was that day or if it was several days later --

4 Mark Haddon met with me to talk about the IG

5 investigation, and he had told me that I had brought

6 all of this investigation on everyone and that people

7 at SERC were very unhappy with me because of it and I

8 had brought it on because of my attitude and that

9 that -- my bad attitude caused disease in my body and

10 that I should -- I needed to think about that and

11 maybe seek treatment for that.

12       He was reconsidering our travel to Panama

13 because of all of this. I told him that I had asked

14 Mr. Roy specifically about the trip to Panama and Mr.

15 Roy said it was fine, Panama was never a problem.

16       And I told him the threats that Mr. Roy

17 had made against me, the inappropriate questions he

18 had asked, the way he sat between me and the doorway

19 so I didn't feel I could leave the room and what the

20 threat of being arrested the next time there was even

21 so much as a question or an allegation or an

22 accusation against me.

Page 87

1   Q.   What were Mr. Haddon's responses when you

2 told him that?

3   A.   Mr. Haddon said I was the only one in the

4 room, other than Mr. Roy, and so I was the only one

5 that could say what did or did not happen in there.

6   Q.   Is that all he said?

7   A.   Yes. Since I was the only one in the room

8 with Mr. Roy, all he had was what I said.

9   Q.   You said Mr. Haddon stated to you that

10 your bad attitude had caused disease in your body?

11   A.   Yes.

12   Q.   Did you have any understanding as to what

13 he was referring to?

14   A.   I did not, but he told me that he had

15 several books that I could read if I was interested,

16 and he was telling me this because he would lend me

17 these books if I wanted to read them about how this

18 bad attitude caused disease in my body.

19   Q.   Did Mr. Haddon indicate that he believed

20 you had a disease?

21   A.   He said your bad attitude is causing

22 disease in your body and I have these books you can

Page 88

1 read about it if you want to take steps to correct

2 it.

3   Q.   Had you ever told Mr. Haddon you had any

4 kind of physical or any kind of disease?

5   A.   Mr. Haddon knew I had irritable bowel

6 syndrome.

7   Q.   And how did he know that?

8   A.   His wife also had it, and so we had talked

9 about how he understood what I have going through. I

10 knew about his wife's condition.

11   Q.   Now, you said that you told Mr. Haddon

12 that Mr. Roy had told you that the trip to Panama was

13 okay?

14   A.   Yes.

15   Q.   Had you told Mr. Roy that Mr. Yunger had

16 been scheduled to go to Panama as well?

17   A.   Yes. I specifically asked Mr. Roy if the

18 Panama trip was okay and if Phillip going was okay,

19 and he said, yes, that was never a problem.

20   Q.   Did he ever explain to you what the

21 problem had been with the Hawaii trip?

22   A.   No. I didn't understand then. It seemed

Page 89

1 to be the problem was that Phillip was willing to pay

2 for his own plane ticket that had caused the problem.

3 Mr. Simons and Mr. Galligher subsequently when I went

4 to them to talk to them and tell them what Mr. Roy

5 had said to me, they had said that Kathie Suite and

6 whoever she was working with downtown in travel had

7 not liked my attitude.

8       They had decided around the Panama and

9 Belize trip that that was the type to adjust my

10 attitude and calling the IG was the way to do it, but

11 then when that trip got indefinitely postponed, they

12 lost that opportunity.

13       And then with the Hawaii trip, the Hawaii

14 trip then became the opportunity to call the IG as

15 they had -- to have the IG come out and talk to me.

16   Q.   Now, earlier I asked you about the size of

17 the room and I made the mistake that I asked you not

18 to make, which was not to gesture and not to -- to

19 make sure that everything is very clear for the

20 record.

21       So when you say this room, looking at this

22 a month from now, we won't be able to tell how big

23 (Pages 86 to 89)

Page 94

1    BY MS. JOHNSON:
2    Q.    Okay. Now, did Mr. Roy ever say to you
3 that he believed you had committed a crime?
4    A.    He said to me that he was investigating
5 fraud. I'm trying to think of the other words that
6 he used, that the crimes -- he was investigating
7 whether crimes had been committed such as fraud,
8 falsification of documents, yes. Those words.
9    Q.    Did he ever directly tell you, Ms. Klugel,
10 you've committed a crime?
11    A.    No.
12    Q.    Did he ever say to you that you could
13 possibly go to jail?
14    A.    Other than when he said he could come out
15 and arrest me?
16    Q.    Well, I think you said he said I'll come
17 back with the lights flashing and the handcuffs?
18    A    Correct.
19    Q.    Did you understand him to be saying that
20 he could arrest you?
21    A.    Yes, and take me to jail.
22    Q.    Did he ever threaten you and say, you

Page 95

1 know, I'm going -- this is going to be a result of --
2 this is going to result in criminal prosecution where
3 you will do jail time, those kind of words, aside
4 from the lights flashing and handcuffs?
5    A.    If crimes had been -- he was coming to
6 find out if crimes had been committed, crimes such as
7 fraud or falsification of documents. Did he then say
8 if you are found to be guilty of that then there will
9 be a trial and you will be convicted and you will go
10 to jail? No, he did not say those words. He just
11 said handcuffs and red lights flashing.
12    Q.    Did Mr. Hines ever question you about your
13 trip to Hawaii?
14    A.    Mr. Hines did not, no.
15    Q.    Did you ever have any conversations with
16 Mr. Hines about the Hawaii trip?
17    A.    I did not have any conversations with Mr.
18 Hines. I had conversations with Mr. Galligher and
19 Mr. Simons and Mr. Haddon.
20    Q.    And who was Mr. Hines to you at this time
21 during the 2004, 2005 period?
22    A.    Tuck Hines was the assistant director of

Page 96

1 SERC. Ross Simons was the director but had been
2 unusually absent and no one knew where he was, and in
3 times that Mr. Simons was not available, then Tuck
4 Hines was assistant director and acting director.
5    Q.    Do you know if Mr. Hines had knowledge
6 that you were being questioned about the trip to
7 Hawaii?
8        MR. BYRNES: Objection. Calls for her to
9 speculate.
10        Go ahead and answer, if you can.
11        THE WITNESS: When I met with Mr. Hines, I
12 can say what Mr. Hines told me. When I met with Mr.
13 Hines, Mr. Hines had said that he had intentionally
14 stayed out of the investigation, that he had
15 intentionally stayed out of the investigation, but
16 that afterwards he had told me what he had been told
17 about the investigation.
18        BY MS. JOHNSON:
19    Q.    When did you meet with Mr. Hines? Do you
20 recall how long -- was it after the questioning?
21    A.    It was after the questioning.
22    Q.    You eventually left SERC in what year --

Page 97

1        MR. BYRNES: Well, we asked a series of
2 compound questions before she answered. I just want
3 to make sure we're clear on the record.
4        Are you asking her when she met with Mr.
5 Hines and then was it after the investigation or --
6 in other words, are you finished with your question?
7        MS. JOHNSON: No. I'm asking a separate
8 question. I want to try to narrow down the time you
9 maybe spoke with Mr. Hines.
10        BY MS. JOHNSON:
11    Q.    So you were questioned in December?
12    A.    Yes.
13    Q.    I believe you left SERC in March of '05.
14 Am I right?
15    A.    I believe May.
16        THE REPORTER: Excuse me --
17        MR. BYRNES: Wait a minute. In order to
18 keep the court reporter from losing her sanity, I
19 think we need to restart the series of questions
20 because it was getting -- that was my point in my
21 objection. I was kind of losing where you were in
22 your question.

25 (Pages 94 to 97)

Page 98

1      MS. JOHNSON: That's fine. Can you read
2 the last question and answer that you have?
3      (The reporter read back the requested
4 testimony.)
5      BY MS. JOHNSON:
6      Q.   What date did you leave SERC as an
7 employee?
8      A.   It was the beginning of May, May 2nd
9 maybe, 2005.
10     Q.   And I believe you had said you had a
11 meeting with Mr. Hines; is that correct?
12     A.   I did not meet with Mr. Hines. I met with
13 Mr. Simons and I met with Mr. Galligher.
14     Q.   Okay. And so the meeting with Mr. Simons,
15 I'm trying to pinpoint when that could have happened.
16 Was it after the time you spoke to Mr. Roy?
17     A.   That was -- I spoke with Mr. Simons and
18 Mr. Galligher after I spoke with Mr. Roy about my
19 conversation with Mr. Roy.
20     Q.   And do you remember whether it was in May
21 when you were leaving? Was it before that?
22     A.   Maybe the -- sometime in December or the

Page 99

1 beginning of January. I believe it was before we
2 even went to Hawaii, which was the beginning of
3 January that I met with Mr. Simons and Mr. Galligher.
4 Though I'm not 100 percent sure about that.
5      And it would depend on when it was Mr.
6 Simons came back after being away for a while.
7      Q.   Okay. And you've already indicated some
8 of the specifics of your discussion with Mr. Haddon
9 about the fact that you felt Mr. Roy had asked you
10 inappropriate questions.
11     I want to take now your conversation with
12 Mr. Simons. Did you inform him that you felt Mr. Roy
13 had acted inappropriately?
14     A.   Yes.
15     Q.   And what did you tell him?
16     A.   I told him what Mr. Roy had said to me
17 asking about questions about my sex life, implying
18 that I was sleeping around -- I was arranging travel
19 to sleep with men on the trips and that Mr. Roy had
20 told me that -- right.
21     He was going to try to crack me and come
22 out with the handcuffs and the red lights flashing if

Page 100

1 there was even so much of another question about me.
2 If he had to come back and talk to me that's how he
3 was going to come back out.
4      Q.   And what was Mr. Simon's response?
5      A.   Mr. Simons said that it was Mr. Simon's
6 understanding that I was now what he would call a
7 marked employee, meaning I was one step away from
8 either being fired or having to resign.
9      He then told me again that this had
10 happened because Kathie Suite didn't like me, worked
11 with someone downtown in travel looking for a reason
12 to be able to call the IG about me; that they had not
13 -- that Kathie Suite had not gone through proper
14 channels if she had questions about my travel; and
15 that she and whoever downtown viewed me as a
16 character from the movie Grease.
17     I was Rizzo with a black jacket and
18 smoking cigarettes and that I was trying to corrupt
19 Sandra Dee and that was Amy Erb.
20     Q.   Okay. Did Mr. --
21     MR. BYRNES: Counsel, I don't see much
22 humor in that.

Page 101

1      THE WITNESS: It was not funny.
2      BY MS. JOHNSON:
3      Q.   I'm sorry. The laughter wasn't about what
4 you said. It was in reference to the characters you
5 identified because I've seen the movie.
6      Did he say who had told him that it was --
7 that you were a marked employee? Because you said it
8 was his understanding that you were now a marked
9 employee. Did he say who he got that from?
10     A.   No. that was just his understanding and
11 that I should stay at my desk and keep my head down.
12     Q.   That's what Mr. Simons said to you?
13     A.   Yes.
14     Q.   What was your response?
15     A.   I was very upset and he -- yes. He could
16 see that I was very upset and that's when I said to
17 him, you know, what has happened from the
18 investigation? What has been the ruling?
19     He's like, well, there wasn't anything
20 ever that came out of it. There was no wrongdoing
21 that was found. Nobody at SERC thinks that you have
22 done anything wrong. Nobody at SERC thinks that you

26 (Pages 98 to 101)

Page 102

1 were trying to defraud the government or thinks you
2 were falsifying documents. In order to avoid being
3 fired or having to quit, I should sit at my desk and
4 keep my head down.
5    Q. Looking at Exhibit 10, which is your
6 complaint, paragraph 14, which is on page 4, it
7 states on January 12th, 2005, Mr. Hines told Ms.
8 Klug. that she is one step away from being a marked
9 employee. The statement was suggesting not only
10 adverse action but potential criminal prosecution.
11       Is it your recollection that Mr. Hines
12 specifically told you that you were one step away
13 from being a marked employee?
14    A. No. It was Mr. Simons.
15    Q. Okay. And so -- did Mr. Simons state to
16 you that you were a marked employee?
17    A. Yes. One step away from being fired or
18 having to be -- or having to resign.
19    Q. Did he say that to you directly or did he
20 say that was his understanding?
21    A. He said to me directly that that was his
22 understanding.

Page 103

1    Q. Okay. Now, you said you also had a
2 conversation with Mr. Galligher. When did you —
3 would that have been around the same time in January
4 or February?
5    A. Yes or late December.
6    Q. And what did you tell Mr. Galligher?
7    A. I told Mr. Galligher the same things, my
8 conversation with Gerry Roy, the things that Gerry
9 Roy said to me and that I asked him if he would
10 review my travel documents to Panama because I didn't
11 want Mr. Roy to come back out with the red lights or
12 the handcuffs and so would he please do that.
13       He said that he would be happy to and that
14 he apologized as well, that it should be Kathie Suite
15 that was looking over my travel to make sure
16 everything was in order but that she wasn't because
17 she didn't like me and was waiting for me to make a
18 mistake and again work with whomever she was working
19 with downtown in the travel office to then report
20 that mistake to the IG and that they -- neither
21 Kathie nor whoever she was working with had gone
22 through appropriate channels.

Page 104

1       He said, didn't go through appropriate
2 channels, that if Kathie had had questions, she
3 should have gone to my supervisor. If she had had
4 questions, she should have gone to Bob Galligher, who
5 was her supervisor. If she wasn't happy with that,
6 she should have gone to Mr. Simons, or if Mr. Hines
7 was acting as director, she should have gone to him
8 but that none of those things happened.
9       So he was willing to provide that
10 assistance for me in looking over my travel forms
11 before we turned anything in to Kathie.
12    Q. Did you have problems with Ms. Suite that
13 you were aware of prior to the OIG coming out to
14 question you?
15    A. Yes.
16    Q. What problems were those?
17    A. We had personality issues. We had issues
18 in personality. Yes. We had differences in
19 personality.
20    Q. Had you ever had any occasion to scream at
21 Ms. Suite?
22    A. I never screamed at Ms. Suite.

Page 105

1    Q. Did she ever scream at you?
2    A. She never screamed at me, no.
3    Q. How were your interactions? Were they in
4 person?
5    A. No. Ms. Suite was up at the what we call
6 the main campus, so her office was up in the main
7 administration building. My office was down in the
8 education building, and so she would E-mail me and I
9 would generally E-mail her back. That's how we
10 mainly went, through E-mail.
11    Q. When you say there were personality
12 conflicts, how did those come out? How were those
13 expressed, in E-mail?
14    A. Yes, tones in E-mail. I would notice that
15 other person's travel would get processed quickly or
16 differently than mine. When there were the times
17 that we did speak on the phone, they were tense.
18    Q. And had you ever spoken to her on the
19 phone and there weren't problems? I guess my
20 question is, every time you interacted with her, do
21 you recall like there being this tension?
22    A. No. I noticed the tension building around

27 (Pages 102 to 105)

Page 106

1 the travel to Panama.
2       In November, there was a period of time --
3 we were traveling again with Project View, the
4 Schenectady City School District. She needed
5 documentation from me that the Schenectady City
6 School District wasn't a foreign government because
7 we weren't allowed to take money from foreign
8 government.
9       There would be these weird random requests
10 for documentation that I didn't understand. She did
11 not appreciate my being confused and asking about
12 those, so I really noticed her tension building up
13 around that Panama trip, but no, not every time we
14 spoke or E-mailed was there an issue.
15   Q.   Had you had any discussions with Mr.
16 Haddon about the issues you were having with Ms.
17 Suite?
18   A.   Ms. Suite E-mailed Mark Haddon and said
19 that she wanted to talk to Mark about my attitude,
20 and as far as I know, Mark didn't talk to her. What
21 he did was he sent the E-mail to me. I felt bad.
22       I called her and said -- and this was

Page 107

1 right around whenever the Smithsonian teacher's open
2 night was, so I won't be able to give you a date, but
3 I remember it being around then because I remember
4 telling -- at that event telling Mr. Haddon.
5       I called Kathie and said -- apologized for
6 any way that I had made her feel uncomfortable or had
7 expressed this attitude to her and was there some way
8 that we could resolve this and work passed it. She
9 said everything was fine and thanked me for calling.
10   Q.   Did Mr. Haddon ever suggest to you that
11 you take an anger management course?
12   A.   He did not. I volunteered to take a
13 course that was called how to handle people with tact
14 and skill. That was of my own initiation. No one at
15 SERC suggested I do that.
16   Q.   Why did you decide to take that course?
17   A.   Because I was concerned if Kathie Suite
18 was having problems with working with me, I wanted to
19 do everything I could to better the working
20 relationship.
21   Q.   Do you remember the time frame that you
22 took that course?

Page 108

1   A.   I don't remember the time frame.
2   Q.   Were there any other persons, aside from
3 Mr. Simons and Mr. Galligher and Mr. Haddon, that you
4 talked to about the conversation that you had had
5 with Mr. Roy?
6   A.   No.
7   Q.   And what happened after that occurred in
8 terms of -- I know that's vague, so I want to try to
9 narrow it down -- in terms of the OIG's looking into
10 your travel? Were there any other actions that you
11 were aware of that they were taking in regards to
12 your travel?
13   A.   No one from the IG's office let me know if
14 that were the case and so that was part of why I was
15 talking with Mr. Haddon and Mr. Galligher and Mr.
16 Simons that it never -- it was never -- that loop was
17 never closed.
18       If there was a file about it or something,
19 nothing was ever closed. There was never any --
20 what's the word I'm looking for? There was never any
21 decision that came out of it, other than -- about me.
22       And so it seemed like it didn't go

Page 109

1 anywhere else, but it didn't go away, and Mr. Roy had
2 told me you're still on my radar screen and so it was
3 still there just waiting for somebody to call the
4 IG's office again.
5       So I expressed my concern to Mr. Haddon
6 and Mr. Galligher and Mr. Simons that it had not gone
7 away and I was still on this radar screen of the IG's
8 office and hadn't been found guilty of anything but
9 hadn't been cleared either.
10   Q.   After that day that Mr. Roy spoke to you,
11 did he or anyone else ask you any questions about
12 your relationship with Mr. Yunger?
13   A.   Not that I recall, no.
14   Q.   What about any inappropriate questioning
15 about your sexual partners or behavior? Anyone else
16 after that day make those -- ask you those kind of
17 questions?
18   A.   Nobody else asked me those kinds of
19 questions, no.
20   Q.   I'd like to show you paragraph 12 of your
21 complaint, which is Exhibit 10, specifically
22 paragraph 12 is on page 3. And it states, during

28 (Pages 106 to 109)

**Doratha Klugel**

Page 110

1 December of 2004, Special Agent Gerry Roy and Mr.
2 Hines continued to harass Ms. Klugel about her
3 boyfriend Mr. Yunger and made remarks to Ms. Klugel
4 and to others about Ms. Klugel's sexuality.
5          Aside from that day that Mr. Roy
6 questioned you, were there any other instances that
7 you were aware of that he — well, were there any
8 other harassment or questioning aside from that one
9 day?
10    A.    About my sex life, no.
11    Q.    About your boyfriend and about your
12 sexuality.
13    A.    There were no further questions about my
14 sex life or my boyfriend from that day, no.
15    Q.    And Mr. Hines, did he in any way harass
16 you about your boyfriend or your sexuality?
17    A.    Mr. Hines, no.
18    Q.    And it says that there were remarks made
19 to you and to others about your sexuality. Are you
20 aware of any remarks that Mr. Hines or Mr. Roy made
21 to others about your sexuality?
22    A.    Well, Mr. Roy and his comments to Mr.

Page 111

1 Simons about what had happened in the investigation,
2 this whole thing about how I was Rizzo and I was
3 trying to corrupt Sandra Dee. Those were comments
4 that Mr. Roy had with Mr. Simons. I don't know the
5 rest of the extent of that conversation.
6    Q.    Okay. Also on paragraph 12, the last
7 sentence, the Smithsonian thereafter continued to
8 make inappropriate and unreasonable inquiries into
9 Ms. Klugel's personal life and her relationship with
10 Mr. Yunger and thereafter attempted to portray Ms.
11 Klugel as unchaste, U-N-C-H-A-S-T-E.
12          What was the basis for that allegation?
13 What facts do you support that statement with?
14    A.    That was all of the questioning that
15 stemmed out of my questioning with Mr. Roy and then
16 the fact that that questioning never went away, that
17 it never got resolved. It never got closed. It
18 never went away. I was just told that me and my
19 behavior was on his radar screen.
20    Q.    Paragraph 16, the second sentence states,
21 Mr. Hines, S.A. Roy, and others reiterated
22 disparaging remarks about Ms. Klugel which they knew

Page 112

1 to be untrue or which were made with reckless
2 disregard as to the truth or falsity of such
3 statements.
4          Do you have any knowledge of any
5 statements that Mr. Hines made about you that were
6 disparaging?
7    A.    I don't know what Mr. Hines said, no.
8    Q.    And when you were referring to Mr. Roy,
9 what statements are you referring to?
10    A.    I'm referring to the original statements
11 from the December investigation and then questions by
12 Mr. Haddon and Mr. Galligher.
13    Q.    Okay. Aside from the questioning on that
14 day, were there any other actions that the
15 Smithsonian took against you or that you felt were
16 taken against you regarding the travel?
17    A.    What do you mean by that?
18    Q.    Sure.
19    A.    It seems open-ended.
20    Q.    Okay. Mr. Roy came and questioned you.
21 You said it was kind of open and left out there, but
22 were there any other actions like did Mr. Haddon say

Page 113

1 I'm going to cancel the trip?
2    A.    Yes.
3    Q.    Okay. When did that happen -- did he say
4 it was because of the Hawaii trip?
5    A.    Yes. Mr. Haddon cancelled the Panama —
6 rescheduled the Panama trip.
7    Q.    But you went to Panama, correct?
8    A.    Correct.
9    Q.    So I'm sorry. I'm just not clear. If he
10 cancelled it, how did you go?
11    A.    His decision got reversed.
12    Q.    Okay. Any other incidents like that?
13    A.    Well, there's the cancelling of the Panama
14 trip, and that Panama trip again was with Project
15 View. That trip got cancelled. Project View was
16 very unhappy. They communicated that unhappiness to
17 Mr. Haddon. The trip was reinstated. Then there was
18 a Project View.
19          The colleagues came into town to talk
20 about the grant, and they came to meet with me and
21 Mr. Haddon. Mr. Haddon told me that I could not
22 attend in the meeting. The Project View people were

29 (Pages 110 to 113)

Page 114

1 surprised by that. There was a grant that Project
2 View and SERC were going to pursue together.
3          Mr. Haddon took me off of the grant
4 writing process. There was an electronic field trip
5 that was coming up and I was the project manager and
6 cohost for that. Mr. Haddon took me off of that
7 project.
8    Q.    Did he give you any explanation as to why
9 he took you off the electronic field trip project?
10   A.    I had bad chemistry with the scientist
11 that was working on it.
12   Q.    Do you recall that scientist?
13   A.    Greg Ruiz.
14   Q.    What was your relationship like with Mr.
15 Ruiz at this time at the time that you were taken off
16 the project?
17   A.    I knew Mr. Ruiz from -- in passing from
18 having worked at SERC. This was the first thing we
19 had worked on together. We had not worked very much
20 on it together because of my car accident, and I had
21 been out for a while, and so -- but Mr. Ruiz did not
22 understand that I was -- that I had been in a car

Page 115

1 accident and that I was out.
2          And Mr. Haddon didn't explain, so when Mr.
3 Ruiz complained to Mr. Haddon that I was not working
4 enough on the project, Mr. Haddon didn't explain to
5 Mr. Ruiz it was because I wasn't there, it was
6 because I was out because of a car accident, and so
7 Mr. Ruiz was left thinking that I was at SERC but
8 just not doing my job.
9    Q.    And you said Mr. Haddon also took you off
10 a grant writing process?
11   A.    Yes.
12   Q.    Did he explain why he did that?
13   A.    He did not explain why he did that, other
14 than he had said that people at SERC were not happy
15 with me and others outside of SERC were not happy
16 with me and so he felt it best that I not be involved
17 with that.
18          He didn't explain who those other people
19 were or what their unhappiness was.
20   Q.    Did you have any discussions with anyone
21 like Mr. Simons or Mr. Galligher about Mr. Haddon
22 taking away these responsibilities from you?

Page 116

1    A.    By that point, I'm not sure where Mr.
2 Simons was -- oh, by that point, Mr. Simons had met
3 with Secretary Small and had been placed on a
4 terminal sabbatical, so Mr. Simons was not there to
5 talk to about it.
6          I did not speak directly -- I did not
7 speak directly with Mr. Galligher about this, but I
8 do believe in some of the E-mails Mark would CC Mr.
9 Galligher on them.
10   Q.    A few more questions about the questioning
11 just before I move on to the next topic.
12          Were you aware that Amy Erb was also
13 questioned by Mr. Roy?
14          MR. BYRNES: Objection. Asked and
15 answered.
16          THE WITNESS: I was aware that Mr. Roy met
17 with Ms. Erb for about five or ten minutes, yes.
18          BY MS. JOHNSON:
19   Q.    Did you have any conversations with Ms.
20 Erb about how the questioning went between her and
21 Mr. Roy?
22   A.    Yes.

Page 117

1    Q.    What was said in that conversation?
2    A.    She said that he said to her, your
3 boyfriend is not going on the trip. Don't do this
4 again. That's it.
5    Q.    Okay. That was the whole extent of the
6 conversation?
7    A.    That was the extent of their conversation,
8 yes.
9    Q.    Did you tell Ms. Erb that you felt he had
10 asked you inappropriate questions, that Mr. Roy had
11 asked you inappropriate questions?
12   A.    I don't remember what I said to Ms. Erb.
13 She knew that I had been questioned by him much
14 longer than she had.
15   Q.    Did you ever ask her specific if he asked
16 her any inappropriate questions?
17   A.    I don't remember if I did.
18   Q.    Were you aware -- well, did you feel you
19 were treated differently by Mr. Roy because of your
20 sex because you're a woman?
21          MR. BYRNES: Objection. Calls for a legal
22 conclusion.

30 (Pages 114 to 117)

Page 118

1    THE WITNESS: Yes, I did.
2    BY MS. JOHNSON:
3    Q.   And how so?
4    A.   I wasn't treated the same as Mr. Haddon.
5    I was told the investigation was because of me and
6    since I'm female and he's not, yes, I felt I was
7    being treated differently because I was a woman.
8    Q.   Were you present in the room when Ms. Erb
9    met with Mr. Roy?
10   A.   No.
11       MR. BYRNES: Objection. She answered that
12   now twice.
13       BY MS. JOHNSON:
14   Q.   Did anyone ever threaten you with being
15   fired? Aside from what Mr. Simon said, was it your
16   understanding that you were a marked employee? Did
17   anyone say to you that you were going to be fired
18   because of what you've done?
19   A.   No. Though the threat of being arrested
20   was and I assumed that if I had been arrested I would
21   have been fired.
22   Q.   Do you have any knowledge as to when -- as

Page 119

1    to whether or not Mr. Roy discussed the content of
2    your meeting with him with other people?
3        MR. BYRNES: Objection. Calls for her to
4    speculate.
5        THE WITNESS: I don't know. I know that
6    Mr. Roy met with Mr. -- Mr. Roy met with Mr. Simons
7    and Mr. Galligher afterwards.
8        BY MS. JOHNSON:
9    Q.   Now, you've mentioned previously that Mr.
10   Haddon knew you had IBS, irritable bowel syndrome?
11   A.   Yes.
12   Q.   Were there any other physical conditions
13   that you had informed anyone at SERC that you had?
14       MR. BYRNES: At what time?
15       BY MS. JOHNSON:
16   Q.   At any time during your employ from '01 to
17   '05.
18   A.   My coworkers knew I had irritable bowel
19   syndrome. I had informed Mr. Haddon in the fall of
20   2004 I believe that I was having trouble sleeping and
21   was seeing a sleep doctor for that and then with my
22   car accident they knew I was being seen for that.

Page 120

1    Q.   Looking at paragraph 17 of your complaint,
2    the second self-defense, the statements were made
3    with discriminatory animus because of the Plaintiff's
4    gender, her handicap, anxiety and perceived mental
5    disability.
6        Can you elaborate on the anxiety that
7    you've identified in your complaint?
8    A.   Yes. Well, that -- Mr. -- to the point
9    Mr. Galligher asked me to see an employee assistance
10   counselor. He talked about how I seemed -- I didn't
11   seem myself and Mr. Haddon talked about that as well.
12       And so Mr. Galligher wanted me to see an
13   employee assistance counselor to calm me and to
14   reassure me and then -- so there was several
15   conversations about that.
16   Q.   Prior to Mr. Galligher asking you to see
17   the EAP counselor -- and that's employee assistance
18   program, correct --
19   A.   Yes.
20   Q.   -- had you had any dealings with the EAP?
21   A.   No.
22   Q.   Did you know what services EAP provided?

Page 121

1    A.   I'm trying to remember if I knew about
2    them beforehand. I know about them since. I don't
3    know what I knew about them beforehand.
4    Q.   Had any of your coworkers ever stated to
5    you that they had spoken with an EAP counselor?
6    A.   No, not that I know of.
7    Q.   Okay.
8    A    I think there were announcements made at
9    certain -- that there was such a thing as the
10   employees assistance program, but again I don't know
11   what I knew then about the program.
12   Q.   Did you ask Mr. Galligher why he was
13   referring you to talk to the EAP counselor?
14   A.   He had sent me an E-mail asking me --
15   telling me that Debbie Burney from the employee
16   assistance program was going to be at SERC and
17   available, and I do believe he copied Mark Haddon and
18   I do believe he copied Debbie Burney on the E-mail
19   about SERC wanting me to speak with her to reassure
20   me, to calm me down. That's what I recollect about
21   that.
22   Q.   Did you ever have any in-person

31 (Pages 118 to 121)

**Doratha Klugel**

Page 122

1 conversations with Mr. Galligher about -- well,
2 strike that.
3        Did you have any concerns about Mr.
4 Galligher suggesting that you speak to Ms. Burney?
5    A.   Yes.
6    Q.   What were they, your concerns?
7    A.   My concerns were it was completely out of
8 the blue. I didn't know what it was about or in
9 reference to. I was concerned that they -- Mr.
10 Galligher and Mr. Haddon and others at SERC thought
11 that I was unstable or mentally unwell and couldn't
12 do my job and that if -- and by going to the employee
13 assistance counselor it would be admitting that I was
14 unwell or unstable or that I couldn't do my job.
15    Q.   Was it your -- was it your belief or your
16 opinion that people who spoke to the EAP counselor
17 were unstable mentally?
18    A.   I didn't know anyone who had spoken to an
19 employee assistance program counselor before.
20    Q.   Okay.
21        MS. JOHNSON: Let's mark this as Exhibit
22 12.

Page 123

1        (Exhibit Number 12 was marked for
2 identification and was retained by counsel.)
3        BY MS. JOHNSON:
4    Q.   You had referred to an E-mail that Mr.
5 Galligher had sent you about the EPA counselor. Can
6 you identify if Exhibit 12 is that E-mail you were
7 referring to?
8    A.   This E-mail in front of me is actually not
9 the E-mail I was thinking about in my mind. There
10 was the initial E-mail, so at the bottom of Exhibit
11 12 is my E-mail to Bob Galligher, Wednesday, April
12 13th, at 10:37 a.m. And I say hi, Bob; thanks for
13 your E-mail, so there was an E-mail where Bob asked
14 me to first go to -- so that was the E-mail I was
15 referring to.
16    Q.   Okay.
17    A.   This E-mail then from Bob, however, did
18 not make -- did not reassure me because, yes, my --
19 it wanted me to discuss my job and its stresses, my
20 personal life, so again, my personal life was being
21 called into question and the attendant stresses in
22 that and I didn't know what he meant by that.

Page 124

1        And in the last paragraph, he tells me if
2 I don't go, I read this as that he was going to --
3 that he was going to call the attorney's office and
4 the attorney's office was going to get -- this was
5 going to become a labor dispute.
6        Mr. Roy had already told me that again if
7 there were any questions about me that he would come
8 out with the red lights flashing and the handcuffs.
9 I took this as possibly being one step away from me
10 being arrested by Mr. Roy.
11    Q.   Looking at the last paragraph of Exhibit
12 12 where it says Dottie, I'm trying to work with you
13 and Mark, there's a sentence that says, if you insist
14 on having an attorney present for these types of
15 meetings, I have no choice but to refer this matter
16 to the SI's office of Labor Relations to resolve.
17        What was your understanding of his
18 statement there?
19    A.   That he was going to call the Office of
20 Labor Relations if I didn't go to the meeting and if
21 I insisted on having counsel present at such meeting.
22    Q.   At the meeting with the EAP counselor?

Page 125

1    A.   Yes.
2    Q.   And also he suggested that you should
3 check out the EAP web page. Did you, in fact, ever
4 do that?
5    A.   I don't know if I did.
6    Q.   Did you have no interest in talking to the
7 EAP counselor?
8    A.   I had no interest in talking to the EAP
9 counselor without my attorney present.
10    Q.   Did you ever ask anyone if that was
11 against the policies of the EAP counselor to meet
12 with you with your attorney being present?
13    A.   I told Mr. Galligher that -- I had told
14 Mr. Galligher probably back in March maybe that -- I
15 don't know.
16        At some point Mr. Galligher knew I was
17 represented by counsel on matters involving my
18 employment.
19        And so this came out -- so again, this
20 first E-mail that's not seen here, I told him I was
21 represented by counsel and would want counsel
22 available. Besides I had put in the leave request,

32 (Pages 122 to 125)

Page 126

1 so then the next E-mail that comes is an E-mail from
2 Mark saying your leave is denied.
3        And then the next E-mail from Bob
4 Galligher coming is saying I understand your leave
5 request is denied so you will be here and you will be
6 able to meet with Debbie Burney.
7    Q.   Did Mr. Galligher or anyone ever indicate
8 to you that if you failed to talk to Ms. Burney you
9 would lose your job?
10    A.   Mr. Galligher indicated if I did not meet
11 with Mrs. Burney that he would be referring this to
12 the Office of Labor Relations.
13    Q.   Does he state that in the E-mail?
14        MR. BYRNES:  Objection.  The E-mail speaks
15 for itself.
16        THE WITNESS:  I have no choice but to
17 refer this matter to SI's Office of Labor Relations
18 if you insist on having your attorney present, so he
19 knew I was represented by counsel.
20        He knew that I would not be able to attend
21 such a meeting without my attorney being present, and
22 if I insisted on having my attorney present, he would

Page 127

1 refer this to labor relations, which, again, I
2 considered to be at the very least intimidating, if
3 not outright threatening, and again that that would
4 then set in motion another visit from Mr. Roy this
5 time for my arrest.
6        BY MS. JOHNSON:
7    Q.   On what basis?
8    A.   On the basis of what Mr. Roy told me he
9 would do if he ever had to come out and speak to me
10 again.
11    Q.   Did you, in fact, ever talk to Ms. Burney?
12    A.   I did not speak with Mrs. Burney.
13    Q.   And did you ever have any conversations
14 with Mr. Galligher about this E-mail or about why he
15 was trying to get you to speak with Mrs. Burney?  Any
16 further discussions, aside from this E-mail?
17    A.   We just had the E-mail exchanged.  At this
18 point I noticed that Mrs. Burney was now being copied
19 on these E-mails and so questions about my personal
20 life and my mental status, any medical information
21 was now being CC'd -- was now being copied around on
22 E-mails.  That concerned me as well.

Page 128

1    Q.   Were there E-mails in which Mr. Galligher
2 discussed specific mental conditions or physical
3 conditions you might have that you recall Mrs. Burney
4 being CC'd on?
5    A.   Regarding your job and its stresses, your
6 personal life and the attendant stresses in that.
7 That's what he said.
8    Q.   Any other E-mails besides this one, to
9 your knowledge?
10    A.   I don't remember what he said in other
11 E-mails.
12    Q.   Looking at the complaint, which is Exhibit
13 10, paragraph 18, which is on page 4, it states on
14 April 12th, 2005 Mr. Hines directed Ms. Klugel to a
15 mandatory mental health referral to the agency's
16 employee assistance program upon a pretextual claim
17 that Ms. Klugel was mentally ill due to stress and
18 anxiety.  Did that, in fact, occur?
19    A.   Mr. Galligher directed me to meet with
20 Mrs. Burney, yes.
21    Q.   But not Mr. Hines?
22    A.   No.  Mr. Hines was acting director of the

Page 129

1 facility at the time.
2    Q.   Did you review this complaint before you
3 signed it, ma'am?
4    A.   Yes.
5    Q.   So why did you allege that Mr. Hines took
6 that action?
7        MR. BYRNES:  That calls for a conclusion.
8        BY MS. JOHNSON:
9    Q.   I'm --
10        MR. BYRNES:  That calls for a legal
11 conclusion.
12        THE WITNESS:  The Smithsonian
13 Environmental Research Center is listed in this
14 complaint.  Tuck Hines is the acting director of it,
15 so he's responsible for what happens at SERC while
16 he's acting director.
17        BY MS. JOHNSON:
18    Q.   Okay.  But Mr. Galligher is the one that
19 you feel directed you to speak with the EAP
20 counselor?
21    A.   Yes.
22    Q.   And you never spoke to the EAP counselor.

33 (Pages 126 to 129)

**Doratha Klugel**

Page 130

1 Were there any actions or did anyone make any
2 statements to you about your refusal to speak with
3 the EAP counselor?
4    A.   Well, I had said -- right in this E-mail
5 on April 13th that said, however, I have a leave
6 request in for next Tuesday and that is when Mr.
7 Galligher and Mr. Haddon were trying to set up my
8 meeting with Debbie Burney. She was at SERC on that
9 Tuesday.
10       She had to come out from downtown, so she
11 was going to be there on Tuesday, so I said I'm going
12 to be on leave that day. After that then either that day
13 or the next day my leave request was denied. Mr.
14 Galligher E-mailed me back and said I understand your
15 leave request has been denied so you will be here on
16 Tuesday so you can meet with her.
17       And I said, again, I'm represented by
18 counsel and so my attorney would need to be present,
19 and then again it was in that time frame that I was
20 removed from the grant writing project, told not to
21 attend meetings with partners that I had always
22 attended, and taken off the electronic field trip.

Page 131

1    Q.   Mr. Haddon took those actions?
2    A.   Yes.
3       MR. BYRNES:  Could we take a break for
4 three minutes?
5       MS. JOHNSON:  Sure.
6       (A break was taken.)
7       BY MS. JOHNSON:
8    Q.   Did anyone at SERC ever tell you they
9 believed you had a mental impairment?
10       MR. BYRNES:  Objection. Calls for a legal
11 conclusion.
12       Answer if you can.
13       THE WITNESS:  Did they use those specific
14 words?  No.  No one ever said you're mentally
15 impaired.  Mark Haddon told me I had disease in my
16 body.  Mr. Galligher sent me E-mails talking about my
17 job and its stresses and my personal life and its
18 attendant stresses and the stresses he believes are
19 having an affect on me and my job.
20       Mr. Haddon talking about my attitude and
21 my chemistry.  The questioning was always along those
22 lines.

Page 132

1       BY MS. JOHNSON:
2    Q.   You mentioned before that you had told Mr.
3 Haddon and coworkers about your IBS.  Did the IBS
4 affect your ability to work in any way?
5    A.   Yes.  Sometimes I would be sick from my
6 irritable bowel syndrome, so yes.
7    Q.   And how would that be handled if you were
8 too sick to come to work?
9    A.   I would call up Mr. Haddon and let him
10 know.
11    Q.   Did he ever deny your request to stay home
12 because you were not feeling well because of the IBS?
13    A.   No.  No.  None of my leave or requests
14 were ever denied before I was investigated by the
15 Inspector General.
16    Q.   Were there ever requests in relation to
17 the IBS that occurred after the questioning by Mr.
18 Roy?
19    A.   No, not about the IBS.  No.
20    Q.   You said you also had a sleeping problem
21 and you were seeing a doctor?
22    A.   Yes.

Page 133

1    Q.   Were you taking any medicine for that?
2    A.   I was not taking any medication for that.
3 I was meeting with the doctor to find out what was
4 going on.
5    Q.   Did that affect your ability to go to work
6 in any way?
7    A.   That did not affect my ability to go to
8 work, no, except that I might have to take some sick
9 leave to go to doctor's appointments to actually see
10 the sleep doctor.
11    Q.   Are you currently under the care of a
12 doctor?
13    A.   Yes.
14    Q.   For what condition or conditions?
15    A.   Irritable bowel syndrome.
16    Q.   Anything else?
17    A.   No.
18       MS. JOHNSON:  I want to mark this as
19 Exhibit 13.
20       (Exhibit Number 13 was marked for
21 identification and was retained by counsel.)
22       BY MS. JOHNSON:

34 (Pages 130 to 133)

**Doratha Klugel**

Page 138

1    A.   No.

2    Q.   Okay.  Now, we talked a little about the

3 car accident that happened in '04, and I believe you

4 said you had suffered a broken arm?

5    A.   Yes.

6    Q.   And you had said something with your knee

7 and I forgot the medical term.

8    A.   Bilateral contusions to my knee.

9    Q.   I'm presuming you saw a doctor for that

10 diagnosis?

11   A.   Yes.

12   Q.   Did the doctor give you any indication of

13 how long your arm would be -- it would take to heal?

14   A.   No.  It would depend on how the arm healed

15 on its own and then how it responded to physical

16 therapy.

17   Q.   Did he indicate to you how long you'd have

18 to be in physical therapy?

19   A.   That was all based on how my arm responded

20 to the physical therapy.

21   Q.   Did he indicate what type -- was the

22 physical therapy solely to deal with the arm?

Page 139

1    A.   It was for my arm and for my knees.

2    Q.   Okay.

3    A.   It originally started for my arm and my

4 knees.  At some point my knees got better, but it

5 continued on for my arm.

6    Q.   Okay.  Who did you -- did you tell anyone

7 at SERC regarding the -- about the car accident?

8    A    Yes.

9    Q.   Who did you tell?

10   A.   I called Mark and told him that I'd been

11 in a car accident and had broken my arm, and he said,

12 okay; I'll see you next week.

13   Q.   How long were you out from work -- were

14 you out from work after the car accident?

15   A.   I was out from work, yes.

16   Q.   How long were you out after the car

17 accident?

18   A.   I don't remember, so my car accident would

19 have been the middle of November.  Clearly I was back

20 at work at some point in December if not sooner

21 because I met with Gerry Roy.  Yes, I don't know

22 exactly how long I was out initially for that car

Page 140

1 accident.

2    Q.   Were you wearing a cast on your arm?

3    A.   I did wear a cast.  Yes, I did wear a

4 cast.

5    Q.   And when you returned to work, did you

6 have any problems performing your job?

7    A.   Yes.

8    Q.   What problems were those?

9    A.   Well, I did -- well, I had broken my right

10 arm in three places.  I'm right-handed, so writing

11 was difficult and painful.  I did video conferences

12 which required doing demonstrations and experiments

13 with my arms, so yes there were difficulties in doing

14 those things, lifting things, carrying things.

15       I couldn't lift anything or carry anything

16 with that arm.

17   Q.   Did you ask anyone at SERC for any kind of

18 accommodation or ask that any duties be removed from

19 you because you were having difficulties performing

20 work duties?

21   A.   I did talk with and E-mail, but I more

22 specifically remember E-mail -- talking with Mark

Page 141

1 Haddon about the difficulties I was having in doing

2 video conferences and that I couldn't do the

3 experiments.

4        I asked for help, if there could be just

5 another body there during the video, another person

6 to help me during the video conference so that they

7 could lift or carry things, and -- so I told him I

8 was having trouble doing the video conferences, I

9 couldn't lift or carry anything, and I asked for

10 help.  I said, does that mean that I should cancel

11       His response was he was not available to

12 help.

13   Q.   Did you ask him for someone else to help,

14 if he could get someone else to help?

15   A.   I said -- he said he was not available to

16 help.  I said, does that mean that I should cancel

17 the video conferences, and he said if that's what you

18 have to do if you can't do them.

19   Q.   So did you cancel them?

20   A.   Yes, the video conferences had to be

21 cancelled.  Yes.

22   Q.   How many were cancelled?

36 (Pages 138 to 141)

Page 142

1    A.   I don't know.
2    Q.   You were taking time off to go to physical
3 therapy?
4    A.   Yes.
5    Q.   How many days a week did you have to go to
6 physical therapy?
7    A.   I believe I went to physical therapy twice
8 a week.
9    Q.   And how many hours a day were you in
10 physical therapy on those two days?
11    A.   It depended.  In the beginning, it was
12 more because it was both my knees and my arm.  Then
13 at some point it was just physical therapy for my
14 arm.  I don't remember how many hours it would have
15 been a day.
16    Q.   Were you taking full days off for those
17 two days a week that you had to go to physical
18 therapy?
19    A.   I believe I usually did, yes.
20    Q.   And why were you taking a full day off?
21    A.   Because of the pain that was associated
22 with my arm and with my physical therapy, so for

Page 143

1 example, if I tried working in the morning and going
2 to physical therapy in the afternoon, by the time I
3 would get to the physical therapy in the afternoon,
4 my arm would be so sore and tired that it wouldn't —
5 I couldn't do the physical therapy very well.
6        My arm wasn't responding to the physical
7 therapy, so I scheduled physical therapy earlier in
8 the morning, but then physical therapy then caused my
9 arm to hurt.  I also lived in D.C. and was out at
10 SERC and so that also -- the pain and the broken arm
11 affected my ability to drive.
12    Q.   Okay.  Were you granted those two days off
13 a week that you needed to be in physical therapy?
14    A.   I was for a while, but then questions
15 started to come in from Mr. Haddon and Mr. Galligher
16 about why all the physical therapy and why it was
17 going on for so long and when would it end and then
18 leave requests started to be denied.
19    Q.   Your requests for medical leave was
20 denied?
21    A.   Yes.  There was -- that was towards the
22 end of April when I realized that requests for

Page 144

1 physical therapy were being denied.  I wasn't going
2 to be able to continue my physical therapy and
3 continue working.
4        MS. JOHNSON:  Let me show you Exhibit
5 Number 14.
6        (Exhibit Number 14 was marked for
7 identification and was retained by counsel.)
8        BY MS. JOHNSON:
9    Q.   Ma'am, go ahead and take a minute to read
10 that.  Have you had a chance to read what's been
11 marked as Exhibit 14?
12    A.   Yes.
13    Q.   My first question is, what class were you
14 having Friday mornings in January of '05?
15    A.   I was taking a class entitled — yes.  I
16 was taking space, time, and deity -- is that the name
17 of the class? -- at Wesley Theological Seminary.  I'm
18 trying to remember if that was the class I was taking
19 then.  I don't remember.  I was taking a class at
20 Wesley Theological Seminary.
21    Q.   It also states in about the third line
22 that you had also tried to schedule your physical

Page 145

1 therapy on Friday afternoons.  Were you at this time
2 only taking physical therapy one day a week?
3    A.   I don't remember.  There was another day
4 in the week that I was also taking physical therapy
5 and that the second physical therapy appointment I
6 was trying to schedule on a Friday afternoon to
7 minimize the time that I was out of the office I
8 don't remember.
9    Q.   Did you have any conversations with anyone
10 -- referring to this last paragraph, it states that
11 you're using your sick leave as soon as you earn it
12 and you use annual leave for doctor's appointments
13 when no sick leave is available.
14        Did you have any conversations with anyone
15 about the fact that you were exhausting your leave
16 reserves?
17    A.   I told Mark that I was exhausting my
18 leave.  I asked him — well, when the car accident
19 happened, I asked him what do I do about the leave,
20 and he said you use your leave that you have until
21 you run out of it and then you go on leave without
22 pay.

37 (Pages 142 to 145)

**Doratha Klugel**

Page 150

1 around those trips.
2    Q.    Okay.
3    A.    I was also trying to honor commitments to
4 our partners who were responsible for the grant that
5 was funding my job, and so it was not their fault
6 that I had been in a car accident and that this trip
7 had not been able to happen in November.
8         And Mark had already made it clear that
9 others outside of SERC were unhappy, and I was trying
10 to honor commitments with our partners to keep our
11 funders happy.
12    Q.    Was this -- this E-mail, Exhibit 15, was
13 this the referral -- the denial of medical leave that
14 you were referring to previously or was there another
15 denial?
16    A    There was this and then I do believe there
17 was another denial at the end of April, somewhere
18 around the very end of the month.
19    Q.    Was that denial on April also for medical
20 leave?
21    A.    Yes.
22    Q.    Do you recall how many days you were

Page 151

1 requesting?
2    A.    I was just requesting time off for
3 physical therapy. I remember because not only did
4 Mark X the denial box, but he X'd it through several
5 times and -- he colored -- put circles around the box
6 and boxed the box in to make it a point that it had
7 been denied.
8         MR. BYRNES: Could we take a break so I
9 can feed my meter?
10        MS. JOHNSON: Sure.
11        (A break was taken.)
12        BY MS. JOHNSON:
13    Q.    We were discussing leave you had requested
14 that had been denied. Going back to Exhibit 15, were
15 the three days that you were asking for leave in
16 addition to the two days, were those for physical
17 therapy?
18        MR. BYRNES: Objection. Asked and
19 answered.
20        Go ahead.
21        THE WITNESS: Again, looking at this
22 E-mail, I don't think that the three day -- I'm sorry

Page 152

1 -- the three days were not for physical therapy, no.
2        BY MS. JOHNSON:
3    Q.    What were the days for?
4        MR. BYRNES: Objection. Asked and
5 answered.
6        Go ahead.
7        THE WITNESS: For the rescheduling of the
8 Belize trip with Project View.
9        BY MS. JOHNSON:
10    Q.    The E-mail below where Mark was indicating
11 that you were asking for six days off, do you have
12 any understanding of what he was referring to?
13    A.    I don't. I don't remember, no.
14    Q.    Okay. So you were not asking for a total of
15 three days leave?
16        MR. BYRNES: Objection.
17        BY MS. JOHNSON:
18    Q.    I'm trying to be clear on what the request
19 was.
20    A.    And I'm trying to -- you see before you
21 the same thing I see. Three days and two days.
22 That's what I know is in this E-mail.

Page 153

1    Q.    Were there two days of physical therapy?
2    A    I'm assuming the two days were for
3 physical therapy.
4    Q.    And looking at page 2 of Exhibit 15 where
5 you state I am disappointed that my recent leave
6 request was denied due not only to financial reasons,
7 what were the financial reasons you were referring
8 to?
9    A.    The financial cost of the Belize trip.
10    Q.    Were you paying for that trip personally?
11    A.    At that point I don't know. I don't
12 remember in talking with Project View how things were
13 being paid for.
14    Q.    And you also stated the effect that your
15 plans will have on others. What were you referring
16 to there?
17    A.    I was referring to Project View.
18    Q.    Did you have any conversations with Mr.
19 Haddon about this specific request that you had made?
20    A.    He told me that the reasons for it did not
21 matter to him, my leave was denied.
22    Q.    And was it your intention to do physical

39 (Pages 150 to 153)

Page 154

1 -- how were you going to do the physical therapy if
2 you were in Belize?

3      MR. BYRNES: Objection. We've gone over
4 this twice. It's been asked and answered.

5      THE WITNESS: Again, to the best of my
6 recollection, the physical therapy was being
7 scheduled around the trip, so no, I was not going to
8 do p... ical therapy in Belize. I was going to do
9 physical therapy around Belize.

10      BY MS. JOHNSON:

11      Q. Did you ever go on the Belize trip?

12      A. No.

13      Q. Now, you mentioned previously that at some
14 point you were being asked for documentation about
15 your leave?

16      A. Yes.

17      Q. Do you recall when that first started?

18      A. What I recall is that I was in the car
19 accident. My insurance company needed documentation
20 of my car accident and that I was being treated for
21 that car -- for the injuries sustained in that car
22 accident and that I was going to be taking time off

Page 155

1 from work.

2      There was a form that my insurance company
3 needed to be filled out -- Mark asked me -- by my
4 supervisor. Mark said this will sit on my desk and
5 get lost, so you fill it out and I'll sign it. I
6 then gave it to my insurance company.

7      My insurance company called Mark to verify
8 the information on the form, and Mark told my
9 insurance company that he couldn't verify it because
10 he signed things that people put in front of him
11 without always reading them and that he did not
12 remember reading the document.

13      So it was at that point my insurance
14 company came back to me and asked me about it. I
15 asked Mark about it. That is when we met -- Mark and
16 I met with Mr. Gallipher.

17      Mr. Gallipher said it was unfortunate that
18 Mark had either signed it without having read it or
19 had told the insurance company that and that we
20 needed to be more clear about documentation of my
21 accident subsequent to that.

22      Q. Do you remember what was contained in that

Page 156

1 form or what you had typed -- what information was in
2 the form?

3      A. I don't remember things about when the
4 accident was, you know, what sort of injuries I had
5 sustained, what sort of treatment my injuries
6 required, things of that nature.

7      Q. Aside from this issue regarding
8 documentation about your leave, did anyone at SERC
9 ever request that you provide documentation about
10 your leave?

11      A. In that meeting Mr. Gallipher had asked
12 Mark what was the policy of leave documentation in
13 the Department of Education, and Mark said that he
14 didn't require us to fill out leave forms and Bob
15 Gallipher said that we could be dinged for that -- he
16 used that word dinged -- and so it was going to be
17 important that we document things more carefully.

18      And that's when they asked for
19 documentation around my arm. One of the things that
20 they wanted was documentation from my physical
21 therapist. I explained to them that I didn't receive
22 any documentation from my physical therapist because

Page 157

1 there was a car accident being handled through my
2 insurance company, that all that documentation went
3 to my insurance company.

4      I didn't get any documentation, and so it
5 wasn't that I wasn't providing them documentation. I
6 just couldn't provide them what they were asking me
7 for, and so I asked them for other things that I
8 could provide for them, doctor's note, those sorts of
9 things.

10      And then that is when we came up with the
11 arrangement that I think is referenced in here that
12 at the beginning of the week or at the end of the
13 week I give Mark a leave slip for whatever the
14 physical therapy is for the next week.

15      Q. When you said referencing here, you're
16 talking about Exhibit 15?

17      A. I'm referring to Exhibit 15.

18      Q. Did you, in fact, start doing what you
19 indicated you would do in Exhibit 15, providing a
20 leave slip at the end of the week?

21      A. Yes, either the end of the week or the
22 beginning of the week, whatever exactly the

40 (Pages 154 to 157)

Page 158

1 arrangement was, but the arrangement was the week
2 before I give him a leave slip for the next week.
3    Q.    Did anyone request any documentation above
4 and beyond the leave slips?
5    A.    As I said, they wanted documentation from
6 my physical therapist, but again, I explained to them
7 that there wasn't documentation coming out of my
8 physical therapist.
9        They wanted the records that were coming
10 out -- that were being kept by my physical therapist.
11 I did not have access to those records. I was not
12 being given those records, that documentation. I had
13 nothing from them to be turning over that I wasn't
14 turning over.
15    Q.    Was that what their specific request was
16 for the records being kept by your physical
17 therapist?
18    A.    Yes. They wanted documentation from my
19 physical therapist, yes.
20    Q.    Okay.
21    A.    At that point it seemed that they didn't
22 believe me that I was going to physical therapy and

Page 159

1 so they were looking for the medical records from my
2 physical therapist.
3    Q.    Did you ever provide any documents from
4 your physical therapist?
5    A.    There weren't documents from my physical
6 therapist to provide to them, and it was also at that
7 meeting that I let Mr. Galligher and Mr. Haddon know
8 that I was represented by counsel.
9        Because again it seemed that there were
10 questions coming up about my credibility and my
11 integrity, and again, any questions I knew could lead
12 to Mr. Roy coming back out, and so that is when I
13 informed them that I was represented by counsel and
14 if there were any questions about my employment or my
15 leave it needed to come through my attorney.
16        MS. JOHNSON: Let's mark this as Exhibit
17 16.
18        (Exhibit Number 16 was marked for
19 identification and was retained by counsel.)
20        BY MS. JOHNSON:
21    Q.    Can you identify what's been marked as
22 Exhibit 16?

Page 160

1    A.    Yes. This is a doctor's note from the
2 surgeon who was treating me for my broken arm.
3    Q.    Was this something that you provided to
4 Mr. Haddon?
5    A.    Yes. This was trying to provide
6 documentation to Mr. Haddon and Mr. Galligher to
7 prove to them that I did need physical therapy and
8 did need time off work as they seemed to be
9 questioning.
10    Q.    After you gave this to them, were there
11 any further requests for documentation?
12    A.    They still wanted -- Mr. Haddon -- there
13 wasn't for Mr. Galligher. Mr. Haddon still wanted
14 documentation of my physical therapy visits from my
15 physical therapist. Again, explaining to him those
16 weren't -- I didn't know that that existed. Those
17 weren't things I had access to. I was not given any
18 of those kinds of records. It was not that I had
19 those records and was refusing to turn them over.
20    Q.    Were you ever denied the right to go to --
21 the question to go to physical therapy, aside from
22 the incident we talked about in Exhibit 15?

Page 161

1    A.    There is the incident in Exhibit 15 and
2 again the incident that I talked about at the end of
3 April.
4    Q.    Was that to go to physical therapy?
5        MR. BYRNES: Objection. Asked and
6 answered.
7        THE WITNESS: Yes.
8        BY MS. JOHNSON:
9    Q.    You had been going to physical therapy for
10 two days a week; is that correct?
11        MR. BYRNES: Objection. Asked and
12 answered.
13        THE WITNESS: Yes. Again, I don't
14 remember at that point how many days I was still
15 going to physical therapy, but I was still going to
16 physical therapy at this point.
17        BY MS. JOHNSON:
18    Q.    And was the request at the end of April
19 for an additional day? If you were already being
20 granted the two days, I'm trying to figure out what
21 the request in April was.
22    A.    No. It was for the request. It was not

41 (Pages 158 to 161)

Page 158

1 arrangement was, but the arrangement was the week
2 before I give him a leave slip for the next week.
3    Q.   Did anyone request any documentation above
4 and beyond the leave slips?
5    A.   As I said, they wanted documentation from
6 my physical therapist, but again, I explained to them
7 that there wasn't documentation coming out of my
8 physical therapist.
9        They wanted the records that were coming
10 out -- that were being kept by my physical therapist.
11 I did not have access to those records. I was not
12 being given those records, that documentation. I had
13 nothing from them to be turning over that I wasn't
14 turning over.
15    Q.   Was that what their specific request was
16 for the records being kept by your physical
17 therapist?
18    A.   Yes. They wanted documentation from my
19 physical therapist, yes.
20    Q.   Okay.
21    A.   At that point it seemed that they didn't
22 believe me that I was going to physical therapy and

Page 159

1 so they were looking for the medical records from my
2 physical therapist.
3    Q.   Did you ever provide any documents from
4 your physical therapist?
5    A.   There weren't documents from my physical
6 therapist to provide to them, and it was also at that
7 meeting that I let Mr. Galligher and Mr. Haddon know
8 that I was represented by counsel.
9        Because again it seemed that there were
10 questions coming up about my credibility and my
11 integrity, and again, any questions I knew could lead
12 to Mr. Roy coming back out, and so that is when I
13 informed them that I was represented by counsel and
14 if there were any questions about my employment or my
15 leave it needed to come through my attorney.
16    MS. JOHNSON: Let's mark this as Exhibit
17 16.
18    (Exhibit Number 16 was marked for
19 identification and was retained by counsel.)
20    BY MS. JOHNSON:
21    Q.   Can you identify what's been marked as
22 Exhibit 16?

Page 160

1    A.   Yes. This is a doctor's note from the
2 surgeon who was treating me for my broken arm.
3    Q.   Was this something that you provided to
4 Mr. Haddon?
5    A.   Yes. This was trying to provide
6 documentation to Mr. Haddon and Mr. Galligher to
7 prove to them that I did need physical therapy and
8 did need time off work as they seemed to be
9 questioning.
10    Q.   After you gave this to them, were there
11 any further requests for documentation?
12    A.   They still wanted -- Mr. Haddon -- there
13 wasn't for Mr. Galligher. Mr. Haddon still wanted
14 documentation of my physical therapy visits from my
15 physical therapist. Again, explaining to him those
16 weren't -- I didn't know that that existed. Those
17 weren't things I had access to. I was not given any
18 of those kinds of records. It was not that I had
19 those records and was refusing to turn them over.
20    Q.   Were you ever denied the right to go to --
21 the question to go to physical therapy, aside from
22 the incident we talked about in Exhibit 15?

Page 161

1    A.   There is the incident in Exhibit 15 and
2 again the incident that I talked about at the end of
3 April.
4    Q.   Was that to go to physical therapy?
5    MR. BYRNES: Objection. Asked and
6 answered.
7    THE WITNESS: Yes.
8    BY MS. JOHNSON:
9    Q.   You had been going to physical therapy for
10 two days a week; is that correct?
11    MR. BYRNES: Objection. Asked and
12 answered.
13    THE WITNESS: Yes. Again, I don't
14 remember at that point how many days I was still
15 going to physical therapy, but I was still going to
16 physical therapy at this point.
17    BY MS. JOHNSON:
18    Q.   And was the request at the end of April
19 for an additional day? If you were already being
20 granted the two days, I'm trying to figure out what
21 the request in April was.
22    A.   No. It was for the request. It was not

41 (Pages 158 to 161)

**Page 166**

1      MS. JOHNSON: I just asked if she had any
2 understanding.
3      MR. BYRNES: No. What you said is that
4 she was not able to handle.
5      MS. JOHNSON: She's answered the question.
6 Thank you.
7      MR. BYRNES: I want to make sure the
8 record is clear, Counsel.
9      MS. JOHNSON: Go ahead and state your
10 objection then.
11      MR. BYRNES: I don't want it clouded. It
12 misstates testimony, so the answer to the question
13 may not be what you think it is.
14      THE WITNESS: And also during that period
15 of time asked to be removed as the volunteer
16 coordinator.
17      BY MS. JOHNSON:
18      Q.   Why did you make that request?
19      A.   I made that request in order to -- so I
20 would be able to focus on -- I would have the time to
21 work on the electronic field trip and the video
22 conferences and the grant writing project.

**Page 167**

1      It became important to me to be removed as
2 the volunteer coordinator when I was asked to have
3 post-docs, postdoctoral students, post-docs and
4 research associates, volunteers, in order to, as it
5 was explained to me, get around the Smithsonian's
6 policy about workmens' comp. and insurance coverage.
7      And I objected to making them volunteers
8 because they weren't volunteers, so I would be
9 misrepresenting them as volunteers to BIARC, and also
10 they were receiving stipends, at least some of them,
11 and so in a sense they would be compensated twice.
12 They would receive their stipend plus the tax
13 benefits of having the volunteer hours.
14      And so -- and again, after the IG
15 investigation, I did not want to do anything that
16 even had the appearance of being improper, and so I
17 raised those objections and was told that SERC had
18 checked with General Counsel's office in the
19 Smithsonian and had been told that it was okay and to
20 go ahead and do it.
21      But I continued to express my concern at
22 being asked to do that and it would just be best if I

**Page 168**

1 was not the volunteer coordinator and would,
2 therefore, not be in that position.
3      Q.   Who did you express your concerns to?
4      A.   Mr. Haddon.
5      Q.   What was his response?
6      A.   His response was that he would look into
7 it, and then he came back and said that he had looked
8 into it and that General Counsel had said that it was
9 all right to go ahead with but that Mr. Haddon would
10 consider having me moved as volunteer coordinator.
11      Q.   Did you ever communicate that concern to
12 Mr. Simons?
13      A.   I do believe Mr. Simons was involved in
14 that, but again, I'm trying to remember the dates of
15 when Mr. Simons was there and when Mr. Simons was
16 not.
17      MS. JOHNSON: Let's mark this as Exhibit
18 17.
19      (Exhibit Number 17 was marked for
20 identification and was retained by counsel.)
21      BY MS. JOHNSON:
22      Q.   Take a moment to look through what's been

**Page 169**

1 marked as Exhibit 17. Have you had a chance to
2 review what's been marked as Exhibit 17?
3      A.   Yes.
4      Q.   Is this the E-mail you were referring to
5 on page 2 of the exhibit?
6      A.   Yes, so this is the E-mail after my
7 initial concern about making people who weren't
8 volunteers, so this is Ross's response to me and to
9 Mark and to Bob Galligher.
10      Q.   So Mr. Simons was in the office at this
11 time, to your knowledge?
12      A.   To my knowledge, yes.
13      Q.   And when you expressed your concern
14 regarding taking -- being taking -- having the role
15 of volunteer coordinator being taken away from you,
16 what was your primary concern expressed in the
17 E-mail?
18      A.   I did not want to be doing anything that
19 even -- that to use Mr. Roy's words, didn't pass the
20 smell test, and I didn't want to be involved in
21 making people volunteers who were not volunteers and
22 reporting hours that they were volunteering that they

43 (Pages 166 to 169)

Doratha Klugel

Page 170

1 were not actually volunteering. They were research
2 assistants and post-docs.
3        I did not want to be involved in that.
4    Q.   Mr. Simons indicated that he was not able
5 to shift the role at that time. At any point, was
6 that taken away from you, the role as a volunteer
7 coordinator?
8    A.   I don't remember. Mark and I had talked
9 about removing me as volunteer coordinator after my
10 car accident. It was not a critical element in my
11 performance review as doing the electronic field
12 trips and the video conferences and the other
13 distance learning, and so it made sense to remove
14 that from my duties.
15        He told me that that made sense to him as
16 well, but he never took any action to do so. Then
17 when this happened in February we revisited the issue
18 of me as volunteer coordinator.
19    Q.   But you still stayed on as volunteer
20 coordinator is my question?
21    A.   I don't remember what ended up happening.
22    Q.   Okay. After you were told that the

Page 171

1 electronic field conferences -- field trips -- I'm
2 sorry.
3        I'm confusing them with the video
4 conference -- the electronic field trips were being
5 taken away from you, what responsibilities did you
6 have left?
7    A.   At that point, the responsibilities I had
8 left if I was still volunteer coordinator -- again, I
9 don't remember whatever happened with that -- I would
10 have still been volunteer coordinator and conducting
11 video conferences.
12    Q.   Okay. Do you recall during that time when
13 you were told that the electronic field trips were
14 being taken away from you how many video conferences
15 you were working on?
16    A.   I don't remember.
17    Q.   Was it keeping you busy?
18    A.   Yes. Yes.
19    Q.   And looking at Exhibit 17 again, was there
20 any reason why you didn't state to Mr. Simons in your
21 E-mail that you had concerns about listing people as
22 volunteers when they were not? You cited your

Page 172

1 workload.
2    A.   Right. I had cited those concerns to Mark
3 and I believe Mark had shared those with Ross and
4 then the E-mails we're seeing here in Exhibit 17 were
5 the subsequent conversations after I expressed my
6 concerns.
7    Q.   Did you ever express those concerns in
8 written form to Mr. Simons directly?
9    A.   I don't remember. I do believe I E-mailed
10 those to my supervisor to share those with Ross
11 Simons. I do not recall sharing those directly with
12 Mr. Simons.
13    Q.   Were you ever placed on a progress report?
14    A.   Yes.
15    Q.   What do you understand that term to mean,
16 progress report?
17    A.   I didn't understand it as it had never
18 happened to me before and never happened to anybody
19 else in the department before that I received an
20 E-mail from Mark. I do not remember — it was after
21 the IG investigation. It was after raising
22 objections to this.

Page 173

1        It was after objections to wanting medical
2 documents after all of that. Then it was — I was
3 placed on a progress report, so it probably would
4 have been sometime in April.
5    Q.   I'll refer you to your complaint, which is
6 Exhibit 10, paragraph 23. It's on page 5. It says
7 in further retaliation of reprisal on May 2nd, 2005,
8 the Smithsonian Institution placed Ms. Klugel on a
9 progress report despite no documented performance
10 deficiencies.
11        Does that allegation remind you -- refresh
12 your memory as to the timing that this progress
13 report may have — you may have been placed on a
14 progress report?
15    A.   Again, it happened sometime at the end of
16 April.
17    Q.   Okay. And who told you you were being
18 placed on a progress report?
19    A.   Mr. Haddon.
20    Q.   And what did he say to you?
21    A.   He used the words progress report. I
22 believe it was in an E-mail.

44 (Pages 170 to 173)

Doratha Klugel

Page 174

1   Q.   Do you recall anything about the way it
2 was phrased like you were being placed on a progress
3 report?
4   A.   Yes. I'm trying to remember the phrasing.
5 I believe it was -- there was an E-mail about he
6 needed to meet with me about -- I don't remember. I
7 don't remember the words progress report and I
8 remember meeting to discuss my job duties and my
9 continued job duties at SERC or my ongoing job duties
10 at SERC. It was in the E-mail.
11   Q.   Okay. Was it an E-mail from Mr. Haddon to
12 you?
13   A.   To the best of my recollection, I believe.
14   Q.   Did he ever give you a written document
15 that he said this is the progress report? I'm trying
16 to understand -- I don't have an E-mail here.
17   A.   There was an E-mail about progress report
18 and needing to meet with my ongoing job duties.
19   Q.   Did you have that meeting?
20   A.   Yes.
21   Q.   Who was that meeting with?
22   A.   Mr. Haddon.

Page 175

1   Q.   Just the two of you?
2   A.   Yes.
3   Q.   And what was discussed during that
4 meeting?
5   A.   The progress of the projects I was working
6 on.
7   Q.   Did he express any dissatisfaction or any
8 reaction to how the progress was going?
9   A.   I don't remember.
10   Q.   Aside from this meeting, were there any
11 other actions regarding the progress report?
12   A.   I think from that meeting, that action
13 that was to be taken, I would need to meet with him
14 on a regular basis to update the progress report.
15   Q.   Was there a written report that you were
16 aware of?
17   A.   Not that I'm aware of.
18   Q.   Did you ever ask him if a written report
19 was being created or what this progress report would
20 be used for -- well, let me break it up.
21        Did you ever ask him whether or not he was
22 going to be writing some kind of progress report?

Page 176

1   A.   I don't remember asking that.
2   Q.   Did you ever ask him what the purpose of
3 the progress report was?
4   A.   Yes. I asked him what the purpose of the
5 progress report was and whether the progress report
6 -- whether this was action that was still continuing
7 to stem out of the IG investigation and my complaint
8 of how I was treated during that investigation and my
9 need to take off for physical therapy and his
10 questions about whether I was actually going to
11 physical therapy.
12        I was wondering if these were all
13 questions about whether he thought I was doing my job
14 or not.
15   Q.   And what was his response?
16   A.   His response was that he had recently gone
17 to supervisory training or recently received some
18 sort of training and during that -- from that
19 training he realized that he should be doing this
20 with me. That was his explanation.
21   Q.   Did you ask him if any other employees
22 were also going to be on similar progress reports?

Page 177

1   A.   I don't know if I asked him that question.
2   Q.   Did you have any knowledge of any other
3 employees being placed on similar progress reports?
4   A.   I did not have any knowledge of any other
5 employees being on progress reports.
6   Q.   Did you ever have any discussions with Mr.
7 Galligher about this progress report?
8   A.   I did not.
9   Q.   What about Mr. Simons, if he was around?
10   A.   I did not.
11   Q.   So after certain responsibilities have
12 been removed, you continued to deal with the video
13 conferences and serve as the SERC volunteer
14 coordinator. Were there any other responsibilities
15 you had that I've not listed?
16   A.   Not that I remember, no. And again, I'm
17 unclear about the volunteer coordinator thing what
18 exactly got resolved with that, if anything.
19        MR. BYRNES: How are we doing on time,
20 Counsel?
21        MS. JOHNSON: I mean, I have probably
22 another 40 minutes.

45 (Pages 174 to 177)

EXHIBIT 3

Doratha C. Klugel

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3

 4 DORATHA KLUGEL,              *

 5            Plaintiff,    * Civil Action 06-01886

 6 vs.                           *

 7 CHRISTIAN SAMPER, et al,  *

 8            Defendants.    * Pages 1 - 107

 9

10

11

12                    (VOLUME II)

13        Deposition of Doratha C. Klugel

14               Washington, D.C.

15             Thursday, May 8, 2008

16

17

18

19

20

21 Reported by:  Carla J. Briggs, RPR-RMR-CRR

22 Job No. 187245a
```

**Doratha C. Klugel**

Page 6

1 marked for identification.)

2　　　BY MS. JOHNSON:

3　Q　And take your time to look at the entire

4 document. My question will concern the last page of

5 this document.

6　A　Okay.

7　　　(Witness reviews the document.)

8　Q　And my question is this: You had

9 indicated that there was a form on which Mr. Haddon

10 had denied you leave. Does this look like the form

11 on this last page where he had denied you leave you

12 had requested?

13　A　I don't -- I can't be for certain, but I

14 think it was a later date than this.

15　Q　Okay.

16　A　They were all the same forms, and so all

17 of the forms obviously look the same. There was not

18 any of this other writing on here. The form I had,

19 Mark had not signed, and I think it was a couple of

20 days after this. I can't be for certain.

21　Q　Okay.

22　A　I'm not sure if this is that form.

Page 7

1　Q　Okay. When Mr. Haddon denied you that

2 leave in April or May, do you know if, in fact, you

3 were eventually allowed to take that leave? Do you

4 remember?

5　A　I do not believe so, and I believe I

6 resigned a few days later.

7　　　MS. JOHNSON: We'll mark this as

8 Exhibit 20.

9　　　(Klugel Deposition Exhibit Number 20 was

10 marked for identification.)

11　　　BY MS. JOHNSON:

12　Q　If you could just take a minute to review

13 it, and let me know if that appears to be the time

14 sheet you may be referring to. Actually, there's

15 documentation on the back as well.

16　　　(Witness reviews the document.)

17　A　Again, I don't know. This one is dated

18 for May, and the one I'm recollecting was the end of

19 April.

20　Q　Okay. And none of the documents in

21 Exhibit 18, which I believe are time sheets from the

22 end of April --

Page 8

1　　　MS. NICHOLSON: 19.

2　Q　I'm sorry. Exhibit 19. -- appear to be

3 the document. If you turn the page, there's the

4 actual sheets from April. Do any of those appear to

5 be the document you were referring to?

6　　　(Witness reviews the document.)

7　A　No, none of these appear to be the one

8 that I am recollecting, no.

9　Q　Okay. You stated that you resigned a few

10 days later. Do you remember when you first notified

11 someone at SERC -- and that's S-E-R-C -- that you

12 were resigning?

13　A　I informed Mr. Haddon at some point in May

14 when I was meeting with him.

15　Q　Did you inform him orally? Were you

16 having a conversation with him?

17　A　We were having a conversation, and I

18 informed him during that conversation.

19　Q　And did you tell him why you were

20 resigning?

21　A　I gave him my resignation letter which

22 stated why I was resigning.

Page 9

1　Q　Okay.

2　　　MS. JOHNSON: Go ahead and mark that as

3 Exhibit 21.

4　　　(Klugel Deposition Exhibit Number 21 was

5 marked for identification.)

6　　　BY MS. JOHNSON:

7　Q　Ma'am, do you recognize what's been marked

8 as Exhibit 21?

9　A　I do.

10　Q　Is this the resignation letter you were

11 referring to?

12　A　Yes.

13　Q　Prior to submitting this resignation, had

14 you told anyone at SERC that you were going to be

15 resigning?

16　A　I do not believe so, no.

17　Q　Had you had any discussions with anyone at

18 SERC about the specific allegations you made in your

19 resignation letter, specifically the hostility you

20 were facing in your work environment, denial of

21 leave, inappropriate review of travel, an attempt to

22 obstruct your ability to use and consult with

3 (Pages 6 to 9)

**Doratha C. Klugel**

Page 10

1 counsel, and discrimination based on gender?

2    A   Yes. These were all ongoing conversations

3 that Mark Haddon and Bob Gallagher and I were having

4 over the months after the IG investigation.

5    Q   And how many conversations, if you can

6 estimate? Were they something that was happening

7 daily or frequently, infrequently? I'm just trying

8 to get an idea of timing.

9    A   It was frequently. I don't know if it was

10 every day, but things were happening every week.

11    Q   When you were referring to the hostility

12 you faced in your work environment, what are

13 specific actions that have been taken against you

14 that you felt were hostile towards you?

15    A   Well, there was the investigation by the

16 IG, there was the way the Special Agent Roy treated

17 me -- certainly hostile -- and then there was

18 Mr. Haddon's hostility towards me when he told me

19 that this was all my fault and I had brought all of

20 this on and I had disease in my body. There was the

21 hostility that Mr. Haddon and Mr. Simons and

22 Mr. Gallagher described that Kathie Suite and Carol

Page 11

1 Ailes had against me, and that that hostility had

2 not gone away and would continue to affect my

3 ability to travel and, therefore, my ability to do

4 my job, and it continued with the hostility

5 Mr. Haddon had towards me and Mr. Gallagher had

6 towards me after I told them I was represented by

7 counsel, and that's really when -- well -- and the

8 hostility had been pretty rampant and pretty high up

9 until that point, but it certainly escalated after I

10 told the two of them I was represented by counsel

11 and they needed to address my attorney about the

12 questions about my employment.

13        They were mad and Mark was mad because --

14 and some point during I think one of our progress --

15 the progress report, he said to me that I was the

16 one that was holding on to this and I was the one

17 that wouldn't let this go and people at SERC weren't

18 happy with me and people outside of SERC weren't

19 happy with me and it was all because I wouldn't let

20 this go, then he took me off projects because he

21 said I had bad chemistry, so that's hostility that

22 continues to go on.

Page 12

1        There's the denial of leave. This

2 inappropriate review of my travel references back to

3 this investigation with the IG. Again, Gallagher

4 and Haddon and Ross all told me that nobody at SERC

5 thought I had done anything wrong, that it was

6 clearly because -- that it was because Kathie Suite

7 and Carol Ailes didn't like me, that I was going to

8 need to keep my head down at my desk, I was a marked

9 employee, and then, right, the insistence that I see

10 an employment -- the employee assistance counselor

11 to talk about, right, my stresses in my life, and

12 that I couldn't see -- I could have an attorney

13 present. And these projects that I was taken off

14 of -- the electronic field trip, the writing the

15 grant -- they were all male employees who had no

16 experience doing those projects or working with

17 those partners were given those duties to do, and so

18 that's the discrimination that I'm referencing here

19 in this letter.

20    Q   Do you know which male employee was given

21 the responsibility for writing the grant?

22    A   I believe it was Wayne Coats, C-O-A-T-S.

Page 13

1    Q   Was he an employee in SERC?

2    A   Yes.

3    Q   Thank you.

4        And what about the electronic field trip?

5 Do you know who was given that responsibility?

6    A   Greg Ruiz, R-U-I-Z, also an employee of

7 SERC.

8    Q   After the OIG had spoken to you about your

9 travel, did you ever have any conversations with

10 Miss Suite or Miss Ailes regarding the hostility

11 that you were hearing they were feeling towards you?

12    A   No. I thought it was best not to talk

13 directly to them. Mr. Simons had told me to stay at

14 my desk and keep my head down with them, and so I

15 took his advice.

16    Q   Were either Miss Ailes or Miss Suite in a

17 supervisory position over you?

18    A   No.

19    Q   Did you know who their supervisor was?

20    A   Bob Gallagher, I believe, was Mrs. Suite's

21 supervisor and I believe Judy Petroski,

22 P-E-T-R-O-S-K-I, was Mrs. Ailes's supervisor, but

4 (Pages 10 to 13)

**Doratha C. Klugel**

Page 18

1    A    Yes.

2    Q    How would you describe your working
3    relationship with him up until December of '04 when
4    you had the OIG come speak with you?

5    A    I would describe our working relationship
6    as very good.

7    Q    And so when did it change for you, in your
8    mind?

9    A    It changed -- our working relationship
10   changed, in my mind, when I complained to him about
11   how Mr. Roy had treated me during the investigation,
12   and it continued to deteriorate after that.

13   Q    What about Mr. Gallagher? Had you worked
14   with Mr. Gallagher since roughly 2001?

15   A    No. Mr. Gallagher was a recent -- a
16   recent hire at SERC. I'm not even -- I may have met
17   him once or twice before all of this -- before
18   December of 2004.

19   Q    Okay. What about Mr. Hines? Had you
20   worked with Mr. Hines for any length of time?

21   A    I had worked with Mr. Hines, yes.

22   Q    So how would you describe your

Page 19

1    relationship with working with Mr. Hines from the
2    time you began working with him in -- was it 2001
3    roughly?

4    A    Yes. The first electronic field trip we
5    did at SERC was based primarily on Mr. Hines's
6    research lab -- the "crab lab" as it's
7    affectionately called that he was the primary
8    investigator for -- so I had worked with him on that
9    electronic field trip.

10   Q    Did you say "crab lab"?

11   A    Crab lab, yes.

12   Q    Were there crabs kept there?

13   A    Yes. He does research on the blue crab
14   population in the Chesapeake Bay.

15   Q    Okay.

16   A    And then Mr. Hines had accompanied us to
17   do the electronic field trip in Belize -- I'm not
18   going to be able to remember what year that was --
19   2003, 2004 -- and so we had worked together then as
20   well.

21   Q    And how was your working relationship with
22   him?

Page 20

1    A    I thought it was fine.

2    Q    Did you notice any change in the
3    relationship prior to the time you resigned?

4    A    I had very little interaction with
5    Mr. Hines after -- after the Belize trip, I had very
6    little interaction with Mr. Hines; so, no, I did not
7    notice any change. Yeah. I'm trying to remember.
8    I don't remember very much interaction at all with
9    him after that Belize trip.

10   Q    Did you have very much interaction with
11   Mr. Simons?

12   A    Again, Mr. Simons was sometimes there and
13   sometimes not there. We did not have any change in
14   our working relationship, yeah. And I went to
15   Mr. Hines to talk to him about the IG investigation
16   and what had happened, and I found him to be very
17   forthcoming and very supportive during that meeting.

18   Q    How many of the employees were working in
19   SERC in 2004? Were there many?

20   A    There was maybe a hundred -- somewhere
21   between a hundred and a hundred and fifty. I think
22   if you count everybody in all of the research

Page 21

1    labs -- all of the post-docs, research assistants --
2    maybe a hundred, yeah.

3    Q    Were you working in a very specific lab?

4    A    I was working in the Education Center
5    which was also just a -- sort of about a mile away
6    from the main campus.

7    Q    And how many employees, if you know, were
8    in the Education Center?

9    A    At the time -- roughly around 2004, there
10   were five, including Mr. Haddon and myself.

11   Q    Do you remember who those persons were?
12   There was Amy Erb, we know.

13   A    Amy Erb, Jane Holly, and Anna
14   Vanderheijden, V-A-N-D-E-R-H-E-I-J-D-E-N.

15   Q    And how was your relationship with the
16   other four -- other three women who were working
17   there in around 2004? Any change in your working
18   relationships with them?

19   A    No. We had a very good working
20   relationship -- the three of us -- and there was no
21   change in our relationship after that.

22   Q    And this letter indicated that your last

6 (Pages 18 to 21)

**Doratha C. Klugel**

Page 30

1 outreach ministries.

2    Q    That's a long title.

3    A    I have really big business cards.

4    Q    Okay.  What are your job responsibilities?

5    A    My job responsibilities as the student

6 associate is to seek funding for diversity training

7 between Capitol Hill United Methodist Church and

8 Ebenezer United Methodist Church, to plan and

9 coordinate and implement the diversity training

10 between the two congregations, to sit on the

11 Ebenezer Capitol Hill Cooperative Parish Council --

12 yes, Ebenezer Capitol Hill Cooperative Parish

13 Council -- and to help facilitate and organize the

14 outreach ministries of Capitol Hill United Methodist

15 Church.

16    Q    How long have you been in this position?

17    A    Two-and-a-half years roughly.  Since

18 December 2005, I believe.

19    Q    What's your annual salary there?

20    A    $15,000.

21    Q    Are you working anywhere else?

22    A    As of a week or two ago, I am also doing

Page 31

1 some contract work for the Animals and Religion

2 Department of the United States Humane Society.

3    Q    I'm assuming since it's only been a week,

4 you don't really know what your earnings are, but do

5 you have any kind of agreement in place as to how

6 much you will be paid?

7    A    $20 an hour, 10 hours a week.

8    Q    Are you taking any classes or anything

9 right now?

10    A    Yes.

11    Q    Where are you taking classes?

12    A    Wesley Theological Seminary.

13    Q    When did you start classes there?

14    A    I began as a special student at Wesley

15 Theological Seminary fall of '04.

16    Q    And what will be your -- I'm very ignorant

17 when it comes to seminary, so is there a degree that

18 you're looking to obtain?

19    A    I am seeking a Master's of Divinity

20 degree.

21    Q    Do you plan to preach or teach or -- what

22 does one do -- what do you plan to do with your

Page 32

1 Master's of Divinity I guess I should ask?

2    A    I am obtaining a Master's of Divinity

3 degree to be ordained as a United Methodist

4 minister.

5    Q    Okay.

6    A    Preaching periodically and teaching

7 periodically are also part of my duties as student

8 associate at Capitol Hill United Methodist Church.

9    Q    Okay.  Are you enjoying your work now?

10    A    Yes.

11    Q    Now, are there medical expenses that you

12 will seek as damages in this lawsuit, medical bills

13 that you feel stem from the treatment you allege in

14 your complaint?

15    A    No.

16    Q    Were there any kind of emotional stresses

17 or -- any claims for emotional distress stemming

18 from the allegations in your complaint?

19    A    Yes. I suffered, yeah, extensive

20 emotional distress starting with the IG

21 investigation and then the hostility and retaliation

22 from Mr. Haddon and Mr. Gallagher.  That continued

Page 33

1 for months until having to resign so as not to be

2 fired.  It was a terribly emotionally stressful

3 time.  I would come home and cry and was miserable,

4 and emotional disturbance/emotional distress from

5 realizing that my career at the Smithsonian was

6 gone, had been destroyed by two people deciding that

7 they didn't like my attitude and the way to adjust

8 my attitude was to go over every supervisor's head

9 and go straight to the IG.

10         It was all I'd ever wanted to do was to be

11 a marine biologist and to work for the Smithsonian.

12 I remember my parents taking me to the Natural

13 History Museum and I was walking in the Sea Life

14 Hall under the big blue whale and thinking "I want

15 to do this and I want to work here."  And then in

16 1993 after graduation from college, I was there.  I

17 was working at the Smithsonian and was terribly

18 proud of that and worked very, very hard at my job

19 and was recognized for my hard work by special

20 awards and acts, and then all of a sudden -- all of

21 a sudden -- my credibility had been questioned, I'd

22 was on the Inspector General's radar screen, I'd

9 (Pages 30 to 33)

Page 34

1 been physically threatened, I'd been threatened with
2 arrest, and Mr. Haddon was mad at me because, in his
3 words, "I wouldn't let it go." And from that place,
4 he then began reacting to me by denying leave and
5 taking away my assignments, assignments that he
6 himself had recommended me for awards for. It
7 didn't make any sense, and I was distraught by how
8 quickly it had all unraveled and come to an end, and
9 nobody was doing anything about it. Nobody and no
10 one could protect me from Kathie Suite and Carol
11 Ailes not doing it to me again.
12    Q    During this period, did you consult with a
13 psychologist or psychiatrist about the stress you
14 were feeling?
15    A    I believe at that time, I was seeing a
16 psychologist.
17    Q    Could you tell me his or her name?
18    A    Jade Chen, C-H-E-N, is her name.
19    Q    Is Miss Chen in Washington, D.C.?
20    A    She is in Greenbelt, Maryland.
21    Q    Do you know how often you were seeing her
22 and what — well, let me first ask what period of

Page 35

1 time it would have been that you were talking to her
2 about the stress at work?
3    A    I don't remember. I had seen her on and
4 off for a period of time. I believe I was seeing
5 her once a week or so during that particular time,
6 so after December 2004, I may have been seeing her
7 before then, but then was seeing her throughout that
8 period of time and then afterwards as well to deal
9 with the emotional distress of that period of time
10 and then no longer being able to work at the
11 Smithsonian.
12    Q    Did Dr. Chen — was she a psychologist or
13 psychiatrist?
14    A    I think she's a social worker technically,
15 but she's not a psychiatrist. She is Dr. Chen, so
16 it must be a degree -- Ph.D -- in social work, but
17 not a medical degree.
18    Q    Did she ever tell you you were -- like
19 give you a diagnoseable condition?
20    A    If she did have a diagnosis for me, she
21 did not share that with me.
22    Q    And did she ever recommend that you start

Page 36

1 taking any medication to deal with the stress that
2 you were feeling?
3    A    She was not a doctor, and so we did not
4 discuss medication.
5    Q    Okay. Did you ever start taking any kind
6 of medication to deal with the stress?
7    A    I do believe that Dr. Chen already knew
8 that I was on Celexa, which is an antidepressant.
9    Q    How long have you been on Celesta?
10 Celesta?
11    A    Celexa, C-E-L-E-X-A.
12    Q    Okay. Thank you.
13    A    That was prescribed by my
14 gastroenterologist, Dr. Trujillo, to help deal with
15 my irritable bowel syndrome, which is also
16 exacerbated by emotional stress. Clearly, that was
17 an emotionally stressful period of time that
18 contributed to my irritable bowel syndrome.
19    Q    Were there any other drugs that you may
20 have been taking in this period in 2004? And we can
21 actually refer to -- there was that list that you
22 had printed out. I think you said those were all

Page 37

1 the drugs -- let me find it so I'm not just
2 referring in a vacuum. I think it was Exhibit --
3 yeah, Exhibit 13.
4         Was the Gabitril -- I think we had talked
5 about the others except for the Gabitril and the
6 Temazepam.
7    A    Right. The Gabitril and Temazepam were
8 for the sleeping disorder that I was diagnosed with
9 during that period of time.
10    Q    When you say this period, this is all,
11 like, December of '04?
12    A    Yes.
13    Q    And did Dr. Trujillo prescribe you that
14 medication?
15    A    No. I saw a neurologist for that. I just
16 blanked on her name.
17    Q    Was it someone in D.C.?
18    A    Yes.
19    Q    Did you see the neurologist specifically
20 for the sleeping issues that you were having?
21    A    Yes.
22    Q    Did you have to start seeing him or her on

10 (Pages 34 to 37)

Doratha C. Klugel

Page 50

1   Q   Take a minute to look at that.

2   A   (Witness complies.)

3   Q   I see that your Social Security number is

4 on there. I ought to mark that out.

5       MR. BYRNES: Well, I think we know what it

6 is, so --

7       MS. JOHNSON: Well, yeah, but just in case

8 the deposition transcript gets in someone else's

9 hands.

10      MR. BYRNES: And I also now think the

11 federal courts are now requiring that, but I'm not

12 sure.

13      MS. JOHNSON: They do.

14      MR. BYRNES: Yeah. They require you to

15 excise it.

16      MS. JOHNSON: I usually remember to do it.

17 I'm sorry.

18      BY MS. JOHNSON:

19   Q   I previously had asked you whether you had

20 an understanding that your appointment at SERC as a

21 trust employee would be a temporary appointment

22 and --

Page 51

1       MR. BYRNES: Objection. It calls for a

2 legal conclusion.

3   Q   -- you said no. Do you recognize --

4   A   I'm sorry. Could you repeat that?

5   Q   Sure. Previously -- meaning Tuesday -- I

6 had asked you whether or not you had any

7 understanding that your status as a trust employee

8 would be temporary or might be subject to funding,

9 and you -- I believe you said -- and I don't want to

10 put words in your mouth -- that you thought that it

11 would be indefinite, the position would last

12 indefinitely?

13   A   Yes.

14   Q   My question is whether you recognize the

15 documents that have been marked as Exhibit 23. Have

16 you ever seen these before?

17   A   I've seen personnel notification documents

18 before. I can't say whether I've seen these

19 specific ones before or not.

20   Q   Okay. So you had no knowledge that SERC

21 was categorizing your appointment as temporary?

22      MR. BYRNES: Objection; calls for a legal

Page 52

1 conclusion. Objection; assumes facts not in

2 evidence, calls for her to speculate.

3   A   I knew I wasn't a permanent employee, and

4 so whatever language SERC used for that. I knew

5 that I was a trust fund employee, and trust fund

6 employees were not permanent employees. I did

7 understand that, yes.

8       MS. JOHNSON: Let's take a five-minute

9 break. I think I'm almost done. So I'll just go

10 over my notes, okay?

11      MR. BYRNES: Okay.

12      (Brief Recess.)

13      BY MS. JOHNSON:

14   Q   Miss Klugel, I just have a few more

15 follow-up questions.

16      The documents that we've marked as

17 Exhibit 23 -- those are right in front of you, I

18 think.

19   A   Okay.

20   Q   Even though I think the first page may be

21 missing. Here's the first page.

22      I know you said you don't remember

Page 53

1 receiving them, but did you typically receive

2 documents of this nature?

3   A   Yes.

4   Q   Did you have any specific recollection of

5 receiving any documents notifying you that your

6 appointment might be ending on a certain date?

7   A   No.

8   Q   Do you remember receiving any documents

9 notifying you that your appointment had been

10 extended for a certain period of time?

11   A   Well, that's what this document is.

12   Q   Well, you said you didn't remember

13 receiving these specific ones. I'm just asking if

14 you recall receiving any specific ones in which they

15 notified you that your appointment had been extended

16 for a period of time?

17   A   I don't remember receiving a specific

18 document, no.

19   Q   Did you understand that your position was

20 subject to funding?

21   A   Yes.

22   Q   And how did you come to that

14 (Pages 50 to 53)

**Doratha C. Klugel**

Page 54

1 understanding?

2    A    I was told that upon hiring.

3    Q    By who?

4    A    By Mr. Haddon and Mr. Simons.

5    Q    Did Mr. Haddon or Mr. Simons -- well, did
6 you know there was a grant that had been provided to
7 SERC that would be funding your position?

8    A    Yes.

9    Q    Did you have any understanding of how long
10 the grant was funded for, the period of time?

11    A    I believe the grant was funded for five
12 years, and then there was the grant that SERC and
13 Project View was going to apply for during the 2005
14 period of time. That was the grant that I was not
15 allowed to work on and Mr. Haddon removed me from
16 working on.

17    Q    Did you have any discussions with
18 Mr. Haddon regarding funding running out for your
19 position at any time?

20    A    What do you mean by "discussion"? I mean,
21 what did --

22    Q    Do you recall any --

Page 55

1    A    Could you clarify?

2    Q    Sure. Do you recall any specific
3 discussions with Mr. Haddon in which he may have
4 informed you that he had concerns about funding for
5 your position running out?

6    A    I don't remember him ever saying that he
7 had concerns about my funding running out. There
8 was the discussion about the grant that SERC was
9 going to work on with Project View, and so I was
10 eager to work on that grant. He removed me from
11 that grant. We also had other funders, and so I
12 knew there was funding from other sources.

13    Q    Did you know what other sources there was
14 funding from?

15    A    Yes. Ball State University and Best Buy
16 Corporation.

17    Q    Did you know a woman by the name of Diane
18 Wilkinson?

19    A    Yes.

20    Q    Who did you know Miss Wilkinson to be?

21    A    She worked for Project View.

22    Q    Did you ever have any discussions with

Page 56

1 Miss Wilkinson about funding for your position

2 running out?

3    A    In 2005?

4    Q    At any time.

5    A    I don't remember. I know that the grant
6 that Project View and SERC were going to work on in
7 2005, Sal De'Angelo -- D-E apostrophe A-N-G-E-L-O --
8 Sal De'Angelo and Diane Wilkinson came to D.C. to
9 meet with SERC to talk about writing this grant.
10 Mark would not let me go to the meeting and would
11 not let me work on the grant. The two of them
12 contacted me and were concerned about why I would
13 not be involved in the discussions. I told them I
14 didn't know. They would need to talk with my
15 supervisor. So those are the discussions I remember
16 about the funding and Project View.

17    Q    Okay. Nothing specific with
18 Miss Wilkinson though?

19    A    Not that I remember.

20    Q    And how much are you seeking in comp
21 damages -- compensatory damages -- figure-wise?

22        MR. BYRNES: Objection; calls for a legal

Page 57

1 conclusion.

2    A    That is in my -- the figure is in my
3 complaint, whatever this exhibit is.

4    Q    Yeah, Exhibit 10.

5    A    Exhibit 10.

6    Q    Yeah. Actually, there isn't a figure.
7 That's why I was asking, to try to get an idea.

8        MR. BYRNES: Well, that calls for a legal
9 conclusion and calls for interpretation of the
10 statute.

11    A    Right. I would need to consult with
12 counsel about that.

13        MS. JOHNSON: I have no further questions.

14        MR. BYRNES: I just have a few.

15        MS. NICHOLSON: Could we hold on just a
16 second?

17        (Brief discussion off the record.)

18        MS. JOHNSON: I'm going to stay on the
19 record about the documents you've not yet produced.

20        MR. BYRNES: Okay. Well, we've already
21 told you that we're going to --

22        MS. JOHNSON: Yeah.

15 (Pages 54 to 57)

**Doratha C. Klugel**

Page 78

1 Ball State University.

2    Q    So did you ever take a trip or apply to
3 take a trip for Project View which you didn't seek
4 funding from the Smithsonian for?  In other words,
5 that you sought to pay on your own or —

6    A    Yes.

7    Q    What was that trip?

8    A    That was the rescheduling of the Belize
9 trip and for the manatee tagging project in April of
10 '05.

11    Q    But if Project View was funding SERC, did
12 you believe that going on the Belize trip was not
13 part of the official business you were doing for
14 SERC?

15    A    The Belize trip was being rescheduled
16 because I had been in a car accident and broken my
17 arm and had not been able to keep that commitment
18 and obligation to one of our funders.  I wanted to
19 keep our funders happy since they were the ones who
20 were funding my position.  By that point, the
21 hostility in the workplace and Mr. Haddon's dealings
22 with me were such that I was going to travel with

Page 79

1 Project View to Belize, not at all at the
2 Smithsonian's expense.

3    Q    But that was for official business, wasn't
4 it?

5    MS. JOHNSON:  Objection as to form.

6    A    Mr. Haddon wouldn't approve that trip, and
7 so -- and so no, it was not going to end up being
8 for official travel.

9    Q    Did you have any discussions with Project
10 View as to whether they were in any way disgruntled
11 by what happened to you in the workplace?

12    MS. JOHNSON:  Objection to vague.

13    A    They were very unhappy.  They were unhappy
14 when I wasn't allowed to meet with them when they
15 specifically came from New York to Washington, D.C.
16 They called and wanted to know why.  When the Panama
17 trip got rescheduled -- Mark approved the Panama
18 trip being rescheduled.  He then denied the trip and
19 told me to tell Project View.  Project View told me
20 to tell Mark that they were very unhappy and that
21 this would affect their working relationship and
22 implications for the grant.  That concerned me.

Page 80

1    I wasn't — it occurred to me that Mark
2 was possibly sabotaging the working relationship
3 with Project View so that there would be no more
4 funding so that I would be terminated; that I would,
5 in a sense, be fired.  Project View was then very
6 unhappy when they went to work with Mark — went to
7 work with SERC on the writing an additional grant
8 and I was not allowed to participate in that, and a
9 male SERC employee who had no experience working
10 with Project View and their grant was given that
11 assignment.

12    Q    Who was that employee?

13    A    Wayne Coats.

14    Q    And there was another male employee you
15 mentioned who'd been given another assignment that
16 you'd had?

17    A    Greg Ruiz had been given the assignment to
18 produce and host the electronic field trip even
19 though SERC was contractually obligated with Ball
20 State and Best Buy for me to produce and host
21 electronic field trips.

22    Q    And where was that electronic field trip

Page 81

1 going to be held that Mark Ruiz (sic) was going to
2 have to produce and host?

3    A    That electronic field trip was going to
4 happen in San Francisco.

5    Q    And this gentleman, what's his name again?
6 I'm sorry.

7    A    Dr. Greg Ruiz.

8    Q    Okay.  And do you know what his position
9 was prior to that?

10    MS. JOHNSON:  Objection; vague.

11    A    He was the senior scientist of the
12 invasive species -- invasive biology lab at SERC.

13    Q    Okay.  There was some communications that
14 maybe you didn't get along with him.  Do you recall
15 those?

16    A    Yes.  Mark told me I had bad chemistry
17 with Greg Ruiz, and took me off of that project.

18    Q    Okay.  And that was -- do you know whether
19 or not Mr. Ruiz wanted to go to San Francisco?

20    MS. JOHNSON:  Objection; calls for
21 speculation.

22    A    Mr. Ruiz did want to go to San Francisco.

21 (Pages 78 to 81)

EXHIBIT 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Doratha Klugel, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action 06-01886 (HHK) |
| | ) | |
| G. Wayne Clough, Secretary, | ) | |
| Smithsonian Institution, | ) | |
| | ) | |
| and the United States of America, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF ALEXANDER MARK HADDON

1. I am the Education Director for the Smithsonian Environmental Research Center, a unit of the Smithsonian Institution, located in Edgewater, Maryland. I have held this position since 1989.

2. In my official capacity, I oversee all programs intended to educate the public about research being conducted at SERC. I also seek and administer funding for the department's programs which comes primarily from grants from outside sources.

3. I was Plaintiff's first-line supervisor during her employment with SERC from February 11, 2001 to May 13, 2005. At no time during her employment, did I place Plaintiff on a "progress report," nor did I prepare a report concerning Plaintiff's "progress."

4. The final extension of Plaintiff's temporary appointment was to end on August 5, 2005, when the grant that had funded her position would be depleted.

5. Prior to the end of her temporary appointment, Plaintiff resigned her position effective May 13, 2005.

-1-

Pursuant to 28 U.S.C. §1746. I declare under penalty of perjury that the foregoing is true

and correct.

Alexander Mark Haddon

EXECUTED on July 8, 2008

EXHIBIT 5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
---------------------------x
DORATHA KLUGEL,              :
                            :
         Plaintiff,          :
                            :
      v.                     : No. 06-1886
                            :
CRISTIAN SAMPER et al.,      :
                            :
         Defendants.         :
---------------------------x
```

Falls Church, Virginia

Wednesday, April 16, 2008

Deposition of

ALEXANDER M. HADDON

a witness, called for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, beginning at approximately 10:11 a.m., at

the law offices of Grad Logan & Klewans, PC, 3141

Fairview Park Drive, Falls Church, Virginia,

before Stephen K. Garland of Anderson Court

Reporting, notary public in and for the

Commonwealth of Virginia, when were present on

behalf of the respective parties:

ANDERSON COURT REPORTING
706 Duke Street, Suite 100
Alexandria, VA 22314
Phone (703) 519-7180  Fax (703) 519-7190

Page 2

1  APPEARANCES:
2    On behalf of Plaintiff:
3      KEVIN BYRNES, ESQUIRE
         Grad Logan & Klewans, PC
4        3141 Fairview Park Drive, Suite 350
         Falls Church, Virginia  22042
5        (703) 535-5393
6    On behalf of Defendants:
7      MICHELLE N. JOHNSON, ESQUIRE
         United States Department of Justice
8        United States Attorney's Office
         555 Fourth Street, NW., Room E4212
9        Washington, D.C.  20530
         (202) 514-7139
10
       CHRISTINE NICHOLSON, ESQUIRE
11       Smithsonian Institution
         Office of General Counsel
12       1000 Jefferson Drive, SW., Suite 302
         Washington, D.C.  20560
13       (202) 633-5104
14   Also Present:
15     EPIN H. CHRISTENSEN
16
17
18          * * * * *
19
20
21
22

Page 3

CONTENTS

1
2  EXAMINATION BY:                    PAGE
3    Counsel for Plaintiff           5
4    Counsel for Defendants          157
5  FURTHER EXAMINATION BY:
6    Counsel for Plaintiff           174
7    Counsel for Defendants          181
8  DEPOSITION EXHIBITS:
9  No. 1 - E-mail, Klugel to Haddon       120
10 No. 2 - E-mail, Campbell to Haddon     126
11 No. 3 - Medical Document               130
12
13
14          * * * * *
15
16
17
18
19
20
21
22

Page 4

PROCEEDINGS

1
2       THE VIDEOGRAPHER:  This is the case of
3  Doratha Klugel v. Christian Samper, Acting
4  Secretary, the Smithsonian Institution et al.,
5  case number 06 1886 HHK, in the United States
6  District Court for the District of Columbia.  The
7  deposition is being taken at the law offices of
8  Grad Logan and Klewans PC, 3141 Fairview Park
9  Drive, Falls Church, Virginia.  The court reporter
10 today is Steve Garland of Anderson Reporting of
11 Alexandria, Virginia.  I'm the videographer Mark
12 Guenther also with Anderson Reporting.  Would the
13 attorneys present please introduce themselves and
14 who they represent?
15      MR. BYRNES:  Kevin Byrnes for the
16 Plaintiff.
17      MS. JOHNSON:  Michelle Johnson for the
18 Defendants.
19      MS. NICHOLSON:  Christine Nicholson,
20 Associate General Counsel, for the Smithsonian
21 Institution.
22      MS. CHRISTENSEN:  Epin H. Christensen,

Page 5

1  Counsel to the Inspector General, also with the
2  Smithsonian Institution.
3  Whereupon,
4       ALEXANDER M. HADDON
5  was called as a witness, and having been first
6  duly sworn, was examined and testified as follows:
7       EXAMINATION BY COUNSEL FOR PLAINTIFF
8       BY MR. BYRNES:
9      Q·  Could you please state your name for the
10 record and spell your last name?
11     A  Yes, Alexander Mark Haddon, H-a-d-d-o-n.
12     Q  Do you go by the name Alexander Haddon
13 or Mark Haddon?
14     A  Mark.
15     Q  Mr. Haddon, where are you employed?
16     A  Smithsonian, in the Environmental
17 Research Center.
18     Q  What is your position there?
19     A  Education director.
20     Q  How long have you been the education
21 director for the Smithsonian Environmental
22 Research Center?

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 6

1    A    Just one second.  Nineteen years.
2    Q    How long have you been an employee with
3  the Smithsonian?
4    A    For 23 years.
5    Q    What is your pay grade or rating at the
6  Smithsonian?
7    A    I am a GS-12.  If you need to know the
8  step, I don't know.  I forget the step.  I'm
9  sorry.  Four, three.
10    Q    What are your duties as the education
11  director for the Smithsonian Environmental
12  Research Center?
13    A    I oversee all of the public programs for
14  school children, for the general public, and any
15  other activities that are included in the
16  education department that provide or interpret
17  information about research going on there.  I also
18  oversee all budget that is having to do directly
19  with the education department.
20    Q    Who is your reporting senior?
21    A    The director.
22    Q    What is his name?

Page 7

1    A    His name is Dr. Anson Heins.
2    Q    How long has Dr. Heins been the
3  director?
4    A    I'm sorry, I don't know that.
5    Q    More than 10 years?
6    A    More than 10 years, no.
7    Q    More than 5 years?
8    A    Probably not more than 5 years.
9    Q    More than 3 years?
10    A    Yes.
11    Q    What's the highest grade of education
12  you've completed?
13    A    I have a master's degree.
14    Q    From where?
15    A    Towson State.
16    Q    What is your master's degree in?
17    A    Secondary education.
18    Q    Have you ever been a teacher?
19    A    You need to define that.
20    Q    Have you ever taught in a public school
21  or private school system?
22    A    I have.

Page 8

1    Q    When did you do that?
2    A    When I was getting my bachelor's degree
3  through my -- it was called like student training.
4    Q    Have you ever been deposed before?
5    A    No.
6    Q    Did you review any documents in
7  preparation for your deposition today?
8    A    Did I review them today?
9    Q    At any time in preparation for your
10  deposition.
11    A    Yes.
12    Q    What documents did you review?
13    A    I reviewed my own notes from -- that I
14  wrote down about meetings.
15    Q    Have you provided copies of those notes
16  to counsel in response to production requests?
17    A    Yes.
18    Q    All of the notes?
19    A    Yes.
20    MR. BYRNES:  Counsel, I'd ask that --
21    MS. JOHNSON:  They've already been
22  produced.

Page 9

1    MR. BYRNES:  In their original form if I
2  could review them, that would be something I'd
3  like to see.
4    BY MR. BYRNES:
5    Q    The documents you reviewed, were they
6  copies of were they the originals?
7    A    I don't know how to answer that.  They
8  were electronic files.
9    Q    Are there any electronic files or notes
10  or anything that you created at the time in 2004
11  and 2005 when these events were occurring that you
12  destroyed prior to this litigation?
13    A    Are you referring to any emails?
14    Q    Right, that involve Ms. Klugel or the
15  matters that are raised in this litigation.
16    A    There were lots of emails that Dottie
17  and I exchanged throughout the time of her
18  employment.  If you're referring to -- to 2004 and
19  2005, no.
20    Q    You have not destroyed any of those
21  records?
22    A    No.

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 10

1    Q    Since the litigation commenced have you
2    deleted or lost or destroyed any records?
3    A    No.
4    Q    So it's fair to say then what you
5    produced to counsel was the full ambit of
6    documents that you had that discussed your
7    interaction with Mr. Klugel in 2004 and 2005?
8    A    As best of my ability -- best of -- to
9    my knowledge, yes.
10    Q    In your capacity as education director
11    did you have the opportunity to work with Ms.
12    Klugel?
13    A    Yes.
14    Q    When did Ms. Klugel come into employ
15    with you?
16    A    I think it was the year 2000 -- early --
17    early in the year 2000.
18    Q    What was her position while she was
19    under your supervision?
20    A    She was a distance learning coordinator,
21    volunteer coordinator. I believe that was it.
22    Q    What does the distance learning

Page 11

1    coordinator do?
2    A    Is responsible for any activities that
3    involve video conferences, electronic field trips,
4    or activities surrounding those such as teacher
5    workshops, planning meetings, liaison between
6    universities and scientists.
7    Q    What was Ms. Klugel's grade when she
8    came to you in early 2000 and first began working
9    for you?
10    MS. JOHNSON: Objection. Lack of
11    foundation.
12    THE WITNESS: Nine. She was a SI I
13    believe the terminology is 9 -- grade 9.
14    BY MR. BYRNES:
15    Q    Was she a federal employee?
16    MS. JOHNSON: Objection. Lack of
17    foundation.
18    THE WITNESS: No.
19    BY MR. BYRNES:
20    Q    What sort of capacity did she have with
21    the Smithsonian?
22    A    I don't understand that question.

Page 12

1    Q    Was she a contract employee or was she
2    paid or was she a volunteer. You said an SI-9.
3    What is that?
4    A    She came on as a trust employee.
5    Q    What's a trust employee?
6    A    Within the Smithsonian there's usually
7    two general categories of employees. Ones -- ones
8    that are -- whose salary is funded by federal
9    funds. Anything else, any other employee, that
10    had their salary not funded by federal funds is in
11    general considered a trust employee. In this
12    particular case, since they weren't federal funds,
13    she was considered a trust employee.
14    Q    Is there any distinction to your
15    knowledge in the rights granted a federal employee
16    versus the rights granted a trust employee?
17    MS. JOHNSON: Objection. Calls for
18    legal conclusion.
19    THE WITNESS: To my knowledge, no.
20    BY MR. BYRNES:
21    Q    Let's talk a little bit about Ms.
22    Klugel's work as a volunteer coordinator. What

Page 13

1    was that?
2    A    She was responsible for the registration
3    of new -- of new volunteers. She was responsible
4    for acquiring the number of hours that -- that
5    current volunteers served at SERC and then sent
6    those to our volunteer office downtown.
7    Q    So is it fair to say that based on her
8    job description --
9    MS. JOHNSON: I'll just object because
10    he wasn't done answering the question.
11    BY MR. BYRNES:
12    Q    Were you? I'm sorry.
13    A    There were other --
14    Q    Go ahead. I'm sorry. I thought you
15    were finished.
16    A    She was also responsible for learning
17    about volunteer opportunities from those labs so
18    that she could talk to potential volunteers about
19    those present opportunities.
20    Q    Would she actually place volunteers for
21    SERC?
22    A    Yes, that would be part of that -- that

Page 46

1    Q   Have you as a supervisor ever asked an
2  individual questions about their level of sexual
3  activity?
4        MS. JOHNSON: Objection to form.
5        THE WITNESS: No.
6        BY MR. BYRNES:
7    Q   Have you ever asked them about whether
8  or not they were having sex?
9    A   No.
10   Q   Have you ever inquired of a female
11 employee who she was sleeping with?
12   A   No.
13   Q   Other than perhaps your girlfriend.
14       MS. JOHNSON: Objection to the form.
15       THE WITNESS: My girlfriend was never an
16 employee.
17       BY MR. BYRNES:
18   Q   That would always be inappropriate in
19 your view wouldn't it?
20       MS. JOHNSON: Objection to form. Calls
21 for a legal conclusion.
22       THE WITNESS: Yes.

Page 47

1        MR. BYRNES: Do you want to take a break
2  for minutes?
3        MS. JOHNSON: Yes. Can we get some more
4  water?
5        (Recess)
6        BY MR. BYRNES:
7    Q   Mr. Haddon, before the break we were
8  just talking about conversations that Ms. Klugel
9  had with you regarding the OIC investigation. Do
10 you recall how many conversations she had with
11 you?
12   A   No, I don't.
13   Q   Was it more than one?
14   A   Yes.
15   Q   Other than saying that they were
16 questioning her about her relationships, do you
17 recall Ms. Klugel raising any other concerns?
18   A   No.
19   Q   How long was the conversation that you
20 had with her regarding the questioning by the OIG?
21       MS. JOHNSON: Objection to form.
22       THE WITNESS: I don't -- I don't

Page 48

1  remember.
2        BY MR. BYRNES:
3    Q   More than a minute?
4    A   Yes.
5    Q   More than 10 minutes?
6    A   Probably not.
7    Q   What action did you take if any after
8  Ms. Klugel came to you and expressed her concerns
9  about how OIC was conducting the investigation?
10       MS. JOHNSON: Objection to form.
11 Mischaracterizes prior testimony.
12       THE WITNESS: There was no
13 investigation.
14       BY MR. BYRNES:
15   Q   Did anyone from the Office of Inspector
16 General speak to you?
17   A   Yes.
18   Q   Who?
19   A   Jerry Roy.
20   Q   What did he talk to you about?
21   A   The travel to Hawaii.
22   Q   By who?

Page 49

1    A   By Amy or Dottie, Ray and Phil.
2    Q   Ray?
3    A   Ray's last name -- Ray is -- do you want
4  to know?
5    Q   Yes.
6    A   Presently Amy's husband, and Phil
7  Younger.
8    Q   What did Mr. Roy ask you about the
9  travel?
10   A   He asked me about the duties that -- the
11 -- the duties for -- that Phil and -- and Ray, and
12 again I don't remember his last name, would
13 perform in Hawaii.
14   Q   What did you tell him if anything?
15   A   I told him that they would be serving to
16 -- mostly videotape presentations that were being
17 made by Amy and Dottie.
18   Q   What other questions did Mr. Roy have if
19 any after you told him what Mr. Younger and the
20 other gentleman would be doing?
21   A   He asked if this sort of thing was done
22 before.

13 (Pages 46 to 49)

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 50

1    Q    What sort of thing?
2    A    Volunteers coming to tape presentations.
3    Q    What did you tell him?
4    A    Yes.
5    Q    Did he ask any other questions?
6    A    He asked about if I know that those --
7    that that kind of taping duties was going to
8    happen, if I was aware of that situation.
9    Q    What situation?
10   A    Of the volunteers coming and taping
11   Dottie and Amy.
12   Q    Did Mr. Roy ask you and questions about
13   the nature of the relationships between Mr.
14   Younger and Ms. Klugel and Ray and Amy?
15       MS. JOHNSON: Objection to form.
16       THE WITNESS: No.
17       BY MR. BYRNES:
18   Q    I'm sorry?
19   A    No.
20   Q    He didn't raise any questions about them
21   being boyfriend and girlfriend?
22   A    Not those words.

Page 51

1    Q    What words did he use?
2    A    Were they friends.
3    Q    How did he explain the word friends if
4    he did?
5    A    He said why don't you just hire somebody
6    there to tape them in Hawaii.
7    Q    Mr. Roy said that?
8    A    Not a quote, but that's -- he said why
9    don't -- you know, he was asking why don't you
10   contract a videographer in Hawaii to take them.
11   Q    Why did you say?
12   A    I said that that was -- didn't seem to
13   be a practical solution to having that. It would
14   be hard to arrange that in Hawaii.
15   Q    Which would cost more money in your
16   background or your mind, to hire a videographer or
17   to send volunteers?
18       MS. JOHNSON: Objection. Lack of
19   foundation.
20       THE WITNESS: Hire a videographer.
21       BY MR. BYRNES:
22   Q    Why would that be cheaper?

Page 52

1        MS. JOHNSON: Objection. Calls for
2    speculation.
3        BY MR. BYRNES:
4    Q    I'm sorry, which would be more
5    expensive, to hire a videographer?
6    A    Hire a videographer would be more
7    expensive.
8    Q    Volunteers work I take it for nothing.
9    A    Yes.
10   Q    That's inherent in the term volunteer.
11       MS. JOHNSON: Objection to form.
12       THE WITNESS: That is correct.
13       BY MR. BYRNES:
14   Q    Did you inform Mr. Roy that these were
15   volunteers?
16       MS. JOHNSON: Objection to the form.
17       THE WITNESS: Yes.
18       BY MR. BYRNES:
19   Q    What did he say when you told him they
20   were volunteers?
21   A    He wanted to know what qualifications
22   they had for going and doing this videography.

Page 53

1    Q    What did you tell him?
2    A    I said that Phil Younger was very
3    qualified to be a -- he was -- I don't know about
4    exactly all of his professional training and that,
5    but I knew that he was competent -- very competent
6    in videography and this was an acceptable solution
7    to what I, Dottie, and Amy had discussed about --
8    talking about -- about wanting to videotape them
9    and their presentations.
10   Q    Did you perceive or feel that Mr. Roy
11   was questioning your judgment?
12       MS. JOHNSON: Objection to the form.
13       THE WITNESS: He was questioning my
14   judgment? He was questioning the situation which
15   I guess involved my judgment.
16       BY MR. BYRNES:
17   Q    So he was questioning your judgment.
18   Correct?
19   A    Yes.
20   Q    How did you feel about that?
21   A    I felt okay.
22   Q    You weren't at all upset or intimidated

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 54

1  by the fact that an investigator from OIG had come
2  and questioned your judgment?
3       MS. JOHNSON: Objection to the form.
4       THE WITNESS: No.
5       BY MR. BYRNES:
6    Q   Why not?
7    A   Because my feeling was if I had done
8  anything to put the institution in any kind of
9  jeopardizing situation, I wanted to know about it
10 and if he thought that I did, I wanted to be able
11 to explain to him why I made that decision.
12   Q   Was there any follow-up from Mr. Roy
13 after his conversation with you about the results
14 of his review of the travel to Hawaii?
15   A   I need to get that clarified. I met
16 with Jerry two times.
17   Q   Let's break that down. When was the
18 first time that you recall meeting with Mr. Roy?
19   A   Well, two times that day. Okay? So I
20 met with him initially.
21   Q   What day was that? Do you recall?
22   A   I'm sorry, I don't remember that.

Page 55

1    Q   Did Mr. Roy meet you alone or was there
2  anyone else present when this happened?
3    A   Alone.
4    Q   Both times?
5    A   Yes.
6    Q   Did he take notes while he was talking
7  to you?
8    A   I don't know. No, he did not.
9    Q   He did not?
10   A   He did not.
11   Q   Did he tape record you?
12   A   No.
13   Q   Did he place you under oath?
14   A   No.
15   Q   Did he give you any warnings before he
16 took your statement?
17       MS. JOHNSON: Objection. Lack of
18 foundation.
19       THE WITNESS: No.
20       BY MR. BYRNES:
21   Q   Did he identify who he was?
22   A   Only by name. He didn't show me any

Page 56

1  identification.
2    Q   Did he identify the fact that he was an
3  investigator for OIG at any time?
4    A   Yes.
5    Q   You said earlier that this wasn't an
6  investigation. What did you mean by that?
7    A   When -- what did I mean by that? I
8  meant that it was told to me that it was an
9  inquiry.
10   Q   Who told you that?
11   A   Ross Simons.
12   Q   Mr. Roy didn't use those words?
13   A   I don't recall if he described that.
14   Q   What's the difference between an inquiry
15 and an investigation if you know?
16       MS. JOHNSON: Objection. Lack of
17 foundation.
18       THE WITNESS: I don't know what the
19 Smithsonian -- I view it -- I view it was one is
20 more formal than another one.
21       BY MR. BYRNES:
22   Q   But other than Mr. Simons using the word

Page 57

1  inquiry as opposed to investigation, there was no
2  other discussion as to what Mr. Roy's contact was?
3       MS. JOHNSON: Objection to form.
4       THE WITNESS: There was no other
5  discussion to what?
6       BY MR. BYRNES:
7    Q   As to what it was. Mr. Roy just said
8  I'm going to come down and talk to you?
9    A   Yes, regarding the travel.
10   Q   Did he call you or did he write to you,
11 or how did the initial with Mr. Roy come?
12   A   I think that we -- we may have, though I
13 don't remember -- sorry, I don't remember what
14 that was.
15   Q   Did Mr. Roy contact you or did someone
16 else contact you and say that Mr. Roy would be
17 coming to speak with you?
18   A   I believe I -- I either -- I
19 communicated with Mr. Roy.
20   Q   Did he initiate the communication or did
21 you call him up and say I really need to talk to
22 you about this travel?

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 66

1  of his personal knowledge in an attempt to have
2  him conform his testimony and I think I'm entitled
3  to go into that.
4      MS. JOHNSON: I said that's over a year
5  ago.
6      MR. BYRNES: So over a year.
7      MS. JOHNSON: Over a year.
8      MR. BYRNES: Not a year ago. I'm not
9  going to debate. His testimony is what his
10 testimony is.
11     MS. JOHNSON: His testimony is what it
12 is, but in terms of conversations he had with
13 Christine Nicholson, those would be
14 attorney-client communications.
15     MR. BYRNES: Unless those communications
16 were designed to change testimony.
17     MS. JOHNSON: You can ask him that
18 question.
19     BY MR. BYRNES:
20     Q   Did anyone suggest to you how to testify
21 here today?
22     A   No.

Page 67

1      Q   Did anyone give you facts about matters
2  that you were not aware of prior to your coming to
3  testify today?
4      A   No.
5      Q   Didn't you just testify that Mr.
6  Gallagher and you met to get the "larger picture"?
7      A   To help me understand some stuff, yes.
8      Q   That you didn't understand before you
9  talked to him. Correct?
10     A   Um-hum.
11     Q   Is that a yes?
12     A   Yes. That's a yes.
13     Q   So other than Mr. Gallagher did you talk
14 with anyone else? Did you talk with Mr. Simmons?
15     A   Simons?
16     Q   Simons?
17     A   No.
18     Q   Did you talk with Mr. Roy?
19     A   Not specifically about this.
20     Q   What specifically did you talk to him
21 about?
22     A   I visited him at his office.

Page 68

1      Q   When?
2      A   In May of '05.
3      Q   Why?
4      A   Because I was having an EEO course. I
5  was taking an EEO supervisory training course and
6  I just happened to be in the same building that
7  Jerry Roy was in.
8      Q   Did you discuss this case?
9      A   No.
10     Q   Had you had any EEO supervisory training
11 before that meeting that was in May?
12     A   Yes.
13     Q   When Ms. Klugel came to you and told you
14 that she felt that the work environment had
15 changed and that she was under greater scrutiny,
16 what action if any did you take?
17     MS. JOHNSON: Objection. Lack of
18 foundation.
19     THE WITNESS: I had a conversation with
20 Dottie. That was my -- that was the action.
21     BY MR. BYRNES:
22     Q   How did you address her complaints?

Page 69

1      A   I communicated to her that -- in so many
2  words, I don't -- I'm not quoting myself here,
3  that what was found in this inquiry is past now,
4  that I assured Jerry Roy that this would not --
5  this -- this kind of -- we would -- that we would
6  be more upfront about volunteers and their duties
7  when they -- when they traveled with other
8  employees and that there was nothing that Dottie
9  or Amy or I needed to be worried about as far as
10 our job -- jeopardy of our job, that we were to
11 take this and say, okay, we've learned from it and
12 let's continue on with our duties.
13     Q   Isn't one of the concerns Ms. Klugel
14 raised is that she thought her job was in
15 jeopardy?
16     A   That -- that was something that she
17 raised.
18     Q   Right, and she raised that to you during
19 the course of the investigation. Correct?
20     A   Yes.
21     Q   And didn't she say that Mr. Roy had told
22 her that her job was in jeopardy?

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 74

1        MS. JOHNSON: Objection to form.
2        THE WITNESS: As volunteers?
3        BY MR. BYRNES:
4    Q   Yes.
5    A   I don't know of any.
6    Q   Did Mr. Simons?
7    A   I have no idea.
8    Q   Do you know if Mr. Heins ever did?
9    A   I am not --
10   Q   Didn't he bring his daughter on a trip
11   with him?
12       MS. JOHNSON: Objection. Calls for
13   speculation. Lack of foundation.
14       BY MR. BYRNES:
15   Q   As a volunteer?
16   A   I don't know. I don't know. Jessica
17   Heins his daughter served in many capacities.
18   Q   For the Smithsonian.
19   A   For SERC.
20   Q   Right. And Jerry Roy never questioned
21   that did he?
22       MS. JOHNSON: Objection. Lack of

Page 75

1    foundation.
2        THE WITNESS: I have no idea.
3        BY MR. BYRNES:
4    Q   He didn't question it to you.
5    A   It would --
6    Q   He didn't question it to you did he?  He
7    didn't come in and say I want a list of every
8    person who has a personal relationship with a
9    volunteer and I want to find out why these people
10   are being listed as volunteer.
11       MS. JOHNSON: Objection to form and
12   vague.
13       BY MR. BYRNES:
14   Q   Correct?
15   A   He did not do that with me, no.
16   Q   No. He only came in and talked to you
17   about Amy Erb and Dottie Klugel. Correct?
18       MS. JOHNSON: Objection to form.
19       THE WITNESS: Yes. Yes, he only did.
20       BY MR. BYRNES:
21   Q   In the entire time that you'd been with
22   SERC have you ever had an OIG investigator ever

Page 76

1    come to you before regarding the travel of an
2    employee?
3    A   No.
4    Q   Were you aware that Ms. Klugel was in an
5    automobile accident at some point in the fall of
6    2004?
7    A   Yes.
8    Q   As a result of that automobile accident
9    did Ms. Klugel take additional sick and annual
10   leave to deal with her injuries after the
11   automobile accident?
12       MS. JOHNSON: Objection. Calls for
13   speculation.
14       THE WITNESS: Yes.
15       BY MR. BYRNES:
16   Q   Who was the person who would approve or
17   deny her leave requests?
18   A   Me.
19   Q   Did you ever deny any of Ms. Klugel's
20   leave requests for annual or sick leave that she
21   sought to use to deal with the injuries she
22   received as a result of her automobile accident?

Page 77

1        MS. JOHNSON: Objection. Calls for
2    speculation.
3        THE WITNESS: No.
4        BY MR. BYRNES:
5    Q   Did you ever deny her leave?
6    A   Yes.
7    Q   When?
8    A   Late April, early May, somewhere around
9    there of 2006.
10   Q   What leave did you deny?  Do you recall?
11   A   It was a request for 6 days.
12   Q   To go where?
13   A   That I don't know.
14   Q   Do you know whether it was for medical
15   leave or personal leave?
16   A   At the time I believe it be personal
17   leave.
18   Q   Where was she going to go?  Do you
19   recall?
20   A   That was not discussed.
21   Q   Why did you deny her leave?
22   A   I denied her leave because of increased

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 78

1  activity in the education department of which all
2  employees particulate.
3      Q   Were here duties --
4      A   Wait a minute.
5      Q   Go ahead.
6      A   I denied because I believe at that time
7  she had little or no leave to take. I denied it
8  because -- I'll just -- I'll end it -- the answer
9  right there.
10     Q   As a supervisor, what training have you
11  had in the Rehabilitation Act of 1973 and its
12  application to the Smithsonian if any?
13     A   None.
14     Q   In all of your training with EEO they've
15  never had any training with you about the
16  Rehabilitation Act of 1973?
17     A   I don't remember that specifically.
18     Q   Did you ever have any training on how to
19  provide an employee reasonable accommodations in
20  the workplace?
21     A   Yes, I understand that.
22     Q   Did you have training on it?

Page 79

1      A   If that's included -- I would assume
2  that that's included in the EEO.
3      Q   Do you ever recall having specific
4  training on the issue of reasonable accommodations
5  in the workplace?
6      A   I don't.
7      Q   What is your understanding as a
8  supervisor as to your duties to provide an
9  individual reasonable accommodations in the
10  workplace for physical or mental impairments?
11     MS. JOHNSON: Objection to the form.
12  Calls for a legal conclusion.
13     THE WITNESS: It was my understanding I
14  am willing to do that. It's -- it's pretty high
15  in my priorities.
16     BY MR. BYRNES:
17     Q   What is your understanding as to your
18  obligation to do so?
19     MS. JOHNSON: Objection. Calls for a
0  legal conclusion, and to form.
21     MR. BYRNES: It calls for him to tell us
22  what his understanding is. It doesn't call for a

Page 80

1  legal conclusion.
2      MS. JOHNSON: No, it does.
3      BY MR. BYRNES:
4      Q   Go ahead.
5      A   My understanding is that it is my duty
6  as a supervisor to see that that is carried out.
7      Q   Where did you obtain that understanding
8  from?
9      A   I found that to be intuitive.
10     Q   Sir, you said that your understanding
11  was intuitive. What did you mean by that?
12     A   It was common sense that a supervisor
13  take care of and be aware of the needs whether or
14  how special or whatever of their employees.
15     Q   What is your understanding of whether or
16  not you should take into account an individual's
17  physical disability in making an employment
18  decision?
19     MS. JOHNSON: Objection to form. Calls
20  for a legal conclusion.
21     THE WITNESS: I need that question --
22     BY MR. BYRNES:

Page 81

1      Q   In other words, based on your knowledge,
2  do you believe it appropriate to make a decision
3  on an employment issue by reference to the
4  physical disability of the employee?
5      MS. JOHNSON: Objection to form. Legal
6  conclusion.
7      THE WITNESS: I don't understand the
8  question.
9      BY MR. BYRNES:
10     Q   Do you believe that a person with
11  physical disabilities should be treated like any
12  other employee?
13     MS. JOHNSON: Object to the form.
14     THE WITNESS: How do I answer that
15  question?
16     BY MR. BYRNES:
17     Q   Do you believe that?
18     A   As much as possible.
19     Q   There should be no special provisions
20  given to an individual with a physical disability
21  should there?
22     MS. JOHNSON: Objection to form. Calls

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 82

1    for a legal conclusion.
2        THE WITNESS: There very well may be.
3        BY MR. BYRNES:
4    Q    There may be?
5    A    Special provisions for people with
6    disabilities -- given to people with disabilities.
7    Q    Do you believe that as a result of the
8    automobile accident that Ms. Klugel was disabled
9    physically?
10        MS. JOHNSON: Objection. Calls for a
11    legal conclusion.
12        THE WITNESS: Disabled? She was
13    partially disabled?
14        BY MR. BYRNES:
15    Q    Right. What did you see as a result of
16    the automobile accident — what physical
17    impairment or disability did you see her as
18    having?
19        MS. JOHNSON: Objection. Calls for a
20    legal conclusion. Vague.
21        THE WITNESS: She had a cast on her arm
22    for some time because she had broken her arm, and

Page 83

1    -- and then after she removed the -- after the
2    cast was removed there was physical therapy to
3    some extent that needed to happen.
4        BY MR. BYRNES:
5    Q    What was your understanding of how long
6    she was going to suffer from these injuries?
7        MS. JOHNSON: Objection to form. Calls
8    for speculation.
9        THE WITNESS: I think I received a note
10    from her doctor saying that she would be in
11    physical therapy for I'd say 4 to 6 weeks.
12        BY MR. BYRNES:
13    Q    Do you know stayed in physical therapy
14    more than 4 to 6 weeks?
15    A    I don't know that.
16    Q    Did she continue to suffer
17    symptomatology during the entire time she was at
18    the agency up until her resignation?
19        MS. JOHNSON: Objection. Calls for
20    speculation, and to form.
21        BY MR. BYRNES:
22    Q    If you know.

Page 84

1    A    No.
2    Q    So her condition resolved itself as far
3    as you know?
4        MS. JOHNSON: Objection to form.
5        THE WITNESS: It improved as far as I
6    know.
7        BY MR. BYRNES:
8    Q    Did it ever get resolved where she was
9    not requesting any medical leave to deal with the
10    car accident?
11        MS. JOHNSON: Objection to form. Calls
12    for speculation.
13        THE WITNESS: She was continuing to
14    request medical leave up to the time that she
15    left.
16        BY MR. BYRNES:
17    Q    So as far as you know, from the time she
18    was in the accident until the time she left she
19    was requesting medical leave to deal with the
20    injuries from the accident?
21    A    Yes.
22    Q    Didn't you at one point, you and Mr.

Page 85

1    Gallagher, express concern over the amount of time
2    she was taking away from the job to deal with her
3    physical injuries?
4        MS. JOHNSON: Objection to form.
5        THE WITNESS: No.
6        BY MR. BYRNES:
7    Q    If I were to tell you that Mr. Gallagher
8    testified yesterday that you had expressed that
9    concern, would that be correct or incorrect?
10        MS. JOHNSON: Objection to form. Lack
11    of foundation.
12        THE WITNESS: It would have been an
13    interpretation of that -- interpretation of my
14    concern.
15        BY MR. BYRNES:
16    Q    Did you have a concern about the amount
17    of leave she was taking?
18    A    No, I did not have a concern about the
19    amount of leave. My concern was more of her
20    documenting that leave.
21    Q    Let me ask you a question. You said you
22    denied her leave in part because she had exhausted

Page 90

1  Mischaracterizes his testimony.
2        THE WITNESS: Not the way you're
3  phrasing it, no.
4        BY MR. BYRNES:
5     Q   You were concerned with the amount of
6  leave she was taking. Correct?
7        MS. JOHNSON: Objection to form.
8        BY MR. BYRNES:
9     Q   That's why you denied it. Correct?
10       MS. JOHNSON: Objection to form.
11  Mischaracterizes testimony.
12       THE WITNESS: That is not totally based
13  on that decision.
14       BY MR. BYRNES:
15    Q   But that was one of the factors?
16    A   It was one of the factors, but it wasn't
17  based on that factor.
18    Q   Why else would you deny leave other than
19  your concern of the workload being performed?
20    A   That actually was the third reason that
21  I can think of. So there were -- there were the
22  three. Going over them again, one is that is a

Page 91

1  very busy time in enhanced activities in the
2  education department. Would be very unusual for
3  any employee to ask for time off during April
4  through the middle of June. That's one. The
5  second one is that -- and this is not in any
6  specific order of importance, but the second one
7  was that Dottie if I remember correctly did not
8  have any leave at that time. The third was that
9  when she was there 2 days or 3 days a week because
10  the other days she was doing physical therapy, the
11  things that I needed her to do, her duties, were
12  not being completed. So that was the basis of me
13  saying no to this.
14    Q   Did you make any efforts to modify or
15  change her workload as a result of her automobile
16  accident?
17       MS. JOHNSON: Objection to form.
18       THE WITNESS: Her workload was reduced.
19       BY MR. BYRNES:
20    Q   How?
21    A   We focused on three projects that she
22  needed to concentrate on and any other duties

Page 92

1  associated with being distance learning
2  coordinator could be set aside.
3     Q   Did you ever submit any written
4  statements regarding her inability to perform any
5  of her work that you recall?
6        MS. JOHNSON: Objection to form.
7        THE WITNESS: I don't recall that.
8        BY MR. BYRNES:
9     Q   What was her final rating when she left
10  the agency? Did you give her one?
11    A   I did not.
12    Q   What was her rating period? When did
13  that happen? When would you normally give her
14  evaluation?
15    A   Let's see. That time I think that we
16  were on our -- it would have been probably October
17  of '04.
18    Q   Other than the fact that she was taking
19  physical therapy essentially part-time, were you
20  seeing any decline in the actual work she
21  performed in the workplace while she was present
22  at SERC?

Page 93

1        MS. JOHNSON: Objection. Vague.
2        THE WITNESS: Yes.
3        BY MR. BYRNES:
4     Q   When did that occur?
5     A   That occurred in the -- in the late
6  winter and spring of '05.
7     Q   And that was after the OIG
8  investigation. Correct?
9     A   Yes.
10    Q   Did you draw any linkage between Ms.
11  Klugel's decreased work performance and the fact
12  that OIG had investigated her?
13       MS. JOHNSON: Objection to form.
14       THE WITNESS: You need to change -- I
15  won't agree to that statement because there was no
16  investigation.
17       BY MR. BYRNES:
18    Q   After OIG spoke to her.
19    A   There was -- it happened the same time.
20    Q   Did you draw any connection between the
21  two events?
22    A   Yes, I did.

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 94

1    Q    How did you address that?
2    A    I spoke to her in -- in meetings and
3 probably some emails, but at meetings.
4    Q    Didn't Ms. Klugel tell you that she felt
5 that the questions posed to her by the IG were
6 overly intrusive and that she felt after that
7 point that she was a "marked employee"?
8        MS. JOHNSON:  Objection to form.
9        THE WITNESS:  Yes.
10       BY MR. BYRNES:
11   Q    Did you ever ask Ms. Klugel to provide
12 information regarding her medications to you?
13   A    Medications?  No.
14   Q    Did she provide information regarding
15 her medications to you?
16   A    I wasn't aware of any medications that
17 Dottie was taking.  Are you referring to the time
18 of the therapy -- physical therapy?
19   Q    Yes.
20   A    I was not aware of any medications.
21   Q    Other than the physical impairment, were
22 you ever made aware by Ms. Klugel or anyone else

Page 95

1 that Ms. Klugel suffered from any physical or
2 mental conditions?
3        MS. JOHNSON:  Objection to form.
4        THE WITNESS:  Other than the --
5        BY MR. BYRNES:
6    Q    The auto accident.
7    A    Yes.
8    Q    What else did you hear?
9    A    She shared with me that she suffered
10 from what probably was considered an irritable
11 bowel syndrome.
12   Q    Did that impact on her work at all?
13   A    Somewhat.
14   Q    What accommodations if any were made to
15 assist her with that condition?
16       MS. JOHNSON:  Objection to form.  Calls
17 for a legal conclusion.
18       THE WITNESS:  Occasionally it was days
19 off, sick leave, calling that morning and saying I
20 can't come in.  I feel badly.  To there may have
21 been some times, and I don't have specifics, but
22 there may have been some times where somebody had

Page 96

1 to step in to do some duties that she would have
2 done that day but she was at home.
3        BY MR. BYRNES:
4    Q    The duties that she performed for SERC,
5 did she have direct client contact?
6    A    I don't know what you mean.
7    Q    What did she physically do at the
8 workplace?  When she was working on the distance
9 learning center and the virtual classroom and all
10 those things, what would she do?
11       MS. JOHNSON:  Objection.  Calls for
12 speculation.
13       BY MR. BYRNES:
14   Q    You're her supervisor.  Right?
15   A    Yes.
16   Q    So I take it you're familiar with what
17 she actually did during the day.
18   A    Most of the time.
19   Q    Right.  So I wouldn't be asking you to
20 speculate if I were to ask you to tell me what it
21 is you understood she did.
22   A    In general there were a number of

Page 97

1 different duties throughout the entire education
2 department.  She had her assigned duties, but
3 everybody who also had their assigned duties would
4 -- would occasionally be asked to participate in
5 various other kinds of education activities.
6    Q    Let's talk about her assigned duties.
7    A    Okay.
8    Q    What did she specifically do?
9    A    She specifically developed -- designed
10 and developed video conferencing programs' agenda
11 that were on a specific subject.  I was trying to
12 answer your question.
13   Q    Go ahead.
14   A    So that would be something that she
15 would design.  And then she would coordinate with
16 other teachers, schools, school districts, tech
17 people throughout the country if not the world
18 where they would be interested in having that
19 program delivered or communicated to classes
20 around the country.
21   Q    When she would design a program she
22 would type that out?

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 114

1      THE WITNESS:  None of those.
2          BY MR. BYRNES:
3      Q   Does Kathy Suit do travel for all of
4  SERC?
5          MS. JOHNSON:  Lack of foundation.
6          BY MR. BYRNES:
7      Q   To your knowledge?
8      A   Not to my knowledge.
9      Q   In February 2005 did you schedule a
10  meeting for Ms. Klugel and Mr. Gallagher?
11     A   Yes.
12     Q   Why?
13     A   I scheduled the meeting to talk -- to
14  discuss asking Dottie for documentation on her
15  physical therapy visits.
16     Q   What documentation were you requesting?
17     A   Something to -- something for SERC
18  records to show that she actually went to physical
19  therapy.
20     Q   Why did you need those?
21     A   It was my understanding that for record
22  keeping and in case this was questioned months or

Page 115

1  years in the future by auditors of some sort that
2  all of this leave 2 or 3 days a week for an
3  extensive period of time with a little
4  prescription slip from a doctor saying we needed
5  -- that -- that she needed to do this therapy,
6  other than that we had no -- we had no -- we had
7  no records of her actually going to physical
8  therapy except for her -- her calling up and
9  saying I'm going to physical therapy for a couple
10  hours a day.
11     Q   Did you have reason to ever question the
12  integrity of Ms. Klugel?
13         MS. JOHNSON:  Objection to form. Vague.
14         THE WITNESS:  Up until that time no.
15         BY MR. BYRNES:
16     Q   Did you question her integrity when she
17  told you she was going to physical therapy?
18         MS. JOHNSON:  Objection to form and
19  vague.
20         THE WITNESS:  I -- not when she started
21  physical therapy.
22         BY MR. BYRNES:

Page 116

1      Q   But as it dragged on you began to become
2  concerned that she wasn't actually going to the
3  appointments?
4          MS. JOHNSON:  Objection to form.
5          THE WITNESS:  Yes.
6          BY MR. BYRNES:
7      Q   You suspected her of malingering.
8  Correct?
9          MS. JOHNSON:  Objection to form.
10         THE WITNESS:  Only when she -- only when
11  -- yes.
12         BY MR. BYRNES:
13     Q   Is this something Mr. Gallagher
14  suggested to you or did you raise these concerns
15  with Mr. Gallagher?
16         MS. JOHNSON:  Objection to form.
17         THE WITNESS:  I don't remember who --
18  who raised them to who, but they were discussed.
19         BY MR. BYRNES:
20     Q   Was anyone other than you and Mr.
21  Gallagher involved in any discussions of the
22  necessity of medical forms for Ms. Klugel?

Page 117

1      A   No.
2      Q   Mr. Gallagher's function was at the time
3  you were speaking to him?
4      A   Administrative -- executive -- executive
5  administrator -- executive administrator.
6      Q   Was any recommendation ever made to Ms.
7  Klugel to take leave under the Family Medical
8  Leave Act?
9          MS. JOHNSON:  Objection. Lack of
10  foundation.
11         THE WITNESS:  I don't -- I don't
12  remember doing that.
13         BY MR. BYRNES:
14     Q   Was there ever a discussion that you or
15  Mr. Gallagher had with her saying under the
16  Family Medical Leave Act you can take off this
17  time and maybe you should to go deal with these
18  injuries?
19         MS. JOHNSON:  Objection. Asked and
20  answered. Lack of foundation.
21         THE WITNESS:  There was -- there was no
22  need to do that.

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 122

1    Q    So you would agree in reviewing that
2  that that document was sent to you?
3    A    Yes.
4    Q    Who if anyone informed you what
5  information to request for Ms. Klugel in terms of
6  her medical treatment?
7    A    The only people that I -- the only
8  person that I talked to was Bob Gallagher.
9    Q    What was the purpose for which the
10  information was requested?
11    MS. JOHNSON:  Objection to form.
12    THE WITNESS:  The purpose was to protect
13  my -- to protect the institution from -- if any
14  future audits were made any people questioned why
15  documentation was not obtained for all of this
16  leave that was taken.  That was -- that's my
17  understanding.
18    BY MR. BYRNES:
19    Q    Where did you get that understanding
20  from?
21    A    Of what I just said?
22    Q    Yes.

Page 123

1    A    From conversations I had with Bob
2  Gallagher.
3    Q    Why were you requesting future
4  treatment?
5    MS. JOHNSON:  Objection to form.
6    BY MR. BYRNES:
7    Q    Why did you request from Ms. Klugel a
8  diagnosis from her doctor and a prognosis as to
9  future treatment?
10    MS. JOHNSON:  Objection.
11  Mischaracterizes testimony.
12    THE WITNESS:  I wanted to -- it was
13  actually present.  If he wanted to -- if the
14  doctor wanted to include future letters -- future,
15  excuse me, weeks, but what -- you know, how long
16  is this expected to continue?
17    BY MR. BYRNES:
18    Q    Did you say we also need a letter from
19  your doctor stating the requirements for P.T. and
20  necessary schedules past, present, and future
21  pertaining to your arm?
22    MS. JOHNSON:  Objection.  Vague.

Page 124

1    THE WITNESS:  That would be reasonable,
2  yes.
3    BY MR. BYRNES:
4    Q    Why were you asking her about future
5  treatment?
6    A    That would seem a reasonable request
7  from me as to how long this would be going on.
8  Since her duties were reduced before, it would --
9  how long would they continue to be reduced?
10    Q    So what was the purpose for requesting
11  future treatment -- a prognosis of future
12  treatment?
13    MS. JOHNSON:  Objection to form.
14    THE WITNESS:  I guess it would -- it
15  would be from my own planning and running of the
16  department that I needed to know what Dottie's
17  abilities or disabilities would be both now and in
18  the future.
19    BY MR. BYRNES:
20    Q    Did Ms. Klugel provide you with any
21  medical documents?
22    A    I think that -- I believe I remember

Page 125

1  seeing one document.
2    Q    Where was that document maintained?
3    MS. JOHNSON:  Objection.  Calls for
4  speculation.  Vague.
5    THE WITNESS:  I don't know where it is.
6    BY MR. BYRNES:
7    Q    Did you get it?  Did she give it to you,
8  Ms. Klugel?
9    A    It was in my hands -- it was in my
10  hands.  I probably -- I don't have it in my
11  office.  It wasn't something I kept in my office.
12  It may have been kept with leave records which is
13  why we were asking for the documentation to begin
14  with so that they could be kept with those leave
15  requests.
16    Q    Did you get a letter from her treating
17  physician at any time?  Did she provide you with a
18  letter from her doctors?
19    A    All I remember seeing a -- like a
20  prescription sized piece of paper with her
21  doctor's -- with a doctor's written statement
22  about how much time she might need to do physical

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 150

1  initial travel request even though the Smithsonian
2  was not paying for that travel. And when
3  questioned about it I would assume by Kathy --
4  when questioned about it, she may not have been --
5  I'll just -- I'll just say that -- that it -- it
6  should have been included in the initial travel
7  request and wasn't.
8      Q   Didn't you approve the initial travel
9  request?
10     A   Yes, I did, and it wasn't in there.
11     Q   You knew that though. Correct?
12         MS. JOHNSON: Objection. Vague.
13     BY MR. BYRNES:
14     Q   You knew what was in the request and it
15  wasn't when you approved it. Correct?
16         MS. JOHNSON: Objection. Vague.
17         THE WITNESS: I knew what was in the
18  request, yes.
19     BY MR. BYRNES:
20     Q   And you're the supervisor. Correct? Is
21  that correct? Is that a yes? You're the
22  supervisory approving official for the travel?

Page 151

1      A   Yes.
2      Q   So if there was anything inappropriate,
3  it was your job to pick it up wasn't it?
4          MS. JOHNSON: Objection. Lack of
5  foundation.
6          THE WITNESS: I'm not sure if the Belize
7  plans were in place at the time the initial
8  request was made.
9          BY MR. BYRNES:
10     Q   Now are you saying the initial travel
11  request was appropriate when it was submitted
12  because the Belize plans weren't in place?
13         MS. JOHNSON: Objection to form. Vague.
14         THE WITNESS: I think that they were
15  being planned.
16         BY MR. BYRNES:
17     Q   But then the original travel request was
18  appropriate because the Belize planning hadn't
19  been completed. Isn't that correct?
0          MS. JOHNSON: Objection to form.
21         THE WITNESS: I don't think so. I think
22  that if there were plans of the Belize segment of

Page 152

1  the trip then they should have -- should have
2  waited until all the plans were firmed up.
3          BY MR. BYRNES:
4      Q   But isn't that your job as the
5  supervisor to tell her we need to wait until the
6  plans are firmed up before we submit this travel
7  request?
8          MS. JOHNSON: Objection. Lack of
9  foundation. Vague.
10         THE WITNESS: Yes, it is.
11         BY MR. BYRNES:
12     Q   So when there was a failure in the
13  submission of this, wasn't that failure yours?
14         MS. JOHNSON: Objection. Lack of
15  foundation.
16         THE WITNESS: Yes, by definition.
17         BY MR. BYRNES:
18     Q   And you weren't investigated by the IG.
19  Correct?
20         MS. JOHNSON: Objection to form.
21         THE WITNESS: Nobody was investigated.
22         BY MR. BYRNES:

Page 153

1      Q   You weren't questioned as to your
2  conduct by the IG were you?
3          MS. JOHNSON: Objection. Misstates his
4  prior testimony.
5          THE WITNESS: Yes, I was. I was part of
6  that.
7          BY MR. BYRNES:
8      Q   Do you believe that Ms. Klugel should
9  have been more forthcoming with Ms. Suit?
10         MS. JOHNSON: Objection. Vague.
11         THE WITNESS: With the travel request.
12         BY MR. BYRNES:
13     Q   But that travel request having been
14  approved by you, did you see anything that was not
15  forthcoming at any time when any of those travel
16  requests were submitted?
17         MS. JOHNSON: Objection to form. Vague.
18         THE WITNESS: At that time of the
19  request?
20         BY MR. BYRNES:
21     Q   Yes.
22     A   At that time of the request, no.

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 158

1    A   Yes.
2    Q   What was your purpose in asking for Ms.
3  Klugel to provide documentation?
4    A   The purpose -- the main purpose that we
5  would -- we -- that -- that SERC would be able to
6  document the -- the time taken for physical
7  therapy. It was just -- from conversations with
8  Bob Gallagher it was brought to my attention that
9  this might be needed further down the -- years
10 down the road in case an audit came up. That was
11 really the conversation. And so I said, well, I
12 can just ask Dottie for some documentation and he
13 said that would be fine.
14    Q   At the time you had the conversation
15 with Ms. Klugel asking her for documentation
16 regarding her leave, had Ms. Klugel been
17 documenting her leave?
18    A   Not the physical therapy stuff.
19    Q   You said at some point that you believed
20 that Ms. Klugel was not using all the leave she
21 had been requesting to attend physical therapy.
22 Is that true?

Page 159

1    A   Can you say that again?
2    MR. BYRNES: Objection to the form.
3  It's leading.
4    BY MS. JOHNSON:
5    Q   Is it accurate that previously you
6  testified that you believed that Ms. Klugel was
7  not using all of her -- is it accurate that you
8  previously testified that you had concerns that
9  Ms. Klugel was not using all of her leave for
10 physical therapy -- her medical leave?
11    MR. BYRNES: Objection as to the form.
12    THE WITNESS: There as -- there was --
13 yes, there was some concern about that. Right.
14    BY MS. JOHNSON:
15    Q   What were your concerns?
16    A   My concerns were that because
17 documentation wasn't -- she wasn't volunteering
18 this documentation that I couldn't figure out why
19 she would not want to bring in a piece of paper
20 that says physical therapy, physical therapy, and
21 if she wasn't -- I couldn't figure out why she
22 wouldn't do that. So one of my thoughts would be,

Page 160

1  you know, what if she's not doing that? What if
2  she's not going to physical therapy? I asked her
3  and there's just no reason why I would -- there's
4  no reason why I was thinking that she wasn't other
5  than her inability to bring in some documentation
6  that said that. I explained to her, I said you
7  need to have some documentation for the -- for
8  this leave.
9    Q   When she would attend physical therapy
10 was she coming in to work at all on those days?
11    MR. BYRNES: Objection as to the time.
12 Vague.
13    THE WITNESS: No.
14    BY MS. JOHNSON:
15    Q   So she would be out of work for a full
16 day when she had physical therapy?
17    MR. BYRNES: Objection as to the form.
18 Leading.
19    THE WITNESS: Yes.
20    BY MS. JOHNSON:
21    Q   Did you have any concern about that, the
22 fact that she would be missing an entire day of

Page 161

1  work to attend physical therapy?
2    A   Yes.
3    Q   What did you say to her in that
4  conversation or those conversations?
5    A   I asked her if it was possible to have
6  physical therapy in the afternoon so she would
7  come in to work in the morning and then take
8  physical therapy in the afternoon as opposed to
9  what she was doing before was doing physical
10 therapy in the morning and staying home for the
11 rest of the day in the afternoon.
12    Q   What was her response to that?
13    A   Her response was that if she came to
14 work and worked that her arm would bother her and
15 hurt and the physical therapy would not be as
16 effective.
17    Q   Did you have any concerns that she was
18 using time off that she claimed was for medical
19 leave for another purpose?
20    A   Those were thoughts, yes.
21    Q   What were those thoughts specifically?
22    A   Those thoughts were that at one time she

Page 162

1   had -- she had asked for some time off because of
2   she wanted to attend some classes in a -- in a
3   seminary kind of setting. I don't know the exact
4   institution but it was she was just mentioning
5   that she wanted to get into the ministry and
6   wanted to take some classes and how could we, we
7   being she and I and maybe SERC, arrange that in
8   some way, and it -- nothing formal came of that.
9   She didn't start taking off an afternoon a month,
10  or week or something like that. It was not that.
11  But then I was thinking to myself that the time
12  that she was taking physical therapy, the days
13  that she was taking physical therapy, those also
14  might be days that she was attending class.
15      Q   Did you ever ask her whether or not she
16  was attending classes on those dates?
17      A   No.
18      Q   Do you know sitting here today whether
19  in fact she ever attended classes at a seminary?
20          MR. BYRNES: Objection.
21      BY MS. JOHNSON:
22      Q   Sitting here today do you know whether

Page 163

1   she in fact ever attended seminary classes?
2           MR. BYRNES: Objection as to relevance.
3           MS. JOHNSON: The relevance is preserved
4   so you don't have to make that on the record.
5           MR. BYRNES: What time period?
6       BY MS. JOHNSON:
7       Q   You can answer the question.
8       A   I had no knowledge of her going to
9   seminary classes.
10      Q   Regarding the denial of leave, and I
11  believe it was April 2005 when you denied leave to
12  her. Is that correct?
13      A   Yes.
14      Q   You have to say yes. You can't shake
15  her head.
16      A   Okay. Yes.
17      Q   What type of leave was Ms. Klugel
18  requesting at that time?
19      A   I believe -- I don't remember.
20      Q   Was she requesting medical leave?
21          MR. BYRNES: Objection. Leading. He
22  stated he doesn't remember.

Page 164

1           THE WITNESS: Medical being the reason
2   why she needed to take it off?
3       BY MS. JOHNSON:
4       Q   Yes, the reason that she was requesting
5   the leave. The reason she needed to be out of the
6   office.
7       A   One of those days was for physical
8   therapy which was something that had been
9   approved. I think that she said that she was
10  going to have physical therapy one of those days
11  and then the other 5 days she was going to be not
12  -- on a trip or something like that or away.
13      Q   Did she indicate whether or not it was a
14  personal trip?
15      A   From the discussion that I had with her,
16  I got the impression that it was a personal trip.
17  Reservations were made, tickets were bought. It
18  was some place that she was going.
19      Q   Did you have a concern with her request
20  for leave being made at that time in April 2005?
21      A   Yes, I did.
22      Q   What were your concerns regarding her

Page 165

1   request for leave at that time?
2       A   My concerns were that she would be away
3   from the education department and needed to
4   support, aid, assist, in some of the activities
5   that were -- that were happening at that time.
6   She was also -- my -- my other concerns were that
7   I think that this was either depleting to zero or
8   getting her leave pretty much down to zero at that
9   time. And then she and I had been discussing a
10  number of times her projects that she was working
11  on and in some of the comments and discussions
12  that we had she was saying I don't have enough
13  time to do these, I don't have enough time to do
14  these. And so I was questioning why she was
15  taking a week off when she was not able to do the
16  things that I needed her to do.
17          (Recess)
18      BY MS. JOHNSON:
19      Q   Mr. Haddon, at any time during her
20  employment did Ms. Klugel ever ask you if she
21  could work from home?
22      A   Yes.

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 166

1    Q   When was that?
2    A   It would be a -- I don't have a date.
3  It would be within the 5 years that she was
4  working at the Smithsonian. She would call up --
5  it wouldn't be -- excuse me, she would call up and
6  say I'm not feeling well. I'd like to work from
7  home today or something to that effect, and I
8  would agree to that.
9    Q   Did you ever deny her request?
10   A   No.
11   Q   After her automobile accident did Ms.
12 Klugel ever request that she be allowed to work
13 from home on a more permanent basis?
14   A   No.
15   Q   Did you ever deny her request to seek
16 leave for -- did you ever deny a request she made
17 to take leave for a medical purpose?
18   A   No.
19   Q   You stated earlier that there were times
20 that you saw Ms. Klugel yelling. Is that correct?
21   MR. BYRNES: Objection.
22 Mischaracterizes his testimony. Go ahead.

Page 167

1    THE WITNESS: Yes.
2    BY MS. JOHNSON:
3    Q   Let's do it this way. On roughly how
4  many occasions during the approximately 5 years
5  that you worked with Ms. Klugel had you seen her
6  yell?
7    A   Three.
8    Q   Who did you see her yelling at?
9    MR. BYRNES: Objection. Assumes facts
10 not in evidence.
11   THE WITNESS: I saw her yelling at Mark
12 Cornman.
13   BY MS. JOHNSON:
14   Q   Anyone else?
15   A   There were other times that I did not
16 see her but actually could hear her yelling be it
17 either on the phone -- she was on the phone with
18 somebody else and I was in an adjacent room.
19 Something like that. So I don't what the
20 circumstances were.
21   Q   Did Ms. Klugel ever yell at you?
22   A   No.

Page 168

1    Q   Had you seen her -- prior to the time
2  that the OIG agent came to speak to her, had you
3  seen Ms. Klugel get angry before?
4    A   Yes, I did.
5    Q   In your opinion did you believe that Ms.
6  Klugel tended to get upset when people questioned
7  her about things?
8    MR. BYRNES: Objection. Calls for
9  expert testimony.
10   THE WITNESS: Getting upset when she was
11 questioned? That would -- yes.
12   BY MS. JOHNSON:
13   Q   Sir, regarding SERC travel, have you
14 personally reviewed the travel regulations that
15 apply to employees who travel with SERC?
16   A   No.
17   Q   Regarding the trip to Belize -- to
18 Panama and Belize, what did the initial trip
19 request -- what locations did the initial SERC
20 request that Ms. Klugel submitted to you ask for
21 her to travel to?
22   A   The initial request was originating in

Page 169

1  Baltimore and going to Panama and then returning
2  to Baltimore.
3    Q   So the initial request did not mention
4  Belize. Is that correct?
5    MR. BYRNES: Objection as to form.
6    THE WITNESS: Yes, it did not mention
7  Belize.
8    BY MS. JOHNSON:
9    Q   Are you aware, sir, that Ms. Klugel
10 submitted a form with Belize on it -- added on it
11 after you had -- without your signature?
12   MR. BYRNES: Objection as to form.
13 Assumes facts not in evidence. No foundation.
14   BY MS. JOHNSON:
15   Q   Do you have any knowledge of that?
16   A   I have knowledge of that, yes.
17   Q   Are you aware, sir, that Mr. Younger had
18 submitted a form for travel in which he indicated
19 her would reimburse the government for his travel?
20   MR. BYRNES: Objection. Compound.
21 Objection as to form.
22   THE WITNESS: Yes, I'm aware of that.

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

EXHIBIT 6

**Philip G. Yunger**

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3

 4 DORATHA KLUGEL,              *

 5            Plaintiff,   * Civil Action 06-01886

 6 vs.                          *

 7 CHRISTIAN SAMPER, et al,     *

 8            Defendants.   * Pages 1 - 45

 9

10

11                          COPY

12

13         Deposition of Philip G. Yunger

14              Washington, D.C.

15           Thursday, May 8, 2008

16

17

18

19

20

21 Reported by:  Carla J. Briggs, RPR-RMR-CRR

22 Job No. 187245b
```

**Philip G. Yunger**

1 the second question first?

2          MS. JOHNSON:  Well, the second question is

3 the question.

4     Q     **How is it that you were familiar with**

5 **SERC?**

6     A     When I met my wife, she was working at

7 SERC.

8     Q     **So you met her in 2000?**

9     A     Yeah.

10    Q     **Okay.  And when you became a volunteer in**

11 **2000, had you previously volunteered at any other**

12 **organization?**

13    A     Yes, ma'am.  I'd been volunteering for the

14 homeless people and homeless veterans since 1981.

15 Western Presbyterian Church, I was a fund-raiser for

16 them, and I currently work with Capitol United

17 Methodist Church with their homeless kitchen, and

18 I'm also working at AmeriCorps' homeless veterans

19 project.

20    Q     **Are those all activities that are ongoing**

21 **currently?**

22    A     Yes.  The Western Presbyterian Church, I'm

**Philip G. Yunger**

1 not doing, but the other two are current ones.

2    Q    How did you come to decide to volunteer at

3 SERC in 2000?

4    A    They were doing an open house and they

5 needed some videotape shot and also a sound system

6 set up, so they volunteered me to do that.

7    Q    You said they volunteered you.  Who

8 volunteered you?

9    A    My wife and her supervisor, Mark Haddon.

10    Q    Was she your wife at the time?

11    A    No.

12    Q    Did you know Mr. Haddon prior to the time

13 you became a volunteer at SERC?

14    A    No.

15    Q    And what experience had you had as a

16 videographer?

17         THE WITNESS:  They don't have my resume?

18         MR. BYRNES:  Tell them.

19    A    I started working in 1966 for my union

20 which has jurisdiction over motion picture

21 film-making and stage technology here in the

22 Washington, D.C. area, so I have 41 years of

**Philip G. Yunger**

1 experience.  I've worked on a dozen major motion

2 pictures, two Academy Award-winning films, 30-plus

_ Emmys, two Telly Awards.

4      Q      **Which were the two Academy Award winners?**

5      A      "The Exorcist" and "Silence of the Lambs."

6      Q      **Both are good movies.  I can't watch "The**

7 **Exorcist" to this day by myself.**

8      A      Please rent it.

9      Q      **Was it your understanding that -- well,**

10 **what was your understanding when you decided to**

11 **volunteer as to what your responsibilities would be,**

12 **what kind of work you'd be doing?**

13      A      When I -- first when I was a volunteer was

14 mostly for the video stuff, but then they found out

15 I had a boat captain's license and I started running

16 their boats for them, the Saxatalis (phonetic),

17 which is the boat they use for their research

18 cruises for the children in the Education

19 Department.  So I did -- probably 60 percent of the

20 time was working with the boats and 40 percent of

21 the time was working with the Education Department

22 with video photography.

**Philip G. Yunger**

```
 1      Q    Now, who was your direct supervisor?

 2      A    Mostly Mark Haddon.  And then at times, I

 3 worked with my wife.  I built a television studio

 4 for them out there and that kind of stuff, so --

 5      Q    And I'm sorry.  Did you know Miss Klugel

 6 before you started volunteering at SERC?

 7      A    No.

 8      Q    Or did you meet her there at SERC?

 9      A    No.  I met her here in Washington, and she

10 took me out to SERC.

11      Q    She was working at SERC?

12      A    Bingo.

13      Q    Okay.  Got you.

14           Were you aware of the registration process

15 for volunteers?

16      A    I filled out all the paperwork they gave

17 me, yeah.

18      Q    Did anyone explain to you what the

19 paperwork was about, the registration paperwork?

20      A    I read it and I signed it.

21      Q    Okay.  Did they -- did anyone at SERC

22 explain that there were any requirements for being a
```

Philip G. Yunger

Page 19

```
1      A     No.  Generally, they'd hand me a piece of

2 paper that I was supposed to sign, and I signed it.

3      Q     Now, in January of 2005, you took a trip

4 with Miss Klugel to Hawaii.  Do you recall that?

5      A     Uh-huh.

6      Q     When did you first -- when do you first

7 remember being informed about that trip?

8            MR. BYRNES:  Let me object to the

9 relevance of this line of inquiry.  I mean, it's not

10 even tangentially related to either a claim or

11 defense in the case.

12           MS. JOHNSON:  Well, it actually is related

13 to the investigation into Hawaii.  And relevance

14 objections are preserved --

15           MR. BYRNES:  But there was no

16 investigation into Hawaii.

17           MS. JOHNSON:  Relevance objections are

18 preserved for the record.

19           MR. BYRNES:  Well, I know, but -- but this

20 is -- for this particular witness, relevance is

21 related, but the question has to be designed in good

22 faith to lead to discoverable evidence.
```

## Philip G. Yunger

1          MS. JOHNSON:  Yeah.

2          MR. BYRNES:  And I'm not sure that there

3 is any issue that needs to be discovered -- if

4 Mr. Yunger has no knowledge of travel and if he has

5 no knowledge of --

6          MS. JOHNSON:  I'm asking about a specific

7 trip he took.

8          MR. BYRNES:  Okay.  I'm going to have a

9 standing objection that that line of inquiry is not

10 related to any issue even tangentially involved in

11 this lawsuit, but go ahead.

12          BY MS. JOHNSON:

13      Q    You took a trip with Miss Klugel in

14 January of 2005, correct?

15      A    Yes.

16      Q    What were you informed was the purpose of

17 this trip?

18          MR. BYRNES:  Vague as to --

19      Q    What did you understand to be the purpose

20 was (sic)?

21      A    What was I informed?  I was going to

22 Hawaii with my girlfriend at the time.  I wasn't an

**Philip G. Yunger**

1 employee or a volunteer.  I paid for my own

2 ticket --

3      Q     Was there --

4      A     -- to go there.

5      Q     I'm sorry.  Go ahead.

6      A     I paid for myself to go to Hawaii.

7      Q     Was there any discussion about having SERC

8 pay for you to travel to Hawaii?

9      A     I don't know.

10      Q     You don't know?

11      A     No.

12      Q     Were you ever approached about videotaping

13 anything in -- a conference in Hawaii?

14      A     They asked me to videotape the

15 presentations for Dottie and for Amy while I was

16 there.

17      Q     Did you, in fact, do that?

18      A     Yes.

19      Q     And who asked you to do that?

20      A     I don't remember.

21      Q     Do you remember how long Miss Klugel's

22 presentation was?

Philip G. Yunger

1    A    Under an hour, then there was some small

2 break-off seminar stuff for questions and answers,

3 so those might have lasted 35 or 40 minutes.  Amy's

4 was about the same as well.

5    Q    Did you have anyone assisting you with the

6 videotaping of those -- of the conference?

7    A    No.

8    Q    Did you have any discussions -- did you

9 know someone by the name of we Recep Celikay?

10         THE REPORTER:  Of who?

11         MS. JOHNSON:  Recep, R-E-C-E-P; Celikay,

12 C-E-L-I-K-A-Y.

13         MR. BYRNES:  I think it's I-P.

14         MS. JOHNSON:  Is it I-P?  I thought it was

15 Recep.

16         MS. NICHOLSON:  I think it's R-E-C-E-P.

17         MR. BYRNES:  Whatever.  I thought it was

18 Recip.

19         BY MS. JOHNSON:

20    Q    Do you know who that is?

21    A    No.  I have no idea.

22    Q    Okay.  Did you know that Miss Erb's

**Philip G. Yunger**

1 boyfriend traveled with her to Hawaii?

2     A     When I got there, I found out he was

3 there, yeah.

4     Q     Did you know his name?

5     A     No.  I think I saw him once the whole week

6 I was there.

7     Q     You don't recall any discussions regarding

8 trying to get the government rate for your ticket to

9 Hawaii?

10          MR. BYRNES:  Objection; assumes facts not

11 in evidence, foundation.

12     A     No.  I remember using my American Express

13 card to pay for it.

14          MS. JOHNSON:  I'd like to mark Exhibit 2.

15          (Yunger Deposition Exhibit Number 2 was

16 marked for identification.)

17          BY MS. JOHNSON:

18     Q     So this is what's been marked as

19 Exhibit 2, an attendance report.  The first page is

20 for fiscal year '04.  I actually want to ask you

21 about the second page which is fiscal year '05.

22          You will see under the "Distance Learning"

EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Doratha Klugel,                        )
                                       )
        Plaintiff,                     )
                                       )
v.                                     )      Civil Action 06-01886 (HHK)
                                       )
G. Wayne Clough, Secretary,            )
Smithsonian Institution,               )
                                       )
and the United States of America,      )
                                       )
        Defendants.                    )

## DECLARATION OF AMY LEMON

1.    I am employed by the Smithsonian Institution as the coordinator of the Behind-the-Scenes

Volunteer Program.  I have held this position since 2000.

2.    In my official capacity, I maintain records for the Behind-the-Scenes Volunteers Program.

On or about August 5, 2002, Phillip Yunger submitted a Behind-the-Scenes Volunteer Record Update

in which he listed "Dottie Klugel" as his emergency contact and he specified her relationship to him as

"partner" and provided her phone number.  A true and accurate copy of that Record Update is

attached here as Exhibit A  (SI-764 to 765).

3.    During the time Mr. Yunger served as a Behind-the-Scenes Volunteer at SERC, Dorotha

Klugel was his supervisor and timekeeper.  The registration form for Mr. Yunger received by the

Behind-the-Scenes Volunteer Program in April 2002 (SI-768 to 780), contains the notation, made by

my program assistant Celeste Moneme, "D. Klugel" as "Sup." for supervisor and "TK" for timekeeper.

(SI-770)  A true and accurate copy of this registration form (SI-768 to 779)  is attached here as

Exhibit B.  In addition, his project description submitted to the Behind-the-Scenes Volunteer Program

on April 29, 2002, identified "Dottie Klugel" as "supervisor" and "also timekeeper." It also identified

Mark Haddon as a supervisor. (SI-780)  A true and accurate copy of this project description is

attached here as Exhibit C.

4.  A true and accurate copy of the Behind-the-Scenes Volunteer Program Attendance

Reports for Fiscal Years 2002, 2003, 2004 and 2005, listing "Dottie Klugel" as the timekeeper for

Distance Learning volunteers including Mr. Yunger, is attached here as Exhibit D (SI-783 to 786).

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and

correct.

Amy Lemon

EXECUTED on July 9, 2008.

# EXHIBIT A

**Behind-the-Scenes Volunteer Record Update**
**2002**

*COMMUNITY SERVICE*

BTS: 7101
Term: 9/15/05 (FY05)
Code: TKNOTICE

Philip Yunger
P.O. Box 29197
Washington, DC 20017

2002 -5 P 1: 30

Yunger, P.

Please help us update your volunteer record in the Behind-the-Scenes Volunteer Program database by answering the following questions.

**Please return this form in the enclosed envelope by August 1, 2002 .**

The label above indicates how your name and home address are listed in the volunteer database. **Please make any corrections or additions in the space to the right of the label.**

I give permission for my name and address to be put on a general mailing list to receive any mailings from other Smithsonian departments.   Yes ✓ No____ (If you currently receive the *Smithsonian Torch*, you will continue receiving it even if you mark No).

Please provide your current e-mail address: _____ PhilYunger ██████

Please provide your home phone number: (██████

Please provide your work phone number, if appropriate: (___) _____

EMERGENCY CONTACT: Please list the name of the person we may contact in the event of an emergency. Include a daytime phone number with the area code and indicate your relationship to the person.

Name: ___ DOTTIE  KRUGEL _____

Relationship: ___ PARTNER _____     Phone: (██████

**(OVER)**

KLUGEL V. SAMPER
SI - 0764

Museums often need volunteer help for one or two days preparing special short-term projects ( i.e. assembling programs and gift bags, mailing invitations and announcements). If you would like to help with these special short-term projects, please indicate which day(s) you would be available to work.

_✓_ Yes, I am willing to help with short-term projects. I am available:

Monday _____    Tuesday _____    Wednesday _____    Thursday _____ Friday _____

Any day _✓_

____ No, I do not want to help with special short-term projects.

Museums occasionally need volunteer help for one or two days with public programs ( i.e. registration at conferences, exhibit openings, taking tickets and helping with crowd control at exhibits). If you would like to help with public programs, please indicate which day(s) you would be available to work.

_✓_ Yes, I am willing to help with public programs. I am available:

Monday _____    Tuesday _____    Wednesday _____    Thursday _____ Friday _____

Any day _✓_

____ No, I do not want to help with public programs.

Once a year the Behind-the-Scenes Volunteer Office prints and mails approximately 1200 tax letters for volunteers. The letters state the number of days and hours each volunteer worked the previous year. Volunteers who itemize on their tax returns use the letters to take a tax deduction.

_✓_ Yes, please continue to send me a tax letter.

____ No, do not send me a tax letter.

Thank you for your cooperation in our efforts to update your volunteer record. We appreciate your contribution of time and talent to the Smithsonian Institution. If you have any questions, please call the Behind-the-Scenes Volunteer Program at 202/357-2987.

KLUGEL V. SAMPER
SI - 0765

# EXHIBIT B

RECEIVED
APR 2 3 2002

**Behind-the-Scenes Volunteer Program**
Visitor Information and Associates' Reception Center
Smithsonian Institution

Registration
Application: please print or type

Name _Philip Yunger_    Date _4/21/02_

Current address ▓▓▓▓▓▓▓▓▓▓    City _Wash DC_

State ____ Zip+4 _20017_ -    E-mail _philyunger_ ▓▓▓▓

Home phone ( ▓▓ )▓▓▓▓▓    Other phone ( ▓ )▓▓▓▓▓

Permanent address _____

Emergency contact:
Name _Dottie Klugel_    Relationship _friend_ Phone (▓▓▓) ▓▓▓▓

Note: Participants may be photographed for educational, archival, and public relations purposes for the Smithsonian and the Behind-the-Scenes Volunteer Program.

Your signature (parent/guardian must sign if applicant is under 18) _PYunger_

♦♦ If you are under 18, please provide: Age _____    Date of birth _____ mo/day/yr

Parent/guardian name _____    Phone ( ) _____

**Education:** _See resume_

List any colleges or universities attended, degrees, and major fields of study

School _____ Degree _____ Major _____
School _____ Degree _____ Major _____
School _____ Degree _____ Major _____
Other _____

**If you are a high school student, please provide:**

School currently attending _____
Grade or level _____ City _____ State _____

**Availability:**

Start date _4/02_ to _open_    Total hours per week you want to volunteer _5-10_
month/year    month/year or open

| | Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|---|
| Preferred Hours  Morning | | | | | |
| Afternoon | | | | | |

KLUGEL V. SAMPER
SI - 0768

**Skills:** (check all that apply)

|  | highly skilled | some experience |
|---|---|---|
| **General skills** | | |
| Academic Research | ☐ | ☐ |
| Administrative | ☐ | ☐ |
| American History | ☐ | ☐ |
| Anthropology | ☐ | ☐ |
| Art History | ☐ | ☐ |
| Aviation | ☐ | ☐ |
| Biology | ☐ | ☐ |
| Drawing/Painting | ☐ | ☐ |
| Fundraising/Special Events | ☐ | ☐ |
| Geology | ☐ | ☐ |
| Graphic Design | ☐ | ☐ |
| Horticulture | ☐ | ☐ |
| Librarianship | ☐ | ☐ |
| Music | ☐ | ☐ |
| Management | ☐ | ☐ |
| Photography | ☒ | ☐ |
| Public Relations | ☐ | ☐ |
| Sewing/Weaving/Crafts | ☐ | ☐ |
| Teaching | ☐ | ☐ |
| Writing/Editing | ☐ | ☐ |
| Other (please specify) | | |
| electrician | ☒ | ☐ |
| boat licence | ☐ | ☐ |

|  | highly skilled | some experience |
|---|---|---|
| **Computer skills** | | |
| Databases | ☐ | ☐ |
| Spreadsheets | ☐ | ☐ |
| WordPerfect™ | ☐ | ☐ |
| Microsoft Word™ | ☐ | ☐ |
| Other Word Processing | ☐ | ☐ |
| Adobe Photoshop* | ☐ | ☐ |
| Adobe Pagemaker* | ☐ | ☐ |
| HTML | ☐ | ☐ |
| Programming | ☐ | ☐ |
| Other (please specify) | | |
|  | ☐ | ☐ |
|  | ☐ | ☐ |

**Language skills**
Foreign language ( please specify)

|  | highly skilled | some experience |
|---|---|---|
|  | ☐ | ☐ |
|  | ☐ | ☐ |
| Sign language | ☐ | ☐ |

## How did you hear about volunteering at the Smithsonian?

☐ Smithsonian volunteer
☐ The *Associate* (RAP newsletter)
☒ Smithsonian staff member
☐ Friend/Relative

☐ *The Washington Post*
☐ High school career development program
☐ College bulletin board/placement office
☐ Other

## What are your objectives in seeking a volunteer position at the Smithsonian?

To help SERC's distance learning program + Education dept

KLUGEL V. SAMPER
SI - 0769

## Previous Experience

→ See resume

### Work Experience

1. **Organization:** Kennedy Center    **City/State:**    **Title of position:** Stagehand    **Dates of position:**

**Supervisor's name:**    **Supervisor's title:**    **Supervisor's telephone:**

**Duties:** electrician, rigging, flyman, props, etc

2. **Organization:** JR Associates    **City/State:**    **Title of position:** Producer/Director/Camera    **Dates of position:**

**Supervisor's name:** Jimmy Rogers    **Supervisor's title:** owner    **Supervisor's telephone:**

**Duties:**

### Volunteer Experience

1. **Organization:**    **City/State:**    **Title of position:**    **Dates of position:**

**Supervisor's name:**    **Supervisor's title:**    **Supervisor's telephone:**

**Duties:**

2. **Organization:**    **City/State:**    **Title of position:**    **Dates of position:**

**Supervisor's name:**    **Supervisor's title:**    **Supervisor's telephone:**

**Duties:**

You may also submit a 2-page résumé with this application.

References (list two persons, not relatives, different from above).

**Name:** Dottie Klugel    **Phone (**

**Name:** Mark Hadden    **Phone (**

| For office use only | BTS# 7707 | Reg date 4/23/02 | Start 4/23/02 | Org. 5880 |
|---|---|---|---|---|
| | Sup D. Klugel | TK D. Klugel | Entered | Term date |

#885

KLUGEL V. SAMPER
SI - 0770

# Philip G. Yunger



Email: philyunge

## Skills:

Video and Film camera operator
Still Photographer (1984 DC Art Directors Award, U of Missouri Photojournalism
Workshop 1978)
Theatrical electrician, flyman, spot operator

## Experience:

Vast experience in all job areas of the theatrical and TV and Motion Picture
industries for the following companies:

1966-present

| | | |
|---|---|---|
| National theater | Columbia Pictures | WETA |
| NBC News | Universal | WTTG |
| CBS | Warner Brothers | |
| Wolf Trap | UPI Newsfilm | |

1977-1982
    George Meany Center for Labor Studies- Media Coordinator
1972-Present
    The Kennedy Center- all stages- Stage electrician, visual projection,
    rigging and flyman, properties departments
1995-1999
    President of IATSE Local 22 Stagehands, Washington, DC
1997-1998
    International Representative IATSE
1994-2000
    Technical Director for NBC Newwchannel, studio facilities, DC

## Current:

    Producer/Director/Camera Operator for JR Associates, Ft. Washington,
MD

## Motion Pictures:     Stills - Blind Ambition 1978, Stills – Nothing Personal

1979, Camera for numerous documentary film by the Kamber group 1980-1985,
Gaffer – No Way Out 1986, Grip & Gaffer – Tin Men 1986, Gaffer – Suspect
1987, Gaffer – Silence of the Lambs 1989

## Memberships:   Locals 22, 600 IATSE  Local 1200 IBEW

KLUGEL V. SAMPER
SI - 0771

# This Certificate is Awarded to

*Philip Yunger*



In acknowledgement of successful completion
of the BOAT/U.S. Foundation On-line Course



NABLA
APPROVED

on 1/7/99 6:51:38 PM

This course is an interactive, non-proctored exam provided at no cost on the internet by
the BOAT/U.S. Foundation for Boating Safety
at 880 S. Pickett Street, Alexandria, VA 22304 (703)823-9550 www.boatus.com.

The On-line Boating Safety Course is approved by the National Association
of Boating Law Administrators (NASBLA) and recognized by the United States Coast Guard.

By signing this certificate I certify that I successfully completed the Online
Boating Safety Course on my own and without the assistance of others.
(Failure to sign this certificate invalidates its authenticity.)

Signature: Philip Yunger

Philip Yunger
P.O. Box 29197
Washington, DC 20017
Date of Birth: 10/5/49
Exam Score: 94%
State Specific Exam: DC
Certificate Number: 986103355

KLUGEL V. SAMPER
SI - 0772

DEPARTMENT OF THE TREASURY—BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

## LICENSE/PERMIT (18 U.S.C. CHAPTER 40, EXPLOSIVES)

In accordance with the provision of Title XI, Organized Crime Control Act of 1970, and the regulations issued thereunder (27 CFR Part 55), you may engage in the activity specified in this license/permit within the limitation of Chapter 40, Title 18, United States Code and the regulations issued thereunder, until the expiration date shown. See "WARNING" and "NOTICE" on back.

| | | |
|---|---|---|
| CHIEF, F & E LICENSING CENTER | LICENSE/PERMIT NUMBER | 1-VA-141-20-2D-12186 |
| BATF, P.O. BOX 2994 ATLANTA, GA 30301-2994 | EXPIRATION DATE | APRIL 1, 2007 |

LICENSED PREMISES:
BROKEN ROSE IMAGE CO, THE

1406 NEWTON ST NE
WASHINGTON, DC 20017

TYPE OF LICENSE/PERMIT    20—MANUFACTURER OF HIGH EXPLOSIVES

PURCHASING CERTIFICATION

LICENSEE OR PERMITTEE MAILING ADDRESS

YUNGER, PHILIP G
BROKEN ROSE IMAGE CO, THE
PO BOX 29197
WASHINGTON, DC
20017



GOVERNMENT
OF THE
DISTRICT OF COLUMBIA

DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
OCCUPATIONAL AND PROFESSIONAL LICENSING ADMINISTRATION
BOARD OF INDUSTRIAL TRADES
Certifies that

PHILIP G YUNGER
P O BOX 29197
WASH DC 20017

has met all requirements prescribed by law and regulations and is hereby licensed as a
Journeyman Electrician EJ1072

ISSUE DATE: 12/01/1999                EXPIRATION DATE: 11/30/2001

Acting Administrator

KLUGEL V. SAMPER
SI - 0773

# Behind-the-Scenes Volunteer Program

Visitor Information and Associates' Reception Center

Smithsonian Institution

**Application:** please print or type

Name _Philip Yunger_    Date _4/21/02_

Current address _____    City _Wash DC_

State _____ Zip+4 _20017-_    E-mail _philyunger@_____

Home phone (_____    Other phone (_____

Permanent address _____

Emergency contact:

Name _Dottie Klugel_    Relationship _friend_ Phone (_____

Note: Participants may be photographed for educational, archival, and public relations purposes for the Smithsonian and the Behind-the-Scenes Volunteer Program.

Your signature (parent/guardian must sign if applicant is under 18) _P Yunger_

◆◆ If you are under 18, please provide: Age _____    Date of birth _____ mo/day/yr

Parent/guardian name _____ Phone (____) _____

Education: _See resume_

List any colleges or universities attended, degrees, and major fields of study

School _____ Degree _____ Major _____

School _____ Degree _____ Major _____

School _____ Degree _____ Major _____

Other _____

_____

If you are a high school student, please provide:

School currently attending _____

Grade or level _____ City _____ State _____

Availability:

Start date _4/02_ to _open_    Total hours per week you want to volunteer _5-10_
mo/year            month/year or open

| Preferred Hours | | Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|---|---|
| | Morning | | | | | |
| | Afternoon | | | | | |

Cover art: Bill Blandy

| General skills | highly skilled | some experience |
|---|---|---|
| Academic Research | ☐ | ☐ |
| Administrative | ☐ | ☐ |
| American History | ☐ | ☐ |
| Anthropology | ☐ | ☐ |
| Art History | ☐ | ☐ |
| Aviation | ☐ | ☐ |
| Biology | ☐ | ☐ |
| Drawing/Painting | ☐ | ☐ |
| Fundraising/Special Events | ☐ | ☐ |
| Geology | ☐ | ☐ |
| Graphic Design | ☐ | ☐ |
| Horticulture | ☐ | ☐ |
| Librarianship | ☐ | ☐ |
| Music | ☐ | ☐ |
| Management | ☐ | ☐ |
| Photography | ☑ | ☐ |
| Public Relations | ☐ | ☐ |
| Sewing/Weaving/Crafts | ☐ | ☐ |
| Teaching | ☐ | ☐ |
| Writing/Editing | ☐ | ☐ |
| Other (please specify) | | |
| Electrician | ☑ | ☐ |
| Boat licence | ☐ | ☐ |

| Computer skills | highly skilled | some experience |
|---|---|---|
| Databases | ☐ | ☐ |
| Spreadsheets | | |
| WordPerfect™ | ☐ | ☐ |
| Microsoft Word™ | ☐ | ☐ |
| Other Word Processing | ☐ | ☐ |
| Adobe Photoshop* | ☐ | ☐ |
| Adobe Pagemaker* | ☐ | ☐ |
| HTML | ☐ | ☐ |
| Programming | ☐ | ☐ |
| Other (please specify) | | |
| _____ | ☐ | ☐ |
| _____ | ☐ | ☐ |

**Language skills**

| Foreign language ( please specify) | | |
|---|---|---|
| _____ | ☐ | ☐ |
| _____ | ☐ | ☐ |
| Sign language | ☐ | ☐ |

## How did you hear about volunteering at the Smithsonian?

☐ Smithsonian volunteer
☐ The Associate (RAP newsletter)
☐ Smithsonian staff member
☐ Friend/Relative

☐ The Washington Post
☐ High school career development program
☐ College bulletin board/placement office
☐ Other

## What are your objectives in seeking a volunteer position at the Smithsonian?

To help SERC's distance learning program
Education dept

KLUGEL V. SAMPER
SI - 0775

## Previous Experience

→ See resume

### Work Experience

1. Organization: _Kennedy Center_    City/State: _____    Title of position: _Stagehand_    Dates of position: _____

   Supervisor's name: _____    Supervisor's title: _____    Supervisor's telephone: _____

   Duties: _electrician, rigging, flyman, props, etc_

2. Organization: _JR Associates_    City/State: _____    Title of position: _Producer/Director/Camera_    Dates of position: _____

   Supervisor's name: _Jimmy Rogers_    Supervisor's title: _Owner_    Supervisor's telephone: _____

   Duties: _____

### Volunteer Experience

1. Organization: _____    City/State: _____    Title of position: _____    Dates of position: _____

   Supervisor's name: _____    Supervisor's title: _____    Supervisor's telephone: _____

   Duties: _____

   Organization: _____    City/State: _____    Title of position: _____    Dates of position: _____

   Supervisor's name: _____    Supervisor's title: _____    Supervisor's telephone: _____

   Duties: _____

ou may also submit a 2-page resume with this application.

eferences (list two persons, not relatives, different from above)

Name _Dottie Kugel_    Phone ████████

Name _Mark Haddon_    Phone ████████

| For office use only | BTS# | Reg date | Start | Org |
|---|---|---|---|---|
| | Sup: | TK | Entered: | Term date |

f:\publica\duplica\bvpappli\bvpapplication.p65  Nov. 1995

KLUGEL V. SAMPER
SI - 0776

# Philip G. Yunger

Email: philyunger@earthlink.net

## Skills:
Video and Film camera operator
Still Photographer (1984 DC Art Directors Award, U of Missouri Photojournalism Workshop 1978)
Theatrical electrician, flyman, spot operator

## Experience:
Vast experience in all job areas of the theatrical and TV and Motion Picture industries for the following companies:

1966-present

| | | |
|---|---|---|
| National theater | Columbia Pictures | WETA |
| NBC News | Universal | WTTG |
| CBS | Warner Brothers | |
| Wolf Trap | UPI Newsfilm | |

1977-1982
George Meany Center for Labor Studies- Media Coordinator

1972-Present
The Kennedy Center- all stages- Stage electrician, visual projection, rigging and flyman, properties departments.

1995-1999
President of IATSE Local 22 Stagehands, Washington, DC

1997-1998
International Representative IATSE

1994-2000
Technical Director for NBC Newwchannel, studio facilities, DC

## Current:
Producer/Director/Camera Operator for JR Associates, Ft. Washington, MD

## Motion Pictures:
Stills - Blind Ambition 1978, Stills – Nothing Personal 1979, Camera for numerous documentary film by the Kamber group 1980-1985, Gaffer – No Way Out 1986, Grip & Gaffer – Tin Men 1986, Gaffer – Suspect 1987, Gaffer – Silence of the Lambs 1989.

## Memberships:
Locals 22, 600 IATSE  Local 1200 IBEW

KLUGEL V. SAMPER
SI - 0777



# This Certificate is Awarded to

*Philip Yunger*

In acknowledgement of successful completion
of the BOAT/U.S. Foundation On-line Course

**on 1/7/99 6:51:38 PM**



This course is an interactive, non-proctored exam provided at no cost on the Internet by
the BOAT/U.S. Foundation for Boating Safety
at 880 S. Pickett Street, Alexandria, VA 22304 (703)823-9550 www.boatus.com.

*The On-line Boating Safety Course is approved by the National Association
of Boating Law Administrators (NASBLA) and recognized by the United States Coast Guard.*

By signing this certificate I certify that I successfully completed the Online
Boating Safety Course on my own and without the assistance of others.
*(Failure to sign this certificate invalidates its authenticity.)*

Signature Philip Yunger

Philip Yunger
P.O. Box 29197
Washington, DC 20017
Date of Birth: 10/6/49
Exam Score: 84%
State Specific Exam: DC
Certificate Number: 98810535

KLUGEL V. SAMPER
SI - 0778

U.S. DEPARTMENT OF THE TREASURY—BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

## LICENSE/PERMIT (18 U.S.C. CHAPTER 40, EXPLOSIVES)

In accordance with the provision of Title XI, Organized Crime Control Act of 1970, and the regulations issued thereunder (27 CFR Part 55), you may engage in the activity specified in this license/permit within the limitation of Chapter 40, Title 18, United States Code and the regulations issued thereunder, until the expiration date shown. See "WARNING" and "NOTICE" on back.

CHIEF, F & E LICENSING CENTER

BATF, P.O. BOX 2994
ATLANTA, GA  30301-2994-

| LICENSE/PERMIT NUMBER | 1-VA-141-20-20-12186 |
| EXPIRATION DATE | APRIL 1, 2007 |

**LICENSED PREMISES:**
BROKEN ROSE IMAGE CO, THE

1406 NEWTON ST NE
WASHINGTON, DC 20017

TYPE OF LICENSE OR PERMIT

20 — MANUFACTURER OF HIGH EXPLOSIVES

SIGNATURE, F & E LICENSING CENTER

PURCHASING CERTIFICATION
I certify that this is a true copy of a license/permit issued to me to engage in the activity specified

SIGNATURE OF LICENSEE/PERMITTEE

The licensee or permittee named herein shall use a reproduction of this license/permit to assist a transferor of explosives to verify the identity of the licensee/permittee as provided in 27 CFR Part 55. The signature on each reproduction must be an ORIGINAL signature.

ATF E 5400.14/5400.15, Part 1 (8/89)

**MAILING ADDRESS**

YUNGER, PHILIP G
BROKEN ROSE IMAGE CO, THE
PO BOX 29197
WASHINGTON, DC
20017



GOVERNMENT
OF THE
DISTRICT OF COLUMBIA

DEPARTMENT OF CONSUMER AND REGULATORY AFFAIRS
OCCUPATIONAL AND PROFESSIONAL LICENSING ADMINISTRATION
BOARD OF INDUSTRIAL TRADES

certifies that

PHILIP G YUNGER
P O BOX 29197
WASH D C 20017

has met all requirements prescribed by law and regulations and is hereby licensed as a

Journeyman Electrician EJ1072

ISSUE DATE: 12/01/1999         EXPIRATION DATE: 11/30/2001

Acting Administrator

KLUGEL V. SAMPER
SI - 0779

# EXHIBIT C

APR 2 9 2002

By_____

### Education Volunteer:

Activities have included (but are not limited to): photography, mailing, preparing equipment and materials for programs, greeting groups, and helping out with education activities like the Open House event, evening lecture series, Watershed Radio, and video conferences. Boat and electrical experience also needed.

Supervisor: Dottie Klugel (also timekeeper) or Mark Haddon

Location: SERC property, Reed Center specifically

KLUGEL V. SAMPER
SI - 0780

EXHIBIT D

Smithsonian Institution
Behind-the-Scenes Volunteer Program
Attendance Report for FY03

Run Date: 05/14/0
Page: 6

ORGANIZATION
DEPARTMENT
TIMEKEEPER

| VOLUNTEER | Start Date | | OCT DD HR | NOV DD HR | QTR1 DEC DD HR | JAN DD HR | FEB DD HR | QTR2 MAR DD HR | APR DD HR | MAY DD HR | QTR3 JUN DD HR | JUL DD HR | AUG DD HR | QTR4 SEP DD HR | FY TOTAL DD HR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**SMITHSONIAN ENVIRONMENTAL RESEARCH CENTER**

Canopy Lab
  Michele Berger

| Hays, Quentin | 01/06/03 | T | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| Miller, Craig | 04/26/00 | T | 1 3 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 1 3 |
| Miller, Dawn | 04/07/99 | A | 6 30 | 4 19 | 2 8 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 12 57 |
| Miller, Maureen | 06/15/99 | A | 1 8 | 1 4 | 0 0 | 1 4 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 3 16 |
| Peel, Robert | 09/29/98 | A | 3 21 | 2 10 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 5 31 |
| Pinkney, Loretta | 05/08/02 | T | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| Pinkney, William | 05/08/02 | T | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| Schick, Joyce | 07/19/01 | A | 4 44 | 1 12 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 5 56 |
| Schmitt, Edward | 05/18/94 | A | 3 21 | 2 11 | 1 5 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 6 37 |
| Shields, Susan | 05/08/02 | A | 4 20 | 3 15 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 7 35 |

17 Vols Total: 281

**Development Office**

James DeLorbe

| Hahn, Suzanne | 08/14/02 | A | 3 17 | 4 19 | 5 27 | 8 43 | 0 0 | 9 55 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 29 161 |
| Shafery, Patricia | 08/01/01 | T | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |

2 Vols Total: 161

**Distance Learning**

Dottie Klugel

| Cramer, Krista | 12/10/01 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| Gibbons, Brian | 12/10/01 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| Gladman, Elizabeth | 07/13/01 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| Goodison, Michael | 07/12/01 | T | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| Goulet, Pierre | 12/20/02 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| Hines, Jessica | 04/29/02 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| Innis, Anne | 07/09/01 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| Orochena, Salvador | 04/29/02 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| Rao, Leela | 08/07/01 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| Restivo, Angela | 07/30/01 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |
| Yunger, Philip | 04/23/02 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |

(FY02)
10/1/01 - 9/31/02

no attendance report in the archives - see FY03 Award
- IRS report for volunteer hours.

KLUGEL V. SAMPER
SI - 0783

# Smithsonian Institution
## Behind-the-Scenes Volunteer Program

Run Date: 05/14/0?
Page: 7

**ORGANIZATION**
**DEPARTMENT**
**TIMEKEEPER**

| VOLUNTEER | StartDate | | OCT DD HR | NOV DD HR | DEC DD HR | JAN DD HR | FEB DD HR | MAR DD HR | APR DD HR | MAY DD HR | JUN DD HR | JUL DD HR | AUG DD HR | SEP DD HR | FY TOTAL DD HR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**SMITHSONIAN ENVIRONMENTAL RESEARCH CENTER**
**Distance Learning**
Dottie Klugel

**Solar Monitoring Laboratory**
William Brinley    (443)482-2430

| Volunteer | StartDate | | OCT | NOV | DEC | JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | FY TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 0 |

11 Vols Total:

| Baer, James | 10/08/02 | A | 0 0 | 3 9 | 3 24 | 4 34 | 4 32 | 4 35 | 3 26 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 21 160 |
| Daly, William | 06/15/98 | A | 4 24 | 4 23 | 4 23 | 5 28 | 4 24 | 5 28 | 6 36 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 32 186 |
| Thouin, David | 09/29/98 | A | 6 61 | 6 36 | 4 25 | 10 69 | 5 34 | 8 52 | 9 63 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 51 340 |

3 Vols Total: 686

**SMITHSONIAN INSTITUTION ARCHIVES** (9vol 92hrs)
Sarah Steuderman

| Breen, Patricia | 05/01/89 | A | 5 30 | 4 24 | 3 18 | 2 12 | 3 18 | 4 24 | 5 32 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 26 158 |
| Cohen, Heather | 02/27/95 | A | 5 30 | 3 18 | 3 18 | 2 12 | 2 12 | 4 24 | 3 18 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 22 132 |
| Fogle, Laura | 07/25/02 | A | 0 0 | 3 21 | 2 11 | 3 18 | 2 14 | 3 19 | 3 20 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 16 103 |
| Glider, Joan | 05/15/01 | A | 0 0 | 0 0 | 3 17 | 5 31 | 3 20 | 2 26 | 4 26 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 17 120 |
| Jensen, Doris | 08/24/99 | A | 5 30 | 3 15 | 0 0 | 4 20 | 2 10 | 2 10 | 3 13 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 17 88 |
| Livermore, Jane | 02/19/92 | A | 4 30 | 4 24 | 1 5 | 4 24 | 3 17 | 2 11 | 5 30 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 24 141 |
| Martindale, Zoe | 02/06/97 | A | 0 0 | 0 0 | 0 0 | 0 0 | 1 7 | 2 14 | 3 21 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 6 42 |
| Poting, Carole | 03/16/98 | A | 2 16 | 3 21 | 0 5 | 4 27 | 3 21 | 4 29 | 3 18 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 20 137 |
| Tsun, Betty | 07/02/01 | T | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 |

9 Vols Total: 921

**SMITHSONIAN INSTITUTION LIBRARIES** (66vol 2643hrs)
**Acquisitions Services**
Crystal McKenzie

| Hunter, Rita | 09/01/80 | A | 1 8 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 1 8 |

1 Vols Total: 8

**African Art Branch**
Janet Stanley

| Achraf, Ahmed | 02/06/98 | A | 1 6 | 1 5 | 2 8 | 2 11 | 2 11 | 0 0 | 4 25 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 12 66 |

KLUGEL V. SAMPER
SI - 0784

Smithsonian Institution
Senior-the-Scenes Volunteer Program
Attendance Report for FY04

Run Date: 02/01/0?
Page: 8?

| ORGANIZATION DEPARTMENT TIMEKEEPER VOLUNTEER | StartDate | OCT DD HR | NOV DD HR | DEC DD HR | QTR1 DD HR | JAN DD HR | FEB DD HR | MAR DD HR | QTR2 DD HR | APR DD HR | MAY DD HR | JUN DD HR | QTR3 DD HR | JUL DD HR | AUG DD HR | SEP DD HR | QTR4 DD HR | FY TOTAL DD HR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**SMITHSONIAN ENVIRONMENTAL RESEARCH CENTER**

**Development Office**
James De Lorbe

1 Vols Total:  0

**Distance Learning**
Dottie Klugel  (301)261-3204

| Volunteer | StartDate | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bamworth, Natalie | 07/01/04 A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Beukema, Kendrien | 09/01/03 A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bratman, Callum | 07/01/04 A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Goulet, Pierre | 12/20/02 A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Orochena, Salvador | 04/29/02 A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Yunger, Philip | 04/23/02 A | 2 16 | | 2 16 | 2 16 | 2 16 | 2 16 | 2 16 | 2 16 | 2 16 | 2 16 | 2 16 | 2 16 | 2 16 | 4 32 | 4 32 | 28 224 | 224 |

6 Vols Total:  28  224

**Ecological Modeling**
Don Weller

Fisher, Richard  05/15/03 T  3 8 | | | 3 8 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3 8 | 8

1 Vols Total:  8

**Education**
Dottie Klugel
Van der Meijden, Anna  07/01/03 T  3 24 | 1 8 | | 1 8 | 2 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 64 | 64

1 Vols Total:  64

**Invasions Lab**
Kelly Lyles

| Cheng, Andy | 01/28/04 A | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Voss, Rene | 07/15/03 T | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

2 Vols Total:  0

**Plant Ecology Lab**
Valery Terwilliger

| Oles, Dee-Inge | 01/28/04 T | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Pimm, Stephanie | 06/15/03 T | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

2 Vols Total:  0

**Solar Monitoring Laboratory**
William Brinley
Baer, James  10/09/02 A  4 35 | 3 26 | | 2 16 | 3 23 | 3 25 | 4 34 | 3 26 | 0 | 0 1 9 | | 2 16 | 2 16 | 26 219

KLUGEL V. SAMPER
SI - 0785

Smithsonian Institution

Attendance Report for FY05

Run Date: 10/2?/0
Page 9

| ORGANIZATION DEPARTMENT TIMEKEEPER VOLUNTEER | StartDate | | OCT DD HR | NOV DD HR | DEC DD HR | JAN DD HR | FEB DD HR | MAR DD HR | APR DD HR | MAY DD HR | JUN DD HR | JUL DD HR | AUG DD HR | SEP DD HR | FY TOTAL DD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **SMITHSONIAN ENVIRONMENTAL RESEARCH CENTER** | | | | | | | | | | | | | | | |
| **Canopy Lab** | | | | | | | | | | | | | | | |
| Dawn Miller | | | | | | | | | | | | | | | |
| Schmitt, Edward | 05/18/94 | A | 1 7 | 5 27 | 2 11 | 2 14 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 10 |
| Sheerin, John | 07/01/04 | A | 4 23 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 4 |
| Smerling, Tom | 06/07/05 | T | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 |
| | | | | | | | | | | | | | | | **14 Vols Total:** |
| **Development Office** | | | | | | | | | | | | | | | |
| James De Lorbe | | | | | | | | | | | | | | | **0 Vols Total:** |
| **Distance Learning** | | | | | | | | | | | | | | | |
| Dottie Klugel | (301)261-3204 | | | | | | | | | | | | | | |
| Bamforth, Natalie | 07/01/04 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 |
| Bass, Bill | 04/11/05 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 |
| Beckema, Henchien | 09/01/03 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 |
| Breman, Callan | 07/01/04 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 |
| Duke, Carla | 04/11/05 | A | 0 0 | 0 0 | 0 0 | 0 0 | 5 40 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 5 |
| Goulet, Pierre | 12/20/02 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 |
| Harris, Jennifer | 04/11/05 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 3 24 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 8 |
| Yunger, Philip | 04/23/02 | T | 0 0 | 0 0 | 0 0 | 5 40 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | |
| | | | | | | | | | | | | | | | **8 Vols Total:** |
| **Ecological Modeling** | | | | | | | | | | | | | | | |
| Don Weller | | | | | | | | | | | | | | | **0 Vols Total:** |
| **Education** | | | | | | | | | | | | | | | |
| Dottie Klugel | | | | | | | | | | | | | | | |
| Bates, David | 05/23/05 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 |
| Breitburg-Smith, Maya | 05/31/05 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 |
| Duxbury, Josh | 10/06/04 | T | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 |
| Flannery, James | 05/09/05 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 |
| Hawkins, Cory | 05/31/05 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 |
| Johnson, Frances | 05/09/05 | A | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 0 | 0 |

KLUGEL V. SAMPER
SI - 0786

EXHIBIT 8

To: Mark Haddon

From: Dottie Klugel

Date: May 1, 2005

RE: Resignation

I hereby tender my resignation as Distance Learning Coordinator due to the hostility I face in my work environment, evidenced by the denial of leave, the inappropriate review of my travel, the attempt to obstruct my ability to use and consult with counsel, and the discrimination I face based on my gender.

My last day will be Friday, May 13, 2005.

EXHIBIT NO. 21
CJB 5/8/08

KLUGEL V. SAMPER
SI - 0115

EXHIBIT 9



Smithsonian
Institution

SMITHSONIAN DIRECTIVE 107

December 1, 2005

## OFFICE OF THE INSPECTOR GENERAL

| | |
|---|---|
| Purpose | 1 |
| Background | 1 |
| Overview of the Inspector General Function | 2 |
| Authority of the Office of the Inspector General | 3 |
| Responsibilities of the Inspector General | 4 |
| Responsibilities of Smithsonian Officials and Employees | 5 |

**Purpose**

This directive describes audit and investigation authorities and responsibilities of the Office of the Inspector General (OIG), and the relationship of the OIG to Smithsonian organizations and employees.

**Background**

The Inspector General Act Amendments of 1988 (P.L. 100 – 504) created an independent and objective office (1) to conduct and supervise audits and investigations relating to programs and operations of the Smithsonian Institution; (2) to recommend policies and procedures designed (A) to promote economy, efficiency, and effectiveness in the administration of, and (B) to prevent and detect fraud and abuse in Smithsonian programs and operations; and (3) to keep the Secretary, the Board of Regents, and the Congress fully and currently informed about problems and deficiencies relating to the administration of such programs and operations and the necessity for and progress of corrective action. The Inspector General is appointed by the Secretary of the Smithsonian Institution and reports to the Secretary, the Audit Committee of the Board of Regents, and to Congress.

Smithsonian Directive 107,
12/01/05

**Overview of the Inspector General Function**

a. **Audits and Audit-Related Activities**. The OIG reviews Smithsonian programs and activities under the general guidelines contained in "Government Auditing Standards" issued by the Comptroller General of the United States. The purpose of these reviews is to determine the effectiveness, economy, and efficiency of a given program or operation. These reviews include financial audits, attestation engagements, and performance audits, as well as audit-related activities such as management reviews and prospective studies. These reviews may encompass an examination of financial transactions, accounts, and reports, including an evaluation of compliance with applicable laws and regulations; a review of efficiency and economy in the use of resources; and a review to determine whether desired program or activity results are effectively achieved. In conducting audits and audit-related activities, OIG reviews and evaluates transactions and activities and makes appropriate recommendations but does not determine whether, and the degree to which, a recommendation will be adopted. Furthermore, the OIG is not assigned responsibility for developing new organization patterns, methods, systems, or procedures although the OIG may call attention to problems in any of these areas and make recommendations. The OIG follows up on the status of actions taken on audit findings and recommendations. Internal audits are conducted in accordance with an annual audit plan. The IG develops this plan with input from management.

b. **Investigations**. Inquiries are conducted through a planned, systematic search for facts and evidence derived through interviews, record examination, and the application of other approved professional techniques. Investigations involve suspected criminal activities, fraud, or waste and abuse, against Smithsonian programs activities, staff or visitors. Investigations may be

Smithsonian Directive 107,
12/01/05

**Overview of the Inspector General Function** (continued)

conducted in support of criminal, civil, or administrative actions.

**Authority of the Office of the Inspector General**

Under the provisions of 5 *United States Code* (U.S.C.), App. 3, the Smithsonian Institution Inspector General is authorized to:

a. Conduct audits and investigations relating to the administration of the Smithsonian's programs and operations as are, in the judgment of the Inspector General, necessary or desirable

b. Have access to all records, reports, audits, reviews, documents, papers, recommendations, or other material which relate to Smithsonian programs and operations

c. Request such information or assistance as may be necessary from any federal, state, or local governmental agency or unit

d. Report to the Secretary without delay whenever requested information or assistance is, in the judgment of the Inspector General, unreasonably refused or not provided

e. Require by subpoena the production of all information, documents, reports, answers, records, accounts, papers, and other data and documentary evidence necessary in the performance of the functions assigned by P.L. 100 – 504 which is enforceable by order of any appropriate United States District Court. NOTE: Procedures other than subpoenas shall be used to obtain documents and information from federal agencies

f. Administer to or take from any person an oath, affirmation, or affidavit, whenever necessary in the performance of the functions assigned by the Inspector General Act

3

Smithsonian Directive 107,
12/01/05

| | |
|---|---|
| **Authority of the Office of the Inspector General** (continued) | g. Select, appoint, and employ such officers and employees as may be necessary for carrying out the functions, powers, and duties of the OIG |
| | h. Obtain the temporary or intermittent services of experts or consultants, or an organization thereof, subject to federal and Smithsonian procurement regulations |
| **Responsibilities of the Inspector General** | The Inspector General is responsible to: |
| | a. Provide policy direction for and to conduct, supervise, and coordinate all audits and investigations relating to the programs and operations of the Smithsonian Institution |
| | b. Prevent and detect fraud and abuse in Smithsonian programs and operations |
| | c. Keep the Secretary, the Board of Regents, and the Congress fully and currently informed, by means of semiannual reports and otherwise, of fraud and other serious problems, abuses, and deficiencies relating to the administration of programs and operations administered or financed by the Smithsonian. The Inspector General recommends corrective action concerning such problems, abuses, and deficiencies, and reports on the progress made in implementing such corrective actions (P.L. 100 – 504, Sec. 4 (a)(4)) |
| | d. Comply with Governmental Auditing Standards issued by the Comptroller General of the United States (P.L. 100 – 504, Sec. (4)(b)(1)(A)) |
| | e. Receive and investigate complaints or information from Smithsonian employees or others concerning possible fraud, waste, abuse, or violation of law at the Institution, and how to keep the source of the complaint or information confidential |

4

Smithsonian Directive 107,
12/01/05

| | |
|---|---|
| **Responsibilities of the Inspector General** (continued) | f.  Report expeditiously to the Attorney General whenever the Inspector General has reasonable grounds to believe there has been a violation of federal criminal law |
| | g.  Prepare semiannual reports not later than April 30 and October 31 of each year, summarizing the activities of the OIG during the immediately preceding 6 month periods ending March 31 and September 30. Such reports shall be furnished to the Secretary, who shall transmit the reports to the Congress. |
| **Responsibilities of Smithsonian Officials and Employees** | a.  The Secretary is responsible for ensuring that effective management practices are followed throughout the Smithsonian and has available various management tools, including the use of internal audits, to help make determinations as to the effectiveness of management. The Deputy Secretary coordinates with the OIG on a regular basis to ensure that management responses to OIG recommendations are timely and responsive. The Deputy Secretary also appraises the adequacy of follow-up procedures on findings and recommendations made by the Office. |
| | b.  Secretarial officers and the heads of principal organization units are responsible for extending cooperation to the OIG in implementing an effective audit program, for objectively reviewing and evaluating audit findings and recommendations, for taking timely action to correct deficiencies reported, and to adopt any recommendations that are considered beneficial. |
| | c.  Heads of principal organization units who disagree with recommended corrective actions will develop adequate documentation to support their conclusions. |
| | d.  Heads of units should refer all requests for audits and criminal investigations to the OIG. |

Smithsonian Directive 107,
12/01/05

**Responsibilities
of Smithsonian
Officials and
Employees**
(continued)

e. Heads of units should immediately notify the OIG of any audit or investigation announcements by any non-Smithsonian Institution entities, including the Government Accountability Office and Congress, and shall immediately provide copies of any resulting draft and final reports to the OIG.

f. All Smithsonian employees should immediately notify the OIG when they become aware of possible violations of laws, rules, or regulations or mismanagement, gross waste of funds, or abuse of authority.

g. Any outside requests for information from any audit or investigative organization regarding Smithsonian programs or operations should be referred to the OIG.

CANCELLATION:      SD 701, July 9, 1991
INQUIRIES:              Office of the Inspector General
RETENTION:           Indefinite. Subject to review for currency 24 months from date of issue

# EXHIBIT 10

COPY

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------x
DORATHA KLUGEL,                    :
                                   :
            Plaintiff,             :
                                   :
      v.                           : No. 06-1886
                                   :
CRISTIAN SAMPER *et al.*,          :
                                   :
            Defendants.            :
---------------------------x

                        Falls Church, Virginia

                        Tuesday, April 15, 2008

Deposition of

               MICHAEL PICKETT

a witness, called for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, beginning at approximately 2:59 p.m., at

the law offices of Grad Logan & Klewans, PC, 3141

Fairview Park Drive, Falls Church, Virginia,

before Steven Garland of Anderson Court Reporting,

notary public in and for the Commonwealth of

Virginia, when were present on behalf of the

respective parties:

5

1    Institution.

2              MS. CHRISTENSEN:  Epin Christensen,

3    Counsel to the Inspector General, also with the

4    Smithsonian Institution.

5              THE VIDEOGRAPHER:  Swear the witness

6    please.

7    Whereupon,

8                        MICHAEL PICKETT

9    was called as a witness and, having been first

10   duly sworn, was examined and testified as follows:

11             EXAMINATION BY COUNSEL FOR PLAINTIFF

12             BY MR. BYRNES:

13        Q    Sir, could you please state your name

14   and spell your last name please.

15        A    My name is Michael Pickett,

16   P-I-C-K-E-T-T.

17        Q    Mr. Pickett, where are you employed?

18        A    I'm employed with the Inspector

19   General's Office, Smithsonian Institution.

20        Q    And what do you do with the Inspector

21   General's Office?

22        A    I am a Senior Special Agent.  I'm an

8

1    essentially been in law enforcement your entire

2    career?

3         A    That's true.

4         Q    Alright.  And I take it you've had

5    training on investigative techniques and methods

6    of conducting investigations of individuals

7    suspected of misconduct or criminal offenses?

8         A    Yes.

9              MS. JOHNSON:  Objection as vague as to

10   time.  Go ahead.

11             BY MR. BYRNES:

12        Q    Okay.  Well, throughout your career?

13        A    Yes.

14        Q    It's pretty much an ongoing thing I

15   would think, correct?

16        A    Correct.

17        Q    Alright.  Now, what types of issues does

18   the Inspector General's Office investigate for the

19   Smithsonian when it comes to employees?

20        A    They investigate fraud, waste or abuse

21   as it affects the programs or operations of the

22   Institution.

9

1       Q    So an employee subject to an IG

2    investigation would reasonably, reasonably think

3    that they might be being charged with fraud, waste

4    or abuse, correct?

5         MS. JOHNSON:  Objection.  Calls for

6    speculation.  Lack of foundation.

7         BY MR. BYRNES:

8       Q    You can answer.

9         MS. NICHOLSON:  Could you repeat the

10    question -- I'm sorry.

11         BY MR. BYRNES:

12       Q    An employee, for instance, since you

13    investigate fraud, waste and abuse, I take it that

14    -- well, let me put it this way.  You don't get

15    involved in the day-to-day personnel matters of

16    the agency, do you?

17       A    Not generally.

18       Q    Right.  Generally you limit yourself to

19    allegations of serious misconduct, I would take

20    it?

21         MS. JOHNSON:  Objection to form.

22         BY MR. BYRNES:

10

1       Q    Correct?

2            MS. JOHNSON:  You can answer.

3            THE WITNESS:  I guess I'm waiting for a

4   judge to rule on the objection.  So, repeat the

5   question.

6            BY MR. BYRNES:

7       Q    You would generally focus on serious

8   allegations of misconduct within the agency,

9   correct?

10           MS. JOHNSON:  Objection to form.

11           THE WITNESS:  Yes and no.  That's what

12  we would investigate.

13           BY MR. BYRNES:

14      Q    Okay.

15      A    There are complaints that come into the

16  office of all varying degrees and when we receive

17  a complaint, we do a preliminary inquiry and the

18  purpose of that is to determine whether it's

19  significant enough, whether it's credible and

20  specific enough to recommend to the Inspector

21  General that we open a case either for a criminal

22  investigation or an administrative inquiry.

EXHIBIT 11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

--------------------------------x
DORATHA KLUGEL,                  :
                                 :
            Plaintiff,           :
                                 :
        v.                       : No. 06-1886
                                 :
CRISTIAN SAMPER et al.,          :
                                 :
            Defendants.          :
--------------------------------x


                            Falls Church, Virginia

                        Wednesday, April 16, 2008

Deposition of

                    CAROL AILES

a witness, called for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, beginning at approximately 2:54 p.m., at

the law offices of Grad Logan & Klewans, PC, 3141

Fairview Park Drive, Falls Church, Virginia,

before Catherine B. Crump of Anderson Court

Reporting, notary public in and for the

Commonwealth of Virginia, when were present on

behalf of the respective parties:

7

Q    Okay.  Now, Ms. Ailes, what are your
duties involved in the travel office?

A    At the present?

Q    Yes.

A    I am the supervisor of the Travel
Management Office which is the new GovTrip Travel
System.

Q    And how long has that system been in
existence?

A    One year as of April, this April 23rd.

Q    Prior to that, what was your title?

A    Supervisory Passenger Rate Specialist.

Q    And what did a Supervisory Passenger
Rate Specialist, what does that person do?  What
did you do?

A    I was the Assistant Manager of the
Travel Office, of the Services Office.  I take
reservations, issue tickets in all aspects of the
travel for the Institution.

Q    Okay.  Do you also verify the
correctness of travel forms in your job?

MS. JOHNSON:  Objection.  Vague.

8

1        Q    Let me rephrase that.

2        BY MR. BYRNES:

3        Q    Would you review and determine whether a

4  travel voucher that was submitted was accurate or

5  not?

6        MS. JOHNSON:  Objection as to form.

7        A    No.

8        BY MR. BYRNES:

9        Q    Okay.  Did there come a time that you

10  made a referral to the Inspector General's Office

11  regarding Ms. Klugel?

12       A    Yes.

13       Q    Okay.  What was that based on?

14       A    I felt that the request to me was not

15  correct and it was against the rules and

16  regulations --

17       Q    What request --

18       A    -- of the FTR.

19       Q    What request are you referring to?

20       A    Adding a personal stop on an official

21  government ticket.

22       Q    And where was that?  Do you remember the

9

1    ticket that that involved?

2              MS. JOHNSON:  Objection.  Vague.

3              BY MR. BYRNES:

4         Q    In other words, what specific ticket

5    from Ms.  Klugel caused you to have that concern?

6         A    Panama and Belize.

7         Q    And who apprised you that this, of this

8    trip initially?  I mean how did you learn about

9    this form?

10             MS. JOHNSON:  Objection.  Lack of

11   foundation.

12             BY MR. BYRNES:

13        Q    In other words, how did this come to

14   your attention that Ms. Klugel was seeking to do

15   this?

16        A    She called to make a reservation.

17        Q    Had you ever referred employees to the

18   IG before this?

19        A    Yes.

20        Q    How many times?

21        A    I don't remember.

22        Q    More than ten?

10

```
1        A    I don't remember.

2        Q    More than five?

3        A    Probably.

4        Q    Between five and ten?

5        A    It's hard to remember over 28 years.

6        Q    In how many of those cases were you ever

7   apprised by the IG as to the results of their

8   investigation?

9             MS. JOHNSON:  Objection.  Lack of

10  foundation.  Form.

11            THE WITNESS:  I never know.

12            BY MR. BYRNES:

13       Q    Okay.  And did you make any effort to

14  determine whether or not Ms. Klugel was authorized

15  to go to Belize?

16       A    Yes.

17       Q    Who did you speak to?

18       A    The traveler.

19       Q    And what did she say?

20       A    She said yes.

21       Q    Okay.  And did you refer the matter to

22  the IG before or after she said yes?
```

11

```
 1        A    After.

 2        Q    Why?

 3        A    Because I questioned were both stops

 4   official Smithsonian business as is policy.

 5        Q    Well, generally -- go ahead.

 6        A    She said yes.

 7        Q    So why, what further efforts did you

 8   make other than asking her about whether the

 9   business was official or not?

10             MS. JOHNSON:  Objection.  Vague.

11             BY MR. BYRNES:

12        Q    Other than speaking to Ms. Klugel, what

13   other efforts did you make to investigate it?

14             MS. JOHNSON:  Objection to form.

15             THE WITNESS:  Checked with her office.

16             BY MR. BYRNES:

17        Q    Who in the office?

18        A    The travel person at SERC.

19        Q    Which was who?

20        A    Kathy Suite.

21        Q    Did Ms. Suite contact you initially or

22   did you contact Ms. Suite?
```

12

1       A    I contacted her.

2       Q    Okay.  And what did Ms. Suite say?

3       A    That Belize was a personal stop.  Her

4  understanding.

5       Q    Did you contact Ms. Klugel's supervisor

6  to determine whether he approved this trip?

7       A    No.

8       Q    Have you ever heard of Project View?

9       A    No.

10      Q    Who was paying for Ms. Klugel to go to

11  Belize?

12      MS. JOHNSON:  Objection.  Lack of

13  foundation.

14      BY MR. BYRNES:

15       Q    If you know?

16       A    I don't know.

17       Q    You said that it violated the FTR.  How

18  did it violate the FTR?

19      MS. JOHNSON:  Objection.  Calls for

20  legal conclusion.

21      THE WITNESS:  We are not allowed to add

22  a personal stop that is not on your official

13

1    travel papers and on your Government ticket

2    together.

3                BY MR. BYRNES:

4        Q    Other than asking Ms. Suite whether or

5    not the travel was personal, did you take any

6    other steps to determine whether or not the travel

7    was truly personal or not?

8        A    Yes.

9        Q    What?

10       A    I e-mailed the passenger.

11       Q    And did she tell you again that it was

12   business related?

13       A    Yes.

14       Q    And why did you believe that that was

15   inaccurate?

16               MS. JOHNSON:   Objection to the form.

17   Mischaracterizes her testimony.   You can answer.

18               THE WITNESS:   Because I called again and

19   asked Ms.  Suite what was going on.

20               BY MR. BYRNES:

21       Q    And what did she say?

22       A    She had an in-house travel form that

14

1    stated Belize was personal.

2        Q    Did she show you that form?

3        A    No.

4        Q    Have you ever seen any written

5    documentation that would establish that the

6    initial trip or any subsequent trip to Belize was

7    personal in nature?

8        A    I'm sorry.  Say again.

9        Q    Have you seen anything in writing that

10   would confirm you suspicions that the trip to

11   Belize was personal?

12       A    No.

13       Q    Are you aware of who was paying for the

14   trip to Belize?

15       A    No.

16       Q    If I were to advise you that Project

17   View paid for that trip to Belize, would that

18   affect your opinion on whether that trip was

19   appropriate or not?

20            MS. JOHNSON:  Objection.  Calls for

21   speculation.

22            THE WITNESS:  It would have to be on her

18

1      Correct?

2          A    Yes.

3          Q    And you relied only on Mr. Suite's word

4      that it was not.  Correct?

5          A    Well, yes.

6          Q    So if Ms Suite was lying and inaccurate

7      then would that have affected your decision to

8      send the matter to the IG?

9              MS. JOHNSON:  Objection.  Calls for

10     speculation and to form.

11             THE WITNESS:  Depends.

12             BY MR. BYRNES:

13         Q    What do you mean it depends?

14         A    She told me she had documentation that

15     Belize was a personal stop.

16         Q    And so, of course, you requested that

17     documentation before you contacted the Inspector

18     General, didn't you?

19             MS. JOHNSON:  Objection to form.

20             THE WITNESS:  No.

21             BY MR. BYRNES:

22         Q    So you just relied on the word of some

22

1    committed fraud, waste or abuse?

2              MS. JOHNSON:  Objection to form.

3              THE WITNESS:  No.

4              BY MR. BYRNES:

5        Q    So why did you refer the matter to the

6    Inspector General then?

7              MS. JOHNSON:  Objection to form.

8              THE WITNESS:  Because it was against the

9    FTR Rules and Regulations and therefore I am

10   required to put in a question to them.

11             BY MR. BYRNES:

12       Q    Where does it; is there a document in

13   any of your training materials or in your job

14   description that says every time there's a

15   question about a travel form, you're to report it

16   to the Inspector General?

17             MS. JOHNSON:  Objection to form.  Lack

18   of foundation.

19             THE WITNESS:  No.

20             BY MR. BYRNES:

21       Q    So this was just your discretionary

22   decision.  You just decided this was a good idea.

23

1          MS. JOHNSON:  Objection to form.

2          THE WITNESS:  It's what I'm paid to do.

3          BY MR. BYRNES:

4      Q    Is it?  How many times have you done it?

5      A    I don't remember.

6      Q    Have you ever been sued for slander,

7   ma'am?

8          MS. JOHNSON:  Objection.  Relevance.

9          THE WITNESS:  No.

10          BY MR. BYRNES:

11      Q    Do you know whether or not the Inspector

12   General found that your claim of inaccuracy was

13   well founded?

14          MS. JOHNSON:  Objection to form.  Lack

15   of foundation.

16          THE WITNESS:  I do not know.

17          BY MR. BYRNES:

18      Q    Would it surprise you to know they found

19   no improper action with respect to this?

20          MS. JOHNSON:  Objection.  Calls for

21   speculation.

22          THE WITNESS:  I have no comment on that.

24

BY MR. BYRNES:

1

2      Q      Did anyone from the agency bother to

3  tell you that Mr. Hadden had approved the trip to

4  Belize at any time?

5      A      I don't remember.

6      Q      What about Ms. Suite?

7      A      I don't remember.

8      Q      Why didn't you ask her to confirm with

9  the manager whether or not the trip was

10  authorized?

11      A      I don't remember.

12      Q      Did you think -- do you have problems

13  with your memory?

14      A      No.

15      Q      Are you on any medications that would

16  affect your ability to remember?

17      A      No.

18      Q      Had you had any dealings with my client

19  prior to the time you referred the matter to the

20  Inspector General?

21          MS. JOHNSON:   Objection to form.

22          THE WITNESS:   I don't remember.  I might

25

1    have done travel for her before.

2         BY MR. BYRNES:

3    Q    Did you have any problems with her?

4    A    Not that I remember.

5    Q    How many trips had she taken, do you

6    know?

7    A    I don't know.

8    Q    Your knowledge of the FTRs, what is it

9    -- in your position, has the agency allowed

10   volunteers to travel along with members of the

11   agency?

12        MS. JOHNSON:  Objection to form.

13        THE WITNESS:  It depends on how they're

14   registered and what kind of paperwork they're on.

15        BY MR. BYRNES:

16   Q    Well, do you know --

17   A    Yes, volunteers can travel.

18   Q    What rate do they get on flights?

19        MS. JOHNSON:  Objection.  Vague.

20        THE WITNESS:  If the Smithsonian is

21   paying and they're on official travel

22   documentation, travel orders, then they're allowed

26

1    the Government fare.

2            BY MR. BYRNES:

3        Q    Did you have any questions about Ms.

4    Klugel traveling to Hawaii?

5            MS. JOHNSON:  Objection.  Lack of

6    foundation.

7            THE WITNESS:  No.

8            BY MR. BYRNES:

9        Q    Did you raise any inquiry to the

10   Inspector General regarding the Hawaii trip that

11   she took with Mr.  Younger?

12       A    No.

13       Q    So this was the totally the Belize trip?

14       A    My recollection, yes.

15       Q    Now, have you, in your position in the

16   Travel Office, ever seen where an outside entity

17   paid for the travel of Smithsonian employees?

18       A    Yes.

19       Q    Is there anything inappropriate about

20   that?

21            MS. JOHNSON:  Objection to form.

22            THE WITNESS:  Depends on who it is and

EXHIBIT 12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
------------------------------x
DORATHA KLUGEL,                 :
                                :
            Plaintiff,          :
                                :
       v.                       : No. 06-1886
                                :
CRISTIAN SAMPER et al.,         :
                                :
            Defendants.         :
------------------------------x
```

Falls Church, Virginia

Monday, April 21, 2008

Deposition of

GERARD ROY

a witness, called for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, beginning at approximately 20:38 a.m., at

the law offices of Grad Logan & Klewans, PC, 3141

Fairview Park Drive, Falls Church, Virginia,

before Stephen K. Garland of Anderson Court

Reporting, notary public in and for the

Commonwealth of Virginia, when were present on

behalf of the respective parties:

ANDERSON COURT REPORTING
706 Duke Street, Suite 100
Alexandria, VA 22314
Phone (703) 519-7180  Fax (703) 519-7190

Page 18

1  legal conclusion.
2      THE WITNESS: I can -- I think I can
3  best phrase it by saying unintended. Don't do
4  things that are unintended. If the person,
5  whoever it may be, objects, then it could
6  constitute harassment. That's as best I can
7  recall right now.
8      BY MR. BYRNES:
9      Q   What training, if any, did you have from
10 the Smithsonian on the limits of possible
11 questions that could be asked under the
12 Rehabilitation Act of 1973?
13     MS. JOHNSON: Objection to form.
14     THE WITNESS: I don't recall any
15 specific training on --
16     BY MR. BYRNES:
17     Q   What is your understanding of what
18 limits, if any, are imposed by the Rehabilitation
19 Act of 1973 on talking to employees about medical
20 conditions?
21     MS. JOHNSON: Objection; calls for a
22 legal conclusion.

Page 19

1      THE WITNESS: I normally would not talk
2  to an individual about a medical condition. We
3  have forms that we would ask someone to sign to
4  release medical information to us. But unless the
5  allegation we're dealing with dealt with fraud of
6  some sort, it's not a subject that would come up
7  in our office.
8      BY MR. BYRNES:
9      Q   During your tenure in the Inspector
10 General's Office, did you -- was there a time --
11 did there come a time when you were involved in a
12 review of the conduct of Doratha Klugel?
13     MS. JOHNSON: Objection to form.
14     THE WITNESS: We received an allegation
15 about alleged improprieties by Ms. Klugel and
16 another employee, yes.
17     BY MR. BYRNES:
18     Q   Who did you receive that allegation
19 from?
20     A   I believe it was from Carol Ailes in the
21 travel office, the main travel office for the
22 Smithsonian.

Page 20

1      Q   Had you ever dealt with Ms. Ailes before
2  this allegation occurred?
3      A   Yes.
4      Q   What had you dealt with Ms. Ailes
5  previously on?
6      A   She would call whenever she found what
7  she thought to be travel irregularities, yeah.
8      Q   And how many individuals did she call on
9  in the two years preceding your investigation of
10 Ms. Klugel?
11     A   I can't tell you. I don't know.
12     Q   Okay. Did you keep records of those
13 contacts at all?
14     A   Normally no.
15     Q   Why not?
16     A   Because sometimes she would just call to
17 complain about something that was going on with
18 management. Sometimes she would have a specific
19 issue, but it didn't raise itself to, in my
20 opinion, to the level of an IG's inquiry. And
21 sometimes she would call saying she had a specific
22 allegation.

Page 21

1      Q   Within the Smithsonian, could all
2  employees contact the IG?
3      A   Yes.
4      MS. JOHNSON: Objection; lack of
5  foundation.
6      THE WITNESS: Oh, sorry.
7      MS. JOHNSON: Go ahead.
8      THE WITNESS: Yes.
9      BY MR. BYRNES:
10     Q   And was Ms. Ailes somebody who regularly
11 contacted the IG's office?
12     MS. JOHNSON: Objection; calls for
13 speculation.
14     THE WITNESS: She'd phoned as have
15 others, yes.
16     BY MR. BYRNES:
17     Q   Did you -- how did you perceive Ms.
18 Ailes?
19     MS. JOHNSON: Objection; vague.
20     THE WITNESS: As someone who was very
21 conscientious about her job.
22     BY MR. BYRNES:

Page 26

1   be inefficient, uneconomical, or --
2       Q   Well, with respect to Ms. Klugel, was
3   this an auditory function or was this an
4   investigatory function?
5       A   This was --
6       MS. JOHNSON:  Objection to form.
7       THE WITNESS:  This was an inquiry.  We
8   would determine if we'd need an investigation.
9       BY MR. BYRNES:
10      Q   Well, what's the difference?
11      A   Between what, sir?
12      Q   An inquiry and an investigation.
13      A   One is gathering some information and
14  the other is that we have some substantial
15  information to pursue it.
16      Q   Well, are there differences in the
17  techniques you use for each?
18      A   I would imagine so, yes.
19      Q   Are there rights advisements you give
20  employees with -- when it involves an
21  investigation?
22      A   At some point in time in the

Page 27

1   investigation, perhaps.
2       Q   What sort of rights would you normally
3   give an employee who you suspected of misconduct
4   before asking them questions about that
5   misconduct?
6       MS. JOHNSON:  Object to form.
7       THE WITNESS:  It would depend.
8       BY MR. BYRNES:
9       Q   Have you ever heard the term calkins?
10      A   Yes.
11      Q   What is your understanding of what
12  calkins warnings are?
13      MS. JOHNSON:  Objection; calls for a
14  legal conclusion.
15      THE WITNESS:  My understanding is a
16  calkins warning is given after a U.S. attorney has
17  declined prosecution of a specific event or a
18  specific allegation.
19      BY MR. BYRNES:
20      Q   Isn't it that a calkins warning is given
21  every time an individual is asked to answer a
22  question in an administrative inquiry that could

Page 28

1   also lead to potentially criminal charges but the
2   office has made a determination to proceed
3   administratively?
4       MS. JOHNSON:  Objection; calls for a
5   legal conclusion.
6       THE WITNESS:  That's not my
7   understanding, no.
8       BY MR. BYRNES:
9       Q   What other rights, warnings, if any,
10  would be given during an investigation?
11      A   There are Weingarden rights, as I
12  recall.
13      Q   What's your understanding of Weingarden
14  rights?
15      MS. JOHNSON:  Objection; calls for legal
16  conclusion.
17      MR. BYRNES:  Not as to his
18  understanding.
19      MS. JOHNSON:  It does.  You're asking
20  him for a legal definition of his understanding.
21      MR. BYRNES:  No, I'm asking him what his
22  understanding of it is.

Page 29

1       MS. JOHNSON:  My objection remains.
2       MR. BYRNES:  All right.  It's a
3   frivolous objection, but go ahead.
4       THE WITNESS:  I think it has something
5   to do with union employees.
6       BY MR. BYRNES:
7       Q   Okay.  How about Miranda warnings; did
8   you ever give those?
9       A   Infrequently, but yes.
10      Q   Well, in 2005, did you have arrest
11  powers?
12      A   No.
13      Q   Did you have the power to restrain an
14  individual against their will?
15      MS. JOHNSON:  Objection to form.
16      THE WITNESS:  Don't know.  We never
17  exercised it if we did.
18      BY MR. BYRNES:
19      Q   Well, did you ever sit an employee down
20  and tell them they weren't free to leave?
21      A   No.
22      Q   With respect to Ms. Klugel, did you ever

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 30

1  tell her she wasn't free to leave when you talked
2  to her?
3      A   No.
4      Q   Did you advise her that she was free to
5  leave at anytime?
6      A   No.
7      Q   Did you advise her whether or not she
8  had to answer questions?
9      A   No.
10     Q   Why not?
11     A   Just I was there to ask questions.  If
12  she chose not to answer them, then she could
13  choose not to answer them.
14     Q   Well --
15     A   She was not being compelled to answer
16  anything.
17     Q   When you went to talk to her -- let's go
18  into that a little bit.  What were the
19  circumstances that led you to question Ms. Klugel?
20         MS. JOHNSON:  Object to form.
21         THE WITNESS:  There were several, and it
22  was really the totality of the information we

Page 31

1  received that caused us to wonder what was going
2  on.
3         BY MR. BYRNES:
4      Q   What was the information you received?
5      A   As I recall -- and I have to state that
6  this truly was a relatively minor matter or what
7  turned out to be a relatively minor matter.  But
8  as we received the information, what we were told
9  is that there were two employees from SERC that
10  were going to a conference in Hawaii and that the
11  plans for this trip had begun months prior.
12         Days before the trip -- days before the
13  trip was supposed to happen or -- the volunteer
14  was going to accompany at least one of the
15  employees, but the employee wasn't paying a fee to
16  enter the conference.  That employee also wanted
17  the government -- wanted to -- wanted the
18  government to buy his ticket and he was going to
19  reimburse the government.
20         Shortly thereafter, a second employee --
21  I'm sorry, a second volunteer signed up to also go
22  to Hawaii.  I don't recall if that employee was

Page 32

1  going to buy a ticket and reimburse the government
2  or the government was going to buy a ticket and
3  reimburse, but that's kind of my recollection.
4         The first volunteer had been a volunteer
5  for a period of time.  The second volunteer only
6  became a volunteer a week or so before this trip.
7  The second volunteer was going to accompany the
8  first volunteer as an assistant to photograph this
9  event.
10        The addition of the second employee --
11  I'm sorry, the second volunteer as someone wanting
12  to accompany the first volunteer was the threshold
13  that crossed, at least in my mind, to say what's
14  going on here.
15     Q   Who was the employee who brought the
16  second volunteer?
17     A   Amy Erb as I recall.
18     Q   Ms. Klugel's volunteer was a gentleman
19  by the name of Phillip Younger?
20     A   Yes.
21     Q   All right.  Mr. Younger had been a long
22  time volunteer with the Smithsonian; had he not?

Page 33

1      A   That's what I was --
2          MS. JOHNSON:  Objection; lack of
3  foundation.
4          THE WITNESS:  That's what I was told.
5          BY MR. BYRNES:
6      Q   Right.  There was nothing inappropriate
7  about bringing a volunteer on travel; was there?
8          MS. JOHNSON:  Objection to form, lack of
9  foundation.
10         THE WITNESS:  In general terms, no.
11         BY MR. BYRNES:
12     Q   Well, in specific terms, what was wrong
13  with it?
14     A   In specific terms, having an individual
15  travel on government fare or have the government
16  paying for someone to go, in this case, to
17  videotape -- to go to Hawaii for a week to
18  videotape a one-hour presentation could be
19  considered wasteful.
20     Q   Well, hadn't you been apprised by the
21  travel office before that individual in SERC,
22  including senior management were signing up family

Page 34

1  members as volunteers?
2      MS. JOHNSON: Objection to form, lack of
3  foundation.
4      THE WITNESS: I'm sorry. I don't recall
5  that.
6      BY MR. BYRNES:
7  Q   Ms. Ailes never told you that Mr.
8  Simmons and Mr. Haddon had traveled with family
9  members as volunteers for SERC?
10  A   I'm sorry. If so, I don't recall.
11  Q   How many investigators were there with
12  the IG's office at the time you conducted the
13  investigation with Ms. Klugel?
14      MS. JOHNSON: Objection to form.
15      THE WITNESS: I think there were only
16  two of us.
17      BY MR. BYRNES:
18  Q   Okay. And who was the other
19  investigator?
20  A   In 2005?
21  Q   Five, yes, sir.
22  A   That would have been Special Agent –

Page 35

1  Senior Special Agent Michael Pickett.
2  Q   There were only two investigators for
3  the entire agency?
4  A   Uh-huh. I'm sorry, yes.
5  Q   Oh, by the way, have you ever had your
6  deposition taken before?
7  A   Yes.
8  Q   Okay. You seem to know what to do. So,
9  when was the last time you had a deposition taken?
10  A   In the 1990s.
11  Q   Have you ever had – been a party to a
12  complaint similar to this before or witness to a
13  complaint similar to this before?
14      MS. JOHNSON: Objection to form, lack of
15  foundation.
16      THE WITNESS: Not similar to this, no.
17      BY MR. BYRNES:
18  Q   Well, have you ever been deposed as part
19  of your official duties with the agency?
20  A   Yes.
21  Q   Okay. In what capacity were you deposed
22  – no, strike that.

Page 36

1      What was the type of matter you were
2  deposed in previously?
3  A   I think it was an EEO suit, but I don't
4  specifically recall.
5  Q   Okay. And was your conduct or behavior
6  ever questioned in that suit?
7  A   Not in that matter.
8  Q   Have you ever been -- has your conduct
9  or behavior ever been questioned before by -- in a
10  deposition?
11      MS. JOHNSON: Objection to form, vague.
12      THE WITNESS: I don't think so.
13      BY MR. BYRNES:
14  Q   When you say don't think so, have you
15  ever been named as — because of the manner in
16  which did you conducted your duties that you
17  engaged in any form of discrimination or
18  impropriety prior to Ms. Klugel's complaint?
19  A   No.
20      MS. JOHNSON: Objection to form.
21      THE WITNESS: Sorry.
22      BY MR. BYRNES:

Page 37

1  Q   And in terms of the travel involving Ms.
2  Klugel to Hawaii, why did that raise any concern
3  on your part?
4  A   It wasn't Ms. Klugel's travel to Hawaii
5  that raised a concern.
6  Q   Well, what, if anything, raised a
7  concern?
8      MS. JOHNSON: Objection; asked and
9  answered.
10      THE WITNESS: The addition of the second
11  volunteer to accompany the two employees on this
12  trip was what raised the concern.
13      BY MR. BYRNES:
14  Q   Did you make any inquiry into the
15  relationship between the volunteers and the
16  individuals who were traveling?
17      MS. JOHNSON: Objection; vague.
18      THE WITNESS: Yes.
19      BY MR. BYRNES:
20  Q   Did you ask whether or not these
21  individuals were boyfriend and girlfriend?
22  A   Yes.

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 38

1    Q    Who did you ask that?
2    A    I think I asked Carol Ailes first, just
3  by way of getting background on who the
4  individuals were that she was talking to me about.
5    Q    Why would that be relevant?
6    A    Part of the standard of conduct speaks
7  to are you engaging in action that could either be
8  real or perceived as doing something that is a
9  personal benefit to you.
10    Q    Well, would the status have been any
11  different for these individuals if they were
12  bringing their husbands or wives?
13    MS. JOHNSON:  Objection; calls for
14  speculation.
15    THE WITNESS:  No, not particularly, no.
16    BY MR. BYRNES:
17    Q    Did you ever investigate anyone's travel
18  when they were bringing a husband, wife, or
19  daughter or son with them?
20    MS. JOHNSON:  Objection to form.
21    THE WITNESS:  I don't recall
22  specifically, but it's not outside the realm of

Page 39

1  possibility.
2    BY MR. BYRNES:
3    Q    Okay.  So, have you ever questioned the
4  romantic relationship between individuals on
5  travel prior to the questioning of Ms. Klugel?
6    MS. JOHNSON:  Objection to the form.
7    THE WITNESS:  I don't think I asked
8  about a romantic relationship.
9    BY MR. BYRNES:
10    Q    Well, you asked if they were boyfriend
11  and girlfriend; correct?
12    A    Yes.
13    Q    Well, a boyfriend or girlfriend would
14  suggest an intimate other, wouldn't it?
15    A    Not necessarily.
16    Q    What in your mind would it suggest?
17    A    It's a corroboration of a piece of
18  information that I got.
19    Q    Why is the relationship between the
20  parties at all relevant to your inquiry?
21    MS. JOHNSON:  Objection to form.
22    THE WITNESS:  As I said, if it's a

Page 40

1  matter where one could be perceived as deriving a
2  personal benefit, it could be a violation of the
3  standard of conduct.  In this case, it was
4  corroboration of a piece of information we had.
5  The inquiry phase, we're trying to determine did
6  the information we receive, was it accurate.
7    And if I'm being told that the
8  individual is a specific relative of some sort,
9  I'll ask.  If it turns out that they're not, then
10  that begins to question the nature of the
11  allegation.
12    BY MR. BYRNES:
13    Q    How many people did you question with
14  respect to Ms. Klugel's travel situation?
15    MS. JOHNSON:  Objection; vague.
16    THE WITNESS:  I spoke with Carol Ailes,
17  Mark Hadden, and Kathy Suit, I believe.
18    BY MR. BYRNES:
19    Q    What about Ms. Klugel, did you speak
20  with her?
21    A    And I'm sorry, Ms. Klugel, sure, of
22  course.

Page 41

1    Q    What about Mr. Younger?
2    A    Never spoke with Mr. Younger.
3    Q    Ms. Erb?
4    A    I spoke with Ms. Erb about Ms. Erb.
5    Q    Did you speak to Mr. Seleke, Resip
6  Seleke?
7    A    No, I never spoke with him.
8    Q    Did you speak with Mr. Gallagher?
9    A    I talked with Mr. Gallagher when I was
10  done and just briefed him on the results.
11    Q    What about Ms. Petrovsky?
12    A    Ms. Petrovsky is the head of the travel
13  office.  And I contacted her after you contacted to
14  me to advise her that I was contacted and that if
15  there are any information she has, she probably
16  should keep it.
17    Q    Okay.  With respect to these individuals
18  you contacted, did you take notes of your
19  interviews?
20    A    No, I didn't.
21    Q    Why not?
22    A    Because it quickly -- let me rephrase.

Page 42

1    I didn't because after talking with Mark Hadden,
2    who I believe was the first one I spoke to, I
3    realized that the matter was not going to be a
4    violation of law. At best, it might be a
5    violation of the standards of conduct. So, at
6    worst, it's just management has made a terrible
7    mistake here. And at this point in time, I'm just
8    gathering information. If it turned out to be
9    wrong, then I would do it again. That's all.
10    Q    Well, in your training at FLETC, aren't
11    you trained that you should take notes when
12    talking to individuals?
13    A    If it's necessary, sure.
14    Q    Well, aren't you trained as a matter of
15    course that in any sort of inquiry you should keep
16    notes of the nature of the inquiry?
17         MS. JOHNSON: Objection; vague.
18         THE WITNESS: There are -- we have
19    discretion as to what we do.
20         BY MR. BYRNES:
21    Q    Isn't the better practice to maintain
22    notes so you can refresh your recollection later

Page 43

1    if called to testify?
2         MS. JOHNSON: Objection; calls for
3    speculation.
4         THE WITNESS: If it -- if I had made a
5    mistake, if my estimation of the circumstances
6    were wrong, then I would have done it again. It
7    would have been done. I would have -- my
8    philosophy as an investigator as an agent with the
9    institution is that there's a difference between
10    being an external investigator and an internal
11    investigator.
12         BY MR. BYRNES:
13    Q    And what would that difference be?
14    A    As an internal investigator, you are
15    going to revisit these people time and again. You
16    are going to see them often. As an external
17    investigator, you can come in, you can bluster,
18    you can fulminate. It doesn't matter because
19    chances are you will never visit with this
20    organization again.
21         An internal investigator to me, the
22    subject of an investigation one day could be the

Page 44

1    source of an investigation the next day. And it
2    does me no good to create enemies.
3    Q    Well, but isn't the purpose for creating
4    notes so that if the investigation, internal or
5    external, leads somewhere, you have a reference
6    point to go back to to make sure what areas you've
7    covered?
8    A    And if I had felt during the course of
9    our conversations that it was -- that my
10    estimation of what was going on was wrong and that
11    there was some form of impropriety going on, then
12    I would have started taking notes.
13    Q    And is it fair to say that when you
14    spoke to Mr. Hadden, you quickly realized that
15    there was no impropriety going on?
16    A    No, that's not what -- that's not what I
17    said.
18    Q    Well, then why didn't you take notes?
19    A    Because I wanted to hear what the others
20    had to say first.
21    Q    But if you suspected an impropriety, why
22    wouldn't you have taken notations?

Page 45

1         MS. JOHNSON: Objection; asked and
2    answered.
3         MR. BYRNES: All right.
4         THE WITNESS: I asked -- I wasn't sure
5    what Mr. Hadden's role in this whole thing was.
6    It could have been that he was caught up in
7    something.
8         BY MR. BYRNES:
9    Q    What did you think he might be caught up
10    in?
11    A    Well, I seem to recall and this predates
12    much of the online stuff, but I seem to recall
13    that when we filled out travel authorization
14    forms, that there was notations in there saying
15    that be careful what you say because you could
16    commit a violation of law, 18USC287 or 18USC1001.
17         With the addition of the second
18    volunteer accompanying this trip, I began to
19    wonder if we had a conspiracy, 18USC286, to file a
20    false claim, to commit some form of travel fraud.
21    After talking with Mark, I realized that no, he's
22    not -- there's no engagement here. There's no

Page 54

1    MS. JOHNSON: Objection to form.
2    THE WITNESS: I don't know.
3    BY MR. BYRNES:
4    Q    Did you keep statistics as to the name
5    of the individuals that you would investigate?
6    MS. JOHNSON: Objection to form.
7    THE WITNESS: There is a case management
8    system, but we don't break things out.
9    BY MR. BYRNES:
10   Q    Do you break them out by sex?
11   A    No. There's not -- we wouldn't even
12   necessarily know if an individual is a male or a
13   female other than the name. And if a name is
14   unusual, we wouldn't know.
15   Q    Well, you would know when you talked to
16   them; correct?
17   A    Oh, we would know when we meet, sure.
18   Q    All right. Well, how many other women
19   did you look into that you had an inquiry in in
20   2005 for travel related issues?
21   A    I don't know.
22   Q    Could it have been none?

Page 55

1    A    It's a possibility, sure.
2    Q    With respect to the privacy act, do you
3    -- are your records at all covered under the
4    privacy act, if you know?
5    MS. JOHNSON: Objection; calls for a
6    legal conclusion.
7    THE WITNESS: I don't know.
8    BY MR. BYRNES:
9    Q    Did you give any warnings that this is
10   privacy act protected material, supplying it for
11   this specific purpose?
12   MS. JOHNSON: Objection; vague.
13   THE WITNESS: No, I don't believe so.
14   BY MR. BYRNES:
15   Q    Okay. So, you talked to Mr. Hadden and
16   what did Mr. Hadden tell -- what did you raise
17   with Mr. Hadden with regard to Ms. Klugel and Ms.
18   Erb's travel?
19   A    I had contacted Mr. Hadden in early
20   December sometime by email -- I had never spoken
21   with him -- asking him to set up a meeting between
22   Ms. Klugel or Younger and Seleke. And I proposed

Page 56

1    a time that I thought would be convenient. He
2    wrote back to say that the date was okay but the
3    time was inconvenient and asked me to come a few
4    hours later.
5    Q    Did you suggest in anyway that these
6    contacts were voluntary on the part of the
7    employees, that they could refuse or not refuse?
8    A    No.
9    Q    Is it fair to say that you expected the
10   employees would show up?
11   A    Oh, sure.
12   Q    Okay. And the employees were in essence
13   required to cooperate in any inquiry you're
14   conducting?
15   A    They were expected to cooperate, sure.
16   Q    Right. So, there is no voluntariness to
17   this, they are to come and talk to you; correct?
18   MS. JOHNSON: Objection to form.
19   THE WITNESS: Employees are always free
20   to not cooperate.
21   BY MR. BYRNES:
22   Q    Have you ever suggested discipline

Page 57

1    against an employee based on their failure to
2    cooperate with your inquiry?
3    A    I don't have a specific recollection,
4    but I would imagine sometime over my career I've
5    told people that it's important that they do
6    cooperate.
7    Q    Right, okay. So, you sent this email to
8    Mr. Hadden. Do you recall what the email asked
9    him to do other than to have the employees ready
10   for an interview? Did it say anything else that
11   you can recall?
12   A    Probably said that we have some
13   questions about travel, probably the specific trip
14   to Hawaii. You know, there's -- I have a vague
15   recollection of another trip. There was a trip to
16   Panama and a trip to Belize. But my recollection
17   is that I really wanted to talk about this Hawaii
18   trip.
19   Q    Did you -- prior to coming here for the
20   deposition today, did you review any notes or
21   writings?
22   A    Yes.

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 70

1    Q    What did you ask him after that?
2    A    I asked him who Phillip Younger and
3  Resip Seleke were.
4    Q    What did he say?
5    A    He said they were volunteers.
6    Q    What was your understanding of what
7  volunteers did for the agency if you had any at
8  that time?
9    A    I guess I had a vague understanding that
10  they just supported the organization in its
11  mission.
12    Q    Do you know from your experience in the
13  IG's office whether they were authorized to travel
14  at government rate or not, volunteers?
15    MS. JOHNSON: Objection to form.
16    THE WITNESS: I would imagine they are,
17  but I don't know specifically. I would imagine
18  they are.
19    BY MR. BYRNES:
20    Q    And so, you asked them about the
21  volunteers. Did you ask them how they were?
22    A    Yes. I asked them who they were.

Page 71

1    Q    What did he say?
2    A    He said that Mr. Younger was a long time
3  volunteer. Mr. Seleke, I only have a vague,
4  vague recollection of him, just saying he was a
5  volunteer.
6    Q    What else did you ask Mr. Hadden after
7  that?
8    A    I asked Mr. Hadden about Younger, saying
9  that he -- one of the forms said he was going as a
10  photographer on this and what was the nature of
11  that. And he said that Younger is a photographer
12  and has been a photographer and was going to
13  photograph a conference or a workshop or something
14  that Dottie was going to participate in in Panama.
15    And so, I asked about that and was told
16  that that was a weeklong conference, workshop,
17  something -- I can't characterize the nature. But
18  it was supposed to be a weeklong event and that
19  Younger was either going to video it or maybe even
20  transmit it live. Again, I don't remember. And
21  that he was going to do something similar on this
22  trip to Hawaii.

Page 72

1    Q    Did Mr. Hadden tell you that it was cost
2  effective for the agency to send Mr. Younger to
3  videotape the Hawaii conference?
4    A    No, I don't believe so.
5    Q    Didn't he tell you that it was more cost
6  effective to have a volunteer, pay his way to
7  Hawaii and videotape it than it was to hire a
8  videographer in Hawaii?
9    MS. JOHNSON: Objection; asked and
10  answered.
11    THE WITNESS: I don't believe so, but I
12  -- and I wouldn't have objected if Phillip was
13  going to pay his own way.
14    THE VIDEOGRAPHER: We're out of time.
15    MR. BYRNES: Okay. Why don't we change
16  the tape? Do you want to take a break for about
17  --
18    THE VIDEOGRAPHER: We're going off the
19  record. The time is 11:39 a.m. This ends tape
20  number one in the video deposition of Gerard Roy.
21    (Recess)
22    THE VIDEOGRAPHER: This begins tape

Page 73

1  number two in the video deposition of Gerard Roy.
2  The time on the video is 11:48 a.m. We are back
3  on the record.
4    BY MR. BYRNES:
5    Q    Mr. Roy, after Mr. Hadden, you talked to
6  him about the Panama trip, I take it because you
7  mentioned the Panama trip. Did you talk to him
8  about the Hawaii trip?
9    A    Yeah, yeah.
10    Q    What did you ask him about that?
11    A    I think the question that we left off
12  with was would it be inappropriate for Mr. Younger
13  to go to Hawaii. And the answer is no, it
14  wouldn't have been inappropriate for him to go to
15  Hawaii. It could be questionable whether it was
16  worth the investment of the government to send
17  someone to videotape a one- hour presentation as
18  opposed to the weeklong conference that was going
19  to take place in Panama. But that -- it could be
20  a management call.
21    It was, in my opinion, inappropriate for
22  the government to become a travel agent for Mr.

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 74

1  Younger, buy him a ticket at government fare and
2  then have Mr. Younger reimburse the government for
3  that trip.
4      Q   Why?
5      A   Because I think that's a violation of
6  the travel regulations, okay.
7      Q   Well —
8      A   But there's another reason too, if I
9  may.
10     Q   Sure.
11     A   The Smithsonian is this hybrid
12  organization of trust employees and federal
13  employees, but travel is audited by the general
14  services administration.  And over the time that
15  I've been with the institution, Judy Petrovsky
16  particularly was always concerned about anything
17  that would provoke the GSA to take a harder look
18  at the Smithsonian.
19         The Smithsonian trust employees are
20  allowed to travel as if they were government
21  employees.  And it's not at all clear to Judy —
22  it wasn't at all clear to Judy that GSA would

Page 75

1  necessarily allow that to continue if there were
2  perceived abuses.
3      Q   And so, you felt as part of your mandate
4  to look into this travel arrangement because GSA
5  might look into the abuse of travel?
6      A   It's --
7         MS. JOHNSON:  Objection to form.
8         BY MR. BYRNES:
9      Q   Is that correct?
10     A   It was -- the notations that were on the
11  travel form could cause questions, yes.
12     Q   Did Ms. Petrovsky handle travel for all
13  agency employees?
14     A   She supervised the office that handled
15  it, yes.
16     Q   Sir, if -- since you opened the door to
17  this, if the Smithsonian was so concerned about
18  travel, how could under your watch and Ms.
19  Petrovsky's watch, it possibly missed the fact
20  that its director ran up $900,000 in travel
21  vouchers?
22         MS. JOHNSON:  Objection; lack of

Page 76

1  foundation.
2         THE WITNESS:  I'm sorry.  Which
3  director, sir?
4         MR. BYRNES:  Mr. Smalls.
5         MS. JOHNSON:  Same objection.
6         THE WITNESS:  Why do you assume that we
7  allowed that to happen?
8         BY MR. BYRNES:
9      Q   Well, because every newspaper in the
10  United States reported that it did.
11     A   And is Mr. Smalls still there?
12     Q   Sir —
13     A   Is he gone as a result of the
14  investigation?
15     Q   During your watch and Ms. Petrovsky's
16  watch, Mr. Smalls ran up hundreds of thousands of
17  dollars in questionable travels and expenditures;
18  did he not?
19     A   Don't know, sir.  I wasn't involved.
20     Q   Well, is --
21     A   But I've read the papers, and I would
22  argue that he has been caught and he was punished.

Page 77

1      Q   But you never investigated it?
2      A   I was not involved in that
3  investigation, no.
4      Q   Ms. Petrovsky would have been authorized
5  -- working on his travel; would she not?
6         MS. JOHNSON:  Objection; calls for
7  speculation.
8         THE WITNESS:  Perhaps.
9         BY MR. BYRNES:
10     Q   What about all the other people in the
11  paper recently for travel expenditures, are you
12  aware of any of them?
13     A   I've been gone for over a year, so I'm
14  not really sure.  What was the name of the latest
15  one?
16     Q   Well, isn't it a fact, sir, that what
17  you did was you drew a blind eye to management and
18  their travel abuses and you spent a lot of time
19  investigating individuals like Ms. Klugel on minor
20  issues?
21         MS. JOHNSON:  Objection to form, lack of
22  foundation.

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 86

1      MS. JOHNSON:  Objection; calls for
2  speculation.
3      THE WITNESS:  Don't know, can't tell you
4  that.
5      BY MR. BYRNES:
6    Q    As an investigator, wouldn't you want to
7  get into the personal dynamics between people to
8  challenge their motives or their veracity?
9    A    If this matter had become more
10 substantive, then it probably would have become
11 important.  But I determined, in my opinion, that
12 management had made a mistake and there was no
13 reason to escalate this.
14   Q    What mistake did management make?
15   A    By agreeing to allow Mr. Younger and
16 presumably Mr. Seleke, although I can't recall
17 specifically, to have the government purchase
18 their ticket to be reimbursed by these
19 individuals.  If the two individuals, Younger and
20 Seleke, had purchased their own tickets, then we
21 probably wouldn't have even gotten called.
22   Q    Didn't you learn from Ms. Ailes that

Page 87

1  volunteers were entitled to use government rates
2  as long as they were conducting business for the
3  Smithsonian?
4      MS. JOHNSON:  Objection to form.
5      THE WITNESS:  They can, sure.
6      BY MR. BYRNES:
7    Q    And therefore, there was no impropriety
8  whatsoever with these gentlemen traveling at
9  government rates?
10   A    If they had been authorized to travel.
11   Q    But they were authorized to travel.  You
12 found that out; correct?
13   A    No, they wanted to travel and reimburse
14 the government.  There's a difference.
15   Q    Sir, you found out from Mr. Hadden that
16 he had authorized the travel.
17   A    I had found out from Mr. Hadden that he
18 was going to authorize these people to travel.
19   Q    Right.
20   A    And then, Mr. Younger says and perhaps
21 Mr. Seleke, I can't recall, that they would
22 reimburse the government at government rates.

Page 88

1    Q    Well, wasn't it a fact that volunteers
2  could actually be paid for through the Smithsonian
3  to travel as long as they were helping the
4  Smithsonian on Smithsonian business?
5      MS. JOHNSON:  Objection to form, vague.
6      BY MR. BYRNES:
7    Q    Isn't that true?
8    A    A volunteer, anybody can travel for the
9  government if the government wants them to travel.
10 If the government wants them to travel, then they
11 don't have to reimburse the government.
12   Q    So, the objection was that even though
13 these gentlemen didn't have to reimburse the
14 government they were going to reimburse the
15 government?
16   A    No.  What created the impression was
17 that they wanted to get a cheap ticket to go.
18   Q    But they were going to do business for
19 the Smithsonian; were they not?
20   A    Perhaps Mr. Younger was.  Mr. Seleke
21 becomes a bit of a stretch.
22   Q    Well, but if Mr. Younger was, why was

Page 89

1  there any need to investigate the matter further
2  by talking to anyone other than Mr. Hadden?
3      MS. JOHNSON:  Objection to form.
4      THE WITNESS:  I'm not sure.  Why would I
5  stop with Mr. Hadden?  I want to know --
6      BY MR. BYRNES:
7    Q    Because he had already told you that he
8  had authorized the trip, that Mr. Younger was a
9  regular volunteer, and that Mr. Younger was going
10 to perform a function that was helpful to the
11 Smithsonian.
12   A    And he presumably also told me, although
13 I can't recall specifically, that Mr. Seleke was
14 going to go, and I had a question about that.  The
15 mere fact that he said that he authorized it
16 doesn't mean that the IG's office is done.
17   Q    Well, sir, but you can't recall because
18 you didn't take any notations; correct?
19     MS. JOHNSON:  Objection; calls for
20 speculation.
21     THE WITNESS:  No.
22     BY MR. BYRNES:

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 102

1    A    That he would get her.
2    Q    Okay.  And did he do so?
3    A    Yes.
4    Q    And did you talk to Ms. Klugel?
5    A    Yes, I did.
6    Q    And what did you ask Ms. Klugel?
7    A    She was brought into the office and I
8    presented my credentials and introduced myself.
9    Q    Well, did -- was Mr. Hadden present when
10   this happened?
11   A    When I introduced myself?
12   Q    Yes.
13   A    I don't recall.  He may have been.
14   Q    Did you conduct the interview with my
15   client individually or was Mr. Hadden present
16   during it?
17   A    No, it was only she and I.
18   Q    Okay.  Why did you produce your
19   credentials?
20   A    Because that's our normal way of doing
21   things when we introduce ourselves.
22   Q    What did you intend to convey to her

Page 103

1    when you produced your credentials?
2    A    That this was an official visit.
3    Q    Not a chit chat, this was an inquiry?
4    A    This was an official visit, yeah.
5    Q    Right.  So, you meant to convey your
6    authority to her when you showed her your
7    credentials; correct?
8    A    No.  I meant to convey that this was an
9    official visit.  This was not -- I didn't just
10   stop by, but this was an official visit.
11   Q    Right.  So, you meant to convey your
12   authority as a member of the inspector general's
13   office when you showed her the credentials?
14   MS. JOHNSON:  Objection; asked and
15   answered.
16   THE WITNESS:  Yeah.  I'm not sure I
17   understand.  The implication of your question is
18   that there's a threat involved here and there is
19   not threat.  It's an identification.  This is who
0    --
21   BY MR. BYRNES:
22   Q    I didn't ask you whether there was

Page 104

1    threat.  I asked you what you attended to convey
2    when you produced your credentials.
3    A    And I said it was an official visit.
4    There was no -- the -- as I'm understanding your
5    question, and if I'm wrong, please correct me.  As
6    I'm understanding your question, the term
7    authority as you're using it is to convey some
8    menace and it's not.  It's a means of
9    introduction.  That's all.
10   Q    Well, in your professional history, have
11   most employees that you're conducting an inquiry
12   about assumed that the inspector general's office
13   was simply not conveying any threat?
14   MS. JOHNSON:  Objection; calls for
15   speculation.
16   THE WITNESS:  I'm sure when someone from
17   the IG's office comes in, there is a level of
18   apprehension, yes.
19   BY MR. BYRNES:
20   Q    And you have a badge or something to
21   that equivalent; correct?
22   A    Yes.

Page 105

1    Q    All right.  And that's meant to convey
2    the authority of the office.  Here I am, here's my
3    badge, this is who I am.
4    MS. JOHNSON:  Objection; asked and
5    answered.
6    BY MR. BYRNES:
7    Q    Correct?
8    A    It's -- in my opinion, it's meant to
9    convey that this is who I am, yes.
10   Q    Right.  All right.  So, after you did
11   that, what happened next?
12   A    We sat opposite each other.
13   Q    Who sat closer to the door?
14   A    I sat closer to the door.
15   Q    Is that an investigative technique for
16   you to be between yourself and the door?
17   A    Not necessarily.
18   Q    Well, isn't it designed to make sure
19   that the individual is not in the position where
20   they can get to the doorway without having to pass
21   the agent?
22   A    Maybe if we were in an interrogation

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 106

1  room that might be a strategy, but this was an
2  empty office.
3      Q  Isn't that something they routinely
4  train you on at the federal law enforcement
5  training center, that what you do during an
6  interview is you make sure that the agent is
7  closer to the doorway so that the individual must
8  go by you to get out?
9      A  If we're conducting an interrogation in
10 an interrogation room, maybe that's what you would
11 do.  This was an interview in a vacant office in
12 SERC.
13     Q  Okay.  So, what happened next?
14     A  As I recall the layout of the office,
15 there was a little hallway that we walked into
16 which lead to an open area probably as wide as
17 this conference room and maybe as long and there
18 are at least a couple of desks, two desks.  I sat
19 on a chair behind the desk closest to the doorway.
20 She sat on the desk -- in a chair behind the desk
21 further away closer to a window.
22     Q  Okay.

Page 107

1      A  And the reason I recall that is because
2  when I met with Dottie the second time, it was
3  sunnier and I realized I had made a mistake
4  because I couldn't see her face.  The sunlight was
5  coming through the window.
6          So, in the first interview, after I
7  introduced myself, I told her I believed that
8  something had come up during the routine work of
9  our office involving this trip.  And I asked her
10 about the nature of the trip.
11     Q  Okay.  What else did you ask her?
12     A  I asked her about who Phillip Younger
13 was.  I asked her if he was her boyfriend.
14     Q  Why?
15     A  Again, I'm just trying to confirm
16 information.  That's all.  As a matter of fact, I
17 think she said --
18     Q  Why does she --
19     A  She may have said that he was her
20 fiance, but I don't recall.  But I think it was --
21     Q  Why was that significant?
22     A  Again, it's confirmation.

Page 108

1      Q  Of what?
2      A  Of information that I received.
3      Q  Why was it significant to ask about
4  that?
5          MS. JOHNSON:  Objection; asked and
6  answered.
7          THE WITNESS:  Because it's confirmation.
8  If she had turned out and said no, he's just a
9  person here that we work together, then I would
10 have --
11         BY MR. BYRNES:
12     Q  So --
13     A  -- had some reason to question the
14 information that I got.  Then I could start
15 questioning motives of anything else.
16     Q  Did you ever ask her about her sex life?
17     A  I don't know what that means and it
18 bothers me that I don't know what that means.
19     Q  Did you ask her about whether she was
20 having sex with Mr. Younger?
21     A  No.
22     Q  Did you ask her about her sexual

Page 109

1  orientation?
2      A  No.
3      Q  Did you ask her about the number of
4  boyfriends she had had?
5      A  No.
6      Q  Did you ask her about the number of
7  people she had been having sex with?
8      A  No.
9      Q  Would all of those questions in your
10 mind have been inappropriate for the scope of your
11 inquiry?
12         MS. JOHNSON:  Objection to form, vague.
13         THE WITNESS:  In this type of an
14 inquiry, yes.
15         BY MR. BYRNES:
16     Q  And is it fair to say that had you asked
17 those questions, then you agree that that would
18 have been an inappropriate extension of the
19 inquiry?
20         MS. JOHNSON:  Objection; calls for
21 speculation, form.
22         BY MR. BYRNES:

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 110

1    Q   Go ahead, sir.

2    A   I have no recollection whatsoever of

3  asking those kinds of questions.  If there is some

4  evidence that I did, I would love to see it and I

5  could then look it over.  I received no objection

6  from Dottie to any question that I asked and had I

7  received an objection, I would have addressed it,

8  either that I'd made a mistake, sorry or I would

9  have explained why I asked.

10   Q   Didn't she -- didn't you talk to Mr.

11 Hadden about the fact that Dottie complained to

12 him that in your inquiries you had asked her in

13 great detail about her relationship with Mr.

14 Younger, her sexual partners, and how many

15 boyfriends she had had?

16   A   I had asked her who Mr. Younger was.  I

17 had asked her if he was a boyfriend, if he was her

18 boyfriend.  I had asked her what he was going to

19 do.  I asked her what he was going to do when she

20 was not giving her presentation.

21   Q   Why is that your business, what he's

22 going to do when she's not giving her

Page 111

1  presentation.

2    A   It goes to what is the government

3  function that he is going for.

4    Q   But you already had talked to Mr.

5  Hadden.  He already explained that to you.

6    A   And that doesn't necessarily mean that

7  we agree with it.

8    Q   But he's the manager.

9    A   And we're the IG.

10   Q   And so you asked the individual employee

11 what her boyfriend was going to do when he wasn't

12 in the conference?

13   A   Yeah, yes.

14   Q   Why?

15   MS. JOHNSON:  Objection; asked and

16 answered.

17   THE WITNESS:  If he's going there for a

18 government function, then I want to know what the

19 government function is when she is not there.

0  BY MR. BYRNES:

21   Q   But is she in a position as an employee

22 to make a determination as to the official nature

Page 112

1  of the trip?

2    A   I presume she was --

3    MS. JOHNSON:  Objection lack -- sorry.

4    THE WITNESS:  I presume --

5    MS. JOHNSON:  Calls for speculation.

6    THE WITNESS:  I presume, and it is

7  speculation, that she was in a position to ask for

8  him to accompany her.

9    BY MR. BYRNES:

10   Q   And it's Mr. Hadden's responsibility to

11 sign off on those authorizations; correct?

12   A   And Mr. Hadden can make a mistake.

13   Q   But then it's Mr. Hadden's issue; isn't

14 it?

15   MS. JOHNSON:  Objection to form, vague.

16   THE WITNESS:  Why -- how is it Mr.

17 Hadden's issue?

18   BY MR. BYRNES:

19   Q   Well, he was the one who signed off on

20 the actual authorization for the trip; correct?

21   A   Okay.  And?

22   Q   So, if he had made a mistake, why would

Page 113

1  you inquire into my client's -- what my client and

2  her boyfriend were going to do on this trip when

3  they were not in the conference?

4    MS. JOHNSON:  Objection to form.

5    THE WITNESS:  I wanted to know what Mr.

6  Younger was going to do while she was not in the

7  conference.  I assumed she would be in the

8  conference.  But to get information to go back to

9  Mr. Hadden to say he made a mistake, I needed to

10 know what the intent was.

11   BY MR. BYRNES:

12   Q   Why didn't you just talk to Mr. Younger?

13   A   Because when it was all -- when

14 everything was done, by the time I got through

15 talking to everyone, I realized, again, in my

16 opinion management just made a mistake.  That's

17 all.  Mr. Younger could -- and the mistake was in

18 how the trip was going to be paid for.  The final

19 analysis, that's what it distilled to.  If Mr.

20 Younger was going to pay for the trip on his own,

21 perfectly fine.  But if the government was going

22 to pay, then we have a problem.

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 114

1    Q    What did Mr. Klugel tell you about Mr.
2    Younger was going to do when he wasn't in the
3    conference?
4    A    I believe she said he was just -- he was
5    going to stay in the conference. And I asked --
6    the next question I asked then was how was he
7    going to get into the conference because I recall
8    from the travel form that he did not pay a
9    registration fee.
10    Q    But didn't you find out that the
11    registration fee had already been paid, that --
12    A    For him?
13    Q    -- neither Ms. Klugel -- all of them
14    could get in?
15        MS. JOHNSON:  Objection to form.
16        THE WITNESS:  No.
17        BY MR. BYRNES:
18    Q    The registration fee had already been
19    paid.
20    A    Not for Mr. Younger, no.
21    Q    Well, if he was going to photograph it,
22    would he need to pay a registration fee?

Page 115

1        MS. JOHNSON:  Objection; lack of
2    foundation.
3        THE WITNESS:  That was my question.
4        BY MR. BYRNES:
5    Q    Well, why didn't you ask Mr. Hadden?
6    A    I may very well have asked Mr. Hadden.
7    As a matter of fact, I think I asked Mr. Hadden,
8    yes.
9    Q    What did he say?
10    A    He said he was a photographer.  He was
11    going to go in with a press pass of some sort.
12    Q    So, he wouldn't need to pay?
13    A    Well, that's -- that would be the
14    argument.  I don't know that for a fact.
15    Q    Not the argument, didn't Mr. Hadden tell
16    you that he wouldn't need to pay, he's going to go
17    in and just videotape the thing?
18    A    As far as I knew, Mr. Hadden wasn't
19    running the conference in Hawaii.
20    Q    And neither was my client.
21    A    But she paid an admissions fee to get
22    in.

Page 116

1    Q    Did you know that?
2    A    I believe there's a form that says she
3    paid $390 for registration fee.
4    Q    Didn't you find out that that was paid
5    separately?
6        MS. JOHNSON:  Objection to form.
7        THE WITNESS:  Sorry.  Paid separately
8    from what?
9        BY MR. BYRNES:
10    Q    Didn't you find out that somebody else
11    had actually already paid that fee?
12    A    No.  The fee was paid by SERC.
13    Q    You're certain of that?
14    A    I believe so.
15    Q    Okay.  So, what did she say when you
16    asked her how he was going to get in?
17    A    I believe she said that he was getting
18    in on a press pass.
19    Q    Okay.  Then what did you ask her?
20    A    I don't think I asked much more on that
21    first visit.
22    Q    How long did the first visit last?

Page 117

1    A    Twenty minutes, thirty minutes maybe.
2    Q    Did you take any statements under oath?
3    A    No.
4    Q    Did you tape-record or otherwise record
5    the statement?
6    A    No.
7    Q    All right.  And so, other than -- in the
8    20 minutes, other than what you have said, what
9    else did you talk about?
10    A    I don't recall anything else.  I may
11    have asked about the trip, the nature of the trip
12    --
13    Q    Do you know the date of this interview?
14    A    The date of the interview?
15    Q    Right, the first one.
16    A    I think -- well, there was only one
17    date. I think it was December 14th.
18    Q    2004?
19    A    2004, yeah.
20    Q    Okay.  I asked you a series of questions
21    about 2005.  Is it fair to say that your
22    recollection of 2004 as to the number of women you

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 118

1  questioned regarding travel would be the same as
2  it was for 2005, that you can't recall?
3      A   I'll have to guess yes because I don't
4  --
5      Q   I don't want you to guess.
6      A   Well, I don't remember your question, so
7  it's --
8      Q   Do you recall how many women you
9  interviewed or had an inquiry with regarding
10  travel in 2004 for the Smithsonian?
11     A   No.
12     Q   Do you recall how many men?
13     A   2004?
14     Q   Yes.
15     A   No specific inquiry comes to mind.
16     Q   Other than Ms. Klugel, do you recall any
17  other travel inquiries of men or women that you
18  conducted in 2004 as you sit here today?
19     A   No, I can't be specific to dates. No, I
20  don't know.
21     Q   Okay. Do you recall any during that
22  year?

Page 119

1      A   2004?
2      Q   Yes.
3      A   Same thing, I don't recall.
4      Q   All right.
5      A   There were other inquiries. I just
6  don't remember what dates they were.
7      Q   Were they travel related in 2004?
8      A   You keep asking for 2004 and I don't
9  have a specific recollection of dates.
10     Q   Okay. What I want to know is as you sit
11  here today, do you recall for the year 2004, not
12  the dates but for the entire year, whether or not
13  other than Ms. Klugel you conducted any inquiries
14  into the travel of any male or female employee for
15  the Smithsonian?
16         MS. JOHNSON: Objection to form.
17         BY MR. BYRNES:
18     Q   Go ahead.
19     A   The question centers on a date of 2004
20  and --
21     Q   No. I just want to know for the year.
22  Do you recall as you sit here today --

Page 120

1      A   Well, whether we talk a specific date or
2  the entire year, I can't -- there were travel
3  irregularities that we looked at. I just don't
4  recall which years they may have been.
5      Q   Okay. All right.
6      A   Okay.
7      Q   Thank you. All right. So, did you then
8  interview her again the same day?
9      A   I spoke with -- next I spoke with Amy
10  Erb. I spoke with Kathy Suit, came back to the
11  conference room -- came back to the office and
12  asked to see both Dottie and Amy again, yes.
13     Q   And what did you ask my client in the
14  second interview?
15     A   It was -- I wasn't really asking. I was
16  reporting the results of this inquiry.
17     Q   What did you report to them?
18     A   I told her that the trip was not going
19  to happen the way that she had envisioned, that
20  the government -- it could not be arranged that
21  Mr. Younger could take a trip on government
22  expense and reimburse the government. But if the

Page 121

1  government wanted him to go, then the government
2  would pay for him to go. If the government did
3  not want him to go, then the government would
4  allow him to go on his own dime. But he could not
5  purchase a government ticket.
6      Q   And then pay the government; correct?
7      A   And then pay the government, yeah.
8      Q   So --
9      A   I told her that this -- that it appeared
10  that this trip happened kind of last minute
11  considering that the plans for the trip appeared
12  to have happened months ago and that had she
13  wanted Phillip to accompany her, she probably
14  could have got a better deal or as good a deal
15  using the internet, but she could not use the
16  government for this trip.
17     Q   But she could use the government for
18  this trip, right? I mean, legally she could have
19  used the government for the trip.
20         MS. JOHNSON: Objection to form, vague.
21         BY MR. BYRNES:
22     Q   Isn't what you're saying inconsistent?

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 122

```
 1    A   No, no.  It's not inconsistent at all.
 2  What I'm saying is that if the government, if Mark
 3  had truly agreed to allow him to go, then there
 4  would have been no reason for Mr. Younger to
 5  propose reimbursing the government.
 6    Q   Other than maybe he didn't want the
 7  government to spend money on him.
 8    MS. JOHNSON:  Objection; calls for
 9  speculation.
10    THE WITNESS:  There's -- there is no --
11    BY MR. BYRNES:
12    Q   Do you believe that it's more beneficial
13  to the taxpayers of the United States that he
14  reimburse the government or that the taxpayers pay
15  for his trip?
16    MS. JOHNSON:  Objection; calls for
17  speculation.
18    THE WITNESS:  I think it's more
19  troubling to the taxpayers that we have an
20  individual getting government rates for something
21  that he was willing to pay.
22    BY MR. BYRNES:
```

Page 123

```
 1    Q   You keep going back to that, but Mr.
 2  Hadden had already authorized him to go.
 3    A   So?  That doesn't mean that it was
 4  correct.  That doesn't -- if the trip --
 5    Q   What was incorrect about it, sir?
 6    A   If the travel office --
 7    Q   You've gone -- all morning I've been
 8  asking you the same question.  I would like you to
 9  answer this question.  If you can't, it's okay.
10    What was incorrect about him going, not
11  how it paid for but him actually going to Hawaii
12  as a volunteer for SERC?  What was incorrect about
13  that?
14    MS. JOHNSON:  Objection; asked and
15  answered.
16    THE WITNESS:  I answered you some time
17  ago that he was -- he was allowed to go if the
18  government wanted him to go.
19    BY MR. BYRNES:
20    Q   And the government -- the authorization
21  was in writing; correct?
22    MS. JOHNSON:  Objection; vague.
```

Page 124

```
 1    BY MR. BYRNES:
 2    Q   Is that correct?
 3    A   There was a travel -- well, I don't
 4  recall seeing a travel authorization for it, but I
 5  remember seeing some form.  I'll agree -- I'm not
 6  -- I just don't have a recollection, but I'll
 7  agree, sure.
 8    Q   So, Mr. Younger and Ms. Klugel believed
 9  that this trip had been authorized by Mr. Hadden?
10    A   I don't disagree.  That's why I --
11    MS. JOHNSON:  Objection; calls for
12  speculation.
13    THE WITNESS:  That's why I believe that
14  it was a mistake.  That's all.  To use your own
15  example, the secretary of the Smithsonian had
16  travel authorizations signed for and you take
17  umbrage to how he did it.  These people had travel
18  authorizations which we think were incorrect.
19  That's all.
20    BY MR. BYRNES:
21    Q   The secretary of the Smithsonian didn't
22  offer to pay the government back $900,000; did he?
```

Page 125

```
 1    MS. JOHNSON:  Objection; lack of
 2  foundation.
 3    THE WITNESS:  I don't know.  That I
 4  don't know.
 5    BY MR. BYRNES:
 6    Q   All right.
 7    A   A mistake was made.  That's what I was
 8  willing to allow it to be, a mistake being made.
 9    Q   And I'm asking you if he could go for
10  the government and if he could travel -- if the
11  government could legally pay his ticket for him to
12  go on official business, what mistake was there
13  other than to go to Mr. Younger and say you know
14  what, you don't have to pay for this, we'll pay
15  for it?
16    MS. JOHNSON:  Objection to form.
17    THE WITNESS:  The question or the
18  problem seemed to be that although it appears that
19  Mr. Younger was authorized to travel for the
20  government, that there may have been a question
21  because he then offered to pay for the trip, but
22  he wanted to pay for the trip at the same rate as
```

Page 126

1 a government ticket, as opposed to just buying a
2 regular ticket.
3     BY MR. BYRNES:
4   Q  All right. Did you ever tell my client
5 that you would be closely reviewing her future
6 travel?
7   A  No.
8   Q  Did you ever threaten my client's
9 employment, say it was in jeopardy in way, shape,
10 or form?
11   A  No.
12     MS. JOHNSON: Objection to form.
13     BY MR. BYRNES:
14   Q  Did you ever tell my client that she was
15 a tough nut to crack?
16   A  Oh, absolutely. Absolutely, yes.
17   Q  Why?
18   A  Because we -- just as you and I seem to
19 be having the same conversation, she and I had the
20 same conversation and I just -- I didn't seem to
21 be able to convey the message in a way that she
22 understood that this was wrong. That's all, just

Page 127

1 wrong.
2   Q  It's not -- wasn't it your job to
3 investigate the facts, not make a determination as
4 to whether it was correct or not?
5     MS. JOHNSON: Objection to form.
6     THE WITNESS: No, no.
7     BY MR. BYRNES:
8   Q  Well, you're not a manager and you're
9 not a travel agent; correct?
10   A  No but I do represent the IG.
11   Q  Right. But there was no official
12 review. I mean, the IG usually does an
13 investigation, gathers facts, writes up reports,
14 talks to legal counsel, and issues a decision;
15 correct?
16   A  No, not necessarily. That's among their
17 duties, sure. But we're here to prevent and
18 detect.
19   Q  So, you're sort of a super personnel
20 agent. So, you go in and you can individually now
21 go in and decide whether or not although this was
22 all authorized that this was a "bad idea"?

Page 128

1     MS. JOHNSON: Objection to form, calls
2 for speculation.
3     THE WITNESS: Yes, we can. That's what
4 an IG does.
5     BY MR. BYRNES:
6   Q  What did you mean by a tough nut to
7 crack?
8   A  It meant that I was unable to get
9 through to her successfully that this was a
10 mistake. It wasn't -- he could accompany her. I
11 told her he could accompany her on his own dime.
12 He just couldn't get a government ticket for it.
13 That's all.
14   Q  Were you conveying a lack of candor on
15 her part?
16   A  I don't know. I'm not sure I
17 understand.
18   Q  Well, weren't you using -- I mean, is
19 that a terminology that you normally use, you're a
20 tough nut to crack?
21   A  It's an -- it's an idiom. That's all.
22 It's just --

Page 129

1   Q  Well, why would you need to crack her
2 nuts?
3     MS. JOHNSON: Objection to form.
4     THE WITNESS: That's not what the
5 expression means.
6     BY MR. BYRNES:
7   Q  What does it mean?
8   A  It's an idiom that means we're having a
9 hard time getting through.
10   Q  Do you believe that Ms. Klugel took
11 offense to that remark?
12     MS. JOHNSON: Objection; calls for
13 speculation.
14     THE WITNESS: I don't know.
15     BY MR. BYRNES:
16   Q  Well, let me ask you again, in your
17 sexual harassment training, isn't it how the
18 recipient perceives the comments that lies at the
19 core of whether it's sexually harassing or not?
20     MS. JOHNSON: Objection; calls for a
21 legal conclusion.
22     BY MR. BYRNES:

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 130

1  Q   Isn't that what you were trained?
2  A   This is not -- this isn't --
3  Q   That's not what I asked.  Isn't that
4  what you were trained?
5  A   No, circumstances determine that.
6  Q   Isn't it how the woman facing an advance
7  or an inappropriate comment in the workplace
8  perceives that comment that lies at the core of
9  sexual harassment?
10  A   No, sir.
11      MS. JOHNSON:  Objection; calls for a
12  legal conclusion.
13      THE WITNESS:  I don't believe so.
14      BY MR. BYRNES:
15  Q   Weren't you trained on that?
16  A   I was trained, yes.  This was not a
17  supervisor, subordinate relationship.  This was an
18  IG inquiry.
19  Q   You don't get to sexually harass people
20  because you're in the IG; do you?
21      MS. JOHNSON:  Objection to form.
22      THE WITNESS:  I don't believe she was

Page 131

1  sexually harassed.
2      BY MR. BYRNES:
3  Q   That's not what I asked you.  You agree
4  with me that you could not engage in sexual
5  harassment merely because you were in the IG's
6  office?
7  A   Right.
8  Q   And the questions that would be
9  inappropriate in an inquiry that the recipient
10  might see as sexually harassing might lay you open
11  to just this sort of claim; correct?
12      MS. JOHNSON:  Objection; calls for legal
13  conclusion, speculation.
14      THE WITNESS:  It's also my understanding
15  that sexual harassment can only be done if the
16  person receiving the information objects to it.
17      BY MR. BYRNES:
18  Q   Well, didn't she object?
19  A   No.
20  Q   She filed a lawsuit, sir.  Isn't that an
21  objection?
22  A   Well, it's a little difficult to --

Page 132

1      MS. JOHNSON:  Objection to form.
2      THE WITNESS:  If she had said something
3  at the time, then I would have said what the
4  comment meant.
5      BY MR. BYRNES:
6  Q   Well, she filed an EEO complaint against
7  you.
8  A   I have no knowledge of that.  At the
9  time --
10  Q   When did you --
11  A   At the time, at the time, at the time is
12  the important thing.  Coming back -- claiming
13  months later that I said something wrong when she
14  could have merely asked what does that mean, I
15  would have told her.  And if I had made a mistake,
16  then I would have apologized.
17  Q   In your training in EEO training, is it
18  required that the person being harassed confront
19  the harasser at the moment the harassment goes on?
20      MS. JOHNSON:  Objection; calls for a
21  legal conclusion, form.
22      THE WITNESS:  Yeah.

Page 133

1      BY MR. BYRNES:
2  Q   It is?
3  A   Yeah, yeah.
4  Q   So, you've had no training that what an
5  individual may do is they may listen to that and
6  then go file a complaint?
7      MS. JOHNSON:  Objection to the form,
8  vague.
9      THE WITNESS:  It is my understanding of
10  the training that if there's an issue comes up,
11  then the person is to speak with the individual or
12  the supervisor, not to file a lawsuit right away
13  but to discuss it.
14      BY MR. BYRNES:
15  Q   Why do you think she had an attorney
16  contact you; do you know?
17      MS. JOHNSON:  Objection; calls for
18  speculation.
19      THE WITNESS:  At the time, I didn't
20  know.  This matter was -- as I said, this matter
21  was over and done with.  It was a relatively minor
22  matter.  As far as I knew, she took the Hawaii

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 134

1  trip, so there was nothing to interfere with her
2  going. I didn't know what the nature of the -- it
3  was.
4      BY MR. BYRNES:
5      Q   Did you review any further travel of my
6  client's after you interviewed her?
7      A   No.
8      Q   Did you have any further discussions --
9  after you interviewed my client and Ms. Erb and
10 told them what the investigation found, did you
11 have any more discussions with Ms. Erb?
12     A   A, it wasn't an investigation so, B, I
13 don't believe I ever spoke with her. If I spoke
14 with her again, it would have been to return a
15 phone call. But there was no reason for me to
16 talk with her ever again.
17     Q   Well, what did you tell Ms. Erb when you
18 got together with her?
19     A   The same thing I would imagine.
20     Q   Well, wasn't Mr. Seleke's situation far
21 more attenuated then my client's?
22     MS. JOHNSON: Objection to form.

Page 135

1      THE WITNESS: I saw them as
2  complimentary.
3      BY MR. BYRNES:
4      Q   Why? One was a long-term photographer
5  and the other one apparently was only the woman's
6  boyfriend, who wasn't going to do anything there;
7  right?
8      MS. JOHNSON: Objection to form, vague.
9      THE WITNESS: According to the travel
10 form, he was going to assist in the photography.
11     BY MR. BYRNES:
12     Q   Did you ask Ms. Erb whether -- was there
13 any collusion with Ms. Klugel?
14     A   I don't recall.
15     Q   Did you ask my client whether she was
16 colluding with Ms. Erb just to have a trip to
17 bring their boyfriends?
18     A   I don't recall.
19     Q   Would you have taken a different
20 position with my client if she brought her husband
21 with her?
22     MS. JOHNSON: Objection; calls for

Page 136

1  speculation.
2      THE WITNESS: No.
3      BY MR. BYRNES:
4      Q   What did you tell Mr. Gallagher after
5  the investigation?
6      MS. JOHNSON: Objection to the form.
7      THE WITNESS: I told Mr. Gallagher that
8  this is my impression of what happened, that Mark
9  appeared to make a mistake here. A mistake was
10 made in that the government -- there was no way of
11 which I was aware that the government could
12 purchase a ticket for somebody and have that
13 person reimburse the government for the ticket.
14 The government is not a travel agency. The
15 government can pay to have you go or you can go if
16 you wish. But the end result of the inquiry just
17 focused on how this ticket was being paid.
18     BY MR. BYRNES:
19     Q   All right. Did you have any -- did Mr.
20 Gallagher have any discussions with you other than
21 this one discussion?
22     MS. JOHNSON: Objection; vague.

Page 137

1      BY MR. BYRNES:
2      Q   Regarding Ms. Klugel and Ms. Erb.
3  That's a fair enough objection.
4      A   I remember getting an email from him
5  asking if there would be a report and I responded
6  back saying no, that as far as I was concerned
7  this was really more of a -- I think I
8  characterized it as a technical assistance visit.
9      Q   All right. How about Ms. Suit? Did you
10 report back to her what you found, Ms. Suit? I'm
11 sorry.
12     A   I don't believe so, but I can't be 100
13 percent sure.
14     Q   What about Ms. Ailes? Did you report
15 back to her what you found?
16     A   Again, I can't be sure.
17     Q   What conversations did you have with Ms.
18 Petrovsky?
19     A   I would have contacted Judy after this
20 suit became known to let her know that if she had
21 any documentation or if the office had any
22 documentation to --

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 138

1    Q    Prior to the lawsuit?
2    A    I don't know if I ever spoke with her
3    about this.
4    Q    When did you first become aware that
5    there was an EEO claim in this case?
6    A    I got a phone call in -- sometime in '05
7    from the -- our equal employment office. That
8    could have been a tort claim. I don't remember.
9    Q    Did you have your statements taken by
10    anyone regarding this matter prior to coming here
11    today?
12    A    No.
13    Q    Okay. With respect to my client, did
14    you conduct any monitoring or surveillance of her
15    at anytime?
16        MS. JOHNSON: Objection to form.
17        THE WITNESS: You mean physical
18    surveillance?
19        BY MR. BYRNES:
20    Q    Any, yes.
21    A    No, no.
22    Q    Okay.

Page 139

1    A    After this one day of meeting with your
2    client for 45 minutes, I've never seen her again.
3    This was the first time and I wasn't even sure who
4    she was when she sat here. I don't recall.
5    Q    Well, did my client strike you as candid
6    and truthful when you talked to her?
7        MS. JOHNSON: Objection to form, vague.
8        THE WITNESS: She was nervous. She was
9    -- the only reason I remember your client at all
10    is because she was argumentative.
11        BY MR. BYRNES:
12    Q    How do you mean?
13    A    The -- one of the reasons I think I used
14    that expression, a tough nut to crack, is rather
15    than argue or ask for an explanation about the
16    government fare, she focused her ire on who the IG
17    was, who was the IG to tell her what she could and
18    could not do, who was the IG to say that
19    management could or could not do something after
20    management had already agreed to whatever it was.
21    And so, I spent time trying to explain the nature
22    of the IG and how it goes about doing its

Page 140

1    business.
2    Q    Okay.
3    A    But I think that no matter what I said,
4    the answers were not satisfactory to her. She
5    didn't understand what it was. And this just
6    harkened back to when I had asked who these people
7    were to begin with. What I was told by Carol
8    Ailes, I believe, was that Mark Hadden is a weak
9    manager and that Dottie can be aggressive and
10    assertive.
11    Q    Ms. Ailes told you that?
12    A    I believe so, yeah.
13    Q    You don't get into -- I take it the IG
14    doesn't investigate the strength of various
15    managers?
16        MS. JOHNSON: Objection to form.
17        THE WITNESS: Well, no, that could be.
18    If we see a manager is consistently making errors,
19    yeah, we could look at the strength of that
20    manager.
21        BY MR. BYRNES:
22    Q    Did you find that Mr. Hadden

Page 141

1    consistently made errors?
2    A    This was a one shot deal. We just
3    looked at this one thing. And as I said, I
4    realized -- I believed it was a mistake and let it
5    go.
6    Q    Do you know what Mr. Hadden's grade was
7    at the time you spoke to him?
8    A    No, I don't recall.
9    Q    Who was at a senior grade, Ms. Ailes or
10    Mr. Hadden?
11        MS. JOHNSON: Objection; lack of
12    foundation.
13        THE WITNESS: I don't know. I would
14    assume Mr. Hadden.
15        BY MR. BYRNES:
16    Q    Do you think it's insubordinate for an
17    employee of a junior grade to claim that a senior
18    manager is weak?
19        MS. JOHNSON: Objection to the form;
20    calls for speculation.
21        THE WITNESS: No, sir.
22        BY MR. BYRNES:

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 146

```
 1    that Ms. Suit sent to you regarding the travel in
 2    this case?
 3        A   I believe so, yes.
 4            MR. BYRNES:  Let's mark this as -- I
 5    think we've marked this as two already, Exhibit 2.
 6            BY MR. BYRNES:
 7        Q   Sir, is this the communication that you
 8    were referring to earlier that you had with Mr.
 9    Hadden regarding meeting with him?
10        A   Yes.
11        Q   Okay.  And that's SI0109 and SI0110?
12        A   Right.
13        Q   And that references communications --
14    email communications on December 13, 2004?
15        A   The communication was the 13th, yes.
16        Q   Do these fair and accurately depict the
17    communications you had with Mr. Hadden?
18            MS. JOHNSON:  Objection; vague.
19            THE WITNESS:  It's the emails that I
20    sent.  Yes, I realize here that the date is wrong.
21    It's Tuesday, December 13th.  It should be
22    Tuesday, December 14th.
```

Page 147

```
 1            MR. BYRNES:  Okay.  Let's mark Exhibit 1
 2    to 3.
 3            (Deposition Exhibit Nos. 1 through
 4            3 were marked for identification.)
 5        BY MR. BYRNES:
 6        Q   Sir, is this the memorandum for the file
 7    that you prepared for your review of this matter?
 8        A   Yes.
 9        Q   Okay.  Were there any other documents
10    that you recall preparing other than this
11    memorandum of interview?
12        A   No.
13        Q   Okay.  Other than these documents, do
14    you recall receiving any other materials from any
15    person at the Smithsonian regarding Ms. Klugel?
16            MS. JOHNSON:  Objection; vague.
17            THE WITNESS:  Yeah.
18        BY MR. BYRNES:
19        Q   What else did you receive?
20        A   There was a bio sheet on Phillip Younger
21    and some corroborative information that he does
22    have press pass, yeah, yeah.
```

Page 148

```
 1        Q   All right.  Do you know where those
 2    documents -- did you surrender those documents to
 3    counsel?
 4        A   Yes.
 5        Q   Okay.
 6            MR. BYRNES:  No further questions.
 7            MS. JOHNSON:  Let's just go off for one
 8    minute.  I'll confer with the agency counsel, I
 9    don't think I have much.
10            THE VIDEOGRAPHER:  We're going off the
11    record.  The time is 12:57 p.m.
12            (Recess)
13            THE VIDEOGRAPHER:  We're back on the
14    record.  The time is 1:01 p.m.
15            MS. JOHNSON:  Yeah.  We have no
16    questions.  Thank you.  Do we want to do read and
17    sign?
18            MR. BYRNES:  They've been doing that,
19    yeah.  You want to read and sign; right?
20            MS. JOHNSON:  Yes.
21            THE VIDEOGRAPHER:  We're going off the
22    record.  The time is 1:01 p.m.  This concludes
```

Page 149

```
 1    today's deposition of Gerard Roy.
 2            (Whereupon, at 1:01 p.m., the
 3            deposition of GERARD ROY was
 4            adjourned.)
 5            * * * * *
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

6328c9d2-0410-40fa-bcbb-7d343985a2be

EXHIBIT 13

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
-----------------------------x
DORATHA KLUGEL,                :
                              :
            Plaintiff,        :
                              :
      v.                      : No. 06-1886
                              :
CRISTIAN SAMPER et al.,       :
                              :
            Defendants.       :
-----------------------------x
```

Falls Church, Virginia

Monday, April 14, 2008

Deposition of

KATHLEEN L. SUITE

a witness, called for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, beginning at approximately 10:02 a.m., at

the law offices of Grad Logan & Klewans, PC, 3141

Fairview Park Drive, Falls Church, Virginia,

before Catherine B. Crump of Anderson Court

Reporting, notary public in and for the

Commonwealth of Virginia, when were present on

behalf of the respective parties:

ANDERSON COURT REPORTING
706 Duke Street, Suite 100
Alexandria, VA 22314
Phone (703) 519-7180  Fax (703) 519-7190

Page 14

1      A    Could you ask it again?
2      Q    There was a term called "volunteers".
3   Are you familiar with that?
4      A    Yes.
5      Q    What was a volunteer?
6      A    Volunteers were people that came in and
7   volunteered their time.  They were registered with
8   the Smithsonian volunteer program.  I can't
9   remember the name of it, but there is such a
10   program they're supposed to register with.
11      Q    Did those volunteers in your experience
12   ever accompany Smithsonian employees on travel?
13      A    A few times.
14      Q    Well, how many times?  Do you recall?
15      A    No, but not very often.
16      Q    More than five?
17      A    It's hard to say.  It could be more than
18   five.
19      Q    Did Mr. Haddon have ever have a
20   volunteer accompany him?
21      MS. JOHNSON:  Objection.  Lack of
22   foundation.

Page 15

1      BY MR. BYRNES:
2      Q    Ma'am?
3      A    Answer?  Not that I remember.
4      Q    Did he ever bring any family members
5   with him on travel?
6      MS. JOHNSON:  Objection.  Lack of
7   foundation.
8      THE WITNESS:  Not that I knew of.
9      BY MR. BYRNES:
10      Q    Did he bring his wife with him to
11   Belize?
12      MS. JOHNSON:  Objection.  Lack of
13   foundation.
14      THE WITNESS:  Not that I knew of.  She
15   wasn't on travel papers.  I can tell you that.  I
16   don't know if he brought her.
17      BY MR. BYRNES:
18      Q    What about Mr. Gallagher; did he ever go
19   on travel?
0      A    Once or twice.
21      Q    Did he ever bring a family member on
22   travel with him?

Page 16

1      A    Not that I know of.
2      Q    Well, you would be the sole person in
3   2004 handling travel.  Correct?
4      A    Right.
5      Q    Is it your testimony that -- well, let
6   me go back.  Ms. Klugel went on travel in 2004.
7   Correct?
8      A    Yes.
9      Q    And she brought a volunteer with her.
10   Correct?
11      A    Yes.
12      Q    And that was Mr. Yunger?
13      A    Yes.
14      Q    All right.  Did she supply you paperwork
15   regarding Mr. Yunger?
16      MS. JOHNSON:  Objection as to vagueness
17   as to which trip you're referring to.
18      BY MR. BYRNES:
19      Q    Ma'am?
20      A    Which trip are you referring to?
21      Q    Any of the trips.  Did she bring Mr.
22   Yunger with him?

Page 17

1      A    Yes.  I mean, I wouldn't -- he could
2   have personally gone with her and I would have no
3   knowledge of that, but as a registered volunteer
4   with SERC paperwork, yes.
5      Q    What would you have to do to be a
6   registered volunteer, if you know?
7      A    I don't know.  I know there's paperwork
8   you have to fill out.
9      Q    Were registered volunteers given a
10   government rate when they went on travel?
11      A    Yes.
12      Q    All right.  Well, what did you know
13   about Mr. Yunger as a registered volunteer, if
14   anything?
15      A    Nothing.
16      Q    All right.
17      A    I mean, the paperwork said he was.  So I
18   trusted that he was.
19      Q    Well, in your experience, were there any
20   other registered volunteers who ever accompanied
21   anyone other than Ms. Klugel on travel in 2004?
22      A    Not that I can think of offhand.

5 (Pages 14 to 17)

Page 18

1      Q    Would the paperwork that was in the
2   agency's possession, did that reflect who went as
3   a volunteer?
4      A    Yes.
5      Q    And that paperwork would be still with
6   the travel office or where would that be?
7      A    I would have it in my office.
8      Q    All right. And you maintain records of
9   all travel --
10      A    Yes.
11      Q    -- by SERC employees. Correct?
12      A    Correct.
13      Q    All right. And that includes all travel
14   by volunteers?
15      A    Correct.
16          MS. JOHNSON: Objection. Lack of
17   foundation.
18          BY MR. BYRNES:
19      Q    All right. So in 2004, did there come a
20   time when you made an inquiry to the Office of
21   Inspector General regarding Ms. Klugel's travel?
22      A    No.

Page 19

1      Q    Is there a time when the Office of
2   Inspector General contacted you regarding Ms.
3   Klugel's travel?
4      A    Yes.
5      Q    Did you initiate the contact with OIG?
6      A    No.
7      Q    Do you know who did?
8      A    Yes.
9      Q    Who?
10      A    Carol Ailes.
11      Q    Who is Carol Ailes?
12      A    Travel Services Office. Travel Services
13   would arrange the airfare, the air, the flights.
14      Q    Did you ever raise an inquiry yourself
15   into Ms. Klugel's travel?
16          MS. JOHNSON: Objection to form.
17          THE WITNESS: I don't understand. With
18   who?
19          BY MR. BYRNES:
20      Q    Did you ever raise any allegations to
21   Ms. Ailes regarding Ms. Klugel's travel?
22      A    Yes.

Page 20

1      Q    What allegation did you raise?
2      A    Regarding a trip to Panama that she had
3   submitted to me, she had also included a note that
4   said she would be going to Belize, taking annual
5   leave, going personally. The next thing I got was
6   Travel Services would send me an itinerary of the
7   flights, and they included Belize. So I called
8   Ms. Ailes and I said why did you include her
9   personal time, and she said she told me it was all
10   business. I said, Well, it's not. And she said,
11   I'm calling the Inspector General.
12      Q    How did you make a determination that it
13   was not?
14      A    Because her paperwork only had Panama on
15   it.
16      Q    That's not what I asked. How did you
17   make a determination that her trip to Belize was
18   not business?
19      A    Because of the paperwork that her
20   supervisor had signed only had Panama. She had
21   given me a note and said she was personally going
22   to Belize.

Page 21

1      Q    So based on her personal note?
2      A    And the signed paperwork by the
3   supervisor that did not have Belize on it.
4      Q    Did you ever raise an inquiry into her
5   traveling anywhere with Mr. Yunger?
6          MS. JOHNSON: Objection to form.
7          THE WITNESS: No.
8          BY MR. BYRNES:
9      Q    Did you ever comment to any supervisor
10   regarding her travel with Mr. Yunger?
11      A    No.
12      Q    You never contacted the Office of
13   Inspector General regarding her trip with Mr.
14   Yunger?
15          MS. JOHNSON: Objection. Asked and
16   answered.
17          THE WITNESS: No.
18          BY MR. BYRNES:
19      Q    All right. Do you know if anyone did?
20          MS. JOHNSON: Objection. Asked and
21   answered.
22          THE WITNESS: I already answered that.

6 (Pages 18 to 21)

Page 22

```
1        BY MR. BYRNES:
2        Q    You answered it with respect to Mr.
3   Yunger?  Which trip did she take with Mr. Yunger,
4   ma'am?
5        A    Oh, okay, Mr. Yunger.  The same thing.
6   Carol Ailes called about that.
7        Q    And you had no input whatsoever into Ms.
8   Ailes inquiry?
9        A    Just I sent the Inspector General the
10  travel papers that I had at the time.
11       Q    So is it your testimony, ma'am, that at
12  no time did you ever raise or initiate an inquiry
13  into Ms. Klugel's travel?
14       MS. JOHNSON:  Objection.  Objection to
15  form and asked and answered.
16       BY MR. BYRNES:
17       Q    Go ahead, ma'am.
18       A    Could you ask it again?
19       Q    Is it your testimony that at no time did
20  you ever raise an inquiry or initiate an inquiry
21  into Ms. Klugel's travel?
22       MS. JOHNSON:  Same objections.
```

Page 23

```
1        THE WITNESS:  I mean, other than --
2        BY MR. BYRNES:
3        Q    No, ma'am.  Any time.  Did you ever
4   initiate an inquiry into Ms. Klugel's travel?
5        A    What do you mean by an inquiry?
6        Q    Did you ever raise a question on your
7   own regarding Ms. Klugel's travel?
8        A    Yes.
9        Q    When?
10       A    When I called Ms. Ailes.
11       Q    About what?
12       A    About the fact that the Belize was on
13  her airfare and it was personal.
14       Q    Did you call Ms. Klugel to talk to her?
15       A    Yes.  When Carol Ailes said she was
16  calling the Inspector General, I contacted Dottie
17  by E-mail and said you can't go to Belize on a
18  government ticket; it's not part of your travel.
19       Q    So what did she do?
20       MS. JOHNSON:  Objection.  Lack of
21  foundation.
22       THE WITNESS:  I don't know what she did.
```

Page 24

```
1        BY MR. BYRNES:
2        Q    Well, why did you send forms to Jerry
3   Roy at OIG?
4        A    Because he contacted me and asked me to.
5        Q    Were you ever involved in any discussion
6   as to whether it was appropriate for Mr. Yunger to
7   attend any conference with Ms. Klugel?
8        A    I can't remember.
9        Q    Do you have problems with your memory?
10       A    No.  I don't think so.
11       Q    Are you on any medications that would
12  affect your ability to remember?
13       A    No.
14       Q    Well, did you have any discussions with
15  the Office of Inspector General regarding the
16  propriety of Ms. Klugel's travel with Mr. Yunger?
17       A    He just asked me to send him the
18  paperwork.  I very briefly talked with him.
19       Q    What did you very briefly talk to him
20  about?
21       MS. JOHNSON:  Objection as vague.  Who
22  is the "he" we're talking about?
```

Page 25

```
1        BY MR. BYRNES:
2        Q    The gentleman you just discussed, Mr.
3   Roy.
4        A    He contacted me, asked me to send him
5   the paperwork, and then he said he was coming out
6   to the office.  I think he contacted me one other
7   time and asked me to send paperwork for Amy Erb.
8        Q    Ma'am, wasn't there a point that you
9   raised an inquiry regarding the propriety of Mr.
10  Yunger accompanying my client on travel?
11       MS. JOHNSON:  Objection.  Asked and
12  answered.
13       THE WITNESS:  No.
14       BY MR. BYRNES:
15       Q    You never did?
16       A    I don't think so.  I mean, if they gave
17  me signed paperwork, the supervisor had signed it,
18  it wasn't my job to determine if he should be
19  going or not.
20       Q    Did you ever raise questions with
21  supervisors regarding the attitude of Ms. Klugel?
22       A    Yes.
```

9ce82780-0275-4d88-b231-1fb59ef694ce

Page 34

1  did you?
2      A   I did or I didn't?
3      Q   You did not.
4      A   I don't think so.
5      Q   Nor did you copy it to Mr. Haddon or Mr.
6  Hines.  Correct?
7      A   Correct.
8      Q   All right.  And there's a series of
9  statements here.  Who typed those, the message,
10  here is the travel authorization?
11     A   I did.
12     Q   Ma'am, in your position as a GS-6, do
13  you make determinations as to what appropriate
14  travel is and what isn't?
15         MS. JOHNSON: Objection to form.
16         THE WITNESS: Yes.
17         BY MR. BYRNES:
18     Q   Is that in your position description?
19     A   I don't know.
20     Q   Well, isn't it true, ma'am, that what
21  you do is you simply handle travel requests?
22         MS. JOHNSON: Objection to form.

Page 35

1          THE WITNESS: And I make sure that they
2  follow the travel rules and regulations, and that
3  is in my position description, I'm pretty sure.
4          BY MR. BYRNES:
5      Q   Well, didn't a supervisor have to sign
6  off on all travel?
7      A   Yes.
8      Q   Did a supervisor sign off on this travel
9  for Ms. Klugel?
10     A   Yes.
11     Q   Did you question that supervisor?
12     A   I didn't at the time because I thought
13  it was only the Panama trip.
14     Q   Who was the supervisor who signed off on
15  Ms. Klugel's travel?
16     A   Mark Haddon.
17     Q   What's his G.S. rating?
18     A   I don't know.
19     Q   He's a director, isn't he?
20     A   Director of education.
21     Q   So he's either a GS-15 or a SES
22  employee?

Page 36

1      A   I don't have idea.
2          MS. JOHNSON: Objection. Lack of
3  foundation.
4          BY MR. BYRNES:
5      Q   Do you know — he's a higher grade than
6  you though.  Correct?
7      A   Oh, yes.
8      Q   All right.  And in essence, ma'am,
9  weren't you questioning Mr. Haddon's authorization
10  by sending this to OIG?
11         MS. JOHNSON: Objection to form. Lack
12  of foundation.
13         BY MR. BYRNES:
14     Q   Go ahead.
15     A   I just thought when the OIG calls and
16  asks me to send something, I send it.
17     Q   Well, but ma'am —
18     A   I wasn't really questioning anything.
19     Q   — did you ever raise an inquiry to Mr.
20  Haddon regarding his authorization of the travel
21  for Ms. Klugel?
22     A   No.

Page 37

1      Q   Well, didn't Mr. Haddon authorize Ms.
2  Klugel to do exactly what she did on travel?
3          MS. JOHNSON: Objection to form.
4          THE WITNESS: Only to Panama.  She added
5  Belize.
6          BY MR. BYRNES:
7      Q   Well, did he review that?
8          MS. JOHNSON: Objection. Lack of
9  foundation.
10         THE WITNESS: I don't know what he did.
11         BY MR. BYRNES:
12     Q   So how do you know whether or not he
13  authorized it?
14     A   Because his signature was on it.
15     Q   Well, do you know whether or not he
16  authorized her to go to Belize?
17     A   Subsequently to that, he did.
18     Q   No.  At the time, did you know whether
19  or not he authorized her to go to Belize?
20     A   No.  The paperwork I had only had Panama
21  and his signature on Panama.
22     Q   When did he authorize her to go to

Page 50

1    Q   Well, what do you mean the whole thing
2  in general?  What do you mean by that?  What's
3  your understanding of the, quote, whole thing in
4  general?
5    A   Nothing really specific, just --
6    Q   Well, ma'am --
7    A   -- general comments.  I can't remember
8  what I said.
9    Q   What general comments?
10   A   I don't remember what they were.
11   Q   You said something to Mr. Gallagher last
12 week?
13   A   I think it was last week.
14   Q   And you cannot remember what you said
15 last week?
16   A   Not word for word.
17   Q   Well, just in substance, what did you
18 discuss with him?
19   A   That I don't think I had realized there
20 were any other issues other than the travel issue.
21   Q   Well, what other issues were you made
22 aware of?

Page 51

1    A   What was on that document.  I wasn't
2  aware of any of that until I got that.
3    Q   Who made you aware of that?
4    A   When they sent me the document.
5    Q   Who was it that sent it to you?
6    A   I believe it was Chris Nicholson.
7    Q   What other information have you seen
8  other than the interrogatories?
9    A   Regarding?
10   Q   Regarding this case.
11   A   Nothing else.
12   Q   Did you ever get a notice from any of
13 the employees regarding production of documents?
14   A   What do you mean "production"?
15   Q   Any sort of E-mail communication
16 regarding the retention or production of
17 documents?
18       I'm sorry.  We need to turn the light
19 back on.
20       (Discussion off the record)
21       MR. BYRNES:  Would you read back the
22 last question?

Page 52

1        (The reporter read the record as
2        requested.)
3        THE WITNESS:  I think a couple of times,
4  I had requests from Mr. Roy, at least once, to
5  send him any travel documents that I had regarding
6  Ms. Klugel, Mr. Yunger, Ms. Erb, and Mr. Celikay,
7  I believe, and then I had to gather the same
8  documents for Mr. Gallagher, who I think probably
9  sent them to Chris Nicholson, and then I myself
10 had to send them to her.
11       BY MR. BYRNES:
12   Q   Now let me ask a question.  Did Mr. Roy
13 and you have any discussion about the substance of
14 his investigation at any time?
15       MS. JOHNSON:  Objection to form.
16       THE WITNESS:  He never said it was an
17 investigation.  He was just coming out to ask some
18 questions.
19       BY MR. BYRNES:
20   Q   Well, what did you understand it to be
21 when the Office of OIG called you?
22   A   Just a fact-finding mission.

Page 53

1    Q   What made you decide that it was a
2  fact-finding mission?
3    A   Because he was asking for all the travel
4  documents.
5    Q   But, ma'am, you've never done that
6  before in 13 years.
7    A   Right.
8    Q   Why did you not think this was an
9  investigation into Ms. Klugel?
10   A   He didn't say it was.  He said he was
11 coming out to ask some questions.
12   Q   All right.  Let's cut to the chase.
13 Isn't it true that you had a disliking for Ms.
14 Klugel, so you helped initiate an OIG
15 investigation of her?
16       MS. JOHNSON:  Objection.
17 Mischaracterizes her testimony.
18       BY MR. BYRNES:
19   Q   Ma'am?
20   A   That is not true.
21       MR. BYRNES:  Now let's look at Exhibit
22 2, which Samper 103 to 104.

Page 54

1           (Deposition Exhibit No. 2 was
2           marked for identification.)
3        MS. JOHNSON: Do you have a copy for me?
4        MR. BYRNES: Yes. I'm sorry.
5        BY MR. BYRNES:
6        Q   Ma'am, did you forward this document to
7   Mr. Roy as well?
8        A   I believe so.
9        Q   Okay. And this is a form filled out by
10  who? Do you know?
11       A   I don't know, a hundred percent sure,
12  but I think Ms. Klugel filled it out for Mr.
13  Yunger.
14       Q   Okay. And it's information concerning
15  Mr. Yunger. Correct?
16       A   Correct.
17       Q   Who blotted out the Social Security
18  number? Do you know?
19       A   I don't know.
20       Q   Do you know why that was taken out?
21       MS. JOHNSON: Objection. Lack of
22  foundation.

Page 55

1        THE WITNESS: No.
2        BY MR. BYRNES:
3        Q   Okay. Does anyone not suspect that Mr.
4   Mr. Yunger and Ms. Klugel don't know their Social
5   Security numbers?
6        MS. JOHNSON: Objection to form.
7        THE WITNESS: I have no idea who did it
8   or why it was done.
9        BY MR. BYRNES:
10       Q   Who approved the authorization for Mr.
11  Yunger?
12       A   Mr. Haddon.
13       Q   And that was on?
14       A   December 8th.
15       Q   All right.
16       A   '04.
17       Q   You forwarded this to Mr. Roy the next
18  day. Correct?
19       A   I don't remember. He must have
20  requested it.
21       Q   Okay.
22       A   If that was part of the packet.

Page 56

1        Q   Did you inform Mr. Haddon that you were
2   in any way, shape, or form questioning the travel
3   of Mr. Yunger or Ms. Klugel?
4        MS. JOHNSON: Objection to form.
5        THE WITNESS: No.
6        BY MR. BYRNES:
7        Q   Why not?
8        A   I wasn't really questioning this one.
9        Q   Well, did you -- did Mr. Roy ever tell
10  you not to contact Mr. Haddon?
11       A   No.
12       Q   Did he tell you not to contact anyone
13  else?
14       A   No.
15       Q   Well, this form was approved by Mark.
16  Correct?
17       A   Correct.
18       Q   The day before you sent the materials to
19  the OIG. Correct?
20       A   Correct.
21       Q   So what was the problem, if any, with
22  this Hawaii trip in your estimation? Was there

Page 57

1   any problem with it?
2        MS. JOHNSON: Objection to form.
3        THE WITNESS: The only thing that I
4   thought was strange was that the airfare was on
5   there and they're repaying it. He was repaying
6   it.
7        BY MR. BYRNES:
8        Q   Why was that strange?
9        A   That didn't normally happen. A
10  volunteer would go and the airfare would be paid
11  for.
12       Q   By who?
13       A   By the Smithsonian, SERC.
14       Q   So Mr. Yunger was paying for it?
15       A   He was getting the government rate
16  ticket, but then he was reimbursing it.
17       Q   So he was actually reimbursing the
18  government for a cost that normally the government
19  would bear?
20       MS. JOHNSON: Objection to form.
21       BY MR. BYRNES:
22       Q   Is that correct?

15  (Pages 54 to 57)

Page 130

1   doesn't specifically say, but you don't see a car
2   on here.
3       Q   All right. So the parking would have
4   been for her vehicle in Washington, D.C.?
5       MS. JOHNSON: Objection. Calls for
6   speculation.
7       MR. BYRNES: That's my point.
8       THE WITNESS: The parking on page 83?
9       BY MR. BYRNES:
10      Q   Yes.
11      A   Yes, and there's a receipt for that,
12  probably, in here. Right here, at Reagan Airport.
13      MS. NICHOLSON: Which page?
14      THE WITNESS: 389.
15      BY MR. BYRNES:
16      Q   Let's look at page 366. It says
17  document history, created, signed, adjusted,
18  approved, processed. What does that form mean?
19      A   That's the signature, the approval
20  process. I created it. I signed it.
21      Q   And then --
22      A   And Mr. Hines approved it.

Page 131

1       Q   Approved the travel?
2       A   Correct.
3       Q   Do you know if Mr. Haddon or Mr. Hines
4   were investigated by OIG regarding their approval
5   of these travel forms?
6       MS. JOHNSON: Objection to form.
7       THE WITNESS: I don't know.
8       BY MR. BYRNES:
9       Q   Well, were you asked any questions about
10  them?
11      A   No.
12      Q   Were you asked to submit any forms about
13  them?
14      A   No.
15      Q   Let's look at page 378. Who is Jeanine
16  Roberts?
17      A   She's our normal approving person. When
18  she would be out, sometimes Mr. Hines would fill
19  in.
20      Q   What was her position?
21      A   I don't know. She's the head of
22  accounting at SERC. I don't know her actual

Page 132

1   title.
2       Q   Did SERC conduct a conference in Hawaii
3   during January 2005?
4       MS. JOHNSON: Objection. Lack of
5   foundation.
6       THE WITNESS: They didn't conduct one.
7   There was a conference there that these people
8   attended.
9       BY MR. BYRNES:
10      Q   Do you know what the conference was?
11      A   Hawaii International Conference on
12  Education.
13      MR. BYRNES: Let's go to the next
14  exhibit in order.
15          (Deposition Exhibit No. 8 was
16          marked for identification.)
17      BY MR. BYRNES:
18      Q   Let's look at page 392. Whose notes are
19  those?
20      A   Mine.
21      Q   When did you take these notes?
22      A   I was trying to clarify the whole thing

Page 133

1   in my mind because it had been years since I'd
2   gone over this. So I just sort of made a timeline
3   of what was going on.
4       Q   When? When did you make this notation?
5       A   Probably in the vicinity of January 24th
6   when I sent it to Ms. Nicholson.
7       Q   How do you know that Philip and Recep's plans
8   were cancelled after the OIG visit on 12-14-2004?
9       A   Because he came back to my office and
10  said that they weren't going to go.
11      Q   Who?
12      A   Mr. Roy said Mr. Yunger and Mr. Celikay
13  were not going to Hawaii, for me to delete them,
14  cancel them.
15      Q   This looks like a duplicate here, the
16  rest of it. This ends at 400. Her government
17  credit card was cancelled for too many late
18  payments, page 400. Whose notation was that?
19      A   Mine.
20      Q   Who were you referring to?
21      A   Ms. Klugel.
22      Q   Why was that important?

Page 138

1    Mr. Celikay's records included in with Ms.
2  Klugel's?  Do you know?
3    A    Mr. Roy had asked me to send everybody's
4  records, I believe.
5    Q    What do you mean everybody?  Who is
6  everybody?
7    A    The four people that were involved in
8  this Hawaii thing.
9    Q    This says "Behind the Scenes
10  Volunteers".  Do you know what that means?
11    A    It's a volunteer program, I believe, in
12  the Education Department.  I'm not positive.
13    Q    Mr. Haddon approved that on December
14  7th?
15    A    Correct.
16    Q    Did you let Mr. Haddon know that you
17  forwarding this information to Mr. Roy?
18    A    No.
19    Q    Why not?
20    A    Never thought of it.
21    Q    Did Mr. Roy tell you not to do that?
22    A    No.

Page 139

1    Q    Do you have any other notes or records
2  that you created since this litigation commenced
3  to assist counsel?
4    A    Just these little timelines, and that
5  was more sort of to help me because it had been so
6  long since I looked at any of this.
7    Q    Were you asked to create a timeline?
8    A    No.
9    Q    Have you been asked to create any
10  documents?
11    A    No.
12    MR. BYRNES:  All right.  Let's mark this
13  as the next exhibit.
14    (Deposition Exhibit No. 9 was
15    marked for identification.)
16    BY MR. BYRNES:
17    Q    This is something you created this year?
18    A    Correct.
19    Q    I just want to be clear, because you
20  just said you didn't create anything else.  So
21  page 401 is something you created this year?
22    A    Correct.

Page 140

1    Q    Okay.  So are you mistaken?  Are there
2  more documents you created that you are aware of?
3    MS. JOHNSON:  Objection to form.
4    THE WITNESS:  No.  I wouldn't -- I mean,
5  this was just something transmitting information I
6  had to Ms. Nicholson.
7    BY MR. BYRNES:
8    Q    Well, why did you communicate this --
9  why didn't you just send her the forms?  Why did
10  you feel the necessity to communicate to her what
11  this meant?
12    MS. JOHNSON:  Objection to form.
13    BY MR. BYRNES:
14    Q    Huh?
15    A    Just for clarification.
16    Q    For who?
17    A    For Ms. Nicholson.
18    Q    Ms. Nicholson's an attorney.  Did you --
19    A    No.  She didn't ask me.
20    Q    -- feel the need to clarify this
21  information for her?
22    MS. JOHNSON:  Objection to form.

Page 141

1    THE WITNESS:  If you're not somebody
2  handling travel, it could look very confusing.
3    BY MR. BYRNES:
4    Q    Right.  So you wanted to give your
5  opinion on what this meant?
6    MS. JOHNSON:  Objection to form.
7    BY MR. BYRNES:
8    Q    Correct?
9    A    Just my view of how it unfolded.
10    Q    Right.  Your view.  Correct?
11    A    Correct.
12    Q    And you're suggesting in this E-mail,
13  are you not, that my client was being dishonest?
14    MS. JOHNSON:  Objection to form.
15    BY MR. BYRNES:
16    Q    Are you not?
17    A    I had that feeling.
18    Q    What did you base that feeling on?
19    A    The fact that she had submitted a note
20  with her proposed travel plans form saying Belize
21  was personal, and then when she couldn't -- when
22  -- okay.  She submitted the note saying the Belize

9ce82780-0275-4d88-b231-1fb59ef694ce

Page 142

1 portion was personal. The only thing on the
2 proposed travel plans form was Panama, and then
3 the itinerary came in from Travel Services that
4 had the entire trip on there. That's when I
5 thought something dishonest was going on, because
6 she had told Ms. Ailes that it was all business.
7    Q  Where did she tell you Ms. Ailes that?
8    A  There's an E-mail somewhere in here.
9    Q  Let's start on page 414 at the back.
10 Ms. Ailes writes to you and says: "New airfare is
11 1099 plus six dollars and needs to be issued
12 today." Correct?
13    A  Correct.
14    Q  That was in reference to what?
15    A  I don't know. I don't know what phase
16 this trip was in, because they actually did go
17 just to Panama.
18    Q  You wrote back to Dottie Klugel, which
19 you CC'd to Mark Haddon: "I did not realize that
20 these needed to be ticketed. So the airfare has
21 gone up. Even if I could have gotten them,
22 Jeanine was not here to approve them. Is SERC

Page 143

1 still paying $500 in Project View 605 or should
2 the breakdown be different? I need to know this
3 before I can proceed."
4      What was that about?
5    A  Exactly what it says.
6    Q  Well, can you explain that to me?
7    A  Travelers would submit the proposed
8 plans form. Sometimes it would be more than a
9 week or sometimes two weeks before I could get
10 them worked up to the top of my pile to prepare
11 them, and I didn't realize, evidently, there was a
12 ticketing deadline on this. So I was just telling
13 her that, and even if I had realized, there wasn't
14 anything I could do because there was no one there
15 to approve it.
16    Q  Whose responsibility was it to handle
17 this part of the process? Yours or hers?
18      MS. JOHNSON: Objection to form.
19      BY MR. BYRNES:
20    Q  The ticketing.
21    A  That's just after the authorization is
22 prepared, then the ticketing can take place.

Page 144

1    Q  Who does the ticketing, the actual
2 ticketing?
3    A  Ms. Ailes in Travel Services.
4    Q  All right. So Ms. Ailes wrote you and
5 said here's the new fare; this needs to be issued
6 today?
7    A  Correct.
8    Q  Did you do that?
9    A  No. There was no one there to approve
10 it.
11    Q  Wasn't Ms. Ailes senior to you?
12      MS. JOHNSON: Objection.
13 Mischaracterizes testimony.
14      BY MR. BYRNES:
15    Q  Ma'am?
16    A  No. She had nothing to do with me.
17    Q  All right. So she writes you and tells
18 you essentially issue this today?
19    A  If we want that fare, it needs to be
20 issued today, and all the SERC travelers know that
21 --
22    Q  That's not what she says. She says new

Page 145

1 fare is 1099 and needs to be issued today.
2 Correct?
3    A  To get that fare or it could go up.
4    Q  Then you write Ms. Klugel and tell her
5 that you can't get it approved today and the cost
6 could go up again?
7    A  Correct.
8    Q  Now, had you challenged other travelers
9 like this? Have you sent them other E-mails like
10 the ones you were sending Ms. Klugel?
11      MS. JOHNSON: Objection to form.
12      THE WITNESS: Travelers are supposed to
13 give me two weeks notice for domestic travel, a
14 month for foreign travel, and I always said --
15 every so often, I would send out a blurb that I
16 couldn't guarantee I could meet ticketing
17 deadlines. I mean, if there are five ticketing
18 deadlines in one day, obviously, I can't meet them
19 all.
20      BY MR. BYRNES:
21    Q  How many employees are there at SERC?
22    A  Probably a little over a hundred.

9ce82780-0275-4d88-b231-1fb59ef694ce

Page 158

1      BY MR. BYRNES:
2      Q    Ma'am, who requested that you send these
3    things?
4      A    Ms. Nicholson requested that I send the
5    travel --
6      Q    Did you create documents for her?
7      A    Just this, and this was created for me.
8      Q    She requested that you create a
9    chronology?
10      A    No.
11      Q    Well, you knew you were going to be a
12    witness in this case. Correct?
13      A    Not in the beginning.
14      Q    Well, you knew at the time you sent
15    these documents you would be?
16      MS. JOHNSON: Objection to form.
17      BY MR. BYRNES:
18      Q    Correct?
19      A    No.
20      Q    Why did you as a GS-6 feel it necessary
21    to instruct the lawyer as to the chronology?
22      MS. JOHNSON: Objection to form.

Page 160

1    what that means. The second version was the
2    second version of it that she submitted. The
3    third version was the third and final version she
4    submitted of the proposed travel plans form.
5      Q    What was the significance of any of
6    that?
7      A    The first version had only Panama on it.
8    The second version was not signed by Mark. It had
9    Panama and Belize, but with a note saying Mark has
10    already signed this.
11      Q    So you wanted to show an inconsistency?
12      A    No.
13      MS. JOHNSON: Objection to form.
14      THE WITNESS: No.
15      BY MR. BYRNES:
16      Q    Ma'am, let's be honest. Didn't you want
17    to show that she was changing her trip and trying
18    to get something from the government for free?
19      MS. JOHNSON: Objection to form.
20      THE WITNESS: I wrote this solely for me
21    in the beginning.
22      BY MR. BYRNES:

Page 159

1      BY MR. BYRNES:
2      Q    Ma'am?
3      A    I wrote this to clarify it for myself.
4      Q    Why?
5      A    Because the trips would get confused. I
6    would think is this Panama or was this Hawaii. So
7    I wrote --
8      Q    But you used it for versions. Didn't
9    you do that to show that my client had been
10    changing her claims on the various travels?
11      A    No.
12      MS. JOHNSON: Objection to form.
13      BY MR. BYRNES:
14      Q    Isn't that what you meant by first,
15    second, and third version, that she was changing
16    her statements as to facts?
17      MS. JOHNSON: Objection to form. Asked
18    and answered.
19      BY MR. BYRNES:
0      Q    Ma'am?
21      A    No. The first version was the first
22    version of the proposed travel plans form. That's

Page 161

1      Q    Well, why would you need it?
2      A    Because it was very confusing. It was a
3    long drawn-out thing.
4      Q    Well, if you did it solely for you, why
5    did you give it to counsel?
6      A    I thought it might be useful.
7      Q    Why did you -- why?
8      A    I don't know.
9      Q    Ma'am, let me remind you of the oath.
10    Okay? What I want to know is didn't you create
11    these documents so you could put a version of
12    events out to show that my client was lying?
13      MS. JOHNSON: Objection. Asked and
14    answered.
15      BY MR. BYRNES:
16      Q    Ma'am?
17      A    No.
18      Q    You just created them because you needed
19    to clarify the situation?
20      A    Correct.
21      Q    Because the situation was, what, too
22    confusing?

9ce82780-0275-4d88-b231-1fb59ef694ce

Page 194

1    the particular year in that folder.
2    Q    And so for each employee for whom you
3    have arranged travel, do you maintain copies of
4    records regarding those employees?
5    A    Yes.
6    Q    And during the time that there were
7    questions regarding Ms. Klugel's travel by the
8    OIG, you stated that you did not see anything
9    inappropriate with the travel to Hawaii or Belize;
10   is that correct?
11       MR. BYRNES: Objection to form.
12       THE WITNESS: Not to Hawaii. To Panama,
13   it started out just Panama and that was all that
14   was on the paperwork that I got, was only Panama
15   with the note that she was going to Belize for
16   personal business, which meant she couldn't fly to
17   Belize on a government ticket.
18       BY MS. JOHNSON:
19   Q    Concerning the trip to Hawaii, was there
20   anything that you felt was inappropriate?
21   A    If the travel -- well, they had purposes
22   on there. So normally, no air is reimbursed by a

Page 195

1    traveler, normally.
2    Q    Okay.
3    A    The government pays and it's not
4    normally ever reimbursed.
5    Q    And so regarding Hawaii, was there a
6    traveler who was stating that he was going to
7    reimburse the fare?
8    A    Yes.
9    Q    And who was that?
10   A    There were two.
11   Q    Who were those?
12   A    Philip Yunger and Recep Celikay.
13   Q    And that's not normally how it's done?
14   A    Correct.
15       MR. BYRNES: Objection. Is she
16   qualified as an expert or is she testifying from
17   her personal knowledge?
18       MS. JOHNSON: All of this is from her
19   personal knowledge, the same as the questions you
20   asked.
21       MR. BYRNES: Well, that's different. If
22   you're asking her -- you asked her if she was

Page 196

1    familiar with the travel regulations and travel
2    authorizations, and she can answer to her personal
3    knowledge, but I don't want her being qualified as
4    an expert.
5        MS. JOHNSON: Well, we've not moved to
6    qualify her as an expert. So I guess we'll deal
7    with that when we do that.
8        MR. BYRNES: I don't think she's a
9    30(b)(6) designee.
10       BY MS. JOHNSON:
11   Q    Now, when the IOG was asking you
12   questions regarding Ms. Klugel's travel, did you
13   have any discretion in deciding whether or not to
14   comply with their request?
15       MR. BYRNES: Objection to form.
16       THE WITNESS: To comply with the request
17   to submit the paperwork?
18       MS. JOHNSON: Yes.
19       MR. BYRNES: Calls for a legal
20   conclusion.
21       THE WITNESS: No.
22       BY MS. JOHNSON:

Page 197

1    Q    And is that part of your job
2    responsibilities, to comply with requests from the
3    OIG?
4    A    Yes.
5    Q    Now, you stated earlier that volunteers
6    can travel on official business; is that correct?
7    A    Correct.
8    Q    If a volunteer were to travel and was
9    not on official business, would that volunteer be
10   allowed to use the government rate?
11       MR. BYRNES: Objection. Calls for
12   speculation and form of the question.
13       THE WITNESS: No.
14       BY MS. JOHNSON:
15   Q    Earlier, you mentioned a Candy Feller,
16   regarding the fact that Ms. Feller's husband had
17   traveled with her on SERC travel. Do you recall
18   that testimony?
19   A    Yes.
20   Q    Do you know the circumstances under
21   which the husband was permitted to travel?
22   A    Most of the time, he would buy his own

9ce82780-0275-4d88-b231-1fb59ef694ce

# EXHIBIT 14

**Suite, Kathie**

| From: | Klugel, Dottie |
|---|---|
| Sent: | Wednesday, October 27, 2004 5:01 PM |
| To: | Suite, Kathie |
| Subject: | FW: FW: travel to Panama |

```
-----Original Message-----
From: Petroski Judith
Sent: Friday, September 24, 2004 12:27 PM
To: Klugel, Dottie
Subject: Re: FW: travel to Panama
```

I have booked the flights below but they can be changed.  There is no government fare from/to BWI.  There is no afternoon flight returning on which government fare is available.

```
SALES PERSON: J1              ITINERARY              DATE: 24 SEP
04
  CUSTOMER NBR: 0000008641              EVORVX         PAGE: 01

         TO: SMITHSONIAN INSTITUTION
             TRAVEL SERVICES OFFICE
             WASHINGTON DC 20560
             TELEPHONE 202-633-1730
             FAX 202-357-2049

    FOR: KLUGEL/DORATHA


 14 NOV 04  -  SUNDAY
     AIR    AMERICAN AIRLINES    FLT:1047    ECONOMY
            LV WASHINGTON REAGAN           614A          EQP: BOEING 757
            DEPART: TERMINAL B                           02HR 28MIN
            AR MIAMI INTERNTNL             842A          NON-STOP
                                                         REF: EVORVX

     AIR    AMERICAN AIRLINES    FLT:2131    ECONOMY
            LV MIAMI INTERNTNL            1105A          EQP: BOEING 757
                                                         02HR 47MIN
            AR PANAMA CITY  PA             152P          NON-STOP
                                                         REF: EVORVX


 17 NOV 04  -  WEDNESDAY
     AIR    DELTA AIR LINES INC  FLT:498     COACH       BREAKFAST
            LV PANAMA CITY  PA             840A          EQP: BOEING 737-800
                                                         02HR 57MIN
            AR ATLANTA                    1237P          NON-STOP
            ARRIVE: SOUTH TERMINAL                       REF: 44R895
     AIR    DELTA AIR LINES INC  FLT:1582   COACH
            LV ATLANTA                     230P          EQP: MD-80
            DEPART: SOUTH TERMINAL                       01HR 41MIN
            AR WASHINGTON REAGAN           411P          NON-STOP
            ARRIVE: TERMINAL B                           REF: 44R895


 PLEASE CHECK www.EVERTRAVEL.COM FOR THE MOST RECENT
 AIRLINE AND FLIGHT INFORMATION AND TO OBTAIN YOUR
 BOARDING PASSES.

 ALL UNUSED TICKETS MUST BE RETURNED TO TRAVEL SERVICES
 FOR REFUND
```

KLUGEL V. SAMPER
SI - 0449

1

YOU MUST RECONFIRM YOUR RETURN RESERVATION AT LEAST
72 HOURS IN ADVANCE.

IF TRAVELING OUTSIDE OF THE U.S., CHECK WITH THE OFFICE
OF INTL RELATIONS ON PASSPORT/VISA REQUIREMENTS AND
STATE DEPT COUNTRY ADVISORIES/WARNINGS.


>>> Klugel, Dottie 09/24/04 10:40AM >>>


  -----Original Message-----
From:  Klugel, Dottie
Sent: Friday, September 24, 2004 10:39 AM
To: Ailes Carol
Subject: travel to Panama


Carol-

What flights are there from BWI preferrably or National if need be to Panama City, Panama,
leaving DC area on Nov 14 and returning from Panama on Nov 17?
I am looking for an early flight Nov 14 and a mid afternoon flight on Nov 17 but know my
options are probably limited.

Also, are immunizations and visas required for this travel?

Thanks Carol.

Dottie Klugel
Distance Learning Coordinator
Smithsonian Environmental Research Center
647 Contees Wharf Rd
Edgewater, MD 21037
443-482-2470
443-482-2319 Fax
klugeld@si.edu
www.serc.si.edu/education/dl

KLUGEL V. SAMPER
SI - 0450

# EXHIBIT 15

2nd version

Circles are what SERC pays for.

20260

## PROPOSED TRAVEL PLANS REQUIRING SI TRAVEL AUTHORIZATION

**A. CONTACT INFORMATION** G.

| | | | |
|---|---|---|---|
| Name: | Philip Yunger | Position: | Volunteer |
| SSN: | [redacted] | Email: | philyunger@ [redacted] |
| Tel (home): | [redacted] | Tel (office): | |
| Home Address: | [redacted] | Office Address: | SERC |

Wash DC
20007

Personal time Nov. 17 & 18 & Nov. 23 & 24

| Dates | Times of Travel | Itinerary Points |
|---|---|---|
| leave Nov 14 | 6:14 am | DCA |
| arrive | 2 pm | Panama City |
| leave | bopa 5:30 | " |
| arrive | 6 pm | Barro Colorado Island |
| leave Nov 16 | afternoon | " |
| arrive " | " | Panama City |
| leave Nov 19 | 6 am | " |
| arrive " | 9 am | Belize City |
| leave Nov 22 | am | " |
| arrive " | afternoon | DCA |

**PURPOSE OF TRAVEL** (research, meeting, conference, etc.)

to participate in teacher workshop   Panama and Belize

Airfare has been charged to personal credit card

$500 SERC

mandate program (Bob 20)

**C. COSTS**

| | | | |
|---|---|---|---|
| Registration Fees | Taxi/Shuttle credit card | Airfare | $1570 used → $1070 |
| Rental Car | Gasoline $60 | Tolls | 1105.70 $435.30 |
| Parking | Mileage Y/N | Per diem | |
| Excess baggage | supplies $50 | Other | Project View |

If lodging and/or meals are different from standard SI: 

Lodging (Y/N)  $ Covered by Project View (Panama + Belize)

OVER →

Project View (Panama + Belize)

Project VIEW will reimburse traveler

Airfare initially paid by traveler's personal card

KLUGEL V. SAMPER
SI - 0437

**TRAVEL PLANS FORM  (continued)**   *Philip Yunger*
                                     *040213*

→ FUND/S TO BE CHARGED: ~~EPA STAR 2005~~ # 799210 ~~8002~~

Give dates, where you will stay, and phone number (hotel, friend, relative) in case of emergency:

_____ Beth King STRI  2027862094 x8216 _____

## D. EMPLOYEE STATUS

1. **Employee Travelers only**  *(Be sure you have applied for a government credit card.)*

Will annual leave be taken during this trip? _____ Dates of leave: _____

*(You are responsible to turn in an SF-71 to your timekeeper for these dates.)*

2. **Non-Employee Traveler** *(Identify status.)*

a. Document establishing status _____ Date: _____

b. Office in which document is filed _____

Do you want a travel advance (non-employees only) (Y/N)? _____
*(Unless requested otherwise, advance will be 80% of per diem and expenses.)*

→ **E. AUTHORIZATION**

Approved By: _____        Date: 11/5/04
            (Supervisor/Funds Manager)

KLUGEL V. SAMPER
SI - 0438

EXHIBIT 16

*2nd version not signed*

Kathie — (circles) are what SERC pays for

## PROPOSED TRAVEL PLANS REQUIRING SI TRAVEL AUTHORIZATION

### A. CONTACT INFORMATION    and Philip Yunger

| | |
|---|---|
| Name: Doratha Klugel | Position: Distance Learning Coor. |
| SSN: ▮▮▮ | Email: klugeld@▮▮▮ |
| Tel (home): ▮▮▮ | Tel (office): ▮▮▮ |
| Home Address: ▮▮▮ Edgewater MD 21037 (▮▮▮) | Office Address: 647 Contees Wharf Rd Edgewater, MD 21037 |

### B. TRAVEL INFORMATION

| | Dates | Times of Travel | Itinerary Points |
|---|---|---|---|
| leave | Nov 14 | 6:14 am | DCA |
| arrive | | 2 pm | Panama City |
| leave | | 6pm 5:30 | " |
| arrive | | 6 pm | Barro Colorado Island |
| leave | Nov 16 | afternoon | " |
| arrive | " | " | Panama City |
| leave | Nov 19 | 6 am | " |
| arrive | " | 9 am | Belize City |
| leave | Nov 24 | morning | " |
| arrive | " | afternoon | DCA |

*(If necessary, continue itinerary on back of form.)*

**PURPOSE OF TRAVEL (research, meeting, conference, etc.)**

### C. COSTS

Airfare has been charged to personal → $500 SERC

| | | | |
|---|---|---|---|
| Registration Fees | Taxi/Shuttle/Town Car | Airfare | $919.60 |
| Rental Car | Gasoline | Tolls | |
| Parking | Mileage (Y/N) | Total Miles? | |
| Excess baggage | Supplies $50 | Other | $100 day + |

Project View

*If lodging and/or meals are different than allowed GSA per diem rates, please specify dollar amount.*

Lodging (Y/N)  $ Covered by Project View (Panama + Belize)    **OVER →**    Meals (Y/N)  $ covered by Project View (Panama + Belize)

KLUGEL V. SAMPER
SI-0439

TRAVEL PLANS FORM  (continued)

FUND/S TO BE CHARGED: _You have this already._

Give dates, where you will stay, and phone number (hotel, friend, relative) in case of emergency.

D. EMPLOYEE STATUS

  1. Employee Travelers only  *(Be sure you have applied for a government credit card.)*
  Will annual leave be taken during this trip?          Dates of leave: 11/17 - 18
  *(You are responsible to turn in an SF-71 to your timekeeper for these dates.)*  11/23 - 24

  2. Non-Employee Traveler *(Identify status.)*

   a. Document establishing status                                    Date:

   b. Office in which document is filed

  Do you want a travel advance (non-employees only) (Y/N)?
  *(Unless requested otherwise, advance will be 80% of per diem and expenses.)*

E. AUTHORIZATION

  Approved By: _____                         Date:
                 (Supervisor/Funds Manager)

KLUGEL V. SAMPER
SI - 0440

# EXHIBIT 17

## PROPOSED TRAVEL PLANS REQUIRING SI TRAVEL AUTHORIZATION

### A. CONTACT INFORMATION

Name: Philip Yunger    Position: Volunteer

SSN: ███████    Email: philyunger@ ███████

Tel (home): ███████    Tel (office): Dottie Klugel - 5X2470

Home Address: ███████    Office Address: SERC

Washington DC

### B. TRAVEL INFORMATION

| | Dates | Times of Travel | Itinerary Points |
|---|---|---|---|
| leave | Jan 3 | 8:24 am | Wash DC |
| arrive | | | Hawaii |
| leave | Jan 9 | 5:55 pm | Hawaii |
| arrive | Jan 10 | 0:14 am | Wash DC |
| leave | | | |
| arrive | | | |
| leave | | | |
| arrive | | | |

*(If necessary, continue itinerary on back of form.)*

**PURPOSE OF TRAVEL** (research, meeting, conference, etc.)
To attend conference as volunteer photographer and cameraman. Volunteer will pay own expenses.

### C. COSTS

| | | | |
|---|---|---|---|
| Registration Fees | Taxi/Shuttle | Airfare | 986.70 volunteer pays |
| Rental Car | Gasoline | Tolls | |
| Parking | Mileage (Y/N) Y | Total Miles? | |
| Excess baggage | Supplies | Other | |

*If lodging and/or meals are different than allowed GSA per diem rates, please specify dollar amount.*

Lodging (Y/N) N $ ___    Meals (Y/N) N $ ___

**OVER →**


SLUTE
EXHIBIT NO. 2
4/14/08
C. CRUMP

KLUGEL V. SAMPER
SI - 0103

TRAVEL PLANS FORM  (continued)

FUND/S TO BE CHARGED: _____

Give dates, where you will stay, and phone number (hotel, friend, relative) in case of emergency:

_____

D. EMPLOYEE STATUS

   1. Employee Travelers only  *(Be sure you have applied for a government credit card.)*

   Will annual leave be taken during this trip? _____   Dates of leave: _____

   *(You are responsible to turn in an SF-71 to your timekeeper for these dates.)*


   2. Non-Employee Traveler *(Identify status.)*

   a. Document establishing status _____   Date: _____

   b. Office in which document is filed _____

   Do you want a travel advance (non-employees only) (Y/N)? _____
   *(Unless requested otherwise, advance will be 80% of per diem and expenses.)*


E. AUTHORIZATION

   Approved By: _____   Date: 12/8/0Y
                    (Supervisor/Funds Manager)

# EXHIBIT 18

## PROPOSED TRAVEL PLANS REQUIRING SI TRAVEL AUTHORIZATION

### A. CONTACT INFORMATION

Name: Recep Celikay          Position: Volunteer

SSN: ▓▓▓▓▓          Email:

Tel (home): ▓▓▓▓▓          Tel (office):

Home Address:
▓▓▓▓▓
Norwood PA 19074          Office Address:

### B. TRAVEL INFORMATION

| | Dates | Times of Travel | Itinerary Points |
|---|---|---|---|
| leave | 1/3/05 | | Reagan Airport |
| arrive | 1/3/05 | | Honolulu, HI |
| leave | 1/8/05 | | Honolulu, HI |
| arrive | 1/9/05 | | Reagan Airport |
| leave | | | |
| arrive | | | |
| leave | | | |
| arrive | | | |

*(If necessary, continue itinerary on back of form.)*

**PURPOSE OF TRAVEL  (research, meeting, conference, etc.)**
Conference - HA International Conference on Education

### C. COSTS

| | | | |
|---|---|---|---|
| Registration Fees | Taxi/Shuttle | Airfare | $1010.70 +6 |
| Rental Car | Gasoline | Tolls | |
| Parking | Mileage (Y/N) | Total Miles? | |
| Excess baggage | Supplies | Other | |

He is paying for his own way.

*If lodging and/or meals are different than allowed GSA per diem rates, please specify dollar amount.*

Lodging (Y/N) ____ $ _____          Meals (Y/N) ____ $ _____

## OVER →

TRAVEL PLANS FORM (continued)

FUND/S TO BE CHARGED: ~~I~~ I will be paying for this ~~on this card~~ *from my own personal acct*

Give dates, where you will stay, and phone number (hotel, friend, relative) in case of emergency:

_____

**D. EMPLOYEE STATUS**

   **1. Employee Travelers only**  *(Be sure you have applied for a government credit card.)*

   Will annual leave be taken during this trip? _____ Dates of leave: _____

   *(You are responsible to turn in an SF-71 to your timekeeper for these dates.)*


   **2. Non-Employee Traveler** *(Identify status.)*

   .a. Document establishing status  *Behind-the-Scenes Volunteer*  Date: _____

   b. Office in which document is filed  *Education Office*

   Do you want a travel advance (non-employees only) (Y/(N))
   *(Unless requested otherwise, advance will be 80% of per diem and expenses.)*


**E. AUTHORIZATION**

   Approved By: _Mark Heft_____        Date: _12/7/04_
                  (Supervisor/Funds Manager)

# EXHIBIT 19

SUITE
EXHIBIT NO. 3
4/14/08
C. CRUMP

## PROPOSED TRAVEL PLANS REQUIRING SI TRAVEL AUTHORIZATION

### A. CONTACT INFORMATION

| | | |
|---|---|---|
| Name: Doratha Klugel | Position: | Distance Learning Coor. |
| SSN: ▓▓▓ | Email: | klugeld@si.edu |
| Tel (home): ▓▓▓ | Tel (office): | |

Home Address: ▓▓▓
Edgewater MD 21037

Office Address:
647 Contees Wharf Rd
Edgewater, MD
21037

### B. TRAVEL INFORMATION

| | Dates | Times of Travel | Itinerary Points |
|---|---|---|---|
| leave | Dec 30 Jan. 3 | 8am | Wash, DC |
| arrive | | | Honolulu, Hawaii |
| leave | Jan 8 | 8am | Honolulu |
| arrive | Jan. 9 | am | Wash, DC |
| leave | | | |
| arrive | | | |
| leave | Personal — Jan. 2 + 10 | | |
| arrive | | | |

*(If necessary, continue itinerary on back of form.)*

**PURPOSE OF TRAVEL** (research, meeting, conference, etc.)
To present at the Hawaii International Conference on Education

### C. COSTS

ACCS2 X62 = $452            $550, 70+6

| | | | | | |
|---|---|---|---|---|---|
| Registration Fees $390 | Taxi/Shuttle $50 | Airfare ~~$800~~ |
| Rental Car | Gasoline | Tolls |
| Parking $50 | Mileage (Y/N) | Total Miles? |
| Excess baggage | Supplies $50 | Other |

Jan 3-8

*If lodging and/or meals are different than allowed GSA per diem rates, please specify dollar amount.*

✱ Lodging (Y/N) Y  $ AVG $150.40/night  Meals (Y/N) Y  $ (Jan 4+6) 1 dinner (Jan 7), 3 breakfasts and 2 lunches included in registration fee

✱ Actual expense Conference Hotel rate

**OVER →**

TRAVEL PLANS FORM  (continued)

**FUND/S TO BE CHARGED:** ~~EPA — STATE~~  402.  040213

Give dates, where you will stay, and phone number (hotel, friend, relative) in case of emergency:

Hawaii Sheraton    1800 782 9488
Waikiki

D. **EMPLOYEE STATUS**

1. **Employee Travelers only**  *(Be sure you have applied for a government credit card.)*
Will annual leave be taken during this trip?  Y    Dates of leave:  Dec 20 + 31
*(You are responsible to turn in an SF-71 to your timekeeper for these dates.)*

2. **Non-Employee Traveler** *(Identify status.)*

a. Document establishing status _____    Date: _____

b. Office in which document is filed _____

Do you want a travel advance (non-employees only) (Y/N)?
*(Unless requested otherwise, advance will be 80% of per diem and expenses.)*

E. **AUTHORIZATION**

Approved By: _____    Date: 10/8/04
          (Supervisor/Funds Manager)

EXHIBIT 20

**From:** Haddon, Mark
**To:** Roy. Jerry
**Date:** 12/13/04 12:00PM
**Subject:** RE: Travel Authorization Questions

Jerry

I will be happy to meet with you tomorrow. However, I am participating in an education workshop attended by SERC's Education Committee, Education Dept, and the Director. It will be from 8:30am - 1:00pm. This is an important planning workshop that we have been preparing for for months. As you can imagine, it is very difficult to synchronize the schedules of 15 people.

If you could delay your visit to SERC until the afternoon, that would work out for me, as well as Dottie Klugel and Amy Erb, who will also be attending the workshop.

You can plan on me being available anytime after 1pm. Dottie and Amy will also be available. The two volunteers you refer to, Phil Yunger and Ray Celikay, will not be here tomorrow. However we will provide a way for you to get in touch with them if you think it is necessary.
I look forward to meeting with you,
Mark

A. Mark Haddon
Director of Education
Smithsonian Environmental
Research Center
P O Box 28
Edgewater, MD 21037
443-482-2218
443-482-2380 FAX
www.serc.si.edu

——Original Message——
From: Roy, Jerry
Sent: Monday, December 13, 2004 10:49 AM
To: Haddon, Mark
Subject: Travel Authorization Questions

Good morning. My name is Jerry Roy. I am with the Inspector General's Office. I would like to meet with you tomorrow (Tuesday, Dec 13) morning in your office to discuss travel authorizations you signed for Ms. Krugel and Ms Erb to go to Hawaii. I anticipate getting there by 10am and will call you while in route.

I also understand that two male SERC volunteers have either requested or been authorized to take this trip also. I understand that you are the supervisor to Ms. Krugel and Erb and may also supervise the volunteers. We have questions that need to be addressed before these travel authorizations can be processed so we want to resolve these questions expeditiously.

After meeting with you, I would like to meet with your staff members, Ms. Krugel, and Ms. Erb, and Mr. Yunger and Mr. Celikay, if they are available. Please request Ms. Krugel and Erb to be available to meet with me. If you have any questions, my contact information is listed below.

Gerard A. Roy
Senior Special Agent

KLUGEL V. SAMPER
SI - 0109

Office of Inspector General
Smithsonian Institution
750 Ninth Street, NW
Room 4200
Washington, DC  20560-0905
202-275-2172 (Office)
202-236-7930 (Cell)
202-275-1435 (Fax)


**CC:**           Gallagher. Robert, Klugel. Dottie, Erb. Amy

# EXHIBIT 21

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Doratha Klugel,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | Civil Action 06-01886 (HHK) |
| | ) | |
| **G. Wayne Clough, Secretary,** | ) | |
| **Smithsonian Institution,** | ) | |
| | ) | |
| **and the United States of America,** | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF GERARD ROY

1. From 1992 to 2007, I was employed by the Smithsonian Institution's Office of the Inspector General (OIG) in various positions, including as a Senior Special Agent, Assistant Inspector General for Investigations, and Acting Inspector General. In 2004 and 2005, I served as a Senior Special Agent for the Smithsonian OIG. I am currently retired from the federal government.

2. In my official capacity as a Senior Special Agent, on December 8, 2004, I received an allegation about alleged improprieties by Plaintiff Doratha Klugel.

3. After conducting an inquiry into the allegations regarding Plaintiff, I wrote an internal Memorandum for the File on December 16, 2004. Attached here as Exhibit A is a true and accurate copy of the Memorandum for the File regarding the OIG's inquiry into Plaintiff's alleged improprieties. In this Memorandum, I discussed my visit to the Smithsonian Environmental Research Center (SERC) on December 14, 2004, which included interviews with the individuals involved. Id. I stated that the SERC management decided not to allow the travel

-1-

at issue and concluded that there was "no need for further OIG involvement in this Complaint." Id. The complaint was then closed. Id.

4. Also on December 16, 2004, I sent an email to Robert Gallagher, then Administrative Officer for SERC. Attached here as Exhibit B is a true and accurate copy of the December 16, 2004 email to Robert Gallagher. In this email, I informed Mr. Gallagher that, following normal OIG practice, I did not prepare a report regarding the inquiry; that instead I prepared an internal memo that described the incident; and that this memo stated "that the OIG received a complaint concerning the alleged travel irregularities, that I met with the individuals involved and that the travel allegation has been resolved by management with no further action necessary by the OIG. The complaint was closed." Id. I also told Mr. Gallagher that he "could consider my participation as more of a Technical Assistance Visit than an inquiry." Id.

5. On December 20, 2004, I sent an email to William Hoyt, Administrative Officer for OIG, indicating that the "Complaint was closed on 12/16/04. Management cancelled the trip for the two male Volunteers." Attached here as Exhibit C is a true and accurate copy of the December 20, 2004 email to William Hoyt.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Gerard Ray

EXECUTED on July 8, 2008.

-2-

# EXHIBIT A

MEMORANDUM FOR THE FILE

On December 14, 2004, the reporting agent visited the Smithsonian Environmental Research Center (SERC) to discuss an allegation received by the OIG that two employees, Dottie KLUGER and Amy ERB, who had been authorized to travel to Hawaii to participate in a conference, were being accompanied on this trip by their respective boyfriends, Philip YUNGER and Recep CELIKAY, both of whom are SERC Volunteers, and both had been authorized to travel on Government fare to pay for their trips. The men volunteered to reimburse the Government fare. The women had paid to participate in the conference; the men had not paid.

The reporting agent met with Mark HADDEN, the supervisor of the two women. HADDEN stated that both women were presenting papers at the conference and that YUNGER, who is a credentialed photographer, was going to photograph the proceedings. CELIKAY was going to assist YUNGER. YUNGER had been assigned to accompany KLUGER on a trip to Panama to visit the Smithsonian Tropical Research Institute and photograph the participants in an official proceeding there. That trip was postponed.[1]

The reporting agent also met with KLUGER, ERB, Kathy SUITE, SERC Travel Coordinator and Robert GALLAGHER, SERC Administrative Officer. After meeting with all of the parties, management decided not to allow YUNGER and CELIKAY to travel on Government fare. If the men wanted to accompany the SI employees, the men would have to purchase travel tickets on their own.

There is no need for further OIG involvement in this Complaint.

Complaint closed.

[signature]

---

[1] The OIG learned that a side trip was planned by KLUGER and YUNGER to go to Belize on Government fare for a vacation. Management was advised that that portion of the trip would not be authorized if it should be requested in the future.

# EXHIBIT B

**From:**      "Gallagher, Robert" <gallagherr@si.edu>
**To:**        <GRoy@oig.si.edu>
**Date:**      12/16/04 3:02PM
**Subject:**   RE: SERC Travel Issue

No problem.  Thanks very much for the information..........

Bob

Robert P. Gallagher
Administrative Officer
Smithsonian Environmental Research Center
PO Box 28
MRC 540
647 Contees Wharf Road
Edgewater, MD  21037
443-482-2336 (V)
443-482-2295 (Fx)


——-Original Message——-
From: "Jerry Roy" <GRoy@oig.si.edu>
Sent: Thursday, December 16, 2004 2:55 PM
To: Gallagher, Robert
Subject: Re: SERC Travel Issue

Normally, when we close out a complaint, the agent assigned merely writes a
memo to the file over his signature.  It does not go to the IG for
concurrence.  It is not a report.  It contains only enough information to be
descriptive of the incident.  It does not summarize the process or catagorize
the allegation as substantiated or unfounded.

What I said in the memo was that the OIG received a complaint concerning
alleged travel irregularities, that I met with the individuals involved and
that the travel allegation has been resolved by management with no further
action necessary by the OIG.  The complaint was closed.

The "official" memo to the file is an internal document only.  Sorry.

But, thank you for your kind note.  I was glad to be of service and even
more
gratified that we were able to resolve this with minimal effort.  You could
consider my participation as more of a Technical Assistance Visit than an
inquiry.

Gerard A. Roy
Senior Special Agent
Office of Inspector General
Smithsonian Institution
750 Ninth Street, NW
Room 4200
Washington, DC  20560-0905
202-275-2172 (Office)
202-236-7930 (Cell)
202-275-1435 (Fax)

KLUGEL V. SAMPER
SI - 0112

>>> "Gallagher, Robert" <gallagherr@si.edu> 12/16/04 02:02PM >>>

Gerry:          Once again thanks for your time on Tuesday and I appreciate
your willingness to work with us to resolve issues such as these, although
they have been, thankfully, few and far between.  One additional thought
occurred to me after you left and that is whether there is some kind of report
for the files which you will generate.  Do you "close out" complaints with
some manner of documentation?  Would it be possible to receive a copy for our
own files as well?  Thanks for your insights***.. Bob Robert P.
GallagherAdministrative OfficerSmithsonian Environmental Research CenterPO Box
28MRC 540647 Contees Wharf  RoadEdgewater, MD  21037443-482-2336 (V)443-482-2295 (Fx)

KLUGEL V. SAMPER
SI - 0113

EXHIBIT C

| | |
|---|---|
| **From:** | Jerry Roy |
| **To:** | William Hoyt |
| **Date:** | 12/20/04 11:31AM |
| **Subject:** | Complaint 05C-15 |

This Complaint was closed on 12/16/04. Management cancelled the trip for the two male Volunteers.

Gerard A. Roy
Senior Special Agent
Office of Inspector General
Smithsonian Institution
750 Ninth Street, NW
Room 4200
Washington, DC 20560-0905
202-275-2172 (Office)
202-236-7930 (Cell)
202-275-1435 (Fax)

KLUGEL V. SAMPER
SI - 0114

EXHIBIT 22

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Doratha Klugel, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action 06-01886 (HHK) |
| | ) | |
| G. Wayne Clough, Secretary, | ) | |
| Smithsonian Institution, | ) | |
| | ) | |
| and the United States of America, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF NICOLE CAMPBELL

1. I am employed by the Smithsonian Environmental Research Center (SERC), a unit of the Smithsonian Institution, located in Edgewater, Maryland, as an office assistant in the administrative group. I have held this position since June 2006. Previously, my position was office clerk in the administrative group beginning in May 2003.

2. As part of my official duties, I served as the time keeper for SERC employees in the education department from April 2004 through September 2007.

3. According to Plaintiff's official time and attendance reports, from November 10, 2004 through May 13, 2005, the effective date of her resignation, she took 257 hours of annual leave, 64 hours of sick leave, and 130 hours of leave without pay (LWOP). True and accurate copies of Plaintiff's time and attendance reports for that time period (SI-685 to 761, and 788) are attached here as Exhibit A.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Nicole Campbell

EXECUTED ON July 8 , 2008

# EXHIBIT A

SMITHSONIAN ... .TUTION TIME AND ATTENDANCE REPORT

KLUGEL V. SAMPER
SI - 0685

## REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| Doratha Klugel | |

**3. ORGANIZATION** SERC

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | DATE To: | TIME From: | TIME To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☒ Accrued Annual Leave | | | | | 6 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☒ Accrued Sick Leave | 5/3/05 | | 9 | 5 | 2 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

| Purpose | ☐ Medical/dental/optical examination of requesting employee    ☐ Other    ☐ Care of family member/bereavement, including medical/dental/optical examination of family member | ☐ Birth/Adoption/Foster Care  ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent |
|---|---|---|

| | | ☐ Serious Health Condition of Self |
|---|---|---|
| ☐ Compensatory Time Off | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Leave Without Pay | | |

**6. REMARKS:** Dr appt    Employee only has 2 hrs Sick leave & 6 hrs Annual leave ®

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

**EMPLOYEE SIGNATURE** Doratha Klugel    **DATE** 8/2/05

**OFFICIAL ACTION ON REQUEST:** ☒ APPROVED    ☐ DISAPPROVED
*(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**SIGNATURE** Bale    **DATE** 8/16/2005

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; in a Federal agency when conducting an investigation for employment security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Giving the employee identification number is your Social Security Number; collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

Any agency use of the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

7540-00-753-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0588

**Campbell, Nicole**

| | |
|---|---|
| **From:** | Gallagher, Robert |
| **Sent:** | Monday, May 09, 2005 9:29 AM |
| **To:** | Klugel, Dottie |
| **Cc:** | Campbell, Nicole |
| **Subject:** | RE: today |

OK. Just keep me posted......... Thanks.

Bob

Robert P. Gallagher
Administrative Officer
Smithsonian Environmental Research Center PO Box 28
647 Contees Wharf Road
Edgewater, MD  21037
443-48 -2336 (V)
443-48 -2295 (Fx)
MRC 54
www.serc.si.edu

> -----Original Message-----
> From: Klugel, Dottie
> Sent: Monday, May 09, 2005 9:17 AM
> To: Gallagher, Robert
> Subject: today
>
> Bob-
>
> My car is in the shop today - some kind of engine problem. I therefore
> won't be in today. I can sign a leave form tomorrow (I am hoping the
> car will be fixed, or I will make other arrangements to get in).
>
> Thanks.
>
> Dottie

KLUGEL V. SAMPER
SI - 0687

## REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| Klugel, Doratha | |

**3. ORGANIZATION**   Smithsonian Environmental Research Center

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☑ Accrued Annual Leave | ~~5/9/05~~ | | ~~9~~ | | ~~8~~ | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | | | | | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |
| Purpose: ☐ Medical/dental/optical examination of requesting employee  ☐ Other   ☐ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | | | ☐ Birth/Adoption/Foster Care  ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent  ☐ Serious Health Condition of Self |
| ☐ Compensatory Time Off | | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☒ Leave Without Pay | 5/9/05 | 5/9/05 | 9 | 5 | 8 | |

**6. REMARKS:**   Employee has no accrued leave

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

**EMPLOYEE SIGNATURE**   Doatha Klugel    **DATE**  5/10/05

**8. OFFICIAL ACTION ON REQUEST:**   ☑ APPROVED    ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

**SIGNATURE**  [signature]    **DATE**  5/10/2005

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

While the completion of this form is voluntary, failure to furnish the requested personal information, including your Social Security Number, may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-7 3-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0688

SMITHSONIAN INSTITUTION TIME AND ATTENDANCE REPORT

KLUGEL V. SAMPER
SI - 0689

DURATHA

APPR / DRS
506
Leave as of PP 06
A/L  0.00  A/C 6
S/L  -10.00

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* Klugel, Doratha | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |

| 3. ORGANIZATION  Smithsonian Environmental Research Center |

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From:  To: | TIME From:  To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|

☐ Accrued Annual Leave

☐ Restored Annual Leave

☐ Advance Annual Leave

☐ Accrued Sick Leave

☒ Advance Sick Leave    4/20/05   9   5   8

Purpose:  ☐ Medical/dental/optical examination of requesting employee   ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Compensatory Time Off

☐ Other Paid Absence *(Specify in Remarks)*

☒ Leave Without Pay    4/20   9   5   8

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☐ I hereby invoke my entitlement Family and Medical Leave for:

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

Contact your supervisor and/or your personnel office to obtain additional information about your entitlement and responsibilities under the Family and Medical Leave Act of 1993.

**6. REMARKS:**  Use SL/AL/LWP for dr appt

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

EMPLOYEE SIGNATURE  *Doratha Klugel*    DATE  4/18/05

**8. OFFICIAL ACTION ON REQUEST:**   ☐ APPROVED    ☐ DISAPPROVED
*(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

SIGNATURE  *[signature]*    DATE  4/19/05

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

While the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

Your agency may use the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

SN 7540-00-7: 5-067    STANDARD FORM 71 (Rev. 12-97)
PREVIOUS EDITION MAY BE USED    PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI. 0690

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* Klugel, Doratha C | | | | | | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|

**3. ORGANIZATION**
Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *(check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | 4/22/05 | | 9 | 5 | 8 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

Purpose: ☐ Medical/dental/optical examination of requesting employee   ☐ Other
☑ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

| ☐ Compensatory Time Off | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | | |
| ☑ Leave Without Pay | 4/22 | | 9 | 5 | 6 | |

Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993.

**6. REMARKS:** Use SL / AL / LWP relating to broken arm injury Nov. 9, 2004

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

EMPLOYEE SIGNATURE *Doratha Klugel*    DATE 4/14/05

**8. OFFICIAL ACTION ON REQUEST:**   ☐ APPROVED   ☐ DISAPPROVED
*(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

SIGNATURE _____    DATE 4/19/05

## PRIVACY ACT STATEMENT

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security purposes; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-332-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0691

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME (Last, First, Middle Initial) | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| Klugel, Doratha | ████████ |

**3. ORGANIZATION**

Smithsonian Environmental Research Center

| 4. TYPE OF LEAVE/ABSENCE (check appropriate box(es) below.) | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☒ Accrued Sick Leave | 4/25/05 | | 8:30 | 10:30 | 2 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

**Purpose**
☐ Medical/dental/optical examination of requesting employee    ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

☐ **Compensatory Time Off**

☐ **Other Paid Absence** (Specify in Remarks)

☒ **Leave Without Pay**

Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993.

**6. REMARKS:** Use SL/AL/LWP for time off related to broken arm

**CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

**EMPLOYEE SIGNATURE** Doratha Klugel    **DATE** 4/25/05

**OFFICIAL ACTION ON REQUEST:**    ☒ APPROVED    ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

**SIGNATURE** _(signature)_    **DATE** 7/20/05

## PRIVACY ACT STATEMENT

5 U.S.C. 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State or local unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Disclosure of your Social Security Number (SSN) is for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

**10-00-753-50** ?
**US EDITION MAY BE USED**

**STANDARD FORM 71** (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR, PART 630

KLUGEL V. SAMPER
SI - 0892

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| NAME *(Last, First, Middle Initial)* | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| Klugel, Doratha | ▓▓▓▓▓▓▓ |

**3. ORGANIZATION**  Smithsonian Environmental Research Center

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | 4/28/05 | | 3 | 5 | 2 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

**Purpose:** ☐ Medical/dental/optical examination of requesting employee ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

| ☐ Compensatory Time Off | | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☒ Leave Without Pay | 4/28/05 | | | | | |

**6. REMARKS:** SL/AL/LWP for Dr Appt with orthopedic surgeon for broken arm

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

**EMPLOYEE SIGNATURE** Doratha Klugel    **DATE** 4/27/05

**OFFICIAL ACTION ON REQUEST:** ☒ APPROVED    ☐ DISAPPROVED
*(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

**SIGNATURE** *[signature]*    **DATE** 4/27/05

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State or employment compensation office regarding a claim to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

While the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067    STANDARD FORM 71 (Rev. 12-97)
PREVIOUS EDITIONS MAY BE USED    PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

## REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME (Last, First, Middle Initial) | | | 2 EMPLOYEE OR SOCIAL SECURITY NUMBER | |
|---|---|---|---|---|
| Klugel, Doratha | | | | |

**3. ORGANIZATION** Smithsonian Environmental Research Center

| 4. TYPE OF LEAVE/ABSENCE (Check appropriate box(es) below.) | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☒ Accrued Annual Leave | 4/29/05 | 1 | | 5 | 8 6 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | | | | | | |
| ☐ Advance Sick Leave | | | | | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| Purpose: ☐ Medical/dental/optical examination of requesting employee   ☐ Other   ☐ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | | | ☐ Birth/Adoption/Foster Care   ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent |
| ☐ Compensatory Time Off | | | | | | ☐ Serious Health Condition of Self |
| ☐ Other Paid Absence (Specify in Remarks) | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Leave Without Pay | 4/29/05 | | 9 am | 11 am | 2 | |

**6. REMARKS:** Use AL or LWP

*[handwritten remarks, illegible]*

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

**EMPLOYEE SIGNATURE** Doratha Klugel    **DATE** 4/25/05

**OFFICIAL ACTION ON REQUEST:** ☒ APPROVED    ☒ DISAPPROVED

(If disapproved, give reason. If annual leave, initiate action to reschedule.) *now approved*

**SIGNATURE** *[signature]*    **DATE** 4/28/05

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Since the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If any other use the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

7540-00-753-5027    STANDARD FORM 71 (Rev. 12-97)
PREVIOUS EDITION MAY BE USED    PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

SMITHSONIAN INSTITUTION TIME AND ATTENDANCE REPORT

KLUGEL V. SAMPER
SI-0695

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle initial)* | | | | | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|
| Klugel, Doratha C | | | | | |

**3. ORGANIZATION**  Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☒ Accrued Annual Leave | 4/5 | 4/5 | 3 | 5pm | 2 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | 4/5/05 | | 3 | 5 | 2 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

Purpose: ☐ Medical/dental/optical examination of requesting employee   ☐ Other
☒ Care of family member/bereavement, including medical/dental/optical examination of family member

- ☐ Birth/Adoption/Foster Care
- ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
- ☐ Serious Health Condition of Self

| ☐ Compensatory Time Off | |
|---|---|
| ☐ Other Paid Absence *(Specify in Remarks)* | |
| ☐ Leave Without Pay | |

Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993.

**6. REMARKS:** ~~Took off related to the car accident~~
~~Will~~ Use SL, then AL then LWP
If appt unrelated to accident

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

EMPLOYEE SIGNATURE  *Doratha Klugel*    DATE  4/4/05

**8. OFFICIAL ACTION ON REQUEST:** ☐ APPROVED    ☐ DISAPPROVED
*(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

SIGNATURE  *[signature]*    DATE  4/5/05

## PRIVACY ACT STATEMENT

Section 6311, Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its records management responsibilities.

When the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-  52-5067                                              STANDARD FORM 71 (Rev. 12-97)
PREVIOUS EDITION MAY BE USED                        PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0696

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME (Last, First, Middle Initial) | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| Hugel, Doratha C | |

**3. ORGANIZATION** Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE (Check appropriate box(es) below.) | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☑ Accrued Sick Leave | 4/7/05 | | 1 | 5 | 4 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |
| Purpose: ☐ Medical/dental/optical examination of requesting employee ☐ Other ☐ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | | | ☐ Birth/Adoption/Foster Care ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent ☐ Serious Health Condition of Self |
| ☐ Compensatory Time Off | | | | | | |
| ☐ Other Paid Absence (Specify in Remarks) | ✓ | ✓ | ✓ | | ✓ | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☒ Leave Without Pay | | | | | | |

**6. REMARKS:** Time off related to car accident on 11/9/04. Use SL, then AL, then LWP.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| EMPLOYEE SIGNATURE _Doratha Hugel_ | DATE 4/4/05 |
|---|---|

**8. OFFICIAL ACTION ON REQUEST:** ☐ APPROVED  ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

| SIGNATURE | DATE 4/5/05 |
|---|---|

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by managers and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to an unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If you agree, use the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-01 753-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

**MUSTAFA A. HAQUE, M.D.**
Department of Orthopaedic Surgery
*MedStar - Georgetown University Hospital*
3800 Reservoir Road, N.W. • Washington, D.C. 20007
Telephone: 202-444-8766 • Fax: 202-444-7804

NAME: Doratha Klugel                    DOB:

ADDRESS:                                 DATE: 3/29/05

**R**

PT/OT

please restrict gentle (R) wrist ROM,
strengthening, nerve + tendon glides.
(stop using UBE)

2x/wk × 4wk

Label Contents ☐ Yes ☐ No

Refill  0 - 1 - 2 - PRN

DEA No. BH 5793814                        _____ M.D.

MATH-XX (8/03)

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| Klugel, Doratha C | |

**3. ORGANIZATION** Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From | DATE To | TIME From | TIME To | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☒ Accrued Annual Leave | 4/8 | 4/8 | 1 | 5 | 4 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | 4/14/W | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | 4/8/05 | 9 | 5 | 8 | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

| | | ☐ Birth/Adoption/Foster Care |
|---|---|---|
| Purpose | ☐ Medical/dental/optical examination of requesting employee   ☐ Other | ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent |
| | ☒ Care of family member/bereavement, including medical/dental/optical examination of family member | ☐ Serious Health Condition of Self |

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Compensatory Time Off | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | 4/14/W | |
| ☒ Leave Without Pay | 4/8 | | 9 | 1 | 4 | |

**6. REMARKS:** Time off related to car accident on 11/9/04. Use SL, then AL, then LWP.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| EMPLOYEE SIGNATURE *Doratha Klugel* | DATE 4/31/05 |
|---|---|

**8. OFFICIAL ACTION ON REQUEST:**   ☐ APPROVED   ☐ DISAPPROVED
*(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

| SIGNATURE *(signature)* | DATE 4/5/05 |
|---|---|

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a state unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

When the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-153-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0699

**MUSTAFA A. HAQUE, M.D.**
Department of Orthopaedic Surgery
*MedStar - Georgetown University Hospital*
3800 Reservoir Road, N.W. • Washington, D.C. 20007
Telephone: 202-444-8766 • Fax: 202-444-7804

NAME: _Doratha Klugel_     DOB: _____

ADDRESS: _____     DATE: _3/24/05_

℞

PT/OT

please restrict gentle Ⓡ wrist ROM,

strengthening, nerve + tendon glides.

(stop using UBE)

2x/wk × 4 wk

Label Contents ☐ Yes ☐ No

Refill: 0 - 1 - 2 - PRN

_____ M.D.

DEA No. BH 5793814

MAJ-RX (3/03)

KLUGEL V. SAMPER
SI - 0700

## REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* Klugel, Doratha | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|

**3. ORGANIZATION** Smithsonian Environmental Research Center

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE | | TIME | | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| | From: | To: | From: | To: | | |
| ☐ Accrued Annual Leave | 4/15/05 | | 9 | 5 | 8 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | | | | | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |
| Purpose: ☐ Medical/dental/optical examination of requesting employee ☐ Other ☐ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | | | ☐ Birth/Adoption/Foster Care ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent ☐ Serious Health Condition of Self |
| ☐ Compensatory Time Off | | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☑ Leave Without Pay | | | | | | |

**6. REMARKS:** Use SL/AL (LWP) relating to broken arm injury Nov 9, 2004

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

**EMPLOYEE SIGNATURE** Doratha Klugel      **DATE** 4/14/05

| OFFICIAL ACTION ON REQUEST: ☐ APPROVED | ☐ DISAPPROVED |
|---|---|
| *(If disapproved, give reason. If annual leave, initiate action to reschedule.)* | |

**SIGNATURE** | **DATE**

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness to a State unemployment compensation office regarding a claim to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

When this employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If other agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| NSN 7540-00-253-5 167 VIOUS EDITION MAY BE USED | **KLUGEL V. SAMPER** **SI - 0701** | STANDARD FORM 71 (Rev. 12-97) PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR, PART 630 |
|---|---|---|

**MUSTAFA A. HAQUE, M.D.**
Department of Orthopaedic Surgery
*MedStar - Georgetown University Hospital*
3800 Reservoir Road, N.W. • Washington, D.C. 20007
Telephone: 202-444-8766 • Fax: 202-444-7804

NAME: _Doratha Klugel_          DOB: _____

ADDRESS: _____          DATE: _3/29/05_

**R**

PT/OT

please restart gentle Ⓡ wrist ROM,

strengthening, nerve + tendon glides.

(stop using UBE)

2x/wk X 4 wk

Label Contents ☐ Yes ☐ No

Refill 0 - 1 - 2 - PRN

*DEA No. BH 5793814*

MAH-IIX (8/02)

_____ M.D.

KLUGEL V. SAMPER
SI - 0702

# SMITHSONIAN INSTITUTION TIME AND ATTENDANCE REPORT

KLUGEL V. SAMPER
SI-0703

**NAME (KLUGEL DORATHA C)**
M-F 8

FROM 03-20-05
4-02-05

APPR / DRG
506        35/40
Leave as of PP 04
A/L 0.00 A/C 6
S/L -8.00

**Certified correct, all of the above information on hours worked and leave due is true, accurate, and in accordance with law or regulation.**

Sen 4 Grad ? Grad
#786063
BF-7H on file.

Pay Period No. 05   Agency No. 71   State 11   Town 0010   Fed Ser 04

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| Klugel, Doratha C | |

3. ORGANIZATION

Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | 3/24/05 | | 12 | 5 | 5 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |
| Purpose: ☐ Medical/dental/optical examination of requesting employee ☐ Other ☐ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | | | ☐ Birth/Adoption/Foster Care ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent ☐ Serious Health Condition of Self |
| ☐ Compensatory Time Off | | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Leave Without Pay | | | | | | |

6. REMARKS

Time off related to car accident on 11/9/04. Use SL, then AL, then LWP.

7. CERTIFICATION: I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| EMPLOYEE SIGNATURE *Doratha Klugel* | DATE 3/24/05 |
|---|---|

8. OFFICIAL ACTION ON REQUEST:    ☑ APPROVED    ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

| SIGNATURE | DATE 3/21/05 |
|---|---|

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067    STANDARD FORM 71 (Rev. 12-97)
PREVIOUS EDITION MAY BE USED    PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0704

**MUSTAFA A. HAQUE, M.D.**
Department of Orthopaedic Surgery
*MedStar - Georgetown University Hospital*
3800 Reservoir Road, N.W. • Washington, D.C. 20007
Telephone: 202-444-8766 • Fax: 202-444-7804

NAME: _Doratha Klugel_____ DOB:_____

ADDRESS: _____ DATE: _3/29/05_

**Rx**

PT/OT

please restart gentle Ⓡ wrist ROM,
strengthening, nerve + tendon glides.
(stop using UBE)

2x/wk X 4wk

Label Contents ☐ Yes ☐ No

Refill  0 - 1 - 2 - PRN

*DEA No. BH 5793814*
MAH-XX (3/05)

_____ M.D.

KLUGEL V. SAMPER
SI - 0705

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)*<br>Klugel, Doratha C | | | | | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER | |

| 3. ORGANIZATION   Smithsonian Environmental Research Center (SERC) | | | | | | |

| 4. TYPE OF LEAVE/ABSENCE<br>*(check appropriate box(es) below.)* | DATE | | TIME | | TOTAL<br>HOURS | 5. FAMILY AND<br>MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| | From: | To: | From: | To: | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Accrued Annual Leave | | | | | | |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | 3/25/05 | 9 | 5 | | 8 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

Purpose: ☐ Medical/dental/optical examination of requesting employee   ☐ Other
☑ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

| ☐ Compensatory Time Off | | | | | | |
| ☐ Other Paid Absence<br>*(Specify in Remarks)* | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Leave Without Pay | | | | | | |

6. REMARKS: Time off related to car accident on 11/9/04. Use SL, then AL, then LWP.

7. CERTIFICATION: I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action including removal.

EMPLOYEE SIGNATURE *Doratha Klugel*   DATE 3/21/05

8. OFFICIAL ACTION ON REQUEST:   ☑ APPROVED   ☐ DISAPPROVED
*(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

SIGNATURE *Mark Haddon*   DATE 3/21/05

## PRIVACY ACT STATEMENT

Section 631 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-755-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 13-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0706

**MUSTAFA A. HAQUE, M.D.**
Department of Orthopaedic Surgery
*MedStar - Georgetown University Hospital*
3800 Reservoir Road, N.W. • Washington, D.C. 20007
Telephone: 202-444-8766 • Fax: 202-444-7804

NAME: _Dorothea Klugel_          DOB: _____

ADDRESS: _____          DATE: _3/29/05_

**R**

PT/OT

please restart gentle Ⓡ wrist ROM,
strengthening, nerve + tendon glides.
(stop using UBE)

2x/wk X 4wk

Label Contents ☐ Yes ☐ No

Refill  0 - 1 - 2 • PRN

_DEA No. BH 5793814_                          _____ M.D.

MAH-RX (8/03)

KLUGEL V. SAMPER
SI - 0707

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| Klugel, Doratha C | |

**3. ORGANIZATION**

Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☒ Accrued Sick Leave | 3/29/05 | 9 | 5 | | 8 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☒ Advance Sick Leave | | | | | | |

Purpose: ☐ Medical/dental/optical examination of requesting employee  ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☒ Serious Health Condition of Self

| ☐ Compensatory Time Off | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | |
| ☒ Leave Without Pay | | | | |

Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993.

**6. REMARKS:** Time off related to car accident on 11/9/04. Use SL, then AL, then LWP.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action including removal.

EMPLOYEE SIGNATURE  *Doratha Klugel*     DATE  3/28/05

**8. OFFICIAL ACTION ON REQUEST:**  ☐ APPROVED     ☐ DISAPPROVED

(If disapproved, give reason. If annual leave, initiate action to reschedule.)

SIGNATURE  _____     DATE  3/28/05

## PRIVACY ACT STATEMENT

Section 311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by assignment and your payroll office to approve (and account) or use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If you supply any of the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0708

**MUSTAFA A. HAQUE, M.D.**
Department of Orthopaedic Surgery
*MedStar - Georgetown University Hospital*
3800 Reservoir Road, N.W. • Washington, D.C. 20007
Telephone: 202-444-8766 • Fax: 202-444-7804

NAME: Dorothea Klugel

DOB:

ADDRESS:

DATE: 3/24/05

℞

PT/OT

please restart gentle (R) wrist ROM,
strengthening, nerve + tendon glides.
(stop using UBE)

2x/wk × 4 wk

Label Contents ☐ Yes ☐ No

Refill 0 - 1 - 2 - PRN

*DEA No. BH 5793814*

MAH-RX (8/05)

_____ M.D.

KLUGEL V. SAMPER
SI - 0709

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| Klugel, Doratha C | ▮▮▮▮▮▮ |

**3. ORGANIZATION**   Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | DATE To: | TIME From: | TIME To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☒ Accrued Sick Leave | 4/1/05 | | 9 | 5 | 8 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

Purpose: ☐ Medical/dental/optical examination of requesting employee   ☐ Other
☒ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☒ Serious Health Condition of Spouse, Son, Daughter, or Parent
☒ Serious Health Condition of Self

| | | | | | |
|---|---|---|---|---|---|
| ☐ Compensatory Time Off | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | |
| ☒ Leave Without Pay | | | | | |

Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993.

**6. REMARKS:** Time off related to car accident on 11/9/04. Use SL, then AL, then LWP.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

**EMPLOYEE SIGNATURE** *Doratha Klugel*   DATE 3/28/05

**8. OFFICIAL ACTION ON REQUEST:**   ☐ APPROVED   ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

**SIGNATURE** *[signature]*   DATE 3/28/05

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0710

**MUSTAFA A. HAQUE, M.D.**
Department of Orthopaedic Surgery
*MedStar - Georgetown University Hospital*
3800 Reservoir Road, N.W. • Washington, D.C. 20007
Telephone: 202-444-8766 • Fax: 202-444-7804

NAME: _Doratha Klugel_      DOB: _____

ADDRESS: _____    DATE: _3/29/05_

**R**

PT/OT

please restart gentle ® wrist ROM,

strengthening, nerve + tendon glides.

(stop using UBE)

2x/wk X 4 wk

Label Contents ☐ Yes ☐ No

Refill 0 - 1 - 2 - PRN             _____ M.D.

DEA No. BH 5793814

NAH-XX (8/03)

KLUGEL V. SAMPER
SI - 0711

# SMITHSONIAN INSTITUTION TIME AND ATTENDANCE REPORT

KLUGEL V. SAMPER
SI- 0712

## REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| Klugel, Doratha C | |

**3. ORGANIZATION**  Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | 3/8/05 | | 9 | 5 | 8 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

Purpose:  ☐ Medical/dental/optical examination of requesting employee    ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

| ☐ Compensatory Time Off | |
| ☐ Other Paid Absence *(Specify in Remarks)* | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Leave Without Pay | |

**6. REMARKS:**  Time off related to car accident on 11/9/04. Use SL until depleted, then AL, then LWP.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

EMPLOYEE SIGNATURE  *Doratha Klugel*    DATE  3/7/05

**8. OFFICIAL ACTION ON REQUEST:**  ☐ APPROVED    ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

SIGNATURE  *[signature]*    DATE  3/7/05

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067    STANDARD FORM 71 (Rev. 13-97)
PREVIOUS EDITION MAY BE USED    PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0713

GEORGETOWN UNIVERSITY HOSPITAL
# SPORTS MEDICINE & REHABILITATION PRESCRIPTION

☒ **PHYSICAL THERAPY**        ☐ **OCCUPATIONAL THERAPY**

nt's Name: _Dorothia Klugel_                                  Date: _2/21/05_

Frequency: _2x_ per week for _____ _4_ weeks        Follow-up Appointment: _____

Rx:  ☐ Non-operative    ☐ Pre-operative    ☐ Post-operative

Surgery Type/Date: _____

DIAGNOSIS (Write or check below): (R) _distal radius fx_ (813.40)

| | | |
|---|---|---|
| **Ankle:** | **Elbow:** | **Hip:** |
| ☐ Achilles Rupture 845.09 ☐ partial ☐ complete | ☐ Epicondylitis ☐ lateral 726.32 ☐ medial 726.31 | ☐ Arthritis 716.95 |
| ☐ Achilles Tendonitis 726.71 | ☐ Fracture | ☐ Capsular Sprain 726.50 |
| ☐ Impingement 727.7 | ☐ Olecranon Impingement | ☐ Tensor Fascia Tightness 726.50 |
| ☐ Instability 718.87 | ☐ UCL Sprain 841.1    grade ____ | ☐ Trochanteric Bursitis 726.50 |
| ☐ Sprain Lateral/Medial Ankle 845.00 | ☐ Ulnar Neuritis 723.4 | |
| grade ____ | | **Shoulder:** |
| **Hand / Wrist** | **Knee:** | ☐ AC Sprain 840.0    grade ____ |
| ☐ Arthritis 716.94 | ☐ ACL Tear 717.83 ☐ partial ☐ complete | ☐ Adhesive Capsulitis 726.0 |
| ☐ Burns 944.00 | ☐ Arthritis ☐ degenerative 715.96 ☐ inflammatory 714.0 | ☐ Impingement 726.20  stage ____ |
| ☐ Carpal Tunnel 354.00 | ☐ Iliotibial Band Syndrome 726.60 | ☐ Impingement-Instability 718.61 |
| ☐ Crush Injury | ☐ MCL Sprain 717.82    grade ____ | ☐ Instability 718.81 ☐ ant. ☐ post. ☐ mdi. |
| ☐ De Quervain's 727.04 | ☐ Meniscus Tear ☐ medial 836.0 ☐ lateral 836.1 | |
| ☐ Dupuytren's 728.6 | ☐ Osgood-Schlatters/Patellar Tendonitis 732.4 | **Spine:** |
| ☐ Fracture | ☐ Patellar Instability 718.6 ☐ sublux. ☐ disloc. | ☐ Arthritis ☐ lumbar 721.91 ☐ cervical 721.0 |
| ☐ Jt. Contracture 718.4 | ☐ Patellofemoral Pain Syndrome (PFPS) 717.7 | ☐ Disc 722.8 ☐ bulge ☐ hern. ____ |
| ☐ Nerve Injury | | ☐ Spinal Stenosis 724.00 |
| ☐ RSD | | ☐ Spondylolisthesis 738.4 |
| ☐ Sprain 8 42.10 | | ☐ Sprain ☐ lumbar 847.2 ☐ cervical 847.0 |

## THERAPY ORDERS

☐ Evaluate and Treat

| **Local Modalities:** | **Brace Order:** | **Exercise:** | **Other:** | |
|---|---|---|---|---|
| ☐ Ice/Heat/Contrast | ☐ Foot | ☐ Isometric | ☐ Stretching _____ | ☐ ADL |
| ☐ Ultrasound/ | ☐ Ankle | ☐ Isotonic | ☐ PF Taping Program | ☐ Functional Activities |
| ~Phonophoresis | ☐ Knee | ☐ Isokinetic | ☐ Proprioception | ☐ Joint Protection |
| ☐ Iontophoresis | ☐ Lumbar Spine | ☐ P.R.E. | ☐ Traction | ☐ Splinting (static/dynamic) |
| ☐ TENS/Electrical Stim. | ☐ C Spine | | ☐ Williams Flexion Exercises | ☐ Scar Management |
| ☐ Massage Mobilization | ☐ Shoulder | **Range of Motion:** | ☐ McKenzie Exercises | ☐ Desensitization |
| ☐ Whirlpool | ☐ Elbow | ☐ Active | ☐ Lumbar Stabilization | ☐ Sensory Reeducation |
| ☐ Paraffin | ☐ Wrist | ☐ Active/Assistive | ☐ Pre-op Eval. | ☐ Aquatic Therapy |
| | ☐ Thumb | ☐ Passive | ☐ Gait Eval. | ☐ Orthotic Consult |
| **Tests:** | ☐ Finger | | | ☐ Wheelchair Eval. |
| ☐ Biodex | ☐ Other | **Refer to:** | | |
| ☐ BTE Simulator | _____ | ☐ Physiatrist | | |
| | | ☐ Pain Management | | |

Other/Special Instructions: _Please continue (R) wrist pain, strength & modalities_
_→ If wrist flexion is not > 45° in 2 weeks_
_Start JAS split_

Cautions: _____

_Thedes_

Physician's Signature _____

WHITE - PATIENT COPY        PINK - PHYSICAL THERAPY COPY        YELLOW - OFFICE COPY

KLUGEL V. SAMPER
S1-0714

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | | | | | | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|
| Klugel, Doratha C | | | | | | |

**3. ORGANIZATION** — Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *(check appropriate box(es) below)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | 3/1/05 | | 9 | 5 | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |
| Purpose: ☐ Medical/dental/optical examination of requesting employee  ☐ Other  ☒ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | | | ☐ Birth/Adoption/Foster Care  ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent  ☐ Serious Health Condition of Self |
| ☐ Compensatory Time Off | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | | |
| ☐ Leave Without Pay | | | | | | |

**6. REMARKS:** Time off related to car accident or 11/9/04. Use SL until depleted, then AL, the LWP

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

**EMPLOYEE SIGNATURE** *(signature)*                    **DATE**

**8. OFFICIAL ACTION ON REQUEST:**    ☐ APPROVED        ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

**SIGNATURE** *(signature)*                    **DATE** 3/9/05

## PRIVACY ACT STATEMENT

Section 63 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by supervisors and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-1-252-5067                    STANDARD FORM 71 (Rev. 12-97)
PREVIOUS EDITION MAY BE USED                    PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT; 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0715

# SPORTS MEDICINE & REHABILITATION PRESCRIPTION

☒ **PHYSICAL THERAPY**      ☐ **OCCUPATIONAL THERAPY**

Patient's Name: _Dorothea Klugel_      Date: _2/21/05_

Frequency: _2x_ per week for _4_ weeks      Follow-up Appointment: _____

Tx:  ☐ Non-operative    ☐ Pre-operative    ☐ Post-operative

Surgery Type/Date: _____

**DIAGNOSIS** (Write or check below): (R) _distal radius fx_ (813.40)

**Ankle:**
- ☐ Achilles Rupture 845.09  ☐ partial  ☐ complete
- ☐ Achilles Tendonitis 726.71
- ☐ Impingement 727.7
- ☐ Instability 718.87
- ☐ Sprain Lateral/Medial Ankle 845.00  grade ___

**Hand / Wrist:**
- ☐ Arthritis 716.94
- ☐ Burns 944.00
- ☐ Carpal Tunnel 354.00
- ☐ Crush Injury
- ☐ De Quervain's 727.04
- ☐ Dupuytren's 728.6
- ☐ Fracture
- ☐ Jt. Contracture 718.4
- ☐ Nerve Injury
- ☐ RSD
- ☐ Sprain 842.10

**Elbow:**
- ☐ Epicondylitis ☐ lateral 726.32 ☐ medial 726.31
- ☐ Fracture
- ☐ Olecranon Impingement
- ☐ UCL Sprain 841.1  grade ___
- ☐ Ulnar Neuritis 723.4

**Knee:**
- ☐ ACL Tear 717.83  ☐ partial  ☐ complete
- ☐ Arthritis ☐ degenerative 715.96 ☐ Inflammatory 714.0
- ☐ Iliotibial Band Syndrome 726.60
- ☐ MCL Sprain 717.82  grade ___
- ☐ Meniscus Tear ☐ medial 836.0 ☐ lateral 836.1
- ☐ Osgood-Schlatters/Patellar Tendonitis 732.4
- ☐ Patellar Instability 718.6 ☐ sublux. ☐ disloc.
- ☐ Patellofemoral Pain Syndrome (PFPS) 717.7

**Hip:**
- ☐ Arthritis 716.95
- ☐ Capsular Sprain 726.50
- ☐ Tensor Fascia Tightness 726.50
- ☐ Trochanteric Bursitis 726.50

**Shoulder:**
- ☐ AC Sprain 840.0  grade ___
- ☐ Adhesive Capsulitis 726.0
- ☐ Impingement 726.20  stage ___
- ☐ Impingement-instability 718.81
- ☐ Instability 718.81 ☐ ant. ☐ post. ☐ mdl.

**Spine:**
- ☐ Arthritis ☐ lumbar 721.91 ☐ cervical 721.0
- ☐ Disc 722.6 ☐ bulge ☐ hern. ___
- ☐ Spinal Stenosis 724.00
- ☐ Spondylolisthesis 738.4
- ☐ Sprain ☐ lumbar 847.2 ☐ cervical 847.0

## THERAPY ORDERS

☐ Evaluate and Treat

**Physical Modalities:**
- ☐ Ice/Heat ☐ Contrast
- ☐ Ultrasound
- ☐ Phonophoresis
- ☐ Iontophoresis
- ☐ TENS/Electrical Stim.
- ☐ Massage/Mobilization
- ☐ Whirlpool
- ☐ Paraffin

**Tests:**
- ☐ Biodex
- ☐ BTE Simulator

**Brace Order:**
- ☐ Foot
- ☐ Ankle
- ☐ Knee
- ☐ Lumbar Spine
- ☐ C Spine
- ☐ Shoulder
- ☐ Elbow
- ☐ Wrist
- ☒ Thumb
- ☐ Finger
- ☐ Other

**Exercise:**
- ☒ Isometric
- ☐ Isotonic
- ☐ Isokinetic
- ☐ P.R.E.

**Range of Motion:**
- ☐ Active
- ☐ Active/Assistive
- ☒ Passive

**Refer to:**
- ☐ Physiatrist
- ☐ Pain Management

**Other:**
- ☐ Stretching _____
- ☐ PF Taping Program
- ☐ Proprioception
- ☐ Traction
- ☐ Williams Flexion Exercises
- ☐ McKenzie Exercises
- ☐ Lumbar Stabilization
- ☐ Pre-op Eval.
- ☐ Gait Eval.

- ☐ ADL
- ☐ Functional Activities
- ☐ Joint Protection
- ☐ Splinting (static/dynamic)
- ☐ Scar Management
- ☐ Desensitization
- ☐ Sensory Reeducation
- ☐ Aquatic Therapy
- ☐ Orthotic Consult
- ☐ Wheelchair Eval.

Special Instructions: _Please continue (R) wrist pain, strength & modalities_
_⇒ If wrist flexion is not > 45° in 2 weeks_
_start TAS splint_

Precautions: _____

Physician's Signature _____

KLUGEL V. SAMPER
SI - 0716

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | | | | | | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|
| Klugel, Doratha C | | | | | | |

**3. ORGANIZATION**   Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | 3/15/05 | 12 | 5 | | 5 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |
| Purpose: ☐ Medical/dental/optical examination of requesting employee  ☐ Other ☐ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | | | ☐ Birth/Adoption/Foster Care ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent ☐ Serious Health Condition of Self |
| ☐ Compensatory Time Off | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | | |
| ☒ Leave Without Pay | | | | | | |

**6. REMARKS:** Time off related to car accident on 1/9/04. Use SL, then AL, then LWP.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| EMPLOYEE SIGNATURE   *Doratha Klugel* | DATE   3/14/05 |
|---|---|

**8. OFFICIAL ACTION ON REQUEST:**   ☐ APPROVED    ☐ DISAPPROVED
*(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

| SIGNATURE   *[signature]* | DATE   3/15/05 |
|---|---|

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If you are not sure the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0717

GEORGETOWN UNIVERSITY HOSPITAL

# SPORTS MEDICINE & REHABILITATION PRESCRIPTION

☑ **PHYSICAL THERAPY**   ☐ **OCCUPATIONAL THERAPY**

Patient's Name: _Dorethia Klugel_

Frequency: _2x_ per week for _4_ weeks   Date: _2/21/05_

Follow-up Appointment: _____

Tx: ☐ Non-operative   ☐ Pre-operative   ☐ Post-operative

Surgery Type/Date: _____

DIAGNOSIS (Write or check below): (Rt) _distal radius fx_ (813.40)

**Ankle:**
- ☐ Achilles Rupture 845.09 ☐ partial ☐ complete
- ☐ Achilles Tendonitis 726.71
- ☐ Impingement 727.7
- ☐ Instability 718.87
- ☐ Sprain Lateral/Medial Ankle 845.00
  grade _____

**Hand / Wrist:**
- ☐ Arthritis 716.94
- ☐ Burns 144.00
- ☐ Carpal Tunnel 354.00
- ☐ Crush Injury
- ☐ De Quervain's 727.04
- ☐ Dupuytren's 728.6
- ☐ Fracture
- ☐ Jt. Contracture 718.4
- ☐ Nerve Injury
- ☐ RSD
- ☐ Sprain 842.10

**Elbow:**
- ☐ Epicondylitis ☐ lateral 726.32 ☐ medial 726.31
- ☐ Fracture
- ☐ Olecranon Impingement
- ☐ UCL Sprain 841.1 grade _____
- ☐ Ulnar Neuritis 723.4

**Knee:**
- ☐ ACL Tear 717.83 ☐ partial ☐ complete
- ☐ Arthritis ☐ degenerative 715.96 ☐ inflammatory 714.0
- ☐ Iliotibial Band Syndrome 726.60
- ☐ MCL Sprain 717.82 grade _____
- ☐ Meniscus Tear ☐ medial 836.0 ☐ lateral 836.1
- ☐ Osgood-Schlatters/Patellar Tendonitis 732.4
- ☐ Patellar Instability 718.6 ☐ sublux. ☐ disloc.
- ☐ Patellofemoral Pain Syndrome (PFPS) 717.7

**Hip:**
- ☐ Arthritis 716.95
- ☐ Capsular Sprain 726.50
- ☐ Tensor Fascia Tightness 726.50
- ☐ Trochanteric Bursitis 726.50

**Shoulder:**
- ☐ AC Sprain 840.0 grade _____
- ☐ Adhesive Capsulitis 726.0
- ☐ Impingement 726.20 stage _____
- ☐ Impingement-instability 719.81
- ☐ Instability 718.81 ☐ ant. ☐ post. ☐ mdi.

**Spine:**
- ☐ Arthritis ☐ lumbar 721.91 ☐ cervical 721.0
- ☐ Disc 722.8 ☐ bulge ☐ hern. _____
- ☐ Spinal Stenosis 724.00
- ☐ Spondylolisthesis 738.4
- ☐ Sprain ☐ lumbar 847.2 ☐ cervical 847.0

## THERAPY ORDERS

Evaluate and Treat

**Physical Modalities:**
- Ice/Heat/Contrast
- Ultrasound
- Phonophoresis
- Iontophoresis
- TENS/Electrical Stim.
- Massage/Mobilization
- Whirlpool
- Paraffin

Is:
- Biodex
- ITE Simulator

**Brace Order:**
- ☐ Foot
- ☐ Ankle
- ☐ Knee
- ☐ Lumbar Spine
- ☐ C-Spine
- ☐ Shoulder
- ☐ Elbow
- ☐ Wrist
- ☐ Thumb
- ☐ Finger
- ☐ Other

**Exercise:**
- ☐ Isometric
- ☐ Isotonic
- ☐ Isokinetic
- ☐ P.R.E.

**Range of Motion:**
- ☐ Active
- ☐ Active/Assistive
- ☐ Passive

**Refer to:**
- ☐ Physiatrist
- ☐ Pain Management

**Other:**
- ☐ Stretching _____
- ☐ PF Taping Program
- ☐ Proprioception
- ☐ Traction
- ☐ Williams Flexion Exercises
- ☐ McKenzie Exercises
- ☐ Lumbar Stabilization
- ☐ Pre-op Eval.
- ☐ Gait Eval.

- ☐ ADL
- ☐ Functional Activities
- ☐ Joint Protection
- ☐ Splinting (static/dynamic)
- ☐ Scar Management
- ☐ Desensitization
- ☐ Sensory Reeducation
- ☐ Aquatic Therapy
- ☐ Orthotic Consult
- ☐ Wheelchair Eval.

Special Instructions: _Please continue (R) wrist ROM, strength & modalities_
_→ If wrist flexion is not > 45° in 2 weeks_
_start JAS splint_

_thanks_

Physician's Signature _[signature]_

(12/02)

Georgetown University Hospital • 3800 Reservoir Road NW • Washington, DC 20007-2197

**WHITE - PATIENT COPY   PINK - PHYSICAL THERAPY COPY   YELLOW - OFFICE COPY**

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)*<br>Klugel, Doratha C | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|

| 3. ORGANIZATION<br>Smithsonian Environmental Research Center (SERC) |
|---|

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | DATE To: | TIME From: | TIME To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | 3/16/05 | | 9 | 5 | 8 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

Purpose: ☐ Medical/dental/optical examination of requesting employee  ☐ Other
☑ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

| ☐ Compensatory Time Off | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
|---|---|---|---|---|---|---|
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | | |
| ☒ Leave Without Pay | 3/16 | | | | 8 | |

6. REMARKS: Time off related to car accident on 11/9/04. Use SL until depleted, then AL, then LWP.

7. CERTIFICATION: I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

EMPLOYEE SIGNATURE *Doratha Klugel*    DATE 3/14/05

8. OFFICIAL ACTION ON REQUEST:  ☐ APPROVED   ☐ DISAPPROVED
*(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

SIGNATURE *Mark Haddon*    DATE 3/15/05

## PRIVACY ACT STATEMENT

Section 6311 of Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosure of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

When the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-153-5167
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT; 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0719

GEORGETOWN UNIVERSITY HOSPITAL

# SPORTS MEDICINE & REHABILITATION PRESCRIPTION

☒ **PHYSICAL THERAPY**        ☐ **OCCUPATIONAL THERAPY**

Patient's Name: _Doretha Klugel_        Date: _2/21/05_

Frequency: _2x_ per week for _4_ weeks        Follow-up Appointment: _____

Rx: ☐ Non-operative    ☐ Pre-operative    ☐ Post-operative

Surgery Type/Date: _____

DIAGNOSIS (Write or check below): (Rt) _distal radius fx_ (813.40)

**Ankle:**
☐ Achilles Rupture 845.09 ☐ partial ☐ complete
☐ Achilles Tendonitis 726.71
☐ Impingement 727.7
☐ Instability 718.87
☐ Sprain Lateral/Medial Ankle 845.00 grade ___

**Hand / Wrist:**
☐ Arthritis 716.94
☐ Burns 944.00
☐ Carpal Tunnel 354.00
☐ Crush Injury
☐ De Quervain's 727.04
☐ Dupuytren's 728.6
☐ Fracture
☐ Jt. Contracture 718.4
☐ Nerve Injury
☐ RSD
☐ Sprain 842.10

**Elbow:**
☐ Epicondylitis ☐ lateral 726.32 ☐ medial 726.31
☐ Fracture
☐ Olecranon Impingement
☐ UCL Sprain 841.1 grade ___
☐ Ulnar Neuritis 723.4

**Knee:**
☐ ACL Tear 717.83 ☐ partial ☐ complete
☐ Arthritis ☐ degenerative 715.96 ☐ Inflammatory 714.0
☐ Iliotibial Band Syndrome 726.60
☐ MCL Sprain 717.82 grade ___
☐ Meniscus Tear ☐ medial 836.0 ☐ lateral 836.1
☐ Osgood-Schlatters/Patellar Tendonitis 732.4
☐ Patellar Instability 718.6 ☐ sublux. ☐ disloc.
☐ Patellofemoral Pain Syndrome (PFPS) 717.7

**Hip:**
☐ Arthritis 716.95
☐ Capsular Sprain 726.50
☐ Tensor Fascia Tightness 726.50
☐ Trochanteric Bursitis 726.50

**Shoulder:**
☐ AC Sprain 840.0 grade ___
☐ Adhesive Capsulitis 726.0
☐ Impingement 726.20 stage ___
☐ Impingement-instability 718.81
☐ Instability 718.81 ☐ ant. ☐ post. ☐ mdi.

**Spine:**
☐ Arthritis ☐ lumbar 721.91 ☐ cervical 721.0
☐ Disc 722.8 ☐ bulge ☐ hern. ___
☐ Spinal Stenosis 724.00
☐ Spondylolisthesis 738.4
☐ Sprain ☐ lumbar 847.2 ☐ cervical 847.0

## THERAPY ORDERS

☒ Evaluate and Treat

**Physical Modalities:**
Ice/Heat/Contrast
Ultrasound/
Phonophoresis
Iontophoresis
TENS/Electrical Stim.
Massage/Mobilization
Whirlpool
Paraffin

**Ts:**
Biodex
BTE Simulator

**Brace Order:**
☐ Foot
☐ Ankle
☐ Knee
☐ Lumbar Spine
☐ C Spine
☐ Shoulder
☐ Elbow
☐ Wrist
☐ Thumb
☐ Finger
☐ Other

**Exercise:**
☐ Isometric
☐ Isotonic
☐ Isokinetic
☐ P.R.E.

**Range of Motion:**
☐ Active
☐ Active/Assistive
☐ Passive

**Refer to:**
☐ Physiatrist
☐ Pain Management

**Other:**
☐ Stretching _____
☐ PF Taping Program
☐ Proprioception
☐ Traction
☐ Williams Flexion Exercises
☐ McKenzie Exercises
☐ Lumbar Stabilization
☐ Pre-op Eval.
☐ Gait Eval.

☐ ADL
☐ Functional Activities
☐ Joint Protection
☐ Splinting (static/dynamic)
☐ Scar Management
☐ Desensitization
☐ Sensory Reeducation
☐ Aquatic Therapy
☐ Orthotic Consult
☐ Wheelchair Eval.

Special Instructions: _Please continue (R) wrist pain, strength & modalities_
_→ If wrist flexion is not > 45° in 2 weeks_
_start JAS splint_
_Thanks:_

Physician's Signature _____

KLUGEL V. SAMPER
SI - 0720

## REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME (Last, First, Middle Initial)<br>Kugel, Doratha C | | | | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER<br>████████ |
|---|---|---|---|---|

3. ORGANIZATION
Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE<br>(Check appropriate box(es) below.) | DATE | | TIME | | TOTAL<br>HOURS | 5. FAMILY AND<br>MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| | From: | To: | From: | To: | | |
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | 3/17/05 | 9 | 5 | 8 | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |
| Purpose: ☐ Medical/dental/optical examination of requesting employee  ☐ Other<br>☐ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | | | ☐ Birth/Adoption/Foster Care<br>☐ Serious Health Condition of Spouse, Son, Daughter, or Parent |
| ☐ Compensatory Time Off | | | | | | ☐ Serious Health Condition of Self |
| ☐ Other Paid Absence<br>(Specify in Remarks) | ✓ | ✓ | ✓ | | ✓ | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☒ Leave Without Pay | | | | | | |

6. REMARKS: Time off related to car accident on 11/9/04. Use SL, then AL, then LWP.

7. CERTIFICATION: I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

EMPLOYEE SIGNATURE  *Doratha Kugel*    DATE  3/21/05

8. OFFICIAL ACTION ON REQUEST:  ☒ APPROVED    ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

SIGNATURE  *[signature]*    DATE  3/21/05

PRIVACY ACT STATEMENT

Section 6311, Title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If you are asked to furnish the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-935-5067<br>PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)<br>PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0721

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)*<br>Klugel, Doratha C | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|

| ORGANIZATION   Smithsonian Environmental Research Center (SERC) | |
|---|---|

| TYPE OF LEAVE/ABSENCE<br>*(Check appropriate box(es) below)* | DATE<br>From:  To: | TIME<br>From:  To: | TOTAL<br>HOURS | 5. FAMILY AND<br>MEDICAL LEAVE |
|---|---|---|---|---|
| ☒ Accrued Annual Leave | 2/18/05 | 9  1 | 4 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | |
| ☐ Advance Annual Leave | | | | |
| ☐ Accrued Sick Leave | | | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | |
| Purpose: ☐ Medical/dental/optical examination of requesting employee  ☐ Other<br>☐ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | ☐ Birth/Adoption/Foster Care<br>☐ Serious Health Condition of Spouse, Son, Daughter, or Parent |
| ☐ Compensatory Time Off | | | | ☐ Serious Health Condition of Self |
| ☐ Other Paid Absence<br>*(Specify in Remarks)* | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☒ Leave Without Pay | 3/18  3/18 | 9  8 | 8 | |

6. REMARKS:  Use AL or LWP

Not accident related

7. CERTIFICATION: I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| EMPLOYEE SIGNATURE  *Doratha Klugel* | DATE  3/14/05 |
|---|---|

| 8. OFFICIAL ACTION ON REQUEST:  ☐ APPROVED       ☐ DISAPPROVED<br>(If disapproved, give reason. If annual leave, initiate action to reschedule.) | |
|---|---|
| SIGNATURE | DATE  3/15/05 |

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency which conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

While the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067<br>PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)<br>PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER<br>SI - 0722

# SMITHSON INSTITUTION TIME AND ATTENDANCE REPORT

FROM 8-30-05

1 NAME Klugel, Dorotha C.

DO NOT ATTACH OR STAPLE DOCUMENTS TO THIS FORM

KLUGEL V. SAMPER
BI-0723

CERTIFIED: CORRECT. ALL OF THE ABOVE INFORMATION ON HOURS WORKED AND LEAVE USED IS TRUE, ACCURATE, AND IN ACCORDANCE WITH LAW OR REGULATION.

EMPLOYEE'S INITIAL:
TIMEKEEPER'S SIGNATURE:
SUPERVISOR'S SIGNATURE:

Remarks: Gov't Grant + Contract #7786053 SF-71 on file Employee unable to ...

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME (Last, First, Middle Initial) | | | | | | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|
| Angel Dorotha C | | | | | | |

**3. ORGANIZATION**  SERC

| 4. TYPE OF LEAVE/ABSENCE (Check appropriate box(es) below.) | DATE | | TIME | | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| | From: | To: | From: | To: | | |
| ☐ Accrued Annual Leave | 2/23 | 2/23 | 9 | 5 | 8 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | | | | | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

**Purpose:** ☐ Medical/dental/optical examination of requesting employee  ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

☐ Compensatory Time Off
☐ Other Paid Absence (Specify in Remarks)
☐ Leave Without Pay

Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993.

**6. REMARKS:** Leave request for physical therapy. Request to use any sick leave accrued; otherwise any annual leave accrued; otherwise leave without pay

**CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| EMPLOYEE SIGNATURE | Dorotha Klugel | DATE | 2/22/05 |
|---|---|---|---|

**OFFICIAL ACTION ON REQUEST:** ☐ APPROVED  ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

| SIGNATURE | | DATE | 2/22/05 |
|---|---|---|---|

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment security purposes; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

If the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

540-00-753-5057
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

**KLUGEL V. SAMPER**
**SI - 0724**

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| Klugel, Doratha C | |

**ORGANIZATION** Smithsonian Environmental Research Center (SERC)

| TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☑ Accrued Sick Leave | 2/25 | 2/25 | open | close | 6 2 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | ☐ Birth/Adoption/Foster Care |

Purpose: ☐ Medical/dental/optical examination of requesting employee   ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

| ☐ Compensatory Time Off | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
|---|---|---|---|---|---|---|
| ☑ Other Paid Absence *(Specify in Remarks)* | 2/25 | 2/25 | | | 6 | |
| ☑ Leave Without Pay | | | | | | |

**REMARKS:** Leave for broken arm and ongoing treatment. Contact supervisor for questions about type of leave. SERC closed 2/24, *2 hour delay on 2/25

**CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| EMPLOYEE SIGNATURE  *Doratha Klugel* | DATE 3/1/05 |
|---|---|

| OFFICIAL ACTION ON REQUEST: ☑ APPROVED   ☐ DISAPPROVED | |
|---|---|
| *(If disapproved, give reason. If annual leave, initiate action to reschedule.)* | |
| SIGNATURE  *Mark Haddon* | DATE 3/2/05 |

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

When the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

STANDARD FORM 71 (Rev. 12-97)
NSN 7540-00-753-5067
PREVIOUS EDITION MAY BE USED
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0725

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME (Last, First, Middle Initial) | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| **Klugel, Doratha C** | |

**3. ORGANIZATION**

Smithsonian Environmental Research Center (SERC)

| TYPE OF LEAVE/ABSENCE (Check appropriate box(es) below.) | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | 3/2 | 3/2 | 8:30 | 12:30 | 4 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |
| Purpose: ☐ Medical/dental/optical examination of requesting employee ☐ Other ☐ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | | | ☐ Birth/Adoption/Foster Care  ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent  ☐ Serious Health Condition of Self |
| ☐ Compensatory Time Off | | | | | | |
| ☐ Other Paid Absence (Specify in Remarks) | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☒ Leave Without Pay | 3/2 | 3/2 | 8:30 | 12:30 | 8 | |

**6. REMARKS:** Leave for broken arm and ongoing treatment. Contact Supervisor for questions about type of leave.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| EMPLOYEE SIGNATURE  D. Klugel | DATE 3/1/05 |
|---|---|

**8. OFFICIAL ACTION ON REQUEST:**  ☐ APPROVED   ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

| SIGNATURE | DATE 3/2/05 |
|---|---|

## PRIVACY ACT STATEMENT

Section 311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

When an employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If you supply any taxes the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0726

...bell, Nic ole

...                Klugel, Dottie
:                 Wednesday, March 02, 2005 1:30 PM
                  Campbell, Nicole
...ect:            RE: Leave

...hments:         image001.jpg; image002.gif

...ole-

...ut in a leave request for today for this morning; I need to extend that to all day.  I
...out all day today for physical therapy.

...ttie

...---Original Message-----
...om: Campbell, Nicole
...ent: Tue 3/1/2005 3:46 PM
...o:   Erb  Amy; Haddon, Mark; Holly, Jane; Klugel, Dottie; van der Heijden, Anna
...c:
...ubject:   Leave

Please let me know if you took any additional time due to the snow.  I also need to know
if you are planning on any leave during the rest of the week.  Thank you.

Nicole .. Campbell

PO Box 28

647 Cortees Wharf Rd.

Edgewater, MD  21037

443-482-2206

443-412-2380  (fax)

KLUGEL V. SAMPER
SI - 0727

## REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | | | | | | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|
| Klugel, Doratha C | | | | | | |

**3. ORGANIZATION**
Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *Check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | 3/4 | 3/4 | 9 | 5 | 8 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

Purpose: ☐ Medical/dental/optical examination of requesting employee  ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

| ☐ Compensatory Time Off | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☒ Leave Without Pay | 3/4 | 3/4 | 9 | 5:30 | 8 | |

**6. REMARKS:** Leave for broken arm and ongoing treatment. Contact supervisor for questions about type of leave.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| EMPLOYEE SIGNATURE  C. Klugel | DATE  3/1/05 |
|---|---|

| 8. OFFICIAL ACTION ON REQUEST: ☐ APPROVED     ☐ DISAPPROVED | |
|---|---|
| *(If disapproved, give reason. If annual leave, initiate action to reschedule.)* | |
| SIGNATURE | DATE  3/1/05 |

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-755-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0728

Case 1:06-cv-01866-HHK-DAR    Document 27-25    Filed 07/09/2008    Page 49 of 82

# SMITHSONIAN INSTITUTION TIME AND ATTENDANCE REPORT

NAME: Klugel, Diana C.

SOCIAL SECURITY NUMBER:

FLSA STATUS: E

STATUS CHANGE

PAY: 63  ARMORY:  STATE: 11  AGNCY: IDO 10  UNIT: 1/2  TIME: 4

N - F B

ACCOUNTING DATA

RECORD OF PARTIAL DAYS LEAVE

TIMEKEEPER'S REMARKS

Emp 4 6 and 6 Annual
#746.053

Advance leave due to conting time used
Chanced sales made
Employee wishes to install
All leave. Approved A.O.

CERTIFIED CORRECT: ALL OF THE ABOVE INFORMATION ON HOURS WORKED AND LEAVE USED IS TRUE, ACCURATE, AND IN ACCORDANCE WITH LAW OR REGULATION.

EMPLOYEE'S INITIALS:

TIMEKEEPER'S SIGNATURE:

SUPERVISOR'S SIGNATURE:

PHONE:    DATE:

KLUGEL V. SAMPER
SI - 0729

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME (Last, First, Middle Initial) | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| Flugel, Doratha C | |

**3. ORGANIZATION**
Smithsonian Environmental Research Center (SERC)

**4. TYPE OF LEAVE/ABSENCE** (Check appropriate box(es) below)

| | DATE From: / To: | TIME From: / To: | TOTAL HOURS |
|---|---|---|---|
| ☐ Accrued Annual Leave | 2/10/05 | 9 / 5 | 8 |
| ☐ Restored Annual Leave | | | |
| ☐ Advance Annual Leave | | | |
| ☒ Accrued Sick Leave | | | |
| ☐ Advance Sick Leave | | | |

**Purpose:**
☐ Medical/dental/optical examination of requesting employee   ☐ Other
☒ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Compensatory Time Off
☐ Other Paid Absence (Specify in Remarks)
☐ Leave Without Pay

**5. FAMILY AND MEDICAL LEAVE**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information:

☐ I hereby invoke my entitlement Family and Medical Leave for:

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993.

**6. REMARKS:** Time off related to car accident on Nov. 9, 2004. Use SL until depleted, then AL.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

**EMPLOYEE SIGNATURE** Doratha Klugel    **DATE** 3/3/05

**8. OFFICIAL ACTION ON REQUEST:** ☐ APPROVED    ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

**SIGNATURE** _____    **DATE** 3/3/05

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State or local employment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

When the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

Your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement of existing those purposes.

7540-00-753-4367
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0730

GEORGETOWN UNIVERSITY HOSPITAL

# SPORTS MEDICINE & REHABILITATION PRESCRIPTION

☑ PHYSICAL THERAPY  or  ☑ OCCUPATIONAL THERAPY

Date: 1/26/05

nt's Name: _Dorathea Klugel_

Follow-up Appointment: _____

ency: __2x__ per week for ____4____ weeks

☐ Non-operative   ☐ Pre-operative   ☐ Post-operative

ery Type/Date: _____

NOSIS (Write or check below): (R) _distal radius fx. (P13.40)_

**e:**
☐ Achilles Rupture 845.09 ☐ partial ☐ complete
☐ Achilles Tendonitis 726.71
☐ Impingement 727.7
☐ Instability 718.87
☐ Sprain Lateral/Medial Ankle 845.00
grade ____

**d / Wrist:**
☐ Arthritis 715.94
☐ Burns 944.00
☐ Carpal Tunnel 354.00
☐ Crush Injury
☐ De Quervain's 727.04
☐ Dupuytren's 728.6
☐ Fracture
☐ Jt. Contracture 718.4
☐ Nerve Injury
☐ RSD
☐ Sprain 842.10

**Elbow:**
☐ Epicondylitis ☐ lateral 726.32 ☐ medial 726.31
☐ Fracture
☐ Olecranon Impingement
☐ UCL Sprain 841.1    grade ____
☐ Ulnar Neuritis 723.4

**Knee:**
☐ ACL Tear 717.83 ☐ partial ☐ complete
☐ Arthritis ☐ degenerative 715.96 ☐ inflammatory 714.0
☐ Iliotibial Band Syndrome 726.60
☐ MCL Sprain 717.82    grade ____
☐ Meniscus Tear ☐ medial 836.0 ☐ lateral 836.1
☐ Osgood-Schlatters/Patellar Tendonitis 732.4
☐ Patellar Instability 718.6 ☐ sublux. ☐ disloc.
☐ Patellofemoral Pain Syndrome (PFPS) 717.7

**Hip:**
☐ Arthritis 716.95
☐ Capsular Sprain 726.50
☐ Tensor Fascia Tightness 726.50
☐ Trochanteric Bursitis 726.50

**Shoulder:**
☐ AC Sprain 640.0    grade ____
☐ Adhesive Capsulitis 726.0
☐ Impingement 726.20  stage ____
☐ Impingement-instability 718.81
☐ Instability 718.81 ☐ ant. ☐ post. ☐ mdl.

**Spine:**
☐ Arthritis ☐ lumbar 721.91 ☐ cervical 721.0
☐ Disc 722.8 ☐ bulge ☐ hern.
☐ Spinal Stenosis 724.00
☐ Spondylolisthesis 738.4
☐ Sprain ☐ lumbar 647.2 ☐ cervical 847.0

## THERAPY ORDERS

Evaluate and Treat

**cal Modalities:**
☐ Ice/Heat/Contrast
☐ Ultrasound /
   Phonophoresis
☐ Iontophoresis
☐ TENS/Electrical Stim.
☐ Massage/Mobilization
☐ Whirlpool
☐ Paraffin

**asts:**
☐ Biodex
☐ BTE Simulator

**Brace Order:**
☐ Foot
☐ Ankle
☐ Knee
☐ Lumbar Spine
☐ C Spine
☐ Shoulder
☐ Elbow
☐ Wrist
☐ Thumb
☐ Finger
☐ Other

**Exercise:**
☐ Isometric
☐ Isotonic
☐ Isokinetic
☐ P.R.E.

**Range of Motion:**
☐ Active
☐ Active/Assistive
☐ Passive

**Refer to:**
☐ Physiatrist
☐ Pain Management

**Other:**
☐ Stretching ____
☐ PF Taping Program
☐ Proprioception
☐ Traction
☐ Williams Flexion Exercises
☐ McKenzie Exercises
☐ Lumbar Stabilization
☐ Pre-op Eval.
☐ Gait Eval.

☐ ADL
☐ Functional Activities
☐ Joint Protection
☐ Splinting (static/dynamic)
☐ Scar Management
☐ Desensitization
☐ Sensory Reeducation
☐ Aquatic Therapy
☐ Orthotic Consult
☐ Wheelchair Eval.

her/Special Instructions: _Please start gentle (R) wrist rom, stretch, modalities + strength_

utions: _____

Physician's Signature _____

KLUGEL V. SAMPER
SI - 0731

## REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* Klugel, Doratha C | | | | | | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|

**3. ORGANIZATION** Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: To: | TIME From: To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|
| ☒ Accrued Annual Leave | 2/11/05 | 1 — 5 | 4 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | |
| ☐ Advance Annual Leave | | | | |
| ☐ Accrued Sick Leave | | | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | |
| Purpose: ☐ Medical/dental/optical examination of requesting employee ☐ Other ☐ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | ☐ Birth/Adoption/Foster Care ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent |
| ☐ Compensatory Time Off | | | | ☐ Serious Health Condition of Self |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Leave Without Pay | | | | |

**6. REMARKS:** Time off related to car accident on Nov. 9, 2004. Use SL until depleted then AL.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

EMPLOYEE SIGNATURE *Doratha Klugel*    DATE 3/8/05

**8. OFFICIAL ACTION ON REQUEST:**    ☒ APPROVED    ☐ DISAPPROVED

(If disapproved, give reason. If annual leave, initiate action to reschedule.)

SIGNATURE *Mark Haddon*    DATE 3/8/05

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosure of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for the examination of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

When an agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

7540-00-753-5867
NSN EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

## SPORTS MEDICINE & REHABILITATION PRESCRIPTION

☑ PHYSICAL THERAPY  or  ☑ OCCUPATIONAL THERAPY

Patient's Name: _Dorothie Klugel_  Date: _1/26/05_

Frequency: _2x_ per week for _4_ weeks    Follow-up Appointment: _____

Tx:  ☐ Non-operative   ☐ Pre-operative   ☐ Post-operative

Surgery Type/Date: _____

DIAGNOSIS (Write or check below): (R) _distal radius fx. (813.40)_

**Ankle:**
- ☐ Achilles Rupture 845.09  ☐ partial  ☐ complete
- ☐ Achilles Tendonitis 726.71
- ☐ Impingement 727.7
- ☐ Instability 718.87
- ☐ Sprain Lateral/Medial Ankle 845.00  grade ____

**Hand / Wrist:**
- ☐ Arthritis 716.94
- ☐ Burns 944.00
- ☐ Carpal Tunnel 354.00
- ☐ Crush Injury
- ☐ De Quervain's 727.04
- ☐ Dupuytren's 728.6
- ☐ Fracture
- ☐ Jt. Contracture 718.4
- ☐ Nerve Injury
- ☐ RSD
- ☐ Sprain 842.10

**Elbow:**
- ☐ Epicondylitis  ☐ lateral 726.32  ☐ medial 726.31
- ☐ Fracture
- ☐ Olecranon Impingement
- ☐ UCL Sprain 841.1   grade ____
- ☐ Ulnar Neuritis 723.4

**Knee:**
- ☐ ACL Tear 717.83  ☐ partial  ☐ complete
- ☐ Arthritis ☐ degenerative 715.96 ☐ inflammatory 714.0
- ☐ Iliotibial Band Syndrome 726.60
- ☐ MCL Sprain 717.82   grade ____
- ☐ Meniscus Tear ☐ medial 836.0 ☐ lateral 836.1
- ☐ Osgood-Schlatters/Patellar Tendonitis 732.4
- ☐ Patellar Instability 718.8 ☐ sublux. ☐ disloc.
- ☐ Patellofemoral Pain Syndrome (PFPS) 717.7

**Hip:**
- ☐ Arthritis 716.95
- ☐ Capsular Sprain 726.50
- ☐ Tensor Fascia Tightness 726.50
- ☐ Trochanteric Bursitis 726.50

**Shoulder:**
- ☐ AC Sprain 840.0   grade ____
- ☐ Adhesive Capsulitis 726.0
- ☐ Impingement 726.20  stage ____
- ☐ Impingement-instability 718.81
- ☐ Instability 718.81 ☐ ant. ☐ post. ☐ mdt.

**Spine:**
- ☐ Arthritis ☐ lumbar 721.91 ☐ cervical 721.0
- ☐ Disc 722.8 ☐ bulge ☐ hern.
- ☐ Spinal Stenosis 724.00
- ☐ Spondylolisthesis 738.4 _____
- ☐ Sprain ☐ lumbar 847.2 ☐ cervical 847.0

### THERAPY ORDERS

☐ Evaluate and Treat

**Local Modalities:**
- ☐ Ice/Heat Contrast
- ☐ Ultrasound/ Phonophoresis
- ☐ Iontophoresis
- ☐ TENS/Electrical Stim.
- ☐ Massage/Mobilization
- ☐ Whirlpool
- ☐ Paraffin

**Tests:**
- ☐ Biodex
- ☐ BTE Simulator

**Brace Order:**
- ☐ Foot
- ☐ Ankle
- ☐ Knee
- ☐ Lumbar Spine
- ☐ C Spine
- ☐ Shoulder
- ☐ Elbow
- ☐ Wrist
- ☐ Thumb
- ☐ Finger
- ☐ Other

**Exercise:**
- ☐ Isometric
- ☐ Isotonic
- ☐ Isokinetic
- ☐ P.R.E.

**Range of Motion:**
- ☐ Active
- ☐ Active/Assistive
- ☐ Passive

**Refer to:**
- ☐ Physiatrist
- ☐ Pain Management

**Other:**
- ☐ Stretching _____
- ☐ PF Taping Program
- ☐ Proprioception
- ☐ Traction
- ☐ Williams Flexion Exercises
- ☐ McKenzie Exercises
- ☐ Lumbar Stabilization
- ☐ Pre-op Eval.
- ☐ Gait Eval.

- ☐ ADL
- ☐ Functional Activities
- ☐ Joint Protection
- ☐ Splinting (static/dynamic)
- ☐ Scar Management
- ☐ Desensitization
- ☐ Sensory Reeducation
- ☐ Aquatic Therapy
- ☐ Orthotic Consult
- ☐ Wheelchair Eval.

Other/Special Instructions: _Please start gentle (R) wrist rom, stretch, modalities + strength_

Precautions: _____

Physician's Signature _____

KLUGEL, V. SAMPER
SI - 0733

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME (Last, First, Middle Initial) | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| Klugel, Doratha C | |

**3. ORGANIZATION**  Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE (Check appropriate box(es) below.) | DATE From | To | TIME From | To | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☒ Accrued Annual Leave | 2/10/05 | | 9 | 5 | 0 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | | | | | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |
| Purpose: ☐ Medical/dental/optical examination of requesting employee ☐ Other ☐ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | | | ☐ Birth/Adoption/Foster Care ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent |
| ☐ Compensatory Time Off | | | | | | ☐ Serious Health Condition of Self |
| ☐ Other Paid Absence (Specify in Remarks) | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Leave Without Pay | | | | | | |

**6. REMARKS:** Time off related to car accident on Nov. 9, 2004. Use SL until depleted then AL

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

**EMPLOYEE SIGNATURE** Doratha Klugel      **DATE** 3/3/05

**8. OFFICIAL ACTION ON REQUEST:** ☒ APPROVED   ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

**SIGNATURE** Mark Haddon      **DATE** 3/3/05

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

When the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

Your agency may use the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

7540-00-75-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT; 5 CFR PART 630

GEORGETOWN UNIVERSITY HOSPITAL

# SPORTS MEDICINE & REHABILITATION PRESCRIPTION

☑ PHYSICAL THERAPY  or  ☑ OCCUPATIONAL THERAPY

Patient's Name: _Doratha Klugel_                                      Date: _1/26/05_

Frequency _2A_ per week for _4_ weeks          Follow-up Appointment: _____

Tx: ☐ Non-operative    ☐ Pre-operative    ☐ Post-operative

Surgery Type/Date: _____

DIAGNOSIS (Write or check below): ℞ _distal radius fx. (813.40)_

**Ankle:**
- ☐ Achilles Rupture 845.09 ☐ partial ☐ complete
- ☐ Achilles Tendonitis 726.71
- ☐ Impingement 727.7
- ☐ Instability 718.87
- ☐ Sprain Lateral/Medial Ankle 845.00
  grade ____

**Hand / Wrist:**
- ☑ Arthritis 716.84
- ☐ Burns 944.00
- ☐ Carpal Tunnel 354.00
- ☐ Crush Injury
- ☐ De Quervain's 727.04
- ☐ Dupuytren's 728.6
- ☐ Fracture
- ☐ Jt. Contracture 718.4
- ☐ Nerve Injury
- ☐ RSD
- ☐ Sprain 842.10

**Elbow:**
- ☐ Epicondylitis ☐ lateral 726.32 ☐ medial 726.31
- ☐ Fracture
- ☐ Olecranon Impingement
- ☐ UCL Sprain 841.1  grade _____
- ☐ Ulnar Neuritis 723.4

**Knee:**
- ☐ ACL Tear 717.83 ☐ partial ☐ complete
- ☐ Arthritis ☐ degenerative 715.96 ☐ inflammatory 714.0
- ☐ Iliotibial Band Syndrome 726.60
- ☐ MCL Sprain 717.82  grade _____
- ☐ Meniscus Tear ☐ medial 836.0 ☐ lateral 836.1
- ☐ Osgood-Schlatters/Patellar Tendonitis 732.4
- ☐ Patellar Instability 718.6 ☐ sublux. ☐ disloc.
- ☐ Patellofemoral Pain Syndrome (PFPS) 717.7

**Hip:**
- ☐ Arthritis 716.95
- ☐ Capsular Sprain 726.50
- ☐ Tensor Fascia Tightness 726.50
- ☐ Trochanteric Bursitis 726.50

**Shoulder:**
- ☐ AC Sprain 840.0  grade _____
- ☐ Adhesive Capsulitis 726.0
- ☐ Impingement 726.20  stage _____
- ☐ Impingement-instability 718.81
- ☐ Instability 718.81 ☐ ant. ☐ post. ☐ mdi.

**Spine:**
- ☐ Arthritis ☐ lumbar 721.91 ☐ cervical 721.0
- ☐ Disc 722.6 ☐ bulge ☐ hern.
- ☐ Spinal Stenosis 724.00  _____
- ☐ Spondylolisthesis 738.4
- ☐ Sprain ☐ lumbar 847.2 ☐ cervical 847.0

## THERAPY ORDERS

☐ Evaluate and Treat

**Local Modalities:**
- ☐ Ice/Heat/Contrast
- ☐ Ultrasound/Phonophoresis
- ☐ Iontophoresis
- ☐ TENS/Electrical Stim.
- ☐ Massage/Mobilization
- ☐ Whirlpool
- ☐ Paraffin

**Tests:**
- ☐ Biodex
- ☐ BTE Simulator

**Brace Order:**
- ☐ Foot
- ☐ Ankle
- ☐ Knee
- ☐ Lumbar Spine
- ☐ C Spine
- ☐ Shoulder
- ☐ Elbow
- ☐ Wrist
- ☐ Thumb
- ☐ Finger
- ☐ Other

**Exercise:**
- ☐ Isometric
- ☐ Isotonic
- ☐ Isokinetic
- ☐ P.R.E.

**Range of Motion:**
- ☐ Active
- ☐ Active/Assistive
- ☐ Passive

**Refer to:**
- ☐ Physiatrist
- ☐ Pain Management

**Other:**
- ☐ Stretching _____
- ☐ PF Taping Program
- ☐ Proprioception
- ☐ Traction
- ☐ Williams Flexion Exercises
- ☐ McKenzie Exercises
- ☐ Lumbar Stabilization
- ☐ Pre-op Eval.
- ☐ Gait Eval.

- ☐ ADL
- ☐ Functional Activities
- ☐ Joint Protection
- ☐ Splinting (static/dynamic)
- ☐ Scar Management
- ☐ Desensitization
- ☐ Sensory Reeducation
- ☐ Aquatic Therapy
- ☐ Orthotic Consult
- ☐ Wheelchair Eval.

Other/Special Instructions: _Please start gentle ℞ wrist Rom, stretching, modalities + strengthening_

Precautions: _____

Physician's Signature _____

# SPORTS MEDICINE & REHABILITATION PRESCRIPTION

☒ PHYSICAL THERAPY   or   ☒ OCCUPATIONAL THERAPY

Patient's Name _Dorette Klugel_ _____   Date: _1/26/05_

Frequency: _2x_ per week for _4_ weeks   Follow-up Appointment: _____

☐ Non operative   ☐ Pre-operative   ☐ Post-operative

Surgery Type/Date: _____

DIAGNOSIS ( Write or check below): ® _distal radius fx. (813.40)_

**Ankle:**
☐ Achilles Rupture 845.09 ☐ partial ☐ complete
☐ Achilles Tendonitis 726.71
☐ Impingement 727.7
☐ Instability 718.87
☐ Sprain Lateral/Medial Ankle 845.00
              grade _____

**Hand / Wrist:**
☐ Arthritis 715.94
☐ Burns 944.00
☐ Carpal Tunnel 354.00
☐ Crush Injury
☐ De Quervain's 727.04
☐ Dupuytren's 728.6
☐ Fracture
☐ Jt. Contracture 718.4
☐ Nerve Injury
☐ RSD
☐ Sprain 842.10

**Elbow:**
☐ Epicondylitis ☐ lateral 726.32 ☐ medial 726.31
☐ Fracture
☐ Olecranon Impingement
☐ UCL Sprain 841.1   grade _____
☐ Ulnar Neuritis 723.4

**Knee:**
☐ ACL Tear 717.83 ☐ partial ☐ complete
☐ Arthritis ☐ degenerative 715.96 ☐ inflammatory 714.0
☐ Iliotibial Band Syndrome 726.60
☐ MCL Sprain 717.82   grade _____
☐ Meniscus Tear ☐ medial 836.0 ☐ lateral 836.1
☐ Osgood-Schlatters/Patellar Tendonitis 732.4
☐ Patellar Instability 718.6 ☐ subluxx. ☐ disloc.
☐ Patellofemoral Pain Syndrome (PFPS) 717.7

**Hip:**
☐ Arthritis 716.95
☐ Capsular Sprain 726.50
☐ Tensor Fascia Tightness 726.50
☐ Trochanteric Bursitis 726.50

**Shoulder:**
☐ AC Sprain 840.0   grade _____
☐ Adhesive Capsulitis 726.0
☐ Impingement 726.20   stage _____
☐ Impingement-instability 718.81
☐ Instability 718.81 ☐ ant. ☐ post. ☐ mdl.

**Spine:**
☐ Arthritis ☐ lumbar 721.91 ☐ cervical 721.0
☐ Disc 722.8 ☐ bulge ☐ hern. _____
☐ Spinal Stenosis 724.00 _____
☐ Spondylolisthesis 738.4 _____
☐ Sprain ☒ lumbar 847.2 ☐ cervical 847.0

## THERAPY ORDERS

☒ Evaluate and Treat

**Physical Modalities:**
☐ Ice/Heat/Contrast
☐ Ultrasound
☐ Phonophoresis
☐ Iontophoresis
☐ TENS/Electrical Stim.
☐ Massage/Mobilization
☐ Whirlpool
☐ Paraffin

**Isokinetics:**
☐ Biodex
☐ BTE Simulator

**Brace Order:**
☐ Foot
☐ Ankle
☐ Knee
☐ Lumbar Spine
☐ C Spine
☐ Shoulder
☐ Elbow
☐ Wrist
☐ Thumb
☐ Finger
☐ Other

**Exercise:**
☐ Isometric
☐ Isotonic
☐ Isokinefic
☐ P.R.E.

**Range of Motion:**
☐ Active
☐ Active/Assistive
☐ Passive

**Refer to:**
☐ Physiatrist
☐ Pain Management

**Other:**
☐ Stretching _____
☐ PF Taping Program
☐ Proprioception
☐ Traction
☐ Williams Flexion Exercises
☐ McKenzie Exercises
☐ Lumbar Stabilization
☐ Pre-op Eval.
☐ Gait Eval.

☐ ADL
☐ Functional Activities
☐ Joint Protection
☐ Splinting (static/dynamic)
☐ Scar Management
☐ Desensitization
☐ Sensory Reeducation
☐ Aquatic Therapy
☐ Orthotic Consult
☐ Wheelchair Eval.

Special Instructions: _Please start gentle ® wrist rom, stretching, modalities + strengthening_

Precautions: _____

Physician's Signature _____

**WHITE - PATIENT COPY      PINK - PHYSICAL THERAPY COPY      YELLOW - OFFICE COPY**

KLUGEL V. SAMPER
SI - 0736

*Corrected Time Sheet*

# SMITHSONIAN INSTITUTION TIME AND ATTENDANCE REPORT

NAME: Khugel Dretha C

M-F5

TIMEKEEPER'S REMARKS: Employee unable to sign. Off site.

CERTIFIED CORRECT: ALL OF THE ABOVE INFORMATION ON HOURS WORKED AND LEAVE AND/OR TIME, ACCURATE, AND IN ACCORDANCE WITH LAW OR REGULATION.

EMPLOYEE'S INITIALS:

TIMEKEEPER'S SIGNATURE:

KLUGEL V. SAMPER
SI - 0737

SMITHSONIAN INSTITUTION TIME AND ATTENDANCE REPORT

KLUGEL V. SAMPER
SI - 073B

NAME (MAXIMUM OF 18 CHARACTERS)
KLUGEL    DOKATHA

PAYROLL REMARKS

APPR / CRG #
5986    3940
Leave as of PP 25
A.L.    29.GR    A/C 6
4.00

CERTIFIED CORRECT: ALL OF THE ABOVE INFORMATION ON HOURS WORKED AND LEAVE USED IS
TRUE, ACCURATE, AND IN ACCORDANCE WITH LAW OR REGULATION.

EMPLOYEE'S INITIALS:

TIMEKEEPER'S SIGNATURE:

SUPERVISOR'S SIGNATURE:

PHONE #

DATE:

MOST COMMONLY USED TRANSACTION CODES:
01  REGULAR TIME - BASE RATE
04  SUNDAY DIFFERENTIAL
08  NIGHT DIFFERENTIAL
10  OVERTIME - OVER 8 HRS. PER DAY
    WITHIN 40 HR. WEEK
20  OVERTIME
30  HOLIDAY WORKED
40  COMP TIME EARNED
60  ANNUAL LEAVE USED
65  SICK LEAVE USED
66  OTHER LEAVE (DEGREE REFERRED)
70  LEAVE WITHOUT PAY (LWOP)
71  ABSENCE WITHOUT LEAVE (AWOL)

ADVANCED LEAVE CODE
1 - ADVANCED ANNUAL
4 - ADVANCED SICK
5 - ADVANCED ANNUAL & SICK

QUARTER HOUR INCREMENTS
2 - 1/4 HOUR
5 - 1/2 HOUR
8 - 3/4 HOUR

(COMPLETE LIST OF CODES ON BACK)

TIMEKEEPER'S REMARKS
Grp # Ground P Control
#786053
ST-31 on file

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| **Klugel, Doratha C** | |

| 3. ORGANIZATION | Smithsonian Environmental Research Center (SERC) |
|---|---|

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☑ Accrued Annual Leave | 1/28 | 1/28 | 9 | 5 | 8 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☑ Accrued Sick Leave | 1/26 | 1/26 | 9 | 5 | 8 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

Purpose: ☐ Medical/dental/optical examination of requesting employee ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

| ☐ Compensatory Time Off | |
| ☐ Other Paid Absence *(Specify in Remarks)* | |
| ☐ Leave Without Pay | |

Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993.

**6. REMARKS:** 1/26 is for dr appts, but am unsure how much if any sick leave I have. If none, annual leave may be used.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| EMPLOYEE SIGNATURE | DATE 1/25/05 |
|---|---|

| 8. OFFICIAL ACTION ON REQUEST: ☐ APPROVED | ☐ DISAPPROVED |
|---|---|
| (If disapproved, give reason. If annual leave, initiate action to reschedule.) | |
| SIGNATURE | DATE |

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

When the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067
PREVIOUS EDITION MAY BE USED

PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

STANDARD FORM 71 (Rev. 12-97)

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)*  Klugel, Doratha C | | | | | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|

3. ORGANIZATION  Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE | | TIME | | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| | From: | To: | From: | To: | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| [X] Accrued Annual Leave | 2/4/05 | | 9 | 5 | 8 | |
| [ ] Restored Annual Leave | | | | | | |
| [ ] Advance Annual Leave | | | | | | [ ] I hereby invoke my entitlement Family and Medical Leave for: |
| [ ] Accrued Sick Leave | | | | | | |
| [ ] Advance Sick Leave | | | | | | |

| Purpose: | [ ] Medical/dental/optical examination of requesting employee | [ ] Other | [ ] Birth/Adoption/Foster Care |
|---|---|---|---|
| | [ ] Care of family member/bereavement, including medical/dental/optical examination of family member | | [ ] Serious Health Condition of Spouse, Son, Daughter, or Parent |

| [ ] Compensatory Time Off | [ ] Serious Health Condition of Self |
|---|---|
| [ ] Other Paid Absence *(Specify in Remarks)* | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| [ ] Leave Without Pay | |

6. REMARKS: Time off related to car accident on Nov. 9, 2004. Use SL until depleted, then AL.

7. CERTIFICATION: I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

EMPLOYEE SIGNATURE  *Doratha Klugel*     DATE  3/3/05

| 8. OFFICIAL ACTION ON REQUEST: | [ ] APPROVED | [ ] DISAPPROVED |
|---|---|---|
| (If disapproved, give reason. If annual leave, initiate action to reschedule.) | | |

SIGNATURE  *[signature]*     DATE  3/3/05

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of this information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is the Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If you are using the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067     STANDARD FORM 71 (Rev. 12-97)
PREVIOUS EDITION MAY BE USED     PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0740

GEORGETOWN UNIVERSITY HOSPITAL

# SPORTS MEDICINE & REHABILITATION PRESCRIPTION

☑ PHYSICAL THERAPY    or    ☑ OCCUPATIONAL THERAPY

Patient's Name: _Dorothe Klugel_    Date: _1/26/05_

Frequency: _2x_ per week for _4_ weeks    Follow-up Appointment: _____

Tx:  ☐ Non-operative    ☐ Pre-operative    ☐ Post-operative

Surgery Type/Date: _____

DIAGNOSIS (Write or check below): (R) _distal radius fx. (813.40)_

**Ankle:**
- ☐ Achilles Rupture 845.09 ☐ partial ☐ complete
- ☐ Achilles Tendonitis 726.71
- ☐ Impingement 727.7
- ☐ Instability 718.87
- ☐ Sprain Lateral/Medial Ankle 845.00
  grade _____

**Hand / Wrist:**
- ☐ Arthritis 716.94
- ☐ Burns 944.00
- ☐ Carpal Tunnel 354.00
- ☐ Crush Injury
- ☐ De Quervain's 727.04
- ☐ Dupuytren's 728.6
- ☐ Fracture
- ☐ Jt. Contracture 718.4
- ☐ Nerve Injury
- ☐ RSD
- ☐ Sprain 842.10

**Elbow:**
- ☐ Epicondylitis ☐ lateral 726.32 ☐ medial 726.31
- ☐ Fracture
- ☐ Olecranon Impingement
- ☐ UCL Sprain 841.1 grade _____
- ☐ Ulnar Neuritis 723.4

**Knee:**
- ☐ ACL Tear 717.83 ☐ partial ☐ complete
- ☐ Arthritis ☐ degenerative 715.96 ☐ inflammatory 714.0
- ☐ Iliotibial Band Syndrome 726.60
- ☐ MCL Sprain 717.82 grade _____
- ☐ Meniscus Tear ☐ medial 836.0 ☐ lateral 836.1
- ☐ Osgood-Schlatters/Patellar Tendonitis 732.4
- ☐ Patellar Instability 718.6 ☐ sublux. ☐ disloc.
- ☐ Patellofemoral Pain Syndrome (PFPS) 717.7

**Hip:**
- ☐ Arthritis 716.95
- ☐ Capsular Sprain 726.50
- ☐ Tensor Fascia Tightness 726.50
- ☐ Trochanteric Bursitis 726.50

**Shoulder:**
- ☐ AC Sprain 840.0 grade _____
- ☐ Adhesive Capsulitis 726.0
- ☐ Impingement 726.20 stage _____
- ☐ Impingement-Instability 718.81
- ☐ Instability 718.81 ☐ ant. ☐ post. ☐ mdl.

**Spine:**
- ☐ Arthritis ☐ lumbar 721.91 ☐ cervical 721.0
- ☐ Disc 722.8 ☐ bulge ☐ hern. _____
- ☐ Spinal Stenosis 724.00
- ☐ Spondylolisthesis 738.4
- ☐ Sprain ☐ lumbar 847.2 ☐ cervical 847.0

## THERAPY ORDERS

☐ Evaluate and Treat

**Local Modalities:**
- ☐ Ice Heat/Contrast
- ☐ Ultrasound/ Phonophoresis
- ☐ Ionophoresis
- ☐ TENS/Electrical Stim.
- ☐ Massage/Mobilization
- ☐ Whirlpool
- ☐ Paraffin

**Tests:**
- ☐ Biodex
- ☐ BTE Simulator

**Brace Order:**
- ☐ Foot
- ☐ Ankle
- ☐ Knee
- ☐ Lumbar Spine
- ☐ C Spine
- ☐ Shoulder
- ☐ Elbow
- ☐ Wrist
- ☐ Thumb
- ☐ Finger
- ☐ Other
  _____

**Exercise:**
- ☐ Isometric
- ☐ Isotonic
- ☐ Isokinetic
- ☐ P.R.E.

**Range of Motion:**
- ☐ Active
- ☐ Active/Assistive
- ☐ Passive

**Refer to:**
- ☐ Physiatrist
- ☐ Pain Management

**Other:**
- ☐ Stretching _____
- ☐ PF Taping Program
- ☐ Proprioception
- ☐ Traction
- ☑ Williams Flexion Exercises
- ☐ McKenzie Exercises
- ☐ Lumbar Stabilization
- ☐ Pre-op Eval.
- ☐ Gait Eval.

- ☐ ADL
- ☐ Functional Activities
- ☐ Joint Protection
- ☐ Splinting (static/dynamic)
- ☐ Scar Management
- ☐ Desensitization
- ☐ Sensory Reeducation
- ☐ Aquatic Therapy
- ☐ Orthotic Consult
- ☐ Wheelchair Eval.

Other/Special Instructions: _Please start gentle (R) wrist Rom, stretches, modalities + strengthen_

Precautions: _____

Physician's Signature _____

KLUGEL V. SAMPER
SI - 0741

# SMITHSONIAN INSTITUTION TIME AND ATTENDANCE REPORT.

Corrected Time Sheet

Klugel, Dorothy C
M-E 8

**CERTIFIED CORRECT: ALL OF THE ABOVE INFORMATION ON HOURS WORKED AND LEAVE USED IS TIME, ACCURATE, AND IN ACCORDANCE WITH LAW OR REGULATION.**

Employee unable to sign due to...

KLUGEL V. SAMPER
SI - 0742

SMITHSONIAN INSTITUTION TIME AND ATTENDANCE REPORT

NAME: KUGATA

APPR / OR13
1506   39940
LEAVE-08 OF PP 25
-7-08 A/C  6

KLUGEL V. SAMPER
SI - 0743

Gov # Grant & Contract
#786.053
SF-71 on file

TIMEKEEPER INITIAL:
TIMEKEEPER'S SIGNATURE:
SUPERVISOR'S SIGNATURE:
DATE: 4/10/05

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* <br> Klugel, Doratha C | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|

| 3. ORGANIZATION |
|---|
| Smithsonian Environmental Research Center (SERC) |

| 4. TYPE OF LEAVE/ABSENCE *( Check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☒ Accrued Sick Leave | 1/11/05 | | 9 | 5 | 8 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

Purpose: ☐ Medical/dental/optical examination of requesting employee ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

| ☐ Compensatory Time Off | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Leave Without Pay | | | | | | |

**6. REMARKS:** Dr appt (not related to broken arm). Use SL until depleted, then AL, then LWP

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

EMPLOYEE SIGNATURE *Doratha Klugel*     DATE 3/8/05

**8. OFFICIAL ACTION ON REQUEST:** ☐ APPROVED ☐ DISAPPROVED
*(If disapproved, give reason. If annual leave, initiate action to reschedule.)*

SIGNATURE _____ DATE 8/1/05

## PRIVACY ACT STATEMENT

Section 63 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0744

## REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| **Klugel, Doratha C** | |

3. ORGANIZATION **Smithsonian Environmental Research Center (SERC)**

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☑ Accrued Annual Leave | 1/8 | /8 | 2 | 5 | 3 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | | | | | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

Purpose: ☐ Medical/dental/optical examination of requesting employee ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

| ☐ **Compensatory Time Off** | | | | | | |
|---|---|---|---|---|---|---|
| ☐ **Other Paid Absence** *(Specify in Remarks)* | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ **Leave Without Pay** | | | | | | |

6. REMARKS:

7. CERTIFICATION: I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

EMPLOYEE SIGNATURE _____    DATE 1/8

8. OFFICIAL ACTION ON REQUEST: ☐ APPROVED    ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

SIGNATURE _____    DATE 1/8/06

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where an employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067    STANDARD FORM 71 (Rev. 12-97)
PREVIOUS EDITION MAY BE USED    PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0745

# SMITHSONIAN INSTITUTION TIME AND ATTENDANCE REPORT

**KLUGEL V. SAMPER**
**SI - 0746**

KLUGEL DORATHA C

ESTABLISHED WORK WEEK AND HOURS: M F 8

FROM 12-08-04
STATUS CHANGE START / END
12-25-04

PAY PERIOD NO. 25 YEAR 04

FFLG NO. 71 ADJ LV CODE 11 APPROVED 0010 NRV CONT FONT 15 CONT 04

TIMEKEEPER'S REMARKS:
Epu & Grant Contract # 78/6053.
Employee is required ...

CERTIFIED CORRECT: ALL OF THE ABOVE INFORMATION ON HOURS WORKED AND LEAVE USED IS TRUE, ACCURATE, AND IN ACCORDANCE WITH LAW OR REGULATION.

EMPLOYEE'S INITIALS:
TIMEKEEPER'S SIGNATURE:
SUPERVISOR'S SIGNATURE:
PHONE: DATE: 1/05/05

**MOST COMMONLY USED TRANSACTION CODES:**
01 REGULAR TIME - 8 HRS RATE
04 SUNDAY DIFFERENTIAL
19 NIGHT DIFFERENTIAL
19 OVERTIME - OVER 8 HRS. PER DAY
OR OVER 40 HR. WEEK
21 OVERTIME
31 HOLIDAY WORKED
32 COMP TIME EARNED
41 ANNUAL LEAVE USED
61 SICK LEAVE USED
62 OTHER PAID TIME USED (SEE PAY/REG)
71 LEAVE WITHOUT PAY (LWOP)
72 ABSENCE W/ZNOUT LEAVE (AWOL)

**ADVANCED LEAVE CODE**
1 — ADVANCED ANNUAL
2 — ADVANCED SICK
3 — ADVANCED ANNUAL & SICK

**QUARTER HOUR INCREMENTS**
1 - 1/4 HOUR
2 - 1/2 HOUR
3 - 3/4 HOUR

PAYROLL REMARKS:
APPR / (REI)
505 3940 8
Leave AB 04 PP 24
A/L 81.00 A/C 6
S/L 0.00

TOTAL TIME IN PAY STATUS: 8 8 8 8
OTHER TIME (HOURS) - NON PAY STATUS

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)*<br>Klugel, Doratha C | | | | | | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER | |
|---|---|---|---|---|---|---|---|

**3. ORGANIZATION**   Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *(check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☑ Accrued Annual Leave | 12/27/04 | | 9 | 5 | 8 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | | | | | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |
| Purpose: ☐ Medical/dental/optical examination of requesting employee ☐ Other<br>☐ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | | | ☐ Birth/Adoption/Foster Care<br>☐ Serious Health Condition of Spouse, Son, Daughter, or Parent<br>☐ Serious Health Condition of Self |
| ☐ Compensatory Time Off | | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Leave Without Pay | | | | | | |

**6. REMARKS:** Time off related to car accident on Nov. 9, 2004. Use SL until depleted, then AL.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| EMPLOYEE SIGNATURE  *Doratha Klugel* | DATE  3/3/05 |
|---|---|

**8. OFFICIAL ACTION ON REQUEST:**  ☐ APPROVED    ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, indicate action to reschedule.)

| SIGNATURE  *[signature]* | DATE  3/3/05 |
|---|---|

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a state unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when considering an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office, when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-0-753-5067<br>PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)<br>PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER<br>SI - 0747

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME (Last, First, Middle Initial)<br>Klugel, Doratha C | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|

**3. ORGANIZATION** Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE<br>(Check appropriate box(es) below.) | DATE From: | DATE To: | TIME From: | TIME To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☑ Accrued Annual Leave | 12/20/04 | | 9 | 5 | 8 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | | | | | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

**Purpose:** ☐ Medical/dental/optical examination of requesting employee ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

| | | | | | | |
|---|---|---|---|---|---|---|
| ☐ Compensatory Time Off | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Other Paid Absence (Specify in Remarks) | | | | | | |
| ☐ Leave Without Pay | | | | | | |

**6. REMARKS:** Time off related to car accident on Nov. 9, 2004. Use SL until depleted then AL.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

**EMPLOYEE SIGNATURE** *Doratha Klugel*     **DATE** 3/3/05

**8. OFFICIAL ACTION ON REQUEST:** ☑ APPROVED    ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

**SIGNATURE** *[signature]*     **DATE** 3/3/05

## PRIVACY ACT STATEMENT

Section 311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

While the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

STANDARD FORM 71 (Rev. 12-97)
NSN 75 4040-753-5067    PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630
PREVA. US EDITION MAY BE USED

KLUGEL V. SAMPER
SI - 0748

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME (Last, First, Middle Initial) | | | | | | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|
| Klugel, Doratha C | | | | | | |

**3. ORGANIZATION**   Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE (Check appropriate box(es) below.) | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☒ Accrued Annual Leave | 12/30/04 | | 9 | 5 | 8 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | | | | | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |
| Purpose: ☐ Medical/dental/optical examination of requesting employee ☐ Other ☐ Care of family member/bereavement, including medical/dental/optical examination of family member | | | | | | ☐ Birth/Adoption/Foster Care ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent ☐ Serious Health Condition of Self |
| ☐ Compensatory Time Off | | | | | | |
| ☐ Other Paid Absence (Specify in Remarks) | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Leave Without Pay | | | | | | |

**6. REMARKS:**  Time off related to car accident on Nov. 9, 2004. Use SL until depleted then AL

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

EMPLOYEE SIGNATURE  *Doratha Klugel*    DATE  3/3/05

**8. OFFICIAL ACTION ON REQUEST:**   ☐ APPROVED    ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

SIGNATURE  *[signature]*    DATE  3/3/05

## PRIVACY ACT STATEMENT

Section 63 1 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067    STANDARD FORM 71 (Rev. 12-97)
PREVIOUS EDITION MAY BE USED    PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0749

KLUGEL V. SAMPER
SI - 0760

SMITHSONIAN INSTITUTION TIME AND ATTENDANCE REPORT

KLUGEL          DORATHA          C

FROM  12-12-04

DO NOT ATTACH OR STAPLE ANY DOCUMENT TO THIS FORM

FLSA STATUS  E

APPR / ORG
505   39948
Leave as of PP 23
A/L  1,335.040  A/C G
B/L  0.000

## REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)*<br>**Klugel, Doratha C** | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|

| 3. ORGANIZATION   Smithsonian Environmental Research Center (SERC) |
|---|

| 4. TYPE OF LEAVE/ABSENCE<br>*(Check appropriate box(es) below.)* | DATE From: | DATE To: | TIME From: | TIME To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☒ Accrued Annual Leave | 12/15 | 12/17 | 9 | 5 | 24 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| [ ] Restored Annual Leave | | | | | | |
| [ ] Advance Annual Leave | | | | | | |
| [ ] Accrued Sick Leave | | | | | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| [ ] Advance Sick Leave | | | | | | |
| Purpose: [ ] Medical/dental/optical examination of requesting employee [ ] Other [ ] Care of family member/bereavement, including medical/dental/optical examination of family member | | | | | | ☐ Birth/Adoption/Foster Care<br>☐ Serious Health Condition of Spouse, Son, Daughter, or Parent<br>☐ Serious Health Condition of Self |
| [ ] Compensatory Time Off | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| [ ] Other Paid Absence *(Specify in Remarks)* | | | | | | |
| [ ] Leave Without Pay | | | | | | |

**6. REMARKS:**   Sick or annual leave depending on what I have accrued

7. CERTIFICATION: I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| EMPLOYEE SIGNATURE   D. Klugel | DATE   12/14/04 |
|---|---|

| 8. OFFICIAL ACTION ON REQUEST: [ ] APPROVED          [ ] DISAPPROVED<br>(If disapproved, give reason. If annual leave, initiate action to reschedule.) | |
|---|---|
| SIGNATURE | DATE   12/14/04 |

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

When the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| NSN 7540-00-753-5067<br>PREVIOUS EDITION MAY BE USED | STANDARD FORM 71 (Rev. 12-97)<br>PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630 |
|---|---|

KLUGEL V. SAMPER
SI - 0751

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME (Last, First, Middle Initial)<br>**Klugel, Doratha C** | | | | | | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|---|---|---|---|---|

**3. ORGANIZATION** Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE<br>*Check appropriate box(es) below.* | DATE From: | DATE To: | TIME From: | TIME To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| [X] **Accrued Annual Leave** | 12/21 | 12/23 | 9 | 5 | 24 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| [ ] **Restored Annual Leave** | | | | | | |
| [ ] **Advance Annual Leave** | | | | | | |
| [ ] **Accrued Sick Leave** | | | | | | [ ] I hereby invoke my entitlement Family and Medical Leave for: |
| [ ] **Advance Sick Leave** | | | | | | [ ] Birth/Adoption/Foster Care |

Purpose: [ ] Medical/dental/optical examination of requesting employee  [ ] Other
[ ] Care of family member/bereavement, including medical/dental/optical examination of family member

[ ] Serious Health Condition of Spouse, Son, Daughter, or Parent
[ ] Serious Health Condition of Self

| [ ] **Compensatory Time Off** | | | | | | |
| [ ] **Other Paid Absence** (Specify in Remarks) | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| [ ] **Leave Without Pay** | | | | | | |

**6. REMARKS:**

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

**EMPLOYEE SIGNATURE** *D. Klugel*     **DATE** 12/20/04

**8. OFFICIAL ACTION ON REQUEST:** [ ] APPROVED   [ ] DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

**SIGNATURE** *[signature]*     **DATE** 12/20/04

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

KLUGEL V. SAMPER
SI - 0752

# SMITHSONIAN INSTITUTION TIME AND ATTENDANCE REPORT

**KLUGEL V. SAMPER**
**SI-0753**

**KLUGEL    DORATHA**

FROM 11-28-04

ESTABLISHED WORK WEEK AND HOURS: M-F 8

PERIOD NO. 24    YEAR 4

DO NOT ATTACH OR STAPLE DOCUMENTS TO THIS FORM

TIMEKEEPER'S REMARKS

Grant Grant: control
# 7860053

SI-71 ...

CERTIFIED CORRECT: ALL OF THE ABOVE INFORMATION ON HOURS WORKED AND LEAVE USED IS TRUE, ACCURATE, AND IN ACCORDANCE WITH LAW AND REGULATION.

EMPLOYEE'S INITIALS:
TIMEKEEPER'S SIGNATURE:
SUPERVISOR'S SIGNATURE:

PHONE: 443-482-2766
DATE: 12/08/04

PAYROLL REMARKS

APPR / ORG    505    3940
Leave    115. of PP 22
A/L    181.00    A/C 5
B/L    0.00

## Request for Leave or Approved Absence

| 1. Name (Last, first, middle) | 2. Employee or Social Security Number |
|---|---|
| Klugel, Doratha | |

3. Organization

   SERC

| 4. | Type of Leave/Absence | | | | | 5. | Family and Medical Leave |
|---|---|---|---|---|---|---|---|

| Check appropriate box(es) and enter date and time below) | Date | | Time | | Total Hours | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993 (FMLA), please provide the following information: |
|---|---|---|---|---|---|---|
| | From | To | From | To | | |
| ✓ Accrued annual leave | 11/29 | 12/3 | 1 | 4 | 36.00 | |
| ☐ Restored annual leave | 12/6 | 12/6 | 8 | 4 | 8.00 | |
| ☐ Advance annual leave | 12/8 | 12/9 | 8 | 4 | 16.00 | |
| ✓ Accrued sick leave | 11/29 | 11/29 | 8 | 12 | 4.00 | |
| ☐ Advance sick leave | | | | | | ☐ I hereby invoke my entitlement to family and medical leave for: |

Purpose:

☐ Illness/injury/incapacitation of requesting employee

☐ Medical/dental/optical examination of requesting employee

☐ Care of family member, including medical/dental/optical examination of family member, or bereavement

☐ Care of family member with a serious health condition

✓ Other

☐ Compensatory time off

☐ Other paid absence (specify in remarks)

☐ Leave without pay

☐ Birth/Adoption/Foster care

☐ Serious health condition of spouse, son, daughter, or parent

☐ Serious health condition of self

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the FMLA. Medical certification of a serious health condition may be required by your agency.*

6. Remarks

   Due to car accident.

7. Certification: I certify that the leave/absence requested above is for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| 7a. Employee signature | 7b. Date signed |
|---|---|
| D.Klugel | 12/10 |

| 8a. Official action on request | ☐ Approved  ☐ Disapproved | *(If disapproved, give reason. If annual leave, initiate action to reschedule.)* |
|---|---|---|

8b. Reason for disapproval

| 8c. Signature | 8d. Date signed |
|---|---|
| Mark Hagdon | 12/10/07 |

**Privacy Act Statement**
Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

**KLUGEL V. SAMPER**
**SI - 0754**

# SMITHSONIAN INSTITUTION TIME AND ATTENDANCE REPORT

KLUGEL V. SAMPER
SI - 0755

NAME: KLUGEL, DOROTHA C



TIMEKEEPER'S REMARKS

SF 71 on 7-20

PP 786053

6 in 4 610-1 - 1 restored

# Request for Leave or Approved Absence

| 1. Name (Last, first, middle) | | | | | | 2. Employee or Social Security Number | |
|---|---|---|---|---|---|---|---|
| Klugel, Doratha | | | | | | | |

**3. Organization**

SEIRC

| 4. | Type of Leave/Absence | | | | | 5. | Family and Medical Leave |
|---|---|---|---|---|---|---|---|

| Check appropriate box(es) and enter date and time below) | Date | | Time | | Total Hours |
|---|---|---|---|---|---|
| | From | To | From | To | |
| ✓ Accrued annual leave | 11/16/04 | 11/19/04 | 8 | 4 | 28.00 |
| ☐ Restored annual leave | | | | | |
| ☐ Advance annual leave | | | | | |
| ✓ Accrued sick leave | 11/15/04 | 11/16/04 | 8:00 | 4:00 | 12.00 |
| ☐ Advance sick leave | | | | | |

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993 (FMLA), please provide the following information:

☐ I hereby invoke my entitlement to family and medical leave for:

Purpose: [✓] Illness/injury/incapacitation of requesting employee

[ ] Medical/dental/optical examination of requesting employee

[ ] Care of family member, including medical/dental/optical examination of family member, or bereavement

[ ] Care of family member with a serious health condition

[ ] Other

☐ Birth/Adoption/Foster care

☐ Serious health condition of spouse, son, daughter, or parent

☐ Serious health condition of self

☐ Compensatory time off
☐ Other paid absence (specify in remarks)
☐ Leave without pay

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the FMLA. Medical certification of a serious health condition may be required by your agency.*

**6. Remarks**

Car accident.

**7. Certification: I certify that the leave/absence requested above is for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.**

| 7a. Employee signature | 7b. Date signed |
|---|---|
| D. Klugel | |

| 8a. Official action on request | ☐ Approved   ☐ Disapproved | *(If disapproved, give reason. If annual leave, initiate action to reschedule.)* |
|---|---|---|

**8b. Reason for disapproval**

| 8c. Signature | 8d. Date signed |
|---|---|
| | 11/22/04 |

**Privacy Act Statement**

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 04-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| Office of Personnel Management | Local Reproduction Authorized | OPM Form 71 |
|---|---|---|
| 5 CFR 630 | | June 2001 |
| | | Formerly Standard Form (SF) 71 |

KLUGEL V. SAMPER
SI - 0756

## Request for Leave or Approved Absence

| 1. Name (Last, first, middle) | 2. Employee or Social Security Number |
|---|---|
| Klugel, Doratha | ███████████ |

**3.** Organization

SERC

| 4. | Type of Leave/Absence | | | | | | 5. | Family and Medical Leave |
|---|---|---|---|---|---|---|---|---|

Check appropriate box(es) and enter date and time below:

| | | Date | | Time | | Total Hours |
|---|---|---|---|---|---|---|
| | | From | To | From | To | |
| ☑ | Accrued annual leave | 11/22/2004 | 11/22/2004 | 8 | 4 | 8.00 |
| ☐ | Restored annual leave | 11 / 24 | 24 | 8 | 4 | 16 |
| ☐ | Advance annual leave | | | | | |
| ☐ | Accrued sick leave | | | | | |
| ☐ | Advance sick leave | | | | | |

**5. Family and Medical Leave**

If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993 (FMLA), please provide the following information:

☐ I hereby invoke my entitlement to family and medical leave for:

☐ Birth/Adoption/Foster care

☐ Serious health condition of spouse, son, daughter, or parent

☐ Serious health condition of self

Purpose:
- ☐ Illness/injury/incapacitation of requesting employee
- ☐ Medical/dental/optical examination of requesting employee
- ☐ Care of family member, including medical/dental/optical examination of family member, or bereavement
- ☐ Care of family member with a serious health condition
- ☐ Other

*Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the FMLA. Medical certification of a serious health condition may be required by your agency.*

| ☐ Compensatory time off | | | | | |
|---|---|---|---|---|---|
| ☐ Other paid absence (specify in remarks) | | | | | |
| ☐ Leave without pay | | | | | |

**6.** Remarks

Car accident.

**7.** Certification: I certify that the leave/absence requested above is for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| 7a. Employee signature  D. Klugel | 7b. Date signed |
|---|---|

| 8a. Official action on request   ☐ Approved    ☐ Disapproved | *(If disapproved, give reason. If annual leave, initiate action to reschedule.)* |
|---|---|

**8b.** Reason for disapproval

| 8c. Signature | 8d. Date signed |
|---|---|
| *[signature]* | 1/22/04 |

**Privacy Act Statement**

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Public Law 104-134 (April 26, 1996) requires that any person doing business with the Federal Government furnish a social security number or tax identification number. This is an amendment to title 31, Section 7701. Furnishing the social security number, as well as other data, is voluntary, but failure to do so may delay or prevent action on the application. If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| Office of Personnel Management | Local Reproduction Authorized | OPM Form 71 |
|---|---|---|
| 5CFR630 | | June 2001 |
| | | Formerly Standard Form (SF) 71 |

✳ Corrected Time Sheet ✳

INDIVIDUAL TIME AND ATTENDANCE REPORT

NAME: Klugel, Dorothea C.

KLUGEL V. SAMPER
SI - 0758

# SMITHSONIAN INSTITUTION TIME AND ATTENDANCE REPORT

SI - 0769

FROM  10-31-04

**NAME ASSIGNED TO 15 CHARACTERS**

M - F - 8

(DO NOT ATTACH OR STAPLE DOCUMENTS TO THIS FORM)

SOCIAL SECURITY NUMBER: — 13 - 04

STATUS CHANGE

PLS STATUS: N

## ACCOUNTING DATA

FUND NUMBER

Gm'l Brod & C Ned

#786053

Employee unable to sign
due to an accident
previous day

## RECORD OF PARTIAL DAYS LEAVE

| DATE: | TIME FROM: | TO: |
| DATE: | TIME FROM: | TO: |
| DATE: | TIME FROM: | TO: |
| DATE: | TIME FROM: | TO: |
| DATE: | TIME FROM: | TO: |
| DATE: | TIME FROM: | TO: |
| DATE: | TIME FROM: | TO: |
| DATE: | TIME FROM: | TO: |

## TIMEKEEPER'S REMARKS

CERTIFIED CORRECT: ALL OF THE ABOVE INFORMATION ON HOURS WORKED AND LEAVE USED IS TRUE, ACCURATE, AND IN ACCORDANCE WITH LAW OR REGULATION.

EMPLOYEE'S INITIALS:

TIMEKEEPER'S SIGNATURE:

SUPERVISOR'S SIGNATURE:

PHONE #: 443-452-2696

DATE: 10/11/04

## TOTAL TIME IN PAY STATUS

| | S | M | T | W | TH | F | S | S | M | T | W | TH | F | S |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 8 | 8 | 8 | 8 | 8 | | | 8 | 8 | 8 | 8 | 8 | |

## MOST COMMONLY USED TRANSACTION/LEAVE CODES:

**01** REGULAR TIME - BASE RATE
**04** SUNDAY DIFFERENTIAL
**11** NIGHT DIFFERENTIAL
**18** OVERTIME - OVER 8 HRS. PER DAY WITHIN 40 HR. WEEK
**21** OVERTIME
**30** HOLIDAY WORKED
**38** DUMP TIME EARNED
**61** ANNUAL LEAVE USED
**62** SICK LEAVE USED
**69** OTHER LEAVE USED (SEE REVERSE)
**71** LEAVE WITHOUT PAY (LWOP)
**72** ABSENCE WITHOUT LEAVE (AWOL)

## ADVANCED LEAVE CODE
**1** - ADVANCED ANNUAL
**8** - ADVANCED SICK
**3** - ADVANCED ANNUAL & SICK

## OVERTIME HOUR INCREMENTS
**1** - 1/4 HOUR
**2** - 1/2 HOUR
**3** - 3/4 HOUR

(COMPLETE LIST OF CODES ON BACK)

## PAYROLL REMARKS

APPR OREG R
SDS 39.40
LEAVE BAL. OF PP 20
159.00 A/C 5

## REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| **Klugel, Doratha C** | ▓▓▓▓▓▓▓▓ |

**3. ORGANIZATION**  Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☐ Accrued Annual Leave | | | | | | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☒ Accrued Sick Leave | 11/10/04 | | 9 | 5 | 8 | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

Purpose: ☐ Medical/dental/optical examination of requesting employee  ☐ Other
☒ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

| ☐ Compensatory Time Off | | | | | | |
| ☐ Other Paid Absence *(Specify in Remarks)* | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Leave Without Pay | | | | | | |

**REMARKS:** Time off related to car accident on Nov 9, 2004. Use SL until depleted, then AL.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| EMPLOYEE SIGNATURE  *D. Klugel* | DATE 3/3/05 |
|---|---|

**8. OFFICIAL ACTION ON REQUEST:** ☐ APPROVED    ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

| SIGNATURE  *[signature]* | DATE 3/3/05 |
|---|---|

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by managers and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

While the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

| NSN 7540-00-753-5067 PREVIOUS EDITION MAY BE USED | STANDARD FORM 71 (Rev. 12-97) PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630 |
|---|---|

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME *(Last, First, Middle Initial)* | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER |
|---|---|
| **Klugel, Doratha C** | |

**3. ORGANIZATION**  Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE *(Check appropriate box(es) below.)* | DATE From: | To: | TIME From: | To: | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☒ Accrued Annual Leave | 11/12/04 | | 9 | 5 | 8 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | | | | | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

Purpose: ☐ Medical/dental/optical examination of requesting employee  ☐ Other

☐ Care of family member/bereavement, including medical/dental/optical examination of family member

☐ Birth/Adoption/Foster Care
☐ Serious Health Condition of Spouse, Son, Daughter, or Parent
☐ Serious Health Condition of Self

| ☐ Compensatory Time Off | |
| ☐ Other Paid Absence *(Specify in Remarks)* | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☐ Leave Without Pay | |

**6. REMARKS:** Time off related to car accident on Nov. 9, 2004. Use SL until depleted, then AL.

**7. CERTIFICATION:** I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

| EMPLOYEE SIGNATURE  *Doratha Klugel* | DATE 3/3/05 |
|---|---|

| 8. OFFICIAL ACTION ON REQUEST: ☐ APPROVED | ☐ DISAPPROVED |
|---|---|
| *(If disapproved, give reason. If annual leave, initiate action to reschedule.)* | |
| SIGNATURE | DATE 3/3/05 |

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

While the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If any agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

NSN 7540-00-753-5067
PREVIOUS EDITION MAY BE USED

STANDARD FORM 71 (Rev. 12-97)
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR PART 630

# REQUEST FOR LEAVE OR APPROVED ABSENCE

| 1. NAME (Last, First, Middle Initial) Klugel, Doratha C | 2. EMPLOYEE OR SOCIAL SECURITY NUMBER 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 |
|---|---|

3. ORGANIZATION Smithsonian Environmental Research Center (SERC)

| 4. TYPE OF LEAVE/ABSENCE (Check appropriate box(es) below.) | DATE From | To | TIME From | To | TOTAL HOURS | 5. FAMILY AND MEDICAL LEAVE |
|---|---|---|---|---|---|---|
| ☒ Accrued Annual Leave | 2/18/05 | | 9 | 51 | 84 | If annual leave, sick leave, or leave without pay will be used under the Family and Medical Leave Act of 1993, please provide the following information: |
| ☐ Restored Annual Leave | | | | | | |
| ☐ Advance Annual Leave | | | | | | |
| ☐ Accrued Sick Leave | | | | | | ☐ I hereby invoke my entitlement Family and Medical Leave for: |
| ☐ Advance Sick Leave | | | | | | |

Purpose: ☐ Medical/dental/optical examination of requesting employee  ☐ Other
☐ Care of family member/bereavement, including medical/dental/optical examination of family member

- ☐ Birth/Adoption/Foster Care
- ☐ Serious Health Condition of Spouse, Son, Daughter, or Parent

| ☐ Compensatory Time Off | | | | | | ☐ Serious Health Condition of Self |
| ☐ Other Paid Absence (Specify in Remarks) | | | | | | Contact your supervisor and/or your personnel office to obtain additional information about your entitlements and responsibilities under the Family and Medical Leave Act of 1993. |
| ☒ Leave Without Pay | 2/18 | 2/18 | 1 Pm | 5 Pm | 4 | |

6. REMARKS: Time off related to car accident on Nov. 9, 2004. Use SL until depleted, then AL.

7. CERTIFICATION: I hereby request leave/approved absence from duty as indicated above and certify that such leave/absence is requested for the purpose(s) indicated. I understand that I must comply with my employing agency's procedures for requesting leave/approved absence (and provide additional documentation, including medical certification, if required) and that falsification of information on this form may be grounds for disciplinary action, including removal.

EMPLOYEE SIGNATURE *Doratha Klugel*    DATE 3/3/05

8. OFFICIAL ACTION ON REQUEST:  ☐ APPROVED    ☐ DISAPPROVED
(If disapproved, give reason. If annual leave, initiate action to reschedule.)

SIGNATURE *M. McFadden*    DATE 3/3/05

## PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal, State, or local law enforcement agency when your agency becomes aware of a violation or possible violation of civil or criminal law; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or to the General Services Administration in connection with its responsibilities for records management.

While the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than those indicated above, it may provide you with an additional statement reflecting those purposes.

N 7540-00-753-5067
N. PREVIOUS EDITION MAY BE USED
PRESCRIBED BY OFFICE OF PERSONNEL MANAGEMENT, 5 CFR, PART 630
STANDARD FORM 71 (Rev. 12-97)

Employee did not have 8 hrs of leave available, only 4 So 4 hrs was moved to the LWOP section *McFadden*

KLUGEL V. SAMPER
SI - 0788

EXHIBIT 23

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
----------------------------x
DORATHA KLUGEL,               :
                             :
           Plaintiff,         :
                             :
      v.                      : No. 06-1886
                             :
CRISTIAN SAMPER et al.,       :
                             :
           Defendants.        :
----------------------------x
```

Falls Church, Virginia

Monday, April 21, 2008

Deposition of

ANSON HINES

a witness, called for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, beginning at approximately 2:16 p.m., at

the law offices of Grad Logan & Klewans, PC, 3141

Fairview Park Drive, Falls Church, Virginia,

before Stephen K. Garland of Anderson Court

Reporting, notary public in and for the

Commonwealth of Virginia, when were present on

behalf of the respective parties:

40

1     investigation.

2          BY MR. BYRNES:

3     Q     Would it have been after December 2004

4     that you received complaints about her

5     performance?

6     A     After -- say that again?

7     Q     After December 2004?

8     A     That was the main time when I was aware

9     of them.  Yes.  And during 2005.

10    Q     Okay.  What did you hear about her

11    performance?

12    A     That she was not available to conduct

13    her job much of the time, that she was taking a

14    lot of leave and was not available to meet the

15    needs of the project that we had contracted.

16    Q     Who told you that she was taking a lot

17    of leave?

18    A     Her supervisor, Mark Haddon.

19    Q     And did he tell you why she was taking

20    so much leave?

21    A     He said that she was taking leave for

22    physical therapy and other medical reasons.

41

1      Q    Okay.  Did you make any inquiry as to

2   what those medical reasons were?

3      A    Yes.  He said it was for physical

4   therapy as a result of an injury apparently from a

5   car accident.  That's what she had told him.

6      Q    What did -- did you -- when he told you,

7   why -- do you know -- what was -- let me go back.

8   How was it that he made you aware of these?  He

9   came and talked to you?  Mr.  Haddon?

10          MS. JOHNSON:  Objection to form.

11          THE WITNESS:  I don't recall exactly how

12   they were initiated.  We were conversing

13   frequently about the progress of this project for

14   an electronic field trip and it was important that

15   the program stay on schedule and we were not

16   meeting this, we were concerned about not meeting

17   the schedule or falling off the schedule.

18          BY MR. BYRNES:

19      Q    Did you make any attempts to assist or

20   accommodate Ms. Klugel?

21          MS. JOHNSON:  Objection to form.

22          THE WITNESS:  Did I?

42

1          BY MR. BYRNES:

2     Q     Yes.

3     A     It wasn't my job to accommodate her per

4  se.  The policy is to accommodate individuals if

5  we can.

6     Q     Well, what efforts were you made aware

7  of from Mr. Haddon that he had engaged in to

8  accommodate her, if any?

9     A     Well, we were allowing her leave

10  requests to go through and then ultimately when it

11  became evident that her needs, express needs for

12  leave and medical leave and otherwise were in

13  conflict with the needed schedule of the project,

14  we attempted to accommodate her by alleviating

15  that pressure on her.

16     Q     How did you do that?

17     A     I recommended that he take over some of

18  those front end responsibilities that would

19  require travel and high pressure deadline

20  performance and allow her to maintain her schedule

21  that she had requested for medical leave.

22     Q     Do you know whether he did that or not?

43

1    Mr.  Haddon?

2         A    Did what?

3         Q    Followed your recommendations.

4         A    Yes, I believe he did.

5         Q    How do you know that?

6         A    Because we discussed it and he

7    ultimately stepped in and took that role.

8         Q    Now do you know whether or not Mr.

9    Haddon ever denied any leave request for Ms.

10   Klugel?

11        A    Denied any leave request?  I don't know.

12   I don't recall exactly.

13        Q    Well --

14        A    He might have, but I don't know.

15        Q    Well, did you ever recommend that he

16   deny any leave request for Ms. Klugel?

17        A    Not that I recall denying leave.  I may

18   have asked for documentation of her leave, but I

19   don't recall denying it.

20        Q    Were you ever involved in any

21   discussions about the need for additional

22   documentation for her leave?

1    A    Yes.

2    Q    Who did you have those discussions with?

3    A    Mark Haddon and Bob Gallagher.

4    Q    What was the nature of the discussion?

5    We have a light on a timer.  Thank you.

6    A    The nature of the discussion -- well,

7    Ms. Klugel was taking a lot of leave and there was

8    a lot to get done on a specific deadline involving

9    a complicated project.  When it became evident

10    that there was sustained, repeated pattern of

11    leave that she claimed was related to a particular

12    injury and medical leave, I suggested, I asked him

13    if she had documentation of that from her

14    physician and suggested that he ask for that

15    documentation explaining what her, documenting her

16    need and what her capabilities were, if they were

17    at all problems in the performance of her duties.

18    Q    Why did you want her to document her

19    leave?

20    A    Want her to document it?

21    Q    Yes.  Ms. Klugel to document it.  Why

22    did you want Ms. Klugel to document her leave?

45

1      A    Because she was taking a lot of leave in

2    a pattern that repeatedly associated with what she

3    claimed was consistent need for physical therapy.

4      Q    Did you have any reason to believe that

5    she did not have that routinely?

6      A    I had no idea, that's why we asked for

7    documentation from a physician.

8      Q    I guess the question I asked though is

9    did you have any reason to question the voracity

10   of what she was saying about her need for leave?

11      A    I wasn't questioning the voracity.  I

12   was asking for documentation of her leave.

13      Q    Do you know whether the Smithsonian,

14   through your training, is subject to the Family

15   Medical Leave Act?

16      A    Yes, it is.

17      Q    And did you ever suggest that she take

18   leave under the Family Medical Leave Act?

19      A    I did not.

20      Q    Okay.  Do you know whether or not you .

21   made any suggestions other than changing the work

22   schedule regarding how you might alleviate some of

1       the difficulties she was having due to her leave?

2               MS. JOHNSON:  Objection to form.

3               THE WITNESS:  Say that again, please.

4               BY MR. BYRNES:

5           Q       In other words, she was taking a large

6       amount of leave, correct?

7           A       Yes.

8           Q       Okay.  Did you get anyone, other than

9       Mr.  Haddon, to temporarily fill her assignment

10      while she was on leave?

11          A       We had nobody else to fill that.  It

12      required somebody with knowledge.  Mark Haddon was

13      the person that was most familiar with and

14      knowledgeable of the position and so I asked him

15      to step in.  I was confident he could do that.

16          Q       What did Mr. Gallagher say, if anything,

17      about Ms. Klugel's leave situation?

18          A       He noted that she was taking a lot of

19      leave and that there wasn't any medical

20      documentation for the medical leave that she was

21      taking.  It's normal policy to ask for that if

22      it's a pattern or exceeds a short term sort of

EXHIBIT 24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
----------------------------x
DORATHA KLUGEL,              :
                            :
          Plaintiff,         :
                            :
     v.                      : No. 06-1886
                            :
CRISTIAN SAMPER et al.,      :
                            :
          Defendants.        :
----------------------------x
```

                              Falls Church, Virginia

                              Monday, April 14, 2008

Deposition of

              ROBERT P. GALLAGHER

a witness, called for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, beginning at approximately 1:48 p.m., at

the law offices of Grad Logan & Klewans, PC, 3741

Fairview Park Drive, Falls Church, Virginia,

before Catherine B. Crump of Anderson Court

Reporting, notary public in and for the

Commonwealth of Virginia, when were present on

behalf of the respective parties:

1    together, and each of them had spoken to me about

2    that, and then we had a number of conversations

3    separately and together trying to resolve some

4    matters.

5        Q    Is that part of your duties, to act

6    almost as a human resources director?

7            MS. JOHNSON:   Objection to form.

8            THE WITNESS:   I would not call it a

9    human resources director.   As I said, I'm the

10   liaison between SERC and the Office of Human

11   Resources.

12           BY MR. BYRNES:

13       Q    Let's go at it this way:   How is it that

14   it came up that you became aware that Mr. Haddon

15   and Ms. Klugel were having difficulty?

16       A    Each of them came to me separately

17   saying that they were having some difficulties

18   with the other, and I was trying to bridge that

19   gap, if you will.

20       Q    What were the natures of the

21   difficulties?  Do you recall?

22       A    I believe it was Mr. Haddon that

10

1    initiated that interaction.  He had some concerns

2    about Dottie's leave.  She had been in an

3    accident, and he was concerned about work getting

4    done.  We had a number of large projects pending

5    in which she was integrally involved in those, and

6    he was looking for advice and guidance on how do I

7    get this done, what do I do.

8         Q    Well, is the Smithsonian, to your

9    knowledge, covered by the Rehabilitation Act of

10   1973?

11        A    I can't say one way or the other.  I

12   don't know.

13        Q    Have you had any training in your

14   liaison duties as to federal rights laws?

15        A    Some.

16        Q    Okay.  Are you aware of what happens

17   when an employee is requesting either an

18   accommodation for any sort of physical or mental

19   impairment?

20             MS. JOHNSON:  Objection to form.

21             THE WITNESS:  I would say I have a

22   conceptual sense.  I don't know that I know the

client was taking?

    A    Not that I recall.

    Q    Have you had any training on the proper
scope of medical inquiries under the
Rehabilitation Act of 1973?

    A    I'm sure the answer to that is no.

    Q    All right.  Do you know whether or not
Ms. Klugel was ever referred for any counseling
inside the agency?

        MS. JOHNSON:  Objection to form.

        THE WITNESS:  I asked -- if this is what
you're getting at, I asked that she meet with our
employee assistance personnel to facilitate
interactions between her and her supervisor.

        BY MR. BYRNES:

    Q    Why did you ask that?

    A    Because I had heard from both of them
separately that their professional relationship
was deteriorating to the point where it was
becoming more difficult for one to work with the
other.  I was trying to facilitate the mending of
that relationship and thought that working with

19

our EAP would be helpful in that regard.

Q    Did you ever have any concerns regarding Ms. Klugel's mental health?

MS. JOHNSON:  Objection to form.

THE WITNESS:  No.

BY MR. BYRNES:

Q    Okay.  Did you ever have any concerns as to Ms. Klugel's physical health, the length of time it would take her to recover from·her injuries?

MS. JOHNSON:  Objection to form.

THE WITNESS:  Yes.

BY MR. BYRNES:

Q    Okay.  And did Mr. Haddon and you ever discuss the specific types of medical documentation that Mr. Klugel should provide in order to justify her leave?

MS. JOHNSON:  Objection to form.

THE WITNESS:  In a broad sense, I think we might have, yes.

BY MR. BYRNES:

Q    Okay.  When you say in a broad sense,

Q    Well, did you ever suggest to her -- did you ever or Mr. Haddon ever make any suggestion to her regarding having her attorney present?

MS. JOHNSON:  Objection.  Lack of foundation.

THE WITNESS:  What kind of a suggestion?

BY MR. BYRNES:

Q    Anything, that that would be appropriate or inappropriate or you wouldn't do that?

A    In terms of the meeting with the employee assistance personnel, she asked or maybe you asked -- I don't remember which of you -- that you be allowed to be present at that meeting.

Q    Right.

A    I spoke to our EAP people -- person about that, who was not comfortable with it unless an attorney for the Smithsonian was also present in the room.  I believe I responded to Dottie and said as much, that if she was going to insist on having you present or an attorney present, that I'd have no choice but to have one from the Smithsonian present as well.

26

1          MS. JOHNSON:   Objection to form.

2          THE WITNESS:   You mean like a

3    physician's report or something like that?

4          BY MR. BYRNES:

5      Q    Yes.

6      A    Not in so many words.  I mean, I

7    remember seeing a very brief note that was written

8    on a physician's -- maybe even a prescription pad

9    that said she was in this accident, she requires

10   -- suffered a broken arm, requires treatment and

11   physical therapy.  So there was nothing any more

12   specific than that.

13     Q    Why was Mr. Haddon concerned about the

14   duration of her physical therapy?

15         MS. JOHNSON:   Objection.  Calls for

16   speculation.

17         THE WITNESS:   You mean the during over a

18   protracted time or within a given session.

19         BY MR. BYRNES:

20     Q    Over a protracted time.

21     A    Because the amount of time that she was

22   not at work was impacting her ability to complete

27

1    her work.

2        Q    And what discussions did you and Mr.

3    Haddon with Ms. Klugel about how to accommodate

4    her in the workplace?

5            MS. JOHNSON:  Objection to form.

6            THE WITNESS:  We sat down with Dottie in

7    my office and talked about the leave that had

8    already occurred, you know, in the prior several

9    months between her accident and the day that we

10   started this, what work needed to be accomplished

11   going forward over the next few months, and how

12   much time we thought it would take to complete

13   those tasks, which is where the question came up

14   how much more time will you need for physical

15   therapy, which we understood, and Dottie couldn't

16   answer that.

17           BY MR. BYRNES:

18       Q    Do you know what the limits are under

19   the Rehabilitation Act for making an inquiry into

20   the medical treatment of an employee?

21           MS. JOHNSON:  Objection.  Lack of

22   foundation.  Calls for a legal conclusion.

38

1    and Mr. Haddon.  Why did you never have a

2    discussion with her attorney regarding her medical

3    condition?

4              MS. JOHNSON:  Objection.  Lack of

5    foundation.  Calls for speculation.

6              THE WITNESS:  I didn't see why I should

7    do that.  Why should I seek out her attorney?

8              BY MR. BYRNES:

9         Q    Well, she was concerned that you were

10   questioning her integrity.

11        A    And we assured her that we were not.

12        Q    How did you assure her?

13        A    We sat down at a meeting around a table

14   in my office, and that was one of the first things

15   that I said.  We're not questioning her integrity.

16   We were simply trying to resolve the issue of

17   getting work done.

18        Q    Well, bit didn't you say to her in your

19   discussions we're concerned about you getting your

20   work done, we're concerned about the duration of

21   your medical condition, you need to provide more

22   documentation of your medical condition?

39

1           MS. JOHNSON:  Objection to form.

2           BY MR. BYRNES:

3      Q    Correct?

4      A    No.  We said we're concerned about the

5    work, here's how much work has to be done, here

6    are the deadlines under which that -- by which

7    that work has to be done, we're concerned that

8    you're not here enough to get that work done, so

9    we would like to figure out a schedule that's

10   going to allow this work to get done.

11     Q    Did you produce such a schedule?

12     A    I believe that we did, although Mr.

13   Haddon was keeping the notes of that.  He may have

14   those.  I didn't.

15     Q    Well, were you ever involved in the

16   draft of a schedule to allow her to complete her

17   benchmarks?

18     A    Yes.  We were there.  The three of us

19   were there and agreed on dates and numbers of

20   electronic field trip -- video conferences that

21   Dottie was running.  We had dates by which -- how

22   many were going to be done by which date, etc.

57

1    foundation.

2         THE WITNESS:  I don't know what normal

3    means, but I know that leave sometimes gets denied

4    if it's being requested at a time when work

5    demands otherwise.

6         BY MR. BYRNES:

7    Q    Do you know what the regulations are for

8    the Smithsonian regarding the approval of sick

9    leave?

10        MS. JOHNSON:  Objection.  Lack of

11   foundation.

12        THE WITNESS:  I believe so.

13        BY MR. BYRNES:

14   Q    Okay.  Is sick leave, when it's denied,

15   must a reason be given for its denial?

16   A    Yes.

17   Q    Was that done with respect to Ms.

18   Klugel?

19        MS. JOHNSON:  Objection.  Lack of

20   foundation.

21        THE WITNESS:  To my knowledge, she never

22   had sick leave denied.

58

1          BY MR. BYRNES:

2       Q   Well, wasn't leave denied to her in

3   February by Mr. Haddon?

4       A   I don't recall sick leave being denied.

5   I know an annual leave request was denied.

6       Q   Do you know if there's any regulation

7   that required under SERC or the Smithsonian that

8   when annual leave is denied, that an explanation

9   be given?

10      A   I believe there is.  I believe you are

11  required to say why, yes.

12      Q   Within the Federal Government, is leave

13  considered a right or a privilege?

14      MS. JOHNSON:  Objection.  Lack of

15  foundation.  Objection as to form.

16      BY MR. BYRNES:

17      Q   If you know.

18      A   Use of leave is your right as an

19  employee.

20      Q   All right.  And so do you know why Ms.

21  Klugel was denied leave?

22      MS. JOHNSON:  Objection.  Calls for

59

1    speculation.

2            THE WITNESS:  Yes.

3            BY MR. BYRNES:

4        Q    Why?

5        A    Because, if I remember correctly, she

6    had asked for about a week of time, give or take a

7    day, not long after we had had this conversation

8    about getting work, and Mark -- Mr. Haddon.  Sorry

9    -- had followed up with her on progress to see if

10   they were meeting their benchmarks, which was not

11   happening, and she had asked for leave and he said

12   I can't give you leave when we have all of this

13   stuff going on.

14       Q    Do you know of any other employees

15   during the 14 months that were there and Ms.

16   Klugel was there that was ever denied leave?

17       A    No.

18           MR. BYRNES:  No further questions.

19           MS. JOHNSON:  Let's just go off the

20   record for two minutes so I can confer with agency

21   counsel.

22           THE VIDEOGRAPHER:  Going off the record

# EXHIBIT 25

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DORATHA KLUGEL,<br>      Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 06-1886 (HHK) |
| | ) |
| CHRISTIAN SAMPER, Acting Secretary,<br>      Smithsonian Institution, | ) |
| | ) |
| and | ) |
| | ) |
| The UNITED STATES OF AMERICA,<br>      Defendants. | ) |

## PLAINTIFFS' RESPONSE TO DEFENDANTS'
## FIRST SET OF INTERROGATORIES

COMES NOW the Plaintiff Doratha Klugel and hereby responds to the

Defendants' First Set of Interrogatories as follows:

### INTERROGATORIES:

**INTERROGATORY NO. 1:**     Identify the name and title of each and every

individual who has knowledge concerning the facts that you have alleged to support your

allegations of discrimination based upon your gender and alleged disability.

**ANSWER**:    Objection to the extent the interrogatory suggests that Plaintiff was

disabled. Plaintiff's claim is for a perceived disability and that it was the Agency and not

Plaintiff who claimed she had a mental impairment or condition. Plaintiff further objects

to the extent the interrogatory seeks to obtain legal conclusions or invades attorney trial

strategy. Plaintiff adopts the persons identified by both Plaintiff and Defendant in their

initial Rule 26 disclosures and adopts the facts set forth in Plaintiff's disclosures. Plaintiff

also adopts the facts set forth in her complaint and all persons identified therein. Plaintiff

1

statements of Philip Yunger concerning his traveling with Ms. Klugel and his relationship to the Agency as a volunteer photographer. Additional statements between Ms. Klugel and Mr. Yunger which occurred after August 12, 2006, are protected marital communications. Mr. Yunger's statements are oral in nature.

**INTERROGATORY NO. 6:**    Please identify each and every document referring or related to the allegations set forth in your Complaint, including in your answer the name and address of the present custodian of each such document; and if any such document has been destroyed or otherwise disposed of, the date and circumstance of such disposition.

**ANSWER:**    Objection. The interrogatory is vague, overbroad, burdensome and seeks to invade attorney-client communications and counsel's trial strategy and work product. Without waiving that objection, Plaintiff relies on documents provided to her or her counsel by the Agency. Plaintiff further states that she has provided responsive documents in her responses to Defendant's Summary Judgment Motion.

**INTERROGATORY NO. 7:**    Describe in detail all facts upon which you rely in support of your assertion that you are disabled, including identification of the doctors who diagnosed such alleged disability, any treatment you have received, and any medication you have taken or are now taking to address the disability.

**ANSWER:**    Objection. Plaintiff has never claimed she is disabled; Plaintiff contends the Agency claimed she was disabled. Without waiving the objection, Plaintiff suffers from irritable bowel syndrome (IBS) for which she takes medication. This condition was known to Mr. Haddon for at least two years before the events in the complaint. IBS is exacerbated by stress.

3

Ms. Klugel also suffers from ideopathetic hypersonomia, a form of sleep interference. That condition is also exacerbated by stress.

Ms. Klugel is being treated by Dr. Nelson Trujillo, a gastroentologist and Dr. Hari-Hall, a neurologist for her sleep disorder. Both conditions were worsened by the conduct of the Smithsonian.

**INTERROGATORY NO. 8:**    Describe in detail all major life activities that you contend are significantly limited by your alleged disability and whether you are taking any medication to ameliorate the effects of any such limitation.

**ANSWER**:    See Answer to Interrogatory No. 7.

**INTERROGATORY NO. 9:**    Please describe in detail all facts that support your statement in paragraph 17 of your complaint that you have a "perceived mental disability."

**ANSWER**:    Plaintiff contends the Agency attempted to force her to attend the equivalent of a mandatory psychological evaluation through the Agency's EAP program in April, 2005, claiming she was suffering from a mental impairment. Robert Gallagher insisted that Ms. Klugel was suffering from a stress and anxiety disorder based on irrational fears of harassment, when Ms. Klugel protested the heavy handed IG Investigation. Mr. Gallagher refused to allow Ms. Klugel to have legal counsel present at any such meeting and suggested that the fact that Ms. Klugel had secured legal representation was itself a basis for a psychological referral.

Mr. Gallagher's retaliation, reprisal and interference with Ms. Klugel's right to counsel were designed to punish Ms. Klugel for objecting to the outrageous actions of ill trained and abusive agents who made inquiry into sexual orientation and

# EXHIBIT 26

Kathie —

What I know so far. Plans are being finalized over the next week, but I obviously needed to get these to you before then.

I put $34 a day for 3 days on my + Philip's ~~form~~ in case Project VIEW doesn't cover this. I do however expect that they ultimately will.

Philip and I are going on to Belize from Panama. I am working with July ~~to figure~~ out if we get round trip tickets from Panama with a trip (annual leave) to Belize in ~~between~~ or if we get tickets to Panama and leaving Belize back to DC. I will let you

KLUGEL V. SAMPER
SI - 0445

know.

When I get the vendor forms from the teachers I will have their SSNs to give you.

I am out tomorrow but in Friday. — Dottie

KLUGEL V. SAMPER
SI - 0446