UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DORATHA KLUGEL,  )
          Plaintiff,  )
  )
  )
v.  )  Civil Action No. 06-1886 (HHK)
  )
CRISTIAN SAMPER, Acting,  )
Secretary, Smithsonian Institution, et al.  )
        Defendants.  )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Comes now the Plaintiff Doratha Klugel, by counsel, and files her Memorandum in Opposition to Defendants' Motion for Summary Judgment; as grounds for this Opposition, Plaintiff states as follows:

## I. INTRODUCTION

Contrary to Defendants' self-serving and argumentative claims, Plaintiff has neither distorted facts nor presented an outlandish theory of her case. As the record shows, Ms. Klugel was subject to a salacious, intrusive and totally unnecessary investigation into her sexual relationship with her now husband, Philip Yunger, a long-time volunteer at the Smithsonian Environmental Research Center, by an untrained, overzealous would-be police officer at the Inspector General's Office. Furthermore, that investigator was doing the bidding of two disgruntled travel office clerks who were annoyed by Ms. Klugel's insistence that they perform their administrative tasks properly.

The investigator, Gerald Roy, ignoring ample evidence that Ms. Klugel had engaged in conduct authorized by her supervisor, Mark Haddon, which was of economic and technical advantage to the Smithsonian, decided to try to bully and frighten Ms.

Klugel; and in his efforts inquired into the number of her sexual partners, and her relations with Mr. Yunger. Thus, the investigation, while ostensibly about whether Mr. Yunger had properly sought a government rate for official SERC business, turned into an ugly witch hunt into whether Ms. Klugel was traveling to further sexual trysts.

When Ms. Klugel vehemently and repeatedly complained to her supervisors of the impropriety of the questioning by the very Agency that would normally investigate such claims, the Agency retaliated. It not only ignored her complaints, it also created an utterly hostile work environment replete with reductions in her work responsibilities, a retaliatory "progress report," and scathing and unwarranted inquiries into her use of leave for treatment of serious physical injuries incurred in a car accident.

Hiding behind the canard that Ms. Klugel was a temporary employee subject to a proper travel inquiry, the Smithsonian seeks to absolve itself of liability and to avoid having its actions scrutinized by a finder of fact who, Plaintiff believes, will see its conduct as juvenile, discriminatory and base.

## II. MATERIAL FACTS SUBJECT TO DISPUTE

Plaintiff Doratha Klugel is a long time employee of SERC who converted from a federal employee to a trust fund employee in 2001. Klugel Deposition 12:11. Ms. Klugel was assured by her supervisor, Mark Haddon, that ample and indefinite funding existed for the Smithsonian and that her change in status from a federal to a trust fund employee would not impact the long term and "indefinite" nature of her employment. Klugel Deposition 12:14-12:16; 13:11; 14:7-15.[1] Indeed, as part of Klugel's responsibilities, she worked with partners such as Project View and on grant proposals. See Exhibit 2, IS-9 Position Description; Klugel Deposition 32:9-14;

---

[1] See Exhibit 1 which incorporates all references to depositions in this matter.

Ms. Klugel was employed as an IS-9 Distance Learning Coordinator. She conducted video conferences for the Smithsonian, webcasts and electronic field trips and worked with funding partners to develop projects of interest to the scientists, employees and third parties working with SERC. Klugel Deposition 15:15-16:02; Exhibit 2, IS-9 Position Description.

Philip Yunger was a SERC volunteer with longstanding and ample experience in videography and film production. Yunger Deposition 12:15-13:03. In fact, Mr. Yunger has 41 years of stage technology and motion picture experience and worked on Academy Award wining films such as "Silence of the Lambs" and "The Exorcist." Yunger Deposition 13:05-13:06; Exhibit 3, Yunger resume.

Mr. Yunger was a well respected and thought of volunteer. Haddon Deposition 53:02-53:09; Hines Deposition 34:06. He worked as a volunteer since June, 2000. Yunger Deposition 10:11.

As a combined federal/private partnership, the Smithsonian relies on volunteers to assist in its various functions. Hines 18:07-18:12. In fact, the Agency utilizes over 1500 such volunteers in its "Behind the Scenes Volunteer Program;" and volunteers are "an integral part of the [Smithsonian] Institution." Deposition of Amy Lemon 8:04-8:08; 8:09-8:14. As attested by the Smithsonian's own 30(b)(6) designee, Amy Lemon, the coordinator of the "Behind the Scenes Program" for the Smithsonian, volunteers would travel with SERC employees when the need arose. Lemon Deposition 8:19. Family members, significant others, and spouses were not prohibited as serving as volunteers. Lemon Deposition 10:2-10:20; 11:10-11:19.

In November, 2004, Ms. Klugel ran into some difficulties with Kathy Suite an administrative clerk in the travel office who was supposed to assist SERC employees in obtaining travel. Suite Deposition 6:01-6:02, 7:08-7:12. The issue arose when Ms. Klugel attempted to combine a trip paid for by the Smithsonian Environmental Research Center (SERC), where she was employed, with a trip to Belize to assist Project View in doing an educational program on manatees. Klugel Deposition 35:3-07. SERC was funding the Panama trip while Project View was paying for the trip to Belize. Klugel 36:3-13. Ms. Klugel would be working in an official capacity on both the Panama and Belize trips. Klugel Deposition 36:16-18. Ms. Klugel was going to be accompanied on these trips by Mr. Yunger who was working as a SERC volunteer. Ms. Klugel fully disclosed Mr. Yunger's travel and role as a volunteer on her Panama/Belize travel voucher (Exhibit 4); Klugel Deposition 36:13-22. Although Mr. Yunger was a registered volunteer with SERC who could have accompanied Ms. Klugel at a government rate, Suite Deposition 17:12-18, Ms. Suite, on her own accord and without any investigation into the validity of the travel, raised an objection to her supervisor, Carol Ailes, over Ms. Klugel's voucher. Suite claimed, for reasons which remain unknown to this day, that her concern was that Klugel was claiming Belize was official travel when it was personal time. Suite Deposition 20:01-20:22. How Suite concluded this in the face of supervisory approval of the trip by Mr. Mark Haddon, Suite Deposition 37:01-38:15; 185:14-17, and without the slightest proof to the contrary, has never been explained.

The facts suggest, however, that the real reason for the referral is that Klugel was upset with Ms. Suite for unilaterally imposing time and other restrictions on travel 29:05-09; 143:07-15; 145:12-19 and had essentially accused her of dilatory conduct and

incompetence when it came to travel. See Exhibit 5, email exchanges between Ms. Suite, Ms. Klugel and supervisory personnel. Ms. Suite, acting in a childish and retaliatory fashion, then prompted Ms. Ailes to have the Inspector General's Office admonish Ms. Klugel.   Indeed, Ms. Suite admits to maintaining notes on (Suite Deposition 29:22-31:03) and to adding editorials, changing documents and highlights to submissions concerning Ms. Klugel to Agent Roy and commented on Ms. Klugel's relationship to Mr. Yunger, her medical treatment (Suite Deposition 110:03-111:18; 115:12-117:07), and singled out Ms. Klugel for review because of her trips with Mr. Yunger while ignoring other officials who brought family members. Suite Deposition 118:03-121:21.  In fact, Ms. Suite went so far as to create a chronology on her own to illustrate her perception of Ms. Klugel's wrongdoing for Agency counsel! Suite Deposition 157:03-164:10.

Relying on the personal animus of a low level clerk and the uncritical acceptance of that clerk's word that Belize was not official travel, Carol Ailes of the Smithsonian Travel office contacted the Inspector General's office to complain that she believed Ms. Klugel was adding a personal stop in Belize while on official travel for SERC to Panama. Ailes Deposition 8:09-8:16. This referral followed complaints by administrator Kathy Suite of Ms. Klugel's "attitude." Ailes Deposition 18:03-18:20.

Ms. Ailes made the referral without requesting or reviewing any backup documentation, without speaking with Ms. Klugel's supervisor, without determining how Ms. Klugel's trip would impact the Institution financially, without determining who was paying for the Belize trip or its actual purpose. Ms. Ailes relied solely on Ms. Suite's self-serving and vindictive word and nothing else. Ailes Deposition 12:17-15:06.[2]

---

[2] Ms. Ailes is a GS-10 administrative official who presents a classic picture of a resentful junior administrative employee misusing her limited authority in personal vendettas. She was also selective in her

Ms. Ailes was aware when she made the referral that Ms. Klugel had not, to her knowledge, engaged in any fiscal waste or abuse. Ailes Deposition 21:18-22:03. Although she claimed the trip violated federal travel regulations, Ms. Ailes did not say how or why.  Ailes Deposition 22:05-22:19.[3] Ms. Ailes had had no prior travel-related problems with Ms. Klugel. Ailes Deposition 25:03-25:04.

The referral was based on perceived irregularities by Ailes and Suite for the Panama-Belize trip scheduled in November, 2004.  Ailes Deposition 26:13-26:14. Ms. Ailes properly admitted that volunteers for the Agency are entitled to a government rate. Ailes Deposition 25:08-26:01. She also admitted that outside entities can pay for travel of employees. Ailes Deposition 26:15-26:18; Exhibit 6, GSA Federal Travel Regulations §304-1.2, while Suite testified that there was no impediment to combining travel and personal leave in one trip. Suite Deposition 65:05-65:08.

Based on this referral by Ms. Ailes, Special Agent Gerald Roy of the Smithsonian Inspector General's office began an investigation into Ms. Klugel's travel. Roy Deposition 19:18-19:22.

What is unaddressed by the Agency, however, is that Agent Roy never investigated the issue of the alleged violation of the federal travel regulations based on Ms. Klugel's "personal" trip to Belize, a trip that did not occur, because Ms. Klugel was in a car accident in November, 2004. Klugel Deposition 38:21-39-22. *Instead, for reasons that to this day remain a mystery, Mr. Roy investigated Ms. Klugel's attending a*

---

decision to refer travel matters to the Inspector General. Though responsible for reviewing travel authorizations of now disgraced former Director Lawrence Small, Ms. Ailes apparently either ignored or failed to catch Mr. Small's massive misuse of Smithsonian travel perks and funds and did not report them to the Inspector General. Ailes Deposition 30:14-32:08.

[3] In discovery, the Agency turned over its 2007 regulations, but not its 2004 regulations. GSA federal travel regulations do not prohibit the type of combined travel Ms. Klugel requested, nor do they prohibit the Agency from receiving outside funding. Exhibit 6.

*pre-approved trip to Hawaii that was slated for January, 2005!* Roy Deposition 57:16-57:18.

Agent Roy began his inquiry by speaking with Ms. Klugel's supervisor, Mark Haddon. Roy Deposition 70:04-72:13. Mr. Haddon explained to Mr. Roy that he had reviewed and approved the Hawaii trip and that its purpose was official business. Mr. Haddon further states he had been notified by Ms. Klugel that she would be bringing Mr. Yunger as a volunteer. Mr. Haddon also states he was familiar with Mr. Yunger and his work and felt that Mr. Yunger's assistance would be invaluable technically, while saving the Smithsonian money on a paid videographer. Id. Haddon Deposition 51:05-53:09.

In face of this exculpatory information which revealed that Ms. Klugel had fully disclosed the nature of her trip and the involvement of Mr. Yunger, and that she had received prior supervisory approval for the trip. Mr. Roy nevertheless persisted in his investigatory efforts.  Ms. Klugel was called into Mr. Haddon's office and placed in a seat behind a desk with Mr. Roy sitting in a manner that precluded her from exiting the room without passing him. Mr. Roy then produced his credentials to convey his authority and began questioning Ms. Klugel about her relationship with Mr. Yunger, whether he was Ms. Klugel's boyfriend, what his purpose for going to Hawaii was, and what Mr. Yunger planned to do while he was not actively working at the conference that Ms. Klugel was attending in Hawaii.[4]  Roy Deposition 37:14; 37:18; 37:20-37:22; 110:16-111:13.

Mr. Roy initially denied he asked Mr. Klugel about her sex life, the number of sex partners she had or the use of travel to forward sexual trysts in exotic vacations. Roy Deposition 108:16-109:08. He admits such questions would have been inappropriate. Roy

---

[4] Ms. Klugel was at the conference to present a paper on behalf of SERC.

Deposition 109:9-109:14. However, he then changed his testimony in further examination by stating, "I have no recollection whatsoever of asking those kinds of questions." Roy Deposition 110:02-110:03. He then stated that he "received no objection" from Ms. Klugel to his interrogation, in an effort to support the propriety of his conduct.

Mr. Roy did, however, admit using the interrogation to make inquiries into Mr. Yunger's conduct. Mr. Roy claimed that he perceived the impropriety of Ms. Klugel's actions to center around Mr. Yunger's accepting a ticket to travel at a government rate and then offering to pay the government for that ticket. Roy Deposition 120:18-121:5.

In a confusing and often contradictory deposition, Mr. Roy identified several alternative bases for investigating Ms. Klugel. Early on, Mr. Roy stated that his investigation involved "a relatively minor matter" involving two SERC employees who were going to a conference in Hawaii; however:

> "... the employee was not paying a fee to enter the conference. That employee also wanted the government ... wanted to ... wanted the government to buy his ticket and he was going to reimburse the government. Shortly thereafter a second employee ... I'm sorry a second volunteer, signed up also to go to Hawaii. I don't recall if that employee was going to buy a ticket and reimburse but that's kind of my recollection. The first volunteer had been a volunteer for a period of time; the second volunteer only became a volunteer a week before the trip. The second volunteer was an assistant to photograph this event. The addition of the second employee ... I'm sorry, the second volunteer, as someone wanting to accompany the first volunteer, was the threshold that was crossed, at least in my mind, to say what's going on." Roy Deposition 31:15-32:14.

Thus, Roy states he originally raised an eyebrow because a second junior volunteer was accompanying a senior volunteer to Hawaii and the employees were asking the government to buy the tickets for the volunteers initially.[5]

Mr. Roy learned that the senior volunteer was Philip Yunger. Roy Deposition 32:18-32:20. As stated above, Mr. Yunger had worked repeatedly for the Smithsonian in the prior four years. Roy Deposition 32:18

The junior volunteer was Recep Celikay, who was the boyfriend of a second employee by the name of Amy Erb. Roy Deposition 32:15-32:17. Neither Mr. Roy nor the Agency has ever explained why Ms. Klugel became the focus of Mr. Roy's efforts since Mr. Yunger's involvement as a volunteer was far more supportable than Mr. Celikay's.

Later in the deposition and upon further examination, Mr. Roy shifted ground and claimed that he was reviewing what he believed to be possible conspiracy and travel fraud. Roy Deposition 45:11-46:04. Then Mr. Roy shifted ground again alleging that the impropriety he saw was that Mr. Yunger was only going to be doing a few hours of work at the conference and thus could not understand his role as videographer or volunteer. Roy Deposition 73:11-73:20.

In the end, Mr. Roy could not definitively state why he investigated this incident or what wrongdoing was involved. Mr. Roy admitted that Mr. Yunger was authorized to obtain a government fare ticket. Roy Deposition 100:03-100:05. He admitted Mr. Haddon had approved the trip. Roy Deposition 92:03-92:05. In addition, he admitted Mr. Haddon defended Mr. Yunger's serving as a volunteer on Smithsonian business. Roy

---

[5] This assertion was categorically untrue. At no time did Ms. Klugel or Mr. Yunger approach the government and ask for payment of Mr. Yunger's ticket. See travel voucher of D. Klugel, Exhibit 4, SI-Sampler 322-344. Yunger Deposition 20:21-21:06.

Deposition 88:18-88:20. He admitted that the government could have paid for Mr. Yunger's ticket, since he was traveling on behalf of the Agency. Roy Deposition 88:08-88:11. The "questionable" conduct then in this case boiled down to Mr. Roy's unsupported belief that there was something sinister in Mr. Yunger's wanting to save the government money by paying for his own ticket.[6]

Mr. Roy's investigative techniques involved no notes concerning advisement of rights. Roy Deposition 41:20; 46:20-47:14. What Mr. Roy did do was interrogate a frightened Ms. Klugel for twenty to thirty minutes advising her at the end of the interrogation that she was a "tough nut to crack." Roy Deposition 128:06-128:08.

According to Ms. Klugel, she was informed by Mr. Haddon, Mr. Gallagher, the administrative officer, and Mr. Simons, her second level supervisor, that she was under "investigation" because her attitude toward Ms. Suite needed readjustment. Klugel Deposition 65:03-67:02.

The investigation into Ms. Klugel was unprecedented. Mark Haddon stated that in his 23 years with the Agency, he was unaware of a single other Inspector General investigation into an employee's travel. Haddon Deposition 42:04-42:10. Ms. Ailes, for her part, could not provide a specific instance when she had referred a specific employee, other than Ms. Klugel, to the Inspector General. Mr. Roy was equally vague on prior Inspector General efforts. Ailes Deposition 20:21-21:03.

The issue of travel by related parties was also a novelty. Director Hines had used family members as volunteers while traveling with the Smithsonian. Hines Deposition

---

[6] Mr. Roy's assessment at what he was investigating differs from that of his supervisor, former Metropolitan Police Department Captain Michael Pickett, and the Senior Special Agent for the Inspector General's Office. Mr. Pickett stated that the allegation the Inspector General received was that Ms. Klugel was misusing travel to take her boyfriend with her on trips. Pickett Deposition 16:5-16:10.

14:15-15:03. Mr. Haddon has traveled with his girlfriend while listing her in volunteer status. Haddon Deposition 30:01-30:10. According to Agent Roy, he never investigated or was even informed that travel with family members was an issue. Roy Deposition 34:07-34:13. The Agency expert on the volunteer program stated that listing family members as volunteers was not atypical and not inappropriate. Lemon Deposition 10: 02-11:13.

Thus, there remains the central issue of why male members of SERC were allowed to travel with girlfriends and children, while Ms. Klugel, and to some extent Ms. Erb, were subject to an Inspector General investigation for the same conduct. Haddon Deposition 75:06-75:15 (neither he nor Mr. Hines were ever questioned about being accompanied by children or a girlfriend on travel).

Further, it is clear that following the Inspector General investigation, Ms. Klugel's attitude and demeanor changed. Mr. Haddon explicitly stated that he watched Ms. Klugel's emotional state change for the worse after the Inspector General inquiry. She became withdrawn, sullen and distrustful. Haddon Deposition 136:16-137:09; 138:15-138:22.

Prior to the Inspector General investigation, Ms. Klugel was an "outstanding employee" with a favorable attitude and work ethic. Haddon Deposition 17:20-18:18. Following the investigation, Ms. Klugel repeatedly complained that she was being subject to discrimination and a hostile work environment. Haddon Deposition 42:12-42:16; 43:02-42:22; 60:10-60:13; 60:15-61:007. She complained of excessive scrutiny of her medical records and condition and of selective treatment on the denial of leave and reduction in assignments. Haddon Deposition 62:07-62:08; 123:01-126:18.

Mr. Haddon took no action on any of these complaints. Haddon Deposition 43:22-44:02. Although Mr. Haddon believed it was inappropriate to ever ask an employee about their level of sexual activity or their sex life, he remained mute. Haddon Deposition 45:16-46:10. Further, Mr. Haddon to this day maintains that he was unaware that Ms. Klugel ever violated a Smithsonian policy. Haddon Deposition 15:14-15:19.

Mr. Haddon also knew that Ms. Klugel was alleging that Mr. Roy had made improper inquiries into her sex life. Haddon Deposition 43:02-44:02. Mr. Haddon was also fully aware that he had told Mr. Roy point blank that Mr. Yunger was an effective volunteer, that the use of Mr. Yunger on trips provided a cost benefit to the Smithsonian, and that it was common practice to use volunteers. Haddon Deposition 49:15-49:17; 50:02-50:04; 51:02; 51:05-52:09; 53:02-53:09.

Given the above, Mr. Haddon's silence is deafening.

Indeed, rather than assist Ms. Klugel, Mr. Haddon exacerbated the issue, along with Robert Gallagher. As a result of her November car accident, Ms. Klugel had fractured her arm and required extensive treatment. Klugel 38:20-22.

The Agency's response was to challenge her changing trip times to accommodate her physical therapy, demanding and securing a list of her medications, denying her leave, and questioning whether she was malingering.

Mr. Haddon admits that he was aware of Ms. Klugel's accident and its attendant injuries. Mr. Haddon's Deposition 76:04-76:14. He was aware she was obtaining physical therapy for these injuries and most significantly he perceived Ms. Klugel as disabled as a result of these injuries. Haddon 82:07-82:13.

In February, 2005, Mr. Haddon, who had no medical expertise, no training in the Rehabilitation Act, and never consulted any physician or EEO official, unilaterally determined that Ms. Klugel's physical therapy was dragging on too long. Haddon Deposition 116:01-116:05; 86:18-87:03. Mr. Haddon consulted with Administrative Officer Robert Gallagher who also had no medical experience and no training in the Rehabilitation Act. Gallagher Deposition 10:8-10:12. Mr. Gallagher also felt Ms. Klugel's medical treatment was too "open-ended." Gallagher Deposition 16:02-16:18.

Mr. Gallagher and Mr. Haddon pressed Ms. Klugel for answers as to the duration of her treatment. Id. Mr. Gallagher acknowledged that the Agency obtained a list of Ms. Klugel's medication but could not recall why they were obtained. Gallagher Deposition 17:10-18:1.

At the time of this inquiry, Ms. Klugel was still in an arm cast. Klugel Deposition 138:02-138:08 (Ms. Klugel suffered a broken arm and contusions to the knee for which she received bi-weekly therapy).

Ms. Klugel was having difficulty performing tasks, such as lifting objects. Mr. Gallagher and Mr. Haddon ignored her requests for assistance and provided no accommodation. Gallagher Deposition  35:22-36:17.

Instead, Mr. Gallagher and Mr. Haddon began demanding verification of the specific nature of Ms. Klugel's medical treatment. Mr. Haddon's Deposition 114:09-114:19. In an electronic mail message and again in person, Ms. Klugel objected that this was an attack on her credibility and integrity. Haddon Deposition 123:01-126:18; Gallagher Deposition 37:16-38:11.

Mr. Haddon's and Mr. Gallagher's response to these protests was to demand that Mr. Klugel have, in essence, a psychological counseling session with the Employee Assistance Program. Gallagher Deposition 42:10-42:21; Haddon Deposition 142:18-143:19.

Faced with the equivalent of a fitness for duty examination, Ms. Klugel demanded that her attorney be present at the EAP session. Mr. Gallagher and Mr. Haddon not only ignored that request, Mr. Gallagher threatened to have an Agency lawyer present at the EAP and refer the whole matter to the General Counsel's Office. Klugel Deposition, Volume II, 10:15-12:19.

At about the same time, Ms. Klugel was removed from grant writing and participation in electronic field trips. Klugel Deposition, Volume II, 12:20-12:22, 13:04-13:07. Further, in April, 2004, Mr. Haddon began denying her leave. Haddon Deposition 77:05-77:09. Mr. Haddon admits that in his 19 years as a supervisor at SERC he has never denied leave to any employee except Ms. Klugel. Haddon Deposition 87:18-88:03. Mr. Haddon's justification for this denial was that it was "unusual" for an employee to ask for time off in the period from April to June.  Haddon Deposition 90:20-91:13. The denial is especially troubling because, as Robert Gallagher testified, that leave is a right in the federal service and among trust employees, and that, except for Ms. Klugel, he has never seen another employee denied leave. Gallagher Deposition 59:14-59:17.

On May 2, 2005, Ms. Klugel was placed by Mr. Haddon on a "progress report" despite no documented evidence of deficiencies. See Exhibit 7, Affidavit of Ms. Klugel.

Fearful of being terminated and of being unable to attend medical treatment, Ms. Klugel resigned from the Smithsonian under protest on May 2, 2005. Id.

Subsequently, Ms. Klugel filed suit naming Anson Hines in her complaint because he was a senior official at SERC and because, as Mr. Hines' deposition shows, he was aware of and took no action to stop the mistreatment of Ms. Klugel. Hines Deposition 40:10-48:01.

Finally, it is clear that the enormity of the outrageous behavior toward Ms. Klugel is recognized by the Agency's own EEO specialist, Karen Margensey, who commented on the central issue in this case. When asked ... "Okay, well, under what circumstances, as the EEO Compliance Officer and somebody involved in the policies and procedures of the Agency, could an inquiry into the number of sexual partners of an employee not be a form of sexual harassment." Margensey Deposition 18:16-18:21. Answer: "I'm sorry. I don't know. I can't think of one." Id. 19:2-19:13.

## III. ARGUMENT

### A. Standard for Summary Judgment

A party is only entitled to summary judgment where the pleadings and evidence show that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. Id. at 255, 106 S.Ct. 2505.  In the context of discrimination cases, summary judgment should be approached with special caution because of the difficulty of proving discriminatory intent and disparate treatment. Morgan v. Federal Home Loan Mortgage Corp., 172 F.Supp.2d 98, 104 (D. D.C.2001) ("While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of

[his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." Indeed, summary judgment must be granted sparingly where the Court is asked to inquire into the intent, state of mind and motives of the actors involved. Gomez v. Trustees of Harvard University, 677 F. Supp. 23, 25 (D.D.C. 1998). The issues in discrimination cases are intensely factual, which invariably must look at the totality of the circumstances, which may include not only the duration and the severity of the conduct at issue but its threatening nature, psychological impact and threat to the employment of the victim. Harris v. Forklift Systems, Inc., 510 U.S. 17.

### B. Gender Discrimination

Viewing the evidence in the light most favorable to Ms. Klugel, it is clear that she can establish sufficient facts to warrant a finding of fact that she was subject to discrimination based on gender. Contrary to Defendants' claims, the inquiry into Ms. Klugel's sex life, sex partners, and use of travel to further sexual conduct amounts to direct evidence of discrimination based on gender and a hostile work environment. *See*, Bailey v. Henderson, 94 Supp. 2d 68 (D.D.C. 2000) (use of derogatory or demeaning language toward women amounts to a jury triable issue on the issue of gender discrimination and hostile work environment). *See*, Lucero-Nelson v. Washington Metropolitan Area Transit Authority, 1 F. Supp 2d 1 (D.D.C. 1998) (questioning about identity and number of sexual partners is a form of gender discrimination). Purcell v. Thomas, 928 A.2d  699 (D.C. 2007) (such comments can form the bases for sexual harassment and gender discrimination under D.C. Human Rights Act).

The Agency's claim that the evidence does not establish direct evidence of gender discrimination and a hostile work environment is erroneous. Special Agent Roy conducted an inquiry into the travel habits of a female employee that focused primarily and almost exclusively on her sexual relationship with her boyfriend although he had already been made aware that the boyfriend was a long term, properly accredited volunteer for the Smithsonian. All witnesses, in fact, acknowledge that Roy asked whether Philip Yunger was Ms. Klugel's "boyfriend;" and the Agency's own witnesses concede there was nothing inappropriate about using such an individual as a volunteer. Clearly, a jury has the right to review and determine whether the inquiry into Ms. Klugel's intimate life was itself an act of gender discrimination and created a hostile work environment.

Further, the Agency ignores that the inquiry in the instant case was, according to Ms. Klugel, an inquiry into whether she was using travel to have sex with  men. It was according to all witnesses, the only such inquiry known to have occurred on the matter with respect to employees at SERC; and Ms. Klugel clearly reported both the nature of the questioning and its inherent impropriety to Mr. Haddon, Mr. Simons and Mr. Gallagher. Further, although male employees such as Mr. Hines and Mr. Haddon had traveled with women, as volunteers, no male employee had ever been subjected to a similar inquiry, even though such travel had occurred near the time of Ms. Klugel's proposed travel with Mr. Yunger.

The fundamental goal of Gerald Roy's investigation was to look into the sexual conduct of Ms. Klugel; and his questioning was, when asked, inappropriate in the minds of both his supervisor, Michael Pickett, and the Agency EEO Officer.  As this Court held

in <u>Bailey v. Henderson</u>, <u>supra</u>, "any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees, if sufficiently patterned or pervasive, comprises an illegal condition of employment under Title VII." <u>Bailey</u> at 75.

Further, this is not an instance where the nature of the sexual inquiry was due to a casual or isolated comment of some errant supervisor or co-worker. The inquiry into Ms. Klugel's sex life was part of an official investigation conducted by quasi law enforcement officials acting under the umbrella of authority, as members of Agency's Office of Inspector General. The inquiry was then part of an intimidating probe officially sanctioned by the Agency. The interrogation of Ms. Klugel's sex life, accompanied as it was by perceived physical threats and the threat of further scrutiny and job loss, was an act sufficient in and of itself to constitute both gender discrimination and a hostile work environment. This is because the Inspector General's Office is the Agency's internal watchdog where it performed the discriminatory conduct itself and put Ms. Klugel in fear of job loss and possible criminal prosecution; this act alone was so direct and egregious to establish discrimination and a workplace permeated by hostility.

**C. <u>Disparate Treatment</u>**

With respect to disparate treatment, Plaintiff has clearly made out at least a jury triable issue on the matter. Again Plaintiff can provide <u>direct</u> <u>evidence</u> of disparate treatment, because no male in the Agency, in any of the witnesses' memories, stretching back over two decades, was ever subjected to an Inspector General's investigation based on perceived improprieties created by the fact that they were traveling with the member of the opposite sex whom they listed as a volunteer.

Mr. Haddon brought his girlfriend with him on travel as a volunteer after Ms. Klugel was subject to interrogation, yet no questioning of his travel occurred. Mr. Hines brought family members with him, and no questioning of his travel occurred; and the Agency cannot point to a single instance where an employee was subjected to the type of questioning to which Ms. Klugel was subjected. See Exhibit 8, Agency's Response to Interrogatory Nos. 3, 5; Agency's Supplemental Response to Interrogatory No. 3; and Agency's Supplemental Response to Interrogatory No. 5 (whereby a lone male employee suspected of having an improper relationship with a subordinate was never questioned, nor was the female subordinate).

Even if the Court entertains any doubt of discrimination, Ms. Klugel has provided sufficient disputed facts to warrant presenting this matter to a jury. The record is certainly contested as to whether the Agency conducted a legitimate inquiry into the Plaintiff's travel. However, it is not the inquiry into the travel itself that is the basis of Ms. Klugel's claims of gender discrimination.[7] It is the linking of the travel inquiry to questions about Ms. Klugel's sex life, the number of sexual partners she had, and whether she was using travel to get sex that triggers this action. Assuming, as the Agency claims, there were "irregularities" on the travel vouchers, it is unclear that these were ever the primary focus of Mr. Roy's inquiries. Indeed, there is no written record whatsoever supporting any

---

[7] The Agency contends, at p.8 of its Brief, that it was not proper for a volunteer to "obtain a government rate and then reimburse the government." This is based on the claims of Mr. Roy and Ms. Suite. However, neither Mr. Roy nor Ms. Suite provided any evidence to support their unsubstantiated claim; and one searches the Agency's submission in vain for the actual written travel regulations upon which this claim is based. Indeed, the General Services Administration, Federal Trade Regulations, Exhibit 6, suggests otherwise; and since the Smithsonian is a hybrid federal private agency, one would suspect it could have pointed to incontrovertible proof to support the prohibition it cites. Nor can the Agency support its contention that Mr. Yunger, as a volunteer, was somehow required to pay a fee to attend the Hawaii conference, the second belated claim advanced in the rather convoluted testimony offered by Mr. Roy. Since Mr. Yunger was merely filming Ms. Klugel's presentation, he was not attending the conference as the Agency claims.

claim that Ms. Klugel engaged in any form of travel fraud.[8] Thus, the Agency's attempt to shift focus is disingenuous and raises irrelevant issues.

The Defendants' belief on this issue is long on the law but ignores the central established facts. These facts portray a travel investigation launched by a low level clerk angry that Ms. Klugel demanded she assist her in obtaining travel forms. Assisted by Ms. Ailes, who appears to have done no factual review whatsoever before invoking the assistant of the Inspector General's office, the Agency launched an investigation into Ms. Klugel's sex life to put Ms. Klugel in her proper place.

No amount of recitation of black letter law on burden shifting is sufficient to alter the fact that the parties have a factual dispute over the motives and actions of the Agency. Given this, a jury should decide the issues, and the Court should not rely in jaundiced self-serving, partial recitations of facts and theories.

The Agency also ignores that Ms. Klugel stated that Agent Roy threatened her with job loss, excessive scrutiny, arrest and physical harm. Nor does the Agency address Mr. Simons' and Mr. Haddon's warnings to Ms. Klugel that she was a "marked employee" who faced forced resignation or termination. Further, Plaintiff was denied leave and is the only employee that Mr. Haddon ever denied leave to in 23 years of service!

He did this with the guidance of Robert Gallagher and the knowledge of Anson Hines. Roy Deposition 47:19-48:02. Yet the Agency insists Ms. Klugel was not subject

---

[8] As Ms. Klugel testified, Mr. Haddon, the supervisory official in charge of overseeing authorization for her travel, approved Mr. Yunger's traveling and thought "it would be great if Philip was willing to pay for it." Klugel Deposition 53:17-20. It is also important to note that the Agency failed to produce any evidence from a travel office official or supervisor that Mr. Yunger was somehow required to pay to attend the Hawaii conference. The claim is a post hoc pretextual rationalization and should be ignored as without any evidence.

to an adverse action, although Ms. Klugel's grant writing duties (grants which supported her continued employment as a trust employee) were taken away; she was denied travel and leave; and she was relieved of the central focus of her position, the production of electronic field trips.

Contrary to Defendants' Brief, at p. 26, the Agency has never asserted that it took away any assignments due to an inability of Ms. Klugel to complete assignments or that it had any problems her abilities. Haddon Deposition, 17:20-18:18; Gallagher Deposition 38;13; 43:10-43:18.  Further, the central issue that led to Ms. Klugel's decision to resign from the Agency was not simply a reduction of duties but an unprecedented denial of leave related to her medical treatment and the threats to her that she was a "marked employee" under the employment equivalent of a Sword of Damocles. Exhibit 7, ¶13. Thus, there is a factual debate over whether the Agency reduced Ms. Klugel's duties as part of a retaliatory scheme, independent acts of gender or Rehabilitation Act discrimination, or because it was truly concerned about Ms. Klugel's ability to maintain her workload while recovering from her accident. The issue is first a factual debate best left for the jury; and second merely an illustration of the greater series of adverse actions the Agency employed.

The "legitimacy" of the Agency's conduct, essentially trying to accommodate Ms. Klugel as the Agency implies, is undercut by the denial of leave, the questioning of her veracity about her medical treatments, the threats of termination and the odd commentary of Mr. Haddon who surmised that Ms. Klugel was making herself "sick in the body." These are jury issues.

The Agency's justification for the denial of leave is both factually inaccurate and contrary to the law. Defendants' Brief, p. 27. Mr. Haddon himself testified he had <u>never</u> denied another employee leave; and Mr. Gallagher stated that leave was a right, the denial of which required written justification. The Agency's claim that it was a "busy time," is not a legitimate rationale for denying Ms. Klugel's right to leave. Further, such a basis flies directly in the face of the Rehabilitation Act and common sense. Mr. Haddon never explained why the period from April to June was a busy one; and a policy of denying leave during particular months of the year is novel, to say the least. Further, since Ms. Klugel was still receiving physical therapy and in need of leave, a blanket demand for a specific time period would be a per se denial of reasonable accommodation to her and, thus, cannot be legitimate. Nor does Plaintiff 's lack of existing leave help the Agency. Ms. Klugel burned over 450 hours of leave in a short period, as the Agency so quickly cites, because of the automobile accident, a fact all the parties agreed on.

With respect to the "progress report" (see Exhibit 7, ¶21) the Agency bizarrely attempts to turn its own misconduct into proof it did not occur. Ms. Klugel stated she was informed she was being put on a "progress report;" that is, an improvement plan. The Agency simply states that because Ms. Klugel cannot establish that the "report" was in written format, she cannot show that such action was adverse. Defendants' Brief at p.28.

The lack of written support for placing Ms. Klugel on a progress report and the failure of the Agency to point to any bases for such a report suggests that Mr. Haddon, Mr. Gallagher and others were engaging in efforts to raise Ms. Klugel's anxiety through non-specific and unsupported claims of poor performance. To claim that such actions

prove the Agency did nothing wrong is to ignore the greater impact of the Kafkaesque atmosphere Ms. Klugel faced in May, 2005.

**D. Hostile Work Environment**

The Plaintiff has already provided detailed facts how being interrogated by the Office of Inspector General on her sexual history; being informed she was a "tough nut to crack;" being subjected to excessive work scrutiny; having assignments reduced; leave denied; her veracity questioned; her mental health challenged; her performance attacked; being told she was a "marked employee" with limited future prospects; and being threatened with arrest (by an Agent who legally lacked such authority) – all of which followed her reporting that she was subject to inappropriate questioning centering, not only on her sex as a woman but, literally, on the sex she was having as a woman – created a pervasive, prolonged hostile work environment that undermined her ability to perform her position and which produced a noticeable, marked change in attitude; following not only the refusal of Messrs. Haddon, Gallagher and Simons to review Ms. Klugel's complaints or take corrective action, but by their threats to her that she had essentially brought the investigation on herself and that she was "marked" as a result.

The Agency once again spouts long on the law but ignores the critical factual inquiry that her resignation, which itself cited the hostile work environment, was triggered by the cascading efforts of the Agency to force her departure which followed an inquiry which focused on the sexual relationships Ms. Klugel was having. The Agency argues sex discrimination does not involve actual sex, an interesting but distorted view. As Ms. Klugel, an aspiring Methodist minister, so aptly put it in describing Mr. Roy's action, "he basically called me a whore in that interview, and I didn't appreciate being

23

called … being insulted like that." Klugel Deposition 75:08-75:10. This case, at its

essence, is about remedying that insult which cut to the very heart of Ms. Klugel's status

as a woman and the respect to which she is entitled as an employee and, frankly, as a

human being. The Agency rightly fears a jury reviewing that outrageous conduct, and so

it tries to equate an officially sponsored coercive and intrusive Agency investigation with

cases involving isolated acts by boorish supervisors.

**E. Rehabilitation Act**

The Agency's argument concerning the Rehabilitation Act can be quickly

dispatched. Contrary to the Agency's view of the law, intrusive medical inquiries are a

violation of the Act, whether the employee is disabled or not.[9]

Second, Mr. Haddon testified that he perceived Ms. Klugel as impaired and

clearly suggested she was diseased in body and mind.[10]  This non-medical and bizarre

assessment was the basis for the demand by Mr. Haddon and Mr. Gallagher that Ms.

Klugel attend a mandatory meeting with the Employee Assistance Counselor (a

functional equivalent of a fitness for duty examination). When Ms. Klugel demanded that

her counsel be present for such an interview, Mr. Gallagher threatened Ms. Klugel with

adverse consequences.[11] See Exhibit 7, ¶11.

---

[9] There is no requirement that an individual be disabled for the Agency to violate the medical inquiry or medical records prong of the Rehabilitation Act (which incorporated the confidentiality and inquiry provision of the Americans with Disabilities Act. *See,* Doe vs. U.S. Postal Service, 317 F.3d 339 (D.C. Cir. 2003) 29 USC§791(g), 42 USC§12112(d)(2)-(4).  The Agency's focus on whether Ms. Klugel was or was not disabled is simply erroneous as a matter of well established law. *See,* Doe vs. U.S. Postal Service, 317 F.3d 339 (CA. D.C. 2003); Cassette v. Minnesota Power and Light, 188 F.3d 964 (8th Cir. 1999) (disclosure of medical information disability status irrelevant to ADA protections); Fredenburg v. Contra Costa County Dept of Health Services (9th Cir. 1999) (same holding); Karraker v. Rent-a-Center, Inc., 239 F. Supp. 828 (C.D. Ill. 2003) (medical inquiries).

[10] The Agency produced a list of medications that Ms. Klugel was taking (see Exhibit 9), but never stated how they acquired that list.

[11] Indeed, the fact that Mr. Haddon perceived Ms. Klugel as disabled and that her attitude was causing her to be "diseased in the body" is sufficient to preclude summary judgment under the Rehabilitation Act, Nichols v. Billington, 402 F. Supp. 48 (D. D.C. 2005). Further, where as here the Agency denied leave

The requests, not only for the basis for her medical treatment but also for all notes reflecting dates of treatment and the questioning of Ms. Klugel's veracity and the denial of leave (combined with an admitted failure by Mr. Haddon to segregate or safeguard this information) reveal that the Agency engaged in discrimination (and reprisal and retaliation). At no time was the material sought for the purpose for which it is supposed to be collected; that is, to provide reasonable accommodation to Ms. Klugel (Haddon Deposition 124:9-124:15; 129:01-129:17) or to assist the office in planning. However, as the Agency itself concedes "the information was requested to protect the Agency from some hypothesized future audit." Defendants' Brief at p. 38.

Clearly, a triable issue exists over the issue as to whether the Agency violated the Rehabilitation Act in the manner and the method by which it addressed Ms. Klugel's condition.

## F. Invasion of Privacy

While the Agency correctly cites the law pertaining to what constitutes an invasion of privacy, it again ignores the facts. The Agency sponsored interrogation by a quasi law enforcement officer of Ms. Klugel's sex life was clearly an unwarranted intrusion into her privacy. The misuse of official authority to gather salacious details of Ms. Klugel's personal life is so offensive as to be an invasion of privacy per se. The attack on Ms. Klugel's personal morality and veracity was so severe that Ms. Klugel emerged shaken and distraught from Mr. Roy's interrogation.

Ordering a helpless employee to submit to questioning in a supervisor's office where she is blocked from the door and forced to respond to insinuations that she is using

---

without following its own regulations requiring that denial to be in writing, and where the Agency referred plaintiff to an EAP, summary judgment is inappropriate. Davis v. Ashcroft, 355 F. Supp. 330 (D. D.C. 2005).

travel to have sex with multiple men is extraordinarily intrusive. The Agency's attempt to

argue that the issue is about the travel documents ignores that the third rail here, as was

Mr. Roy's bluster and bravado in trying to delve into Ms. Klugel's sex life. Sexual

relations are quintessentially private and personal; and except in the rarest of instances, as

Mr. Pickett explained, have no place in any government inquiry. Ms. Klugel was

employed by a federal entity not a celibate religious order. Mr. Roy had simply no right

to try to play police officer at Ms. Klugel's expense, nor did he have any right or need to

explore her relationship with Philip Yunger. If there were irregularities on the travel

vouchers, Mr. Roy might have had the authority to make inquiry about those issues; but

any such issue (i.e., whether Mr. Yunger followed proper procedures in obtaining

volunteer travel) could have been addressed without reference to Mr. Yunger's status as

Ms. Klugel's significant other.

Defendants contend that asking a woman questions about who she is sleeping

with and how many sex partners she has is not highly offensive. Aside from the highly

dubious merits of that contention, what constitutes offensive are factual inquiries best left

to discerning juries.

## IV. CONCLUSION

For the reasons presented, Plaintiff maintains that all of the Plaintiff's remaining

claims must be decided by a jury, and summary judgment should be denied.

Respectfully submitted,


DORATHA KLUGEL
By Counsel

GRAD, LOGAN and KLEWANS, P.C.

_____/s/ Kevin Byrnes_____
Kevin Byrnes, DC Bar #480195
3141 Fairview Park Drive, Suite 350
Falls Church, VA 22042
Firm Telephone: 703-548-8400
Direct Line:  703-535-5393
Facsimile: 703-836-6289
Email: kbyrnes@glklawyers.com
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of August, 2008, a true copy of the foregoing Plaintiff's Opposition to Defendants' Motion for Summary Judgment was delivered via electronic filing to the Defendants, as follows:

Michelle Nicole Johnson
UNITED STATES ATTORNEY'S OFFICE
555 Fourth Street, NW
Room E-4212
Washington, DC 20530
Telephone:  (202) 514-7139
Facsimile:  (202) 514-8780
Email: Michelle.Johnson@usdoj.gov
*Counsel for Defendants*

_____/s/ Kevin Byrnes_____
Kevin Byrnes, DC Bar #480195
GRAD, LOGAN and KLEWANS, P.C
3141 Fairview Park Drive, Suite 350
Falls Church, VA 22042
Firm Telephone: 703-548-8400
Direct Line:  703-535-5393
Facsimile: 703-836-6289
Email: kbyrnes@glklawyers.com
*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DORATHA KLUGEL,               )
        Plaintiff,             )
                              )
v.                           )  Civil Action No. 06-1886 (HHK)
                              )
CRISTIAN SAMPER, Acting,     )
Secretary, Smithsonian Institution, et al.  )
        Defendants.       )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Comes now the Plaintiff Doratha Klugel, by counsel, and files her Memorandum in Opposition to Defendants' Motion for Summary Judgment; as grounds for this Opposition, Plaintiff states as follows:

## I. INTRODUCTION

Contrary to Defendants' self-serving and argumentative claims, Plaintiff has neither distorted facts nor presented an outlandish theory of her case. As the record shows, Ms. Klugel was subject to a salacious, intrusive and totally unnecessary investigation into her sexual relationship with her now husband, Philip Yunger, a long-time volunteer at the Smithsonian Environmental Research Center, by an untrained, overzealous would-be police officer at the Inspector General's Office. Furthermore, that investigator was doing the bidding of two disgruntled travel office clerks who were annoyed by Ms. Klugel's insistence that they perform their administrative tasks properly.

The investigator, Gerald Roy, ignoring ample evidence that Ms. Klugel had engaged in conduct authorized by her supervisor, Mark Haddon, which was of economic and technical advantage to the Smithsonian, decided to try to bully and frighten Ms.

Klugel; and in his efforts inquired into the number of her sexual partners, and her

relations with Mr. Yunger. Thus, the investigation, while ostensibly about whether Mr.

Yunger had properly sought a government rate for official SERC business, turned into an

ugly witch hunt into whether Ms. Klugel was traveling to further sexual trysts.

When Ms. Klugel vehemently and repeatedly complained to her supervisors of the

impropriety of the questioning by the very Agency that would normally investigate such

claims, the Agency retaliated. It not only ignored her complaints, it also created an utterly

hostile work environment replete with reductions in her work responsibilities, a

retaliatory "progress report," and scathing and unwarranted inquiries into her use of leave

for treatment of serious physical injuries incurred in a car accident.

Hiding behind the canard that Ms. Klugel was a temporary employee subject to a

proper travel inquiry, the Smithsonian seeks to absolve itself of liability and to avoid

having its actions scrutinized by a finder of fact who, Plaintiff believes, will see its

conduct as juvenile, discriminatory and base.

## II. MATERIAL FACTS SUBJECT TO DISPUTE

Plaintiff Doratha Klugel is a long time employee of SERC who converted from a

federal employee to a trust fund employee in 2001. Klugel Deposition 12:11. Ms. Klugel

was assured by her supervisor, Mark Haddon, that ample and indefinite funding existed

for the Smithsonian and that her change in status from a federal to a trust fund employee

would not impact the long term and "indefinite" nature of her employment. Klugel

Deposition 12:14-12:16; 13:11; 14:7-15.[1] Indeed, as part of Klugel's responsibilities, she

worked with partners such as Project View and on grant proposals. See Exhibit 2, IS-9

Position Description; Klugel Deposition 32:9-14;

---

[1] See Exhibit 1 which incorporates all references to depositions in this matter.

2

Ms. Klugel was employed as an IS-9 Distance Learning Coordinator. She conducted video conferences for the Smithsonian, webcasts and electronic field trips and worked with funding partners to develop projects of interest to the scientists, employees and third parties working with SERC. Klugel Deposition 15:15-16:02; Exhibit 2, IS-9 Position Description.

Philip Yunger was a SERC volunteer with longstanding and ample experience in videography and film production. Yunger Deposition 12:15-13:03. In fact, Mr. Yunger has 41 years of stage technology and motion picture experience and worked on Academy Award wining films such as "Silence of the Lambs" and "The Exorcist." Yunger Deposition 13:05-13:06; Exhibit 3, Yunger resume.

Mr. Yunger was a well respected and thought of volunteer. Haddon Deposition 53:02-53:09; Hines Deposition 34:06.  He worked as a volunteer since June, 2000. Yunger Deposition 10:11.

As a combined federal/private partnership, the Smithsonian relies on volunteers to assist in its various functions. Hines 18:07-18:12. In fact, the Agency utilizes over 1500 such volunteers in its "Behind the Scenes Volunteer Program;" and volunteers are "an integral part of the [Smithsonian] Institution."  Deposition of Amy Lemon 8:04-8:08; 8:09-8:14. As attested by the Smithsonian's own 30(b)(6) designee, Amy Lemon, the coordinator of the "Behind the Scenes Program" for the Smithsonian, volunteers would travel with SERC employees when the need arose. Lemon Deposition 8:19. Family members, significant others, and spouses were not prohibited as serving as volunteers. Lemon Deposition 10:2-10:20; 11:10-11:19.

In November, 2004, Ms. Klugel ran into some difficulties with Kathy Suite an administrative clerk in the travel office who was supposed to assist SERC employees in obtaining travel. Suite Deposition 6:01-6:02, 7:08-7:12. The issue arose when Ms. Klugel attempted to combine a trip paid for by the Smithsonian Environmental Research Center (SERC), where she was employed, with a trip to Belize to assist Project View in doing an educational program on manatees. Klugel Deposition 35:3-07. SERC was funding the Panama trip while Project View was paying for the trip to Belize. Klugel 36:3-13. Ms. Klugel would be working in an official capacity on both the Panama and Belize trips. Klugel Deposition 36:16-18. Ms. Klugel was going to be accompanied on these trips by Mr. Yunger who was working as a SERC volunteer. Ms. Klugel fully disclosed Mr. Yunger's travel and role as a volunteer on her Panama/Belize travel voucher (Exhibit 4); Klugel Deposition 36:13-22. Although Mr. Yunger was a registered volunteer with SERC who could have accompanied Ms. Klugel at a government rate, Suite Deposition 17:12-18, Ms. Suite, on her own accord and without any investigation into the validity of the travel, raised an objection to her supervisor, Carol Ailes, over Ms. Klugel's voucher. Suite claimed, for reasons which remain unknown to this day, that her concern was that Klugel was claiming Belize was official travel when it was personal time. Suite Deposition 20:01-20:22. How Suite concluded this in the face of supervisory approval of the trip by Mr. Mark Haddon, Suite Deposition 37:01-38:15; 185:14-17, and without the slightest proof to the contrary, has never been explained.

The facts suggest, however, that the real reason for the referral is that Klugel was upset with Ms. Suite for unilaterally imposing time and other restrictions on travel 29:05-09; 143:07-15; 145:12-19 and had essentially accused her of dilatory conduct and

incompetence when it came to travel. See Exhibit 5, email exchanges between Ms. Suite, Ms. Klugel and supervisory personnel. Ms. Suite, acting in a childish and retaliatory fashion, then prompted Ms. Ailes to have the Inspector General's Office admonish Ms. Klugel.   Indeed, Ms. Suite admits to maintaining notes on (Suite Deposition 29:22-31:03) and to adding editorials, changing documents and highlights to submissions concerning Ms. Klugel to Agent Roy and commented on Ms. Klugel's relationship to Mr. Yunger, her medical treatment (Suite Deposition 110:03-111:18; 115:12-117:07), and singled out Ms. Klugel for review because of her trips with Mr. Yunger while ignoring other officials who brought family members. Suite Deposition 118:03-121:21.  In fact, Ms. Suite went so far as to create a chronology on her own to illustrate her perception of Ms. Klugel's wrongdoing for Agency counsel! Suite Deposition 157:03-164:10.

Relying on the personal animus of a low level clerk and the uncritical acceptance of that clerk's word that Belize was not official travel, Carol Ailes of the Smithsonian Travel office contacted the Inspector General's office to complain that she believed Ms. Klugel was adding a personal stop in Belize while on official travel for SERC to Panama. Ailes Deposition 8:09-8:16. This referral followed complaints by administrator Kathy Suite of Ms. Klugel's "attitude." Ailes Deposition 18:03-18:20.

Ms. Ailes made the referral without requesting or reviewing any backup documentation, without speaking with Ms. Klugel's supervisor, without determining how Ms. Klugel's trip would impact the Institution financially, without determining who was paying for the Belize trip or its actual purpose. Ms. Ailes relied solely on Ms. Suite's self-serving and vindictive word and nothing else. Ailes Deposition 12:17-15:06.[2]

---

[2] Ms. Ailes is a GS-10 administrative official who presents a classic picture of a resentful junior administrative employee misusing her limited authority in personal vendettas. She was also selective in her

Ms. Ailes was aware when she made the referral that Ms. Klugel had not, to her knowledge, engaged in any fiscal waste or abuse. Ailes Deposition 21:18-22:03. Although she claimed the trip violated federal travel regulations, Ms. Ailes did not say how or why.  Ailes Deposition 22:05-22:19.[3] Ms. Ailes had had no prior travel-related problems with Ms. Klugel. Ailes Deposition 25:03-25:04.

The referral was based on perceived irregularities by Ailes and Suite for the Panama-Belize trip scheduled in November, 2004.  Ailes Deposition 26:13-26:14. Ms. Ailes properly admitted that volunteers for the Agency are entitled to a government rate. Ailes Deposition 25:08-26:01. She also admitted that outside entities can pay for travel of employees. Ailes Deposition 26:15-26:18; Exhibit 6, GSA Federal Travel Regulations §304-1.2, while Suite testified that there was no impediment to combining travel and personal leave in one trip. Suite Deposition 65:05-65:08.

Based on this referral by Ms. Ailes, Special Agent Gerald Roy of the Smithsonian Inspector General's office began an investigation into Ms. Klugel's travel. Roy Deposition 19:18-19:22.

What is unaddressed by the Agency, however, is that Agent Roy never investigated the issue of the alleged violation of the federal travel regulations based on Ms. Klugel's "personal" trip to Belize, a trip that did not occur, because Ms. Klugel was in a car accident in November, 2004. Klugel Deposition 38:21-39-22. *Instead, for reasons that to this day remain a mystery, Mr. Roy investigated Ms. Klugel's attending a*

---

decision to refer travel matters to the Inspector General. Though responsible for reviewing travel authorizations of now disgraced former Director Lawrence Small, Ms. Ailes apparently either ignored or failed to catch Mr. Small's massive misuse of Smithsonian travel perks and funds and did not report them to the Inspector General. Ailes Deposition 30:14-32:08.

[3] In discovery, the Agency turned over its 2007 regulations, but not its 2004 regulations. GSA federal travel regulations do not prohibit the type of combined travel Ms. Klugel requested, nor do they prohibit the Agency from receiving outside funding. Exhibit 6.

*pre-approved trip to Hawaii that was slated for January, 2005!* Roy Deposition 57:16-57:18.

Agent Roy began his inquiry by speaking with Ms. Klugel's supervisor, Mark Haddon. Roy Deposition 70:04-72:13. Mr. Haddon explained to Mr. Roy that he had reviewed and approved the Hawaii trip and that its purpose was official business. Mr. Haddon further states he had been notified by Ms. Klugel that she would be bringing Mr. Yunger as a volunteer. Mr. Haddon also states he was familiar with Mr. Yunger and his work and felt that Mr. Yunger's assistance would be invaluable technically, while saving the Smithsonian money on a paid videographer. Id. Haddon Deposition 51:05-53:09.

In face of this exculpatory information which revealed that Ms. Klugel had fully disclosed the nature of her trip and the involvement of Mr. Yunger, and that she had received prior supervisory approval for the trip. Mr. Roy nevertheless persisted in his investigatory efforts.   Ms. Klugel was called into Mr. Haddon's office and placed in a seat behind a desk with Mr. Roy sitting in a manner that precluded her from exiting the room without passing him. Mr. Roy then produced his credentials to convey his authority and began questioning Ms. Klugel about her relationship with Mr. Yunger, whether he was Ms. Klugel's boyfriend, what his purpose for going to Hawaii was, and what Mr. Yunger planned to do while he was not actively working at the conference that Ms. Klugel was attending in Hawaii.[4]  Roy Deposition 37:14; 37:18; 37:20-37:22; 110:16-111:13.

Mr. Roy initially denied he asked Mr. Klugel about her sex life, the number of sex partners she had or the use of travel to forward sexual trysts in exotic vacations. Roy Deposition 108:16-109:08. He admits such questions would have been inappropriate. Roy

---

[4] Ms. Klugel was at the conference to present a paper on behalf of SERC.

Deposition 109:9-109:14. However, he then changed his testimony in further examination by stating, "I have no recollection whatsoever of asking those kinds of questions." Roy Deposition 110:02-110:03. He then stated that he "received no objection" from Ms. Klugel to his interrogation, in an effort to support the propriety of his conduct.

Mr. Roy did, however, admit using the interrogation to make inquiries into Mr. Yunger's conduct. Mr. Roy claimed that he perceived the impropriety of Ms. Klugel's actions to center around Mr. Yunger's accepting a ticket to travel at a government rate and then offering to pay the government for that ticket. Roy Deposition 120:18-121:5.

In a confusing and often contradictory deposition, Mr. Roy identified several alternative bases for investigating Ms. Klugel. Early on, Mr. Roy stated that his investigation involved "a relatively minor matter" involving two SERC employees who were going to a conference in Hawaii; however:

> "… the employee was not paying a fee to enter the conference. That employee also wanted the government … wanted to … wanted the government to buy his ticket and he was going to reimburse the government. Shortly thereafter a second employee … I'm sorry a second volunteer, signed up also to go to Hawaii. I don't recall if that employee was going to buy a ticket and reimburse but that's kind of my recollection. The first volunteer had been a volunteer for a period of time; the second volunteer only became a volunteer a week before the trip. The second volunteer was an assistant to photograph this event. The addition of the second employee … I'm sorry, the second volunteer, as someone wanting to accompany the first volunteer, was the threshold that was crossed, at least in my mind, to say what's going on." Roy Deposition 31:15-32:14.

Thus, Roy states he originally raised an eyebrow because a second junior volunteer was accompanying a senior volunteer to Hawaii and the employees were asking the government to buy the tickets for the volunteers initially.[5]

Mr. Roy learned that the senior volunteer was Philip Yunger. Roy Deposition 32:18-32:20. As stated above, Mr. Yunger had worked repeatedly for the Smithsonian in the prior four years. Roy Deposition 32:18

The junior volunteer was Recep Celikay, who was the boyfriend of a second employee by the name of Amy Erb. Roy Deposition 32:15-32:17. Neither Mr. Roy nor the Agency has ever explained why Ms. Klugel became the focus of Mr. Roy's efforts since Mr. Yunger's involvement as a volunteer was far more supportable than Mr. Celikay's.

Later in the deposition and upon further examination, Mr. Roy shifted ground and claimed that he was reviewing what he believed to be possible conspiracy and travel fraud. Roy Deposition 45:11-46:04. Then Mr. Roy shifted ground again alleging that the impropriety he saw was that Mr. Yunger was only going to be doing a few hours of work at the conference and thus could not understand his role as videographer or volunteer. Roy Deposition 73:11-73:20.

In the end, Mr. Roy could not definitively state why he investigated this incident or what wrongdoing was involved. Mr. Roy admitted that Mr. Yunger was authorized to obtain a government fare ticket. Roy Deposition 100:03-100:05. He admitted Mr. Haddon had approved the trip. Roy Deposition 92:03-92:05. In addition, he  admitted Mr. Haddon defended Mr. Yunger's serving as a volunteer on Smithsonian business. Roy

---

[5] This assertion was categorically untrue. At  no time did Ms. Klugel or Mr. Yunger approach the government and ask for payment of Mr. Yunger's ticket. See travel voucher of D. Klugel, Exhibit 4, SI-Sampler 322-344. Yunger Deposition 20:21-21:06.

Deposition 88:18-88:20. He admitted that the government could have paid for Mr.

Yunger's ticket, since he was traveling on behalf of the Agency. Roy Deposition 88:08-

88:11. The "questionable" conduct then in this case boiled down to Mr. Roy's

unsupported belief that there was something sinister in Mr. Yunger's wanting to save the

government money by paying for his own ticket.[6]

Mr. Roy's investigative techniques involved no notes concerning advisement of

rights. Roy Deposition 41:20; 46:20-47:14. What Mr. Roy did do was interrogate a

frightened Ms. Klugel for twenty to thirty minutes advising her at the end of the

interrogation that she was a "tough nut to crack." Roy Deposition 128:06-128:08.

According to Ms. Klugel, she was informed by Mr. Haddon, Mr. Gallagher, the

administrative officer, and Mr. Simons, her second level supervisor, that she was under

"investigation" because her attitude toward Ms. Suite needed readjustment. Klugel

Deposition 65:03-67:02.

The investigation into Ms. Klugel was unprecedented. Mark Haddon stated that in

his 23 years with the Agency, he was unaware of a single other Inspector General

investigation into an employee's travel. Haddon Deposition 42:04-42:10. Ms. Ailes, for

her part, could not provide a specific instance when she had referred a specific employee,

other than Ms. Klugel, to the Inspector General. Mr. Roy was equally vague on prior

Inspector General efforts. Ailes Deposition 20:21-21:03.

The issue of travel by related parties was also a novelty. Director Hines had used

family members as volunteers while traveling with the Smithsonian. Hines Deposition

---

[6] Mr. Roy's assessment at what he was investigating differs from that of his supervisor, former
Metropolitan Police Department Captain Michael Pickett, and the Senior Special Agent for the Inspector
General's Office. Mr. Pickett stated that the allegation the Inspector General received was that Ms. Klugel
was misusing travel to take her boyfriend with her on trips. Pickett Deposition 16:5-16:10.

14:15-15:03. Mr. Haddon has traveled with his girlfriend while listing her in volunteer status. Haddon Deposition 30:01-30:10. According to Agent Roy, he never investigated or was even informed that travel with family members was an issue. Roy Deposition 34:07-34:13. The Agency expert on the volunteer program stated that listing family members as volunteers was not atypical and not inappropriate. Lemon Deposition 10: 02-11:13.

Thus, there remains the central issue of why male members of SERC were allowed to travel with girlfriends and children, while Ms. Klugel, and to some extent Ms. Erb, were subject to an Inspector General investigation for the same conduct. Haddon Deposition 75:06-75:15 (neither he nor Mr. Hines were ever questioned about being accompanied by children or a girlfriend on travel).

Further, it is clear that following the Inspector General investigation, Ms. Klugel's attitude and demeanor changed. Mr. Haddon explicitly stated that he watched Ms. Klugel's emotional state change for the worse after the Inspector General inquiry. She became withdrawn, sullen and distrustful. Haddon Deposition 136:16-137:09; 138:15-138:22.

Prior to the Inspector General investigation, Ms. Klugel was an "outstanding employee" with a favorable attitude and work ethic. Haddon Deposition 17:20-18:18. Following the investigation, Ms. Klugel repeatedly complained that she was being subject to discrimination and a hostile work environment. Haddon Deposition 42:12-42:16; 43:02-42:22; 60:10-60:13; 60:15-61:007. She complained of excessive scrutiny of her medical records and condition and of selective treatment on the denial of leave and reduction in assignments. Haddon Deposition 62:07-62:08; 123:01-126:18.

Mr. Haddon took no action on any of these complaints. Haddon Deposition 43:22-44:02. Although Mr. Haddon believed it was inappropriate to ever ask an employee about their level of sexual activity or their sex life, he remained mute. Haddon Deposition 45:16-46:10. Further, Mr. Haddon to this day maintains that he was unaware that Ms. Klugel ever violated a Smithsonian policy. Haddon Deposition 15:14-15:19.

Mr. Haddon also knew that Ms. Klugel was alleging that Mr. Roy had made improper inquiries into her sex life. Haddon Deposition 43:02-44:02. Mr. Haddon was also fully aware that he had told Mr. Roy point blank that Mr. Yunger was an effective volunteer, that the use of Mr. Yunger on trips provided a cost benefit to the Smithsonian, and that it was common practice to use volunteers. Haddon Deposition 49:15-49:17; 50:02-50:04; 51:02; 51:05-52:09; 53:02-53:09.

Given the above, Mr. Haddon's silence is deafening.

Indeed, rather than assist Ms. Klugel, Mr. Haddon exacerbated the issue, along with Robert Gallagher. As a result of her November car accident, Ms. Klugel had fractured her arm and required extensive treatment. Klugel 38:20-22.

The Agency's response was to challenge her changing trip times to accommodate her physical therapy, demanding and securing a list of her medications, denying her leave, and questioning whether she was malingering.

Mr. Haddon admits that he was aware of Ms. Klugel's accident and its attendant injuries. Mr. Haddon's Deposition 76:04-76:14. He was aware she was obtaining physical therapy for these injuries and most significantly he perceived Ms. Klugel as disabled as a result of these injuries. Haddon 82:07-82:13.

In February, 2005, Mr. Haddon, who had no medical expertise, no training in the Rehabilitation Act, and never consulted any physician or EEO official, unilaterally determined that Ms. Klugel's physical therapy was dragging on too long. Haddon Deposition 116:01-116:05; 86:18-87:03. Mr. Haddon consulted with Administrative Officer Robert Gallagher who also had no medical experience and no training in the Rehabilitation Act. Gallagher Deposition 10:8-10:12. Mr. Gallagher also felt Ms. Klugel's medical treatment was too "open-ended." Gallagher Deposition 16:02-16:18.

Mr. Gallagher and Mr. Haddon pressed Ms. Klugel for answers as to the duration of her treatment. Id. Mr. Gallagher acknowledged that the Agency obtained a list of Ms. Klugel's medication but could not recall why they were obtained. Gallagher Deposition 17:10-18:1.

At the time of this inquiry, Ms. Klugel was still in an arm cast. Klugel Deposition 138:02-138:08 (Ms. Klugel suffered a broken arm and contusions to the knee for which she received bi-weekly therapy).

Ms. Klugel was having difficulty performing tasks, such as lifting objects. Mr. Gallagher and Mr. Haddon ignored her requests for assistance and provided no accommodation. Gallagher Deposition 35:22-36:17.

Instead, Mr. Gallagher and Mr. Haddon began demanding verification of the specific nature of Ms. Klugel's medical treatment. Mr. Haddon's Deposition 114:09-114:19. In an electronic mail message and again in person, Ms. Klugel objected that this was an attack on her credibility and integrity. Haddon Deposition 123:01-126:18; Gallagher Deposition 37:16-38:11.

Mr. Haddon's and Mr. Gallagher's response to these protests was to demand that Mr. Klugel have, in essence, a psychological counseling session with the Employee Assistance Program. Gallagher Deposition 42:10-42:21; Haddon Deposition 142:18-143:19.

Faced with the equivalent of a fitness for duty examination, Ms. Klugel demanded that her attorney be present at the EAP session. Mr. Gallagher and Mr. Haddon not only ignored that request, Mr. Gallagher threatened to have an Agency lawyer present at the EAP and refer the whole matter to the General Counsel's Office. Klugel Deposition, Volume II, 10:15-12:19.

At about the same time, Ms. Klugel was removed from grant writing and participation in electronic field trips. Klugel Deposition, Volume II, 12:20-12:22, 13:04-13:07. Further, in April, 2004, Mr. Haddon began denying her leave. Haddon Deposition 77:05-77:09. Mr. Haddon admits that in his 19 years as a supervisor at SERC he has never denied leave to any employee except Ms. Klugel. Haddon Deposition 87:18-88:03. Mr. Haddon's justification for this denial was that it was "unusual" for an employee to ask for time off in the period from April to June. Haddon Deposition 90:20-91:13. The denial is especially troubling because, as Robert Gallagher testified, that leave is a right in the federal service and among trust employees, and that, except for Ms. Klugel, he has never seen another employee denied leave. Gallagher Deposition 59:14-59:17.

On May 2, 2005, Ms. Klugel was placed by Mr. Haddon on a "progress report" despite no documented evidence of deficiencies. See Exhibit 7, Affidavit of Ms. Klugel.

Fearful of being terminated and of being unable to attend medical treatment, Ms. Klugel resigned from the Smithsonian under protest on May 2, 2005. Id.

Subsequently, Ms. Klugel filed suit naming Anson Hines in her complaint because he was a senior official at SERC and because, as Mr. Hines' deposition shows, he was aware of and took no action to stop the mistreatment of Ms. Klugel. Hines Deposition 40:10-48:01.

Finally, it is clear that the enormity of the outrageous behavior toward Ms. Klugel is recognized by the Agency's own EEO specialist, Karen Margensey, who commented on the central issue in this case. When asked ... "Okay, well, under what circumstances, as the EEO Compliance Officer and somebody involved in the policies and procedures of the Agency, could an inquiry into the number of sexual partners of an employee not be a form of sexual harassment." Margensey Deposition 18:16-18:21. Answer: "I'm sorry. I don't know. I can't think of one." Id. 19:2-19:13.

### III. ARGUMENT

#### A. Standard for Summary Judgment

A party is only entitled to summary judgment where the pleadings and evidence show that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party. Id. at 255, 106 S.Ct. 2505.  In the context of discrimination cases, summary judgment should be approached with special caution because of the difficulty of proving discriminatory intent and disparate treatment. Morgan v. Federal Home Loan Mortgage Corp., 172 F.Supp.2d 98, 104 (D. D.C.2001) ("While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of

[his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." Indeed, summary judgment must be granted sparingly where the Court is asked to inquire into the intent, state of mind and motives of the actors involved. Gomez v. Trustees of Harvard University, 677 F. Supp. 23, 25 (D.D.C. 1998). The issues in discrimination cases are intensely factual, which invariably must look at the totality of the circumstances, which may include not only the duration and the severity of the conduct at issue but its threatening nature, psychological impact and threat to the employment of the victim. Harris v. Forklift Systems, Inc., 510 U.S. 17.

## B. Gender Discrimination

Viewing the evidence in the light most favorable to Ms. Klugel, it is clear that she can establish sufficient facts to warrant a finding of fact that she was subject to discrimination based on gender. Contrary to Defendants' claims, the inquiry into Ms. Klugel's sex life, sex partners, and use of travel to further sexual conduct amounts to direct evidence of discrimination based on gender and a hostile work environment. *See*, Bailey v. Henderson, 94 Supp. 2d 68 (D.D.C. 2000) (use of derogatory or demeaning language toward women amounts to a jury triable issue on the issue of gender discrimination and hostile work environment). *See*, Lucero-Nelson v. Washington Metropolitan Area Transit Authority, 1 F. Supp 2d 1 (D.D.C. 1998) (questioning about identity and number of sexual partners is a form of gender discrimination). Purcell v. Thomas, 928 A.2d  699 (D.C. 2007) (such comments can form the bases for sexual harassment and gender discrimination under D.C. Human Rights Act).

The Agency's claim that the evidence does not establish direct evidence of gender discrimination and a hostile work environment is erroneous. Special Agent Roy conducted an inquiry into the travel habits of a female employee that focused primarily and almost exclusively on her sexual relationship with her boyfriend although he had already been made aware that the boyfriend was a long term, properly accredited volunteer for the Smithsonian. All witnesses, in fact, acknowledge that Roy asked whether Philip Yunger was Ms. Klugel's "boyfriend;" and the Agency's own witnesses concede there was nothing inappropriate about using such an individual as a volunteer. Clearly, a jury has the right to review and determine whether the inquiry into Ms. Klugel's intimate life was itself an act of gender discrimination and created a hostile work environment.

Further, the Agency ignores that the inquiry in the instant case was, according to Ms. Klugel, an inquiry into whether she was using travel to have sex with men. It was according to all witnesses, the only such inquiry known to have occurred on the matter with respect to employees at SERC; and Ms. Klugel clearly reported both the nature of the questioning and its inherent impropriety to Mr. Haddon, Mr. Simons and Mr. Gallagher. Further, although male employees such as Mr. Hines and Mr. Haddon had traveled with women, as volunteers, no male employee had ever been subjected to a similar inquiry, even though such travel had occurred near the time of Ms. Klugel's proposed travel with Mr. Yunger.

The fundamental goal of Gerald Roy's investigation was to look into the sexual conduct of Ms. Klugel; and his questioning was, when asked, inappropriate in the minds of both his supervisor, Michael Pickett, and the Agency EEO Officer. As this Court held

in <u>Bailey v. Henderson</u>, <u>supra</u>, "any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee or employees, if sufficiently patterned or pervasive, comprises an illegal condition of employment under Title VII." <u>Bailey</u> at 75.

Further, this is not an instance where the nature of the sexual inquiry was due to a casual or isolated comment of some errant supervisor or co-worker. The inquiry into Ms. Klugel's sex life was part of an official investigation conducted by quasi law enforcement officials acting under the umbrella of authority, as members of Agency's Office of Inspector General. The inquiry was then part of an intimidating probe officially sanctioned by the Agency. The interrogation of Ms. Klugel's sex life, accompanied as it was by perceived physical threats and the threat of further scrutiny and job loss, was an act sufficient in and of itself to constitute both gender discrimination and a hostile work environment. This is because the Inspector General's Office is the Agency's internal watchdog where it performed the discriminatory conduct itself and put Ms. Klugel in fear of job loss and possible criminal prosecution; this act alone was so direct and egregious to establish discrimination and a workplace permeated by hostility.

### C. **Disparate Treatment**

With respect to disparate treatment, Plaintiff has clearly made out at least a jury triable issue on the matter. Again Plaintiff can provide <u>direct</u> <u>evidence</u> of disparate treatment, because no male in the Agency, in any of the witnesses' memories, stretching back over two decades, was ever subjected to an Inspector General's investigation based on perceived improprieties created by the fact that they were traveling with the member of the opposite sex whom they listed as a volunteer.

Mr. Haddon brought his girlfriend with him on travel as a volunteer <u>after</u> Ms. Klugel was subject to interrogation, yet no questioning of his travel occurred. Mr. Hines brought family members with him, and no questioning of his travel occurred; and the Agency cannot point to a single instance where an employee was subjected to the type of questioning to which Ms. Klugel was subjected. See Exhibit 8, Agency's Response to Interrogatory Nos. 3, 5; Agency's Supplemental Response to Interrogatory No. 3; and Agency's Supplemental Response to Interrogatory No. 5 (whereby a lone male employee suspected of having an improper relationship with a subordinate was never questioned, nor was the female subordinate).

Even if the Court entertains any doubt of discrimination, Ms. Klugel has provided sufficient disputed facts to warrant presenting this matter to a jury. The record is certainly contested as to whether the Agency conducted a legitimate inquiry into the Plaintiff's travel. However, it is not the inquiry into the travel itself that is the basis of Ms. Klugel's claims of gender discrimination.[7] It is the linking of the travel inquiry to questions about Ms. Klugel's sex life, the number of sexual partners she had, and whether she was using travel to get sex that triggers this action. Assuming, as the Agency claims, there were "irregularities" on the travel vouchers, it is unclear that these were ever the primary focus of Mr. Roy's inquiries. Indeed, there is no written record whatsoever supporting any

---

[7] The Agency contends, at p.8 of its Brief, that it was not proper for a volunteer to "obtain a government rate and then reimburse the government." This is based on the claims of Mr. Roy and Ms. Suite. However, neither Mr. Roy nor Ms. Suite provided any <u>evidence</u> to support their unsubstantiated claim; and one searches the Agency's submission in vain for the <u>actual</u> written travel regulations upon which this claim is based. Indeed, the General Services Administration, Federal Trade Regulations, Exhibit 6, suggests otherwise; and since the Smithsonian is a hybrid federal private agency, one would suspect it could have pointed to incontrovertible proof to support the prohibition it cites. Nor can the Agency support its contention that Mr. Yunger, as a volunteer, was somehow required to pay a fee to attend the Hawaii conference, the second belated claim advanced in the rather convoluted testimony offered by Mr. Roy. Since Mr. Yunger was merely filming Ms. Klugel's presentation, he was not attending the conference as the Agency claims.

claim that Ms. Klugel engaged in any form of travel fraud.[8] Thus, the Agency's attempt to shift focus is disingenuous and raises irrelevant issues.

The Defendants' belief on this issue is long on the law but ignores the central established facts. These facts portray a travel investigation launched by a low level clerk angry that Ms. Klugel demanded she assist her in obtaining travel forms. Assisted by Ms. Ailes, who appears to have done no factual review whatsoever before invoking the assistant of the Inspector General's office, the Agency launched an investigation into Ms. Klugel's sex life to put Ms. Klugel in her proper place.

No amount of recitation of black letter law on burden shifting is sufficient to alter the fact that the parties have a factual dispute over the motives and actions of the Agency. Given this, a jury should decide the issues, and the Court should not rely in jaundiced self-serving, partial recitations of facts and theories.

The Agency also ignores that Ms. Klugel stated that Agent Roy threatened her with job loss, excessive scrutiny, arrest and physical harm. Nor does the Agency address Mr. Simons' and Mr. Haddon's warnings to Ms. Klugel that she was a "marked employee" who faced forced resignation or termination. Further, Plaintiff was denied leave and is the only employee that Mr. Haddon ever denied leave to in 23 years of service!

He did this with the guidance of Robert Gallagher and the knowledge of Anson Hines. Roy Deposition 47:19-48:02. Yet the Agency insists Ms. Klugel was not subject

---

[8] As Ms. Klugel testified, Mr. Haddon, the supervisory official in charge of overseeing authorization for her travel, approved Mr. Yunger's traveling and thought "it would be great if Philip was willing to pay for it." Klugel Deposition 53:17-20. It is also important to note that the Agency failed to produce any evidence from a travel office official or supervisor that Mr. Yunger was somehow required to pay to attend the Hawaii conference. The claim is a post hoc pretextual rationalization and should be ignored as without any evidence.

to an adverse action, although Ms. Klugel's grant writing duties (grants which supported her continued employment as a trust employee) were taken away; she was denied travel and leave; and she was relieved of the central focus of her position, the production of electronic field trips.

Contrary to Defendants' Brief, at p. 26, the Agency has never asserted that it took away any assignments due to an inability of Ms. Klugel to complete assignments or that it had any problems her abilities. Haddon Deposition, 17:20-18:18; Gallagher Deposition 38;13; 43:10-43:18. Further, the central issue that led to Ms. Klugel's decision to resign from the Agency was not simply a reduction of duties but an unprecedented denial of leave related to her medical treatment and the threats to her that she was a "marked employee" under the employment equivalent of a Sword of Damocles. Exhibit 7, ¶13. Thus, there is a factual debate over whether the Agency reduced Ms. Klugel's duties as part of a retaliatory scheme, independent acts of gender or Rehabilitation Act discrimination, or because it was truly concerned about Ms. Klugel's ability to maintain her workload while recovering from her accident. The issue is first a factual debate best left for the jury; and second merely an illustration of the greater series of adverse actions the Agency employed.

The "legitimacy" of the Agency's conduct, essentially trying to accommodate Ms. Klugel as the Agency implies, is undercut by the denial of leave, the questioning of her veracity about her medical treatments, the threats of termination and the odd commentary of Mr. Haddon who surmised that Ms. Klugel was making herself "sick in the body." These are jury issues.

The Agency's justification for the denial of leave is both factually inaccurate and contrary to the law. Defendants' Brief, p. 27. Mr. Haddon himself testified he had <u>never</u> denied another employee leave; and Mr. Gallagher stated that leave was a right, the denial of which required written justification. The Agency's claim that it was a "busy time," is not a legitimate rationale for denying Ms. Klugel's right to leave. Further, such a basis flies directly in the face of the Rehabilitation Act and common sense. Mr. Haddon never explained why the period from April to June was a busy one; and a policy of denying leave during particular months of the year is novel, to say the least. Further, since Ms. Klugel was still receiving physical therapy and in need of leave, a blanket demand for a specific time period would be a per se denial of reasonable accommodation to her and, thus, cannot be legitimate. Nor does Plaintiff 's lack of existing leave help the Agency. Ms. Klugel burned over 450 hours of leave in a short period, as the Agency so quickly cites, because of the automobile accident, a fact all the parties agreed on.

With respect to the "progress report" (see Exhibit 7, ¶21) the Agency bizarrely attempts to turn its own misconduct into proof it did not occur. Ms. Klugel stated she was informed she was being put on a "progress report;" that is, an improvement plan. The Agency simply states that because Ms. Klugel cannot establish that the "report" was in written format, she cannot show that such action was adverse. Defendants' Brief at p.28.

The lack of written support for placing Ms. Klugel on a progress report and the failure of the Agency to point to any bases for such a report suggests that Mr. Haddon, Mr. Gallagher and others were engaging in efforts to raise Ms. Klugel's anxiety through non-specific and unsupported claims of poor performance. To claim that such actions

prove the Agency did nothing wrong is to ignore the greater impact of the Kafkaesque atmosphere Ms. Klugel faced in May, 2005.

### D. Hostile Work Environment

The Plaintiff has already provided detailed facts how being interrogated by the Office of Inspector General on her sexual history; being informed she was a "tough nut to crack;" being subjected to excessive work scrutiny; having assignments reduced; leave denied; her veracity questioned; her mental health challenged; her performance attacked; being told she was a "marked employee" with limited future prospects; and being threatened with arrest (by an Agent who legally lacked such authority) – all of which followed her reporting that she was subject to inappropriate questioning centering, not only on her sex as a woman but, literally, on the sex she was having as a woman – created a pervasive, prolonged hostile work environment that undermined her ability to perform her position and which produced a noticeable, marked change in attitude; following not only the refusal of Messrs. Haddon, Gallagher and Simons to review Ms. Klugel's complaints or take corrective action, but by their threats to her that she had essentially brought the investigation on herself and that she was "marked" as a result.

The Agency once again spouts long on the law but ignores the critical factual inquiry that her resignation, which itself cited the hostile work environment, was triggered by the cascading efforts of the Agency to force her departure which followed an inquiry which focused on the sexual relationships Ms. Klugel was having. The Agency argues sex discrimination does not involve actual sex, an interesting but distorted view. As Ms. Klugel, an aspiring Methodist minister, so aptly put it in describing Mr. Roy's action, "he basically called me a whore in that interview, and I didn't appreciate being

23

called ... being insulted like that." Klugel Deposition 75:08-75:10. This case, at its

essence, is about remedying that insult which cut to the very heart of Ms. Klugel's status

as a woman and the respect to which she is entitled as an employee and, frankly, as a

human being. The Agency rightly fears a jury reviewing that outrageous conduct, and so

it tries to equate an officially sponsored coercive and intrusive Agency investigation with

cases involving isolated acts by boorish supervisors.

### E. Rehabilitation Act

The Agency's argument concerning the Rehabilitation Act can be quickly

dispatched. Contrary to the Agency's view of the law, intrusive medical inquiries are a

violation of the Act, whether the employee is disabled or not.[9]

Second, Mr. Haddon testified that he perceived Ms. Klugel as impaired and

clearly suggested she was diseased in body and mind.[10]  This non-medical and bizarre

assessment was the basis for the demand by Mr. Haddon and Mr. Gallagher that Ms.

Klugel attend a mandatory meeting with the Employee Assistance Counselor (a

functional equivalent of a fitness for duty examination). When Ms. Klugel demanded that

her counsel be present for such an interview, Mr. Gallagher threatened Ms. Klugel with

adverse consequences.[11] See Exhibit 7, ¶11.

---

[9] There is no requirement that an individual be disabled for the Agency to violate the medical inquiry or medical records prong of the Rehabilitation Act (which incorporated the confidentiality and inquiry provision of the Americans with Disabilities Act. *See,* Doe vs. U.S. Postal Service, 317 F.3d 339 (D.C. Cir. 2003) 29 USC§791(g), 42 USC§12112(d)(2)-(4).  The Agency's focus on whether Ms. Klugel was or was not disabled is simply erroneous as a matter of well established law. *See,* Doe vs. U.S. Postal Service, 317 F.3d 339 (CA. D.C. 2003); Cassette v. Minnesota Power and Light, 188 F.3d 964 (8th Cir. 1999) (disclosure of medical information disability status irrelevant to ADA protections); Fredenburg v. Contra Costa County Dept of Health Services (9th Cir. 1999) (same holding); Karraker v. Rent-a-Center, Inc., 239 F. Supp. 828 (C.D. Ill. 2003) (medical inquiries).

[10] The Agency produced a list of medications that Ms. Klugel was taking (see Exhibit 9), but never stated how they acquired that list.

[11] Indeed, the fact that Mr. Haddon perceived Ms. Klugel as disabled and that her attitude was causing her to be "diseased in the body" is sufficient to preclude summary judgment under the Rehabilitation Act, Nichols v. Billington, 402 F. Supp. 48 (D. D.C. 2005). Further, where as here the Agency denied leave

The requests, not only for the basis for her medical treatment but also for all notes reflecting dates of treatment and the questioning of Ms. Klugel's veracity and the denial of leave (combined with an admitted failure by Mr. Haddon to segregate or safeguard this information) reveal that the Agency engaged in discrimination (and reprisal and retaliation). At no time was the material sought for the purpose for which it is supposed to be collected; that is, to provide reasonable accommodation to Ms. Klugel (Haddon Deposition 124:9-124:15; 129:01-129:17) or to assist the office in planning. However, as the Agency itself concedes "the information was requested to protect the Agency from some hypothesized future audit." Defendants' Brief at p. 38.

Clearly, a triable issue exists over the issue as to whether the Agency violated the Rehabilitation Act in the manner and the method by which it addressed Ms. Klugel's condition.

### F. Invasion of Privacy

While the Agency correctly cites the law pertaining to what constitutes an invasion of privacy, it again ignores the facts. The Agency sponsored interrogation by a quasi law enforcement officer of Ms. Klugel's sex life was clearly an unwarranted intrusion into her privacy. The misuse of official authority to gather salacious details of Ms. Klugel's personal life is so offensive as to be an invasion of privacy per se. The attack on Ms. Klugel's personal morality and veracity was so severe that Ms. Klugel emerged shaken and distraught from Mr. Roy's interrogation.

Ordering a helpless employee to submit to questioning in a supervisor's office where she is blocked from the door and forced to respond to insinuations that she is using

---

without following its own regulations requiring that denial to be in writing, and where the Agency referred plaintiff to an EAP, summary judgment is inappropriate. Davis v. Ashcroft, 355 F. Supp. 330 (D. D.C. 2005).

travel to have sex with multiple men is extraordinarily intrusive. The Agency's attempt to argue that the issue is about the travel documents ignores that the third rail here, as was Mr. Roy's bluster and bravado in trying to delve into Ms. Klugel's sex life. Sexual relations are quintessentially private and personal; and except in the rarest of instances, as Mr. Pickett explained, have no place in any government inquiry. Ms. Klugel was employed by a federal entity not a celibate religious order. Mr. Roy had simply no right to try to play police officer at Ms. Klugel's expense, nor did he have any right or need to explore her relationship with Philip Yunger. If there were irregularities on the travel vouchers, Mr. Roy might have had the authority to make inquiry about those issues; but any such issue (i.e., whether Mr. Yunger followed proper procedures in obtaining volunteer travel) could have been addressed without reference to Mr. Yunger's status as Ms. Klugel's significant other.

Defendants contend that asking a woman questions about who she is sleeping with and how many sex partners she has is not highly offensive. Aside from the highly dubious merits of that contention, what constitutes offensive are factual inquiries best left to discerning juries.

## IV. CONCLUSION

For the reasons presented, Plaintiff maintains that all of the Plaintiff's remaining claims must be decided by a jury, and summary judgment should be denied.

Respectfully submitted,

DORATHA KLUGEL
By Counsel

GRAD, LOGAN and KLEWANS, P.C.

_____/s/ Kevin Byrnes_____
Kevin Byrnes, DC Bar #480195
3141 Fairview Park Drive, Suite 350
Falls Church, VA 22042
Firm Telephone: 703-548-8400
Direct Line:  703-535-5393
Facsimile: 703-836-6289
Email: kbyrnes@glklawyers.com
_Counsel for Plaintiff_

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of August, 2008, a true copy of the foregoing Plaintiff's Opposition to Defendants' Motion for Summary Judgment was delivered via electronic filing to the Defendants, as follows:

Michelle Nicole Johnson
UNITED STATES ATTORNEY'S OFFICE
555 Fourth Street, NW
Room E-4212
Washington, DC 20530
Telephone:  (202) 514-7139
Facsimile:  (202) 514-8780
Email: Michelle.Johnson@usdoj.gov
_Counsel for Defendants_

_____/s/ Kevin Byrnes_____
Kevin Byrnes, DC Bar #480195
GRAD, LOGAN and KLEWANS, P.C
3141 Fairview Park Drive, Suite 350
Falls Church, VA 22042
Firm Telephone: 703-548-8400
Direct Line:  703-535-5393
Facsimile: 703-836-6289
Email: kbyrnes@glklawyers.com
_Counsel for Plaintiff_

# EXHIBIT 1

# Deposition Excerpts

| | |
|---|---|
| **Ailes Deposition** | **1-a** |
| **Gallagher Deposition** | **1-b** |
| **Haddon Deposition** | **1-c** |
| **Hines Deposition** | **1-d** |
| **Klugel Deposition** | **1-e** |
| **Lemon Deposition** | **1-f** |
| **Margensey Deposition** | **1-g** |
| **Pickett Deposition** | **1-h** |
| **Roy Deposition** | **1-i** |
| **Suite Deposition** | **1-j** |
| **Yunger Deposition** | **1-k** |

# Exhibit 1-a

# Ailes Deposition

8

1          Q      Let me rephrase that.

2                 BY MR. BYRNES:

3          Q      Would you review and determine whether a

4    travel voucher that was submitted was accurate or

5    not?

6                 MS. JOHNSON:   Objection as to form.

7          A      No.

8                 BY MR. BYRNES:

9          Q      Okay.  Did there come a time that you

10   made a referral to the Inspector General's Office

11   regarding Ms. Klugel?

12         A      Yes.

13         Q      Okay.  What was that based on?

14         A      I felt that the request to me was not

15   correct and it was against the rules and

16   regulations --

17         Q      What request --

18         A      -- of the FTR.

19         Q      What request are you referring to?

20         A      Adding a personal stop on an official

21   government ticket.

22         Q      And where was that?  Do you remember the

12

```
 1          A     I contacted her.

 2          Q     Okay.  And what did Ms. Suite say?

 3          A     That Belize was a personal stop.  Her

 4    understanding.

 5          Q     Did you contact Ms. Klugel's supervisor

 6    to determine whether he approved this trip?

 7          A     No.

 8          Q     Have you ever heard of Project View?

 9          A     No.

10          Q     Who was paying for Ms. Klugel to go to

11    Belize?

12          MS. JOHNSON:  Objection.  Lack of

13    foundation.

14          BY MR. BYRNES:

15          Q     If you know?

16          A     I don't know.

17          Q     You said that it violated the FTR.  How

18    did it violate the FTR?

19          MS. JOHNSON:  Objection.  Calls for

20    legal conclusion.

21          THE WITNESS:  We are not allowed to add

22    a personal stop that is not on your official
```

13

1    travel papers and on your Government ticket

2    together.

3              BY MR. BYRNES:

4        Q    Other than asking Ms. Suite whether or

5    not the travel was personal, did you take any

6    other steps to determine whether or not the travel

7    was truly personal or not?

8        A    Yes.

9        Q    What?

10       A    I e-mailed the passenger.

11       Q    And did she tell you again that it was

12   business related?

13       A    Yes.

14       Q    And why did you believe that that was

15   inaccurate?

16             MS. JOHNSON:  Objection to the form.

17   Mischaracterizes her testimony.  You can answer.

18             THE WITNESS:  Because I called again and

19   asked Ms.  Suite what was going on.

20             BY MR. BYRNES:

21       Q    And what did she say?

22       A    ·She had an in-house travel form that

14

1      stated Belize was personal.

2          Q    Did she show you that form?

3          A    No.

4          Q    Have you ever seen any written

5      documentation that would establish that the

6      initial trip or any subsequent trip to Belize was

7      personal in nature?

8          A    I'm sorry.  Say again.

9          Q    Have you seen anything in writing that

10     would confirm you suspicions that the trip to

11     Belize was personal?

12         A    No.

13         Q    Are you aware of who was paying for the

14     trip to Belize?

15         A    No.

16         Q    If I were to advise you that Project

17     View paid for that trip to Belize, would that

18     affect your opinion on whether that trip was

19     appropriate or not?

20              MS. JOHNSON:  Objection.  Calls for

21     speculation.

22              THE WITNESS:  It would have to be on her

15

1    travel authorization.

2         BY MR. BYRNES:

3         Q    If I were to tell you that Mr. Hadden

4    just testified this morning that he authorized

5    that trip, would that change your view of whether

6    that was personal or business in nature?

7         MS. JOHNSON:  Objection.  Calls for

8    speculation.

9         THE WITNESS:  I have to see it on the

10   travel document.

11        BY MR. BYRNES:

12        Q    Well, ma'am, why did you never call Mr.

13   Hadden since he had signed the documentation to

14   determine whether or not he approved the trip?

15        A    Because our contact is with the travel

16   person in the organization at SERC and she has the

17   documentation that is the travel authorization and

18   that's who we deal with.

19        Q    But the travel authorization in this

20   case was signed by Mr. Hadden, was it not?

21        MS. JOHNSON:  Objection.  Lack of

22   foundation.

18

1     Correct?

2        A    Yes.

3        Q    And you relied only on Mr. Suite's word

4     that it was not.  Correct?

5        A    Well, yes.

6        Q    So if Ms Suite was lying and inaccurate

7     then would that have affected your decision to

8     send the matter to the IG?

9           MS. JOHNSON:  Objection.  Calls for

10    speculation and to form.

11          THE WITNESS:  Depends.

12          BY MR. BYRNES:

13        Q    What do you mean it depends?

14        A    She told me she had documentation that

15    Belize was a personal stop.

16        Q    And so, of course, you requested that

17    documentation before you contacted the Inspector

18    General, didn't you?

19          MS. JOHNSON:  Objection to form.

20          THE WITNESS:  No.

21          BY MR. BYRNES:

22        Q    So you just relied on the word of some

20

1             MS. JOHNSON:  Objection to form.

2             THE WITNESS:  No.

3             BY MR. BYRNES:

4        Q    What did you tell the Inspector General?

5             MS. JOHNSON:  Objection to form.  Lack

6    of foundation.

7             THE WITNESS:  I had a question.

8             BY MR. BYRNES:

9        Q    To who?

10       A    To the Inspector General.

11       Q    How many travel forms do you review, did

12   you review during the year 2005?

13            MS. JOHNSON:  Objection.  Vague.

14            THE WITNESS:  Depends on how many

15   tickets I issued.  I looked at every form –

16            BY MR. BYRNES:

17       Q    More than 100?

18       A    Of course.

19       Q    More than 1,000?

20       A    I don't remember.

21       Q    How many people did you refer to the

22   Inspector General's Office in 2005?

21

1          A    I don't know.

2          Q    More than one?

3          A    I don't remember.

4          Q    How long have you worked with Ms. Suite?

5          A    I don't remember when she came on board.

6          Q    Would you consider yourself her friend?

7          A    In what way?

8          Q    Well, is she friendly with you?

9               MS. JOHNSON:  Objection.  Vague.

10              THE WITNESS:  She's a polite, nice

11      employee that we work with.

12              BY MR. BYRNES:

13         Q    And did she tell you that she was having

14      problems with my client and her attitude?

15              MS. JOHNSON:  Objection to the form.

16              THE WITNESS:  No.

17              BY MR. BYRNES:

18         Q    Did you ever make an accusation against

19      my client that she committed any criminal

20      misconduct?

21         A    No.

22         Q    Did you ever make an allegation that she

22

1    committed fraud, waste or abuse?

2             MS. JOHNSON:  Objection to form.

3             THE WITNESS:  No.

4             BY MR. BYRNES:

5        Q    So why did you refer the matter to the

6    Inspector General then?

7             MS. JOHNSON:  Objection to form.

8             THE WITNESS:  Because it was against the

9    FTR Rules and Regulations and therefore I am

10   required to put in a question to them.

11            BY MR. BYRNES:

12       Q    Where does it, is there a document in

13   any of your training materials or in your job

14   description that says every time there's a

15   question about a travel form, you're to report it

16   to the Inspector General?

17            MS. JOHNSON:  Objection to form.  Lack

18   of foundation.

19            THE WITNESS:  No.

20            BY MR. BYRNES:

21       Q    So this was just your discretionary

22   decision.  You just decided this was a good idea.

25

1    have done travel for her before.

2            BY MR. BYRNES:

3        Q    Did you have any problems with her?

4        A    Not that I remember.

5        Q    How many trips had she taken, do you

6    know?

7        A    I don't know.

8        Q    Your knowledge of the FTRs, what is it

9    -- in your position, has the agency allowed

10   volunteers to travel along with members of the

11   agency?

12           MS. JOHNSON:  Objection to form.

13           THE WITNESS:  It depends on how they're

14   registered and what kind of paperwork they're on.

15           BY MR. BYRNES:

16       Q    Well, do you know --

17       A    Yes, volunteers can travel.

18       Q    What rate do they get on flights?

19           MS. JOHNSON:  Objection.  Vague.

20           THE WITNESS:  If the Smithsonian is

21   paying and they're on official travel

22   documentation, travel orders, then they're allowed

26

1    the Government fare.

2            BY MR. BYRNES:

3        Q    Did you have any questions about Ms.

4    Klugel traveling to Hawaii?

5            MS. JOHNSON:  Objection.  Lack of

6    foundation.

7            THE WITNESS:  No.

8            BY MR. BYRNES:

9        Q    Did you raise any inquiry to the

10   Inspector General regarding the Hawaii trip that

11   she took with Mr.  Younger?

12       A    No.

13       Q    So this was the totally the Belize trip?

14       A    My recollection, yes.

15       Q    Now, have you, in your position in the

16   Travel Office, ever seen where an outside entity

17   paid for the travel of Smithsonian employees?

18       A    Yes.

19       Q    Is there anything inappropriate about

20   that?

21            MS. JOHNSON:  Objection to form.

22            THE WITNESS:  Depends on who it is and

# Exhibit 1-b

# Gallagher Deposition

Page 14

1 extent of her injuries?
2    MS. JOHNSON: Objection. Calls for
3 speculation.
4    THE WITNESS:
5    A   I can't speak to what he knew or didn't
6 know.
7    BY MR. BYRNES:
8    Q   Did he ever say to you I'm concerned
9 about the extent of her injuries?
10   A   No.
11   Q   Did he ever talk to you about methods
12 and mechanisms to accommodate her in the
13 workplace?
14   MS. JOHNSON: Objection to form.
15   THE WITNESS: No.
16   BY MR. BYRNES:
17   Q   Okay. Mr. Haddon, how did he -- based
18 on what he told you, what was he saying about her
19 leave, Ms. Klugel's leave?
20   MS. JOHNSON: Objection. Calls for
21 speculation.
22   THE WITNESS: Again, his concerns as he

Page 15

1 expressed to me were that there were a number of
2 projects that were coming due in that spring. He
3 was concerned -- and Dottie was integrally
4 involved in these projects. He was concerned that
5 these projects were not going to get completed by
6 the deadline.
7    BY MR. BYRNES:
8    Q   All right. Did he request -- were there
9 any discussions between you and Mr. Haddon
10 regarding what type of medical documentation Ms.
11 Klugel needed?
12   MS. JOHNSON: Objection to form.
13   THE WITNESS: Not ones in which Dottie
14 was not herself present.
15   BY MR. BYRNES:
16   Q   Well, the ones where Dottie was present,
17 was there any discussion regarding what sort of
18 medical documentation Ms. Klugel was required to
19 give SERC as a result of her injuries?
20   MS. JOHNSON: Objection to form.
21   THE WITNESS: Yes. We discussed what we
22 would like to see, yes.

Page 16

1    BY MR. BYRNES:
2    Q   What would you have liked to see?
3    A   Well, the way it came up was I wanted to
4 -- part of laying out the schedule for the
5 subsequent spring was knowing what Dottie -- how
6 much more she needed to do in terms of her
7 physical therapy and her rehabilitation. That's
8 really what we were asking for, because it seemed
9 very open-ended. We had asked Dottie herself, you
10 know, what how much longer is the therapy going to
11 take, is it a week, is it a month, is it six
12 months. She didn't know, understandably. I could
13 understand that.
14   So we asked for something from the
15 therapist or her physician that gave us some
16 indication that this could be another five or six
17 months or this could be another month. We didn't
18 know.
19   Q   Did you ask Ms. Klugel to provide you
20 the names of the medications she was on?
21   A   No.
22   Q   I noticed in documents that were

Page 17

1 produced by the agency, there was a list of
2 medications. Did you ever see that list?
3    A   Not that I recall.
4    Q   Do you know whether or not Mr. Haddon
5 ever asked Ms. Klugel to provide the medications
6 she was on?
7    MS. JOHNSON: Objection. Lack of
8 foundation.
9    THE WITNESS: I don't know.
10   MR. BYRNES: Let me show you what's been
11 marked as -- I haven't made copies of this because
12 we changed this deposition, but I will. This is
13 SI-239.
14   BY MR. BYRNES:
15   Q   Did you ever see that form before?
16   A   Not that I recollect.
17   Q   Okay. Do you know -- did you ever tell
18 Mr. Haddon that he should request from my client a
19 list of medications that she was taking?
20   A   Not that I recall.
21   Q   Did Mr. Haddon ever bring up to you the
22 discussion as to the nature of the medications my

Page 34

1    A   I asked her.
2    Q   What efforts did you make to follow up?
3    A   I didn't thing the onus was on me to
4  follow up.
5    Q   Well, you were questioning --
6    A   Right.
7    Q   -- whether she was going or not.  Did
8  you make any effort to follow up and say, Okay, I
9  need some medical documentation from you to show
10  that you're going to a doctor that day?
11    A   This happened several days, maybe even
12  less than a day, that we had to make this change.
13  This was not something that there was a lot of
14  lead time that we could look into.  I didn't have
15  that option.  I made a decision.
16    Q   Well, but you made a decision regarding
17  the medical treatment of an individual based on
18  your gut.  Correct?
19    A   No.
20    MS. JOHNSON:  Objection to form.
21    THE WITNESS:  That's not correct.
22    BY MR. BYRNES:

Page 35

1    Q   Well, you decided in the back of your
2  mind that somebody doesn't go to a doctor on
3  Sunday.  Correct?
4    A   No.  I decided that I was not going to
5  allow that change in travel to occur.
6    Q   Even if she went to a doctor?
7    MS. JOHNSON:  Objection to form.  Calls
8  for speculation.
9    BY MR. BYRNES:
10    Q   Correct?  You were going to deny that
11  whether she went to a doctor or not?
12    MS. JOHNSON:  Objection.  Calls for
13  speculation.
14    BY MR. BYRNES:
15    Q   You can answer.
16    A   If she had been able to respond and say
17  that she had an appointment and this was the
18  doctor's appointment she had, I would have
19  re-thought my decision.  I can't say to you today
20  that I would have changed my decision.  All I can
21  tell you is I would have reconsidered it.
22    Q   Aren't you obligated, sir, under the

Page 36

1  federal law to make an accommodation for an
2  individual to go see a treating physician?
3    MS. JOHNSON:  Objection.  Calls for a
4  legal conclusion.
5    BY MR. BYRNES:
6    Q   If you know.
7    A   I don't know if I'm required to or not,
8  but I would make that conclusion.
9    Q   But you didn't -- what happened?  You
10  requested the document from her when?  When did
11  you request a document showing that she had
12  medical treatment?
13    A   I don't remember the dates.  I don't
14  remember the details.  As I already stated, this
15  happened on a very, very short timeframe.  In
16  order to make that change in ticket, it needed a
17  very quick decision.
18    Q   Who did you consult with regarding that
19  decision?  Anyone?
20    A   I tried to call Dottie.
21    Q   Well, what about legal counsel?  Did you
22  try to talk to anyone and say what are my

Page 37

1  obligations where I've got somebody who is going
2  to medical treatment on the day they're supposed
3  to be traveling?
4    A   No.
5    Q   Okay.  And did you put any of this in
6  writing?
7    A   Not that I recall unless -- it may be in
8  some E-mails, but I don't recall that.
9    Q   Is that your practice, not to put things
10  in writing like this?
11    MS. JOHNSON:  Objection to form.
12    THE WITNESS:  I don't know what my
13  practice is or isn't.  I mean, it just happens to
14  be that day.
15    BY MR. BYRNES:
16    Q   On February 22nd, Ms. Klugel wrote to
17  you and said: "I am concerned given recent events
18  that questions may be raised at this meeting as to
19  credibility and integrity."  We're talking about
20  documentation concerning her broken arm.  "As a
21  precaution, I have retained legal counsel."
22    Okay.  And she wrote that to both you

Page 38

1  and Mr. Haddon. Why did you never have a
2  discussion with her attorney regarding her medical
3  condition?
4       MS. JOHNSON: Objection. Lack of
5  foundation. Calls for speculation.
6       THE WITNESS: I didn't see why I should
7  do that. Why should I seek out her attorney?
8       BY MR. BYRNES:
9    Q   Well, she was concerned that you were
10 questioning her integrity.
11   A   And we assured her that we were not.
12   Q   How did you assure her?
13   A   We sat down at a meeting around a table
14 in my office, and that was one of the first things
15 that I said. We're not questioning her integrity.
16 We were simply trying to resolve the issue of
17 getting work done.
18   Q   Well, bit didn't you say to her in your
19 discussions we're concerned about you getting your
20 work done, we're concerned about the duration of
21 your medical condition, you need to provide more
22 documentation of your medical condition?

Page 39

1       MS. JOHNSON: Objection to form.
2       BY MR. BYRNES:
3    Q   Correct?
4    A   No. We said we're concerned about the
5  work, here's how much work has to be done, here
6  are the deadlines under which that -- by which
7  that work has to be done, we're concerned that
8  you're not here enough to get that work done, so
9  we would like to figure out a schedule that's
10 going to allow this work to get done.
11   Q   Did you produce such a schedule?
12   A   I believe that we did, although Mr.
13 Haddon was keeping the notes of that. He may have
14 those. I didn't.
15   Q   Well, were you ever involved in the
16 draft of a schedule to allow her to complete her
17 benchmarks?
18   A   Yes. We were there. The three of us
19 were there and agreed on dates and numbers of
20 electronic field trip -- video conferences that
21 Dottie was running. We had dates by which -- how
22 many were going to be done by which date, etc.

Page 40

1    Q   Didn't Mr. Haddon reduce her assignments
2  and take those away from her?
3       MS. JOHNSON: Objection. Lack of
4  foundation.
5       THE WITNESS: Not on that day.
6       BY MR. BYRNES:
7    Q   But he did on at some point; he took
8  away her assignments. Correct?
9    A   At some time subsequent to that.
10   Q   And she resigned shortly after he took
11 away her assignments. Correct?
12      MS. JOHNSON: Objection to form.
13      THE WITNESS: If you say so.
14      BY MR. BYRNES:
15   Q   Why did he take away her assignments?
16 Were you a part of that discussion?
17      MS. JOHNSON: Objection. Calls for
18 speculation.
19      MR. BYRNES: Hot if he was part of the
20 discussion.
21      THE WITNESS: I'm only -- I was not part
22 of the direct discussion. I am peripherally aware

Page 41

1  of some of that.
2       BY MR. BYRNES:
3    Q   How are you peripherally aware of it?
4    A   Because one of the -- in fact, probably
5  the largest project that Dottie was involved in
6  was something called the electronic field trip,
7  which was going to take place in Port of Oakland
8  sometime in May, I believe, of 2005, a project
9  that requires probably a year of advanced planning
10 and effort, and there was considerable concern
11 that that project was not going to hit the mark,
12 and this was a big deal for the Smithsonian and it
13 was a big deal for the other partners, and there
14 was lots of concern that things just weren't
15 coming together.
16   Q   Okay. Did you and I ever have a
17 discussion about Ms. Klugel?
18   A   I believe we did.
19   Q   At that time, weren't you requested to
20 make some accommodations to her?
21   A   Not that I recall. That was not the
22 nature of our conversation.

Page 42

1    Q    Do you remember when the conversation
2  occurred?
3    A    I would say it was in April of 2005.
4    Q    And who contacted who?  Do you remember?
5    A    You called me.
6    Q    And do you remember what we spoke about?
7    A    You expressed concern to me about my
8  suggestion that Dottie go see our employee
9  assistance counselor.
10    Q    Okay.  And did I express concern because
11  I felt that you were perceiving her as having a
12  mental disability?
13        MS. JOHNSON:  Objection.  Calls for
14  speculation.
15        THE WITNESS:  I don't remember that you
16  specifically mentioned mental condition.  I think
17  it was more general than that, about you
18  mentioned, I believe, the Employee Rehabilitation
19  Act.  I don't recall that you specifically asked
20  me whether I had concerns about her mental
21  condition or not.
22        BY MR. BYRNES:

Page 43

1    Q    Do you recall in March getting an E-mail
2  from Mr. Haddon for you to review regarding her
3  medical leave -- her leave slips?  Do you recall
4  having a discussion with Mr. Haddon about leave
5  slips for therapy sessions?
6    A    I don't recall a specific one, but I
7  wouldn't doubt that they occurred.  I mean, we
8  talked about lots of -- this issue came up a lot
9  in that relatively brief time period.
10    Q    Do you have any reason to believe that
11  my client in any way lacked credibility on any
12  issue when she was an employee?
13        MS. JOHNSON:  Objection.  Vague.
14        THE WITNESS:  No.
15        BY MR. BYRNES:
16    Q    Do you have any reason to believe that
17  my client lied about anything, from travel to her
18  medical condition?
19        MS. JOHNSON:  Objection to form.  Vague.
20        THE WITNESS:  No.
21        BY MR. BYRNES:
22    Q    Okay.  What was your understanding of my

Page 44

1  client's work performance prior to the time she
2  was injured?
3    A    Everything I had heard about her job,
4  her duties and performance, were all very good.
5    Q    Okay.  Well, when she brought to your
6  attention that she was having trouble with Ms.
7  Suite, what action did you take?
8    A    I don't remember that she brought to my
9  attention a problem with Ms. Suite.
10        MR. BYRNES:  All right.  Well, let's
11  mark this as Exhibit 1.
12            (Deposition Exhibit No. 1 was
13            marked for identification.)
14        MR. BYRNES:  Perhaps that, Exhibit 203,
15  will refresh your recollection.
16        MS. JOHNSON:  Do you have another copy?
17        MR. BYRNES:  No.  I'll make one at the
18  end.
19        THE WITNESS:  Okay.  Sorry.
20        BY MR. BYRNES:
21    Q    Do you recall her discussing --
22        MS. NICHOLSON:  Could you hold on a

Page 45

1  second so we can look at this?
2        MR. BYRNES:  Sorry.  Well, only one
3  counsel should be on the record, but that's fine.
4        MS. JOHNSON:  Go ahead.
5        BY MR. BYRNES:
6    Q    Do you recall her discussing problems
7  with Ms. Suite?
8    A    Yeah.  I recall getting that E-mail.  I
9  don't know that Dottie and I ever had a
10  face-to-face conversation about that.
11    Q    What's your impression of Ms. Suite --
12        MS. JOHNSON:  Objection to form.
13        MR. BYRNES:  -- as an employee?
14        MS. JOHNSON:  Objection to form.
15        THE WITNESS:  That's a pretty broad
16  question.  Is there something more specific I can
17  answer?
18        BY MR. BYRNES:
19    Q    Certainly.  Were you aware that Ms.
20  Suite was requesting an investigation into my
21  client's travel?
22        MS. JOHNSON:  Objection to form.

ed5ff75f-0109-4dea-873a-56307a557d12

Page 58

1        BY MR. BYRNES:
2        Q    Well, wasn't leave denied to her in
3    February by Mr. Haddon?
4        A    I don't recall sick leave being denied.
5    I know an annual leave request was denied.
6        Q    Do you know if there's any regulation
7    that required under SERC or the Smithsonian that
8    when annual leave is denied, that an explanation
9    be given?
10       A    I believe there is.  I believe you are
11   required to say why, yes.
12       Q    Within the Federal Government, is leave
13   considered a right or a privilege?
14       MS. JOHNSON:  Objection.  Lack of
15   foundation.  Objection as to form.
16       BY MR. BYRNES:
17       Q    If you know.
18       A    Use of leave is your right as an
19   employee.
20       Q    All right.  And so do you know why Ms.
21   Klugel was denied leave?
22       MS. JOHNSON:  Objection.  Calls for

Page 59

1    speculation.
2        THE WITNESS:  Yes.
3        BY MR. BYRNES:
4        Q    Why?
5        A    Because, if I remember correctly, she
6    had asked for about a week of time, give or take a
7    day, not long after we had had this conversation
8    about getting work, and Mark -- Mr. Haddon.  Sorry
9    -- had followed up with her on progress to see if
10   they were meeting their benchmarks, which was not
11   happening, and she had asked for leave and he said
12   I can't give you leave when we have all of this
13   stuff going on.
14       Q    Do you know of any other employees
15   during the 14 months that were there and Ms.
16   Klugel was there that was ever denied leave?
17       A    No.
18       MR. BYRNES:  No further questions.
19       MS. JOHNSON:  Let's just go off the
20   record for two minutes so I can confer with agency
21   counsel.
22       THE VIDEOGRAPHER:  Going off the record

Page 60

1    at 14:34.
2        (Recess)
3        THE VIDEOGRAPHER:  We're back on the
4    record at 14:37.
5        EXAMINATION BY COUNSEL FOR DEFENDANTS
6        BY MS. JOHNSON:
7        Q    Mr. Gallagher, under questioning by Mr.
8    Byrnes, you indicated you asked Ms. Klugel to
9    speak to the EAP counselor?
10       A    Yes.
11       Q    Did you ask anyone else to also?
12       A    Yes.
13       Q    Who was that?
14       A    Mr. Haddon.
15       Q    Do you know if Mr. Haddon, in fact,
16   talked to the EAP counselor?
17       A    I believe he did.
18       MS. JOHNSON:  Thank you.  I have no
19   further questions.
20       MR. BYRNES:  Nothing further.
21       THE VIDEOGRAPHER:  Going off the record
22   at.

Page 61

1        (Whereupon, at 4:38 p.m., the
2    deposition of ROBERT P. GALLAGHER
3    was adjourned.)
4        * * * * *
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

16  (Pages 58 to 61)

# Exhibit 1-c

# Haddon Deposition

Page 10

1    Q    Since the litigation commenced have you
2  deleted or lost or destroyed any records?
3    A    No.
4    Q    So it's fair to say then what you
5  produced to counsel was the full ambit of
6  documents that you had that discussed your
7  interaction with Mr. Klugel in 2004 and 2005?
8    A    As best of my ability -- best of -- to
9  my knowledge, yes.
10   Q    In your capacity as education director
11 did you have the opportunity to work with Ms.
12 Klugel?
13   A    Yes.
14   Q    When did Ms. Klugel come into employ
15 with you?
16   A    I think it was the year 2000 -- early --
17 early in the year 2000.
18   Q    What was her position while she was
19 under your supervision?
20   A    She was a distance learning coordinator,
21 volunteer coordinator.  I believe that was it.
22   Q    What does the distance learning

Page 11

1  coordinator do?
2    A    Is responsible for any activities that
3  involve video conferences, electronic field trips,
4  or activities surrounding those such as teacher
5  workshops, planning meetings, liaison between
6  universities and scientists.
7    Q    What was Ms. Klugel's grade when she
8  came to you in early 2000 and first began working
9  for you?
10   MS. JOHNSON:  Objection.  Lack of
11 foundation.
12   THE WITNESS:  Nine.  She was a SI I
13 believe the terminology is 9 -- grade 9.
14   BY MR. BYRNES:
15   Q    Was she a federal employee?
16   MS. JOHNSON:  Objection.  Lack of
17 foundation.
18   THE WITNESS:  No.
19   BY MR. BYRNES:
20   Q    What sort of capacity did she have with
21 the Smithsonian?
22   A    I don't understand that question.

Page 12

1    Q    Was she a contract employee or was she
2  paid or was she a volunteer.  You said an SI-9.
3  What is that?
4    A    She came on as a trust employee.
5    Q    What's a trust employee?
6    A    Within the Smithsonian there's usually
7  two general categories of employees.  Ones -- ones
8  that are -- whose salary is funded by federal
9  funds.  Anything else, any other employee, that
10 had their salary not funded by federal funds is in
11 general considered a trust employee.  In this
12 particular case, since they weren't federal funds,
13 she was considered a trust employee.
14   Q    Is there any distinction to your
15 knowledge in the rights granted a federal employee
16 versus the rights granted a trust employee?
17   MS. JOHNSON:  Objection.  Calls for
18 legal conclusion.
19   THE WITNESS:  To my knowledge, no.
20   BY MR. BYRNES:
21   Q    Let's talk a little bit about Ms.
22 Klugel's work as a volunteer coordinator.  What

Page 13

1  was that?
2    A    She was responsible for the registration
3  of new -- of new volunteers.  She was responsible
4  for acquiring the number of hours that -- that
5  current volunteers served at SERC and then sent
6  those to our volunteer office downtown.
7    Q    So is it fair to say that based on her
8  job description --
9    MS. JOHNSON:  I'll just object because
10 he wasn't done answering the question.
11   BY MR. BYRNES:
12   Q    Were you?  I'm sorry.
13   A    There were other --
14   Q    Go ahead.  I'm sorry.  I thought you
15 were finished.
16   A    She was also responsible for learning
17 about volunteer opportunities from those labs so
18 that she could talk to potential volunteers about
19 those present opportunities.
20   Q    Would she actually place volunteers for
21 SERC?
22   A    Yes, that would be part of that -- that

4  (Pages 10 to 13)

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 14

1  job, placing them. The ultimate decision is going
2  to be with the senior scientist, but it would be
3  her responsibility to encourage them to — to join
4  a particular lab.
5      Q    So as part of her duties was she to
6  learn the policies and procedures within the
7  Smithsonian that govern the use of volunteers?
8      A    Could you say that again?
9      Q    As part of her duties was she to learn
10  the policies and procedures of the Smithsonian
11  that apply to volunteers?
12      A    I — I wouldn't go as far as knowing all
13  of the policies and procedures for the entire
14  institution. It did not certainly involve the
15  numbers of volunteers that downtown would involve,
16  so our numbers were very small. She had available
17  to her volunteer procedure information and she was
18  expected to understand that, yes.
19      Q    Did you have an occasion to question
20  whether or not she was actually following proper
21  procedures when it came to volunteers?
22          MS. JOHNSON: Objection. Lack of

Page 15

1  foundation.
2          THE WITNESS: Did I have an occasion to
3  question that?
4          BY MR. BYRNES:
5      Q    Yes.
6      A    I had occasions. Yes, I had many
7  occasions. I had occasions to question that.
8      Q    What questions —
9      A    I had occasions —
10      Q    — did you have?
11      A    See, I don't know if I answered — I
12  don't know if I understand what — exactly what
13  you meant.
14      Q    Let me rephrase it then. Was there ever
15  a time in the time that Ms. Klugel was employed
16  under your supervision that you felt she was
17  acting contrary to Smithsonian policy with respect
18  to volunteers?
19      A    That would be no.
0      Q    Would volunteer that worked with SERC
21  travel with other members of SERC for certain
22  projects or conferences?

Page 16

1      A    Yes, they would.
2      Q    Would Ms. Klugel have as her position
3  the responsibility of ensuring at least with
4  respect to SERC that those volunteers' travel was
5  addressed and carried out?
6          MS. JOHNSON: Objection as to form. You
7  can answer if you understand.
8          THE WITNESS: I'm really sorry, you need
9  to ask that question again.
10          BY MR. BYRNES:
11      Q    Was part of her responsibility to ensure
12  knowledge of who was traveling with SERC employees
13  as volunteer?
14          MS. JOHNSON: Objection to the form.
15          THE WITNESS: Not outside of the
16  education department.
17          BY MR. BYRNES:
18      Q    That's what I mean, within —
19      A    Well, there's volunteers —
20      Q    — the education department, within the
21  parameters of the section she was working in, was
22  it her responsibility to coordinate the travel of

Page 17

1  volunteers?
2          MS. JOHNSON: Objection to the form.
3          THE WITNESS: No.
4          BY MR. BYRNES:
5      Q    Whose responsibility was that?
6      A    It was — it would be the responsibility
7  of the individual employees of the education
8  department.
9      Q    Would Ms. Klugel be aware as part of her
10  responsibilities of which volunteers were working
11  with which employees in the education department?
12      A    Yes.
13      Q    Would she also be made aware of travel
14  that would occur between employees of the
15  education department and the volunteers?
16          MS. JOHNSON: Objection. Calls for
17  speculation.
18          THE WITNESS: Yes.
19          BY MR. BYRNES:
20      Q    During the time that Ms. Klugel worked
21  for you, how did you rate her as an employee?
22          MS. JOHNSON: Objection to the form.

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 18

1      THE WITNESS: Most if not all the time
2  outstanding.
3      BY MR. BYRNES:
4   Q   What is your opinion of Ms. Klugel's
5  work ethic?
6      MS. JOHNSON: Objection to the form.
7      THE WITNESS: What I observed from
8  Dottie in my opinion was that it was satisfactory.
9      BY MR. BYRNES:
10  Q   Was she satisfactory our outstanding in
11 her work ethic?
12  A   She was satisfactory in her work ethic.
13  Q   Did you ever have concerns about her
14 work ethic while she worked under you?
15  A   I did not.
16  Q   You said that you had rated her
17 outstanding. Did that rating include an analysis
18 of her attitude in the work place?
19     MS. JOHNSON: Objection to the form.
20     THE WITNESS: It did include that, yes.
21     BY MR. BYRNES:
22  Q   Did you ever in any way reprimand,

Page 19

1  discipline, or institute any adverse action
2  against Ms. Klugel?
3      MS. JOHNSON: Objection to the form.
4  Calls for a legal conclusion.
5      THE WITNESS: Are you referring to
6  formally?
7      BY MR. BYRNES:
8   Q   Right, any sort of formal discipline.
9   A   As opposed to a conversation?
10  Q   Right, any formal discipline where you
11 put down on a piece of paper I am disciplining you
12 for the following?
13  A   No.
14  Q   Were there any informal counselings
15 concerning any aspects of her employment that you
16 had with her?
17  A   Yes.
18  Q   What were they?
19  A   They were conversations referring to
20 exchanges of -- with Kathy Suite.
21  Q   Other than that did you ever have any
22 conversations with her about any matter involving

Page 20

1  her work that you considered negative?
2      MS. JOHNSON: Objection to the form.
3      THE WITNESS: There were other -- yes, I
4  had other conversations.
5      BY MR. BYRNES:
6   Q   What other conversations did you have?
7   A   They were also -- well, they were about
8  conversations or -- conversations with Mark
9  Cornman.
10  Q   Who's Mark Cornman?
11  A   Mark Cornman at that time was the -- I
12 don't know his exact formal title but he was the
13 -- sort of like the director of the -- I want to
14 say -- it was the director of the distance
15 learning electronic field trip component of Ball
16 State University.
17  Q   When did the conversations that you're
18 referring to about the exchanges with Kathy Suit
19 occur? Do you recall?
20  A   You're asking for a date?
21  Q   An approximate date, month, year.
22  A   Pretty sure that they were in '05 and

Page 21

1  early -- early in -- during the year in '05.
2   Q   What about the conversations with Mark
3  Cornman? When did that arise?
4   A   They were multiple, probably '03, '04 --
5  '03 and '04.
6   Q   Did you reflect any of these discussions
7  or concerns in a performance evaluation that you
8  gave Ms. Klugel?
9      MS. JOHNSON: Objection to the form.
10     THE WITNESS: No.
11     BY MR. BYRNES:
12  Q   The matters involving Kathy Suit in
13 early 2005, what was the issue that you were
14 trying to address when you had the conversations?
15  A   Those issues were arguments that were
16 happening between Dottie and Kathy at the time
17 referring to travel procedures.
18  Q   How did you resolve those arguments if
19 at all?
20  A   My tact was to counsel Dottie to act and
21 speak professionally even though this was an
22 apparent frustrating position -- situation for

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 30

1    Q    Who was the family member or significant
2    other who served with you as a volunteer when you
3    were on travel?
4    A    You're saying -- you're asking for a
5    name?
6    Q    No, relationship.  Your wife, your
7    daughter, your son, your girlfriend.
8    A    I want to say girlfriend.
9    Q    When did that travel occur?
10   A    That occurred in 2006 -- March of 2006.
11   Q    Did your girlfriend get a government
12   rate for her travel?
13   A    She -- she did not.
14   Q    Who did she submit the travel voucher
15   to?
16       MS. JOHNSON:  Objection.  Lack of
17   foundation.
18       BY MR. BYRNES:
19   Q    Did she submit a travel voucher?
20   A    No.
21   Q    What volunteer duties did she do for the
22   Smithsonian?

Page 31

1    A    She assisted in the organization of the
2    -- of an electronic field trip.
3    Q    Has there been any to your knowledge
4    change in the travel relations applicable to
5    volunteers traveling with SERC members since Ms.
6    Klugel left the office?
7        MS. JOHNSON:  Objection to the form.
8    Lack of foundation.
9        THE WITNESS:  No.
10       BY MR. BYRNES:
11   Q    Who is Amy Erb?
12   A    Amy Erb presently?
13   Q    Yes.
14   A    She's a teacher in Pennsylvania.
15   Q    Did she ever work for SERC?
16   A    She did.
17   Q    How long did she work for SERC?
18   A    Three years.
19   Q    Which 3 year do you recall her working
0    there?
21   A    She left -- just one second.  She left
22   '06.  '03 to '06.

Page 32

1    Q    How was her performance as an employee?
2        MS. JOHNSON:  Lack of foundation.  Go
3    ahead.
4        THE WITNESS:  She -- highly successful
5    to outstanding.
6        BY MR. BYRNES:
7    Q    Did she work for you?
8    A    Yes.
9    Q    Do you know why she left?
10   A    Yes.
11   Q    Why?
12   A    She got married.  Actually she left
13   because she was moving to Pennsylvania.
14   Q    So there was no disciplinary action or
15   adverse action against her to your knowledge?
16       MS. JOHNSON:  Objection to form.
17       THE WITNESS:  No.
18       BY MR. BYRNES:
19   Q    Did there come a time in late 2004 and
20   early 2005 that you became aware of friction
21   between Ms. Klugel and Ms. Suit regarding travel
22   with Phillip Younger?

Page 33

1        MS. JOHNSON:  Objection to form.
2        THE WITNESS:  I -- no.
3        BY MR. BYRNES:
4    Q    You said earlier that there was some
5    issue involving Ms. Suit and Ms. Klugel.  What was
6    the issue as you understood?
7        MS. JOHNSON:  Objection.  Asked and
8    answered.
9        THE WITNESS:  The issue was that Dottie
10   was not able to control her temper when dealing --
11   when trying to resolve communication issues with
12   Kathy Suit.
13       BY MR. BYRNES:
14   Q    Had you seen Ms. Klugel have similar
15   temper issues with anyone else?
16   A    Yes.
17   Q    Who?
18   A    Mark Cornman.
19   Q    Those issue never rose to the level
20   where you gave any sort of written counseling or
21   written communication to Ms. Klugel regarding her
22   attitude toward Mr. Cornman?

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 42

1    MS. JOHNSON: Objection to the form.
2    THE WITNESS: No.
3    BY MR. BYRNES:
4    Q   To your knowledge at the time that you
5  have been education director right up until today,
6  other than Ms. Klugel's investigation by IG, were
7  there any other OIC investigations into travel
8  procedures of employees that you're aware of?
9    MS. JOHNSON: Objection to form.
10    THE WITNESS: I am not aware.
11    BY MR. BYRNES:
12    Q   Did Ms. Klugel ever communicate to you a
13  concern about the manner in which the investigator
14  was asking her questions during the investigation?
15    MS. JOHNSON: Objection to form.
16    THE WITNESS: Yes.
17    BY MR. BYRNES:
18    Q   What did she say, referring to Ms.
19  Klugel?
20    A   I don't remember those exact words.
21    Q   Did you take any notes of that
22  conversation?

Page 43

1    A   No.
2    Q   Didn't Ms. Klugel communicate to you
3  that she felt that Investigator Roy was asking her
4  questions about her sex life?
5    A   I don't remember those exact words, sex
6  life.
7    Q   About her intimate relations, that he
8  was asking her questions about who she was dating,
9  who she was sleeping with, those types of
10  questions?
11    MS. JOHNSON: Objection to form.
12    THE WITNESS: I don't remember her using
13  the word intimate relationships.
14    BY MR. BYRNES:
15    Q   What words do you remember her using?
16    A   Relationships.
17    Q   So she raised to you a concern that
18  Investigator Roy was asking her questions about
19  her personal relationships?
20    A   Relationships. I don't remember the
21  adjective before that.
22    Q   What further inquiry if any did you make

Page 44

1  when she came to you with these concerns?
2    A   I didn't make any other.
3    Q   What is the policy that the Smithsonian
4  has on sexual harassment in the workplace?
5    MS. JOHNSON: Objection. Lack of
6  foundation.
7    THE WITNESS: The policy is -- to my
8  understanding?
9    BY MR. BYRNES:
10    Q   Yes.
11    A   Is zero tolerance.
12    Q   What training have you had as a
13  supervisor on the agency's policy on sexual
14  harassment?
15    A   I have had a course on it that the
16  Smithsonian offered, a -- I'm trying to think of
17  the word, update -- an update.
18    Q   When did you first take a course on
19  sexual harassment training?
20    A   It was I would say somewhere in the mid-
21  1990s.
22    Q   When did you last take a course on

Page 45

1  sexual harassment training?
2    A   A month ago.
3    Q   What training did you have been 2000 and
4  2005 on sexual harassment?
5    A   I don't know.
6    Q   When you take the training, are you
7  required to sign a sheet that shows that you've
8  actually taken the training?
9    A   Yes.
10    Q   Is the training online or is it in a
11  session in person?
12    A   At that time it was in person.
13    Q   Is it currently online?
14    A   A refresher course, refresher or update
15  is -- is available online.
16    Q   As supervisor, did you believe that an
17  inquiry into an individual's sex life was
18  appropriate or inappropriate?
19    MS. JOHNSON: Objection. Calls for a
20  legal conclusion.
21    THE WITNESS: Inappropriate.
22    BY MR. BYRNES:

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 46

1    Q   Have you as a supervisor ever asked an
2    individual questions about their level of sexual
3    activity?
4        MS. JOHNSON: Objection to form.
5        THE WITNESS: No.
6        BY MR. BYRNES:
7    Q   Have you ever asked them about whether
8    or not they were having sex?
9    A   No.
10   Q   Have you ever inquired of a female
11   employee who she was sleeping with?
12   A   No.
13   Q   Other than perhaps your girlfriend.
14       MS. JOHNSON: Objection to the form.
15       THE WITNESS: My girlfriend was never an
16   employee.
17       BY MR. BYRNES:
18   Q   That would always be inappropriate in
19   your view wouldn't it?
20       MS. JOHNSON: Objection to form. Calls
21   for a legal conclusion.
22       THE WITNESS: Yes.

Page 47

1        MR. BYRNES: Do you want to take a break
2    for minutes?
3        MS. JOHNSON: Yes. Can we get some more
4    water?
5        (Recess)
6        BY MR. BYRNES:
7    Q   Mr. Haddon, before the break we were
8    just talking about conversations that Ms. Klugel
9    had with you regarding the OIC investigation. Do
10   you recall how many conversations she had with
11   you?
12   A   No, I don't.
13   Q   Was it more than one?
14   A   Yes.
15   Q   Other than saying that they were
16   questioning her about her relationships, do you
17   recall Ms. Klugel raising any other concerns?
18   A   No.
19   Q   How long was the conversation that you
0    had with her regarding the questioning by the OIG?
21       MS. JOHNSON: Objection to form.
22       THE WITNESS: I don't -- I don't

Page 48

1    remember.
2        BY MR. BYRNES:
3    Q   More than a minute?
4    A   Yes.
5    Q   More than 10 minutes?
6    A   Probably not.
7    Q   What action did you take if any after
8    Ms. Klugel came to you and expressed her concerns
9    about how OIC was conducting the investigation?
10       MS. JOHNSON: Objection to form.
11   Mischaracterizes prior testimony.
12       THE WITNESS: There was no
13   investigation.
14       BY MR. BYRNES:
15   Q   Did anyone from the Office of Inspector
16   General speak to you?
17   A   Yes.
18   Q   Who?
19   A   Jerry Roy.
20   Q   What did he talk to you about?
21   A   The travel to Hawaii.
22   Q   By who?

Page 49

1    A   By Amy or Dottie, Ray and Phil.
2    Q   Ray?
3    A   Ray's last name -- Ray is -- do you want
4    to know?
5    Q   Yes.
6    A   Presently Amy's husband, and Phil
7    Younger.
8    Q   What did Mr. Roy ask you about the
9    travel?
10   A   He asked me about the duties that -- the
11   -- the duties for -- that Phil and -- and Ray, and
12   again I don't remember his last name, would
13   perform in Hawaii.
14   Q   What did you tell him if anything?
15   A   I told him that they would be serving to
16   -- mostly videotape presentations that were being
17   made by Amy and Dottie.
18   Q   What other questions did Mr. Roy have if
19   any after you told him what Mr. Younger and the
20   other gentleman would be doing?
21   A   He asked if this sort of thing was done
22   before.

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 50

1   Q   What sort of thing?
2   A   Volunteers coming to tape presentations.
3   Q   What did you tell him?
4   A   Yes.
5   Q   Did he ask any other questions?
6   A   He asked about if I know that those --
7   that that kind of taping duties was going to
8   happen, if I was aware of that situation.
9   Q   What situation?
10  A   Of the volunteers coming and taping
11  Dottie and Amy.
12  Q   Did Mr. Roy ask you and questions about
13  the nature of the relationships between Mr.
14  Younger and Ms. Klugel and Ray and Amy?
15      MS. JOHNSON: Objection to form.
16      THE WITNESS: No.
17  BY MR. BYRNES:
18  Q   I'm sorry?
19  A   No.
20  Q   He didn't raise any questions about them
21  being boyfriend and girlfriend?
22  A   Not those words.

Page 51

1   Q   What words did he use?
2   A   Were they friends.
3   Q   How did he explain the word friends if
4   he did?
5   A   He said why don't you just hire somebody
6   there to tape them in Hawaii.
7   Q   Mr. Roy said that?
8   A   Not a quote, but that's -- he said why
9   don't -- you know, he was asking why don't you
10  contract a videographer in Hawaii to take them.
11  Q   Why did you say?
12  A   I said that that was -- didn't seem to
13  be a practical solution to having that. It would
14  be hard to arrange that in Hawaii.
15  Q   Which would cost more money in your
16  background or your mind, to hire a videographer or
17  to send volunteers?
18      MS. JOHNSON: Objection. Lack of
19  foundation.
20      THE WITNESS: Hire a videographer.
21  BY MR. BYRNES:
22  Q   Why would that be cheaper?

Page 52

1       MS. JOHNSON: Objection. Calls for
2   speculation.
3       BY MR. BYRNES:
4   Q   I'm sorry, which would be more
5   expensive, to hire a videographer?
6   A   Hire a videographer would be more
7   expensive.
8   Q   Volunteers work I take it for nothing.
9   A   Yes.
10  Q   That's inherent in the term volunteer.
11      MS. JOHNSON: Objection to form.
12      THE WITNESS: That is correct.
13      BY MR. BYRNES:
14  Q   Did you inform Mr. Roy that these were
15  volunteers?
16      MS. JOHNSON: Objection to the form.
17      THE WITNESS: Yes.
18      BY MR. BYRNES:
19  Q   What did he say when you told him they
20  were volunteers?
21  A   He wanted to know what qualifications
22  they had for going and doing this videography.

Page 53

1   Q   What did you tell him?
2   A   I said that Phil Younger was very
3   qualified to be a -- he was -- I don't know about
4   exactly all of his professional training and that,
5   but I knew that he was competent -- very competent
6   in videography and this was an acceptable solution
7   to what I, Dottie, and Amy had discussed about --
8   talking about -- about wanting to videotape them
9   and their presentations.
10  Q   Did you perceive or feel that Mr. Roy
11  was questioning your judgment?
12      MS. JOHNSON: Objection to the form.
13      THE WITNESS: He was questioning my
14  judgment? He was questioning the situation which
15  I guess involved my judgment.
16      BY MR. BYRNES:
17  Q   So he was questioning your judgment.
18  Correct?
19  A   Yes.
20  Q   How did you feel about that?
21  A   I felt okay.
22  Q   You weren't at all upset or intimidated

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 58

1      A   It was only to set up an appointment of
2   the day.
3      Q   Who contacted who first?
4      A   I believe it would have been -- it would
5   have been him.
6      Q   So when you say this wasn't an
7   "investigation" that's not anything that you have
8   any written confirm of by anyone.  Correct?
9      A   No.
10     Q   So nobody wrote to you and said this is
11  merely an inquiry and it's not an investigation by
12  OIG.  Correct?
13         MS. JOHNSON:  Objection to form.
14         THE WITNESS:  That's correct.
15         BY MR. BYRNES:
16     Q   Do you recall the approximate time or
17  the month that Mr. Roy spoke to you?
18     A   April.
19     Q   April of what year?
20     A   That's a really good question.  Of '05.
21  I don't remember.  I guess the answer to that is I
22  don't remember what time of year.

Page 59

1      Q   Did you hear anything further after Mr.
2   Roy talked to you about the Hawaii travel from the
3   IG's office?
4      A   Directly from Mr. Roy?
5      Q   Yes.
6      A   No.
7      Q   Did you hear from anyone else as to what
8   the results of the IG's review of the travel
9   situation was?
10     A   Yes, I did.
11     Q   Who did you hear from?
12     A   I knew that was his next question.  I
13  don't remember that.
14     Q   What did you hear?
15     A   That it was -- that it was -- there were
16  -- there were no further action.  There -- there
17  would be no -- no more further question.
18     Q   Did Ms. Klugel ever tell you that Mr.
19  Roy had threatened her continuation as an employee
20  with SERC as part of his investigation of her?
21         MS. JOHNSON:  Objection to form.
22         THE WITNESS:  I wouldn't say that he

Page 60

1   used those words.
2          BY MR. BYRNES:
3      Q   I'm not asking what he used.  Did Ms.
4   Klugel ever communicate to you that she felt that
5   Mr. Roy was placing her job in jeopardy in any of
6   the communications he had?
7          MS. JOHNSON:  Objection to form.
8          THE WITNESS:  No.
9          BY MR. BYRNES:
10     Q   Did Ms. Klugel ever communicate to you
11  that she felt she was working in a hostile work
12  environment?
13     A   Yes.
14     Q   When?
15     A   When she turned in her resignation.
16     Q   At any time previous to that had she
17  complained about the level of scrutiny she was
18  under?
19         MS. JOHNSON:  Objection to form.
20         THE WITNESS:  Scrutiny?  She -- she had
21  indicated -- complained about that, yes.
22         BY MR. BYRNES:

Page 61

1      Q   When?
2      A   Again you're looking for a day?
3      Q   Approximate times.
4      A   Approximate times?  It's difficult for
5   me to answer that because I don't remember the
6   date -- the date or the month when Jerry Roy came
7   out, but it was subsequent to those visits.
8      Q   Did Ms. Klugel communicate to you then
9   that she felt the work environment changed for her
10  after Mr. Roy conducted an investigation?
11     A   Work environment changed?  I don't think
12  that --
13     Q   I'm sorry?
14     A   I don't know if it -- are you asking me
15  if the work environment changed?
16     Q   No, not if it did, but did Ms. Klugel
17  come to you and say, look, I'm excessive scrutiny
18  after Mr. Roy had come and conducted his
19  investigation?
20     A   No.
21     Q   When did she complain of it then?
22         MS. JOHNSON:  Objection.  Lack of

Page 62

1  foundation.
2      THE WITNESS: Of what?
3      BY MR. BYRNES:
4  Q   The excessive scrutiny.
5      MS. JOHNSON: Objection. Lack of
6  foundation.
7      THE WITNESS: More immediately after --
8  shortly after Jerry Roy came to visit.
9      BY MR. BYRNES:
10 Q   That was my question. Her complaints
11 about changes in the level of scrutiny of her
12 occurred after Mr. Roy's visit. Correct?
13     MS. JOHNSON: Objection to form.
14     THE WITNESS: Her complaint occurred
15 after the visit referring to Jerry Roy's meeting
16 with Dottie.
17     BY MR. BYRNES:
18 Q   And how many times after that meeting
19 with Dottie that Mr. Roy had did Ms. Klugel come
20 in and tell you that she felt that she was under
21 scrutiny in the workplace?
22 A   I don't -- I don't remember any other

Page 63

1  time.
2  Q   Did Ms. Klugel ever tell you that she
3  felt she was being treated improperly because she
4  was a woman?
5      MS. JOHNSON: Objection to form.
6      THE WITNESS: I don't remember her
7  coming to me.
8      BY MR. BYRNES:
9  Q   You seem to be shaking your head yes and
10 then you said --
11 A   I'm shaking my head no.
12 Q   Let me ask you a question. Other than
13 with the lawyers present day have you discussed
14 your testimony prior to coming here with anyone
15 else?
16 A   Yes.
17 Q   Who?
18 A   My testimony? A family member.
19 Q   Is that family member an attorney?
20 A   No.
21 Q   Anyone within the agency?
22 A   Yes.

Page 64

1  Q   Who?
2  A   Bob Gallagher.
3  Q   What did you discuss with him?
4  A   Different -- different dates. Maybe --
5  not maybe, but I also discussed with him trying to
6  get the larger picture of what is actually
7  happening with this case because I didn't really
8  understand all of those components.
9  Q   Did he show you the complaint?
10 A   He did not, no.
11 Q   Did someone show you the complaint?
12 A   Yes.
13 Q   Who?
14 A   Christine.
15 Q   When were you shown the complaint?
16 A   I was shown a number of -- or a number
17 -- multiple complaints or -- excuse me, I don't
18 know the terminology, but I was -- as -- as
19 correspondence between the Smithsonian and -- and
20 this office happened, whatever those were
21 inappropriate, Christine would forward them to me.
22 Q   So you saw our letters to your agency?

Page 65

1  A   Letters did I see? I mean, I -- I saw
2  documents that shows the different complaints.
3  Q   When did that occur?
4  A   Over probably a year.
5  Q   Did you discuss your potential responses
6  to the items raised in the complaint?
7      MS. JOHNSON: Objection to form. Vague.
8      BY MR. BYRNES:
9  Q   In other words, how you were going to
10 respond to these allegations?
11 A   No, I did not.
12 Q   What did you discuss?
13     MS. JOHNSON: Objection. Vague.
14     THE WITNESS: With who?
15     BY MR. BYRNES:
16 Q   What's that?
17 A   With who?
18 Q   With anyone regarding the complaint.
19     MS. JOHNSON: Objection to the extent
20 you're asking for conversations with counsel.
21     MR. BYRNES: I'm trying to find out
22 whether he was shown information that was outside

Page 74

1      MS. JOHNSON: Objection to form.
2      THE WITNESS: As volunteers?
3      BY MR. BYRNES:
4    Q   Yes.
5    A   I don't know of any.
6    Q   Did Mr. Simons?
7    A   I have no idea.
8    Q   Do you know if Mr. Heins ever did?
9    A   I am not --
10   Q   Didn't he bring his daughter on a trip
11  with him?
12     MS. JOHNSON: Objection. Calls for
13  speculation. Lack of foundation.
14     BY MR. BYRNES:
15   Q   As a volunteer?
16   A   I don't know. I don't know. Jessica
17  Heins his daughter served in many capacities.
18   Q   For the Smithsonian.
19   A   For SERC.
20   Q   Right. And Jerry Roy never questioned
21  that did he?
22     MS. JOHNSON: Objection. Lack of

Page 75

1   foundation.
2      THE WITNESS: I have no idea.
3      BY MR. BYRNES:
4    Q   He didn't question it to you.
5    A   It would --
6    Q   He didn't question it to you did he? He
7   didn't come in and say I want a list of every
8   person who has a personal relationship with a
9   volunteer and I want to find out why these people
10  are being listed as volunteer.
11     MS. JOHNSON: Objection to form and
12  vague.
13     BY MR. BYRNES:
14   Q   Correct?
15   A   He did not do that with me, no.
16   Q   No. He only came in and talked to you
17  about Amy Erb and Dottie Klugel. Correct?
18     MS. JOHNSON: Objection to form.
19     THE WITNESS: Yes. Yes, he only did.
20     BY MR. BYRNES:
21   Q   In the entire time that you'd been with
22  SERC have you ever had an OIG investigator ever

Page 76

1   come to you before regarding the travel of an
2   employee?
3    A   No.
4    Q   Were you aware that Ms. Klugel was in an
5   automobile accident at some point in the fall of
6   2004?
7    A   Yes.
8    Q   As a result of that automobile accident
9   did Ms. Klugel take additional sick and annual
10  leave to deal with her injuries after the
11  automobile accident?
12     MS. JOHNSON: Objection. Calls for
13  speculation.
14     THE WITNESS: Yes.
15     BY MR. BYRNES:
16   Q   Who was the person who would approve or
17  deny her leave requests?
18   A   Me.
19   Q   Did you ever deny any of Ms. Klugel's
20  leave requests for annual or sick leave that she
21  sought to use to deal with the injuries she
22  received as a result of her automobile accident?

Page 77

1      MS. JOHNSON: Objection. Calls for
2   speculation.
3      THE WITNESS: No.
4      BY MR. BYRNES:
5    Q   Did you ever deny her leave?
6    A   Yes.
7    Q   When?
8    A   Late April, early May, somewhere around
9   there of 2006.
10   Q   What leave did you deny? Do you recall?
11   A   It was a request for 6 days.
12   Q   To go where?
13   A   That I don't know.
14   Q   Do you know whether it was for medical
15  leave or personal leave?
16   A   At the time I believe it it be personal
17  leave.
18   Q   Where was she going to go? Do you
19  recall?
20   A   That was not discussed.
21   Q   Why did you deny her leave?
22   A   I denied her leave because of increased

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 82

1    for a legal conclusion.
2        THE WITNESS: There very well may be.
3        BY MR. BYRNES:
4    Q    There may be?
5    A    Special provisions for people with
6    disabilities -- given to people with disabilities.
7    Q    Do you believe that as a result of the
8    automobile accident that Ms. Klugel was disabled
9    physically?
10       MS. JOHNSON: Objection. Calls for a
11   legal conclusion.
12       THE WITNESS: Disabled? She was
13   partially disabled?
14       BY MR. BYRNES:
15   Q    Right. What did you see as a result of
16   the automobile accident -- what physical
17   impairment or disability did you see her as
18   having?
19       MS. JOHNSON: Objection. Calls for a
20   legal conclusion. Vague.
21       THE WITNESS: She had a cast on her arm
22   for some time because she had broken her arm, and

Page 83

1    -- and then after she removed the -- after the
2    cast was removed there was physical therapy to
3    some extent that needed to happen.
4        BY MR. BYRNES:
5    Q    What was your understanding of how long
6    she was going to suffer from these injuries?
7        MS. JOHNSON: Objection to form. Calls
8    for speculation.
9        THE WITNESS: I think I received a note
10   from her doctor saying that she would be in
11   physical therapy for I'd say 4 to 6 weeks.
12       BY MR. BYRNES:
13   Q    Do you know stayed in physical therapy
14   more than 4 to 6 weeks?
15   A    I don't know that.
16   Q    Did she continue to suffer
17   symptomatology during the entire time she was at
18   the agency up until her resignation?
19       MS. JOHNSON: Objection. Calls for
20   speculation, and to form.
21       BY MR. BYRNES:
22   Q    If you know.

Page 84

1    A    No.
2    Q    So her condition resolved itself as far
3    as you know?
4        MS. JOHNSON: Objection to form.
5        THE WITNESS: It improved as far as I
6    know.
7        BY MR. BYRNES:
8    Q    Did it ever get resolved where she was
9    not requesting any medical leave to deal with the
10   car accident?
11       MS. JOHNSON: Objection to form. Calls
12   for speculation.
13       THE WITNESS: She was continuing to
14   request medical leave up to the time that she
15   left.
16       BY MR. BYRNES:
17   Q    So as far as you know, from the time she
18   was in the accident until the time she left she
19   was requesting medical leave to deal with the
20   injuries from the accident?
21   A    Yes.
22   Q    Didn't you at one point, you and Mr.

Page 85

1    Gallagher, express concern over the amount of time
2    she was taking away from the job to deal with her
3    physical injuries?
4        MS. JOHNSON: Objection to form.
5        THE WITNESS: No.
6        BY MR. BYRNES:
7    Q    If I were to tell you that Mr. Gallagher
8    testified yesterday that you had expressed that
9    concern, would that be correct or incorrect?
10       MS. JOHNSON: Objection to form. Lack
11   of foundation.
12       THE WITNESS: It would have been an
13   interpretation of that — interpretation of my
14   concern.
15       BY MR. BYRNES:
16   Q    Did you have a concern about the amount
17   of leave she was taking?
18   A    No, I did not have a concern about the
19   amount of leave. My concern was more of her
20   documenting that leave.
21   Q    Let me ask you a question. You said you
22   denied her leave in part because she had exhausted

Page 86

1 her leave balance. Is that correct?
2     MS. JOHNSON: Objection, vague.
3     THE WITNESS: That was one of those
4 reasons.
5     BY MR. BYRNES:
6    Q    So you were concerned about the amount
7 of leave she was taking. Correct?
8     MS. JOHNSON: Mischaracterizes
9 testimony.
10     THE WITNESS: No.
11     BY MR. BYRNES:
12    Q    Does your agency allow for advanced
13 leave for people with injuries?
14     MS. JOHNSON: Objection. Lack of
15 foundation.
16     THE WITNESS: I believe so, yes.
17     BY MR. BYRNES:
18    Q    Did you consult with anyone from the EEO
19 office at any time regarding how to address the
20 physical injuries suffered by Ms. Klugel as a
21 result of the car accident?
22     MS. JOHNSON: Objection to form.

Page 87

1     THE WITNESS: No, I did not.
2     BY MR. BYRNES:
3    Q    Why not?
4    A    I didn't feel that there was a need to
5 do that.
6    Q    Prior to the automobile accident had Ms.
7 Klugel ever exhausted her leave balance prior to
8 that?
9     MS. JOHNSON: Objection. Lack of
10 foundation.
11     THE WITNESS: No.
12     BY MR. BYRNES:
13    Q    How many other employees other than Ms.
14 Klugel have you ever denied leave to?
15    A    I think that in an informal setting I
16 would -- I would say that there were maybe two
17 other employees.
18    Q    Over the course of 19 years?
19    A    Yeah.
0    Q    In a formal setting, a formal denial
21 where somebody submitted a leave slip and you
22 said, no, I'm not going to give you leave, how

Page 88

1 many times have you done that except for Ms.
2 Klugel?
3    A    None.
4    Q    Of the other two individuals you
5 informally denied leave, were they requesting
6 medical or annual leave at the time?
7    A    Annual leave.
8    Q    Were those individuals people who had
9 been in accidents and have exhausted their leave
10 balance as a result?
11    A    No.
12    Q    Were you concerned that the continuation
13 of Ms. Klugel's treatment and the necessity of
14 medical leave was impacting her ability to keep up
15 with her job requirements?
16     MS. JOHNSON: Objection to form.
17     THE WITNESS: Could you repeat that?
18     BY MR. BYRNES:
19    Q    Were you concerned that the impact of
20 Ms. Klugel's requesting medical leave --
21    A    The impact?
22    Q    -- was impairing her ability to complete

Page 89

1 her job requirements?
2     MS. JOHNSON: Objection to form.
3     THE WITNESS: The impact of her
4 requesting medical leave -- the impact of her
5 requesting was interfering with her job.
6     BY MR. BYRNES:
7    Q    Let me rephrase that. Was the amount of
8 leave she was requesting in your mind interfering
9 with her ability to perform her job?
10    A    It did interfere, yes.
11    Q    And you were concerned that since the
12 treatment was continuing that she would continue
13 to request leave for that issue. Right?
14     MS. JOHNSON: Objection.
15 Mischaracterizes his testimony.
16     THE WITNESS: It was -- it was
17 understood that she would continue to request that
18 leave.
19     BY MR. BYRNES:
20    Q    And that concerned you because you felt
21 she was not keeping up with the workload.
22     MS. JOHNSON: Objection to form.

Page 90

1  Mischaracterizes his testimony.
2      THE WITNESS: Not the way you're
3  phrasing it, no.
4      BY MR. BYRNES:
5      Q   You were concerned with the amount of
6  leave she was taking. Correct?
7      MS. JOHNSON: Objection to form.
8      BY MR. BYRNES:
9      Q   That's why you denied it. Correct?
10     MS. JOHNSON: Objection to form.
11 Mischaracterizes testimony.
12     THE WITNESS: That is not totally based
13 on that decision.
14     BY MR. BYRNES:
15     Q   But that was one of the factors?
16     A   It was one of the factors, but it wasn't
17 based on that factor.
18     Q   Why else would you deny leave other than
19 your concern of the workload being performed?
20     A   That actually was the third reason that
21 I can think of. So there were -- there were the
22 three. Going over them again, one is that is a

Page 91

1  very busy time in enhanced activities in the
2  education department. Would be very unusual for
3  any employee to ask for time off during April
4  through the middle of June. That's one. The
5  second one is that -- and this is not in any
6  specific order of importance, but the second one
7  was that Dottie if I remember correctly did not
8  have any leave at that time. The third was that
9  when she was there 2 days or 3 days a week because
10 the other days she was doing physical therapy, the
11 things that I needed her to do, her duties, were
12 not being completed. So that was the basis of me
13 saying no to this.
14     Q   Did you make any efforts to modify or
15 change her workload as a result of her automobile
16 accident?
17     MS. JOHNSON: Objection to form.
18     THE WITNESS: Her workload was reduced.
19     BY MR. BYRNES:
20     Q   How?
21     A   We focused on three projects that she
22 needed to concentrate on and any other duties

Page 92

1  associated with being distance learning
2  coordinator could be set aside.
3      Q   Did you ever submit any written
4  statements regarding her inability to perform any
5  of her work that you recall?
6      MS. JOHNSON: Objection to form.
7      THE WITNESS: I don't recall that.
8      BY MR. BYRNES:
9      Q   What was her final rating when she left
10 the agency? Did you give her one?
11     A   I did not.
12     Q   What was her rating period? When did
13 that happen? When would you normally give her
14 evaluation?
15     A   Let's see. That time I think that we
16 were on our -- it would have been probably October
17 of '04.
18     Q   Other than the fact that she was taking
19 physical therapy essentially part-time, were you
20 seeing any decline in the actual work she
21 performed in the workplace while she was present
22 at SERC?

Page 93

1      MS. JOHNSON: Objection. Vague.
2      THE WITNESS: Yes.
3      BY MR. BYRNES:
4      Q   When did that occur?
5      A   That occurred in the -- in the late
6  winter and spring of '05.
7      Q   And that was after the OIG
8  investigation. Correct?
9      A   Yes.
10     Q   Did you draw any linkage between Ms.
11 Klugel's decreased work performance and the fact
12 that OIG had investigated her?
13     MS. JOHNSON: Objection to form.
14     THE WITNESS: You need to change -- I
15 won't agree to that statement because there was no
16 investigation.
17     BY MR. BYRNES:
18     Q   After OIG spoke to her.
19     A   There was -- it happened the same time.
20     Q   Did you draw any connection between the
21 two events?
22     A   Yes, I did.

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 114

```
 1         THE WITNESS:  None of those.
 2         BY MR. BYRNES:
 3     Q   Does Kathy Suit do travel for all of
 4  SERC?
 5         MS. JOHNSON:  Lack of foundation.
 6         BY MR. BYRNES:
 7     Q   To your knowledge?
 8     A   Not to my knowledge.
 9     Q   In February 2005 did you schedule a
10  meeting for Ms. Klugel and Mr. Gallagher?
11     A   Yes.
12     Q   Why?
13     A   I scheduled the meeting to talk -- to
14  discuss asking Dottie for documentation on her
15  physical therapy visits.
16     Q   What documentation were you requesting?
17     A   Something to -- something for SERC
18  records to show that she actually went to physical
19  therapy.
20     Q   Why did you need those?
21     A   It was my understanding that for record
22  keeping and in case this was questioned months or
```

Page 115

```
 1  years in the future by auditors of some sort that
 2  all of this leave 2 or 3 days a week for an
 3  extensive period of time with a little
 4  prescription slip from a doctor saying we needed
 5  -- that -- that she needed to do this therapy,
 6  other than that we had no -- we had no -- we had
 7  no records of her actually going to physical
 8  therapy except for her -- her calling up and
 9  saying I'm going to physical therapy for a couple
10  hours a day.
11     Q   Did you have reason to ever question the
12  integrity of Ms. Klugel?
13         MS. JOHNSON:  Objection to form.  Vague.
14         THE WITNESS:  Up until that time no.
15         BY MR. BYRNES:
16     Q   Did you question her integrity when she
17  told you she was going to physical therapy?
18         MS. JOHNSON:  Objection to form and
19  vague.
20         THE WITNESS:  I -- not when she started
21  physical therapy.
22         BY MR. BYRNES:
```

Page 116

```
 1     Q   But as it dragged on you began to become
 2  concerned that she wasn't actually going to the
 3  appointments?
 4         MS. JOHNSON:  Objection to form.
 5         THE WITNESS:  Yes.
 6         BY MR. BYRNES:
 7     Q   You suspected her of malingering.
 8  Correct?
 9         MS. JOHNSON:  Objection to form.
10         THE WITNESS:  Only when she -- only when
11  -- yes.
12         BY MR. BYRNES:
13     Q   Is this something Mr. Gallagher
14  suggested to you or did you raise these concerns
15  with Mr. Gallagher?
16         MS. JOHNSON:  Objection to form.
17         THE WITNESS:  I don't remember who --
18  who raised them to who, but they were discussed.
19         BY MR. BYRNES:
20     Q   Was anyone other than you and Mr.
21  Gallagher involved in any discussions of the
22  necessity of medical forms for Ms. Klugel?
```

Page 117

```
 1     A   No.
 2     Q   Mr. Gallagher's function was at the time
 3  you were speaking to him?
 4     A   Administrative -- executive -- executive
 5  administrator -- executive administrator.
 6     Q   Was any recommendation ever made to Ms.
 7  Klugel to take leave under the Family Medical
 8  Leave Act?
 9         MS. JOHNSON:  Objection.  Lack of
10  foundation.
11         THE WITNESS:  I don't -- I don't
12  remember doing that.
13         BY MR. BYRNES:
14     Q   Was there ever a discussion that you or
15  Mr. Gallagher had with her saying under the
16  Family Medical Leave Act you can take off this
17  time and maybe you should to go deal with these
18  injuries?
19         MS. JOHNSON:  Objection.  Asked and
20  answered.  Lack of foundation.
21         THE WITNESS:  There was -- there was no
22  need to do that.
```

Page 122

```
 1     Q    So you would agree in reviewing that
 2  that that document was sent to you?
 3     A    Yes.
 4     Q    Who if anyone informed you what
 5  information to request for Ms. Klugel in terms of
 6  her medical treatment?
 7     A    The only people that I -- the only
 8  person that I talked to was Bob Gallagher.
 9     Q    What was the purpose for which the
10  information was requested?
11        MS. JOHNSON: Objection to form.
12        THE WITNESS: The purpose was to protect
13  my -- to protect the institution from -- if any
14  future audits were made any people questioned why
15  documentation was not obtained for all of this
16  leave that was taken.  That was -- that's my
17  understanding.
18        BY MR. BYRNES:
19     Q    Where did you get that understanding
20  from?
21     A    Of what I just said?
22     Q    Yes.
```

Page 123

```
 1     A    From conversations I had with Bob
 2  Gallagher.
 3     Q    Why were you requesting future
 4  treatment?
 5        MS. JOHNSON: Objection to form.
 6        BY MR. BYRNES:
 7     Q    Why did you request from Ms. Klugel a
 8  diagnosis from her doctor and a prognosis as to
 9  future treatment?
10        MS. JOHNSON: Objection.
11  Mischaracterizes testimony.
12        THE WITNESS: I wanted to -- it was
13  actually present.  If he wanted to -- if the
14  doctor wanted to include future letters -- future,
15  excuse me, weeks, but what -- you know, how long
16  is this expected to continue?
17        BY MR. BYRNES:
18     Q    Did you say we also need a letter from
19  your doctor stating the requirements for P.T. and
20  necessary schedules past, present, and future
21  pertaining to your arm?
22        MS. JOHNSON: Objection. Vague.
```

Page 124

```
 1        THE WITNESS: That would be reasonable,
 2  yes.
 3        BY MR. BYRNES:
 4     Q    Why were you asking her about future
 5  treatment?
 6     A    That would seem a reasonable request
 7  from me as to how long this would be going on.
 8  Since her duties were reduced before, it would --
 9  how long would they continue to be reduced?
10     Q    So what was the purpose for requesting
11  future treatment -- a prognosis of future
12  treatment?
13        MS. JOHNSON: Objection to form.
14        THE WITNESS: I guess it would -- it
15  would be from my own planning and running of the
16  department that I needed to know what Dottie's
17  abilities or disabilities would be both now and in
18  the future.
19        BY MR. BYRNES:
20     Q    Did Ms. Klugel provide you with any
21  medical documents?
22     A    I think that -- I believe I remember
```

Page 125

```
 1  seeing one document.
 2     Q    Where was that document maintained?
 3        MS. JOHNSON: Objection. Calls for
 4  speculation.  Vague.
 5        THE WITNESS: I don't know where it is.
 6        BY MR. BYRNES:
 7     Q    Did you get it?  Did she give it to you,
 8  Ms. Klugel?
 9     A    It was in my hands -- it was in my
10  hands.  I probably -- I don't have it in my
11  office.  It wasn't something I kept in my office.
12  It may have been kept with leave records which is
13  why we were asking for the documentation to begin
14  with so that they could be kept with those leave
15  requests.
16     Q    Did you get a letter from her treating
17  physician at any time?  Did she provide you with a
18  letter from her doctors?
19     A    All I remember seeing a -- like a
20  prescription sized piece of paper with her
21  doctor's -- with a doctor's written statement
22  about how much time she might need to do physical
```

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 126

1  therapy.
2      Q   Didn't Ms. Klugel tell you in February
3  that in terms of requests for employment
4  information or regarding medical information that
5  you should contact me?
6      A   She said that a number -- a number of
7  times.
8      Q   To your knowledge, did you ever initiate
9  a contact with me regarding the extent or duration
10 of her injuries?
11     MS. JOHNSON:  Objection to form.
12     THE WITNESS:  No, I did not.
13     BY MR. BYRNES:
14     Q   Didn't she tell you that one of the
15 things she was concerned about is that you were
16 challenging her credibility and integrity?
17     MS. JOHNSON:  Objection.  Vague.
18     THE WITNESS:  Yes.
19     MR. BYRNES:  Let's mark this as 2.
20     (Deposition Exhibit No. 2 was
21     marked for identification.)
22     BY MR. BYRNES:

Page 127

1      Q   Sir, do you recall ever receiving that
2  document?
3      A   I don't recall.
4      Q   Do you remember was in your possession
5  at any time?
6      A   These words?
7      Q   What's that?
8      A   These words?
9      Q   Right, that document.  Do you ever
10 recall seeing it before?
11     A   I don't -- I don't recall.  I don't
12 remember.
13     Q   Do you ever recall being told what
14 medications Ms. Klugel was on?
15     A   I don't remember.
16     MS. JOHNSON:  Objection.  Asked and
17 answered.
18     BY MR. BYRNES:
19     Q   You don't remember?  Could you have been
0  told that?
21     A   Yes.
22     Q   Did you ever request of her to know what

Page 128

1  medications she was on?
2      A   I don't remember requesting any
3  medications.
4      Q   Could you have requested them or is that
5  you don't believe you did or are you just having a
6  loss of memory now as to whether you did or
7  didn't?
8      MS. JOHNSON:  Objection to form.
9      THE WITNESS:  I don't see what that
10 would have -- I don't -- I would be very surprised
11 if I requested that information.  I have no
12 interest in that information.
13     BY MR. BYRNES:
14     Q   Who is Nicole Campbell?
15     A   Who is she?
16     Q   Yes.
17     A   She is a female who works in the
18 administrative area of SERC.
19     Q   What's her position?  Do you recall?
20     A   I don't know the -- she is -- I don't
21 know the exact name of her position.  She would be
22 like an administrative aide.  I'm sorry.

Page 129

1      Q   When you were sending these emails to
2  Ms. Klugel and C.C.ing other employees regarding
3  her medical condition, what steps did you make to
4  ensure that those email communications were kept
5  confidential?
6      MS. JOHNSON:  Objection.  Vague.  Lack
7  of foundation.
8      THE WITNESS:  I did not make take any
9  other steps.
10     BY MR. BYRNES:
11     Q   Did Mr. Gallagher ever tell you that
12 that information needed to be segregated in any
13 way?
14     MS. JOHNSON:  Objection to form.  Lack
15 of foundation.
16     THE WITNESS:  I don't recall that -- him
17 saying that.
18     BY MR. BYRNES:
19     Q   Didn't Ms. Klugel tell you that she had
20 X- rays and even a CT scan done on her arm at some
21 point?
22     A   I don't remember.

Page 134

1   A   Um-hum.
2   Q   Is that a yes?
3   A   Yes.
4   Q   And after the OIG had spoken to her?
5   A   Yes.
6   Q   You stated did I allow for her emotional
7   state and recuperation after the accident in an
8   email to Mr. Gallagher. Do you recall that?
9   A   Could you repeat that?
10  Q   Did you state to Mr. Gallagher in an
11  email the following, FYI. I am meeting with
12  Dottie tomorrow at 3:00 to discuss some of the
13  matters you and I discussed. She has also turned
14  in a leave request for one entire week starting
15  this Friday when I am very much inclined to
16  disapprove. No wonder she can't get anything
17  done. She's (inaudible) I imagine potential
18  questions from OHR asking what I did to help
19  situation, did I provide guidance and training or
20  something to that effect, did I allow for her
21  emotional state and recuperation after the
22  accident, did I offer counseling. I think I will

Page 135

1   recommend counseling that OHR offers or suggest
2   that she set up an appointment with the HR rep who
3   comes out here every so often. Do you recall
4   writing that email?
5   A   I -- I don't recall writing it, but that
6   would be -- yes, I remember.
7   Q   What concern did you --
8   MS. JOHNSON: Could you let him finish
9   the answer?
10  THE WITNESS: I remember gists of that
11  and -- and communicating that to Bob Gallagher,
12  yes.
13  BY MR. BYRNES:
14  Q   The question I asked, I don't mind you
15  elucidating a further response, but I think it was
16  a yes or no answer. Why were you concerned about
17  her emotional state?
18  A   I was concerned because I was her
19  supervisor and it was my responsibility to be
20  concerned about the emotional state of my
21  employees. I was also concerned about her
22  emotional state because Dottie and I were friends.

Page 136

1   Q   What was it about her emotional state
2   that you were concerned about?
3   A   She was withdrawn. She was -- she was
4   frustrated. She was angry.
5   Q   And that is something that you hadn't
6   seen before either the accident or her meeting
7   with the OIG. Is that correct?
8   MS. JOHNSON: Objection to form.
9   BY MR. BYRNES:
10  Q   Is that a state you had not seen her in
11  before the OIG issue and the accident?
12  MS. JOHNSON: Objection to form.
13  BY MR. BYRNES:
14  Q   Correct?
15  A   Yes.
16  Q   So you saw a change in her emotional
17  state and you became concerned about it.
18  MS. JOHNSON: Objection to form.
19  BY MR. BYRNES:
20  Q   Correct?
21  A   Yes.
22  Q   As a friend and a supervisor. Correct?

Page 137

1   A   Yes.
2   Q   Did you ever go to anyone in the agency
3   to talk to them about how you handle an employee
4   who's showing emotional distress in the workplace?
5   MS. JOHNSON: Objection to form.
6   THE WITNESS: No.
7   BY MR. BYRNES:
8   Q   That's what she was showing though, some
9   sort of emotional distress or stress. Right?
10  MS. JOHNSON: Objection. Calls for a
11  medical conclusion.
12  THE WITNESS: I'll just stay with the
13  words that I described. Emotional stress is -- I
14  -- I don't know what Dottie was -- was actually
15  feeling but she was exhibiting -- what she was
16  exhibiting is what I -- what I think was anger,
17  frustration, and withdrawing.
18  BY MR. BYRNES:
19  Q   Wasn't she angry, frustrated, and
20  withdrawn because she felt she was under
21  additional scrutiny after OIG had spoken to her?
22  MS. JOHNSON: Objection. Lack of

35 (Pages 134 to 137)

Page 138

1  foundation.  Calls for speculation.
2       THE WITNESS:  She would -- she wasn't
3  forthcoming with that information.
4       BY MR. BYRNES:
5    Q   Wasn't?
6    A   Wasn't forthcoming to me with that
7  information.
8    Q   She never told you that?
9    A   Not on a -- not on a -- when I would ask
10 her what is wrong, when I would ask her what can I
11 do to improve things, those kinds of things, I did
12 not get direct answers back.  Sometimes I got
13 silence.  Sometimes I got nothing.  Sometimes I --
14 that was it.
15   Q   So you certainly perceived that there
16 was a change in her emotional state from the time
17 before the OIG investigation and the time after.
18 Correct?
19       MS. JOHNSON:  Objection to form.
20       BY MR. BYRNES:
21   Q   Is that correct?
22   A   Yes.

Page 139

1    Q   Did you consider her leave request in
2  April as part and parcel from the withdrawal from
3  the workplace?
4       MS. JOHNSON:  Objection to form.
5       THE WITNESS:  Withdrawal from the
6  workplace?  She just came to me with a request for
7  5 days or 6 days.
8       BY MR. BYRNES:
9    Q   Why in this email did you draw a linkage
10 between the leave request and her emotional state?
11       MS. JOHNSON:  Objection.  Vague.
12       THE WITNESS:  You'll have to --
13       BY MR. BYRNES:
14   Q   Did you draft that email, sir?
15   A   Yes.
16   Q   That email consists of two paragraphs.
17 Correct?
18   A   Yes.
19   Q   The first talks about Dottie requesting
20 leave.  Correct?
21   A   Yes.
22   Q   The second references her emotional

Page 140

1  state.  Correct?
2    A   Correct.
3    Q   And in essence an inquiry from OHR as to
4  what you may have done to assist Ms. Klugel.
5  Correct?
6       MS. JOHNSON:  Objection to form.
7       BY MR. BYRNES:
8    Q   Weren't you writing to Mr. Gallagher to
9  head off any inquiry that could be done as to what
10 you had been doing to assist Ms. Klugel?
11       MS. JOHNSON:  Objection to form.
12       THE WITNESS:  I was -- yes.
13       BY MR. BYRNES:
14   Q   Do you recall receiving an email from
15 Mr. Gallagher that stated that Debbie Burnie from
16 OHR's employee assistance program will be here all
17 day Tuesday to meet with staff in a one on one
18 session as needed.  Given our previous
19 conversations regarding your status within the
20 organization and your fears of same, I would like
21 you spend some time talking to her.  Do you recall
22 being C.C.'d on that in an email from Robert

Page 141

1  Gallagher to Ms. Klugel?
2    A   I remember.
3    Q   What fears of same was being discussed?
4       MS. JOHNSON:  Objection.  Calls for
5  speculation.
6       THE WITNESS:  I'd have to reread that.
7       BY MR. BYRNES:
8    Q   Wasn't Ms. Klugel saying that she had
9  concerns as to whether or not she was going to be
10 terminated?
11       MS. JOHNSON:  Objection.  Vague.
12       THE WITNESS:  That was not an -- that
13 was never a discussion I had with Dottie.
14       BY MR. BYRNES:
15   Q   But didn't she come forward to you and
16 say I think they're going to try to fire me?
17       MS. JOHNSON:  Objection.  Vague.
18       THE WITNESS:  No.  That was -- that was
19 not something --
20       BY MR. BYRNES:
21   Q   What fears was Ms. Klugel expressing
22 that were referenced in that email?

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Page 142

1    MS. JOHNSON: I was reviewing the
2  document and he hasn't seen it.
3    THE WITNESS: This is to Dottie from Bob
4  and this is -- so your question?
5    BY MR. BYRNES:
6    Q   What fears was being referenced? Do you
7  know?
8    MS. JOHNSON: Calls for speculation.
9    THE WITNESS: No, I don't.
10    BY MR. BYRNES:
11    Q   Did anyone ever suggest that Ms. Klugel
12  go have a meeting with the employee assistance
13  program?
14    A   Yes.
15    Q   Did Ms. Klugel request that her attorney
16  be present when she met with EAP?
17    A   Yes.
18    Q   Her meeting with EAP was to discuss the
19  "stresses in workplace on your personal life and
20  the attendant stresses in that as well." Correct?
21    MS. JOHNSON: Objection. Lack of
22  foundation.

Page 143

1    THE WITNESS: Yes, I -- I believe that
2  that was --
3    BY MR. BYRNES:
4    Q   Were you aware of limitations on a
5  federal instrumentality in conducting an inquiry
6  into the mental health of an individual?
7    MS. JOHNSON: Objection to form. Calls
8  for legal conclusion.
9    THE WITNESS: I am not.
10    BY MR. BYRNES:
11    Q   Have you ever reviewed the fitness for
12  duty regulations of 5 C.F.R. 339?
13    A   No.
14    Q   Have you ever reviewed or been trained
15  on the Rehabilitation Act's limits on medical
16  inquiries?
17    MS. JOHNSON: Objection. Asked and
18  answered.
19    THE WITNESS: No.
20    BY MR. BYRNES:
21    Q   Do you know whether or not an employee
22  who is subjected to an examination on their mental

Page 144

1  health is entitled to have a legal representative
2  with them or not?
3    MS. JOHNSON: Objection. Calls for a
4  legal conclusion.
5    THE WITNESS: I'd imagine, but I don't
6  -- I don't know that.
7    BY MR. BYRNES:
8    Q   You don't know. Did Mr. Gallagher ever
9  direct Ms. Klugel to go to the EAP?
10    MS. JOHNSON: Objection. Lack of
11  foundation.
12    THE WITNESS: I -- I don't know.
13    BY MR. BYRNES:
14    Q   Is there any limitation on the ability
15  of Ms. Klugel to request leave during any
16  particular period of the year?
17    MS. JOHNSON: Objection to form.
18    THE WITNESS: Any limitation?
19    BY MR. BYRNES:
20    Q   Right.
21    A   Not -- not written or formal.
22    Q   Have you had any training on whether

Page 145

1  leave for federal employees is an entitlement or a
2  privilege?
3    A   That was covered in the supervisory
4  training that I had.
5    Q   Is it an entitlement or a privilege to
6  your understanding?
7    MS. JOHNSON: Objection. Calls for a
8  legal conclusion.
9    THE WITNESS: It's -- I don't know. I
10  would say both.
11    BY MR. BYRNES:
12    Q   Do you know whether or not you have to
13  give written justification for denial of a leave
14  request?
15    A   I don't know that.
16    Q   Did you ever written justification for
17  the denial of any leave request given by Ms.
18  Klugel?
19    MS. JOHNSON: Objection to form.
20    THE WITNESS: Nothing was requested.
21  That was not requested.
22    BY MR. BYRNES:

c96cf0d2-2173-48e5-b7fb-d6dd8b804b1d

Exhibit 1-d

Hines Deposition

Page 14

1    A    Who is he?
2    Q    Yes.
3    A    His name is Phillip Younger.  At that
4    time, I guess he was a close friend of Ms. Klugel.
5    Q    Did you know whether or not he served in
6    a capacity as a volunteer for the Smithsonian in
7    2004 or 2005?
8    A    I believe that he did.  Yes.
9    Q    How did you know that?
10   A    Because I saw him around volunteering
11   and was told that he was a volunteer.
12   Q    Have you ever traveled with volunteers
13   as part of your travel for the Smithsonian?
14   A    Yes.
15   Q    Okay.  During the time that you traveled
16   with volunteers, were any of them any family
17   members?
18   A    Yes.
19   Q    Who would that be?
20   A    My daughter.
21   Q    How old is she?
22   A    How old was she?

Page 16

1    Q    Travel authorization to Belize?
2    MS. JOHNSON:  Objection to form.
3    THE WITNESS:  Did I note her to --
4    BY MR. BYRNES:
5    Q    Did you direct Ms. Klugel to have your
6    daughter described as a volunteer for travel to
7    Belize?
8    MS. JOHNSON:  Objection to form.  Vague.
9    THE WITNESS:  I don't, I would say I
10   directed her to sign on my daughter as a
11   volunteer, an official volunteer.
12   BY MR. BYRNES:
13   Q    Did your daughter travel to Belize at
14   Government fare?
15   MS. JOHNSON:  Objection.  Lack of
16   foundation.
17   A    Yes, I believe she did.
18   Q    Who paid for the trip, the Government or
19   her?
20   A    You mean my daughter?
21   Q    Yes.
22   A    I believe that it was on the Smithsonian

Page 15

1    Q    When she traveled with you.
2    A    I'm not sure exactly, maybe about 29
3    years old.
4    Q    And what volunteer position did she have
5    with the Smithsonian when she traveled with you?
6    MS. JOHNSON:  Objection to form.
7    THE WITNESS:  What volunteer position?
8    BY MR. BYRNES:
9    Q    Right.  What was she doing that gave her
10   a volunteer status for the Smithsonian?
11   A    Well, she was a registered volunteer in
12   the official Smithsonian VIARC, volunteers in
13   service program.  She was a graduate student at
14   the University of Maryland in entomology and had
15   been collaborating and working with one of the
16   SERC scientists in the study of mangrove
17   ecosystems in Belize as related to her graduate
18   studies.
19   Q    Did you ever direct Ms. Klugel to note
20   her as a volunteer on a travel to Belize?
21   MS. JOHNSON:  Objection.
22   BY MR. BYRNES:

Page 17

1    funds.  I don't know if it was Government, federal
2    funds or not at this point.
3    Q    Did you see any impropriety in having
4    her travel with you as a volunteer based on a
5    reduced rate to Belize?
6    MS. JOHNSON:  Objection to form.  Lack
7    of foundation.
8    THE WITNESS:  Well, I don't know if it
9    was a reduced rate.  A reduced rate from what?
10   BY MR. BYRNES:
11   Q    From normal travel.  In other words, she
12   was traveling as a Government employee as opposed
13   to an individual.
14   A    She traveled in an official capacity for
15   the Smithsonian and was traveling through their
16   rates.  Yes.
17   Q    And did she perform functions for the
18   Smithsonian while she was there?
19   A    She did.
20   Q    What did she do?
21   A    She conducted field work on mangrove
22   ecosystems and coral reef and sea grass

96ae8682-05c8-476c-a1ef-89e290f1e3cf

Page 18

1   ecosystems.
2        Q    And that was a valuable function that
3   assisted the Smithsonian, was it not?
4        MS. JOHNSON:  Objection to form.
5        THE WITNESS:  It was.
6        BY MR. BYRNES:
7        Q    Okay.  Did the Smithsonian, to your
8   knowledge, use volunteers with some frequency to
9   assist them on field work?
10       MS. JOHNSON:  Objection.  Vague.
11       THE WITNESS:  Some frequency.  Some
12  frequency, yes.
13       BY MR. BYRNES:
14       Q    Is that the only time she traveled with
15  you as a volunteer?  Your daughter?
16       A    I believe so.  Yes.
17       Q    Did you ever have any other family
18  members travel with you in volunteer status while
19  you've been employed with the Smithsonian?
20       A    I believe once my son did as an official
21  volunteer again, as a field research assistant.
22       Q    What did your, what was your son doing

Page 19

1   when he traveled with you?
2        A    He assisted with field work on
3   mangroves, sea grasses and coral reef ecosystems.
4        Q    And how old was he at the time he went
5   with you?
6        A    I'm not sure, maybe 17 or 18 years old.
7        Q    Was he in high school at the time?
8        A    He was.
9        Q    Did he have any specialized training?
10       A    He did.
11       Q    In what?
12       A    Scuba diving.
13       Q    Was that required, a required element of
14  the investigation of mangroves in that area for
15  him to have scuba diving potential?
16       MS. JOHNSON:  Objection to form.
17       THE WITNESS:  Not of mangroves.
18       BY MR. BYRNES:
19       Q    What was he doing that required scuba
20  diving?
21       A    Coral reefs and sea grass ecosystems
22  required diving and he was a registered, certified

Page 20

1   Smithsonian Scientific Diver through the
2   Smithsonian Scientific Diving Program.
3        Q    Has anyone ever questioned your taking
4   children with you on trips under a volunteer
5   status?
6        MS. JOHNSON:  Objection to form.
7        THE WITNESS:  Not that I know of.
8        BY MR. BYRNES:
9        Q    Do you see an impropriety in bringing
10  your children with you on trips and having them
11  designated as volunteers being paid for through
12  the Smithsonian?
13       MS. JOHNSON:  Objection to form.
14  Mischaracterizes statements.
15       THE WITNESS:  Not if they're doing
16  official work for the Smithsonian Institution.
17       BY MR. BYRNES:
18       Q    There is no -- is there -- are you aware
19  of whether there is any nepotism policy in the
20  Smithsonian regarding trips and the use of
21  volunteer status?
22       A    Not that I'm aware of.  In that regard,

Page 21

1   I realize that it's a sensitive issue.
2        Q    Do you see, as you sit here today, any
3   perception, or do you believe there is any
4   perception of impropriety in your brining your
5   children with you on trips for the Smithsonian?
6        MS. JOHNSON:  Objection.  Vague.  Calls
7   for speculation.
8        THE WITNESS:  I'm not really sure what
9   you mean.  It would depend on the circumstances of
10  which it was done.
11       BY MR. BYRNES:
12       Q    Well, do you believe that in the trips
13  your children took with you, that they would have
14  a created a perception of any impropriety your
15  part?
16       MS. JOHNSON:  Objection.  Vague.  Calls
17  for speculation.
18       THE WITNESS:  I have no idea who would
19  be speculating it.
20       BY MR. BYRNES:
21       Q    Well, I'm asking you.  You brought
22  children with you on trips for the Smithsonian.

96ae8682-05c8-476c-a1ef-89e290f1e3cf

Page 34

1  with him, how did he perform?
2      A   How did he perform?
3      Q   Yes.
4      A   You mean quality?
5      Q   Yes.
6      A   Seemed okay to me.
7      Q   Well, did you have any complaints about
8  his work?
9      A   Not particularly.  No.
10     Q   Well, you say not particularly.  In any
11  specifics, did you have any complaints about how
12  he worked?
13     A   I wasn't really tracking how he was
14  working.
15     Q   Well, did you ever have any concerns
16  about him acting as a volunteer?
17         MS. JOHNSON:  Objection to form.
18         THE WITNESS:  Concerns about his acting
19  as a volunteer?  No.
20         BY MR. BYRNES:
21     Q   What volunteer services did he perform
22  when he was working with you?

Page 35

1          MS. JOHNSON:  Objection.  Lack of
2  foundation.
3          THE WITNESS:  What services did he
4  perform?  Well, I wasn't supervising his daily
5  activities or his activities, so I'm not really
6  aware.  He was generally available at times,
7  limited times, to assist in the Education
8  Department.  He also, from time to time, served as
9  assistant on boat cruises for the education
10  program for school kid activities.
11         BY MR. BYRNES:
12     Q   Would he ever do any photography or
13  videography for you?
14     A   For me or for SERC?
15     Q   For SERC.
16     A   I was not aware of him performing that
17  activity.  He may have, but I don't know.
18     Q   Okay.  How long had he been working as a
19  volunteer with SERC in 2004 and 2005?
20         MS. JOHNSON:  Objection.  Lack of
21  foundation.
22         THE WITNESS:  Gee, I don't remember.

Page 36

1          BY MR. BYRNES:
2      Q   Okay.  Was his volunteer activity always
3  associated with Ms. Klugel or was he a volunteer
4  prior to -- was he a volunteer on efforts where
5  Ms. Klugel was not involved, if you know?
6      A   I really don't know.
7      Q   Okay.  The times he was a volunteer,
8  that you were aware of them, was Ms. Klugel
9  present with him on those activities?
10         MS. JOHNSON:  Objection to form.
11         THE WITNESS:  I can't think of a time
12  when he was not.
13         BY MR. BYRNES:
14     Q   When she was not present?
15     A   When she was not at least present and
16  working at SERC.
17     Q   Did you, did that raise any concerns in
18  your mind when you saw them both together?
19     A   No.
20     Q   Did you ever make any inquiry into their
21  relationship with one another?
22     A   I did not.

Page 37

1      Q   Why not?
2      A   I had no particular reason to.
3      Q   Or would it have been inappropriate for
4  you to do so?
5          MS. JOHNSON:  Objection to form.
6          THE WITNESS:  I really don't know.  I
7  don't really inquire into people's personal
8  relationships.  I look at their performance.
9          BY MR. BYRNES:
10     Q   Okay.  Did you review any paperwork
11  before coming here today?
12     A   I looked at a few copies of e-mails and
13  the Supplementary Interrogative Responses.
14     Q   Okay.  Did you help prepare the
15  interrogatory responses?
16     A   I helped prepare the responses that were
17  pertinent to my, to questions about me.
18     Q   Did you review the responses of any
19  other individuals other than the ones you
20  prepared?
21     A   I did not.
22     Q   Okay.  Did you prepare any documents

96ae8682-05c8-476c-a1ef-89e290f1e3cf

Page 38

1   other than the ones that involved, that you
2   prepared in this case?
3       MS. JOHNSON: Objection to form.
4       BY MR. BYRNES:
5       Q   I didn't say that very clearly. Just to
6   correct. What documents did you review other than
7   the interrogatories?
8       A   The only things that I reviewed were the
9   papers that were served on me as a part of this
10  complaint.
11      Q   In other words, for you to come and be
12  noticed for deposition?
13      A   I was served with papers regarding the
14  original suit.
15      Q   Okay. And what did you see?
16      A   What did I see?
17      Q   Yes. As far as the original papers.
18  What do you mean by that?
19      A   They were descriptions that evidently
20  you filed on Ms. Klugel's behalf.
21      Q   Do you have any opinion one way or the
22  other as to the voracity of her complaint?

Page 39

1       MS. JOHNSON: Objection to form.
2       THE WITNESS: Her complaint?
3       BY MR. BYRNES:
4       Q   Yes.
5       A   Complaint overall?
6       Q   Well, her complaint regarding the
7   inquiry conducted by Mr. Roy?
8       A   I have no opinion about that.
9       Q   You don't know what happened there?
10      A   I do not what happened.
11      Q   Okay. And while Ms. Klugel was an
12  employee, did you receive any complaints about her
13  performance?
14      A   Did I receive any complaints? Yes.
15      Q   When?
16      A   Particularly during 2005.
17      Q   After she had been, after the IG had
18  conducted its investigation?
19      MS. JOHNSON: Objection. Lack of
20  foundation.
21      THE WITNESS: I don't know when the IG
22  conducted any inquiry. I don't know about any

Page 40

1   investigation.
2       BY MR. BYRNES:
3       Q   Would it have been after December 2004
4   that you received complaints about her
5   performance?
6       A   After -- say that again?
7       Q   After December 2004?
8       A   That was the main time when I was aware
9   of them. Yes. And during 2005.
10      Q   Okay. What did you hear about her
11  performance?
12      A   That she was not available to conduct
13  her job much of the time, that she was taking a
14  lot of leave and was not available to meet the
15  needs of the project that we had contracted.
16      Q   Who told you that she was taking a lot
17  of leave?
18      A   Her supervisor, Mark Haddon.
19      Q   And did he tell you why she was taking
20  so much leave?
21      A   He said that she was taking leave for
22  physical therapy and other medical reasons.

Page 41

1       Q   Okay. Did you make any inquiry as to
2   what those medical reasons were?
3       A   Yes. He said it was for physical
4   therapy as a result of an injury apparently from a
5   car accident. That's what she had told him.
6       Q   What did -- did you -- when he told you,
7   why -- do you know -- what was -- let me go back.
8   How was it that he made you aware of these? He
9   came and talked to you? Mr. Haddon?
10      MS. JOHNSON: Objection to form.
11      THE WITNESS: I don't recall exactly how
12  they were initiated. We were conversing
13  frequently about the progress of this project for
14  an electronic field trip and it was important that
15  the program stay on schedule and we were not
16  meeting this, we were concerned about not meeting
17  the schedule or falling off the schedule.
18      BY MR. BYRNES:
19      Q   Did you make any attempts to assist or
20  accommodate Ms. Klugel?
21      MS. JOHNSON: Objection to form.
22      THE WITNESS: Did I?

11 (Pages 38 to 41)

96ae8682-05c8-476c-a1ef-89e290f1e3cf

Page 46

1  the difficulties she was having due to her leave?
2      MS. JOHNSON:  Objection to form.
3      THE WITNESS:  Say that again, please.
4      BY MR. BYRNES:
5      Q  In other words, she was taking a large
6  amount of leave, correct?
7      A  Yes.
8      Q  Okay.  Did you get anyone, other than
9  Mr. Haddon, to temporarily fill her assignment
10  while she was on leave?
11     A  We had nobody else to fill that.  It
12  required somebody with knowledge.  Mark Haddon was
13  the person that was most familiar with and
14  knowledgeable of the position and so I asked him
15  to step in.  I was confident he could do that.
16     Q  What did Mr. Gallagher say, if anything,
17  about Ms. Klugel's leave situation?
18     A  He noted that she was taking a lot of
19  leave and that there wasn't any medical
20  documentation for the medical leave that she was
21  taking.  It's normal policy to ask for that if
22  it's a pattern or exceeds a short term sort of

Page 47

1  health issues.
2      Q  In your time in the Smithsonian, have
3  you had other employees who have been involved in
4  taking leave that was akin to the leave that Ms.
5  Klugel was taking in terms of amount?
6      A  Well, there's been a number of employees
7  that have required sustained medical leave for
8  periods of time.  Whether it's exactly akin to Ms.
9  Klugel, I couldn't say.
10     Q  Do you know whether Ms. Klugel was ever
11  told by Mr. Haddon that her work performance was
12  deficient because of her leave?
13     A  I don't know if he said that to her.  I
14  don't know.
15     Q  Did he ever complain to you that she was
16  not performing adequately because of the amount of
17  leave she was taking?
18     A  He complained, he expressed concern to
19  me about the need to meet the schedule and the
20  activities required under the contract that we had
21  for the electronic field trip coming up.  And we
22  discussed strategies to be sure that that got done

Page 48

1  on schedule and still accommodate Ms. Klugel's
2  need for leave.
3      Q  Do you know whether or not Ms. Klugel
4  actually provided the medical information you
5  requested she provide?
6      A  I do not.  I've never seen it if she
7  did.
8      Q  Did you do any follow up with Mr. Haddon
9  and say you really need to get this for me to
10  review?
11     A  We asked for them, asked for it.  Yes.
12     Q  And what happened?
13     A  I believe ultimately Ms. Klugel
14  resigned.
15     Q  Do you know why she resigned?
16     A  Other than her statement.
17     Q  Didn't her statement say she was
18  undergoing a hostile work environment?
19     MS. JOHNSON:  Objection.  Lack of
20  foundation.
21     THE WITNESS:  If she said that, that's
22  what she said in her departure.

Page 49

1      BY MR. BYRNES:
2      Q  Were you aware of whether or not Ms.
3  Klugel was complaining about her work environment
4  prior to her resignation?
5      A  About her work environment?  No, I
6  wasn't aware of that.
7      Q  Were you aware that Ms. Klugel was
8  complaining that she felt the Inspector General's
9  investigation was discriminatory and retaliatory?
10     A  No, I was not.
11     Q  Did Ms. Klugel -- were you ever made
12  aware that Ms. Klugel complained about the scope
13  of the Inspector General's investigation into her
14  private life?
15     A  No, I was not.
16     Q  Well, did Mr. Haddon ever have a
17  discussion with you about the IG investigation?
18     A  No, he did not.
19     Q  At no time?
20     A  Not that I'm aware of.  He and I were
21  both made aware that the inquiry was made, but I
22  never saw the results of it.

13 (Pages 46 to 49)

**Exhibit 1-e**

**Klugel Deposition**

**Doratha Klugel**

Page 10

1    A.   No.

2    Q.   What did you do, if anything, to prepare

3 for your deposition today?

4    A.   I did not do anything to prepare for my

5 deposition today.  I came here today.

6    Q.   You didn't review any documents?

7    A.   No.

8    Q.   Okay.  The focus of our discussion today

9 will be on the time that you were employed at the

10 Smithsonian Environmental Research Center, but I'd

11 like to get a little bit of background regarding your

12 employment history.

13       Prior to coming to work for SERC -- which

14 I believe was in 2001; is that correct?

15    A.   Yes.

16    Q.   And when I say SERC, S-E-R-C, I'm

17 referring to the Smithsonian Environmental Resource

18 Center, okay -- Educational Research Center --

19 Environmental Research Center.

20       MR. BYRNES:  Just so we're clear, it's the

21 Smithsonian Environmental Research Center.

22       MS. JOHNSON:  Yes.

Page 11

1       BY MS. JOHNSON:

2    Q.   When I'm referring to SERC, I'm referring

3 to the Smithsonian Environmental Research Center,

4 okay?

5    A.   Yes.

6    Q.   Prior to being employed by SERC, where

7 were you working?

8    A.   I was working at the Smithsonian's Natural

9 History Museum.

10    Q.   And when did you start your employment

11 there?

12    A.   I began working for the Smithsonian and

13 specifically at the Natural History Museum in July of

14 1993.

15    Q.   And what was your status at the

16 Smithsonian Natural History Museum?  Were you a

17 federal employee?

18    A.   I was a federal employee.

19    Q.   Were you full time?

20    A.   I was.

21    Q.   And what were your job -- what was your

22 job title?

Page 12

1    A.   I had two.  I started as the assistant

2 manager I believe was my job title.  Education

3 specialist was the official title in the exploring

4 marine ecosystems exhibit.

5       And when that exhibit closed, I then

6 became the -- a project manager in the Natural

7 Partners Program, so that would have been 1999 or

8 2000.

9    Q.   And then you began with SERC in 2001; is

10 that correct?

11    A.   Yes.

12    Q.   Why is it that you left the Natural

13 History Museum to work for SERC?

14    A.   Mark Haddon encouraged me to apply for the

15 distance learning coordinator position at SERC and so

16 I did.

17    Q.   Did you know Mr. Haddon previously prior

18 to the time you began working at SERC?

19    A.   I had met him a few times as a colleague.

20    Q.   And so what position did he tell you you

21 should apply for at SERC?

22    A.   Their distance learning coordinator

Page 13

1 position.

2    Q.   And did he explain what kind of status you

3 would have as a distance learning coordinator?

4    A.   What do you mean by status?

5    Q.   Sure.  Would you be a federal employee?

6    A.   He explained I would be a trust fund

7 employee.

8    Q.   What did you understand that to mean?

9    A.   It meant I would not be a federal

10 employee, I would be a trust fund employee.

11    Q.   Did the word trust fund employee to you

12 have any meaning regarding whether your status was

13 going to be full time, whether it be permanent?

14    A.   It would be full time and my position

15 would be paid for by grant money.

16    Q.   Did Mr. Haddon ever indicate to you that

17 there was only going to be a certain amount of

18 funding for your position so that the position might

19 terminate on a certain date --

20       MR. BYRNES:  By time?

21       BY MS. JOHNSON:

22    Q.   -- at the time you were hired?

4 (Pages 10 to 13)

**Doratha Klugel**

Page 14

1    A.    No. There was grant money for -- there
2 was grant money and we would continue to apply for
3 grants to fund the position.
4    Q.    Did he give you the impression -- or were
5 you under the impression that the position would be
6 indefinite?
7    A.    Yes. I did have the impression.
8    Q.    At any time during your employment with
9 SERC, did your understanding of how long the position
10 might be funded for change?
11    A.    No, though I learned subsequently that Mr.
12 Haddon said that.
13    Q.    How did you learn that?
14    A.    In materials that he provided in response
15 to this case, he provided a termination date for me.
16    Q.    Were you ever aware of any documents
17 called a not-to-exceed appointment that were filled
18 out on your behalf in regards to your employment?
19    A.    I don't remember such documents, no.
20    Q.    I'm sorry to jump around, but just before
21 we go further into SERC, aside from the Natural
22 History Museum, were there any other federal jobs

Page 15

1 that you held?
2    A.    No.
3    Q.    Okay. So just the Smithsonian Natural
4 History Museum and SERC?
5    A.    Yes.
6    Q.    And prior to leaving the Natural History
7 Museum, were you having any problems with your
8 coworkers?
9    A.    No.
10    Q.    Now, what were your responsibilities and
11 duties as the distance learning coordinator?
12    A.    As distance learning coordinator, I
13 coordinated our distance learning programs, which
14 were video conferences, web casts and electronic
15 field trips, so I worked with teachers to develop
16 video conferences and electronic field trips.
17        I worked with our partners to develop
18 those projects to select topics that we would do
19 programs about to develop curriculum to go along with
20 it. I worked with Smithsonian scientists to
21 incorporate their research into the projects.
22        I coordinated between the teachers and the

Page 16

1 Smithsonian scientists. I was also the volunteer
2 coordinator for SERC. That's about it.
3    Q.    What were your responsibilities as the
4 volunteer coordinator?
5    A.    My responsibilities as the volunteer
6 coordinator were to facilitate the registration of
7 new volunteers.
8        So if somebody wanted to become a
9 volunteer at SERC, to interview them and place them
10 in an appropriate lab at SERC, to work with the
11 scientists to keep track of their volunteer hours, to
12 collect those hours from the lab and send those
13 forward to -- send them to the downtowns
14 behind-the-scenes volunteer program office.
15    Q.    Were you responsible for recording the
16 time that volunteers spent volunteering at SERC?
17    A.    Unless a volunteer was working
18 specifically for me, I was not responsible for
19 logging their hours.
20    Q.    In 2002 -- 2001 when you began working at
21 SERC, did you have any volunteers working for you?
22    A.    I don't remember who was a volunteer and

Page 17

1 when. Yes, there were volunteers at SERC in 2001. I
2 don't know if there were -- there were volunteers who
3 were behind-the-scenes volunteers and there were also
4 docents who were people that provided educational
5 tours.
6    Q.    Could you spell that, D-O-C-E-N-T? Is
7 that correct?
8    A.    That is correct, yes. Most of the
9 volunteers in the education department were docents
10 and so therefore worked with either Katie Drew
11 (phonetic) or Jane Holley who were the education
12 program people in the education department.
13        So most of the volunteers in the education
14 department would have fallen under them. If there
15 were other volunteers who worked behind the scenes,
16 they primarily would have worked with either Katie or
17 with Jane.
18        And then at some point -- and then whether
19 there would be a volunteer that was specifically
20 working in the distance learning department, in the
21 distance learning part of it, that would be someone
22 who would work directly with me.

5 (Pages 14 to 17)

**Doratha Klugel**

Page 18

1    Q.    Okay.  Did you receive any training
2 regarding your responsibilities as the volunteer
3 coordinator?
4    A.    No.
5    Q.    Did you have an understanding of what
6 forms you were required to fill out for volunteers --
7 well, did you know whether there were forms you had
8 to fill out for volunteers regarding what projects
9 they might be working on within SERC?
10    A.    I know there was an application form to
11 fill out.  There was a time sheet form to fill out.
12 Those are the forms I'm aware of.
13    Q.    Did you ever hear of a field project
14 request form?
15    A.    I don't recall a field project request
16 form.
17    Q.    Okay.
18        MS. JOHNSON:  Let's mark this as Exhibit
19 2.
20        (Exhibit Number 2 was marked for
21 identification and was retained by counsel.)
22        BY MS. JOHNSON:

Page 19

1    Q.    Ma'am, if you'll just take a look at
2 what's been marked as Exhibit 2.  It's a volunteer
3 field project description.  Are you familiar with
4 this form?
5    A.    I am familiar with this form.
6    Q.    Based on your familiarity with the form,
7 can you tell me the instances in which this form
8 would need to be filled out by a volunteer?
9        MR. BYRNES:  Objection.  Assumes -- lack
10 of foundation.
11        THE WITNESS:  It's my understanding that
12 the volunteer does not fill out this form.  The lab
13 or the researcher who is requesting to have
14 volunteers in his or her lab or -- yes, in his or her
15 lab, they would fill out this form.
16        This would be a way to let the
17 behind-the-scenes volunteer office know that they
18 were looking for volunteers and what skills those
19 volunteers would need and what the volunteer would be
20 doing.
21        BY MS. JOHNSON:
22    Q.    Did you understand that volunteers had to

Page 20

1 be registered?
2    A.    Yes, I did understand that volunteers had
3 to be registered.
4        MR. BYRNES:  Objection.  Foundation.
5        BY MS. JOHNSON:
6    Q.    And had you heard of BIARC?
7    A.    Yes.
8    Q.    Could you tell me what BIARC stands for?
9 Do you remember?
10    A.    I can't remember, no.
11    Q.    I believe it's spelled B-I-A-R-C.  What
12 was your -- what did you know about the need to
13 register a volunteer?
14    A.    That a volunteer -- I believe there was a
15 registration form or a volunteer submitted a
16 volunteer's resume, and we sent that to downtown and
17 then BIARC would register that volunteer.  That
18 volunteer's name would then show up on a time sheet
19 and that would indicate that a volunteer was
20 registered.
21    Q.    And were you required as the SERC
22 volunteer coordinator to register all volunteers who

Page 21

1 were giving time or volunteering with SERC?
2        MR. BYRNES:  Objection.  Compound and
3 foundation.
4        THE WITNESS:  Yes.
5        BY MS. JOHNSON:
6    Q.    And did you personally register any such
7 volunteers during your time at SERC between '01 and
8 2005?
9    A.    What do you mean by the question?
10    Q.    Sure.  You just explained that volunteers
11 had to be registered with BIARC, a form had to be
12 filled out, the resume had to be provided.
13        Let me ask, were you the one that had to
14 fill out the form for the volunteer to be registered?
15        MR. BYRNES:  Objection as to the form.
16        THE WITNESS:  No.  The lab that wanted a
17 volunteer would fill out this form.  A volunteer who
18 wanted to become a volunteer would have a form or
19 would have a resume.  Those forms were given to me.
20 I would then send those forms downtown.
21        BY MS. JOHNSON:
22    Q.    So you didn't personally fill out the

6 (Pages 18 to 21)

## Doratha Klugel

Page 30

1    Q.    Have you seen any document similar to this
2  before?
3    A.    No.
4    Q.    You stated previously that you were the
5  one responsible for assigning Mr. Yunger work tasks.
6  Is that true?
7    A    Yes.
8    Q.    And that you were the timekeeping for him
9  for recording his hours?
10    A.    Yes.
11    Q.    Looking at the Quarter 2 period, do his
12  hours -- do his hours seem consistent with your
13  memory as to how much time he spent volunteering
14  during '05, 2005?
15        MR. BYRNES:  Objection.  Form.
16        THE WITNESS:  It was almost three years
17  ago.  I don't remember.
18        BY MS. JOHNSON:
19    Q.    Would you have been the only person who
20  would have been submitting his time?
21    A.    Yes.
22    Q.    So anything -- and were there any

Page 31

1  instances where you did not submit time that he had
2  worked?
3    A.    No.
4    Q.    So you would have submitted all of his
5  time to the volunteer program?
6    A.    Yes.
7    Q.    Okay.  Now, I want to talk about the trip
8  to Panama that you scheduled initially and then was
9  postponed.
10        When did you first began planning the trip
11  to Panama?
12    A.    I don't remember.  The trip would have
13  taken place in November of 2004, so we would have
14  started planning it that fall.  When exactly that
15  happened, I don't know.
16    Q.    What was the purpose of this trip?
17    A.    The purpose was to take a group of
18  teachers and some of our partners to STRI, the
19  Smithsonian Tropical Research Institute, and develop
20  a video conference program about tropical rain
21  forests.
22    Q.    How many teachers were going?

Page 32

1    A.    I think there were four teachers going,
2  four or five teachers going.
3    Q.    And how many employees of SERC?
4    A.    I as the only employee of SERC.
5    Q.    Was this -- were you familiar with an
6  organization called Project View?
7    A.    Yes.
8    Q.    What was Project View?
9    A.    Project View was a partner of SERC's.
10  They were part of the Schenectady City School
11  District and had received a grant to implement
12  distance learning in the Schenectady City School
13  District and they partnered with SERC to develop
14  distance learning programs.
15    Q.    Was this trip to Panama a trip that was
16  being conducted for Project View or was it something
17  --
18    A.    It was for Project View and for SERC.
19    Q.    Was Mr. Yunger scheduled to accompany you
20  on this trip?
21    A.    Yes.
22    Q.    What was his purpose in going?

Page 33

1    A.    He was going as the photographer and
2  videographer.
3    Q.    Had Mr. Yunger served as a photographer
4  for you previously?
5    A.    Yes.
6    Q.    On roughly how many occasions?
7    A.    During the time he was a volunteer.
8  That's what he -- that was how he volunteered.  He
9  was a photographer.  He was a videographer, lighting
10  designer, set development, building the studio,
11  distance learning studio.
12        MS. JOHNSON:  Let's mark this as Exhibit
13  Number 4.
14        (Exhibit Number 4 was marked for
15  identification and was retained by counsel.)
16        BY MS. JOHNSON:
17    Q.    Ma'am, what's been marked as Exhibit 4 is
18  proposed travel plans regarding SI travel
19  authorization.  Had you seen this kind of form
20  before?
21    A.    Yes.
22    Q.    What was your understanding of when this

9 (Pages 30 to 33)

**Doratha Klugel**

Page 34

1 form had to be completed?

2     MR. BYRNES: Objection as to the form.

3 Which -- what are you -- this specific form or the

4 form in general?

5     MS. JOHNSON: This form, the title of this

6 form.

7     BY MS. JOHNSON:

8     Q.    Did you understand my question when I was

9 asking you --

10     A.    I did not understand the question, no.

11     Q.    Based on your knowledge of familiarity

12 with this form, what was your understanding as to

13 when a proposed travel plans form had to be

14 completed?

15     A.    Whenever someone was traveling.

16     Q.    And was that the case for volunteers as

17 well?

18     A.    Yes.

19     Q.    Now on this form, it indicates that there

20 was going to be an itinerary stop in Belize City. Do

21 you see that?

22     A.    Yes.

Page 35

1     Q.    What was the purpose of stopping in

2 Belize?

3     A.    The Belize trip was, along with Project

4 View, to participate in a Manatee tagging program and

5 to scout that location and that project as a

6 potential video conference to be developed with

7 Project View.

8     Q.    And was that part of the -- were the

9 teachers also going to be going to that part of the

10 trip to Belize?

11     A.    No.

12     Q.    Who would be traveling to Belize?

13     A.    Someone from Project View, Phillip Yunger,

14 and myself.

15     Q.    Do you know who was going to be going --

16 who was scheduled to go from Project View?

17     A.    Diane Wilkinson.

18     Q.    And on the bottom of page 439, which is

19 the first page, there's a note that says covered by

20 Project View. Panama and Belize, is that your

21 handwriting, ma'am?

22     A.    Yes.

Page 36

1     Q.    And what was that statement designed to

2 indicate?

3     A.    It was designed to indicate that some of

4 this trip was being paid for directly by SERC, some

5 of it was being paid for directly by Project View.

6     Q.    And did you have any understanding as to

7 what was being directly paid for by SERC?

8     A.    I believe the airfare and the lodging was

9 being paid for by SERC and that the trip to Belize

10 for the scouting trip was to be covered by Project

11 View. Basically the Panama trip would be paid for by

12 SERC and that the Belize trip would be paid for by

13 Project View.

14     Q.    Was the trip to Belize still a part of

15 your work responsibilities -- let me rephrase that.

16     Were you going to be working in Belize?

17     A.    Yes.

18     Q.    You weren't going to be on vacation?

19     A.    No.

20     MS. JOHNSON: Let's mark this as the next

21 exhibit.

22     (Exhibit Number 5 was marked for

Page 37

1 identification and was retained by counsel.)

2     BY MS. JOHNSON:

3     Q.    Ma'am, do you recognize the form I've just

4 marked as Exhibit 5?

5     A.    Yes.

6     Q.    I'd like you to turn to page 445 of the

7 document, which is, I think, the fourth page. It

8 looks like a handwritten note. Do you recognize that

9 handwriting?

10     A.    Yes.

11     Q.    Is that your handwriting?

12     A.    Yes.

13     Q.    Going to the third paragraph, it indicates

14 Phillip and I are going on to Belize from Panama. I

15 am working with Judy to figure out if we can get

16 round trip tickets from Panama with a trip, annual

17 leave, to Belize in between. Why did you write in

18 this note that the trip to Belize was going to be

19 annual leave?

20     A.    There might have been a couple of days

21 that were part of it that were annual leave, but the

22 entire trip was not annual leave.

10 (Pages 34 to 37)

## Doratha Klugel

Page 38

1    Q.   Do you have any recollection as to how
2 many days you were going to be spending working
3 versus how many days you were going to be on annual
4 leave?
5    A.   I do not.  Since it was a trip that never
6 happened, I don't know.
7    Q.   Looking at Exhibit 3, Exhibit 4 and the
8 dates that were indicated for Belize, does that
9 refresh your recollection any as to how many days
10 were going to be annual leave in Belize?
11    A.   Those were the dates of the trip in
12 totality.  I don't have a recollection of anything
13 other than that, no.
14    Q.   So Belize was originally scheduled for
15 November 14th; is that correct -- I'm sorry.
16          Panama was originally scheduled to take
17 place November 14th?
18    A.   Yes.
19    Q.   And that didn't happen?
20    A.   Correct.
21    Q.   Could you explain why that didn't happen?
22    A.   I was in a car accident prior to that.

Page 39

1    Q.   When did your car accident occur?
2    A.   November 9th maybe.
3    Q.   And was that something that occurred here
4 in the District of Columbia?
5    A.   No.
6    Q.   Where did it happen?
7    A.   It happened driving home from SERC.
8    Q.   Somewhere in Maryland?
9    A.   Yes.
10    Q.   Can you tell me a little bit about what
11 happened, the car accident?
12    A.   I was T-boned.  A car -- I was traveling
13 straight.  A car that was stopped at the stop sign
14 pulled out in front of me.
15    Q.   Did your airbags deploy?
16    A.   Yes.
17    Q.   And were you injured as a result of the
18 car accident?
19    A.   Yes.
20    Q.   And what injuries did you have?
21    A.   Contusions to my knees and a broken right
22 arm.

Page 40

1    Q.   Were you in the car alone?
2    A.   Yes.
3    Q.   And so you said the trip never happened.
4 Did you eventually go to Panama?
5    A.   We did eventually go to Panama, yes.
6    Q.   When did you go?
7    A.   We eventually went in February of '05, I
8 believe.
9    Q.   And did you also go to Belize?
10    A.   I did not also go to Belize.
11    Q.   Why not?
12    A.   I was -- a trip -- we were trying to
13 schedule a trip, but I could not go due to work.
14    Q.   Did one of your -- well, who was your
15 supervisor at this time?
16    A.   Mark Haddon.
17    Q.   Did Mr. Haddon tell you you were unable to
18 go to Belize?
19    A.   He told me I was unable to take the time
20 to go.
21    Q.   Were you requesting to go at the same time
22 that you were going to Panama?

Page 41

1          MR. BYRNES:  Objection.  As to the time.
2          THE WITNESS:  No.
3          BY MS. JOHNSON:
4    Q.   When did you request to go to Belize?
5          MR. BYRNES:  Objection again as to the
6 time.
7          MS. JOHNSON:  I just asked when.
8          MR. BYRNES:  But the problem I have is
9 that there are several requests to go -- are we
10 talking about in February?  Are we talking about this
11 form?
12          MS. JOHNSON:  No.  We're talking about
13 after her car accident.
14          MR. BYRNES:  We need to specify that.
15          THE WITNESS:  I don't remember when it
16 was.  It was whenever the tagging project was again
17 happening, but that would have been, I believe, March
18 or April.  It was after the Panama trip.
19          BY MS. JOHNSON:
20    Q.   March or April of 2005?
21    A.   Yes.
22    Q.   And do you recall how much time you were

11 (Pages 38 to 41)

**Doratha Klugel**

1 speak to you, Mr. Haddon?

2    A.    There were questions about the trip to

3 Hawaii.

4    Q.    And did you give any response at that time

5 to Mr. Haddon when he said they want to question you

6 about the Hawaii trip?

7    A.    I don't remember. I may have asked what

8 it was about the Hawaii trip that was in question. I

9 don't remember exactly.

10    Q.    Were you ever told by anyone that OIG was

11 conducting an investigation into your trip to Hawaii?

12    A.    The Inspector General's office was

13 investigating the trip to Hawaii.

14    Q.    And who used those words?

15    A.    Mark Haddon.

16    Q.    Had you had any prior experience with the

17 OIG's office?

18    A.    No.

19    Q.    What about any employment, like any kind

20 of investigatory office within the Smithsonian?

21    A.    I don't know of another investigatory

22 office, no.

1    Q.    Okay. Now, when did you first meet with

2 Mr. Roy?

3    A.    Whenever it was that he came out to SERC.

4 For some reason, December 13th jumps to mind, but it

5 was a date around that, if not that date.

6    Q.    So you met with Mr. Roy on December 13th,

7 2004, to the best of your memory?

8    A.    Yes.

9    Q.    And tell me how you met him. Like, was he

10 introduced to you by someone?

11    A.    I believe he was introduced to me by Mr.

12 Haddon and then I was escorted into Mr. Haddon's

13 office or in the office space that was in the Reed

14 (phonetic) Center -- no. I forget the name of the

15 building. It doesn't matter. Into an office with

16 Mr. Roy, and he introduced himself.

17    MS. JOHNSON: This is Exhibit 9.

18    (Exhibit Number 9 was marked for

19 identification and was retained by counsel.)

20    BY MS. JOHNSON:

21    Q.    Please take a minute and read this

22 document.

1    A.    Yes. I recognize this. Is that what

2 you're asking me?

3    Q.    Yes. I was just saying take a minute to

4 read it. My question is regarding the first

5 sentence, regarding anticipate more questions the IG

6 might have for you. What was your purpose in writing

7 that to Mr. Haddon?

8    A.    I don't remember. Mark may have asked me

9 questions about the Hawaii trip that he anticipated

10 the IG was going to ask.

11    Q.    And at this time, December 10th, you had

12 not been informed the IG wanted to talk to you. The

13 special agent wanted to talk to you as well?

14    MR. BYRNES: Objection. Assumes facts not

15 in evidence.

16    THE WITNESS: I don't believe so. When it

17 was first presented to me it was that Mark was being

18 investigated about the Hawaii trip and at some point

19 -- I don't remember when. At some point that

20 changed, and I was also being investigated.

21    BY MS. JOHNSON:

22    Q.    So it was your understanding that both you

1 and Mr. Haddon were being investigated?

2    MR. BYRNES: Objection as to form.

3    THE WITNESS: Yes, and then after that, I

4 was told it was that I was being investigated and

5 Mark was being questioned as part of that

6 investigation of me.

7    BY MS. JOHNSON:

8    Q.    And who told you that?

9    A.    Ross Simons, Bob Galligher, and Mark

10 Haddon.

11    Q.    And timewise, do you have any memory of

12 when Mr. Simons would have said that to you? Was it

13 before or after the special agent spoke to you?

14    A.    It was after.

15    Q.    What about Mr. Galligher?

16    A.    It was after. I asked to speak with each

17 one of them about the IG visit afterwards, and when I

18 met with each one of them individually -- I don't

19 remember when -- they told me that there had been an

20 investigation of me.

21    Q.    Did any of them mention that Amy Erb was

22 being investigated?

17 (Pages 62 to 65)

**Doratha Klugel**

1   A.   They mentioned that it was not Amy Erb
2 being investigated, it was me being investigated
3 because persons in the travel office did not like my
4 attitude and that they thought that I would be a bad
5 influence on Amy Erb, and so I was being investigated
6 to adjust my attitude so as to no longer be a bad
7 influence on Amy.
8   Q.   Did they indicate who in the travel office
9 did not like your attitude?
10   A.   They indicated Kathie Suite in SERC's
11 travel office. They did not indicate who in the
12 downtown office.
13   Q.   And so you said there was Mr. Simons, Mr.
14 Galligher, and there was a third person you spoke to?
15   A.   Mr. Haddon.
16   Q.   Did they each tell you that same thing
17 regarding the need to -- that someone in travel
18 didn't like you or is that one person who told you
19 that?
20   A.   No. Each one of them told me versions of
21 that story. They did not use all of the exact same
22 words. We were not all together when they told me.

1 In the three separate meetings with them, that's what
2 I was told by them.
3   Q.   What was your response?
4   A.   I was hurt. I had worked for the
5 Smithsonian for a very long time and had done my job
6 well and suddenly my credibility had been called into
7 question and attacked.
8       And I was told that the IG's office -- I
9 was told by Mr. Simons, Mr. Galligher, and Mr. Haddon
10 that the -- Kathie Suite and whoever she was working
11 with in the downtown travel office were using the
12 IG's office to adjust my attitude because they didn't
13 like it.
14   Q.   Did you ever talk to Ms. Suite directly
15 about that?
16   A.   No.
17   Q.   What about anyone else in travel? Did you
18 know anyone else in the travel office at that time?
19   A.   I knew two people in the travel office
20 downtown having traveled before and worked with them.
21 No, I did not talk to anyone in the downtown travel
22 office about that.

1   Q.   Who were the persons that you knew in the
2 downtown office?
3   A.   Judy Petrofsky and Carol Ailes.
4   Q.   Okay. So I want to go back to when you
5 spoke with Mr. Roy. You stated that you went into an
6 office space?
7   A.   Yes.
8   Q.   Was this office space in the SERC building
9 where you worked?
10   A.   It was not in the education building where
11 I worked. It was up in the conference building up on
12 the main campus. There was a large conference room
13 and there was a side office.
14       At some point that side office became Mark
15 Haddon's office. I can't remember if at the time it
16 was Mark Haddon's office during that interview or if
17 it became his office afterwards.
18   Q.   And can you describe what the office
19 looked like for me? Were there windows? Was it big?
20 Was it small?
21   A.   It was probably about the size of this
22 room. There was one wall that about half of the wall

1 were windows almost from floor to ceiling if not
2 completely from floor to ceiling.
3   Q.   Do you remember what floor it was on?
4   A.   It was on the ground floor. There was
5 just one floor to the building.
6   Q.   And was there an office desk? chairs?
7   A.   If I remember correctly, there was a table
8 with some chairs in one corner. Then in the other
9 corner in front of the windows was the desk and a
10 chair and I think it was like an L-shaped desk and a
11 chair.
12   Q.   And when Mr. Roy was going to speak to
13 you, was anyone else present?
14   A.   No.
15   Q.   Did you request that anyone else be
16 present?
17   A.   No.
18   Q.   And can you tell me -- do you remember
19 what time of day it was? Was it the morning? Was it
20 sunny out? Was it evening?
21   A.   It would have been morning or early
22 afternoon. I believe it was before lunch.

18 (Pages 66 to 69)

## Doratha Klugel

Page 138

1  A.  No.

2  Q.  Okay.  Now, we talked a little about the
3 car accident that happened in '04, and I believe you
4 said you had suffered a broken arm?

5  A.  Yes.

6  Q.  And you had said something with your knee
7 and I forgot the medical term.

8  A.  Bilateral contusions to my knee.

9  Q.  I'm presuming you saw a doctor for that
10 diagnosis?

11  A.  Yes.

12  Q.  Did the doctor give you any indication of
13 how long your arm would be — it would take to heal?

14  A.  No.  It would depend on how the arm healed
15 on its own and then how it responded to physical
16 therapy.

17  Q.  Did he indicate to you how long you'd have
18 to be in physical therapy?

19  A.  That was all based on how my arm responded
20 to the physical therapy.

21  Q.  Did he indicate what type — was the
22 physical therapy solely to deal with the arm?

Page 139

1  A.  It was for my arm and for my knees.

2  Q.  Okay.

3  A.  It originally started for my arm and my
4 knees.  At some point my knees got better, but it
5 continued on for my arm.

6  Q.  Okay.  Who did you — did you tell anyone
7 at SERC regarding the — about the car accident?

8  A  Yes.

9  Q.  Who did you tell?

10  A.  I called Mark and told him that I'd been
11 in a car accident and had broken my arm, and he said,
12 okay; I'll see you next week.

13  Q.  How long were you out from work — were
14 you out from work after the car accident?

15  A.  I was out from work, yes.

16  Q.  How long were you out after the car
17 accident?

18  A.  I don't remember, so my car accident would
19 have been the middle of November.  Clearly I was back
20 at work at some point in December if not sooner
21 because I met with Gerry Roy.  Yes.  I don't know
22 exactly how long I was out initially for that car

Page 140

1 accident.

2  Q.  Were you wearing a cast on your arm?

3  A.  I did wear a cast.  Yes, I did wear a
4 cast.

5  Q.  And when you returned to work, did you
6 have any problems performing your job?

7  A.  Yes.

8  Q.  What problems were those?

9  A.  Well, I did — well, I had broken my right
10 arm in three places.  I'm right-handed, so writing
11 was difficult and painful.  I did video conferences
12 which required doing demonstrations and experiments
13 with my arms, so yes there were difficulties in doing
14 those things, lifting things, carrying things.

15      I couldn't lift anything or carry anything
16 with that arm.

17  Q.  Did you ask anyone at SERC for any kind of
18 accommodation or ask that any duties be removed from
19 you because you were having difficulties performing
20 work duties?

21  A.  I did talk with and E-mail, but I more
22 specifically remember E-mail — talking with Mark

Page 141

1 Haddon about the difficulties I was having in doing
2 video conferences and that I couldn't do the
3 experiments.

4      I asked for help, if there could be just
5 another body there during the video, another person
6 to help me during the video conference so that they
7 could lift or carry things, and — so I told him I
8 was having trouble doing the video conferences, I
9 couldn't lift or carry anything, and I asked for
10 help.

11      His response was he was not available to
12 help.

13  Q.  Did you ask him for someone else to help,
14 if he could get someone else to help?

15  A.  I said — he said he was not available to
16 help.  I said, does that mean that I should cancel
17 the video conferences, and he said if that's what you
18 have to do if you can't do them.

19  Q.  So did you cancel them?

20  A.  Yes, the video conferences had to be
21 cancelled.  Yes.

22  Q.  How many were cancelled?

36 (Pages 138 to 141)

## Doratha C. Klugel

1 counsel, and discrimination based on gender?

2    A    Yes. These were all ongoing conversations

3 that Mark Haddon and Bob Gallagher and I were having

4 over the months after the IG investigation.

5    Q    And how many conversations, if you can

6 estimate? Were they something that was happening

7 daily or frequently, infrequently? I'm just trying

8 to get an idea of timing.

9    A    It was frequently. I don't know if it was

10 every day, but things were happening every week.

11    Q    When you were referring to the hostility

12 you faced in your work environment, what are

13 specific actions that have been taken against you

14 that you felt were hostile towards you?

15    A    Well, there was the investigation by the

16 IG, there was the way the Special Agent Roy treated

17 me -- certainly hostile -- and then there was

18 Mr. Haddon's hostility towards me when he told me

19 that this was all my fault and I had brought all of

20 this on and I had disease in my body. There was the

21 hostility that Mr. Haddon and Mr. Simons and

22 Mr. Gallagher described that Kathie Suite and Carol

1 Ailes had against me, and that that hostility had

2 not gone away and would continue to affect my

3 ability to travel and, therefore, my ability to do

4 my job, and it continued with the hostility

5 Mr. Haddon had towards me and Mr. Gallagher had

6 towards me after I told them I was represented by

7 counsel, and that's really when -- well -- and the

8 hostility had been pretty rampant and pretty high up

9 until that point, but it certainly escalated after I

10 told the two of them I was represented by counsel

11 and they needed to address my attorney about the

12 questions about my employment.

13        They were mad and Mark was mad because --

14 and some point during I think one of our progress --

15 the progress report, he said to me that I was the

16 one that was holding on to this and I was the one

17 that wouldn't let this go and people at SERC weren't

18 happy with me and people outside of SERC weren't

19 happy with me and it was all because I wouldn't let

20 this go, then he took me off projects because he

21 said I had bad chemistry, so that's hostility that

22 continues to go on.

1        There's the denial of leave. This

2 inappropriate review of my travel references back to

3 this investigation with the IG. Again, Gallagher

4 and Haddon and Ross all told me that nobody at SERC

5 thought I had done anything wrong, that it was

6 clearly because -- that it was because Kathie Suite

7 and Carol Ailes didn't like me, that I was going to

8 need to keep my head down at my desk, I was a marked

9 employee, and then, right, the insistence that I see

10 an employment -- the employee assistance counselor

11 to talk about, right, my stresses in my life, and

12 that I couldn't see -- I could have an attorney

13 present. And these projects that I was taken off

14 of -- the electronic field trip, the writing the

15 grant -- they were all male employees who had no

16 experience doing those projects or working with

17 those partners were given those duties to do, and so

18 that's the discrimination that I'm referencing here

19 in this letter.

20    Q    Do you know which male employee was given

21 the responsibility for writing the grant?

22    A    I believe it was Wayne Coats, C-O-A-T-S.

1    Q    Was he an employee in SERC?

2    A    Yes.

3    Q    Thank you.

4        And what about the electronic field trip?

5 Do you know who was given that responsibility?

6    A    Greg Ruiz, R-U-I-Z, also an employee of

7 SERC.

8    Q    After the OIG had spoken to you about your

9 travel, did you ever have any conversations with

10 Miss Suite or Miss Ailes regarding the hostility

11 that you were hearing they were feeling towards you?

12    A    No. I thought it was best not to talk

13 directly to them. Mr. Simons had told me to stay at

14 my desk and keep my head down with them, and so I

15 took his advice.

16    Q    Were either Miss Ailes or Miss Suite in a

17 supervisory position over you?

18    A    No.

19    Q    Did you know who their supervisor was?

20    A    Bob Gallagher, I believe, was Mrs. Suite's

21 supervisor and I believe Judy Petroski,

22 P-E-T-R-O-S-K-I, was Mrs. Ailes's supervisor, but

4 (Pages 10 to 13)

# Exhibit 1-f

# Lemon Deposition

8

1    skills are, and then we'd look through our

2    database of -- we have hundreds of jobs in there

3    -- see if there's a good match.

4        Q    Alright.  And I take it this is a fairly

5    large contingent of people?

6        A    The Behind the Scenes Volunteers are the

7    largest volunteer program at the Institution and

8    there are about 1,500 volunteers.

9        Q    Do they form sort of an integral part of

10   the Institution?

11       A    Absolutely.

12       Q    So they're quite useful, I take it then,

13   to the Smithsonian?

14       A    Yes.

15            MS. JOHNSON:  Objection to form.

16            BY MR. BYRNES:

17       Q    Do volunteers travel with the

18   Smithsonian?

19       A    Some do.

20       Q    And when they travel, are they allowed

21   to use Government rates for their travel?

22       A    I don't, I can't speak to that.  That's

10

1          BY MR. BYRNES:

2          Q    Okay.  So, within the volunteer program

3     itself then, Ms. Klugel's male husband served as a

4     volunteer at one point with the Smithsonian as a

5     photographer.  Is that sort of a typical role that

6     someone would play?

7          A    For Behind the Scenes, yes.

8          Q    And would there be any impropriety in

9     that volunteer accompanying Smithsonian members to

10    locations?

11         MS. JOHNSON:  Objection.  Calls for

12    speculation.  Outside of the scope.

13         BY MR. BYRNES:

14         Q    Ma'am?

15         A    Can you say the question again?

16         Q    In other words, when members of the

17    Smithsonian, when employees of the Smithsonian are

18    working, do they work along side volunteers?

19         A    Yes, they do.

20         Q    Okay.  So that's a pretty common

21    situation, correct?

22         A    Yes.

11

1          Q    Alright.  In terms of being a volunteer,

2     are they given access to the buildings as well?

3          A    As long as they have an ID badge, yes.

4          Q    Okay.  Alright.  And is it a Smithsonian

5     ID that they have?

6          A    Yes, it is.  Well, certain might be

7     different, but from Behind the Scenes volunteers

8     who work on the mall, yes, a badge is required to

9     access certain parts of the buildings.

10         Q    Is there any limitation on family

11    members or friends of current employees becoming

12    volunteers?

13         A    No.

14         Q    Alright.  Are you aware of whether or

15    not any family members of the Smithsonian

16    employees are volunteers?

17              MS. JOHNSON:  Objection.  Outside the

18    scope.  You can answer.

19              THE WITNESS:  Yes.

20              BY MR. BYRNES:

21         Q    Okay.  And what sort of situations are

22    you aware of where -- let me put it this way.  It

**Exhibit 1-g**

**Margensey Deposition**

18

1          BY MR. BYRNES:

2      Q    Which is the Equal Employment

3   Commission's Federal Processing Guidelines.

4      A    That's correct.

5      Q    Alright.  Do you also follow the EEOC's

6   guidance on what constitutes forms of sexual

7   harassment?

8      A    Yes.

9      Q    Okay.  So let me ask you again, is an

10  inquiry into the number of sexual partners an

11  employee has a form of sexual harassment?

12          MS. JOHNSON:  Objection.  Outside of the

13  scope.

14          THE WITNESS:  It may be.

15          BY MR. BYRNES:

16     Q    Okay.  Well, under what circumstances,

17  as the EEO Compliance Officer and somebody

18  involved in the policies and procedures of the

19  agency, could an inquiry into the number of sexual

20  partners of an employee, not be a form of sexual

21  harassment?

22          MS. JOHNSON:  Objection.  Calls for

19

```
 1      speculation.  Outside the scope.

 2             THE WITNESS:  I'm sorry.  I don't know.

 3             BY MR. BYRNES:

 4      Q    Well, you said that it depends on the

 5      circumstances.

 6      A    Correct.

 7      Q    So what circumstance would need to be

 8      involved?

 9             MS. JOHNSON:  Same objection.

10             BY MR. BYRNES:

11      Q    For it not to be form of sexual

12      harassment?

13      A    I can't think of one --

14      Q    Okay.

15      A    -- right now.

16      Q    Do you train any members of the Office

17      of the Inspector General?

18      A    All employees of the Smithsonian are

19      trained.

20      Q    So Office of Inspector General

21      investigators should have training in EEO

22      compliance, correct?
```

Exhibit 1-h

Pickett Deposition

16

1    facts of the investigation?

2         A    Not in detail.

3         Q    Okay.

4         A    But, generally I've heard that.

5         Q    Fair to say that that was the issue

6    whether she was misusing travel to have her

7    boyfriend go with her?

8              MS. JOHNSON:  Same objection.  Lack of

9    foundation.

10             THE WITNESS:  That's my understanding.

11             BY MR. BYRNES:

12        Q    Just as a point of reference, I'm sure

13   you've testified hundreds of times before, have

14   you not?

15        A    Yes.

16        Q    So there's no need to tell you all about

17   that gets done.

18        A    That's why I keep waiting for a judge to

19   rule.

20        Q    Yes.  The -- in terms of your

21   investigative techniques, do your investigators go

22   to training on sexual harassment and compliance

**Exhibit 1-i**

**Roy Deposition**

Page 18

1  legal conclusion.
2       THE WITNESS: I can -- I think I can
3  best phrase it by saying unintended. Don't do
4  things that are unintended. If the person,
5  whoever it may be, objects, then it could
6  constitute harassment. That's as best I can
7  recall right now.
8       BY MR. BYRNES:
9       Q   What training, if any, did you have from
10  the Smithsonian on the limits of possible
11  questions that could be asked under the
12  Rehabilitation Act of 1973?
13       MS. JOHNSON: Objection to form.
14       THE WITNESS: I don't recall any
15  specific training on --
16       BY MR. BYRNES:
17       Q   What is your understanding of what
18  limits, if any, are imposed by the Rehabilitation
19  Act of 1973 on talking to employees about medical
20  conditions?
21       MS. JOHNSON: Objection; calls for a
22  legal conclusion.

Page 19

1       THE WITNESS: I normally would not talk
2  to an individual about a medical condition. We
3  have forms that we would ask someone to sign to
4  release medical information to us. But unless the
5  allegation we're dealing with dealt with fraud of
6  some sort, it's not a subject that would come up
7  in our office.
8       BY MR. BYRNES:
9       Q   During your tenure in the Inspector
10  General's Office, did you -- was there a time --
11  did there come a time when you were involved in a
12  review of the conduct of Doratha Klugel?
13       MS. JOHNSON: Objection to form.
14       THE WITNESS: We received an allegation
15  about alleged improprieties by Ms. Klugel and
16  another employee, yes.
17       BY MR. BYRNES:
18       Q   Who did you receive that allegation
19  from?
20       A   I believe it was from Carol Ailes in the
21  travel office, the main travel office for the
22  Smithsonian.

Page 20

1       Q   Had you ever dealt with Ms. Ailes before
2  this allegation occurred?
3       A   Yes.
4       Q   What had you dealt with Ms. Ailes
5  previously on?
6       A   She would call whenever she found what
7  she thought to be travel irregularities, yeah.
8       Q   And how many individuals did she call on
9  in the two years preceding your investigation of
10  Ms. Klugel?
11       A   I can't tell you. I don't know.
12       Q   Okay. Did you keep records of those
13  contacts at all?
14       A   Normally no.
15       Q   Why not?
16       A   Because sometimes she would just call to
17  complain about something that was going on with
18  management. Sometimes she would have a specific
19  issue, but it didn't raise itself to, in my
20  opinion, to the level of an IG's inquiry. And
21  sometimes she would call saying she had a specific
22  allegation.

Page 21

1       Q   Within the Smithsonian, could all
2  employees contact the IG?
3       A   Yes.
4       MS. JOHNSON: Objection; lack of
5  foundation.
6       THE WITNESS: Oh, sorry.
7       MS. JOHNSON: Go ahead.
8       THE WITNESS: Yes.
9       BY MR. BYRNES:
10       Q   And was Ms. Ailes somebody who regularly
11  contacted the IG's office?
12       MS. JOHNSON: Objection; calls for
13  speculation.
14       THE WITNESS: She'd phoned as have
15  others, yes.
16       BY MR. BYRNES:
17       Q   Did you -- how did you perceive Ms.
18  Ailes?
19       MS. JOHNSON: Objection; vague.
20       THE WITNESS: As someone who was very
21  conscientious about her job.
22       BY MR. BYRNES:

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 30

1  tell her she wasn't free to leave when you talked
2  to her?
3      A   No.
4      Q   Did you advise her that she was free to
5  leave at anytime?
6      A   No.
7      Q   Did you advise her whether or not she
8  had to answer questions?
9      A   No.
10     Q   Why not?
11     A   Just I was there to ask questions.  If
12 she chose not to answer them, then she could
13 choose not to answer them.
14     Q   Well --
15     A   She was not being compelled to answer
16 anything.
17     Q   When you went to talk to her -- let's go
18 into that a little bit.  What were the
19 circumstances that led you to question Ms. Klugel?
20     MS. JOHNSON:  Object to form.
21     THE WITNESS:  There were several, and it
22 was really the totality of the information we

Page 31

1  received that caused us to wonder what was going
2  on.
3      BY MR. BYRNES:
4      Q   What was the information you received?
5      A   As I recall -- and I have to state that
6  this truly was a relatively minor matter or what
7  turned out to be a relatively minor matter.  But
8  as we received the information, what we were told
9  is that there were two employees from SERC that
10 were going to a conference in Hawaii and that the
11 plans for this trip had begun months prior.
12     Days before the trip -- days before the
13 trip was supposed to happen or -- the volunteer
14 was going to accompany at least one of the
15 employees, but the employee wasn't paying a fee to
16 enter the conference.  That employee also wanted
17 the government -- wanted to -- wanted the
18 government to buy his ticket and he was going to
19 reimburse the government.
20     Shortly thereafter, a second employee --
21 I'm sorry, a second volunteer signed up to also go
22 to Hawaii.  I don't recall if that employee was

Page 32

1  going to buy a ticket and reimburse the government
2  or the government was going to buy a ticket and
3  reimburse, but that's kind of my recollection.
4      The first volunteer had been a volunteer
5  for a period of time.  The second volunteer only
6  became a volunteer a week or so before this trip.
7  The second volunteer was going to accompany the
8  first volunteer as an assistant to photograph this
9  event.
10     The addition of the second employee --
11 I'm sorry, the second volunteer as someone wanting
12 to accompany the first volunteer was the threshold
13 that crossed, at least in my mind, to say what's
14 going on here.
15     Q   Who was the employee who brought the
16 second volunteer?
17     A   Amy Erb as I recall.
18     Q   Ms. Klugel's volunteer was a gentleman
19 by the name of Phillip Younger?
20     A   Yes.
21     Q   All right.  Mr. Younger had been a long
22 time volunteer with the Smithsonian; had he not?

Page 33

1      A   That's what I was --
2      MS. JOHNSON:  Objection; lack of
3  foundation.
4      THE WITNESS:  That's what I was told.
5      BY MR. BYRNES:
6      Q   Right.  There was nothing inappropriate
7  about bringing a volunteer on travel; was there?
8      MS. JOHNSON:  Objection to form, lack of
9  foundation.
10     THE WITNESS:  In general terms, no.
11     BY MR. BYRNES:
12     Q   Well, in specific terms, what was wrong
13 with it?
14     A   In specific terms, having an individual
15 travel on government fare or have the government
16 paying for someone to go, in this case, to
17 videotape -- to go to Hawaii for a week to
18 videotape a one-hour presentation could be
19 considered wasteful.
20     Q   Well, hadn't you been apprised by the
21 travel office before that individual in SERC,
22 including senior management were signing up family

Page 34

1  members as volunteers?
2      MS. JOHNSON: Objection to form, lack of
3  foundation.
4      THE WITNESS: I'm sorry. I don't recall
5  that.
6      BY MR. BYRNES:
7      Q   Ms. Ailes never told you that Mr.
8  Simmons and Mr. Haddon had traveled with family
9  members as volunteers for SERC?
10     A   I'm sorry. If so, I don't recall.
11     Q   How many investigators were there with
12  the IG's office at the time you conducted the
13  investigation with Ms. Klugel?
14     MS. JOHNSON: Objection to form.
15     THE WITNESS: I think there were only
16  two of us.
17     BY MR. BYRNES:
18     Q   Okay. And who was the other
19  investigator?
20     A   In 2005?
21     Q   Five, yes, sir.
22     A   That would have been Special Agent --

Page 35

1  Senior Special Agent Michael Pickett.
2      Q   There were only two investigators for
3  the entire agency?
4      A   Uh-huh. I'm sorry, yes.
5      Q   Oh, by the way, have you ever had your
6  deposition taken before?
7      A   Yes.
8      Q   Okay. You seem to know what to do. So,
9  when was the last time you had a deposition taken?
10     A   In the 1990s.
11     Q   Have you ever had -- been a party to a
12  complaint similar to this before or witness to a
13  complaint similar to this before?
14     MS. JOHNSON: Objection to form, lack of
15  foundation.
16     THE WITNESS: Not similar to this, no.
17     BY MR. BYRNES:
18     Q   Well, have you ever been deposed as part
19  of your official duties with the agency?
20     A   Yes.
21     Q   Okay. In what capacity were you deposed
22  -- no, strike that.

Page 36

1      What was the type of matter you were
2  deposed in previously?
3      A   I think it was an EEO suit, but I don't
4  specifically recall.
5      Q   Okay. And was your conduct or behavior
6  ever questioned in that suit?
7      A   Not in that matter.
8      Q   Have you ever been -- has your conduct
9  or behavior ever been questioned before by -- in a
10  deposition?
11     MS. JOHNSON: Objection to form, vague.
12     THE WITNESS: I don't think so.
13     BY MR. BYRNES:
14     Q   When you say don't think so, have you
15  ever been named as -- because of the manner in
16  which did you conducted your duties that you
17  engaged in any form of discrimination or
18  impropriety prior to Ms. Klugel's complaint?
19     A   No.
20     MS. JOHNSON: Objection to form.
21     THE WITNESS: Sorry.
22     BY MR. BYRNES:

Page 37

1      Q   And in terms of the travel involving Ms.
2  Klugel to Hawaii, why did that raise any concern
3  on your part?
4      A   It wasn't Ms. Klugel's travel to Hawaii
5  that raised a concern.
6      Q   Well, what, if anything, raised a
7  concern?
8      MS. JOHNSON: Objection; asked and
9  answered.
10     THE WITNESS: The addition of the second
11  volunteer to accompany the two employees on this
12  trip was what raised the concern.
13     BY MR. BYRNES:
14     Q   Did you make any inquiry into the
15  relationship between the volunteers and the
16  individuals who were traveling?
17     MS. JOHNSON: Objection; vague.
18     THE WITNESS: Yes.
19     BY MR. BYRNES:
20     Q   Did you ask whether or not these
21  individuals were boyfriend and girlfriend?
22     A   Yes.

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 38

1    Q   Who did you ask that?
2    A   I think I asked Carol Ailes first, just
3  by way of getting background on who the
4  individuals were that she was talking to me about.
5    Q   Why would that be relevant?
6    A   Part of the standard of conduct speaks
7  to are you engaging in action that could either be
8  real or perceived as doing something that is a
9  personal benefit to you.
10   Q   Well, would the status have been any
11 different for these individuals if they were
12 bringing their husbands or wives?
13   MS. JOHNSON:  Objection; calls for
14 speculation.
15   THE WITNESS:  No, not particularly, no.
16   BY MR. BYRNES:
17   Q   Did you ever investigate anyone's travel
18 when they were bringing a husband, wife, or
19 daughter or son with them?
20   MS. JOHNSON:  Objection to form.
21   THE WITNESS:  I don't recall
22 specifically, but it's not outside the realm of

Page 39

1  possibility.
2    BY MR. BYRNES:
3    Q   Okay.  So, have you ever questioned the
4  romantic relationship between individuals on
5  travel prior to the questioning of Ms. Klugel?
6    MS. JOHNSON:  Objection to the form.
7    THE WITNESS:  I don't think I asked
8  about a romantic relationship.
9    BY MR. BYRNES:
10   Q   Well, you asked if they were boyfriend
11 and girlfriend; correct?
12   A   Yes.
13   Q   Well, a boyfriend or girlfriend would
14 suggest an intimate other; wouldn't it?
15   A   Not necessarily.
16   Q   What in your mind would it suggest?
17   A   It's a corroboration of a piece of
18 information that I got.
19   Q   Why is the relationship between the
20 parties at all relevant to your inquiry?
21   MS. JOHNSON:  Objection to form.
22   THE WITNESS:  As I said, if it's a

Page 40

1  matter where one could be perceived as deriving a
2  personal benefit, it could be a violation of the
3  standard of conduct.  In this case, it was
4  corroboration of a piece of information we had.
5  The inquiry phase, we're trying to determine did
6  the information we receive, was it accurate.
7    And if I'm being told that the
8  individual is a specific relative of some sort,
9  I'll ask.  If it turns out that they're not, then
10 that begins to question the nature of the
11 allegation.
12   BY MR. BYRNES:
13   Q   How many people did you question with
14 respect to Ms. Klugel's travel situation?
15   MS. JOHNSON:  Objection; vague.
16   THE WITNESS:  I spoke with Carol Ailes,
17 Mark Hadden, and Kathy Suit, I believe.
18   BY MR. BYRNES:
19   Q   What about Ms. Klugel, did you speak
20 with her?
21   A   And I'm sorry, Ms. Klugel, sure, of
22 course.

Page 41

1    Q   What about Mr. Younger?
2    A   Never spoke with Mr. Younger.
3    Q   Ms. Erb?
4    A   I spoke with Ms. Erb about Ms. Erb.
5    Q   Did you speak to Mr. Seleke, Resip
6  Seleke?
7    A   No, I never spoke with him.
8    Q   Did you speak with Mr. Gallagher?
9    A   I talked with Mr. Gallagher when I was
10 done and just briefed him on the results.
11   Q   What about Ms. Petrovsky?
12   A   Ms. Petrovsky is the head of the travel
13 office.  And I contacted her after you contacted to
14 me to advise her that I was contacted and that if
15 there are any information she has, she probably
16 should keep it.
17   Q   Okay.  With respect to these individuals
18 you contacted, did you take notes of your
19 interviews?
20   A   No, I didn't.
21   Q   Why not?
22   A   Because it quickly -- let me rephrase.

Page 42

1  I didn't because after talking with Mark Hadden,
2 who I believe was the first one I spoke to, I
3 realized that the matter was not going to be a
4 violation of law. At best, it might be a
5 violation of the standards of conduct. So, at
6 worst, it's just management has made a terrible
7 mistake here. And at this point in time, I'm just
8 gathering information. If it turned out to be
9 wrong, then I would do it again. That's all.
10     Q  Well, in your training at FLETC, aren't
11 you trained that you should take notes when
12 talking to individuals?
13     A  If it's necessary, sure.
14     Q  Well, aren't you trained as a matter of
15 course that in any sort of inquiry you should keep
16 notes of the nature of the inquiry?
17     MS. JOHNSON: Objection; vague.
18     THE WITNESS: There are -- we have
19 discretion as to what we do.
20     BY MR. BYRNES:
21     Q  Isn't the better practice to maintain
22 notes so you can refresh your recollection later

Page 43

1 if called to testify?
2     MS. JOHNSON: Objection; calls for
3 speculation.
4     THE WITNESS: If it -- if I had made a
5 mistake, if my estimation of the circumstances
6 were wrong, then I would have done it again. It
7 would have been done. I would have -- my
8 philosophy as an investigator as an agent with the
9 institution is that there's a difference between
10 being an external investigator and an internal
11 investigator.
12     BY MR. BYRNES:
13     Q  And what would that difference be?
14     A  As an internal investigator, you are
15 going to revisit these people time and again. You
16 are going to see them often. As an external
17 investigator, you can come in, you can bluster,
18 you can fulminate. It doesn't matter because
19 chances are you will never visit with this
20 organization again.
21     An internal investigator to me, the
22 subject of an investigation one day could be the

Page 44

1 source of an investigation the next day. And it
2 does me no good to create enemies.
3     Q  Well, but isn't the purpose for creating
4 notes so that if the investigation, internal or
5 external, leads somewhere, you have a reference
6 point to go back to to make sure what areas you've
7 covered?
8     A  And if I had felt during the course of
9 our conversations that it was -- that my
10 estimation of what was going on was wrong and that
11 there was some form of impropriety going on, then
12 I would have started taking notes.
13     Q  And is it fair to say that when you
14 spoke to Mr. Hadden, you quickly realized that
15 there was no impropriety going on?
16     A  No, that's not what -- that's not what I
17 said.
18     Q  Well, then why didn't you take notes?
19     A  Because I wanted to hear what the others
20 had to say first.
21     Q  But if you suspected an impropriety, why
22 wouldn't you have taken notations?

Page 45

1     MS. JOHNSON: Objection; asked and
2 answered.
3     MR. BYRNES: All right.
4     THE WITNESS: I asked -- I wasn't sure
5 what Mr. Hadden's role in this whole thing was.
6 It could have been that he was caught up in
7 something.
8     BY MR. BYRNES:
9     Q  What did you think he might be caught
10 in?
11     A  Well, I seem to recall and this predates
12 much of the online stuff, but I seem to recall
13 that when we filled out travel authorization
14 forms, that there was notations in there saying
15 that be careful what you say because you could
16 commit a violation of law, 18USC287 or 18USC1001.
17     With the addition of the second
18 volunteer accompanying this trip, I began to
19 wonder if we had a conspiracy, 18USC286, to file a
20 false claim, to commit some form of travel fraud.
21 After talking with Mark, I realized that no, he's
22 not -- there's no engagement here. There's no

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 46

1  conspiracy. He's not involved in something. But
2  that didn't necessarily mean that the others
3  weren't involved in a violation of the standards
4  of conduct.
5     Q   Well, if you -- did you read Mr. Hadden
6  his calkins rights?
7     A   No.
8     Q   If you suspected him of a criminal
9  conspiracy, why did you not do that?
10    A   Because calkins is not administered
11 unless an assistant U.S. attorney says there will
12 be no prosecution.
13    Q   That's your understanding?
14    A   That's my understanding, yes, sir.
15    Q   Have you ever had a case of yours thrown
16 out for violation of calkins warnings?
17    MS. JOHNSON:  Objection to form.
18    THE WITNESS:  No.
19    BY MR. BYRNES:
20    Q   Did you suspect Ms. Klugel when you
21 talked to her for engaging in criminal misconduct?
22    A   It was within the realm of possibility,

Page 47

1  yes.
2     Q   So, what rights did you provide her?
3     A   None.
4     Q   Was she represented by counsel when you
5  spoke to her?
6     MS. JOHNSON:  Objection; lack of
7  foundation.
8     THE WITNESS:  No.
9     BY MR. BYRNES:
10    Q   Did you advise her of the right to
11 counsel?
12    A   No.
13    Q   Did you give her a Miranda warning?
14    A   No.
15    Q   All right. Let's -- so, you went and
16 spoke to Mr. Hadden and you realized that by your
17 own statement that the worst that could happen is
18 a violation of the standards of conduct; correct?
19    MS. JOHNSON:  Objection; it
20 mischaracterizes his testimony.
21    THE WITNESS:  No, not necessarily. I
22 said there's still a possibility -- I ruled out

Page 48

1  what I believed to be a conspiracy, but it's still
2  -- she may have very well have committed a
3  violation of 18USC287 or 1001.
4     BY MR. BYRNES:
5     Q   How? How would she -- what was your
6  suspicion as to what she was doing?
7     A   A 1001 filing -- I don't have the
8  elements in front of me, so I would need to
9  refresh myself on that, but anyone who attempts to
10 commit an artifice to defraud the government could
11 be in violation of the law.
12    Q   All right. Did you believe that Ms.
13 Klugel was defrauding the government?
14    A   Didn't know.
15    MS. JOHNSON:  Objection; vague.
16    THE WITNESS:  Sorry, didn't know.
17    BY MR. BYRNES:
18    Q   So, you suspected that she might be when
19 you started your investigation?
20    A   Right.
21    Q   And so, you clearly -- did you ever --
22 by the way, did you ever contact the U.S.

Page 49

1  Attorney's Office in this case?
2     A   No.
3     Q   All right. Did you ever ask anyone for
4  any -- did you ever request for anyone any
5  guidance on how you should conduct this
6  investigation?
7     A   No.
8     MS. JOHNSON:  Objection to form.
9     THE WITNESS:  No.
10    BY MR. BYRNES:
11    Q   Okay. Did you speak to anyone in your
12 office before you began the investigation?
13    MS. JOHNSON:  Objection; vague.
14    THE WITNESS:  Two things, if I may.
15 One, the answer to the specific question is no.
16 Secondly, it was not an investigation. It's just
17 an inquiry at this point in time. We're gathering
18 information.
19    BY MR. BYRNES:
20    Q   Do you gather information in an
21 investigation?
22    A   Of course.

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 54

1    MS. JOHNSON: Objection to form.
2    THE WITNESS: I don't know.
3    BY MR. BYRNES:
4    Q   Did you keep statistics as to the name
5 of the individuals that you would investigate?
6    MS. JOHNSON: Objection to form.
7    THE WITNESS: There is a case management
8 system, but we don't break things out.
9    BY MR. BYRNES:
10   Q   Do you break them out by sex?
11   A   No. There's not -- we wouldn't even
12 necessarily know if an individual is a male or a
13 female other than the name. And if a name is
14 unusual, we wouldn't know.
15   Q   Well, you would know when you talked to
16 them; correct?
17   A   Oh, we would know when we meet, sure.
18   Q   All right. Well, how many other women
19 did you look into that you had an inquiry in in
20 2005 for travel related issues?
21   A   I don't know.
22   Q   Could it have been none?

Page 55

1    A   It's a possibility, sure.
2    Q   With respect to the privacy act, do you
3 -- are your records at all covered under the
4 privacy act, if you know?
5    MS. JOHNSON: Objection; calls for a
6 legal conclusion.
7    THE WITNESS: I don't know.
8    BY MR. BYRNES:
9    Q   Did you give any warnings that this is
10 privacy act protected material, supplying it for
11 this specific purpose?
12   MS. JOHNSON: Objection; vague.
13   THE WITNESS: No, I don't believe so.
14   BY MR. BYRNES:
15   Q   Okay. So, you talked to Mr. Hadden and
16 what did Mr. Hadden tell -- what did you raise
17 with Mr. Hadden with regard to Ms. Klugel and Ms.
18 Erb's travel?
19   A   I had contacted Mr. Hadden in early
20 December sometime by email -- I had never spoken
21 with him -- asking him to set up a meeting between
22 Ms. Klugel or Younger and Seleke. And I proposed

Page 56

1 a time that I thought would be convenient. He
2 wrote back to say that the date was okay but the
3 time was inconvenient and asked me to come a few
4 hours later.
5    Q   Did you suggest in anyway that these
6 contacts were voluntary on the part of the
7 employees, that they could refuse or not refuse?
8    A   No.
9    Q   Is it fair to say that you expected the
10 employees would show up?
11   A   Oh, sure.
12   Q   Okay. And the employees were in essence
13 required to cooperate in any inquiry you're
14 conducting?
15   A   They were expected to cooperate, sure.
16   Q   Right. So, there is no voluntariness to
17 this, they are to come and talk to you; correct?
18   MS. JOHNSON: Objection to form.
19   THE WITNESS: Employees are always free
20 to not cooperate.
21   BY MR. BYRNES:
22   Q   Have you ever suggested discipline

Page 57

1 against an employee based on their failure to
2 cooperate with your inquiry?
3    A   I don't have a specific recollection,
4 but I would imagine sometime over my career I've
5 told people that it's important that they do
6 cooperate.
7    Q   Right, okay. So, you sent this email to
8 Mr. Hadden. Do you recall what the email asked
9 him to do other than to have the employees ready
10 for an interview? Did it say anything else that
11 you can recall?
12   A   Probably said that we have some
13 questions about travel, probably the specific trip
14 to Hawaii. You know, there's -- I have a vague
15 recollection of another trip. There was a trip to
16 Panama and a trip to Belize. But my recollection
17 is that I really wanted to talk about this Hawaii
18 trip.
19   Q   Did you -- prior to coming here for the
20 deposition today, did you review any notes or
21 writings?
22   A   Yes.

Page 70

1    Q    What did you ask him after that?
2    A    I asked him who Phillip Younger and
3  Resip Seleke were.
4    Q    What did he say?
5    A    He said they were volunteers.
6    Q    What was your understanding of what
7  volunteers did for the agency if you had any at
8  that time?
9    A    I guess I had a vague understanding that
10  they just supported the organization in its
11  mission.
12    Q    Do you know from your experience in the
13  IG's office whether they were authorized to travel
14  at government rate or not, volunteers?
15    MS. JOHNSON:  Objection to form.
16    THE WITNESS:  I would imagine they are,
17  but I don't know specifically.  I would imagine
18  they are.
19    BY MR. BYRNES:
20    Q    And so, you asked them about the
21  volunteers.  Did you ask them how they were?
22    A    Yes.  I asked them who they were.

Page 71

1    Q    What did he say?
2    A    He said that Mr. Younger was a long time
3  volunteer.  Mr. Seleke, I only have a vague,
4  vague recollection of him, just saying he was a
5  volunteer.
6    Q    What else did you ask Mr. Hadden after
7  that?
8    A    I asked Mr. Hadden about Younger, saying
9  that he -- one of the forms said he was going as a
10  photographer on this and what was the nature of
11  that.  And he said that Younger is a photographer
12  and has been a photographer and was going to
13  photograph a conference or a workshop or something
14  that Dottie was going to participate in in Panama.
15    And so, I asked about that and was told
16  that that was a weeklong conference, workshop,
17  something -- I can't characterize the nature.  But
18  it was supposed to be a weeklong event and that
19  Younger was either going to video it or maybe even
20  transmit it live.  Again, I don't remember.  And
21  that he was going to do something similar on this
22  trip to Hawaii.

Page 72

1    Q    Did Mr. Hadden tell you that it was cost
2  effective for the agency to send Mr. Younger to
3  videotape the Hawaii conference?
4    A    No, I don't believe so.
5    Q    Didn't he tell you that it was more cost
6  effective to have a volunteer, pay his way to
7  Hawaii and videotape it than it was to hire a
8  videographer in Hawaii?
9    MS. JOHNSON:  Objection; asked and
10  answered.
11    THE WITNESS:  I don't believe so, but I
12  -- and I wouldn't have objected if Phillip was
13  going to pay his own way.
14    THE VIDEOGRAPHER:  We're out of time.
15    MR. BYRNES:  Okay.  Why don't we change
16  the tape?  Do you want to take a break for about
17  --
18    THE VIDEOGRAPHER:  We're going off the
19  record.  The time is 11:39 a.m.  This ends tape
20  number one in the video deposition of Gerard Roy.
21    (Recess)
22    THE VIDEOGRAPHER:  This begins tape

Page 73

1  number two in the video deposition of Gerard Roy.
2  The time on the video is 11:48 a.m.  We are back
3  on the record.
4    BY MR. BYRNES:
5    Q    Mr. Roy, after Mr. Hadden, you talked to
6  him about the Panama trip, I take it because you
7  mentioned the Panama trip.  Did you talk to him
8  about the Hawaii trip?
9    A    Yeah, yeah.
10    Q    What did you ask him about that?
11    A    I think the question that we left off
12  with was would it be inappropriate for Mr. Younger
13  to go to Hawaii.  And the answer is no, it
14  wouldn't have been inappropriate for him to go to
15  Hawaii.  It could be questionable whether it was
16  worth the investment of the government to send
17  someone to videotape a one- hour presentation as
18  opposed to the weeklong conference that was going
19  to take place in Panama.  But that -- it could be
20  a management call.
21    It was, in my opinion, inappropriate for
22  the government to become a travel agent for Mr.

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 86

1    MS. JOHNSON: Objection; calls for
2 speculation.
3    THE WITNESS: Don't know, can't tell you
4 that.
5    BY MR. BYRNES:
6    Q    As an investigator, wouldn't you want to
7 get into the personal dynamics between people to
8 challenge their motives or their veracity?
9    A    If this matter had become more
10 substantive, then it probably would have become
11 important. But I determined, in my opinion, that
12 management had made a mistake and there was no
13 reason to escalate this.
14    Q    What mistake did management make?
15    A    By agreeing to allow Mr. Younger and
16 presumably Mr. Seleke, although I can't recall
17 specifically, to have the government purchase
18 their ticket to be reimbursed by these
19 individuals. If the two individuals, Younger and
20 Seleke, had purchased their own tickets, then we
21 probably wouldn't have even gotten called.
22    Q    Didn't you learn from Ms. Ailes that

Page 87

1 volunteers were entitled to use government rates
2 as long as they were conducting business for the
3 Smithsonian?
4    MS. JOHNSON: Objection to form.
5    THE WITNESS: They can, sure.
6    BY MR. BYRNES:
7    Q    And therefore, there was no impropriety
8 whatsoever with these gentlemen traveling at
9 government rates?
10    A    If they had been authorized to travel.
11    Q    But they were authorized to travel. You
12 found that out; correct?
13    A    No, they wanted to travel and reimburse
14 the government. There's a difference.
15    Q    Sir, you found out from Mr. Hadden that
16 he had authorized the travel.
17    A    I had found out from Mr. Hadden that he
18 was going to authorize these people to travel.
19    Q    Right.
20    A    And then, Mr. Younger says and perhaps
21 Mr. Seleke, I can't recall, that they would
22 reimburse the government at government rates.

Page 88

1    Q    Well, wasn't it a fact that volunteers
2 could actually be paid for through the Smithsonian
3 to travel as long as they were helping the
4 Smithsonian on Smithsonian business?
5    MS. JOHNSON: Objection to form, vague.
6    BY MR. BYRNES:
7    Q    Isn't that true?
8    A    A volunteer, anybody can travel for the
9 government if the government wants them to travel.
10 If the government wants them to travel, then they
11 don't have to reimburse the government.
12    Q    So, the objection was that even though
13 these gentlemen didn't have to reimburse the
14 government they were going to reimburse the
15 government?
16    A    No. What created the impression was
17 that they wanted to get a cheap ticket to go.
18    Q    But they were going to do business for
19 the Smithsonian; were they not?
20    A    Perhaps Mr. Younger was. Mr. Seleke
21 becomes a bit of a stretch.
22    Q    Well, but if Mr. Younger was, why was

Page 89

1 there any need to investigate the matter further
2 by talking to anyone other than Mr. Hadden?
3    MS. JOHNSON: Objection to form.
4    THE WITNESS: I'm not sure. Why would I
5 stop with Mr. Hadden? I want to know --
6    BY MR. BYRNES:
7    Q    Because he had already told you that he
8 had authorized the trip, that Mr. Younger was a
9 regular volunteer, and that Mr. Younger was going
10 to perform a function that was helpful to the
11 Smithsonian.
12    A    And he presumably also told me, although
13 I can't recall specifically, that Mr. Seleke was
14 going to go, and I had a question about that. The
15 mere fact that he said that he authorized it
16 doesn't mean that the IG's office is done.
17    Q    Well, sir, but you can't recall because
18 you didn't take any notations; correct?
19    MS. JOHNSON: Objection; calls for
20 speculation.
21    THE WITNESS: No.
22    BY MR. BYRNES:

23 (Pages 86 to 89)

Page 90

1    Q   You have no reference point other than
2  your memory to recall what was said in that
3  conversation; correct?
4    A   I recall what was said in the
5  conversation.
6    Q   That's not what I asked you. I said you
7  have no reference point other than your memory;
8  correct?
9    A   Okay.
10    Q   There's no written report. There's no
11 writings of any kind to substantiate what you
12 claim to be the conversation you had with Mr.
13 Hadden; correct?
14    MS. JOHNSON:  Objection to form, vague.
15    THE WITNESS:  There was a document that
16 I wrote shortly after I concluded this inquiry
17 where I summarized what I believed to be
18 management's position.
19    BY MR. BYRNES:
20    Q   But you don't have any documents that
21 reflect the specific conversations you had with
22 Mr. Hadden?

Page 91

1    A   No.
2    Q   Nor do you have any documents that
3  reflect the conversations you've had with Ms.
4  Klugel, Mr. Gallagher, Ms. Suit, Ms. Ailes, or Ms.
5  Petrovsky; correct?
6    MS. JOHNSON:  Objection to form.
7    BY MR. BYRNES:
8    Q   Is that correct?
9    A   Correct.
10    Q   All right. So, even though you learned
11 from Mr. Hadden that he had authorized Mr.
12 Younger, that Mr. Younger was a repetitive
13 volunteer and was performing a valuable function
14 for the Smithsonian and Mr. Younger was entitled
15 to travel under government rates, you still
16 conducted an inquiry into the situation involving
17 Dottie Klugel and Mr. Younger on travel; correct?
18    MS. JOHNSON:  Objection;
19 mischaracterizes the facts.
20    THE WITNESS:  There was a lot of
21 information in that question that I'm not sure I
22 agree with.

Page 92

1    BY MR. BYRNES:
2    Q   Okay. What do you disagree with?
3    A   Mark Hadden, to my understanding, had
4  agreed to authorize the travel for the two
5  employees, agreed for the volunteers. I don't
6  necessarily agree that the function was a valuable
7  one for the institution. And I certainly
8  questioned whether Mr. Seleke, who had only been a
9  volunteer for a week or so, if that, merited the
10 same kind of status as Mr. Younger did.
11    Q   Do you know who Mr. Edgin Heinz is?
12    A   Do I -- I don't even think I've ever met
13 Mr. Heinz.
14    Q   I didn't ask you that. I asked you do
15 you know who he is.
16    A   Then the answer is as a Smithsonian
17 employee.
18    Q   Do you know whether or not Mr. Heinz
19 created for his daughter a volunteer status so she
20 could travel with him at government rate to
21 places?
22    MS. JOHNSON:  Objection to form.

Page 93

1    THE WITNESS:  I don't know that.
2    BY MR. BYRNES:
3    Q   Do you know whether any -- whether Mr.
4  Hadden ever had any of his relatives go with him
5  on travel at government rates?
6    A   I don't know.
7    Q   Did you conduct a general inquiry into
8  whether individuals in the Smithsonian or in SERC
9  were using government rates to fund bringing their
10 relatives with them or their spouses with them on
11 travel?
12    MS. JOHNSON:  Objection to form.
13    THE WITNESS:  We never did a general --
14 I've never done a general inquiry on travel to the
15 SERC.
16    BY MR. BYRNES:
17    Q   Okay. And that's because you responded
18 to what Ms. Ailes said; correct?
19    A   I just --
20    MS. JOHNSON:  Objection;
21 mischaracterizes testimony.
22    THE WITNESS:  I respond to allegations.

Page 98

1    Q    So, why did you not request the travel
2    authorizations for the Panama trip?
3    A    Because my understanding was the Panama
4    trip was cancelled or postponed.
5    Q    Okay.  So, the Panama trip then was not
6    an area where you requested information, written
7    information on; correct?
8    A    Right.
9    Q    All right.  The information on the
10   Hawaii trip you had in you possession at the time
11   you went and talked to Mr. Hadden; correct?
12   A    I had what I had.
13   Q    Which was the written authorizations;
14   correct?
15   A    Right.
16   Q    All right.  And what you had was an
17   authorization from a supervisor to allow Mr.
18   Younger to accompany my client to Hawaii; correct?
19   A    Uh-huh, right.
20   Q    And you had spoken to Ms. Ailes and
21   found out from her that this was boyfriend and
22   girlfriend; correct?

Page 99

1        MS. JOHNSON:  Objection; vague.
2        BY MR. BYRNES:
3    Q    At the time you went to talk to Mr.
4    Hadden?
5    A    Among other things, sure.
6    Q    And you asked Mr. Hadden about my
7    client's relationship with Mr. Younger; correct?
8    A    I asked it, yes.
9    Q    Why?
10   A    To corroborate whether or not the
11   information I got from Carol Ailes was accurate.
12   Q    Weren't you concerned that Ms. Klugel
13   and Mr. Younger were misusing travel to have a
14   vacation together in Hawaii because they were
15   boyfriend and girlfriend?  Wasn't that really what
16   you were worried about?
17   A    I was worried about Younger getting a
18   benefit that he's not -- wasn't be allowed.
19   Q    But you found out that that wasn't the
20   case; correct?
21   A    No, I didn't find out that that -- that
22   was the case.

Page 100

1    Q    What benefit did he get?
2    A    He was getting a government fare ticket.
3    Q    But you've already testified that he was
4    authorized to get a government fare ticket if he
5    was performing services for the Smithsonian.
6    A    No, sir.  I was -- I testified that he
7    was authorized but that didn't mean that we
8    necessarily agreed with management's assessment of
9    it.
10   Q    And the reason you didn't agree is
11   because you were concerned about the boyfriend,
12   girlfriend nature of their situation.
13   A    No.  The reason I didn't agree was
14   because I understood there was a difference
15   between going on a weeklong conference to
16   videotape the entire proceeding and going for a
17   one-hour presentation.
18   Q    Did you ask Mr. Hadden how much it would
19   cost the Smithsonian to hire a videographer in
20   Hawaii to videotape this conference?
21   A    You know, I don't recall asking but it's
22   a question that I probably would have asked, but I

Page 101

1    just don't recall asking it.
2    Q    Didn't Mr. Hadden tell you it would be
3    cheaper to send a volunteer free of charge to do
4    this than it would have been to hire somebody in
5    Hawaii?
6    A    I don't recall that, no.
7    Q    If I were to tell you that he testified
8    to that, would that refresh your recollection?
9    A    No. I -- no, I'm sorry.  It doesn't.
10   Q    Do you believe that not to be the case,
11   that he didn't tell you that?
12   A    I just don't recall.  I just don't
13   recall it.
14   Q    And of course, because you took no
15   notes, we don't know what you said; correct?
16   A    I don't recall what he said, no.
17   Q    All right.  So, after you speak to Mr.
18   Hadden, who do you speak to next?
19   A    I asked Dottie.  I asked to see Dottie.
20   Q    Who'd you ask?
21   A    Mark.
22   Q    Okay.  What did he say?

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 106

1    room that might be a strategy, but this was an
2    empty office.
3        Q   Isn't that something they routinely
4    train you on at the federal law enforcement
5    training center, that what you do during an
6    interview is you make sure that the agent is
7    closer to the doorway so that the individual must
8    go by you to get out?
9        A   If we're conducting an interrogation in
10   an interrogation room, maybe that's what you would
11   do.  This was an interview in a vacant office in
12   SERC.
13       Q   Okay.  So, what happened next?
14       A   As I recall the layout of the office,
15   there was a little hallway that we walked into
16   which lead to an open area probably as wide as
17   this conference room and maybe as long and there
18   are at least a couple of desks, two desks.  I sat
19   on a chair behind the desk closest to the doorway.
20   She sat on the desk -- in a chair behind the desk
21   further away closer to a window.
22       Q   Okay.

Page 107

1        A   And the reason I recall that is because
2    when I met with Dottie the second time, it was
3    sunnier and I realized I had made a mistake
4    because I couldn't see her face.  The sunlight was
5    coming through the window.
6        So, in the first interview, after I
7    introduced myself, I told her I believed that
8    something had come up during the routine work of
9    our office involving this trip.  And I asked her
10   about the nature of the trip.
11       Q   Okay.  What else did you ask her?
12       A   I asked her about who Phillip Younger
13   was.  I asked her if he was her boyfriend.
14       Q   Why?
15       A   Again, I'm just trying to confirm
16   information.  That's all.  As a matter of fact, I
17   think she said --
18       Q   Why does she --
19       A   She may have said that he was her
20   fiancé, but I don't recall.  But I think it was --
21       Q   Why was that significant?
22       A   Again, it's confirmation.

Page 108

1        Q   Of what?
2        A   Of information that I received.
3        Q   Why was it significant to ask about
4    that?
5        MS. JOHNSON:  Objection; asked and
6    answered.
7        THE WITNESS:  Because it's confirmation.
8    If she had turned out and said no, he's just a
9    person here that we work together, then I would
10   have --
11       BY MR. BYRNES:
12       Q   So --
13       A   -- had some reason to question the
14   information that I got.  Then I could start
15   questioning motives of anything else.
16       Q   Did you ever ask her about her sex life?
17       A   I don't know what that means and it
18   bothers me that I don't know what that means.
19       Q   Did you ask her about whether she was
20   having sex with Mr. Younger?
21       A   No.
22       Q   Did you ask her about her sexual

Page 109

1    orientation?
2        A   No.
3        Q   Did you ask her about the number of
4    boyfriends she had had?
5        A   No.
6        Q   Did you ask her about the number of
7    people she had been having sex with?
8        A   No.
9        Q   Would all of those questions in your
10   mind have been inappropriate for the scope of your
11   inquiry?
12       MS. JOHNSON:  Objection to form, vague.
13       THE WITNESS:  In this type of an
14   inquiry, yes.
15       BY MR. BYRNES:
16       Q   And is it fair to say that had you asked
17   those questions, then you agree that that would
18   have been an inappropriate extension of the
19   inquiry?
20       MS. JOHNSON:  Objection; calls for
21   speculation, form.
22       BY MR. BYRNES:

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 110

1    Q   Go ahead, sir.
2    A   I have no recollection whatsoever of
3  asking those kinds of questions. If there is some
4  evidence that I did, I would love to see it and I
5  could then look it over. I received no objection
6  from Dottie to any question that I asked and had I
7  received an objection, I would have addressed it,
8  either that I'd made a mistake, sorry or I would
9  have explained why I asked.
10   Q   Didn't she -- didn't you talk to Mr.
11  Hadden about the fact that Dottie complained to
12  him that in your inquiries you had asked her in
13  great detail about her relationship with Mr.
14  Younger, her sexual partners, and how many
15  boyfriends she had had?
16   A   I had asked her who Mr. Younger was. I
17  had asked her if he was a boyfriend, if he was her
18  boyfriend. I had asked her what he was going to
19  do. I asked her what he was going to do when she
20  was not giving her presentation.
21   Q   Why is that your business, what he's
22  going to do when she's not giving her

Page 111

1  presentation.
2    A   It goes to what is the government
3  function that he is going for.
4    Q   But you already had talked to Mr.
5  Hadden. He already explained that to you.
6    A   And that doesn't necessarily mean that
7  we agree with it.
8    Q   But he's the manager.
9    A   And we're the IG.
10   Q   And so you asked the individual employee
11  what her boyfriend was going to do when he wasn't
12  in the conference?
13   A   Yeah, yes.
14   Q   Why?
15       MS. JOHNSON: Objection; asked and
16  answered.
17       THE WITNESS: If he's going there for a
18  government function, then I want to know what the
19  government function is when she is not there.
20       BY MR. BYRNES:
21   Q   But is she in a position as an employee
22  to make a determination as to the official nature

Page 112

1  of the trip?
2    A   I presume she was --
3       MS. JOHNSON: Objection lack -- sorry.
4       THE WITNESS: I presume --
5       MS. JOHNSON: Calls for speculation.
6       THE WITNESS: I presume, and it is
7  speculation, that she was in a position to ask for
8  him to accompany her.
9       BY MR. BYRNES:
10   Q   And it's Mr. Hadden's responsibility to
11  sign off on those authorizations; correct?
12   A   And Mr. Hadden can make a mistake.
13   Q   But then it's Mr. Hadden's issue; isn't
14  it?
15       MS. JOHNSON: Objection to form, vague.
16       THE WITNESS: Why -- how is it Mr.
17  Hadden's issue?
18       BY MR. BYRNES:
19   Q   Well, he was the one who signed off on
20  the actual authorization for the trip; correct?
21   A   Okay. And?
22   Q   So, if he had made a mistake, why would

Page 113

1  you inquire into my client's -- what my client and
2  her boyfriend were going to do on this trip when
3  they were not in the conference?
4       MS. JOHNSON: Objection to form.
5       THE WITNESS: I wanted to know what Mr.
6  Younger was going to do while she was not in the
7  conference. I assumed she would be in the
8  conference. But to get information to go back to
9  Mr. Hadden to say he made a mistake, I needed to
10  know what the intent was.
11       BY MR. BYRNES:
12   Q   Why didn't you just talk to Mr. Younger?
13   A   Because when it was all -- when
14  everything was done, by the time I got through
15  talking to everyone, I realized, again, in my
16  opinion, management just made a mistake. That's
17  all. Mr. Younger could -- and the mistake was in
18  how the trip was going to be paid for. The final
19  analysis, that's what it distilled to. If Mr.
20  Younger was going to pay for the trip on his own,
21  perfectly fine. But if the government was going
22  to pay, then we have a problem.

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 118

1    questioned regarding travel would be the same as
2    it was for 2005, that you can't recall?
3        A    I'll have to guess yes because I don't
4    --
5        Q    I don't want you to guess.
6        A    Well, I don't remember your question, so
7    it's --
8        Q    Do you recall how many women you
9    interviewed or had an inquiry with regarding
10   travel in 2004 for the Smithsonian?
11       A    No.
12       Q    Do you recall how many men?
13       A    2004?
14       Q    Yes.
15       A    No specific inquiry comes to mind.
16       Q    Other than Ms. Klugel, do you recall any
17   other travel inquiries of men or women that you
18   conducted in 2004 as you sit here today?
19       A    No, I can't be specific to dates.  No, I
20   don't know.
21       Q    Okay.  Do you recall any during that
22   year?

Page 119

1        A    2004?
2        Q    Yes.
3        A    Same thing, I don't recall.
4        Q    All right.
5        A    There were other inquiries.  I just
6    don't remember what dates they were.
7        Q    Were they travel related in 2004?
8        A    You keep asking for 2004 and I don't
9    have a specific recollection of dates.
10       Q    Okay.  What I want to know is as you sit
11   here today, do you recall for the year 2004, not
12   the dates but for the entire year, whether or not
13   other than Ms. Klugel you conducted any inquiries
14   into the travel of any male or female employee for
15   the Smithsonian?
16       MS. JOHNSON:  Objection to form.
17       BY MR. BYRNES:
18       Q    Go ahead.
19       A    The question centers on a date of 2004
20   and --
21       Q    No.  I just want to know for the year.
22   Do you recall as you sit here today --

Page 120

1        A    Well, whether we talk a specific date or
2    the entire year, I can't -- there were travel
3    irregularities that we looked at.  I just don't
4    recall which years they may have been.
5        Q    Okay.  All right.
6        A    Okay.
7        Q    Thank you.  All right.  So, did you then
8    interview her again the same day?
9        A    I spoke with -- next I spoke with Amy
10   Erb.  I spoke with Kathy Suit, came back to the
11   conference room -- came back to the office and
12   asked to see both Dottie and Amy again, yes.
13       Q    And what did you ask my client in the
14   second interview?
15       A    It was -- I wasn't really asking.  I was
16   reporting the results of this inquiry.
17       Q    What did you report to them?
18       A    I told her that the trip was not going
19   to happen the way that she had envisioned, that
20   the government -- it could not be arranged that
21   Mr. Younger could take a trip on government
22   expense and reimburse the government.  But if the

Page 121

1    government wanted him to go, then the government
2    would pay for him to go.  If the government did
3    not want him to go, then the government would
4    allow him to go on his own dime.  But he could not
5    purchase a government ticket.
6        Q    And then pay the government; correct?
7        A    And then pay the government, yeah.
8        Q    So --
9        A    I told her that this -- that it appeared
10   that this trip happened kind of last minute
11   considering that the plans for the trip appeared
12   to have happened months ago and that had she
13   wanted Phillip to accompany her, she probably
14   could have got a better deal or as good a deal
15   using the internet, but she could not use the
16   government for this trip.
17       Q    But she could use the government for
18   this trip, right?  I mean, legally she could have
19   used the government for the trip.
20       MS. JOHNSON:  Objection to form, vague.
21       BY MR. BYRNES:
22       Q    Isn't what you're saying inconsistent?

6328c9d2-0410-40fa-bcbb-7d343985a2be

Page 126

1  a government ticket, as opposed to just buying a
2  regular ticket.
3      BY MR. BYRNES:
4      Q   All right. Did you ever tell my client
5  that you would be closely reviewing her future
6  travel?
7      A   No.
8      Q   Did you ever threaten my client's
9  employment, say it was in jeopardy in way, shape,
10 or form?
11     A   No.
12     MS. JOHNSON: Objection to form.
13     BY MR. BYRNES:
14     Q   Did you ever tell my client that she was
15 a tough nut to crack?
16     A   Oh, absolutely. Absolutely, yes.
17     Q   Why?
18     A   Because we -- just as you and I seem to
19 be having the same conversation, she and I had the
20 same conversation and I just -- I didn't seem to
21 be able to convey the message in a way that she
22 understood that this was wrong. That's all, just

Page 127

1  wrong.
2      Q   It's not -- wasn't it your job to
3  investigate the facts, not make a determination as
4  to whether it was correct or not?
5      MS. JOHNSON: Objection to form.
6      THE WITNESS: No, no.
7      BY MR. BYRNES:
8      Q   Well, you're not a manager and you're
9  not a travel agent; correct?
10     A   No but I do represent the IG.
11     Q   Right. But there was no official
12 review. I mean, the IG usually does an
13 investigation, gathers facts, writes up reports,
14 talks to legal counsel, and issues a decision;
15 correct?
16     A   No, not necessarily. That's among their
17 duties, sure. But we're here to prevent and
18 detect.
19     Q   So, you're sort of a super personnel
20 agent. So, you go in and you can individually now
21 go in and decide whether or not although this was
22 all authorized that this was a "bad idea"?

Page 128

1      MS. JOHNSON: Objection to form, calls
2  for speculation.
3      THE WITNESS: Yes, we can. That's what
4  an IG does.
5      BY MR. BYRNES:
6      Q   What did you mean by a tough nut to
7  crack?
8      A   It meant that I was unable to get
9  through to her successfully that this was a
10 mistake. It wasn't -- he could accompany her. I
11 told her he could accompany her on his own dime.
12 He just couldn't get a government ticket for it.
13 That's all.
14     Q   Were you conveying a lack of candor on
15 her part?
16     A   I don't know. I'm not sure I
17 understand.
18     Q   Well, weren't you using -- I mean, is
19 that a terminology that you normally use, you're a
20 tough nut to crack?
21     A   It's an -- it's an idiom. That's all.
22 It's just --

Page 129

1      Q   Well, why would you need to crack her
2  nuts?
3      MS. JOHNSON: Objection to form.
4      THE WITNESS: That's not what the
5  expression means.
6      BY MR. BYRNES:
7      Q   What does it mean?
8      A   It's an idiom that means we're having a
9  hard time getting through.
10     Q   Do you believe that Ms. Klugel took
11 offense to that remark?
12     MS. JOHNSON: Objection; calls for
13 speculation.
14     THE WITNESS: I don't know.
15     BY MR. BYRNES:
16     Q   Well, let me ask you again, in your
17 sexual harassment training, isn't it how the
18 recipient perceives the comments that lies at the
19 core of whether it's sexually harassing or not?
20     MS. JOHNSON: Objection; calls for a
21 legal conclusion.
22     BY MR. BYRNES:

# Exhibit 1-j

# Suite Deposition

Page 6

1    A    Handle all the travel for SERC,
2    Smithsonian Environmental Research Center.
3    Q    And have you ever been deposed before,
4    ma'am?
5    A    No.
6    Q    The deposition is being taken today both
7    by videotape and by court transcription, which
8    means that all the answers are being written down.
9    Because of that, I would ask that you answer
10    questions verbally.  In other words, don't do what
11    you're doing now, which is to shake your head.  If
12    I ask you a question, say yes or no audibly so
13    they can pick it up.
14    The second thing is I will -- if you
15    have a question that you don't know the answer to,
16    the proper response is I don't know.  The other
17    thing is it is hard for the court reporter to hear
18    two people talking at the same time.  So if
19    there's a situation where we're both talking at
20    the same time, she can't take it down.  So I will
21    try not to interrupt you and if you will try not
22    to interrupt me when we're asking questions, it

Page 7

1    will work out fine.  Okay?
2    A    Okay.
3    Q    All right.  When you say handle all the
4    travel, what do you mean by that?
5    A    It's different now than it was back
6    then.  Should I speak to what it was back in 2004?
7    Q    Yes, ma'am.
8    A    Okay.  Anyone that would be traveling
9    would fill out a proposed travel plan form, have
10    it signed by their supervisor with the fund
11    entered on it, and then I would prepare the travel
12    authorization or the voucher.
13    Q    So in a case of individuals in SERC who
14    would go on travel, they would make a request
15    through their supervisor to conduct travel on
16    behalf of SERC?
17    A    Yes.
18    Q    And is the Smithsonian a government
19    agency?
`0    A    Yes.
21    Q    And when individuals travel, do they get
22    government rates?

Page 8

1    A    Yes.
2    Q    Are those rates generally reduced from
3    commercial rates, to your knowledge?
4    A    I don't know.
5    Q    And what sort of business or what does
6    SERC do?  What does the Smithsonian Environmental
7    Research Center do?
8    A    Environmental Research --
9    (Discussion off the record)
10    MR. BYRNES:  For the record, is the
11    Inspector General a party?
12    MS. JOHNSON:  Well, they are in the
13    sense that they have been asked to produce
14    documents that you've requested, such as the OIG
15    reports, and because Mr. Hines is also involved,
16    he's technically an employee of the Inspector
17    General's Office.
18    MS. NICHOLSON:  Not Mr. Hines.
19    MS. JOHNSON:  I'm sorry.  Not Mr. Hines.
20    Mr. Roy.
21    MR. BYRNES:  The reason I asked is
22    because the agency is normally allowed one

Page 9

1    representative.  Is she here as a representative
2    or as co-counsel?
3    MS. JOHNSON:  She's here as a
4    representative of the Office of the Inspector
5    General.
6    MS. NICHOLSON:  And co-counsel.
7    MR. BYRNES:  Well, we need to specify
8    that, because if she's co-counsel, that's a little
9    bit different.
10    MS. NICHOLSON:  Her name appeared on the
11    pleading as co-counsel.
12    MR. BYRNES:  Okay.  All right.  I just
13    wanted to make sure.
14    BY MR. BYRNES:
15    Q    Ma'am, I'm sorry.
16    A    You asked what SERC does.
17    Q    Yes.  What does SERC do?
18    A    Environmental research on the bay.
19    Q    On which bay?
20    A    Chesapeake Bay.
21    Q    Anything else?
22    A    Education.

Page 14

1    A   Could you ask it again?
2    Q   There was a term called "volunteers".
3  Are you familiar with that?
4    A   Yes.
5    Q   What was a volunteer?
6    A   Volunteers were people that came in and
7  volunteered their time.  They were registered with
8  the Smithsonian volunteer program.  I can't
9  remember the name of it, but there is such a
10 program they're supposed to register with.
11   Q   Did those volunteers in your experience
12 ever accompany Smithsonian employees on travel?
13   A   A few times.
14   Q   Well, how many times?  Do you recall?
15   A   No, but not very often.
16   Q   More than five?
17   A   It's hard to say.  It could be more than
18 five.
19   Q   Did Mr. Haddon have ever have a
20 volunteer accompany him?
21       MS. JOHNSON:  Objection.  Lack of
22 foundation.

Page 15

1        BY MR. BYRNES:
2    Q   Ma'am?
3    A   Answer?  Not that I remember.
4    Q   Did he ever bring any family members
5  with him on travel?
6        MS. JOHNSON:  Objection.  Lack of
7  foundation.
8        THE WITNESS:  Not that I knew of.
9        BY MR. BYRNES:
10   Q   Did he bring his wife with him to
11 Belize?
12       MS. JOHNSON:  Objection.  Lack of
13 foundation.
14       THE WITNESS:  Not that I knew of.  She
15 wasn't on travel papers.  I can tell you that.  I
16 don't know if he brought her.
17       BY MR. BYRNES:
18   Q   What about Mr. Gallagher; did he ever go
19 on travel?
'0   A   Once or twice.
21   Q   Did he ever bring a family member on
22 travel with him?

Page 16

1    A   Not that I know of.
2    Q   Well, you would be the sole person in
3  2004 handling travel.  Correct?
4    A   Right.
5    Q   Is it your testimony that -- well, let
6  me go back.  Ms. Klugel went on travel in 2004.
7  Correct?
8    A   Yes.
9    Q   And she brought a volunteer with her.
10 Correct?
11   A   Yes.
12   Q   And that was Mr. Yunger?
13   A   Yes.
14   Q   All right.  Did she supply you paperwork
15 regarding Mr. Yunger?
16       MS. JOHNSON:  Objection as to vagueness
17 as to which trip you're referring to.
18       BY MR. BYRNES:
19   Q   Ma'am?
20   A   Which trip are you referring to?
21   Q   Any of the trips.  Did she bring Mr.
22 Yunger with him?

Page 17

1    A   Yes.  I mean, I wouldn't -- he could
2  have personally gone with her and I would have no
3  knowledge of that, but as a registered volunteer
4  with SERC paperwork, yes.
5    Q   What would you have to do to be a
6  registered volunteer, if you know?
7    A   I don't know.  I know there's paperwork
8  you have to fill out.
9    Q   Were registered volunteers given a
10 government rate when they went on travel?
11   A   Yes.
12   Q   All right.  Well, what did you know
13 about Mr. Yunger as a registered volunteer, if
14 anything?
15   A   Nothing.
16   Q   All right.
17   A   I mean, the paperwork said he was.  So I
18 trusted that he was.
19   Q   Well, in your experience, were there any
20 other registered volunteers who ever accompanied
21 anyone other than Ms. Klugel on travel in 2004?
22   A   Not that I can think of offhand.

9ce82780-0275-4d88-b231-1fb59ef694ce

Page 18

1     Q     Would the paperwork that was in the
2  agency's possession, did that reflect who went as
3  a volunteer?
4     A     Yes.
5     Q     And that paperwork would be still with
6  the travel office or where would that be?
7     A     I would have it in my office.
8     Q     All right.  And you maintain records of
9  all travel --
10    A     Yes.
11    Q     -- by SERC employees.  Correct?
12    A     Correct.
13    Q     All right.  And that includes all travel
14 by volunteers?
15    A     Correct.
16       MS. JOHNSON:  Objection.  Lack of
17 foundation.
18       BY MR. BYRNES:
19    Q     All right.  So in 2004, did there come a
20 time when you made an inquiry to the Office of
21 Inspector General regarding Ms. Klugel's travel?
22    A     No.

Page 19

1     Q     Is there a time when the Office of
2  Inspector General contacted you regarding Ms.
3  Klugel's travel?
4     A     Yes.
5     Q     Did you initiate the contact with OIG?
6     A     No.
7     Q     Do you know who did?
8     A     Yes.
9     Q     Who?
10    A     Carol Ailes.
11    Q     Who is Carol Ailes?
12    A     Travel Services Office.  Travel Services
13 would arrange the airfare, the air, the flights.
14    Q     Did you ever raise an inquiry yourself
15 into Ms. Klugel's travel?
16       MS. JOHNSON:  Objection to form.
17       THE WITNESS:  I don't understand.  With
18 who?
19       BY MR. BYRNES:
20    Q     Did you ever raise any allegations to
21 Ms. Ailes regarding Ms. Klugel's travel?
22    A     Yes.

Page 20

1     Q     What allegation did you raise?
2     A     Regarding a trip to Panama that she had
3  submitted to me, she had also included a note that
4  said she would be going to Belize, taking annual
5  leave, going personally.  The next thing I got was
6  Travel Services would send me an itinerary of the
7  flights, and they included Belize.  So I called
8  Ms. Ailes and I said why did you include her
9  personal time, and she said she told me it was all
10 business.  I said, Well, it's not.  And she said,
11 I'm calling the Inspector General.
12    Q     How did you make a determination that it
13 was not?
14    A     Because her paperwork only had Panama on
15 it.
16    Q     That's not what I asked.  How did you
17 make a determination that her trip to Belize was
18 not business?
19    A     Because of the paperwork that her
20 supervisor had signed only had Panama.  She had
21 given me a note and said she was personally going
22 to Belize.

Page 21

1     Q     So based on her personal note?
2     A     And the signed paperwork by the
3  supervisor that did not have Belize on it.
4     Q     Did you ever raise an inquiry into her
5  traveling anywhere with Mr. Yunger?
6        MS. JOHNSON:  Objection to form.
7        THE WITNESS:  No.
8        BY MR. BYRNES:
9     Q     Did you ever comment to any supervisor
10 regarding her travel with Mr. Yunger?
11    A     No.
12    Q     You never contacted the Office of
13 Inspector General regarding her trip with Mr.
14 Yunger?
15       MS. JOHNSON:  Objection.  Asked and
16 answered.
17       THE WITNESS:  No.
18       BY MR. BYRNES:
19    Q     All right.  Do you know if anyone did?
20       MS. JOHNSON:  Objection.  Asked and
21 answered.
22       THE WITNESS:  I already answered that.

9ce82780-0275-4d88-b231-1fb59ef694ce

Page 26

1    Q    What was that?  When did you raise the
2  inquiry?
3    A    I don't know exactly when it was, but it
4  was probably sometime in that period, December of
5  '04.
6    Q    How did you perceive her attitude?
7    A    Very aggressive.  I was intimidated by
8  her.
9    Q    And do you have any notes that reflect
10  your being intimidated?
11    A    I think so.
12    Q    Where would they be located?
13    A    I don't know if there are copies here,
14  but I sent them copies of some of them.
15    Q    Some of them, but are there more notes
16  that you have that you didn't send copies to the
17  government?
18    A    No.
19    Q    When you said some of them, what did you
20  mean?
21    A    I sent them what I had.  I'm sure there
22  could have possibly been others that I didn't keep

Page 27

1  a copy of.
2    Q    Well, did you maintain a log or a diary
3  regarding Ms. Klugel at any point?
4    A    No.
5    Q    All right.  When you sent your copies of
6  your notes, where did you send them from?  In
7  other words -- let me rephrase that.  Where did
8  you maintain your notes on Ms. Klugel?
9    A    In the travel file.  For everybody that
10  traveled, I had a file, and if I thought anything
11  needed to be kept, I kept it.
12    Q    Well, did you keep files on anyone other
13  than Ms. Klugel?
14    A    If anyone had -- no, because no one ever
15  treated me like that.
16    Q    So you kept files on Ms. Klugel because
17  she treated you badly?
18    MS. JOHNSON:  Objection to form.
19  Misstates her testimony.
20    BY MR. BYRNES:
21    Q    Ma'am?
22    A    What was the question again?

Page 28

1    Q    You kept files on Ms. Klugel because she
2  treated you badly?
3    MS. JOHNSON:  Same objection.
4    BY MR. BYRNES:
5    Q    Is that correct?
6    A    I didn't keep files on her.  I kept that
7  one or two E-mails with her travel documents.
8    Q    And that was the only employee you've
9  ever done that with since you've been at SERC?
10    A    Yes.
11    Q    So it's fair to say that you didn't like
12  Ms. Klugel?
13    MS. JOHNSON:  Objection.
14  Mischaracterizes testimony.
15    BY MR. BYRNES:
16    Q    Ma'am?
17    A    On a personal level, I didn't have any
18  problem with her.  I just was very intimidated
19  when she would start to do travel.
20    Q    Did you report your intimidation to any
21  of her supervisors?
22    A    Yes.

Page 29

1    Q    Which supervisors?
2    A    Mark Haddon.
3    Q    And when did you do that?
4    A    I don't know an exact date.
5    Q    Did you ever have a discussion with Ms.
6  Klugel where you questioned her about her travel?
7    A    Yes, if there was part of the form that
8  I didn't understand or something that needed
9  further clarification.
10    Q    What other employees in 2004 did you
11  question about travel other than Ms. Klugel?
12    A    Oh, any -- probably dozens.
13    Q    Did you keep notes regarding those other
14  employees?
15    A    I would -- say they were going to a
16  conference.  I would have to --
17    Q    Ma'am, it was really a yes or no
18  question.  Did you keep notes regarding other
19  employees in 2004?
20    A    I don't understand exactly what you mean
21  by the question.
22    Q    All right.  You kept certain notations

9ce82780-0275-4d88-b231-1fb59ef694ce

Page 34

1  did you?
2      A  I did or I didn't?
3      Q  You did not.
4      A  I don't think so.
5      Q  Nor did you copy it to Mr. Haddon or Mr.
6  Hines.  Correct?
7      A  Correct.
8      Q  All right.  And there's a series of
9  statements here.  Who typed those, the message,
10  here is the travel authorization?
11      A  I did.
12      Q  Ma'am, in your position as a GS-6, do
13  you make determinations as to what appropriate
14  travel is and what isn't?
15      MS. JOHNSON:  Objection to form.
16      THE WITNESS:  Yes.
17      BY MR. BYRNES:
18      Q  Is that in your position description?
19      A  I don't know.
20      Q  Well, isn't it true, ma'am, that what
21  you do is you simply handle travel requests?
22      MS. JOHNSON:  Objection to form.

Page 35

1      THE WITNESS:  And I make sure that they
2  follow the travel rules and regulations, and that
3  is in my position description, I'm pretty sure.
4      BY MR. BYRNES:
5      Q  Well, didn't a supervisor have to sign
6  off on all travel?
7      A  Yes.
8      Q  Did a supervisor sign off on this travel
9  for Ms. Klugel?
10      A  Yes.
11      Q  Did you question that supervisor?
12      A  I didn't at the time because I thought
13  it was only the Panama trip.
14      Q  Who was the supervisor who signed off on
15  Ms. Klugel's travel?
16      A  Mark Haddon.
17      Q  What's his G.S. rating?
18      A  I don't know.
19      Q  He's a director, isn't he?
20      A  Director of education.
21      Q  So he's either a GS-15 or a SES
22  employee?

Page 36

1      A  I don't have idea.
2      MS. JOHNSON:  Objection.  Lack of
3  foundation.
4      BY MR. BYRNES:
5      Q  Do you know -- he's a higher grade than
6  you though.  Correct?
7      A  Oh, yes.
8      Q  All right.  And in essence, ma'am,
9  weren't you questioning Mr. Haddon's authorization
10  by sending this to OIG?
11      MS. JOHNSON:  Objection to form.  Lack
12  of foundation.
13      BY MR. BYRNES:
14      Q  Go ahead.
15      A  I just thought when the OIG calls and
16  asks me to send something, I send it.
17      Q  Well, but ma'am --
18      A  I wasn't really questioning anything.
19      Q  -- did you ever raise an inquiry to Mr.
20  Haddon regarding his authorization of the travel
21  for Ms. Klugel?
22      A  No.

Page 37

1      Q  Well, didn't Mr. Haddon authorize Ms.
2  Klugel to do exactly what she did on travel?
3      MS. JOHNSON:  Objection to form.
4      THE WITNESS:  Only to Panama.  She added
5  Belize.
6      BY MR. BYRNES:
7      Q  Well, did he review that?
8      MS. JOHNSON:  Objection.  Lack of
9  foundation.
10      THE WITNESS:  I don't know what he did.
11      BY MR. BYRNES:
12      Q  So how do you know whether or not he
13  authorized it?
14      A  Because his signature was on it.
15      Q  Well, do you know whether or not he
16  authorized her to go to Belize?
17      A  Subsequently to that, he did.
18      Q  No.  At the time, did you know whether
19  or not he authorized her to go to Belize?
20      A  No.  The paperwork I had only had Panama
21  and his signature on Panama.
22      Q  When did he authorize her to go to

9ce82780-0275-4d88-b231-1fb59ef694ce

Page 38

1  Belize?
2      MS. JOHNSON: Objection. Lack of
3  foundation. Calls for speculation.
4      BY MR. BYRNES:
5      Q   Ma'am?
6      A   I don't know the exact date, but at some
7  point, she submitted a second authorization that
8  he signed allowing her and Mr. Yunger to go to
9  Belize.
10     Q   Was that before or after you sent this
11 material to OIG that Mr. Haddon authorized her and
12 Mr. Yunger to go to Belize?
13     A   I don't know. I'd had to look at the
14 travel papers and see the date that he signed
15 them.
16     Q   Well, did you inform Jerry Roy at OIG in
17 any part of your E-mail regarding anything
18 concerning Mr. Haddon's approval?
19     MS. JOHNSON: Objection. Lack of
20 foundation.
21     THE WITNESS: Could you ask it again?
22     BY MR. BYRNES:

Page 39

1      Q   Well, did you -- take a look at Exhibit
2  1, the first page, 0056. Is there any reference
3  to any authorization or lack of authorization for
4  Mr. Haddon?
5      MS. JOHNSON: Objection, and I'll also
6  object as vague since this paperwork relates to a
7  separate trip.
8      MR. BYRNES: That's a speaking
9  objection.
10     MS. JOHNSON: Well, I need to make that
11 clear for the record, Kevin. You're asking her
12 questions about a document.
13     MR. BYRNES: You don't get to make
14 speaking objections, Counsel.
15     MS. JOHNSON: No. I'm allowed to make
16 it clear.
17     MR. BYRNES: That tips off the witness
18 as to what to say.
19     MS. JOHNSON: I'm making it clear for
0  the record.
21     MR. BYRNES: Your objection is vague.
22     MS. JOHNSON: And lack of foundation.

Page 40

1  You're pointing her to documents.
2      MR. BYRNES: Counsel, I hear your
3  objections. It's noted, but why you're objecting
4  is not relevant. I'm not going to allow this
5  witness to be coached through this deposition.
6      MS. JOHNSON: I'm not coaching the
7  witness. I'm not going to let you ask confusing
8  questions in this way.
9      MR. BYRNES: If you're refusing to allow
10 us to ask the question --
11     MS. JOHNSON: No. You asked the
12 question, but I'm going to make my objection.
13     MR. BYRNES: -- then we'll certify it.
14 Can you read back my last question?
15         (The reporter read the record as
16         requested.)
17     MR. BYRNES: Right.
18     THE WITNESS: Are we talking about
19 Belize and Panama or are we talking about Hawaii?
20     BY MR. BYRNES:
21     Q   We're talking this document, 0056. Can
22 you look at the document and tell me whether or

Page 41

1  not you make any reference to Mr. Haddon's
2  approval at any time of these trips?
3      MS. JOHNSON: Objection to form. Lack
4  of foundation.
5      THE WITNESS: This is the Hawaii trip
6  that we're talking about here.
7      BY MR. BYRNES:
8      Q   Ma'am, did you hear? Did Mr. Haddon
9  approve this trip?
10     A   Yes.
11     Q   Did you make any reference to his
12 approval?
13     A   It's attached.
14     Q   No. In your E-mail?
15     A   No.
16     Q   Okay. Well, wasn't that significant
17 that a supervisor had already approved this very
18 travel?
19     A   Significant to what?
20     Q   To whether or not it was appropriate.
21     MS. JOHNSON: Objection to form.
22     THE WITNESS: We're discussing the

11  (Pages 38 to 41)

Page 62

1  travel?
2  Q   For travel where they listed the
3  individual as either a volunteer or the individual
4  got the government rate.
5  A   I can only think of one other instance.
6  Q   Who is that?
7  A   Candy Feller's husband, and he goes with
8  her frequent.
9  Q   And he gets the government rate?
10  A   Yes.
11  Q   And Mr. Roy didn't raise an inquiry
12  about that, did he?
13      MS. JOHNSON:  Objection.  Lack of
14  foundation.
15      BY MR. BYRNES:
16  Q   To your knowledge?
17  A   No.
18  Q   And I take it that Candy's husband is a
19  male?
20  A   Yes.
21      MR. BYRNES:  All right.  Let's look at
22  Exhibit No. 3, which is Samper 105 to 106.

Page 63

1      (Deposition Exhibit No. 3 was
2          marked for identification.)
3      BY MR. BYRNES:
4  Q   Did you forward this information to Mr.
5  Roy?
6  A   Yes.
7  Q   Okay.  Who made the corrections where
8  the stars are on the form?  Do you know?
9  A   That's my writing.
10  Q   When did you fill this out?
11  A   Before it was -- before the travel
12  paperwork was prepared.  It says actual expense
13  rate.  To go over the actual expense rate, I would
14  have had to have had the director's approval.  So
15  that's probably attached.
16  Q   Who changed the airfare?
17  A   I did.
18  Q   Okay.
19  A   The travelers many times don't know
0  exactly what the airfare is going to be.  So they
21  guess and evidently I knew what it was going to
22  be.  The six dollars is a ticketing fee.

Page 64

1  Q   Okay.  What about the three breakfasts
2  and two lunches including the registration fee;
3  who put that down?
4  A   I believe Dottie did.
5  Q   Who changed the overnight rate?
6  A   Where did you see that?
7  Q   Right at the bottom where it says over
8  night.  It says night, 150.40.  Who changed that
9  figure?
10      MS. JOHNSON:  Objection.  Lack of
11  foundation.
12      THE WITNESS:  I did.
13      BY MR. BYRNES:
14  Q   All right.  And this travel was supposed
15  to occur January 3rd.  This is going to go from
16  the 2nd to the 10th.  Correct?
17  A   Well, yes, but when we prepared the
18  official travel back then, we left off the
19  personal days.  So the official dates would have
20  been the 3rd through the 9th.
21  Q   Who put down the personal days?
22  A   I put that down.

Page 65

1  Q   Who changed the December 30th?
2  A   I did.
3  Q   Why?
4  A   Because their date must have changed.
5  Q   All right.  Was there any problem with
6  an individual tacking on personal leave to a
7  business trip?
8  A   No.
9      MS. JOHNSON:  Objection to form.
10      MR. BYRNES:  All right.  Okay.  Let's
11  look at the next exhibit in order, which is Samper
12  107 and 108.
13      (Deposition Exhibit No. 4 was
14          marked for identification.)
15      MR. BYRNES:
16  Q   This was sent on the -- this
17  communication is on the 7th of December.
18  A   Okay.  I have never seen part of this.
19  Q   What part of this have you never seen?
20  A   The "good morning, my name is Jerry Roy"
21  part.
22  Q   You never received that from Mr. -- you

9ce82780-0275-4d88-b231-1fb59ef694ce

Page 110

1  was in a car accident.  Correct?
2    A   Um-hum.
3    Q   Now, you put treatment reasons in
4  parentheses.  What did you mean by that?
5      MS. JOHNSON:  Can you identify the page
6  number, please?
7      THE WITNESS:  For this, page 333.
8      MS. JOHNSON:  Thank you.
9      BY MR. BYRNES:
10   Q   You identified treatment reasons in
11 parentheses.  Why is that?  Page 359.
12   A   I don't know.
13   Q   Well, parentheses suggests that you
14 wanted to highlight the word.  Correct?
15     MS. JOHNSON:  Objection to form.
16     BY MR. BYRNES:
17   Q   Ma'am?
18   A   I don't remember why I put it.
19   Q   Isn't it because you were questioning
20 whether or not she was actually getting treatment?
21   A   That wasn't my job to question that.
22   Q   Well, then isn't -- don't you put things

Page 111

1  in quotation marks like this when you want to
2  challenge whether or not they mean what they say?
3      MS. JOHNSON:  Objection to form.
4      THE WITNESS:  Not necessarily.
5      BY MR. BYRNES:
6    Q   Well, ma'am, in no other communication
7  in all of the records that I've read, if I were to
8  represent to you that in no other communication do
9  you ever put quotations marks on anything, can you
10 tell me what the significance of putting them on
11 treatment reasons is?
12     MS. JOHNSON:  Objection to form.
13     THE WITNESS:  I don't think there was
14 any significance.
15     BY MR. BYRNES:
16   Q   What business is it of yours to raise
17 questions about her treatment?
18     MS. JOHNSON:  Objection to form.
19     THE WITNESS:  I didn't.  I was just
20 trying to get a sense of what he wanted to do
21 about the airfare increase.
22     BY MR. BYRNES:

Page 112

1    Q   But you already knew she was coming back
2  on the 3rd.  You knew that a month before, didn't
3  you?  She told you that.
4    A   I don't think it was a month before.
5    Q   In her original travel vouchers, didn't
6  she say that?
7    A   I don't know.  Can you point that out to
8  me?
9    Q   Well, do you recall the earlier
10 testimony when we went over those travel vouchers?
11   A   Correct.
12   Q   All right.  And there was a discussion
13 about increasing the airfare because she was
14 leaving on a Sunday.  Correct?
15   A   Correct.
16   Q   Okay.  And that had been approved.
17 Correct?
18   A   I believe so.
19   Q   Because you said it was more expensive
20 for her to leave on Sunday than any other day.
21 Correct?
22     MS. JOHNSON:  Objection to form.

Page 113

1  Mischaracterizes her testimony.
2      THE WITNESS:  No.  It wasn't that.  It
3  was just the last minuteness of her changing the
4  dates had increased the air.  It was
5  Christmastime.  I don't think it was more
6  expensive to fly on Sunday or Monday.  It was just
7  because she did this last minute that the increase
8  happened.
9      BY MR. BYRNES:
10   Q   When did you ask her about the increase
11 in the airfare?
12     MS. JOHNSON:  Objection to form.
13     (Discussion off the record)
14     BY MR. BYRNES:
15   Q   Ma'am, look at page 328 and 329 where
16 Ms. Klugel on October -- when Ms. Klugel submitted
17 her travel voucher.  This date was changed.  These
18 communications occur -- it seems like the
19 authorization was on October 8th according to the
20 next page, 329.  I'm not sure.  Are these --
21   A   This was the date that Mark signed it.
22 I crossed this out, this date out, because the

Page 114

1  dates changed before I prepared the document.
2      Q    Did you prepare the document before or
3  after she took the tip?
4      A    Before.
5      Q    So you knew beforehand that she was
6  going on the 3rd, correct, and coming back on the
7  9th?
8      A    Well, she really was going on the 2nd.
9      Q    And coming back on the 10th?
10     A    Right.
11     Q    But you changed it to the 3rd?
12     A    But that was the official travel date,
13 was the 3rd.  Her official was the 3rd.
14     Q    All right.  And then on the 13th after
15 she took the trip, you raised questions about the
16 change in airfare?
17         MS. JOHNSON:  Objection to form.
18         BY MR. BYRNES:
19     Q    Right?
20     A    Correct.
21     Q    All right.  And Mr. Gallagher, you asked
22 Mr. Gallagher to discuss this matter with Ms.

Page 115

1  Klugel, correct, on the 13th?
2      A    No.  I just wanted him to come up with a
3  ruling from Mark as to whether I should process
4  the increase.
5      Q    And this was after you were aware that
6  OIG was looking into her travel?
7      A    But if I have questions about anyone's
8  travel, I go to him.
9      Q    Ma'am, was it before or after you were
10 aware that OIG was looking into her travel?
11     A    After.
12     Q    Okay.  And that's why you used the
13 quotations around treatment reasons.  Correct?
14         MS. JOHNSON:  Objection to form.
15         THE WITNESS:  I don't remember why I
16 used them.
17         BY MR. BYRNES:
18     Q    Because you were going to challenge her
19 credibility on whether she was really injured?
20         MS. JOHNSON:  Objection to form.
21         BY MR. BYRNES:
22     Q    Correct?

Page 116

1      A    No.  I know she was injured.  I saw her
2  cast.
3      Q    So you had no reason, then, to question
4  whether or not she was injured or not, correct,
5  because you saw her injury?
6      A    I questioned whether there -- why there
7  would be treatment on a Sunday.
8      Q    Are you a doctor?
9      A    No, but I've never heard of a doctor
10 seeing anyone on Sunday.
11     Q    What medical training have you had,
12 ma'am?
13     A    Nome.
14     Q    Are you familiar with the treating
15 schedules of Ms. Klugel's treating physicians?
16     A    No.
17     Q    Are you familiar with whether people go
18 to emergency rooms on Sundays?
19     A    No.  Well, yes.  They do.
20     Q    So you made an assumption that you
21 questioned my client being treated on a Sunday?
22     A    Correct.

Page 117

1      Q    Because you didn't think she was treated
2  on a Sunday, did you?
3      A    I don't know.  I questioned it.
4      Q    And where in your GS-6 position in the
5  Travel Office are you granted the authority to
6  question whether or not an employee is treated on
7  a Sunday or not?
8          MS. JOHNSON:  Objection to form.
9          BY MR. BYRNES:
10     Q    Ma'am?
11     A    I didn't question her.  I raised the
12 issue with my boss.
13     Q    Where in your position description do
14 you have the authority to question whether or not
15 an employee is treated on a Sunday or not?
16         MS. JOHNSON:  Objection to form.
17         THE WITNESS:  I don't.
18         BY MR. BYRNES:
19     Q    Okay.  What male employees have you ever
20 questioned travel vouchers on?
21     A    Oh, many.
22     Q    When?

Page 118

1    A    I can't give you specific dates, but
2  many.
3    Q    What male employees have you ever
4  cooperated with the Office of Inspector General to
5  do an investigation on?
6        MS. JOHNSON: Objection to form.
7        THE WITNESS: None.
8        BY MR. BYRNES:
9    Q    Did you tell the Inspector General's
10  Office that Mr. Hines had brought his daughter on
11  travel with him on an official government rate?
12        MS. JOHNSON: Objection. Lack of
13  foundation.
14        THE WITNESS: No.
15        BY MR. BYRNES:
16    Q    Why not?
17    A    I never thought of it. He never asked
18  me about it.
19    Q    Is that ever appropriate? Was it
20  appropriate for her to do that?
21        MS. JOHNSON: Objection. Lack of
22  foundation.

Page 119

1        THE WITNESS: Yes.
2        BY MR. BYRNES:
3    Q    Why?
4    A    She was a volunteer and she was on
5  official travel.
6    Q    So why did you question Mr. Yunger going
7  on travel?
8        MS. JOHNSON: Objection to form.
9        THE WITNESS: I didn't question him.
10  The I.G. did.
11        BY MR. BYRNES:
12    Q    Because you raised an issue regarding
13  travel.
14        MS. JOHNSON: Objection to form.
15        MR. BYRNES: Correct?
16        MS. JOHNSON: Mischaracterizes her
17  testimony.
18        THE WITNESS: Are you talking about
19  Hawaii?
20        BY MR. BYRNES:
21    Q    Well, you raised an issue with your
22  superiors regarding my client's travel. Correct?

Page 120

1    A    What specifically are we talking about?
2    Q    Well, any of it.
3        MS. JOHNSON: Objection to form.
4        BY MR. BYRNES:
5    Q    You contacted Ms. Ailes and you guys had
6  some concerns about her travel, didn't you?
7        MS. JOHNSON: Objection to form.
8        THE WITNESS: Yes.
9        BY MR. BYRNES:
10    Q    Okay. And after that, Ms. Ailes
11  contacted the I.G. Correct?
12        MS. JOHNSON: Objection. Lack of
13  foundation.
14        BY MR. BYRNES:
15    Q    Ma'am?
16    A    Correct.
17    Q    All right. But Mr. Hines brought his
18  daughter. How old was his daughter when she went
19  with him?
20        MS. JOHNSON: Objection. Lack of
21  foundation.
22        THE WITNESS: I don't know.

Page 121

1        BY MR. BYRNES:
2    Q    Over 21?
3    A    I don't know.
4        MS. JOHNSON: Objection. Lack of
5  foundation.
6        THE WITNESS: I don't know how old she
7  is now.
8        BY MR. BYRNES:
9    Q    So when it came to the male supervisor
10  who brought his daughter on travel, your office
11  didn't question that trip. Correct?
12        MS. JOHNSON: Objection to form.
13        BY MR. BYRNES:
14    Q    Ma'am?
15    A    Correct.
16    Q    But when it came to the two females
17  bringing their boyfriends with them, that, your
18  office questioned. Correct?
19        MS. JOHNSON: Objection to form.
20        THE WITNESS: The I.G.'s office
21  questioned it.
22        BY MR. BYRNES:

9ce82780-0275-4d88-b231-1fb59ef694ce

Page 154

1  for foreign travel.
2      Q   And you raised that to Ms. Ailes?
3      A   I called them to see how much the air
4  would go up if we waited until tomorrow, because
5  this was almost time for me to go home in the
6  afternoon.
7      Q   And then you got an answer back on page
8  409 that the airfare had increased.  Right?
9      A   Correct.
10     Q   Then Mark Haddon writes you and tells
11 you they decided all the travel to Panama would be
12 on the old account and that includes teachers'
13 travel and Dottie and Phil's travel.  Correct?
14     A   Correct.
15     Q   So Mr. Haddon was aware that Mr. Yunger
16 was going?
17     A   Correct.
18     Q   He doesn't seem to have any problem with
19 it here, does he?
20     MS. JOHNSON:  Objection.  Lack of
21 foundation.  Calls for speculation.
22     BY MR. BYRNES:

Page 155

1      Q   Ma'am?
2      A   No.
3      Q   Okay.  You wrote on page 405 saying that
4  Jeanine will be out.  Why was it taking you so
5  long to get this approved?
6      MS. JOHNSON:  Objection to form.
7      THE WITNESS:  I think this might have
8  been the day Dottie broke her arm, because she
9  wasn't answering my E-mails, and that's why I kept
10 frantically trying to get an answer, because I
11 knew that ticketing deadline was going to be
12 missed.
13     BY MR. BYRNES:
14     Q   So if it was missed, how much more was
15 the fare going to be?
16     A   I don't know, but I know it was going up
17 every time it got missed.
18     Q   But why are you -- I guess my question
19 is why are you expressing this much concern when
20 it comes to Ms. Klugel's travel?
21     MS. JOHNSON:  Objection to form.
22     THE WITNESS:  Because I didn't want the

Page 156

1  air to go up again.
2      BY MR. BYRNES:
3      Q   Well, has it gone up on other people who
4  traveled because of last minute changes?
5      A   Yes, and if you miss a ticketing
6  deadline, then it's more than likely will
7  increase.
8      Q   Do you make any budgeting decisions for
9  the Smithsonian?
10     A   No.
11     Q   Do you know how much they allocate to
12 travel for SERC?
13     A   No.
14     Q   You know that Mr. Smalls took a lot of
15 travel.  Right?
16     MS. JOHNSON:  Objection.  Lack of
17 foundation.
18     BY MR. BYRNES:
19     Q   According to "The Post."  Were there
20 five other teachers traveling to Panama with
21 Dottie?
22     A   Yes.  I believe there were five.

Page 157

1      Q   Did you approve all of their travel?
2      A   Yes.
3      Q   The notes here, page 402, Panama trip,
4  first version, second version, third version, who
5  wrote that?
6      A   Me.
7      Q   For what reason?
8      A   To clarify it for myself when I started
9  going back over this, and then I decided to send
10 it to Ms. Nicholson.
11     Q   Why did you need to clarify it?
12     A   Because it had been three years, four
13 years.
14     Q   But why would you need to clarify it?
15 Why didn't you just send the documents themselves?
16     A   Because I was wanting to get it straight
17 in my mind as well.
18     Q   Or was it because you were trying to get
19 a version of events across to counsel to show how
20 bad my client was?
21     A   No.
22     MS. JOHNSON:  Objection to form.

9ce82780-0275-4d88-b231-1fb59ef694ce

Page 158

```
 1        BY MR. BYRNES:
 2     Q   Ma'am, who requested that you send these
 3  things?
 4     A   Ms. Nicholson requested that I send the
 5  travel --
 6     Q   Did you create documents for her?
 7     A   Just this, and this was created for me.
 8     Q   She requested that you create a
 9  chronology?
10     A   No.
11     Q   Well, you knew you were going to be a
12  witness in this case.  Correct?
13     A   Not in the beginning.
14     Q   Well, you knew at the time you sent
15  these documents you would be?
16        MS. JOHNSON:  Objection to form.
17        BY MR. BYRNES:
18     Q   Correct?
19     A   No.
20     Q   Why did you as a GS-6 feel it necessary
21  to instruct the lawyer as to the chronology?
22        MS. JOHNSON:  Objection to form.
```

Page 159

```
 1        BY MR. BYRNES:
 2     Q   Ma'am?
 3     A   I wrote this to clarify it for myself.
 4     Q   Why?
 5     A   Because the trips would get confused.  I
 6  would think is this Panama or was this Hawaii.  So
 7  I wrote --
 8     Q   But you used it for versions.  Didn't
 9  you do that to show that my client had been
10  changing her claims on the various travels?
11     A   No.
12        MS. JOHNSON:  Objection to form.
13        BY MR. BYRNES:
14     Q   Isn't that what you meant by first,
15  second, and third version, that she was changing
16  her statements as to facts?
17        MS. JOHNSON:  Objection to form.  Asked
18  and answered.
19        BY MR. BYRNES:
 0     Q   Ma'am?
21     A   No.  The first version was the first
22  version of the proposed travel plans form.  That's
```

Page 160

```
 1  what that means.  The second version was the
 2  second version of it that she submitted.  The
 3  third version was the third and final version she
 4  submitted of the proposed travel plans form.
 5     Q   What was the significance of any of
 6  that?
 7     A   The first version had only Panama on it.
 8  The second version was not signed by Mark.  It had
 9  Panama and Belize, but with a note saying Mark has
10  already signed this.
11     Q   So you wanted to show an inconsistency?
12     A   No.
13        MS. JOHNSON:  Objection to form.
14        THE WITNESS:  No.
15        BY MR. BYRNES:
16     Q   Ma'am, let's be honest.  Didn't you want
17  to show that she was changing her trip and trying
18  to get something from the government for free?
19        MS. JOHNSON:  Objection to form.
20        THE WITNESS:  I wrote this solely for me
21  in the beginning.
22        BY MR. BYRNES:
```

Page 161

```
 1     Q   Well, why would you need it?
 2     A   Because it was very confusing.  It was a
 3  long drawn-out thing.
 4     Q   Well, if you did it solely for you, why
 5  did you give it to counsel?
 6     A   I thought it might be useful.
 7     Q   Why did you -- why?
 8     A   I don't know.
 9     Q   Ma'am, let me remind you of the oath.
10  Okay?  What I want to know is didn't you create
11  these documents so you could put a version of
12  events out to show that my client was lying?
13        MS. JOHNSON:  Objection.  Asked and
14  answered.
15        BY MR. BYRNES:
16     Q   Ma'am?
17     A   No.
18     Q   You just created them because you needed
19  to clarify the situation?
20     A   Correct.
21     Q   Because the situation was, what, too
22  confusing?
```

41 (Pages 158 to 161)

9ce82780-0275-4d88-b231-1fb59ef694ce

Page 162

1    A  It was, how many versions there were.

2    Q  Too confusing for counsel to figure out?

3    A  No. It was confusing for me.

4    Q  Why do you need to figure it out?

5    MS. JOHNSON: Objection to form.

6    THE WITNESS: So I could answer

7 questions if there were any questions.

8    BY MR. BYRNES:

9    Q  But you said you didn't know you were

10 going to be a witness.

11    A  I didn't.

12    Q  Ma'am, you approved travel. Why did you

13 need to clarify this for anyone?

14    MS. JOHNSON: Objection to form.

15    THE WITNESS: I wanted to clarify it for

16 me, and then once I had created it, I thought,

17 well, maybe she could use it.

18    BY MR. BYRNES:

19    Q  For what?

20    MS. JOHNSON: Objection. Asked and

21 answered. You've gone over this several times.

22    MR. BYRNES: I haven't gotten an answer

Page 163

1 yet.

2    MS. JOHNSON: But she's told you what

3 she -- the reason.

4    MR. BYRNES: I don't believe her. Okay?

5    MS. JOHNSON: That's fine, but you don't

6 get to badger the witness.

7    MR. BYRNES: And why I continue to ask

8 her is to get truthful answers.

9    MS. JOHNSON: No. You don't get to

10 badger the witness.

11    MR. BYRNES: I'm not badgering.

12    MS. JOHNSON: You are.

13    MR. BYRNES: I'm getting evasive answers

14 and evasive answers are the same thing as not

15 answering the question.

16    MS. JOHNSON: Well, no. She's answered

17 the question.

18    MR. BYRNES: No, she has not.

19    MS. JOHNSON: She has.

20    BY MR. BYRNES:

21    Q  Ma'am, I'm going to ask you again.

22 Didn't you create these documents to make a

Page 164

1 negative view of my client apparent to the

2 attorneys in this case?

3    MS. JOHNSON: Objection. Asked and

4 answered.

5    BY MR. BYRNES:

6    Q  Ma'am?

7    A  No.

8    Q  Have you done this -- have you ever been

9 involved in litigation before?

10    A  No.

11    Q  What did you do before you came to the

12 Travel Office?

13    A  At the time of this, I believe I was --

14    Q  No. I mean your job before you came to

15 the Travel Office.

16    A  At the Smithsonian or --

17    Q  Anywhere.

18    A  I was the secretary and the travel

19 person for a while.

20    Q  Secretary for who?

21    A  For SERC and the doing travel all. Same

22 time.

Page 165

1    Q  Which is -- what was the secretary's

2 position?

3    A  A secretary.

4    Q  For who?

5    A  For the director.

6    Q  Did he take another secretary?

7    A  Well, they -- obviously, the job got

8 overwhelming, and I chose to stay with the travel

9 and they got a new secretary.

10    Q  Were you demoted?

11    A  No.

12    Q  Okay. What's your current position?

13    A  Travel manager.

14    Q  Okay. What grade, G.S. what?

15    A  Six.

16    Q  Okay. When was the last time you were

17 promoted?

18    A  Never.

19    Q  Okay. Before you came to travel with

20 the Smithsonian, where did you work?

21    A  For an environmental firm.

22    Q  Which one?

9ce82780-0275-4d88-b231-1fb59ef694ce

**Exhibit 1-k**

**Yunger Deposition**

**Philip G. Yunger**

Page 10

1 it, so we would cut down trees.

2    Q    And you left in early 2005; is that

3 correct?

4    A    Yes.

5    Q    What was your reason for leaving?

6    A    The guy came back to work. He got healthy

7 and came back.

8    Q    Was that your only federal employment?

9    A    Yeah. That and the Army.

10    Q    When did you become a volunteer at SERC?

11    A    Early 2000 at probably June. No. See,

12 I -- okay. Sometime between June and December of

13 2000.

14    Q    2000?

15    A    Yeah.

16    Q    Okay. So you had been familiar with SERC

17 prior to becoming an employee there?

18    A    Yeah. That's why they asked me to join,

19 you know, their team for a while.

20    Q    Did you have any friends who worked at

21 SERC? How is it that you were familiar with SERC?

22        MR. BYRNES: Compound. Do you want to ask

Page 11

1 the second question first?

2        MS. JOHNSON: Well, the second question is

3 the question.

4    Q    How is it that you were familiar with

5 SERC?

6    A    When I met my wife, she was working at

7 SERC.

8    Q    So you met her in 2000?

9    A    Yeah.

10    Q    Okay. And when you became a volunteer in

11 2000, had you previously volunteered at any other

12 organization?

13    A    Yes, ma'am. I'd been volunteering for the

14 homeless people and homeless veterans since 1981.

15 Western Presbyterian Church, I was a fund-raiser for

16 them, and I currently work with Capitol United

17 Methodist Church with their homeless kitchen, and

18 I'm also working at AmeriCorps' homeless veterans

19 project.

20    Q    Are those all activities that are ongoing

21 currently?

22    A    Yes. The Western Presbyterian Church, I'm

Page 12

1 not doing, but the other two are current ones.

2    Q    How did you come to decide to volunteer at

3 SERC in 2000?

4    A    They were doing an open house and they

5 needed some videotape shot and also a sound system

6 set up, so they volunteered me to do that.

7    Q    You said they volunteered you. Who

8 volunteered you?

9    A    My wife and her supervisor, Mark Haddon.

10    Q    Was she your wife at the time?

11    A    No.

12    Q    Did you know Mr. Haddon prior to the time

13 you became a volunteer at SERC?

14    A    No.

15    Q    And what experience had you had as a

16 videographer?

17        THE WITNESS: They don't have my resume?

18        MR. BYRNES: Tell them.

19    A    I started working in 1966 for my union

20 which has jurisdiction over motion picture

21 film-making and stage technology here in the

22 Washington, D.C. area, so I have 41 years of

Page 13

1 experience. I've worked on a dozen major motion

2 pictures, two Academy Award-winning films, 30-plus

3 Emmys, two Telly Awards.

4    Q    Which were the two Academy Award winners?

5    A    "The Exorcist" and "Silence of the Lambs."

6    Q    Both are good movies. I can't watch "The

7 Exorcist" to this day by myself.

8    A    Please rent it.

9    Q    Was it your understanding that -- well,

10 what was your understanding when you decided to

11 volunteer as to what your responsibilities would be,

12 what kind of work you'd be doing?

13    A    When I -- first when I was a volunteer was

14 mostly for the video stuff, but then they found out

15 I had a boat captain's license and I started running

16 their boats for them, the Saxatalis (phonetic),

17 which is the boat they use for their research

18 cruises for the children in the Education

19 Department. So I did -- probably 60 percent of the

20 time was working with the boats and 40 percent of

21 the time was working with the Education Department

22 with video photography.

**Esquire Deposition Services, LLC**
DC 1-800-441-3376        MD 1-800-539-6398        VA 1-800-752-8979

# EXHIBIT 2

# IS-9 Education Specialist/Distance Learning Coordinator

## IS-9 Education Specialist/Distance Learning Coordinator

This position is within the Education Department of the Smithsonian Environmental Research Center in Edgewater, Maryland and involves an array of responsibilities that coordinate and implement environmental education programs with multiple audiences. The means of disseminating SERC's research includes communicating with small groups, giving presentations to large audiences, implementing video conferences that connect scientists and students in real time interactions, and coordinating traveling school exhibits in the Maryland/Virginia/ Washington, DC area. The position also includes the duties of a volunteer coordinator.

### PRINCIPAL DUTIES

- *Assists SERC's Education Director:* Incumbent will help conceive, design, implement and evaluate education and distance learning programs.

- *Serve as Distance Learning Coordinator:* Develop and implement at lease four video conferences a year that include various ecological principles and ecosystems studied by SERC scientists. Supervise interns and volunteers to ensure projects remain on schedule and are of the quality set by SERC's Education Committee.

- *Conduct Teacher Workshops:* Develop and lead teacher training workshops for New York and Washington area teachers who are interested and involved with Distance Learning programs offered at SERC.

- *Serve as Volunteer Coordinator for Center's education docents and behind the scenes volunteers:* This involves maintaining contact with the Smithsonian's volunteer office and provides records of volunteer/docent applications, number of hours, and work status. This also includes conducting volunteer recruitment, orientation, and training for research and education staff at SERC as well as writing newsletter articles about volunteer activity.

- *Recruit students, teachers, and the public to participate in SERC's Distance Learning education programs:* This includes attending workshops, conferences and fairs to disseminate SERC's education materials and program information, sending fliers and teacher information packets to schools and principals, and communicating with various community organizations by email or telephone.

- *Communicate with Science Coordinators:* Maintain a professional relationship with various key personnel within the school systems of Maryland, Virginia, Washington, DC, and New York and communicate SERC's education programs and relevance to environmental research that address learning outcomes and standards.

- *Coordinate traveling exhibits to schools:* Incumbent will maintain schedule for SERC's traveling exhibit, *Tales of the blue Crab* and subsequent exhibits, and coordinate the setup and take down operations as well as the teacher workshops associated with the school visit.

- *Assist Education Director in preparing grant proposals:* At various times of the year proposals are written to ensure that environmental programs relating to SERC's research are continued and expanded.

KLUGEL V. SAMPER
SI - 0025

EVALUATION FACTORS

**Knowledge/Experience Required by the Position**
A professional knowledge of the principles of environmental sciences.
Ability to communicate through video communication technology
Skill in English composition and editing of written materials.
Knowledge of educational teaching methods and strategies for various age levels.
Experience in techniques of planning, directing and coordinating public outreach programs is desired.
Basic knowledge of computer programs for word processors, data files, email access, and web browsers is necessary. Experience in video equipment is preferred.

**Supervisory Controls**
Works directly under the supervision of the Director of Education. Receives assignments with suggestions for procedures and information about project scope, objectives to be achieved, and expected problems. Supervisor is consulted for advise and guidance as unusual problems arise and for resolving controversial issues. Incumbent participates with supervisor in regular planning sessions to establish priorities. Completed work is evaluated in terms of professional soundness, appropriateness, and conformance to policy.

**Guidelines**
Guidelines follow Smithsonian mission as well as SERC's research and education mission statements. Financial matters and transactions are to be conducted in accordance with SERC and SI administrative policies and procedures. However, guidelines to not cover specific problems or all areas of assignments. Therefore, the incumbent must use judgement to independently determine to what extent guidelines must be extended or adapted.

**Complexity**
Work involves maintaining the connections between research staff, the education staff, and the various visitors who participate in SERC's on-site and outreach programs. This position provides opportunities to become involved with multi disciplinary programs with a wide variety of participants including scientists, educators, volunteers, teachers, students and the public. Statistical summaries of programs and audiences are necessary for future projection and department planning. Work involves interrelated tasks and/or problems that require judgement and/or analysis in adapting precedents and practices where objectives are clearly defined.

**Scope and Effect**
The purpose of the Education Specialist/Distance Learning Coordinator is to contribute to the development and coordination of the various programs and activities that interpret and disseminate the aquatic, terrestrial, and atmospheric research findings and publications produced by SERC scientists to a local, regional, and national audience. The incumbent is responsible for assessing the effectiveness of assigned projects. The incumbent's work and recommendations impact the operating methods, effectiveness, and cost of SERC's environmental/distance learning education programs.

**Personal Contacts**
The main purpose of contacts outside of SERC is for exchange of mutually beneficial information and to stimulate cooperative ventures that benefit and inform the constituents. Contacts are on a

KLUGEL V. SAMPER
SI - 0026

local, regional, national, and international level for the purpose of disseminating research and education information and establishing collaborations with various organizations.

PURPOSE OF CONTACTS: The incumbent works closely with SERC staff members to improve and plan the education programs and docent training to meet major objectives and with the research volunteers to provide services and assure that their period of service progresses satisfactorily.

**Physical Demands**
The incumbent should be generally familiar with the full array of SERC research and education programs, facilities and projects requiring traveling by walking, boats, field vehicles, and various other means to gain close, hands-on interaction with these activities where students and visitors are working. These activities may require expose to extremes of weather, prolonged heat and cold, wetness, stinging and biting insects, and aquatic animals. Proper precaution should be taken to ensure safety against environmental hazards and exposure to the elements. Travel to other time zones and habitats is required.

**Work Environment**
The work environment is in an office located in the Reed Education Center. Much of the time could be spent outside in the field environment of the terrestrial and aquatic settings of the Chesapeake Bay. Traveling to other parts of the world are also a part of the activities of the position.

Summary of duties and time allocations

IS 9 Ed Specialist/DL Coordinator

| % Time | Description | Hrs/wk |
|--------|-------------|--------|
| 5 | Assists Ed Director | 2 |
| 40 | Distance Learning Coordinator | 16 |
| 20 | Volunteer Coordinator | 8 |
| 10 | Recruit students, teachers, and the public | 4 |
| | | |
| 5 | Communicate with Science Coordinators | 2 |
| 10 | Coordinate traveling exhibits to schools | 4 |
| 5 | Conduct teacher training workshops | 2 |
| 5 | Assist in preparing grant proposals | 2 |
| Total | | Total |
| 100 | | 40 |

KLUGEL V. SAMPER
SI - 0027

# EXHIBIT 3

# Philip Yunger Resume

# Philip Yunger

PO Box 29197
Washington, DC 20017
202-445-9024
philyunger@earthlink.net
SSN 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

## SKILLS

Photographer (1984 Art Director's Award)
Cameraman in both film and video
Theatrical electrician, carpenter, spotlight operator, flyman, rigger

## EXPERIENCE

**Prince William Network**
May 2003 to Present                          Producer/Director/Cameraman/
                                             Teacher – for distance learning

**Smithsonian Environmental Research Center**
September 2002 to Present        Boat and Maintenance Technician
May 2001 to Present              Photographer and Cameraman –
        photograph research sites, techniques, and objects for various audiences, as
        well as live, satellite, international broadcasts

**USS Sequoia, the Presidential Yacht**
2000 to 2002                     Crew Mate

**ShoreShot Tour Boat**
Summer 2002                      First Mate

**JR Associates**
January 2002 to June 2002        Producer/Director/Cameraman –
        directed photographic organization for the production of documentaries and
        training films

**Light Fantastic, Inc**
June 2001 to December 2001       Marketing Director – directed
        photographic organization for the rental of photographic equipment and personnel

**The John F. Kennedy Center for the Performing Arts**
June 1972 to June 2001           Stagehand
2001 to Present                  Teacher – teach photography, camera
        use, and lighting for distance learning program

KLUGEL V. SAMPER
SI - 0163

NBC News Channel
1994 to 2000                                         Technical Director of Studios –
    developed studio for news programs, operated cameras, served as lighting director,
    supervised crew

International Alliance of Theatrical Stage Employees
IATSE Local 22 Stagehands
1995 to 1999                                         President
1997 to 1998                                         International Representative

George Meany Center for Labor Studies
1977 to 1982                                         Media Coordinator

United States Army
December 1969 to January 1972                        521st Military Police Company –
                            Veteran, DD214 available

## ADDITIONAL EXPERIENCE

Vast experience as photographer, cameraman, carpenter, electrician, stagehand, master
technician, flyman, rigger, and lighting operator for the following, from 1966 to 2002:

**Theatrical**

| National Theater | Lisner Auditorium | US Air Arena | |
| Convention Center | Wolf Trap Farm Park | | |

**Television**

| WTTG | UPI Newsfilm | WETA | NBC Television |
| Time Life Films | CBS Television | | |

**Motion Pictures**

| "Blind Ambition" | "Nothing Personal" | "No Way Out" | |
| "Tin Men" | "Suspect" | "Silence of the Lambs" | |
| Columbia Pictures | Paramount Films | Warner Brothers | Universal Pictures |

**Distance Learning**

Serve as photographer, cameraman, unit manager, and boat captain for the Distance
Learning Program at the Smithsonian Environmental Research Center (April 2002 to
Present).  www.serc.si.edu/education/dl

Serve as teacher of lighting, camera, photographic and television techniques for the
Education Department of the John F. Kennedy Center (2001 to Present).  Currently teach
at Hylton High School, TV Studio.  www.kennedy-center.org/education/pwtv

# EXHIBIT 4

# Klugel Travel Voucher Information

**Suite, Kathie**

| | |
|---|---|
| **From:** | Suite, Kathie |
| **Sent:** | Monday, November 01, 2004 3:33 PM |
| **To:** | Petroski Judith |
| **Subject:** | RE: Doratha Klugel |

Can Carol send me her email stating that because I know the part in Belize is not?

-----Original Message-----
From: Petroski Judith
Sent: Monday, November 01, 2004 3:31 PM
To: Suite, Kathie
Subject: Re: Doratha Klugel

I think she told Carol that it is all business.

>>> Suite, Kathie 11/01/04 03:29PM >>>
Judy,

Did you ever hear back from Dottie Klugel as to whether or not she says that her travel to Belize is personal?

Kathie

KLUGEL V. SAMPER
SI - 0425

1

```
==========================================================================
11/08/04        AUTHORIZATION                    | DOC NO:     539XTA1073
 PAGE   2 ** Read Privacy Act On Last Page **    | TA NUM:
==========================================================================
```

Approval by Judy Petroski, TSO, for traveler to purchase air with her personal
credit card.
 (1)
Annual Leave:  November 17 & 18.
 (2)
Traveler staying on Barro Colorado Island, Panama, from November 14-16.

```
==========================================================================
 9) AUTHORIZED BY              TITLE            DATE | INITIALS | DATE
    Jeanine Robert             Financial Admin.      |          |
                                                     |          |
                                                     |          |
==========================================================================
10) FUNDS OBLIGATED

==========================================================================

11) GTR/TICKET NO       VALUE        CR CLS  DATE       FROM         TO
    ----------------    ------------ -- ---  -------     ----------   ----------
==========================================================================
12) ITINERARY AND TRANSPORTATION EXPENSES - TRIP NO          1

   DATE       TIME  DEPARTED/ARRIVED LOCATIONS MODE   COST        DESCRIPTION
   ---------- ----- ------------------------- ----- ------------- ----------------
   11/14/2004       D-RES: Edgewater, MD
   11/14/2004       A-[OTHER],PAN
   11/16/2004       D-[OTHER],PAN
   11/16/2004       A-PANAMA CITY,PAN
   11/19/2004       D-PANAMA CITY,PAN
   11/19/2004       A-BELIZE CITY,BIZ
   11/22/2004       D-BELIZE CITY,BIZ
   11/22/2004       A RES: Edgewater, MD
   11/22/2004                               CAB        50.00
                                                     Taxi
                                                     -------------------
              TOTAL TRANSPORTATION EXPENSES           50.00
==========================================================================
13) SUBSISTENCE AND OTHER REIMBURSABLE EXPENSES

        ACTUAL      LODGING     MEALS M&IE     P-DIEM
  DATE  LODGING     ALLOWED     B L D ALLOW    RATE      OTHER EXPENSES   AMOUNT
  ----- ----------- ----------- ----- -------- -------- --------------- ----------
  11/14   0.00         0.00              0.00#42/31                        0.00
                                                        Outside Purchase Air  500.00
  11/15   0.00         0.00              0.00#42/31                        0.00
  11/16   0.00         0.00              0.00#110/63                       0.00
  11/17   0.00         0.00              0.00#110/63                       0.00
  11/18   0.00         0.00              0.00#110/63                       0.00
  11/19   0.00         0.00              0.00#92/74                        0.00
  11/20   0.00         0.00              0.00#92/74                        0.00
  11/21   0.00         0.00              0.00#92/74                        0.00
  11/22   0.00         0.00              0.00#92/74                        0.00
                                                        Field Equipment   50.00
                                                        Fees              30.00
        ----------- -----------                                         -------------------
          0.00         0.00                                               580.00
```

VRCIV=RATE TABLE DATE=05/01/97=Copyright 2003 Gelco Information Network GSD, Inc

 # M&IE calculation altered.

KLUGEL V. SAMPER
SI - 0427

==============================================================================
Exception to GSA Form 87

In compliance with the Privacy Act of 1974, the following information is
provided: Basic authority for requiring the requested information is contained
in 5 USC 5701-5733, particularly sections 5721-5733, 30 USC 905 and Executive
Order 9397. Disclosure of the data by you is voluntary. The principal purpose
for collecting the data is to determine the amount to reimburse an employee
for expenses incurred in connection with temporary duty travel. Information
may be transferred to appropriate Federal, State, local or foreign agencies
when relevant to civil, criminal or regulatory investigations or prosecutions.
There is no personal liability to you if you do not furnish the requested
information; however, we shall not be able to reimburse you for your expenses.

KLUGEL V. SAMPER
SI - 0428

```
11/08/04          ACCT DETAIL              |Doc No:        539XTA1073
Copyright 2003 Gelco Information Network, Inc. |Klugel, Dorath 0000014439
=================================================================

ACCT                                                      TRIP 1
-------------------------  ---------------  ---------------  ---------------
OTHER-460                                                      580.00
TRANSPORT-411                                                   50.00
                           ---------------  ---------------  ---------------
ACCS1                           0.00             0.00           630.00

Organization:
100-2005-799210-394000-6100-2112-1008---
```

KLUGEL V. SAMPER
SI - 0429

*3rd version*

*Kathie — (circles) are what SERC pays for*

## PROPOSED TRAVEL PLANS REQUIRING SI TRAVEL AUTHORIZATION

**A. CONTACT INFORMATION** *SRP Philip Humphrey?*

| | | | |
|---|---|---|---|
| Name: | Doratha Klugel | Position: | Distance Learning Coor. |
| SSN: | 213 88 1159 | Email: | klugeld@si.edu |
| Tel (home): | 202 544 3342 | Tel (office): | 443 482 2470 |

Home Address:
PO Box 1853
Edgewater, MD 21037
(514 E St NE Apt B, Wash DC, 20002)

Office Address:
647 Contees Wharf Rd
Edgewater, MD
21037

**B. TRAVEL INFORMATION**

| | Dates | Times of Travel | Itinerary Points |
|---|---|---|---|
| leave | Nov 14 | 6:14 am | DCA |
| arrive | | 2 pm | Panama City |
| leave | | ~~1 pm~~ 5:30 | " |
| arrive | | 6 pm | Barro Colorado Island |
| leave | Nov 16 | afternoon | " |
| arrive | " | | Panama City |
| leave | Nov 19 | 6 am | " |
| arrive | " | 9 am | Belize City |

*(If necessary, continue itinerary on back of form.)*
leave Nov ~~24~~ 22 am
arrive Nov afternoon DCA

**PURPOSE OF TRAVEL (research, meeting, conference, etc.)**

Conduct teacher workshop w/ Project VIEW & STRI in Panama & work on
manatee project in Belize. Airfare has been charged to personal credit card.

**C. Costs**

| | | | |
|---|---|---|---|
| | | | $500 SERC |
| Registration Fees | Taxi/Shuttle $50 | Airfare | $919.60 → Klugel |
| Rental Car | Gasoline | Tolls | 1105.90  $450 |
| Parking | Mileage (Y/N) | Total Miles? | $205.90 Project |
| Excess baggage | Supplies $50 | Other $100 (exit) | View |

*If lodging and/or meals are different than allowed GSA per diem rates, please specify dollar amount.*

Lodging (Y/N)  $ Covered by Project View (Panama & Belize)

Meals (Y/N)  $ covered by Project View (Panama & Belize)

**OVER →**

Project VIEW will reimburse traveler.
Airfare initially paid by traveler with personal
credit card - has no govt card.

KLUGEL V. SAMPER
SI - 0430

*3rd Version* — *Created, but cancelled & deleted.*

```
=============================================================================
11/08/04        AUTHORIZATION              |DOC NO:        539XTA1073
 PAGE   1 ** Read Privacy Act On Last Page ** |TA NUM:
=============================================================================
1) NAME: Klugel, Doratha C.            Trav:    0000014439

   ADDR: P.O. Box 1853                 PHONE:   443-482-2470
                                       MAIL CD: 540
         Edgewater, MD   21037         ORG:     3940-SERC-PUB.EDUCTN
                                       TITLE:   Distance Learn. Coord.
   DUTY: Edgewater, MD         TZ: 6   SEC CLR:
   RES:  Edgewater, MD                 CARD:    DECLINEE
   HOURS:  8
   PSft Vendor #   0000014439001       Traveler Status   Employee
=============================================================================
2) TA NUM:                  DATE: 11/08/2004    TYPE: SINGLE TRIP

=============================================================================
3) TRAVEL PURPOSE:  INFORMATION MEETING
 Conduct teacher workshop with ProjectVIEW and STRI in Panama.  Film sealife
 in Belize.
=============================================================================
 4) GENERAL ITINERARY

      DATE       TIME    DEPARTED/ARRIVED LOCATIONS      PER DIEM RATE
    --------    -------  --------------------------      -------------
    11/14/2004           D-RES: Edgewater, MD
    11/14/2004           A-[OTHER],PAN                      42/31
    11/16/2004           D-[OTHER],PAN
    11/16/2004           A-PANAMA CITY,PAN                  110/63
    11/19/2004           D-PANAMA CITY,PAN
    11/19/2004           A-BELIZE CITY,BIZ                  92/74
    11/22/2004           D-BELIZE CITY,BIZ
    11/22/2004           A RES: Edgewater, MD

=============================================================================
5) OTHER AUTHORIZATIONS               |6)        EST COST          ADV AMT
ANNUAL LEAVE OR NON-DUTY DAYS(1)      |OTHER            580.00        580.00
PER DIEM LOCATION FOOTNOTES(2)        |TRANSPORT         50.00         50.00
                                      |         ------------------ ------------
                                      |TOTAL            630.00        630.00
                                      | ADVANCE AUTHORIZED              0.00
=============================================================================
7) ACCT CLASSIFICATIONS                                       EST COST
ACCS1 - 100-2005-799210-394000-6100-2112-1008---
                                                               630.00

=============================================================================
8) REMARKS
Lodging and meals covered by ProjectVIEW under a grant by US Dept. of Education,
a non-profit organization.

$605.90 of air will be reimbursed to traveler by ProjectVIEW.

On personal time from November 23-24; however, if traveler had not had personal
time, she would have returned on November 22.
==VERSION CIV===========Copyright 2003 Gelco Information Network GSD, Inc.======
```

KLUGEL V. SAMPER
SI - 0426

TRAVEL PLANS FORM  (continued)

*Dorotha Klugel*
*0402/3*

**FUND/S TO BE CHARGED:** ~~EPA STAR 2005~~ 799210. ~~E007~~

Give dates, where you will stay, and phone number (hotel, friend, relative) in case of emergency:

Beth King STRI 202786 2094 x 8216

## D.  EMPLOYEE STATUS

**1. Employee Travelers only**  *(Be sure you have applied for a government credit card.)*

Will annual leave be taken during this trip?  Y      Dates of leave:  11/17-18
*(You are responsible to turn in an SF-71 to your timekeeper for these dates.)*    11/23-24

**2. Non-Employee Traveler** *(Identify status.)*

    a. Document establishing status _____   Date: _____

    b. Office in which document is filed _____

Do you want a travel advance (non-employees only) (Y/N)?
*(Unless requested otherwise, advance will be 80% of per diem and expenses.)*

## E.  AUTHORIZATION

Approved By: _____       Date: 11/5/04
      (Supervisor/Funds Manager)

KLUGEL V. SAMPER
SI - 0431

*3rd Version* — *Created, but cancelled + deleted.*

```
=========================================================================
11/08/04        AUTHORIZATION              DOC NO:        539XTA1074
  PAGE  1 ** Read Privacy Act On Last Page **  TA NUM:
=========================================================================
1) NAME: Yunger, Philip G.              Trav:    0000020200

   ADDR: P.O. Box 29197                 PHONE:   443-482-2470
                                        MAIL CD:
          Washington, DC   20017        ORG:     3920-SERC-ENV.BIOLGY
                                        TITLE:   Volunteer
   DUTY: Edgewater, MD          TZ: 6   SEC CLR:
   RES:  Washington, DC                 CARD:    INFREQUENT TRAVELER
   HOURS:  8
   PSft Vendor #   0000020200001        Traveler Status   Invitational
=========================================================================
2) TA NUM:                   DATE: 11/08/2004    TYPE: SINGLE TRIP

=========================================================================
3) TRAVEL PURPOSE:  INFORMATION MEETING
Participate in teacher workshop in Panama and manatee program in Belize.

=========================================================================
4) GENERAL ITINERARY

      DATE      TIME    DEPARTED/ARRIVED LOCATIONS     PER DIEM RATE
      --------  -------  ---------------------------   -------------
      11/14/2004          D-RES: Washington, DC
      11/14/2004          A-[OTHER],PAN                 42/31
      11/16/2004          D-[OTHER],PAN
      11/16/2004          A-PANAMA CITY,PAN             110/63
      11/19/2004          D-PANAMA CITY,PAN
      11/19/2004          A-BELIZE CITY,BIZ             92/74
      11/22/2004          D-BELIZE CITY,BIZ
      11/22/2004          A RES: Washington, DC


=========================================================================
5) OTHER AUTHORIZATIONS            |6)      EST COST          ADV AMT
PER DIEM LOCATION FOOTNOTES(1)     |OTHER             580.00          580.00
                                   |TRANSPORT          50.00           50.00
                                   |                 --------------  --------------
                                   |TOTAL             630.00          630.00
                                   | ADVANCE AUTHORIZED                 0.00
=========================================================================
7) ACCT CLASSIFICATIONS                                   EST COST
ACCS1 - 100-2005-799210-394000-6100-2112-1008---
                                                           630.00

=========================================================================
8) REMARKS
Lodging and meals covered by ProjectVIEW under a grant by US Dept. of Education,
a non-profit organization.

$605.90 of air will be reimbursed to traveler by ProjectVIEW.

On personal time from November 17-18 and November 23-24; however, if traveler
had not had personal time, he would have returned on November 22.
==VERSION CIV===========Copyright 2003 Gelco Information Network GSD, Inc.======
```

KLUGEL V. SAMPER
SI - 0432

```
===============================================================
11/08/04      AUTHORIZATION              | DOC NO:    539XTA1074
  PAGE  2 ** Read Privacy Act On Last Page ** | TA NUM:
===============================================================
```

Approval by Judy Petroski, TSO, for traveler to purchase air with personal
credit card.
 (1)
Traveler staying on Barro Colorado Island, Panama, from November 14-16.

```
===============================================================
 9) AUTHORIZED BY           TITLE         DATE | INITIALS | DATE
    Jeanine Robert          Financial Admin.   |          |
                                                |          |
                                                |          |
===============================================================
10) FUNDS OBLIGATED

===============================================================

11)  GTR/TICKET NO      VALUE       CR CLS  DATE     FROM        TO
     -------------- ----------------- -- --- ------- ---------- ----------
===============================================================
12) ITINERARY AND TRANSPORTATION EXPENSES - TRIP NO        1

  DATE      TIME  DEPARTED/ARRIVED LOCATIONS MODE   COST        DESCRIPTION
  --------- ----- ------------------------- ----- ----------- -----------------
  11/14/2004       D-RES: Washington, DC
  11/14/2004       A-[OTHER],PAN
  11/16/2004       D-[OTHER],PAN
  11/16/2004       A-PANAMA CITY,PAN
  11/19/2004       D-PANAMA CITY,PAN
  11/19/2004       A-BELIZE CITY,BIZ
  11/22/2004       D-BELIZE CITY,BIZ
  11/22/2004       A RES: Washington, DC
  11/22/2004                               CAB         50.00
                                                    Taxi
                                                    ----------------
          TOTAL TRANSPORTATION EXPENSES               50.00
===============================================================
13) SUBSISTENCE AND OTHER REIMBURSABLE EXPENSES

        ACTUAL      LODGING     MEALS  M&IE    P-DIEM
  DATE  LODGING     ALLOWED     B L D  ALLOW   RATE   OTHER EXPENSES    AMOUNT
  ----- ----------- ----------- ------ ------ ------ ------------------ ----------
  11/14   0.00        0.00             0.00#42/31                          0.00
                                                     Outside Purchase Air  500.00
  11/15   0.00        0.00             0.00#42/31                          0.00
  11/16   0.00        0.00             0.00#110/63                         0.00
  11/17   0.00        0.00             0.00#110/63                         0.00
  11/18   0.00        0.00             0.00#110/63                         0.00
  11/19   0.00        0.00             0.00#92/74                          0.00
  11/20   0.00        0.00             0.00#92/74                          0.00
  11/21   0.00        0.00             0.00#92/74                          0.00
  11/22   0.00        0.00             0.00#92/74                          0.00
                                                     Fees                 30.00
                                                     Field Equipment      50.00
        ------------- -------------            ------           ----------
             0.00                                0.00                     580.00

VRCIV=RATE TABLE DATE=05/01/97=Copyright 2003 Gelco Information Network GSD, Inc

  # M&IE calculation altered.
===============================================================
```

KLUGEL V. SAMPER
SI - 0433

Exception to GSA Form 87

In compliance with the Privacy Act of 1974, the following information is
provided: Basic authority for requiring the requested information is contained
in 5 USC 5701-5733, particularly sections 5721-5733, 30 USC 905 and Executive
Order 9397. Disclosure of the data by you is voluntary. The principal purpose
for collecting the data is to determine the amount to reimburse an employee
for expenses incurred in connection with temporary duty travel. Information
may be transferred to appropriate Federal, State, local or foreign agencies
when relevant to civil, criminal or regulatory investigations or prosecutions.
There is no personal liability to you if you do not furnish the requested
information; however, we shall not be able to reimburse you for your expenses.

KLUGEL V. SAMPER
SI - 0434

```
11/08/04        ACCT DETAIL              |Doc No:      539XTA1074
Copyright 2003 Gelco Information Network, Inc. |Yunger, Philip 0000020200
============================================================================

ACCT                                                        TRIP 1
------------------------  ---------------  ----------------  ----------------
OTHER-460                                                       580.00
TRANSPORT-411                                                    50.00
                          ---------------  ----------------  ----------------
ACCS1                              0.00              0.00         630.00

Organization:
100-2005-799210-394000-6100-2112-1008---
```

KLUGEL V. SAMPER
SI - 0435

```
11/08/04          DOCUMENT HISTORY          |Auth:       539XTA1074
Copyright 2003 Gelco Information Network GSD, Inc. |Yunger, Philip 0000020200
===========================================================================

          STATUS                DATE     TIME      SIGNATURE NAME
          --------------------  -------- --------- --------------------
          CREATED               11/08/2004 2:55PM    KATHLEEN SUITE


     I certify that the electronic signatures listed above are
     valid and on file.


     _____      _____
               SIGNED                                DATE
```

KLUGEL V. SAMPER
SI - 0436

2nd version

Circles are what Serc pays for.

20200

## PROPOSED TRAVEL PLANS REQUIRING SI TRAVEL AUTHORIZATION

A. CONTACT INFORMATION G.

| Name: Philip Yunger | Position: Volunteer |
|---|---|
| SSN: 215829133 | Email: philyunger@earthlink.n |
| Tel (home): 2024459024 | Tel (office): 443482 2470 |

Home Address: PO Box 29197 Wash DC 20017

Office Address: SERC

Personal time Nov. 17+18 & Nov. 23 +24

| | Dates | Times of Travel | Itinerary Points |
|---|---|---|---|
| leave | Nov 14 | 6:14 am | DCA |
| arrive | | 2 pm | Panama City |
| leave | | before 5:30 | |
| arrive | | 6 pm | Barro Colorado Island |
| leave | Nov 16 | afternoon | |
| arrive | | " | Panama City |
| leave | Nov 19 | 6 am | |
| arrive | | 9 am | Belize City |

(If necessary, continue itinerary on back of form.)
leave Nov 22   am   "

PURPOSE OF TRAVEL  (research, meeting, conference, etc.)
arrive    afternoon    DCA
to participate in teacher workshop (Panama) and manage program (Belize)

Airfare has been charged to personal credit card

$ 500 SERC

C. COSTS

| Registration Fees | Taxi/Shuttle $50 | Airfare $919.60 → $1105.90 |
|---|---|---|
| Rental Car | Gasoline | Tolls $430 |
| Parking | Mileage (Y/N) | Total Miles? |
| Excess baggage | Supplies $50 | Other $430 (exit) |

$60590
Project View

If lodging and/or meals are different than allowed GSA per diem rates, please specify dollar amount.

Lodging (Y/N) $ Covered by Project View (Panama + Belize)

OVER →

Meals (Y/N) $ covered by Project View (Panama + Belize)

Project VIEW will reimburse traveler. Airfare initially paid by traveler's personal credit card has no govt credit card.

KLUGEL V. SAMPER
SI - 0437

Philip Yunger
040213

**TRAVEL PLANS FORM** (continued)

**FUND/S TO BE CHARGED:** ~~EPA 5TAR 2005~~ $799210 ~~B00~~

Give dates, where you will stay, and phone number (hotel, friend, relative) in case of emergency:

Beth King STR1    2027862094 x8216

### D. EMPLOYEE STATUS

**1. Employee Travelers only** *(Be sure you have applied for a government credit card.)*

Will annual leave be taken during this trip? _____ Dates of leave: _____

*(You are responsible to turn in an SF-71 to your timekeeper for these dates.)*

**2. Non-Employee Traveler** *(Identify status.)*

　a. Document establishing status _____ Date: _____

　b. Office in which document is filed _____

Do you want a travel advance (non-employees only) (Y/N)? _____

*(Unless requested otherwise, advance will be 80% of per diem and expenses.)*

### E. AUTHORIZATION

Approved By: _____    Date: 11/5/04
　　　　　*(Supervisor/Funds Manager)*

KLUGEL V. SAMPER
SI - 0438

*2nd ??? - not required*

Kathie — (Circles) are what SERC pays for

## PROPOSED TRAVEL PLANS REQUIRING SI TRAVEL AUTHORIZATION

**A. CONTACT INFORMATION**   and Philip Yunger

| | | | |
|---|---|---|---|
| Name: | Doratha Klugel | Position: | Distance Learning Coor. |
| SSN: | 213 88 1159 | Email: | klugeld@si.edu |
| Tel (home): | 202 544 3342 | Tel (office): | 443 482 2470 |

Home Address:

PO Box 1853
Edgewater, MD 21037
(514 E St NE Apt B, Wash DC, 20002)

Office Address:

647 Contees Wharf Rd
Edgewater, MD
21037

**B. TRAVEL INFORMATION**

| | Dates | Times of Travel | Itinerary Points |
|---|---|---|---|
| leave | Nov 14 | 6:14 am | DCA |
| arrive | | 2 pm | Panama City |
| leave | | ~~6pm~~ 5:30 | " |
| arrive | | 6 pm | Barro Colorado Island |
| leave | Nov 16 | afternoon | " |
| arrive | " | " | Panama City |
| leave | Nov 19 | 6 am | " |
| arrive | " | 9 am | Belize City |
| leave | Nov 24 | am | " |
| arrive | " | afternoon | DCA |

*(if necessary, continue itinerary on back of form.)*

**PURPOSE OF TRAVEL   (research, meeting, conference, etc.)**

**C. COSTS**

Airfare has been charged to personal credit car → $500 by SERC

| Registration Fees | Taxi/Shuttle $50 | Airfare $919.60 → Klugel |
| Rental Car | Gasoline | Tolls B 420 by Project View |
| Parking | Mileage (Y/N) | Total Miles? |
| Excess baggage | Supplies $50 | Other $100 (ay+) |

*If lodging and/or meals are different than allowed GSA per diem rates, please specify dollar amount.*

Lodging (Y/N) $ Covered by    Meals (Y/N) $ covered by

**OVER →**

Project View
(Panama + Belize)

Project View
(Panama + Belize)

KLUGEL V. SAMPER
SI - 0439

TRAVEL PLANS FORM  (continued)

FUND/S TO BE CHARGED: _____ *You have this already.* _____

Give dates, where you will stay, and phone number (hotel, friend, relative) in case of emergency:

_____

**D. EMPLOYEE STATUS**

    **1. Employee Travelers only**  *(Be sure you have applied for a government credit card.)*

    Will annual leave be taken during this trip? _____ Dates of leave: 11/17 – 18

    *(You are responsible to turn in an SF-71 to your timekeeper for these dates.)* 11/23 – 24

    **2. Non-Employee Traveler** *(Identify status.)*

      a. Document establishing status _____ Date: _____

      b. Office in which document is filed _____

Do you want a travel advance (non-employees only) (Y/N)?

*(Unless requested otherwise, advance will be 80% of per diem and expenses.)*

**E. AUTHORIZATION**

Approved By: _____ Date: _____

         (Supervisor/Funds Manager)

*You have Mark's signature already.*

KLUGEL V. SAMPER
SI - 0440

*first version*

## PROPOSED TRAVEL PLANS REQUIRING SI TRAVEL AUTHORIZATION

### A. CONTACT INFORMATION

Name: Doratha Klugel    Position: Distance Learning Coor.

SSN: 213 88 1159    Email: klugeld@si.edu

Tel (home): 202 544 3342    Tel (office): 443 482 2470

Home Address:
PO Box 1853
Edgewater, MD 21037
(514 E St NE Apt B, Wash DC, 20002)

Office Address:
647 Contees Wharf Rd
Edgewater, MD
21037

### B. TRAVEL INFORMATION

| | Dates | Times of Travel | Itinerary Points |
|---|---|---|---|
| leave | Nov 14 | | Wash, DC (DCA) |
| arrive | | | Panama City, Panama |
| leave | | | " |
| arrive | Nov 14 | | Barro Colorado Island (BCI) |
| leave | Nov 17 | | " |
| arrive | Nov 17 | | Panama City, Panama |
| leave | ~~Nov 18~~ Nov, 19 | | " |
| arrive | Nov, 19 - 22 Nov, 22 | | Belize City DCA |

*(If necessary, continue itinerary on back of form.)*

Returning on 24 Nov. (leave 23 + 24)

**PURPOSE OF TRAVEL** (research, meeting, conference, etc.)
To conduct teacher workshop with Project VIEW and STRI. SERC will pay all airfare and Project VIEW will pay lodging and meals in Panama for volunteers

### C. COSTS

| | | |
|---|---|---|
| Registration Fees | Taxi/Shuttle | Airfare ~~1204~~ 914.60 +6 fee |
| Rental Car | Gasoline | Tolls |
| Parking | Mileage (Y/N) | Total Miles? |
| Excess baggage | Supplies | Other |

*If lodging and/or meals are different than allowed GSA per diem rates, please specify dollar amount.*

Lodging (Y/N) Y $ ___    Meals (Y/N) Y $ ___

**OVER →**

$34 for Nov 14-16 (cost to stay on BCI) (each day)

**TRAVEL PLANS FORM** (continued)

**FUND/S TO BE CHARGED:** _768000_

Give dates, where you will stay, and phone number (hotel, friend, relative) in case of emergency:

_Beth King, STRI,   202-786-_

**D. EMPLOYEE STATUS**

**1. Employee Travelers only** *(Be sure you have applied for a government credit card.)* 17+ AL

Will annual leave be taken during this trip? _Y_   Dates of leave: _Nov 18 – Nov 28_

*(You are responsible to turn in an SF-71 to your timekeeper for these dates.)* _Nov. 23+24_

**2. Non-Employee Traveler** *(Identify status.)*

a. Document establishing status _____   Date: _____

b. Office in which document is filed _____

Do you want a travel advance (non-employees only) (Y/N)?
*(Unless requested otherwise, advance will be 80% of per diem and expenses.)*

**E. AUTHORIZATION**

Approved By: _R. Mark Babb_   Date: _10/27/04_

(Supervisor/Funds Manager)

KLUGEL V. SAMPER
SI - 0442

*first session*

## PROPOSED TRAVEL PLANS REQUIRING SI TRAVEL AUTHORIZATION

### A. CONTACT INFORMATION

Name: Philip Yunger          Position: Volunteer

SSN: 215 52 9133          Email: philyunger@earthlink.net

Tel (home): 2024459024          Tel (office): 443 482 2470

Home Address:          Office Address:
E. PO Box 29197          SERC
Wash, DC
20017

### B. TRAVEL INFORMATION

| | Dates | Times of Travel | Itinerary Points |
|---|---|---|---|
| leave | Nov 14 | 6:14 am | Wash, DC (DCA) |
| arrive | | 1:52 pm | Panama City, Panama |
| leave | | 5:30 pm | " |
| arrive | Nov. 14 | | Barro Colorado Island |
| leave | Nov. 17 | 5:30 pm | |
| arrive | Nov. 17 | | Panama City |
| leave | Nov. 19 | | " |
| arrive | Nov. 19 Nov. 22 | | Belize City DCA |

*(If necessary, continue itinerary on back of form.)*

Returning Nov. 24 (pers. time (Nov. 17-18 & 23 & 24)

**PURPOSE OF TRAVEL** (research, meeting, conference, etc.)

To conduct teacher workshop with ProjectVIEW and STRI. SERC will pay all airfare and Project VIEW will pay lodging and meals in Panama for

### C. COSTS

| | | | |
|---|---|---|---|
| Registration Fees | Taxi/Shuttle $50 | Airfare | $1410 /$1460 volunteers +6 |
| Rental Car | Gasoline | Tolls | |
| Parking | Mileage (Y/N) | Total Miles? | |
| Excess baggage | Supplies | Other | $80 (exit fees) |

*If lodging and/or meals are different than allowed GSA per diem rates, please specify dollar amount.*

Lodging (Y/N) Y  $ _____          Meals (Y/N) Y  $ _____

## OVER →

$34 for Nov 14-17 (cost to stay on BCI)
(each day)

KLUGEL V. SAMPER
SI- 0443

TRAVEL PLANS FORM  (continued)

**FUND/S TO BE CHARGED:** _7/8 000_

Give dates, where you will stay, and phone number (hotel, friend, relative) in case of emergency:

_Beth King, STRI    202-786-2094 ext 216_

**D.  EMPLOYEE STATUS**

**1. Employee Travelers only**  *(Be sure you have applied for a government credit card.)*

Will annual leave be taken during this trip? _____ Dates of leave: _____

*(You are responsible to turn in an SF-71 to your timekeeper for these dates.)*

**2. Non-Employee Traveler** *(Identify status.)*

a. Document establishing status _____ . Date: _____

b. Office in which document is filed _____

Do you want a travel advance (non-employees only) (Y/N)?

*(Unless requested otherwise, advance will be 80% of per diem and expenses.)*

**E.  AUTHORIZATION**

Approved By: _(signature)_    Date: _10/27/04_

(Supervisor/Funds Manager)

KLUGEL V. SAMPER
SI - 0444

10/27/04

Kathie —

What I know so far. Plans are being finalized over the next week, but I obviously needed to get these to you before then.

I put $34 a day for 3 days on my + Philip's form, in case Project VIEW doesn't cover this. I do however expect that they ultimately will.

Philip and I are going on to Belize from Panama. I am working with Judy to figure out if we get round trip tickets from Panama with a trip (annual leave) to Belize in between, or if we get tickets to Panama and leaving Belize back to DC. I will let you

KLUGEL V. SAMPER
SI - 0445

know.

When I get the vendor forms from the teachers I will have their SSNs to give you.

I am out tomorrow but in Friday. —Dottie

KLUGEL V. SAMPER
SI - 0446

**Suite, Kathie**

| | |
|---|---|
| **To:** | Klugel, Dottie |
| **Subject:** | RE: upcoming travel to Panama |

Dottie,

None of the first five are in PeopleSoft so you will need to complete vendor forms for them, including either the waiver or banking information sheet.

Philip's address in PS is PO Box 29197, Washington, DC 20017. His bank account # is 06434118. If any of this information is incorrect, let me know.

Why I asked about ProjectVIEW is that if you are accepting travel support or reimbursement from a for-profit organization or foreign government, you need Office of General Counsel approval. ProjectVIEW does not fall into that category. I just need to put a comment on the authorization stating what they are paying for.

Kathie

-----Original Message-----
| | |
|---|---|
| **From:** | Klugel, Dottie |
| **Sent:** | Wednesday, October 27, 2004 10:30 AM |
| **To:** | Suite, Kathie |
| **Subject:** | RE: upcoming travel to Panama |

Their names are:
Diane Wilkinson
Jean Duxbury
Gay McClaine
Adam Labuda
Jessica Melchior

Plus Philip Yunger and myself.

ProjectVIEW is an entity of the Schenectady City School District in NY. PV was created when SCSD received a grant from the US Dept of Education. I'm not sure I answered your question well enough, so let me refer you to their website if you need more info www.projectview.org

-----Original Message-----
| | |
|---|---|
| **From:** | Suite, Kathie |
| **Sent:** | Wednesday, October 27, 2004 10:25 AM |
| **To:** | Klugel, Dottie |
| **Subject:** | RE: upcoming travel to Panama |

Dottie,

Let me know their names so I can see if they are in PeopleSoft. If not, they will need to fill out vendor forms.

Is ProjectVIEW a non-profit organization? Is it part of any government entity -- university, agency, etc.?

Kathie

-----Original Message-----
| | |
|---|---|
| **From:** | Klugel, Dottie |
| **Sent:** | Wednesday, October 27, 2004 9:57 AM |
| **To:** | Robert, Jeanine; Suite, Kathie |

1

KLUGEL V. SAMPER
SI - 0447

**Cc:** Haddon, Mark
**Subject:**        upcoming travel to Panama

Kathie and Jeanine-

In Nov I will be taking a group of teachers to STRI, Barro Colorado Island. The teachers have been registered as behind the scenes volunteers of the Education Dept. In order to travel, will they also need to fill out vendor forms? Jeanine - I have an electronic version of the form, so if they need to fill it out, I will email the form. Kathie - in the meantime I will fill out travel forms for everyone and get those to you.

SERC is paying for all airfare; our partner ProjectVIEW will pay for everything else.

Let me know what additional info you need in porcessing this travel.

Thanks.

Dottie Klugel
Distance Learning Coordinator
Smithsonian Environmental Research Center
647 Contees Wharf Rd
Edgewater, MD 21037
443-482-2470
443-482-2319 Fax
klugeld@si.edu
<www.serc.si.edu/education/dl>

KLUGEL V. SAMPER
SI - 0448

**EXHIBIT 5**

**Email Exchanges between Klugel and Suite**

Message                                                                    Page 1 of 2

## Suite, Kathie

**From:** Suite, Kathie
**Sent:** Friday, November 05, 2004 3:58 PM
**To:** Haddon, Mark
**Subject:** RE: Travel -- Day Trips

*Mark never called me about this. He passed the message directly to Dottie who was very nasty!*

Mark . . . When you get a few minutes, I would like to talk to you about Dottie's attitude. . . . Kathie

-----Original Message-----
**From:** Haddon, Mark
**Sent:** Friday, November 05, 2004 3:40 PM
**To:** Suite, Kathie
**Cc:** Klugel, Dottie
**Subject:** RE: Travel -- Day Trips

Kathie
We're tied up with the final planning of a Distance Learning Symposium that will be held here all day on Monday. I'll see if I can help her get this form to you by Monday evening.

Mark

A. Mark Haddon
Director of Education
Smithsonian Environmental
Research Center
P.O Box 28
Edgewater, MD  21037
443-482-2218
443-482-2380  FAX
www.serc.si.edu

-----Original Message-----
**From:** Suite, Kathie
**Sent:** Friday, November 05, 2004 3:30 PM
**To:** Haddon, Mark
**Subject:** RE: Travel -- Day Trips

That would be covered by petty cash.  I just didn't list everything that might be covered.

Also, I am just now emailing Dottie (copying you) about this Panama/Belize travel.  If she doesn't get the correctly completed form to me by Monday, I will not be able to guarantee that they can go.  I will be off from Wednesday on.

Kathie

-----Original Message-----
**From:** Haddon, Mark
**Sent:** Friday, November 05, 2004 3:17 PM
**To:** Suite, Kathie
**Subject:** RE: Travel -- Day Trips

KLUGEL V. SAMPER
SI - 0415

12/9/2004

Kathie,

Your explanation didn't mention parking fees.

Jane and Amy needed to fill out paperwork for parking in Baltimore. Why was that necessary?

I am planning on attending a workshop in Balt and will probably have parking fees. Isn't that just handled with petty cash?

Mark

A. Mark Haddon

Director of Education

Smithsonian Environmental

Research Center

P O Box 28

Edgewater, MD 21037

443-482-2218

443-482-2380 FAX

www.serc.si.edu

-----Original Message-----

**From:** Suite, Kathie

**Sent:** Friday, November 05, 2004 2:20 PM

**To:** SERCstaff

**Subject:** Travel – Day Trips

The only travel for which you do not need a travel authorization are DAY TRIPS OF 12 HOURS OR LESS IN MARYLAND, VIRGINIA AND DC. The expenses for these day trips could include mileage, gas (for SI vehicles), tolls and minor field supplies (i.e., maps, ice, plastic containers). These expenses would be reimbursed by petty cash. There will be no reimbursement for lodging or meals.

Travel to all other destinations and travel in excess of 12 hours and/or requiring per diem – YOU MUST HAVE A TRAVEL AUTHORIZATION.

Also, a reminder to those who have Citibank Travel Cards – do NOT charge anyone else's expenses to your card. If you are splitting lodging, only pay your half with your travel card. Thanks for your cooperation!

Kathie

Kathie Suite, Travel Manager

Phone: 443-482-2201

Fax: 443-482-2375

email: suiteka@si.edu

KLUGEL V. SAMPER
SI - 0416

Message

### Suite, Kathie

| | |
|---|---|
| **From:** | Suite, Kathie |
| **Sent:** | Friday, November 05, 2004 3:38 PM |
| **To:** | Klugel, Dottie |
| **Cc:** | Haddon, Mark |
| **Subject:** | Travel |

I need one form for you and one form for Philip -- both signed by Mark.  I am confused about why you purchased the air with your personal credit card.  You have to obtain permission from Judy Petroski (TSO) to do an "outside purchase of air."  I can't do the travel until you get that permission to me.

Also, when you say "covered by ProjectView" do you mean paid directly or they will reimburse?  If it is paid directly, then I would only put $500 of the air on the authorization and a comment saying that they are paying the remaining $419.60.

The purpose for the travel is not filled in.  I need one for both locations.

Please let me know who is the sponsoring U.S. agency for ProjectVIEW.  *(U.S. Dept. of Ed.*

If I don't have these FULLY completed forms by Monday, I cannot guarantee that I can get the travel done.  I still do not have Jessica Melchior's vendor forms so it is highly unlikely that the vendor people will get her into the system in time for me to do the travel before I go on leave.

PLEASE REMIND ALL THE TRAVELERS TO KEEP THEIR RECEIPTS FOR VOUCHERING PURPOSES.

Kathie

KLUGEL V. SAMPER
SI - 0417

Message                                                                        Page 1 of 1

## Suite, Kathie

**From:**    Suite, Kathie
**Sent:**    Thursday, November 04, 2004 8:53 AM
**To:**      Klugel, Dottie
**Cc:**      Haddon, Mark
**Subject:** Travel

I need a correctly filled out form for you and Philip for the travel to Panama and Belize.  The one I have now is much different than what will actually be occurring.  The official travel dates should be only the dates when you are doing official SI business.  Then put a note as to what days you will be on annual leave AND personal time (holidays, weekends).  On the paperwork that I now have, it says "Y" for both lodging and meals and then there is a note that says "$34 for Nov. 14-16 (cost to stay on BCI each day)."  Does that $34/day include both lodging and meals?

On Belize, the lodging rate is $92 and the meals rate is $74.  Do you need that amount for each official day (which I think is Nov. 19-22)?

Also, please tell me again who is the sponsoring agency for Project VIEW.  I know we talked about it once before and that they are non-profit but I can't remember the name and I have to include it in the travel document.  Thanks!

Kathie

KLUGEL V. SAMPER
SI - 0418

Message

## Suite, Kathie

| | |
|---|---|
| **From:** | Suite, Kathie |
| **Sent:** | Tuesday, November 02, 2004 2:50 PM |
| **To:** | Klugel, Dottie |
| **Cc:** | Haddon, Mark |
| **Subject:** | Travel for teachers |

Dottie,

I still have not seen the vendor forms for the teachers. I normally require 1 month's lead time for foreign travel so this is really pushing the limit. I will be off from the 10th and I can't control how long it takes the Vendor Maintenance folks to get them in the system. You need to impress upon them how urgent it is for them to get the forms in right away.

Kathie

$510.50

allow *[illegible crossed out]* ~~$[illegible]~~

for air.

KLUGEL V. SAMPER
SI - 0419

## Suite, Kathie

| | |
|---|---|
| From: | Petroski Judith |
| Sent: | Monday, November 08, 2004 7:29 AM |
| To: | Klugel, Dottie; Suite, Kathie |
| Subject: | Re: airfare purchase |

Yes.  Carol has it set up to use non-government fares and charge your personal credit cards.

Kathie,

You need to show all stops on the travel authorizaiton if they are going to be on Smithsonian time.  If they are on annual leave for any part of this, you do not need to show that part on the TA.  You only need to show the transportation amount for the part SI is paying.

Judith Petroski
Smithsonian Institution
Manager, Travel Services, OCON
Phone 202-633-1729
FAX 202-357-2049
EMail petroskij@si.edu

>>> Klugel, Dottie 11/05/04 03:47PM >>>

Judy-

Kathie needs you to approve the fact that I and Philip Yunger have paid for our airfare to Panama and Belize with our personal credit cards.  Carol has already processed these credit cards with this travel.  We have done this because neither Philip nor I have a govt credit card (by the way - do you know the status of my reissue request?).  Money to pay for the tickets is coming from several places, one outside the SI, and reimbursing SERC for a ticket centrally billed was going to be difficult.  This way, Philip and I can be reimbursed by the various parties and pay for the airfare that way.

Thanks

Dottie Klugel
Distance Learning Coordinator
Smithsonian Environmental Research Center
647 Contees Wharf Rd.
Edgewater, MD 21037
443-482-2470
443-482-2319 Fax
klugeld@si.edu
www.serc.si.edu/education/dl

KLUGEL V. SAMPER
SI - 0420

-1-

Message

## Suite, Kathie

**From:**    Suite, Kathie
**Sent:**    Wednesday, November 03, 2004 2:55 PM
**To:**    Klugel, Dottie
**Cc:**    Haddon, Mark
**Subject:** Vendor Forms

Dottie,

These people are not employees – they are volunteers, right? At least that is what you said at the beginning of this. Again, I have no control over whether they get into PeopleSoft in time for me to do the travel. The longer they take to get the forms in, the greater the chance that they will not be able to go.

Do not put Jeanine's name as the "Vendor Authorized Signer Name." The name, phone # and title should be those of the vendor (traveler). These forms are very difficult to read. I have had to retype almost all of the information so it is readable. I am too busy to continue to do that. If I can't read them, I will return them to you for clarification.

Regarding the travel, everyone else is leaving Panama City on Nov. 17 at 8:40 am to return to DC. You and Philip are not leaving until Nov. 18 for your annual leave in Belize. If you were not taking annual leave, would you and Philip have returned on Nov. 17 with the rest of the group? I cannot include lodging on Nov. 17 and meals on Nov. 18 unless it is official SI business on those dates.

Philip's travel papers say he is leaving BCI on Nov. 16 and staying in Panama City until Nov. 18. Yours say that you are leaving BCI on Nov. 17, staying in Panama City on Nov. 17 and leaving Panama City on Nov. 18. Please clarify.

The final problem is regarding your and Philip's air. Carol was under the impression that the Belize trip was official business. When I told her otherwise, she said that you would have to purchase your own tickets. You will be reimbursed $510.50 (which is what the RT DCA-PTY is). You have to get approval from Judy Petroski for "outside purchase of air". Just send her an email stating that you are purchasing the tickets yourself because you have personal business in the trip.

Kathie

KLUGEL V. SAMPER
SI - 0421

Suite, Kathie

| | |
|---|---|
| **From:** | Petroski Judith |
| **Sent:** | Monday, November 01, 2004 3:52 PM |
| **To:** | Suite, Kathie |
| **Subject:** | Fwd: RE: confirmed itinerary-govt/reg fare 1141.60 plus 6.00 |

This is the email from Dottie Klugel to Carol.  I think Carol took the "Yes"
to an answer to her question "Are all stops official business?"   I think it
is somewhat ambiguous.

I will talk to Carol tonight and see if she talked to her on the phone.  Carol will not be
back in the office until Wednesday.

>>> Klugel, Dottie 11/01/04 09:19AM >>>
Yes.  I don't need to add another city, just change dates.

Leave DCA for Panama City on Nov 14
Leave Panama City for Belize City Nov 19
Leave Belize City for DCA on Nov 23

Is this fare still 919.60?  With or without taxes?

-----Original Message-----
From: Ailes Carol
Sent: Monday, November 01, 2004 7:13 AM
To: Klugel, Dottie
Subject: RE: confirmed itinerary-govt/reg fare 1141.60 plus 6.00

Are all of these stops official SI business?  Yes, adding a city, Panama, to your
itinerary ups the cost.  I have changed the return to the 27th.

Carol P. Ailes
Smithsonian Institution
Travel Services, OCON
NHB CE 221- MRC 172
Washington, DC 20560
Phone 202-633-1730
Fax 202-357-2049
Email  ailesc@si.edu

>>> Klugel, Dottie 10/31/04 06:45PM >>>
We are very close to confirming this, I promise, Carol.  I just need to know if traveling
from Panama City to Belize City on Fri, Nov 19 increases the fare.  Also, we need to
returned to DCA from Belize City on Wed, Nov 27 as we discussed before.  Then we can book
it at the fare of 919.60 for me and Philip.

-----Original Message-----
From: Ailes Carol
Sent: Thu 10/28/2004 11:10 AM
To: Klugel, Dottie
Cc:
Subject: confirmed itinerary-govt/reg fare 1141.60 plus 6.00

If you want a special fare ticket of 919.60 then you need to ticket this by
Nov. 2nd and is nonrefundable.  Yunger has the same itinerary as you do.  I
have booked all of the others and will send you a copy of one of them and know

that they are all confirmed on the same flights. SALES PERSON: J1
ITINERARY                     DATE: 28 OCT 04

1

KLUGEL V. SAMPER
SI - 0422

CUSTOMER NBR: 0000008641                    EVORVX          PAGE: 01

         TO: SMITHSONIAN INSTITUTION
             TRAVEL SERVICES OFFICE
             WASHINGTON DC 20560
             TELEPHONE 202-633-1730
             FAX 202-357-2049

FOR: KLUGEL/DORATHA


14 NOV 04  -  SUNDAY
     AIR   AMERICAN AIRLINES    FLT:1047    ECONOMY
           LV WASHINGTON REAGAN             614A              EQP: BOEING 757
           DEPART: TERMINAL B                                02HR 28MIN
           AR MIAMI INTERNTNL              842A              NON-STOP
           KLUGEL/DORATHA    SEAT-29D
     AIR   AMERICAN AIRLINES    FLT:2131    ECONOMY
           LV MIAMI INTERNTNL             1105A              EQP: BOEING 757
                                                            02HR 47MIN
           AR PANAMA CITY  PA              152P              NON-STOP
           KLUGEL/DORATHA    SEAT-28C

17 NOV 04  -  WEDNESDAY
     AIR   TACA               FLT:522     ECONOMY           MULTI MEALS
           LV PANAMA CITY  PA              600A              EQP: AIRBUS A320
                                                            02HR 50MIN
           AR SAN SALVADOR                750A              1-STOP
                                                            REF: MQYBJR
           KLUGEL/DORATHA    SEAT- 7C
           VIA SAN JOSE CR SJO
     AIR   TACA               FLT:410     ECONOMY           MULTI MEALS
           LV SAN SALVADOR                835A              EQP: AIRBUS A320
                                                            01HR 05MIN
           AR BELIZE CITY   BZE            940A              NON-STOP
                                                            REF: MQYBJR
           KLUGEL/DORATHA    SEAT- 4C

26 NOV 04  -  FRIDAY
     AIR   AMERICAN AIRLINES    FLT:2172    ECONOMY
           LV BELIZE CITY   BZE            123P              EQP: BOEING 737-800
                                                            01HR 55MIN
           AR MIAMI INTERNTNL             418P              NON-STOP
           KLUGEL/DORATHA    SEAT-15D
     AIR   AMERICAN AIRLINES    FLT:428     ECONOMY
           LV MIAMI INTERNTNL             622P              EQP: BOEING 737-800
                                                            02HR 20MIN
           AR WASHINGTON REAGAN            842P              NON-STOP
           ARRIVE: TERMINAL B
           KLUGEL/DORATHA    SEAT-12D


                              CONTINUED ON PAGE 2
                                   ITINERARY
SALES PERSON: J1                                            DATE: 28 OCT
04
CUSTOMER NBR: 0000008641                    EVORVX          PAGE: 02

         TO: SMITHSONIAN INSTITUTION
             TRAVEL SERVICES OFFICE
             WASHINGTON DC 20560
             TELEPHONE 202-633-1730
             FAX 202-357-2049

FOR: KLUGEL/DORATHA

KLUGEL V. SAMPER
SI - 0423

23 SEP 05  -  FRIDAY
   OTHER WASHINGTON

YOU MUST RECONFIRM YOUR RETURN RESERVATION AT LEAST
72 HOURS IN ADVANCE.
...
ALL UNUSED TICKETS MUST BE RETURNED TO TRAVEL SERVICES
FOR REFUND
..
IF TRAVELING OUTSIDE OF THE U.S., CHECK WITH THE OFFICE
OF INTL RELATIONS ON PASSPORT/VISA REQUIREMENTS AND
STATE DEPT COUNTRY ADVISORIES/WARNINGS.
..
PLEASE CHECK www.EXECTRAVEL.COM FOR THE MOST RECENT
AIRLINE AND FLIGHT INFORMATION AND TO OBTAIN YOUR
BOARDING PASSES.
...
..
INTL SOS CARDS CAN BE PRINTED OFF PRISM UNDER TRAVEL


Carol P. Ailes
Smithsonian Institution
Travel Services, OCON
NHB CB 221- MRC 172
Washington, DC 20560
Phone 202-633-1730
Fax 202-357-2049
Email ailesc@si.edu

KLUGEL V. SAMPER
SI - 0424

**EXHIBIT 6**

**GSA Federal Travel Regulations**

Case 1:05-cv-01806-HHK-DAR    Document 35-8    Filed 08/11/2008    Page 2 of 11

 **U.S. General Services Administration**

| | | | | | | SEARCH |

HOME        BUILDINGS        PRODUCTS        SERVICES        TECHNOLOGY        POLICY        ABOUT GSA

**Federal Travel Regulation**

Overview

Table of Contents

Foreword

Chapter 300-General

Chapter 301-Temp Duty (TDY) Allowances

Chapter 302-Relocation Allowances

Chapter 303-Payment Connected With Death

Chapter 304-Payment from Non-Fed Source

FTR & Related Files

Home > About GSA > Reference > Regulations > Federal Travel Regulation > Chapter 301-Temp Duty (TDY) Allowances

### CHAPTER 301—TEMPORARY DUTY (TDY) TRAVEL ALLOWANCES



**Subchapter C—Arranging for Travel Services, Paying Travel Expenses, and Claiming Reimbursement**

## Part 301-51—Paying Travel Expenses

**Authority:** 5 U.S.C 5707. Subpart A is issued under the authority of Sec. 2, Pub. L. 105-264, 112 Stat. 2350 (5 U.S.C. 5701 note); 40 U.S.C. 121(c).

**Note to Part 301-51:** Use of the pronouns "I", "you", and their variants throughout this part refers to the employee.

### Subpart A—General

**§301-51.1  What is the required method of payment for official travel expenses?**

You are required to use the Government contractor-issued travel charge card for all official travel expenses unless you have an exemption.

**§301-51.2  What official travel expenses and/or classes of employees are exempt from the mandatory use of the Government contractor-issued travel charge card?**

The Administrator of General Services exempts the following from the mandatory use of the Government contractor-issued travel charge card:

(a) Expenses incurred at a vendor that does not accept the Government contractor-issued travel charge card;

(b) Laundry/dry cleaning;

(c) Parking;

(d) Local transportation system;

(e) Taxi;

(f) Tips;

(g) Meals (when use of the card is impractical, e.g., group meals or the Government contractor-issued travel charge card is not accepted);

(h) Phone calls (when a Government calling card is available for use in accordance with agency policy);

(i) An employee who has an application pending for the travel charge card;

(j) Individuals traveling on invitational travel;

(k) New appointees;

(l) Relocation allowances prescribed in Chapter 302 of this title, except en-route travel and househunting trip expenses; and

(m) Employees who travel 5 times or less a year. Even though exempt, agencies have the discretion to issue a travel charge card to such an employee.

**§301-51.3  Who in my agency has the authority to grant exemptions from the mandatory use of the Government contractor-issued travel charge card?**

4

The head of your agency or his/her designee(s) has (have) the authority to grant exemptions from the mandatory use of the Government contractor-issued travel charge card.

**§301-51.4  If my agency grants an exemption, does that prevent me from using the card on a voluntary basis?**

No, an exemption from use would not prevent you from using the Government contractor-issued travel charge card on a voluntary basis in accordance with your agency's policy.

**§301-51.5  How may I pay for official travel expenses if I receive an exemption from use of the Government contractor-issued travel charge card?**

If you receive an exemption from use of the Government contractor-issued travel charge card, your agency may authorize one or a combination of the following methods of payment:

(a) Personal funds, including cash or personal charge card;

(b) Travel advances; or

(c) Government Transportation Request (GTR).

**Note to §301-51.5:** City pair contractors are not required to accept payment by the methods in paragraph (a) or (b) of this section.

**§301-51.6  May I use the Government contractor-issued travel charge card for purposes other than those associated with official travel?**

No, the Government contractor-issued travel charge card may be used only for official travel related expenses.

**§301-51.7  What are the consequences of using the Government contractor-issued travel charge card for non-official travel purposes?**

If you use the Government contractor-issued travel charge card for purposes other than official travel, your agency may take appropriate disciplinary action.

### Subpart B—Paying for Common Carrier Transportation

**§301-51.100  What method of payment must I use to procure common carrier transportation?**

You must use a Government contractor-issued individually billed travel card, centrally billed account, or GTR to procure contract passenger transportation services. For all other common carrier transportation, you must use one of the methods specified in the following table:

| For passenger transportation services costing | You must use | Unless |
|---|---|---|
| a) $10 or less, and air excess baggage charges of $15 or less for each leg of a trip. | A Government contractor-issued individually billed travel card or centrally billed account. | Use of the Government contractor-issued individually billed travel card is not accepted, its use is impracticable or special circumstances justify the use of a GTR. |
| b) More than $10, but not more than $100. | A Government contractor-issued individually billed travel card, centrally billed account, or GTR | None of the other methods are practicable, you may use cash. |
| c) More than $100 | Only a Government contractor-issued individually billed travel card, centrally billed account, or GTR. | Your agency authorizes you to use a reduced fare for group, charter, or excursion arrangements or under emergency circumstances where the use of other methods is not possible. |

**§301-51.101  Which payment methods are considered the equivalent of cash?**

Use of one of the following payment methods of this section to procure common carrier transportation is considered the equivalent of cash and you must comply with the rules in

41 CFR 102-118.50 that limit the use of cash for such purposes.

    (a) Personal credit cards;

    (b) Cash withdrawals obtained from an ATM using a Government contractor-issued individually billed travel card; and

    (c) Checks, both personal and travelers (including those obtained through a travel payment system services program).

### §301-51.102  How is my transportation reimbursement affected if I make an unauthorized cash purchase of common carrier transportation?

    If you are a new employee or an invitational or infrequent traveler who is unaware of proper procedures for purchasing common carrier transportation, your agency may allow reimbursement for the full cost of the transportation. In all other instances, your reimbursement will be limited to the cost of such transportation using the authorized method of payment.

### §301-51.103  What is my liability if I lose a GTR?

    You are liable for any Government expenditure that is caused by your negligence in safeguarding the GTR or tickets received in exchange for the GTR. To avoid liability, immediately report a lost or stolen GTR to your administrative office. If the lost or stolen GTR shows the carrier service desired, and point of origin, promptly notify in writing the named carrier and other local initial carriers. Do not use a GTR that is recovered after having been reported as lost or stolen. Instead, report the recovered GTR to your administrative office.

## Subpart C—Receiving Travel Advances

### §301-51.200  For what expenses may I receive a travel advance?

| For | You may receive an advance |
|---|---|
| a) Cash transaction expenses (i.e., expenses that as a general rule cannot be charged and must be paid using cash, a personal check, or travelers check). | Any time you travel. |
| 1) M&IE covered by the per diem allowance or actual expenses allowance; | |
| 2) Miscellaneous transportation expenses such as local transportation system and taxi fares; ferry fees; bridge, road, and tunnel fees; and aircraft parking, landing, and tie-down fees; | |
| 3) Gasoline and other variable expenses covered by the mileage allowance for advantageous use of a privately owned automobile for official business; and | |
| 4) Other authorized miscellaneous expenses that cannot be charged using a Government contractor-issued charge card and for which a cost can be estimated. | |
| b) Non-cash transaction expenses (e.g., lodging, common carrier, advance payment of discounted conference registration fee). | Only in the following situations: |
| | 1) Government contractor-issued charge card not expected to be accepted. |
| | 2) Government contractor-issued charge card issuance denied. Your agency has decided not to provide you a Government contractor-issued individually billed travel card. |
| | 3) Official change of station. Your agency determines that use of a Government contractor-issued individually billed travel card would not be feasible incident to a transfer, particularly a transfer to another agency. |
| | 4) Financial hardship would be incurred. |

### §301-51.201  What is the maximum amount that my agency may advance?

    The amount your agency advances you may not exceed the following amounts:

| For | The maximum amount your agency may advance is |
| --- | --- |
| Cash transaction expenses | The estimated amount of your cash transaction expenses. (For M&IE, your advance is limited to the M&IE rate under the lodgings-plus per diem method.) |
| Non-cash transaction expenses (See §301-51.200(b)). | Generally zero. However, your agency may advance up to the full amount of your expected non-cash transaction expenses for an individual trip (or not to exceed a 45-day period for an open authorization) in accordance with §301-51.200(b). |

### §301-51.202  When must I account for my advance?

You must file a travel claim which accounts for your advance after completion of your assignment, in accordance with your agency's policy. If you are in a continuous travel status (e.g., an auditor or inspector) or if you submit periodic reimbursement vouchers on an individual trip authorization, your agency may reimburse you the full amount of your travel expenses without any deduction of your advance until such time as you file a final voucher. If the amount advanced is less than the amount of the voucher on which it is deducted, you will be reimbursed the net amount. If the advance exceeds the reimbursable amount, you must immediately refund the excess.

### §301-51.203  What must I do about my advance if my trip is canceled or postponed indefinitely?

Promptly notify the appropriate agency officials and refund any monies advanced in connection with the authorized travel.



Last Reviewed 4/9/2007

Printer Friendly format



**U.S. General Services Administration**

[SEARCH]

HOME        BUILDINGS        PRODUCTS        SERVICES        TECHNOLOGY        POLICY        ABOUT GSA

Federal Travel Regulation

Overview

Table of Contents

Foreword

Chapter 300-General

Chapter 301-Temp Duty (TDY) Allowances

Chapter 302-Relocation Allowances

Chapter 303-Payment Connected With Death

Chapter 304-Payment from Non-Fed Source

FTR & Related Files

Home > About GSA > Reference > Regulations > Federal Travel Regulation > Chapter 304-Payment from Non-Fed Source

**CHAPTER 304—PAYMENT OF TRAVEL EXPENSES FROM A NON-FEDERAL SOURCE**
**Subchapter A—Employee's Acceptance of Payment From a Non-Federal Source for Travel Expenses**

# Part 304-1—Authority

**Authority:** 31 U.S.C. 1353 and 5 U.S.C. 5707.

**§304-1.1  To whom do the pronouns "I", "you", and their variants refer throughout this part?**

Use of pronouns "I", "you", and their variants throughout this part refers to the employee.

**§304-1.2  Under what authority may I accept payment of travel expenses from a non-Federal source?**

Under the authority of this part and 31 U.S.C. 1353, you may accept payment of travel expenses from a non-Federal source on behalf of your agency, but not on behalf of yourself, when specifically authorized to do so by your agency and only for official travel to a meeting. Except as provided in §304-3.13 of this subchapter, your agency must approve acceptance of such payments in advance of your travel.



Last Reviewed 4/4/2007

Printer Friendly format

Help  |  Sitemap  |  Accessibility Aids  |  Linking  |  Privacy and Security  |  Contact Us
Also of Interest:   Whitehouse.gov  |  USA.gov  |  E-Gov.gov  |  ExpectMore.gov  |  Other Suggested Sites



**U.S. General Services Administration**

SEARCH

HOME | BUILDINGS | PRODUCTS | SERVICES | TECHNOLOGY | POLICY | ABOUT GSA

Federal Travel Regulation

Overview

Table of Contents

Foreword

Chapter 300-General

Chapter 301-Temp Duty (TDY) Allowances

Chapter 302-Relocation Allowances

Chapter 303-Payment Connected With Death

Chapter 304-Payment from Non-Fed Source

FTR & Related Files

Home > About GSA > Reference > Regulations > Federal Travel Regulation > Chapter 304-Payment from Non-Fed Source

**CHAPTER 304—PAYMENT OF TRAVEL EXPENSES FROM A NON-FEDERAL SOURCE**
**Subchapter A—Employee's Acceptance of Payment From a Non-Federal Source for Travel Expenses**

# Part 304-3—Employee Responsibility

**Authority:** 5 U.S.C. 5707; 31 U.S.C. 1353.

## Subpart A—General

**§304-3.1 To whom do the pronouns "I", "you", and their variants refer throughout this part?**

Use of pronouns "I", "you", and their variants throughout this part refers to the employee.

**§304-3.2 What is the purpose of this part?**

The purpose of this part is to establish Governmentwide policy and guidance for acceptance by a Federal agency of payment for travel expenses from a non-Federal source for employees to attend meetings. It describes how such payments must be accepted by the agency for travel of agency employee(s) and/or his/her spouse for official Government travel. Except as provided in §304-3.13 of this part, advance agency approval is required to receive such payments.

**§304-3.3 May my agency or I accept payment for travel expenses to a meeting from a non-Federal source?**

Yes, you or your agency may accept such a payment from a non-Federal source, but you may only accept when your agency specifically authorizes such acceptance under the requirements of this part. Except as provided in §304-3.13 of this part, your agency must approve acceptance of such payment in advance of your travel.

**§304-3.4 What payments may my agency or I accept from a non-Federal source?**

You or your agency may accept payments other than cash from a non-Federal source for all of your official travel expenses to attend a meeting of mutual interest, or any portion of those travel expenses mutually agreed upon between your agency and the non-Federal source. You may not accept payments for travel that is not to attend a meeting under this part. However, you may be able to accept payments under other authorities (see §304-3.19).

**§304-3.5 May I solicit payment of my travel expenses from a non-Federal source to attend a meeting?**

No, you may not solicit payment for travel expenses from a non-Federal source to attend a meeting.

**§304-3.6 May I inform a non-Federal source of my agency's authority to accept payment for travel expenses to attend a meeting?**

Yes, you or your agency may inform the non-Federal source of your agency's authority to accept payment for travel expenses to attend a meeting.

**§304-3.7 What must I do if I am contacted directly by a non-Federal source offering to pay my travel expenses to attend a meeting?**

If you are contacted directly by a non-Federal source offering to pay any part of your travel expenses to attend a meeting, you must inform your agency, so that the authorized

agency official can determine whether to accept the payment.

### §304-3.8 Must I adhere to the provisions of the Fly America Act when I receive air transportation to a meeting furnished or paid by a non-Federal source?

No, if the payment or ticket was paid in full directly by the non-Federal source or reimbursed to your agency by the non-Federal source, the provisions of the Fly America Act do not apply. (See §§301-10.131 through 301-10.143 of this title for the regulations implementing the Fly America Act.)

### §304-3.9 May I use business-class accommodations when a non-Federal source pays in full for my transportation expenses to attend a meeting?

Yes, you may use business-class accommodations if your agency authorizes you to do so in accordance with §304-5.5 of this chapter.

### §304-3.10 May I use first-class common carrier accommodations when a non-Federal source pays in full for my transportation expenses to attend a meeting?

Generally no. You may not use first-class common carrier accommodations unless you meet one of the criteria for first class travel contained in §§301-10.123, 301-10.162 and 301-10.183 of this title and are authorized to do so by your agency in accordance with §304-5.6 of this chapter.

### §304-3.11 Am I limited to the maximum subsistence allowances (per diem, actual expense, or conference lodging) prescribed in applicable travel regulations for travel expenses paid by a non-Federal source?

Generally yes. Subsistence expenses are usually limited to the maximum subsistence allowances (per diem, actual expenses or conference lodging) prescribed in Chapter 301 of this title for travel in CONUS, by the Secretary of Defense for travel in non-foreign areas and by the Secretary of State for travel in foreign areas. However, acceptance of payment for, and when applicable, reimbursement by an agency to an employee and the accompanying spouse of such employee are not subject to the maximum per diem or actual subsistence expense rates when traveling in CONUS or in non-foreign areas under the following conditions:

(a) The non-Federal source pays the full amount of the subsistence expense, as authorized by your agency; and

(b) The subsistence expense paid by the non-Federal source is comparable in value to that offered to or purchased by other meeting attendees; and

(c) Your agency has approved acceptance of payment from the non-Federal source prior to your travel; if your agency has not approved any acceptance from the non-Federal source, you may not exceed the maximum allowances. See §304-3.13.

Note: The maximum subsistence allowances established by the Secretary of State for travel to foreign areas may not be exceeded.

### §304-3.12 Must I receive advance approval from my agency before I perform travel paid by a non-Federal source to attend a meeting?

Yes, you must receive advance approval from your agency before performing travel paid by a non-Federal source to attend a meeting except as provided in §304-3.13.

### §304-3.13 After I begin travel to a meeting, what should I do if a non-Federal source offers to pay for one or more of my travel expenses without my or my agency's prior knowledge?

(a) If your agency has already authorized acceptance of payment for some of your travel expenses for that meeting from a non-Federal source, then you may accept on behalf of your agency, payment for any of your additional travel expenses from the same non-Federal source as long as—

(1) The expenses paid or provided in kind are comparable in value to those offered to or purchased by other similarly situated meeting attendees; and

(2) Your agency did not decline to accept payment for those particular expenses in advance of your travel.

Case 1:08-cv-01886-HHK-DAR    Document 35-8    Filed 08/11/2008    Page 9 of 11

(b) If your agency did not authorize acceptance of any payment from a non-Federal source prior to your travel, then—

(1) You may accept, on behalf of your agency, payment from a non-Federal source as authorized in this section—

(i) Only the types of travel expenses that are authorized by your travel authorization (i.e., meals, lodging, transportation, but not recreation or other personal expenses); and

(ii) Only travel expenses that are within the maximum allowances stated on your travel authorization (e.g., if your travel authorization states that you are authorized to incur lodging expenses up to $100 per night, you may not accept payment from the non-Federal source for a $200 per night hotel room);

(2) You must request your agency's authorization for acceptance from the non-Federal source within 7 working days after your trip ends; and

(3) If your agency does not authorize acceptance from the non-Federal source, your agency must either—

(i) Reimburse the non-Federal source for the reasonable approximation of the market value of the benefit provided, not to exceed the maximum allowance stated on your travel authorization; or

(ii) Require you to reimburse the non-Federal source that amount and allow you to claim that amount on your travel claim for the trip.

(c) If you accept payment from a non-Federal source for travel expenses in violation of paragraph (a) or (b) of this section, you may be subject to the penalties specified in §304-3.18.

## §304-3.14  May a non-Federal source pay for my spouse to accompany me to a meeting?

Yes, a non-Federal source may pay for your spouse to accompany you when it is in the interest of and authorized in advance by your agency. All limitations and requirements of this part apply to the acceptance of payment from a non-Federal source for travel expenses and/or agency reimbursement of travel expenses for your accompanying spouse. Your agency may determine that your spouse's presence at an event is in the interest of the agency if your spouse will—

(a) Support the mission of your agency or substantially assist you in carrying out your official duties;

(b) Attend a ceremony at which you will receive an award or honorary degree; or

(c) Participate in substantive programs related to the agency's programs or operations.

## §304-3.15  Must I provide my agency with information about any payment I receive on its behalf?

Yes. Your agency must submit to the U.S. Office of Government Ethics (OGE) a semiannual report (SF 326) of all payments it accepts under this part. You must be prepared to give your agency the information it needs in order to submit its report.

## Subpart B—Reimbursement Claims

## §304-3.16  What must I submit to my agency for reimbursement when a non-Federal source pays all or part of my travel expenses to attend a meeting?

You must submit a travel claim listing all allowable travel expenses that you incurred which were not paid in kind by a non-Federal source. Do not claim travel expenses that were furnished in kind by a non-Federal source. Your reimbursement is limited to the types of expenses authorized in Chapter 301 of this title or analogous provisions of the Joint Travel Regulations or Foreign Affairs Manual. Reimbursement from your agency for expenses will not in any case exceed the amount of the expenses you incur. Such reimbursement will also adhere to established regulatory limitations except where your agency accepts payments under §304-5.4, 304-5.5 or 304-5.6 of this chapter.

## Subpart C—Reports

**§304-3.17  If I am required to file a confidential or public financial disclosure report, must I report travel payments I receive from a non-Federal source on that report?**

Generally, no. As long as payments you receive from a non-Federal source are made to or on behalf of your agency, you are not required to report them as gifts on any confidential or public disclosure report you are personally required to file pursuant to law or Office of Government Ethics (OGE) regulations (5 CFR part 2634). However, you may be required to report any such payments that you and/or your accompanying spouse receive on your own behalf, rather than on the agency's behalf, pursuant to other reporting requirements (e.g., those required by the Ethics in Government Act of 1978).

**Note:** The confidential financial disclosure report is OGE Form 450 and the public financial disclosure report is SF 278.

## Subpart D—Penalties

**§304-3.18  What happens if I accept a payment from a non-Federal source that is in violation of this part?**

If you accept payment from a non-Federal source in violation of this part—

(a) You may be required, in addition to any other penalty provided by law and applicable regulations, to pay the general fund of the Treasury, an amount equal to any payment you accepted; and

(b) In the case of reimbursement under paragraph (a) of this section, you will not be entitled to any reimbursement from the Government for your travel expenses that the payment was intended to cover.

## Subpart E—Relation to Other Authorities

**§304-3.19  Are there other situations when I may accept payment from a non-Federal source for my travel expenses?**

Yes, you may also accept payment of travel expenses from a non-Federal source under the following authorities, in addition to this part:

(a) Under 5 U.S.C. 4111 for acceptance of contributions, awards, and other payments from tax-exempt entities for non-Government sponsored training or meetings (see regulations issued by the Office of Personnel Management at 5 CFR part 410).

(b) Under 5 U.S.C. 7342 for travel taking place entirely outside the United States which is paid by a foreign government, where acceptance is permitted by your agency and any regulations which may be prescribed by your agency.

(c) Under 5 U.S.C. 7324(b) when payment is for travel to be performed for a partisan rather than an official purpose in accordance with the Hatch Act (5 U.S.C. 7321-7326); or

(d) Pursuant to the applicable standards of ethical conduct regulations concerning personal acceptance of gifts. For example, under 5 CFR 2635.204(e), which authorizes executive branch employees to accept gifts based on outside business employment relationships. (**Note:** You may also be able to accept attendance at (but not other travel expenses to) a widely attended gathering under 5 CFR 2635.204(g)(2) when the gathering is not a meeting, as defined in this part, and you are not attending in your official capacity.)

---

Last Reviewed 4/4/2007

Printer Friendly format

Case 1:06-cv-01886-HHK-DAR     Document 35-8     Filed 08/11/2008     Page 11 of 11

Help | Sitemap | Accessibility Aids | Linking | Privacy and Security | Contact Us
Also of Interest:     Whitehouse.gov | USA.gov | E-Gov.gov | ExpectMore.gov | Other Suggested Sites

# EXHIBIT 7

# Affidavit of Doratha Klugel

## AFFIDAVIT OF DORATHA KLUGEL

My name is Doratha C. Klugel, and I am a resident of the District of Columbia, I am over 18 years of age and otherwise competent to make this affidavit.

1.      I am a female, a member of a protected class pursuant to Title VII of the Civil Rights Act of 1964 and as someone with a disability (anxiety) and perceived disability, I am protected under Section 503 of the Rehabilitation Act of 1973, as amended.

2.      I was employed at the Smithsonian Environmental Research Center in Edgewater, Maryland 21037 until May 12, 2005 and during all of the relevant times herein.

3.      As a result of acts and omissions taken by the Smithsonian, I suffered retaliation for invoking my federal employment rights, sexual harassment, a hostile work environment based upon perceived disability and my gender, and was subject to disparate treatment on the basis of my perceived disability and gender.

4.      The acts and omissions of the Agency that gave rise to harassment, a hostile work environment, and disparate treatment based upon gender (female) and disability (anxiety and perceived) included threats of termination for continuing a romantic relationship with my then fiancé, and now husband, Mr. Philip Yunger.  The Agency pried unreasonably and asked questions about my relationship with Mr. Yunger, and also asked questions regarding my sexual behavior with Mr. Yunger and others, and asked questions about the number of sexual encounters I have had.  These questions were done with the intent to cause me to resign from the Smithsonian and to unduly embarrass me and intimidate me.

5.      During this time, and continuing until my last date of employment (May 12, 2005), the Agency also removed me from meaningful assignment and duties, demoted me without cause, denied me medial  leave when properly requested, pretextually submitted

1

me to unwarranted supervision, and made unwarranted threats of legal action and criminal prosecution against me.

6.    The Smithsonian Institution's Inspector General's Office (hereinafter "IG Office"), undertook a campaign of harassment and unreasonable intrusion upon my seclusion by prying unjustly into my romantic relationship with my husband Mr. Yunger.

7.    Specifically, in December 2004, I was subject of an unreasonable investigation by the Smithsonian's Inspector General's office based on false claims that I had misused official travel to have liaisons with Mr. Yunger.

8.    On December 14, 2004, a Special Agent of the IG Office, Special Agent Jerry Roy, questioned me about my travel and accommodation arrangements with Mr. Yunger, and asked me how many boyfriends I have.  The Agency thereafter continued to make inappropriate and unreasonable inquiries into my personal life and my relationship with my husband.

9.    During December 2004, Special Agent Jerry Roy continued to harass me about Mr. Yunger.

10.    Between December 14, 2004 and January 12, 2005, I told my supervisor SERC Education Director Mark Haddon, that I believed I was been unfairly treated by the IG Investigator because of my gender.

11.    At this time, Mr. Haddon told me that I was "angry, confrontational, and always had to be right." Mr.  Haddon suggested I suffered from a personality disorder and suggested I get psychological treatment for this disorder.  Mr.  Haddon offered me a book of his on this matter.

12.    On January 12, 2005 I contacted Ross Simmons, SERC's Director at the time. He stated that no action would be needed because he believed that SERC's Education Director Haddon's harsh dealing with me was the result of Mr. Haddon being reprimanded himself.

13.    On January 12, 2005, SERC Director Simmons told me that I was "one step away from being a marked employee" because of my protest.

14.    On January 20, 2005, I was questioned regarding previously submitted medical leave associated with an automobile accident. I had a broken arm and needed to see a doctor and take medical leave. I was required to present evidence of my personal medical condition based upon an unreasonable inquiry.

15.    On February 22, 2005, SERC Administration Officer Robert Gallagher questioned me about my supposed failure to document leave associate with her short term illness (broken arm). At this meeting, I informed the Mr. Gallagher that I had or would retain counsel and that I believed I was being singled-out for my perceived disability and retaliated against and was being discriminated against.

16.    In March of 2005, my duties were reduced in retaliation for the above referenced statements wherein is sought legal authority about whether I needed to continue to answer unreasonable questions about my personal life and because I informed Mr. Gallagher that I would retain counsel to protect my rights and to protect my self from further discrimination.

17.    On April 12, 2005, Mr.Gallagher directed me to a mandatory EAP based upon a claim that she is suffering from stress and anxiety. When I requested to have her attorney present to protect her federal rights and privacy interests, I was threatened again with

3

adverse action. The referral for an EAP was unwarranted and based on an improper and

unfounded belief that I suffer from a mental impairment, a rumor which was circulated

by Smithsonian personnel and management as a means to place me in a false light within

the Smithsonian.

18.    On April 12, 2005, as retaliation for invoking my right to an attorney, my job

assignments were significantly reduced, and assigned to a male co-worker.

19.    On April 18, 2005, my attorney wrote Robert Gallagher, the Administrative

Officer of SERC and informed him that my anti-discrimination workplace rights were

being violated.

20.    After attempts were made by me to obtain guidance on where to file a complaint

in April, 2005, I was informed that there was no EEO office at the SERC and no contact

person at the SERC to notify regarding violation of my rights. I was not referred to

another Agency or section of the Smithsonian and was left to believe that the

Smithsonian was not covered by the federal processing requirements as they pertain to

antidiscrimination complaints.

21.    On May 2, 2005, the Smithsonian Institution placed me on a "progress report"

despite no documented performance deficiencies, in retaliation for this contact which

sought EEO protection. I was denied any EEO protection after my requests, and I

continued to be faced with a pervasive, hostile working environment, and with further

insults to her character, mental impairments or speculation thereon, and my relationship

with my husband, Mr. Yunger.

22.    I resigned under threat of further retaliation and termination.

23.    I was not contacted by the Smithsonian about informal counseling and never advised of my rights or the procedures under which I could file an EEO complaint.

24.    Frustrated that no one had contacted me, my counsel on September 23, 2005 submitted a "Formal EEO Complaint" with the Agency.  In Response, on September 28, 2005, after repeated attempts by my counsel to file a claim and have it acknowledged by the Smithsonian, the Smithsonian, for the first time, acknowledged my claims and attempted to initiate the informal counseling session.

IN THE CITY/COUNTY OF:

I Doratha C. Klugel, having read the above, state that the statements contained herein are true and correct to the best of my knowledge and belief.

_____
Doratha C. Klugel

DISTRICT of COLUMBIA

SUBSCRIBED AND SWORN to before me, this _9_ day of _February_, 2005. 2007

_____
Notary Signature

My Commission Expires:  03-31-08

—

# EXHIBIT 8

# Defendants' Discovery Responses



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Dorotha Klugel,                             )
                                            )
    Plaintiff,           )
                                            )
v.                                          )    Civil Action No. 06-1886 (HHK)
                                            )
Cristian Samper, Acting Secretary,          )
    Smithsonian Institution,  )
                                            )
and                                         )
                                            )
the UNITED STATES OF AMERICA,               )
                                            )
    Defendants.           )

**DEFENDANT'S RESPONSES TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendants hereby respond to Plaintiff's first set of interrogatories. Defendants base the following responses and objections on their current knowledge, information, and belief, and reserve the right to supplement these responses and objections, to the extent appropriate, if additional information is located and reviewed.

**GENERAL OBJECTIONS**

Defendants assert the following general objections to the interrogatories, both individually and collectively, and to the "Definitions and Instruction" sections thereto, whether or not separately set forth in response to each of the discovery requests below:

1. Defendants objects generally to the interrogatories insofar as they seek information not relevant to Plaintiff's three remaining claims in this action, specifically:

-1-

Employee Relations Branch) to request information in response to a FOIA request from Plaintiff's counsel for documents.

The Smithsonian's Office of General Counsel (paralegal Annette Fancher) contacted the OIG (A. Sprightley Ryan) for information relevant to Plaintiff's administrative tort claims.

**Interrogatory No. 3:**  Please identify each and every employee of the Smithsonian by name, gender and actual or perceived disability who has been subject to an investigation by the Smithsonian's Inspector General's Office in the past seven years concerning their use of travel or their being accompanied on travel.  For each employee, state the date and nature of the investigation, the persons conducting it, and the nature and substance of any questioning.

**Response:**  Defendants reiterate and incorporate the general objections noted above. Defendants further object on the ground that this interrogatory seeks information that is not relevant to any of Plaintiff's claims because (1) Plaintiff was not the subject of any investigation by the Smithsonian's OIG; (2) the OIG's questions regarding Plaintiff's travel were not related in any way to any actual or perceived disability; and (3) Plaintiff's claim is that her supervisors at SERC, not the OIG, violated the Rehabilitation Act when they asked her to submit leave requests and documents supporting her requests for medical leave.  Defendant further objects to this interrogatory to the extent it seeks information that is protected by the privacy interests of third parties.

**Interrogatory No. 4:**  Please identify each and every employee of the Smithsonian by name, gender and actual or perceived disability who has been subject to an investigation by the Smithsonian's Inspector General's Office in the past seven years concerning any automobile accident or any injuries resulting from such accident.  For each employee, state the date and

nature of the investigation, the persons conducting it, and the nature and substance of any questioning.

**Response:**   Defendants reiterate and incorporate the general objections noted above. Defendants further object on the ground that this interrogatory seeks information that is not relevant to any of Plaintiff's claims because (1) Plaintiff was not the subject of any investigation by the Smithsonian's OIG; (2) the OIG's questions regarding Plaintiff's travel were not related in any way to any actual or perceived disability; and (3) Plaintiff's claim is that her supervisors at SERC, not the OIG, violated the Rehabilitation Act when they asked her to submit leave requests and documents supporting her requests for medical leave.  Defendants further object  to this interrogatory on the ground that the OIG did not ask any questions regarding any automobile accident or any injuries resulting from such an accident.  The OIG's questions were limited to those relevant to a complaint alleging possible misuse of official government travel.

Defendant further objects on the ground that, if the OIG's office did conduct an investigation of an automobile accident or injuries resulting therefrom, that information would be protected by the privacy interests of individuals other than Plaintiff.

**Interrogatory No. 5:**  Please identify each and every employee of the Smithsonian by name, gender and actual or perceived disability who has been subject to an investigation by the Smithsonian's Inspector General's Office in the past seven years concerning their sexual orientation, sexual history, relationship with any person accompanying them on travel, or which involves any investigation into the nature and extent of any employee's injuries or medical treatment arising out of an automobile accident.  For each employee, state the date and nature of the investigation, the person's [sic] conducting it, and the nature and substance of any

-8-

**Response:**  Defendants reiterate and incorporate the general objections noted above. Defendants further object on the ground that this interrogatory seeks information that is not relevant to any of Plaintiff's claims because (1)  Plaintiff was not the subject of any investigation by the Smithsonian's OIG; (2) the OIG's questions regarding Plaintiff's travel were not related in any way to any actual or perceived disability; Plaintiff's claim is that her supervisors at SERC, not OIG, violated the Rehabilitation Act when they asked her to submit leave requests and documents supporting her requests for medical leave; (3) the OIG's questions regarding Plaintiff's travel were not related in any way to her gender; (4) the OIG did not ask Plaintiff or any other employee any questions regarding any automobile accident or any injuries resulting from such an accident.  Defendants further object to this interrogatory to the extent that it seeks information about third parties and infringes upon the privacy rights of those individuals.

**Interrogatory No. 6:**  Please identify the date and substance of any communications made by Special Agents Gerald Roy and Tuck Hines to Doratha Klugel or to any person concerning Doratha Klugel; and identify the dates they were made, the persons involved in the communications, and whether the communications were oral or written.

**Response:**  Defendants reiterate and incorporate the general objections noted above. Subject to and without waiving these objections, Defendants assert the following:

Tuck Hines is not a Special Agent and has never worked for the OIG.  He is Director of SERC, a position he assumed in July 2005.  From March 29, 2005 to July 2005, Dr. Hines was Acting Director of SERC.  In December 2004, Dr. Hines had no official contact with the Plaintiff and did not act as her first, second, or third line supervisor.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Dorotha Klugel, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 06-1886 (HHK) |
| | ) |
| Cristian Samper, Acting Secretary, | ) |
| Smithsonian Institution, | ) |
| | ) |
| and | ) |
| | ) |
| the United States of America, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' FIRST SUPPLEMENTAL RESPONSE TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rule of Civil Procedure 33, Defendants hereby provide their first

supplemental response to plaintiff's first set of interrogatories.  Defendants base the following

responses and objections on their current knowledge, information, and belief, and reserve their

right to supplement these responses and objections, to the extent appropriate, if additional

information is located and reviewed.

## GENERAL OBJECTIONS

Defendants incorporate the general objections contained in defendants' response to

plaintiff's first set of interrogatories.

## FIRST SUPPLEMENTAL RESPONSE TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendants provide this first supplemental response to plaintiff's first set of

interrogatories without intending to waive, and expressly preserving the right to object to other

discovery procedures involving and related to the subject matter of these document requests.

**Interrogatory No. 3:**    Please identify each and every employee of the Smithsonian by name, gender and actual or perceived disability who has been subject to an investigation by the Smithsonian's Inspector General's Office in the past seven years concerning their use of travel or their being accompanied on travel.  For each employee, state the date and nature of the investigation, the persons conducting it, and the nature and substance of any questioning.

**Supplemental Response:**    Defendants reiterate and incorporate the general objections set forth in their initial response to plaintiff's first set of interrogatories as well as the specific objections set forth in defendant's response to interrogatory no. 3.  Subject to and without waiving these objections, defendants respond as follows:

The OIG does not note actual or perceived disability of a Smithsonian employee unless it is relevant to the investigation.  In the inquires/investigations listed below, the actual or perceived disability, if any, was not relevant and therefore it was not provided in the OIG's files.

From 2001 to 2006, the OIG conducted the following inquires and investigations regarding the use of travel or accompaniment on travel, with one exception.  The OIG cannot locate a file pertaining to an inquiry conducted by Gerard Roy from February 10, 2004 to May 8, 2004.  It apparently involved travel questions regarding an unknown subject.

The dates stated below reflect the opening and closing of an entire complaint file and not necessarily a specific allegation contained within the file.

(1) Employee 1, male — April 9, 2002 to February 23, 2004; substantiated claim that Employee 1 submitted a false, fraudulent, or misleading travel voucher which included expenses for Employee 1's wife who accompanied Employee 1 on the official trip; Anthony Medici and Gerard Roy; Employee 1 was not questioned because he entered into a Settlement Agreement

with the Smithsonian Institution and resigned from his position.

(2) Employees 2, 3, and 4, all male — April 1, 2004 to January 31, 2006; unfounded allegation that Employees 2, 3, and 4 engaged in official travel overseas in violation of the Fly America Act, 49 U.S.C. § 40118; Gerard Roy; Employee 2 may have been questioned about the allegations via an in-person interview; Employee 3 was questioned about the allegations via an in-person interview and claimed that he was not aware of the applicable regulations; Employee 4 may have been questioned about the allegations via a telephonic interview.

(3) Employee 5, male — March 1, 2005 to September 29, 2006; substantiated claim that Employee 5 purchased a ticket less than $100 with Employee 5's government travel card for another Smithsonian employee to accompany Employee 5 on official travel; Gerard Roy; Employee 5 was questioned via telephone (with follow-up via email) during which Employee 5 claimed that the same travel card was mistakenly used for both tickets and was admonished by Gerard Roy to be more careful about the use of travel cards.

(4) Employee 6, female — April 3, 2006 to April 12, 2006; unfounded allegation that Employee 6 used government travel card for non-authorized travel; Michael Pickett; Employee 6 was questioned by Michael Pickett about the allegations and denied any wrongdoing.

**Interrogatory No. 4:** :  Please identify each and every employee of the Smithsonian by name, gender and actual or perceived disability who has been subject to an investigation by the Smithsonian's Inspector General's Office in the past seven years concerning any automobile accident or any injuries resulting from such accident.  For each employee, state the date and nature of the investigation, the persons conducting it, and the nature and substance of any questioning.

**Supplemental Response:**    Defendants reiterate and incorporate the general objections

set forth in their initial response to plaintiff's first set of interrogatories as well as the specific

objections set forth in defendant's response to interrogatory no. 4. Subject to and without

waiving these objections, defendants respond as follows:

The OIG does not conduct investigations regarding persons who have been involved in

automobile accidents, absent an allegation of fraud. There were no such allegations involved in

this case, and the OIG in fact did not conduct any investigation of the plaintiff.

**Interrogatory No. 5:** Please identify each and every employee of the Smithsonian by

name, gender and actual or perceived disability who has been subject to an investigation by the

Smithsonian's Inspector General's Office in the past seven years concerning their sexual

orientation, sexual history, relationship with any person accompanying them on travel, or which

involves any investigation into the nature and extent of any employee's injuries or medical

treatment arising out of an automobile accident. For each employee, state the date and nature of

the investigation, the person's [sic] conducting it, and the nature and substance of any

questioning.

**Supplemental Response:**    Defendants reiterate and incorporate the general objections

set forth in their initial response to plaintiff's first set of interrogatories as well as the specific

objections set forth in defendant's response to interrogatory no. 5. Subject to and without

waiving these objections, defendants respond as follows:

The OIG does not note the actual or perceived disability of a Smithsonian employee

unless it is relevant to the investigation. In the investigation listed below, the actual or perceived

disability, if any, was not relevant and therefore it was not provided in the OIG's files.

For inquires/investigations relating to the accompaniment on travel or automobile

accidents, see Interrogatories 3 and 4 respectively. The OIG does not conduct inquires or

*igations* about sexual harassment, which is in the jurisdiction of Smithsonian's Office of

*Equal* Employment and Minority Affairs, and from 2001 to 2006, the OIG did not conduct any

*inquiries* or investigations regarding sexual orientation.

From 2001 to 2006, the OIG conducted the following investigation regarding sexual

history. The dates stated below reflect the opening and closing of an entire complaint file and not

necessarily a specific allegation contained within the file.

(1) Employee 7, male — February 7, 2006 to January 31, 2007; unsubstantiated allegation

that Employee 7 had an improper relationship with a female subordinate (Employee 8) that

resulted in the subordinate receiving pay increases and questionable authorization of travel;

Gerard Roy; source denied any knowledge about the allegation, and as a result, Employees 7 and

8 were not questioned.

**Interrogatory No. 6:**  Please identify the date and substance of any communications

made by Special Agents Gerald Roy and Tuck Hines to Doratha Klugel or to any person

concerning Doratha Klugel; and identify the dates they were made, the persons involved in the

communications, and whether the communications were oral or written.

**Supplemental Response:**     Defendants reiterate and incorporate the general objections

set forth in their initial response to plaintiff's first set of interrogatories as well as the specific

objections set forth in defendant's response to interrogatory no. 6.  Subject to and without

waiving these objections, defendants respond as follows:

In December 2004, Mr. Hines, then Assistant Director, had oral communication with then

Director Ross Simons, who informed Mr. Hines that OIG was looking into the travel associated

with Ms. Klugel and Ms. Erb.

In April, 2005, as Acting Director, Mr. Hines communicated orally with Mark Haddon

# EXHIBIT 9

# List of Medications

Microgestion
Celexa 20mg
Zelnorm 12mg
Robinul
Gabitril
Temanzapam
Lipitor

KLUGEL V. SAMPER
SI - 0239