## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **DORATHA KLUGEL**, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| **G. WAYNE CLOUGH, Secretary,** | ) |
| **Smithsonian Institution,** | ) |
|  | ) |
| **and** | ) |
|  | ) |
| **THE UNITED STATES OF** | ) |
| **AMERICA,** | ) |
|  | ) |
| Defendants. | ) |

**Civil Action No.: 06-1886 (HHK-DAR)**

### DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR
### MOTION FOR SUMMARY JUDGMENT

_____Defendants, G. Wayne Clough, Secretary of the Smithsonian Institution, and the United

States of America, hereby submit their Reply in Further Support of Their Motion for Summary

Judgment pursuant to Federal Rule of Civil Procedure 56.

### INTRODUCTION

_____Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment

("Pl.'s Opp'n") readily supports defendants' contention that plaintiff has sought to paint a

distorted picture of the events in this case in order to support her claims. In addition to failing to

properly oppose defendants' statement of material facts, plaintiff now seeks to effectively amend

the allegations of her complaint, making various assertions that are simply not supported by the

record in this case. To borrow a phrase from plaintiff, plaintiff's opposition is "long" on the

facts, but "short" on the law, see Pl.'s Opp'n at 23, law which amply supports defendants'

request for summary judgment in this case.

As defendants' motion for summary judgment ("Defs.' Mot.") clearly set forth, there are three claims remaining in this action: plaintiff's gender discrimination claim and hostile work environment claim under Title VII; plaintiff's claim for disability discrimination pursuant to the Rehabilitation Act; and plaintiff's tort claim, pursuant to the Federal Tort Claims Act ("FTCA"), for invasion of privacy. See Memorandum Opinion and Order dated October 25, 2007 ("Mem. Op.") at 15-16.[1]  Furthermore, the only specific claims this Court has held plaintiff may assert are her claims "that the [agency] violated Title VII by discriminating against her on the basis of her sex in connection with the Inspector General's December 2004 investigation[,] . . . her claim that the [agency] violated the Rehabilitation Act by asking her questions about her medical leave" and her invasion of privacy claim. Mem. Op. at 15-16.

When viewed in the context of the legal claims she has remaining, the accurate and undisputed facts in this case amply support defendants' motion for summary judgment.

## ARGUMENT

### I.    Defendants' Statement of Materials Facts Should Be Deemed Admitted.

Plaintiff has failed to properly oppose defendants' statement of material facts as to which there is no genuine dispute and many of plaintiff's alleged "facts" are unsupported by citation to the record, contain improper argument, and are not material.  For these reasons, the Court should deem defendants' statement of material facts admitted.

---

[1]The Court has held that plaintiff is precluded from raising her claims that the agency violated the Rehabilitation Act by referring her to the Employee Assistance Program ("EAP"), that the agency retaliated against her under Title VII and the Rehabilitation Act for complaining about discrimination, and that the agency violated these same statutes by constructively discharging her.  See Mem. Op. at 8-9. The Court also dismissed plaintiff's defamation claim against the United States. Id. at 14.

**A.    Plaintiff Has Failed to Controvert Defendants' Statement of Material Facts.**

Local Civil Rules 56.1 and 7(h) require that an opposition to a motion for summary

judgment

> shall be accompanied by a separate concise statement of genuine
> issues setting forth all material facts as to which it is contended there
> exists a genuine issue necessary to be litigated, which shall include
> references to the parts of the record relied on to support the statement.
> . . . In determining a motion for summary judgment, the court may assume
> that facts identified by the moving party in its statement of material facts
> are admitted, unless such a fact is controverted in the statement of genuine
> issues file[d] in opposition to the motion.

LCvR 56.1; see also LCvR 7(h) (same).

Here, plaintiff has not identified the specific facts contained in defendants' statement of

material facts that she is disputing.  Rather, plaintiff sets forth a narrative of the facts she

contends are "material facts subject to dispute."  Pl.'s Opp'n at 2.  Her failure to identify those

specific facts contained in defendants' statement of facts that she disputes (or contends are not

material) should result in the Court deeming defendants' statement of facts as admitted.  See

Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 154 (D.C. Cir.

1996) ("[T]he . . . district court is under no obligation to sift through the record . . . in order to

evaluate the merits of [a] party's case.  Instead, pursuant to the remedy afforded by [the local

rule], the district court is to deem as admitted the moving party's facts that are uncontroverted by

the nonmoving party's [statement of facts].") (footnote omitted); Frazza v. United States, 529 F.

Supp. 2d 61, 63 (D.D.C. 2008) (holding that defendants' statement of material facts not in

dispute would be deemed admitted where plaintiff's opposition "did not even attempt to

controvert Defendant's specific factual assertions.").

**B.      Plaintiff's Statement of Material Facts Fails to Comport with the Court's Local Rules.**

_____The Court should further deem defendants' statement of material facts as admitted in light of plaintiff's failure to submit a proper statement of material facts in dispute.  Plaintiff was required to submit a "concise statement of genuine issues" that "include[d] references to the parts of the record relied on to support the statement."  LCvR 56.1; LCvR 7(h).  Instead, plaintiff has submitted an approximately 13 page narrative of facts, which is intertwined with improper argument.  See, e.g., Pl.'s Opp'n at 10 ("What Mr. Roy did do was interrogate a frightened Ms. Klugel for twenty to thirty minutes . . . .'"); id. at 11 ("Thus, there remains the central issue of why male members of SERC were allowed to travel with girlfriends and children, while Ms. Klugel, and to some extent Ms. Erb, were subject to an Inspector General investigation for the same conduct.").[2]

In addition, where she does cite to the record, many of the "facts" asserted by plaintiff are simply not supported by the citations she provides.  A sample of these instances readily reveals that plaintiff's statement of facts should not be deemed sufficient to create disputed issues of "material" facts:

♦      Plaintiff contends she would have been working in an official capacity on both the Panama and Belize trips.  Pl.'s Opp'n at 4.  Although plaintiff cites to her deposition testimony where she testified that she was going to be working in Belize, Pl.'s Opp'n, Ex. 1 (Klugel Depo.) at 36:16-18, she ignores that portion of her testimony where she testified that at least part of the trip to Belize was for "annual leave."  Id. at 37:20-22.

♦      Plaintiff contends that "Mr. Yunger was a registered volunteer with SERC who could have accompanied Ms. Klugel at a government rate . . . ."  Pl.'s Opp'n at 4.

_____

[2]As further discussed, infra at 10-11, the incidents plaintiff points to concerning travel by other employees with family members/friends is not similar to plaintiff's conduct in this case.

4

However, the testimony cited by Ms. Suite does not support this assertion.  Pl.'s Opp'n, Ex. 1 (Suite Depo.) at 17:12-18 (testifying that she did not know anything about Mr. Yunger being a registered volunteer, other than what his paperwork stated).

♦        Plaintiff contends that "Ms. Suite, on her own accord and without any investigation into the validity of the travel, raised an objection to her supervisor, Carol Ailes, over Ms. Klugel's voucher."  Pl.'s Opp'n at 4.  However, Ms. Suite's testimony indicates that she raised the question concerning Ms. Klugel's travel because she received an itinerary of plaintiff's flights, which included Belize, which prompted her to call Ms. Ailes to ask why Belize, as personal time, had been included on plaintiff's official government itinerary.  Pl.'s Opp'n, Ex. 1 (Suite Depo) at 20:1-22.  According to Ms. Suite, Ms. Ailes stated that plaintiff had told her that Belize was business related, and said she would call the Inspector General because of the discrepancy in the information received from plaintiff.  Id. Further, Ms. Ailes was not Ms. Suite's supervisor.  See id. at 19.

♦        Plaintiff contends that "[i]n the end, Mr. Roy could not definitively state why he investigated this incident or what wrongdoing was involved.  Mr. Roy admitted that Mr. Yunger was authorized to obtain a government fare ticket."  Pl.'s Opp'n at 9.  Plaintiff cites her counsel's question in support of this assertion.[3]  See Pl.'s

---

[3]It appears plaintiff repeats this tactic when asserting that "[t]he 'questionable' conduct then in this case boiled down to Mr. Roy's unsupported belief that there was something sinister in Mr. Yunger's wanting to save the government money by paying for his own ticket."  Pl.'s Opp'n at 10.  This statement, which is unsupported by any citation to the record, is not supported by Mr. Roy's testimony, but instead, by plaintiff's counsel's question.  Compare Pl.'s Opp'n, Ex. 1, (Roy Depo.) at 88:12-15 ("Q. So, the objection was that even though these gentlemen didn't have to reimburse the government they were going to reimburse the government?") with id. at 88:16-17 ("A. No.  What created the impression [that there was something improper] was that they wanted to get a cheap ticket to go.").  In addition, plaintiff's contention that "Mr. Pickett stated that the allegation the Inspector General received was that Ms. Klugel was misusing travel to take her boyfriend with her on trips[,]" is belied by complete reference to Mr. Pickett's testimony:

Q.    But, the underlying allegations in this case apparently went to claims that Ms. Klugel was finagling travel to allow her boyfriend to go with her to locations.  Are you familiar with that?

A.    Okay

Q.    Are you personally familiar with the facts of the investigation?

A.    Not in detail.

Q.    Okay.

A.    But, generally I've heard that.

Q.    Fair to say that that was the issue whether she was misusing travel to have her boyfriend go with her?

A.    That's my understanding.

5

Opp'n, Ex. 1 (Roy Depo.) at 100:03-100:05 ("Q. But you've already testified that [Mr. Yunger] was authorized to get a government fare ticket if he was performing services for the Smithsonian."). Mr. Roy disavowed this characterization of his testimony and explained that management's authorization of the trip was not the end of the inquiry. See id. at 100:06-100:09) ("No, sir. I was – I testified that he [Mr. Yunger] was authorized but that didn't mean we necessarily agreed with management's assessment of it.").

♦    Plaintiff contends that Mr. Roy "admitted that the government could have paid for Mr. Yunger's ticket, since he was traveling on behalf of the Agency." Pl.'s Opp'n at 10. What the cited testimony reveals, however, is the following statement by Mr. Roy: "A volunteer, anybody can travel for the government if the government wants them to travel. If the government wants them to travel, then they don't have to reimburse the government." Pl.'s Opp'n, Ex. 1 (Roy Depo.) at 88:08-88:11 (emphasis added).

This sampling from plaintiff's statement of material facts reveals that her presentation of the facts she believes are "material" is wholly insufficient and fails to comply with the Court's local rules.[4] See, e.g., Securities Exchange Comm'n v. Banner Fund Internat'l, 211 F.3d 602, 616 (D.C. Cir. 2000) (holding that district court was fully justified in deeming the SEC's statement of material facts as admitted where defendant, in opposing the SEC's motion for summary judgment, failed to "point[ ] to specific parts of the record controverting the SEC's

---

Ex. 1, attached herewith, Excerpts from the Deposition of Michael Pickett ("Pickett Depo."), at 15-16. Notably, Mr. Pickett was the agency's 30(b)(6) deponent concerning OIG procedures, and, as revealed above, was not personally involved in the inquiry concerning plaintiff's travel.

[4]Plaintiff also fails to consistently support her statements of fact with citation to the record. For example, on page 12 of her opposition, plaintiff boldly asserts "[t]he Agency's response was to challenge [plaintiff] changing trip times to accommodate her physical therapy, demanding and securing a list of her medications, denying her leave, and questioning whether she was malingering[,]" without any citation to any part of the record. See also id. (Stating that "[i]ndeed, rather than assist Ms. Klugel, Mr. Haddon exacerbated the issue, along with Robert Gallagher[,]" without any citation to the record). At other points, it is unclear what support plaintiff intends to cite. For example, on page four of her opposition, plaintiff asserts "The facts suggest, however, that the real reason for the referral is that Klugel was upset with Ms. Suite for unilaterally imposing time and other restrictions on travel . . . ." Plaintiff provides a citation to "29:05-09; 143:07-15; 145:12-19" without identifying the deposition from which she is citing. Pl.'s Opp'n at 4.

statement of undisputed facts."); <u>Duniya v. Rice</u>, No. Civ.A. 04-0851, 2007 WL 1549074, at *1

& n.2 (D.D.C. May 25, 2007) (deeming defendant's statement of facts as "uncontroverted" in

light of plaintiff's submission of an opposition with a section entitled "Statement of Material

Facts and Procedural Background" that was devoid of references to the record and contained

conclusory assertions); <u>Colbert v. Chao</u>, No. Civ.A. 99-0625, 2001 WL 710114, at *8 (D.D.C.

June 19, 2001) (holding defendant's statement of facts would be deemed admitted where plaintiff

filed "a narrative section of plaintiff's opposition which [was] 'replete with factual assertions not

material to plaintiff's substantive claims[,]' and . . . 'repeatedly blend[ed] . . . with legal

argument . . . .") (citation omitted).  For these reasons, defendants' statement of material facts

should be deemed admitted.[5]

## II.     Plaintiff Cannot Establish a Claim of Gender Discrimination.

Plaintiff contends that she has successfully presented <u>direct</u> evidence of discrimination,

which warrants her being able to present her claims to a jury.  Alternatively, plaintiff contends

she has presented a sufficient claim of disparate treatment.  Neither of plaintiff's contentions is

true.

---

[5]As in <u>Colbert</u>, many of the facts plaintiff presents here are, even if true, simply not material to this action.  For example, plaintiff contends that "Mr. Yunger was a well respected and thought of volunteer."  Pl.'s Opp'n at 3.  It is not clear why this fact is material to whether plaintiff was properly questioned concerning Mr. Yunger's improper attempt to obtain the government rate for travel.  In addition, this statement is not supported by plaintiff's citation to Messrs. Haddon's and Hines' depositions.  Pl.'s Opp'n, Ex. 1 (Haddon Depo.) at 53:02-53:09 (testifying that he told Mr. Roy that he didn't "know about exactly all of [Mr. Yunger's] professional training" but that he knew that Mr. Yunger was "very competent in videography . . . ."); <u>id.</u> (Hines Depo.) at 34-35 (testifying that the quality of Mr. Yunger's work "seemed okay" to him and noting that he was "not supervising his daily activities . . . .").  Notably, Mr. Hines testified that he "was not aware" of Mr. Yunger performing any photography or videograpy for SERC.  <u>Id.</u> at 35.

A.      **Plaintiff Has Failed to Present Direct Evidence of Discrimination.**

Plaintiff fails to appreciate the concept of "direct evidence" when she contends she has

presented direct evidence of discrimination in this case.[6]  According to plaintiff, she has provided

direct evidence of discrimination because "no male in the Agency, in any of the witnesses'

memories[[7]], stretching back over two decades, was ever subjected to an Inspector General's

investigation based on perceived improprieties created by the fact that they were traveling with

the member of the opposite sex whom they listed as a volunteer."[8]  Pl.'s Opp'n at 18; see also id.

at 16.  This is not direct evidence under Title VII.

"Direct evidence of discrimination is evidence that, 'if believed by the fact finder, proves

---

[6]Although not mentioned by plaintiff, when attempting to prove a direct case of discrimination, reference to the McDonnell Douglas burden shifting paradigm is inappropriate.  Feemster v. BSA Limited Partnership, 471 F. Supp. 2d 87, 100 & n.9 (D.D.C. 2007).  Cases involving "direct evidence" of discrimination are analyzed using the "mixed motives" analysis set forth by the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989).  Id.  This analysis requires plaintiff to show "that discrimination 'was a motivating factor for any [decisionmaker's] practice, even if other factors also motivated the practice.'"  Id. (citation omitted).

[7]Mr. Haddon only testified that he was "not aware" of any other OIG investigations during the time he served as education director.  Pl.'s Opp'n, Ex. 1 (Haddon depo.) at 42:04-42:10.  Furthermore, plaintiff's citation to Ms. Ailes' testimony only supports a finding that Ms. Ailes could not remember how many people she had referred to the OIG's office in 2005.  Pl.'s Opp'n at 10; Pl.'s Opp'n, Ex. 1 (Ailes Depo.) at 20:21-21:03.  Ms. Ailes specifically testified that over an approximate ten year period, she had referred between five and ten people to the OIG's office when she believed there to be potential fraud or abuse of travel.  Defs.' Mot., Ex. 11 (Ailes Depo.) at 9-10.  While plaintiff contends that "Mr. Roy was equally vague on the prior Inspector General efforts[,]" she provides no citation for this fact.  Pl.'s Opp'n at 10.  In fact, Mr. Roy specifically testified that Ms. Ailes would call him "whenever she found what she thought to be travel irregularities . . . [,]" and he perceived Ms. Ailes "[a]s someone who was very conscientious about her job."  Defs.' Mot., Ex. 12 (Roy Depo.) at 20-21.  Further, Mr. Pickett testified that the OIG does "conduct investigations of travel irregularities[.]" Ex. 1 (Pickett Depo.) at 14.

[8]To the extent plaintiff attempts to argue she was singled out for questioning because she sought to travel with an individual who was not her husband, it is clear that Title VII does not protect her.  See Christopher v. Billington, 43 F. Supp. 2d 39, 47 (D.D.C. 1999) (noting that Title VII did not provide a cause of action based on plaintiff's assertion that she was discriminated against on the basis of her "marital status.") (citations omitted).

the particular fact in question' <u>without any need of an inference</u>." <u>Davis v. Ashcroft</u>, 355 F.

Supp. 2d 330, 340 & n.2 (citation omitted). <u>See also</u> <u>Simpson v. Leavitt</u>, 437 F. Supp. 2d 95,

105 (D.D.C. 2006) (holding that evidence that selecting official stated the agency needed to

"bring in" younger people was not direct of age discrimination where evidence did not "'directly

*prove* a fact of consequence in the action,' but instead may 'permit[ ] the fact finder to *infer* the

existence of such a fact . . . .") (citation omitted). <u>Cf.</u> <u>Trans World Airlines, Inc. v. Thurston</u>, 469

U.S. 111, 121-22 (1985) (finding that policy provided direct evidence of discrimination because

it was dependent on a pilot's age and thus was "discriminatory on its face.") (citation omitted).

 Plaintiff cannot provide direct evidence that the basis for her questioning by the OIG was

based on her gender.[9]  Rather, she seeks to have the Court <u>infer</u> this fact based on her assertion

that no witness could recall males being questioned.  However, the evidence in fact demonstrates

that Mr. Haddon was also questioned as a consequence of his approval of the travel in question.

<u>See</u> Defs.' Mot., Ex. 5 (Haddon Depo.) at 53-54, 152-53.  And, most damaging to plaintiff's

assertion is the fact that the agency produced evidence that there were males subjected to

inquiries concerning alleged travel irregularities.  <u>See</u> Pl.'s Opp'n, Ex. 8 (Defendants' First

Supplemental Response to Plaintiff's First Set of Interrogatories ("Defs.' Supp'l Rog Resp."),

response to Interrogatory No. 3 (indicating that between 2001-2006, there were five males who

were questioned about travel).  In short, plaintiff has not provided this Court with any direct

---

[9]In fact, plaintiff believes that "the <u>real reason</u>" that she was questioned by the OIG was Ms. Suite's and Ms. Ailes' personal dislike of her because plaintiff "was upset with Ms. Suite for unilaterally imposing time and other restrictions on travel . . . and had essentially accused her of dilatory conduct and incompetence when it came to travel."  Pl.'s Opp'n at 5.

evidence of gender discrimination.[10]

### B. Plaintiff Has Failed to Refute the Agency's Legitimate Reasons for its Actions.

Since plaintiff has failed to present direct evidence of discrimination, she must attempt to prove a claim of discrimination using indirect evidence. She has attempted to do so by seeking to refute the agency's non-discriminatory reasons for its actions. Plaintiff's attempt is unsuccessful.

First, the agency has produced unrefuted evidence that there were males in the agency who were questioned by the OIG regarding perceived travel irregularities. See Pl.'s Opp'n, Ex. 8 ("Defs.' Supp'l Rog Resp."), Response to Interrogatory No. 3. Plaintiff has not refuted this evidence.[11]

---

[10]None of plaintiff's cited cases support her argument that she has submitted direct evidence of discrimination in this case. See Pl.'s Opp'n at 16. In Bailey v. Henderson, 94 F. Supp. 2d 68, 72 (D.D.C. 2000) (Kennedy, J.), the plaintiff did not even allege she had submitted direct evidence of disparate treatment based on her sex and, in fact, the Court held that she had failed to establish a prima facie case of such discrimination. Similarly, in Lucero-Nelson v. Washington Metro. Area Transit Auth., 1 F. Supp. 2d 1, 6 (D.D.C. 1998), the court did not discuss whether there was direct evidence of discrimination, but instead concluded that the plaintiff had "alleged a viable hostile work environment claim as a matter of law." (footnote omitted). Finally, Purcell v. Thomas dealt with claims under the District of Columbia Human Rights Act ("DCHRA") and did not discuss whether the plaintiff had submitted direct evidence of discrimination. Id. at 712 (finding that plaintiff had "presented ample evidence to refute the appellants' denial of sexually harassing comments and conduct . . . and also to rebut the defense of a legitimate nondiscriminatory reason for her termination . . . .").

[11]Instead of focusing on the instances where males were questioned concerning potential travel irregularities, plaintiff attempts to construe the inquiry concerning her travel as being focused on her relationship with Mr. Yunger and she asserts that the agency's identification of a "lone male employee suspected of having an improper relationship" is not sufficient to refute her claim of pretext because neither the male or female was questioned. Pl.'s Opp'n at 19. However, plaintiff ignores the fact that Special Agent Roy questioned the alleged source of this information, who denied having any knowledge to support the allegation, which led to a conclusion that there was no basis upon which to question the employees at issue. Pl.'s Opp'n, Ex. 8, Resp. to Interrogatory No. 5. In plaintiff's case, however, Mr. Roy said that his review of the documents he received led him to have questions regarding the propriety of the travel in plaintiff's case. Defs.' Mot., Ex. 12 (Roy Depo.) at 31-33.

10

Second, plaintiff's contention that Mr. Haddon and Mr. Hines engaged in behavior similar to plaintiff's but were not questioned is not accurate. Mr. Hines did testify that both his daughter and son traveled with him, however both were registered volunteers and traveled in an official capacity and the Smithsonian paid for their travel; there was no indication that they sought to "reimburse" the government. Pl.'s Opp'n, Ex. 1 (Hines Depo.) at 15-20. Furthermore, Mr. Haddon specifically testified that when his girlfriend traveled with him, she did not submit a travel voucher and did not seek to obtain a government rate for her travel. Id. (Haddon Depo.) at 30-31.[12] In light of these facts, plaintiff has simply not shown that the agency's stated reason for her being questioned by the OIG was pretext.[13]

---

[12] Further diluting plaintiff's claim of gender discrimination is the fact that there was testimony concerning a female scientist at SERC who often traveled with her husband in an official capacity. See Ex. 2, attached hereto, additional excerpts from the deposition of Anson Hines (Hines Depo.) at 25-27.

[13] Plaintiff attempts to create a factual dispute concerning the fact that Mr. Roy never "investigated" the issue of her travel to Belize. Pl.'s Opp'n at 6. However, as plaintiff readily admits, this trip in fact did not occur because plaintiff was injured in a car accident in November 2004, a month prior to the time Mr. Roy came to speak to her. See Defs.' Facts ¶¶ 37, 63. Mr. Roy had a recollection of a trip to Panama and Belize but recalled really being most concerned about the Hawaii trip. Defs.' Mot., Ex. 12 (Roy Depo.) at 57. Plaintiff also alleges that there are no Federal Travel Regulations ("FTR") that prohibit the activity at issue. However, this assertion is belied by reference to section 301.10.110 of the FTR, which provides that the contract passenger transportation service is not available for personal travel. There is no dispute that the government was not asking Mr. Yunger to travel in an official capacity. The citation provided by plaintiff provides only that employees "may accept payment of travel expenses from a non-Federal source on behalf of your agency, but not on behalf of yourself when specifically authorized to do so by your agency and only for official travel to a meeting." Pl.'s Opp'n, Ex. 6, FTR § 304.1.2. What Mr. Yunger sought to do, by virtue of submitting a government travel voucher, was have the government pay for his travel, at the government rate, which he would then "reimburse." Thus, plaintiff's assertion that "[a]t no time did Ms. Klugel or Mr. Yunger approach the government and ask for payment of Mr. Yunger's ticket[,]" Pl.'s Opp'n at 9 & n.5, is categorically untrue. As Mr. Roy testified, "The government is not a travel agency. The government can pay or have you go or you can go if you wish[,]" but there is no way "that the government could purchase a ticket for somebody and have that person reimburse the government for the ticket." Defs.' Mot., Ex. 12 (Roy Depo.) at 136. For the Court's reference, the FTR regulations are publicly available at www.gsa.gov under the "Regulations" section. The FTR regulations in effect in 2004 are available under the "FTR & Related Files" link.

Importantly, however, even plaintiff does not believe that she was questioned by Special Agent Roy "because of" her sex.  According to plaintiff, when Mr. Roy questioned her, he "was doing the bidding of two disgruntled travel office clerks who were annoyed by Ms. Klugel's insistence that they perform their administrative tasks properly."  Pl.'s Opp'n at 1.  See id. at 4.  Thus, based on plaintiff's *own testimony and belief*, the basis for her being questioned by special agent Roy was not because of her sex, but because of the fact that "two disgruntled travel office clerks" were "annoyed" at her.

Finally, plaintiff cannot refute the agency's legitimate reasons for the other actions about which she complains.  Plaintiff cannot refute Mr. Haddon's basis for denying her annual leave.[14]  Plaintiff has not disputed, for example, that she was having a difficult time completing her assignments, that she had little or no leave left to take, or that it was a busy time in the department.  Compare Defs. Facts ¶ 72 with Pl.'s Opp'n at 14 (stating that Mr. Haddon's assertion that it was "unusual" for an employee to ask for time off between April and June "is especially troubling" in light of Mr. Gallagher's testimony that "leave is a right in federal service . . . .").[15]  Plaintiff also fails to specifically refute defendants' assertion that reassignment of her

---

[14]Plaintiff has failed to refute defendants' contention that she was never denied leave to receive treatment for her injuries.  See Defs.' Facts ¶ 70.

[15]Plaintiff's assertion that Mr. Gallagher testified that he had "never seen another employee denied leave" Pl.'s Opp'n at 14 (emphasis added), is not supported by plaintiff's citation.  See Pl.'s Opp'n, Ex. 1 (Gallagher Depo.) at 59:14-59:17 ("Q. Do you know of any other employees during the 14 months that [you] were there and Ms. Klugel was there that was ever denied leave?  A. No.") (emphasis added).  Furthermore, plaintiff makes the unsupported assertion that she was the "only employee that Mr. Haddon ever denied leave to in 23 years of service!"  Pl.'s Opp'n at 20.  Mr. Haddon did not "admit" that in his 19 years he has never denied leave to any employee except plaintiff.  Pl.'s Opp'n at 14.  Rather, he testified that he thought he had informally denied annual leave to two other employees, although plaintiff was the only employee he could recall as having submitted a formal leave slip that he had to deny.  Pl.'s Opp'n, Ex. 1 (Haddon Depo.) at 87-88.

duties was required because of concerns about getting plaintiff's work accomplished timely. Defs.' Facts ¶¶ 75-76.[16]  Nor does plaintiff contend that her allegation that she was placed on a "progress report," which she only supports with citation to her own affidavit, Pl.'s Opp'n at 14, is an adverse action.[17]  In sum, defendants' justifications for the actions about which plaintiff complains remain unrefuted.

### C.     Plaintiff Has Failed to Present a Viable Hostile Work Environment Claim.

The undisputed facts establish that plaintiff was questioned, on one day, for twenty to thirty minutes, about a perceived irregularity concerning her travel.  Defs. Facts ¶ 41.  According to plaintiff, she was asked questions she felt were inappropriate, refused to answer those questions, and there was no attempt to force her to answer those questions. Id. ¶ 42.  Plaintiff does not dispute defendants' assertions that, after the questioning by Mr. Roy on that one day, there were no further questions directed to plaintiff concerning her sex life or her relationship with Mr. Yunger, and there was no surveillance conducted on plaintiff, and her future travel was

---

[16]Again, plaintiff's citations to the record in support of her statement that "the Agency has never asserted that it took away any assignments due to an inability of Ms. Klugel to complete assignments . . . ." is not supported by the citations she provides.  See Pl.'s Opp'n, Ex. 1 (Haddon Depo.) at 17:20-18 (testifying about his rating of plaintiff and stating he did not have concerns about her work ethic).  Compare with id. at 91:9-13 (testifying that due to her need to be out of the office "the things that [Mr. Haddon] needed her to do, her duties, were not being completed.").  Plaintiff's citations to Mr. Gallagher's deposition similarly do not support her assertion.  See id. (Gallagher Depo.) at 38:13 (stating they never questioned plaintiff's integrity); 43:10-43:18 (testifying he had no reason to believe plaintiff lacked credibility or lied).  But see id. at 39:7-10 (testifying he and Mr. Haddon informed plaintiff they were "concerned" she was not at work enough "to get that work done, so we would like to figure out a schedule that's going to allow this work to get done.").

[17]The Court may deem that plaintiff has effectively conceded this argument.  Hopkins v. Women's Div., General Bd. of Global Ministries, 238 F. Supp. 2d 174, 178 (D.D.C. 2002) ("It is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.") (citing FDIC v. Bender, 127 F.3d 58, 67-68 (D.C. Cir. 1997)).

not reviewed.  Id. ¶¶ 53-54.  As the cases cited by plaintiff in support of her other arguments

demonstrate, these facts do not a hostile work environment make.  Cf. Bailey, 94 F. Supp. 2d at

70-71, 75-76 (finding a viable hostile work environment claim where plaintiff alleged she had

been subjected to derogatory comments, including being called a 'bitch'[18] "every working day

from September 1993 through her separation from the Postal Service in May 1994."); Lucero-

Nelson, 1 F. Supp. 2d at 6 (holding prima facie hostile work environment claim established

where employee alleged "that[ ] from 1989 to 1991, she complained . . . about sexual and

national origin harassment . . . ."); Purcell, 928 A.2d at 713 (DCHRA hostile work environment

claim held sufficient where evidence showed that, over a year, plaintiff's coworker made

sexually explicit comments to her, unbuckled his pants in her presence, recounted his past sexual

experiences, and asked plaintiff whether she was wearing underwear).[19]

---

[18]Notably, while plaintiff cites her testimony that Mr. Roy "basically called [her] a whore . . . ." Pl.'s Opp'n at 23 (citing Pl.'s Opp'n, Ex. 1 (Klugel Depo.) at 75:08-75:10), plaintiff, in addition to not providing the page of the testimony she cites as an exhibit, omits that part of her testimony where, when asked whether Mr. Roy specifically used the term "whore" she responded "[h]e did not use the words whore, no.  He just asked me how many boyfriends I have and how many men I sleep with on travel trips."  Defs.' Mot., Ex. 2 (Klugel Depo. Vol. I) at 75:11-75:14.

[19]None of the individual instances of alleged discrimination about which plaintiff complains (such as removal from assignments, denial of leave, and unwarranted scrutiny) are sufficient to establish her hostile work environment claim.  Defs.' Mot. at 33-34.  Furthermore, the Court has dismissed plaintiff's constructive discharge claim, thus her reference to her resignation, Pl.'s Opp'n at 23, is simply not relevant to the Court's inquiry.  Further, plaintiff's assertion that Mr. Haddon warned her that she was a "marked employee" is false.  Compare Pl.'s Opp'n at 20 (stating that Messrs. Simon and Haddon warned her that she was a marked employee) with Defs.' Mot., Ex. 2 (Klugel Depo. Vol. I) at 100 (stating that Mr. Simons told her it was his "understanding" that plaintiff was "what he would call a marked employee, meaning I was one step away from either being fired or having to resign."); id. at 102 (stating that Simons made "marked employee" statement).  Significantly plaintiff has not presented any evidence refuting defendants' statement that no one threatened her with being fired.  See Defs.' Facts ¶ 55.

14

### III.    Plaintiff Has Failed to Salvage Her Rehabilitation Act Claim.

Plaintiff's arguments in support of her Rehabilitation Act claim can be summarily

rejected.[20]

First, plaintiff contends that there is no requirement that an individual be disabled for the

Agency to "violate the medical inquiry or medical records prong of the Rehabilitation Act . . . ."

Pl.'s Opp'n at 24 & n.9.  The cases cited by plaintiff do not support this assertion.[21]  Doe v.

United States Postal Service, 317 F.3d 339 (D.C. Cir. 2003), concerned a claim under the

Rehabilitation Act that the employer had improperly disclosed the contents of the employee's

Family Medical Leave Act ("FMLA") form, which revealed that the employee had HIV.  Id. at

343.  At issue was whether the employer violated the Act's requirement that this information be

kept confidential.  Id. at 345.[22]  Plaintiff does not contend that the agency improperly disclosed

information about her medical condition; she alleges that she was asked for medical

documentation to substantiate her need for medical leave.  See Compl. ¶ 37.  Plaintiff has failed

---

[20]While plaintiff's complaint fails to identify the precise provision of the Rehabilitation Act upon which she bases her claims, see Compl. ¶¶ 2, 36-38, her affidavit reveals that she claims protection under "Section 503."  Pl.'s Opp'n, Ex. 7 (Plaintiff's Affidavit ("Aff.") ¶ 1.  Section 503 does not provide a cause of action for plaintiff and therefore her Rehabilitation Act is subject to dismissal on this basis alone.  See, e.g., Taylor v. Small, 350 F.3d 1286, 1291 (D.C. Cir. 2003) (affirming dismissal of Rehabilitation Act claim premised on Section 504 by former Smithsonian employee because employee could only bring her disability claim under Section 501 of the Act).

[21]In light of plaintiff's legal argument that she does not have to prove she is "disabled," it is unclear why she alleges in her complaint that she in fact is and was perceived as disabled and is a "member of the class of persons protected by the Rehabilitation Act . . . ."  Compl. ¶ 36.

[22]Notably the Doe court reaffirmed the fact that an employer can condition "receipt of FMLA leave on [an employee's] submission of supporting medical documentation . . . ."  Doe, 317 F.3d at 344 (citing 29 U.S.C. § 2613(a), (b)(3)).  See also id. (noting that Congress' purpose, at least in part, in enacting the Americans with Disabilities Act was "to permit employers to inquire into employees' medical conditions in order to provide reasonable accommodations . . . .") (citation omitted).

15

to establish that her claim – i.e., that the agency made unreasonable requests for documentation in support of her leave requests - does not require her to show she was disabled.[23]  See 42 U.S.C. § 12112(d)(1) ("The prohibition against discrimination as referred to in subsection (a) of this section shall include medical examinations and inquiries.") (emphasis added); 42 U.S.C. § 12112(a) (stating the "general rule" is that "[n]o covered entity shall discriminate against a qualified individual with a disability . . . ."); see also Cossette, 188 F.3d at 969 ("[I]t is only discrimination itself (and not illegal disclosure) that requires a showing of disability.") (citing Fredenburg, 172 F.3d at 1182); Fredenburg, 172 F.3d at 1182 (while agreeing that subsection 42 U.S.C. § 12112(d)(1) is limited by subsection (a) and gives only "qualified individuals with a disability . . . a cause of action[,]" the court held that this limitation was not applicable to subsections (d)(2), (d)(3), and (d)(4)).

Second, plaintiff contends that her supervisor, Mark Haddon, believed she was disabled and Mr. Haddon's belief is sufficient to establish that she was "perceived as" being disabled.[24]

---

[23]Plaintiff also cites Cossette v. Minnesota Power & Light, 188 F.3d 964 (8th Cir. 1999).  That case merely holds that a plaintiff may have a cause of action under the ADA protecting her "from unauthorized disclosures of medical information by her employer[,]" whether or not the plaintiff can establish she is disabled.  Id. at 969 (emphasis added).  In addition, in Fredenburg v. Contra Costa Cty Dep't of Health Services, 172 F.3d 1176, 1182 (9th Cir. 1999), the Court only held that the plaintiffs need not prove they are disabled within the meaning of the ADA "in order to bring claims challenging the scope of medical examinations under the ADA."  See also Karraker v. Rent-A-Center, 239 F. Supp. 2d 828, 835 (C.D. Ill. 2003) (noting that it would make "little sense" to require an employee to demonstrate he has a disability to prevent his employer from inquiring whether or not he has a disability.") (internal quotation marks and citation omitted).  Here, plaintiff does not contend that the agency sought to determine whether she was disabled; the documentation was requested to substantiate her need for medical leave.

[24]Plaintiff contends that Mr. Haddon perceived plaintiff was disabled as a result of her car accident.  Pl.'s Opp'n at 12.  Again, Mr. Haddon's testimony does not support plaintiff's assertion:

Q.    Do you believe that as a result of the automobile accident that Ms. Klugel was disabled physically?

However, plaintiff has provided no evidence that Mr. Haddon believed plaintiff to be

significantly limited in any major life activity.  See Sutton v. United Airlines, Inc., 527 U.S. 471,

489 (1999) (An individual is "regarded" as disabled if the employer "mistakenly believes that

[the] person has a physical impairment that substantially limits one or more major life activities .

. . ." or "mistakenly believes that an actual, nonlimiting impairment substantially limits one or

more major life activities."); Weigert v. Georgetown Univ., 120 F. Supp. 2d 1, 13 (D.D.C. 2000)

("[T]he employer must not just erroneously believe that the employee has an impairment, but

must believe that this impairment substantially limits her major life activities) (citation

omitted).[25]

Furthermore, even if plaintiff is not required to establish a disability, her Rehabilitation

Claim should be dismissed because plaintiff cannot refute the agency's legitimate reason for

---

A.    Disabled?  She was partially disabled?
Q.    Right.  What did you see as a result of the automobile accident – what physical impairment or disability did you see her as having?
A.    She had a cast on her arm for some time because she had broken her arm and . . . after the cast was removed there was physical therapy to some extent that needed to happen.
Q.    What was your understanding of how long she was going to suffer from these injuries?
A.    I think I received a note from her doctor saying that she would be in physical therapy for I'd say 4 to 6 weeks.
Q.    Did she continue to suffer symptomatology during the entire time she was at the agency up until her resignation?
A.    No.
Q.    So her condition resolved itself as far as you know?
A.    It improved as far as I know.

Pl.'s Opp'n, Ex. 1 (Haddon Depo.) at 82-84.

[25]Furthermore, an employer's attempts to accommodate an employee's perceived needs does not establish that the employer "regarded" the employee as disabled.  Weigert, 120 F. Supp. 2d at 13(citation omitted).

asking for documentation supporting her medical leave.[26]  Plaintiff does not dispute defendants'

statement of fact that, over a roughly six month period she took 451 hours of leave, Defs'. Facts ¶

66, that her supervisors asked her for documentation to support this leave in the event there was a

future audit and to substantiate plaintiff's claims for leave, id. ¶ 68, and that Mr. Haddon also

asked for this documentation so he could plan for the running of the department and because he

was concerned about plaintiff's ability to complete her assigned tasks.  Id. ¶¶ 69, 75.  These facts

warrant summary judgment.  See, e.g., Christopher, 43 F. Supp. 2d at 52 (holding that

employer's denial of employee's request for annual leave was "eminently reasonable" and court

would not "substitute its judgment" for the employer's determination because "the Court may not

'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'")

(citations omitted).

## IV.    Plaintiff's FTCA Claim Fails as a Matter of Law.

Plaintiff's claim for invasion of privacy fails to pass muster under either District of

Columbia or Maryland law.[27]  Plaintiff does not even attempt to, because she cannot, establish

the elements of her invasion of privacy claim.[28]

---

[26]Plaintiff's Rehabilitation Act claim is limited to her allegation that the agency "made
unreasonable and unwarranted requests for medical information" and does not include her claim that she
was denied leave.  Compl. ¶ 37.  Plaintiff's claim that she was referred to a "mandatory mental health
evaluation with the EAP[,]" Compl. ¶ 38, has already been dismissed by the Court.  See supra, at 2 & n.1.

[27]Plaintiff apparently has no interest in which law applies as she fails to address the choice of law
issue in her opposition.  Pl.'s Opp'n at 25-26.

[28]According to plaintiff, the questioning that occurred was "so offensive to be an invasion of
privacy per se."  Pl.'s Opp'n at 25.  Plaintiff, of course, cites no authority for such a conclusion.  And
such a finding is not supported where, as in this case, plaintiff has failed to establish facts sufficient to
establish any of the elements of her tort claim.  See, e.g., Vuciecevic v. MacNeal Mem'l Hosp., 572 F.
Supp. 1424, 1429 (N.D. Ill. 1983) ("The Court finds that the violations alleged here do not deserve to be
characterized as per se violations; the plaintiff is not relieved of the burden of alleging an anticompetitive

First, plaintiff cannot establish an "invasion or interference by physical intrusion, by use of some form of investigation or examination . . . ." <u>Wolf v. Regardie</u>, 553 A.2d 1213 (D.C. 1989). Mr. Roy's questioning of plaintiff at SERC's offices was by no means a physical "intrusion." In typical dramatic fashion, plaintiff contends that "[o]rdering a helpless employee to submit to questioning in a supervisor's office where she is blocked from the door and forced to respond to insinuations that she is using travel to have sex with multiple men is extraordinarily intrusive." Pl.'s Opp'n at 26. While that may be plaintiff's belief, that is not what the law or facts establish in this case. Notably, Plaintiff's testimony does not support this characterization. At her deposition, plaintiff testified that she simply refused to respond to any questions she felt were inappropriate. Defs.' Mot. Ex. 2 (Klugel Depo. Vol. I) at 70-71, 80-81. Thus, there is no support for her assertion that she was "<u>forced</u> to respond to insinuations that she is using travel to have sex with multiple men . . . ." Pl.'s Opp'n at 25-26 (emphasis added). Further, the types of intrusions encompassed within the tort include: "harassment"; "peeping through windows or into other locations in which a plaintiff has chosen to seclude himself"; "opening personal mail"; "eavesdropping on private conversations"; "entering a plaintiff's home without permission or searching his or her belongings"; "examining a plaintiff's private bank account"; "or other invasions of that nature." <u>Wolf</u>, 553 A.2d at 1218 (citations omitted). Here, Mr. Roy requested plaintiff's government travel documents and scheduled a time to meet with her at SERC's governmental offices. There was simply no intrusion or invasion.

Second, even if she could establish an intrusion, plaintiff can not establish that such intrusion was made "into a place where [she had] secluded [herself], or into [her] private or

_____

injury.")

19

secret concerns . . . ."  Wolf, 552 A.2d at 1217 (citations omitted).  Plaintiff contends that

"[s]exual relations are quintessentially private and personal; and except in the rarest of instances,

as Mr. Pickett explained[29], have no place in any government inquiry."  Pl.'s Opp'n at 26.

Plaintiff's statement misconstrues the nature of the Court's inquiry.  Plaintiff has no privacy right

concerning her potential misuse of government-paid travel.  Wolf, 553 A.2d at 1218 ("The tort of

intrusion upon seclusion "was not created to protect against . . . invasions . . . [such as] the

garnering of information from third parties, and the culling of facts from public records.").

    Finally, plaintiff cannot show that any alleged intrusion would be "highly offensive" to a

reasonable person.  Wolf, 553 A.2d at 1219.  Plaintiff misconstrues defendants' position when

she asserts that "Defendants contend that asking a woman questions about who she is sleeping

with and how many sex partners she has is not highly offensive."  Pl.'s Opp'n at 26.  Defendants

contend that no reasonable jury could find that the questioning in this case was highly offensive,

particularly where plaintiff testified that she simply refused to answer any inappropriate

questions.  See, e.g., Jennings v. North Carolina Univ., 482 F.2d 686, 702 (4th Cir. 2007)

(affirming grant of summary judgment to defendant on plaintiff's constitutional and common law

invasion of privacy claims where "none of the defendants either required Jennings to disclose

personal information or invaded her records to discover such information.") (citations omitted),

cert. denied, 128 S. Ct. 247 (2007) (emphasis added).   And, notably, plaintiff does not address

the requirement that she establish that she suffered emotional distress and embarrassment.

Rather, plaintiff merely contends, without any factual citation to the record, that she "emerged

---

[29]Plaintiff provides no page citation to support her reference to testimony by Mr. Pickett and the lone page of Mr. Pickett's deposition testimony provided by plaintiff does not support this assertion.

shaken and distraught from Mr. Roy's interrogation." Pl.'s Opp'n at 25. Plaintiff's

characterization does not comport with plaintiff's testimony that when she left the room to

retrieve Mr. Yunger's press credentials, she did not stop to ask anyone to accompany her back to

the room, where Mr. Roy was waiting for her. Defs.' Mot., Ex. 2 (Klugel Depo. Vol. I), at 78,

83.

Given these facts, the determination of whether the behavior at issue was "highly

offensive" is best resolved by the Court in light of the case law, or in plaintiff's case, the lack

thereof. See Wolf, 553 A.2d at 1219 ("[T]he trial court must make a threshold determination of

offensiveness in discerning the existence of a cause of action for intrusion . . . .").

## **CONCLUSION**

For the reasons set forth above and in defendants' motion for summary judgment,

defendants respectfully request that this Court grant them summary judgment and dismiss

plaintiff's complaint with prejudice.

Respectfully submitted,

   /s/ Jeffrey A. Taylor
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

   /s/ Rudolph Contreras
RUDOLPH CONTRERAS, D.C. BAR #  434122
Assistant United States Attorney

   /s/ Michelle N. Johnson
MICHELLE N. JOHNSON, D.C. BAR # 491910
Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, NW – Room E4212

Washington, D.C. 20530
(202) 514-7139

COUNSEL FOR DEFENDANTS

Of Counsel:

Christine Nicholson
Associate General Counsel
Office of the General Counsel
Smithsonian Institution Building – Room 302
1000 Jefferson Drive, SW M.C.-012
P.O. Box 23286
Washington, DC 20026

EXHIBIT 1


**COPY**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------------------x
DORATHA KLUGEL,                    :
                                   :
            Plaintiff,             :
                                   :
        v.                         : No. 06-1886
                                   :
CRISTIAN SAMPER et al.,            :
                                   :
            Defendants.            :
----------------------------x

                    Falls Church, Virginia

                    Tuesday, April 15, 2008

Deposition of

            MICHAEL PICKETT

a witness, called for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, beginning at approximately 2:59 p.m., at

the law offices of Grad Logan & Klewans, PC, 3141

Fairview Park Drive, Falls Church, Virginia,

before Steven Garland of Anderson Court Reporting,

notary public in and for the Commonwealth of

Virginia, when were present on behalf of the

respective parties:

14

1    allegations in the underlying case here?

2        A    Yes.

3        Q    And --

4        A    Not in detail, but yes.

5        Q    How were you made aware of those?

6        A    Informed by -- when the lawsuit came

7    into the office, I was informed that there was a

8    lawsuit in connection with that case.

9        Q    Okay.  Have -- let me ask you a

10   question.  Do you investigate travel

11   irregularities for the agency?  Generally?

12           MS. JOHNSON:  Objection to form.

13           THE WITNESS:  I'm not sure what you mean

14   generally.

15           BY MR. BYRNES:

16       Q    In other words --

17       A    We do conduct investigations of travel

18   irregularities depending on exactly what you mean

19   by that.

20       Q    What is the process by which a complaint

21   comes into the IG's office?

22       A    It comes in several different ways.

15

1    Somebody could call.  Somebody could fill out an

2    on-line hotline complaint.  Somebody could send a

3    letter.

4        Q    Okay.

5        A    Any number of different ways.

6        Q    Okay.  And what is -- does your office

7    have a certain discretion on whether to

8    investigate a matter or not?

9        A    We have a statutory responsibility to

10   detect and prevent fraud, waste and abuse.

11       Q    Okay.

12       A    So I don't know if that answers your

13   question or not.

14       Q    But, the underlying allegations in this

15   case apparently went to claims that Ms. Klugel was

16   finagling travel to allow her boyfriend to go with

17   her to locations.  Are you familiar with that?

18            MS. JOHNSON:  Objection as outside the

19   scope.

20            THE WITNESS:  Okay.

21            BY MR. BYRNES:

22       Q    Are you personally familiar with the

16

1    facts of the investigation?

2        A    Not in detail.

3        Q    Okay.

4        A    But, generally I've heard that.

5        Q    Fair to say that that was the issue

6    whether she was misusing travel to have her

7    boyfriend go with her?

8            MS. JOHNSON:   Same objection.   Lack of

9    foundation.

10           THE WITNESS:   That's my understanding.

11           BY MR. BYRNES:

12       Q    Just as a point of reference, I'm sure

13   you've testified hundreds of times before, have

14   you not?

15       A    Yes.

16       Q    So there's no need to tell you all about

17   that gets done.

18       A    That's why I keep waiting for a judge to

19   rule.

20       Q    Yes.   The -- in terms of your

21   investigative techniques, do your investigators go

22   to training on sexual harassment and compliance

17

1    with EEO policy?

2        A    All employees go to training, all

3    Smithsonian employees go to training on sexual

4    harassment.

5        Q    Is it proper for an investigative agent

6    to inquire into the sexual orientation of an

7    .employee?

8            MS. JOHNSON:  Objection as to form.

9    Also outside the scope.  Calls for a legal

10   conclusion and form.  Vague.

11           BY MR. BYRNES:

12       Q    Sir, if you know.

13       A    Okay.  Say it one more time please.

14       Q    Is it a part of your investigative

15   techniques, do you limit the nature of the inquiry

16   that an investigator has so they don't ask

17   questions that would violate the discrimination

18   laws of the United States?

19           MS. JOHNSON:  Objection.  Calls for

20   legal conclusion and form.

21           BY MR. BYRNES:

22       Q    Sir?

18

1     A    The question is getting -- we limit the

2     scope of our questions to what is generally

3     related to the matter being investigated.

4     Q    Alright.  Anything broader than that

5     would be inappropriate, correct?

6          MS. JOHNSON:  Objection to form.

7          BY MR. BYRNES:

8     Q    If I had an inquiry into someone's

9     travel, I normally wouldn't ask them about their

10    children's sexual orientation, for example,

11    correct?

12    A    Not nor --

13         MS. JOHNSON:  Objection calls for

14    speculation.  Go ahead.

15         THE WITNESS:  I can only speculate that

16    not normally.  If it was somehow specifically

17    relevant to the allegations of that inquiry or

18    investigation, then perhaps.

19         BY MR. BYRNES:

20    Q    So, so it is a general rule then that

21    you train your investigators to limit the scope of

22    their questioning to the scope of the actual

# EXHIBIT  2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------x

DORATHA KLUGEL,                  :
                                 :
            Plaintiff,           :
                                 :
      v.                         : No. 06-1886
                                 :
CRISTIAN SAMPER et al.,          :
                                 :
            Defendants.          :
------------------------------x

Falls Church, Virginia

Monday, April 21, 2008

Deposition of

ANSON HINES

a witness, called for examination by counsel for

Plaintiff, pursuant to notice and agreement of

counsel, beginning at approximately 2:16 p.m., at

the law offices of Grad Logan & Klewans, PC, 3141

Fairview Park Drive, Falls Church, Virginia,

before Stephen K. Garland of Anderson Court

Reporting, notary public in and for the

Commonwealth of Virginia, when were present on

behalf of the respective parties:



ANDERSON COURT REPORTING
706 Duke Street, Suite 100
Alexandria, VA 22314
Phone (703) 519-7180  Fax (703) 519-7190

25

1   at the Smithsonian brought spouses or children

2   with them on trips as volunteers?

3           MS. JOHNSON:  Objection to form.

4           THE WITNESS:  Could you repeat the

5   question?

6           BY MR. BYRNES:

7       Q    Are you aware of whether other officials

8   at the Smithsonian brought their spouses or

9   daughters or sons, significant others with them on

10  travel?

11          MS. JOHNSON:  Objection to form.

12          BY MR. BYRNES:

13      Q    As volunteers?

14          MS. JOHNSON:  Objection to form.

15          THE WITNESS:  Yes, I am.

16          BY MR. BYRNES:

17      Q    Who are you aware of that did that?

18      A    Dr. Ilka Feller.

19      Q    And what position did she hold when she

20  brought her family with her?

21      A    She's a scientist at the Smithsonian

22  Environmental Research Center.

26

1    Q    Who did she bring with her?

2    A    She's had her husband serving as a

3    volunteer on trips.

4    Q    And has she brought him with her since

5    late 2004?  Her husband with her?

6    A    I'm aware of one instance when she has.

7    Yes.

8    Q    When was that?

9    A    I believe in 2007.

10   Q    Do you recall the month or the time of

11   the season?

12   A    I don't recall.

13   Q    Spring?  Summer?  Winter?  Fall?

14   A    Latter part of 2007, but I don't know.

15   Q    Okay.  How about Mr. Haddon?  Are you

16   aware of whether or not he ever brought family

17   members or significant others with him as a

18   volunteer on any trips?

19   A    Not aware of any family members that

20   he's brought.

21   Q    He wouldn't normally come through you

22   for that, would he?

27

1          MS. JOHNSON:  Objection to form.

2          THE WITNESS:  For what?

3          BY MR. BYRNES:

4     Q     For travel authorizations.

5     A     Now he would.  Yes.

6     Q     Okay.  Other than the woman you

7  mentioned, of the hundred people you supervise,

8  have any of them brought family members or

9  significant others with them on travel as

10  volunteers for the Smithsonian?

11    A     I don't know.

12    Q     Well --

13    A     None that I'm aware of.

14    Q     Okay.  So then with the exception of

15  this one person who has brought her -- how many

16  times has she brought her husband with her, by the

17  way?

18    A     As an official volunteer?

19    Q     Volunteer.  Yes.

20    A     I don't know.

21    Q     More than two?

22    A     A few times.

28

1    Q    Few.  Okay.  So that would be more than

2    two?

3    A    Yes.

4    Q    Less than ten?

5    A    I suppose.  I don't know.

6    Q    I don't want you to guess, but -- anyone

7    else that you can recall that has brought a family

8    member or relative or a friend as a volunteer?

9        MS. JOHNSON:  Objection.  Asked and

10   answered.

11       THE WITNESS:  Not that I know of at the

12   moment.

13       BY MR. BYRNES:

14   Q    Okay.  Have you ever been advised with

15   respect to this woman -- what was her name again,

16   I'm sorry?  Doctor?

17   A    Feller.

18   Q    Feller.  Have you ever been advised by

19   the Office of the Inspector General that there was

20   anything inappropriate about her trips?

21   A    No, I have not.

22   Q    Is there a policy in the Smithsonian